IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPTAIN NANCY S. DIETZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06-256-SLR |
| | ) |
| JAMES M. BAKER, et al. | ) JURY TRIAL DEMANDED |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT CITY OF WILMINGTON'S
OPPOSITION TO PLAINTIFF'S MOTION
TO COMPEL PRODUCTION OF DOCUMENTS**

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, Defendant City of

Wilmington, by its undersigned attorneys, responds to Plaintiff's motion to compel as follows:

1.     Plaintiff is seeking a copy of the "entire Dispensary medical file for Gilbert

Howell from January 1, 1998 to the present date." Defendant objected that the request sought

highly confidential medical information about a non-party who had not consented to the release

of such information. Defendant also objected that the information sought was irrelevant and the

request was not reasonably calculated to lead to the discovery of admissible evidence and was

thus beyond the scope of  the Federal Rules of Civil Procedure. Plaintiff also seeks a copy of

Inspector Howell's "psychological file," which she argues is included in his "personnel file."[1]

2.     Federal law prohibits Defendant from producing the medical and psychological

records Plaintiff seeks. Requests for medical records raise constitutional privacy concerns.

*Wilson v. Pennsylvania State Police Department*, No. 94-6547, 1999 U.S. LEXIS 3165 (E.D. Pa.

March 12, 1999) (Exhibit A). The Americans with Disabilities Act also requires employers to

---

[1] The Americans with Disabilities Act ("ADA"), at 42 U.S.C. § 12112(d)(4)(C), requires employers to maintain
medical records that they obtain about their employees separately from the employees' personnel files.

065366 1001

keep medical records confidential. 42 U.S.C. § 12112(d)(4)(C). *See also Wilson*, 1999 U.S. LEXIS 3165, *8-9 (plaintiffs not entitled to copies of medical records of other troopers in disability discrimination case). Plaintiff has cited no cases in which production of personally identifiable medical records has been ordered in circumstances such as those presented here.

3.     Defendant has, however, provided Plaintiff with Inspector Howell's attendance records for his entire career with the Wilmington Police Department. In addition, Defendant has provided records that reflect the reasons Inspector Howell gave for his absences from work. Furthermore, as Plaintiff admits, her counsel has taken Inspector Howell's deposition and questioned him about his health; Inspector Howell answered the questions he was asked. Thus, the medical records that Plaintiff seeks are not only protected from disclosure by federal law, they are cumulative of documents already provided to Plaintiff. *See* Fed. R. Evid. 403.

4.     Plaintiff argues that the Court should order production of Inspector Howell's medical dispensary and psychological records so that she can prove he had health issues. Plaintiff's argument is that she was healthier than Inspector Howell and therefore that she was better qualified for the position than he was. Even if one assumes for the sake of argument that Plaintiff was healthier than Inspector Howell, her argument is flawed.

5.     The first flaw in Plaintiff's argument is the premise that it would have been acceptable for Mayor Baker to extend a preference to Plaintiff based on her health as opposed to the health of Inspector Howell. The ADA forbids employers to base employment decisions on an employee's actual disability, perceived disability, or history of disability as long as the employee is otherwise qualified for the job. 42 U.S.C. §§ 12112(a), 12102(2).

6.     The second flaw in Plaintiff's argument is that the issue in this case is not whether Inspector Howell was too disabled to serve as Inspector of Police in November 2005. The issue

2

is whether *Mayor Baker* knew or believed that Inspector Howell was too disabled to serve but nevertheless selected him because of racial or gender bias against Plaintiff. The relevant inquiry looks to the information known by the decision maker. There is no evidence that the Mayor reviewed Inspector Howell's medical records.

7.     The Mayor's knowledge came from what the Chief of Police told him (that Inspector Howell might have health issues) and what Inspector Howell told him. See Baker Dep. 57-58, 60-61 (attached as Exhibit B). Inspector Howell told the Mayor that he had had some health issues but that he had passed the annual police department physical examination and that he could do the job. Baker Dep. 58.

8.     Plaintiff also argues that she is entitled to Inspector Howell's medical records so that she can try to impeach his deposition testimony about the reasons for his absences in the 2003-2005 time period.[2] *See* D.I. 49. However, Inspector Howell was not questioned about and did not specify the reason for any particular absence. He simply said that during this period, he had to take time off to care for his mother and to recover from illnesses that he now believes to have been the result of a medical condition that was diagnosed after his appointment to the rank of Inspector. Inspector Howell's statements at his deposition regarding the reasons for his absences were so general that Plaintiff could not possibly impeach his testimony based on his medical records, and the medical records themselves are extrinsic evidence that would be inadmissible under Rule 608(b).

9.     Finally, Inspector Howell's testimony regarding the reasons for his absences has no bearing on the key issue in the case, which is whether the Mayor's motive in selecting him for the Inspector position was unlawful bias. It is the Mayor's credibility, not Inspector Howell's

---

[2] To the extent that Plaintiff's purpose is to attempt to impeach Inspector Howell's testimony with regard to his absences in 2003-2005, Plaintiff's request for records from 1998 to the present is clearly overbroad.

3

credibility, that will determine the outcome in this case. Whether Inspector Howell was truthful at his deposition when questioned about the reasons for his absences in 2003-2005 has nothing at all to do with Mayor Baker's motivation for selecting Inspector Howell in 2005.

10.    Plaintiff also seeks "[a]ll electronic communications, including but not limited to emails and text messages, between William Montgomery or James Mosley and Gilbert Howell from July 1, 2005 through December 31, 2005 on any subject whatsoever." This request for email messages "on any subject whatsoever" is clearly and on its face so broad as to be far beyond the scope of discovery. Plaintiff had in fact made the following request as well:

> All electronic communications, including but not limited to emails and text messages, between William Montgomery and James Mosley from July 1, 2005 through December 31, 2005 which use any of the following words or phrases:
>
> - Dietz
> - N.D.
> - G.H.
> - Howell
> - Inspector
> - Promotion
> - Promote
> - Appointment
> - Appoint
> - Race
> - Gender
> - Woman
> - Female

See Exhibit C to Plaintiff's Motion (D.I. 48) at page 3. Although Defendant objected to this request, it nevertheless searched for and was unable to locate any responsive documents. Plaintiff's overbroad request for email and text messages "on any subject whatsoever" is beyond the scope of discovery because it seeks documents that are irrelevant to the subject matter of this case and is not reasonably calculated to lead to the discovery of admissible evidence. The request for email correspondence "on any subject whatsoever" should be denied.

065366.1001

**Conclusion**

For all the foregoing reasons, Plaintiff's Motion to Compel should be denied in its entirety.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/  Teresa A. Cheek
Teresa A. Cheek, Esquire (No. 2657)
Margaret M. DiBianca (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6676
Facsimile: (302) 576-3286
Counsel for Defendant City of Wilmington

Dated: May 30, 2007

# EXHIBIT A

FOCUS - 15 of 17 DOCUMENTS

**MICHAEL ANTHONY WILSON, et al. v. PENNSYLVANIA STATE POLICE DEPARTMENT, et al.**

**CIVIL ACTION NO. 94-6547**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1999 U.S. Dist. LEXIS 3165*

**March 11, 1999, Decided**
**March 12, 1999, Entered**

**DISPOSITION:** [*1] Plaintiffs' **Motion to Compel** Discovery GRANTED in part and **DENIED** in part.

**COUNSEL:** ELIZABETH K. AINSLIE, SPECIAL MASTER, Pro se, PHILADELPHIA, PA.

For MICHAEL ANTHONY WILSON, PLAINTIFF: MICHAEL CHURCHILL, PUBLIC INTEREST LAW CTR OF PHILADELPHIA, PHILADELPHIA, PA USA.

For MICHAEL ANTHONY WILSON, PLAINTIFF: ALICE W. BALLARD, RALPH E. LAMAR, IV, LAW OFFICE OF ALICE W. BALLARD, P.C., PHILADELPHIA, PA USA.

For PENNSYLVANIA STATE POLICE DEPARTMENT, GLENN A. WALT, WAYNE DOWLING, DEFENDANTS: HOWARD R. FLAXMAN, CATHERINE T. BARBIERI, FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP, PHILA, PA USA.

For PENNSYLVANIA STATE POLICE DEPARTMENT, GLENN A. WALT, WAYNE DOWLING, DEFENDANTS: SUSAN J. FORNEY, OFFICE OF ATTORNEY GENERAL, HARRISBURG, PA USA.

For PENNSYLVANIA STATE POLICE DEPARTMENT, WAYNE DOWLING, DEFENDANTS: JOANNA N. REYNOLDS, PA STATE POLICE, HARRISBURG, PA USA.

For PENNSYLVANIA STATE POLICE DEPARTMENT, GLENN A. WALT, WAYNE DOWLING, DEFENDANTS: STEPHANIE A. MIDDLETON, OFFICE OF GENERAL COUNSEL, DEPUTY GENERAL, HARRISBURG, PA USA.

**JUDGES:** JACOB P. HART, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JACOB P. HART

**OPINION:**

ORDER AND OPINION

JACOB P. HART
UNITED STATES MAGISTRATE [*2] JUDGE

DATED: March 11, 1999

Michael Anthony Wilson and his co-plaintiffs brought this class action against the Pennsylvania State Police Department, its Commissioner, and the Director of its Bureau of Personnel under the Americans With Disabilities Act. *42 U.S.C. § 12101 et seq.* Now before the Court is Plaintiffs' **Motion to Compel,** in which they seek to compel a response to a **request for production** of documents, as described below. This Court now grants their motion in part and denies it in part.

I. Introduction

Plaintiffs allege that Defendants discriminated against them from 1992 until the present by denying their

applications for the position of State Trooper based on their uncorrected vision levels. In discovery, they requested "all documents regarding the medical condition of all State Troopers who have applied for, or been granted, a disability pension or long-term disability benefits due to a condition that affected his or her vision for any time from 1992 to the present date." Plaintiffs' Second **Request for Production** of Documents Addressed to Defendants, attached to Plaintiffs' **Motion to Compel** as Exhibit A, at 10.

Defendants objected to this discovery request **[*3]** as overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. They added: "Moreover, Defendants object to this request on the grounds that it requests confidential information, and may cause Defendants to violate the Americans With Disabilities Act and/or other legislative or contractual requirements."

In their **Motion to Compel,** Plaintiffs explain that they seek this information to establish a practical working vision standard, presumably as opposed to the unfair standard to which they claim they were held. **Motion to Compel** at 3. Plaintiffs also argue that the requested material might lead to the discovery of evidence of the vision level of certain Troopers at times when they were able to perform their job duties. Id. This, they argue, would help them refute Defendants' claim that Plaintiffs' vision levels posed a threat to the safety of themselves and others. Id.

Plaintiffs argue that privacy considerations can be addressed by the entry of a protective order controlling disclosure and use of the documents they request. They claim that they require only the measured visual acuity of the relevant former officers, corrected and uncorrected, **[*4]** as well as their ability to discern color and whether they have stereoscopic vision. Id. at 6. However, Plaintiffs claim that they need the names and addresses of the people who applied for pension benefits, in order to "obtain any other **medical records** not currently in Defendants' possession which show that the persons did not meet Defendants' vision standards for applicants and ... had worked successfully ... in spite of that fact." Id.

II. Discussion

Plaintiffs have cogently explained why their discovery request is relevant, and why it is designed to lead to the discovery of admissible evidence. The vision

ability of past Pennsylvania State Troopers is clearly relevant to the issue of whether or not the vision requirements imposed upon Plaintiffs were reasonable. If Plaintiffs can show that State Troopers have worked for years with vision no less impaired than Plaintiffs', they will, as they point out, have gone a long way in refuting Defendants' claim that such vision levels are debilitating. Plaintiffs' request for the records of State Troopers who admitted to impaired vision is a reasonable way to narrow the universe of records, since a request for the vision-related **[*5]** **medical records** of *all* State Troopers would obviously be overbroad.

Nevertheless, the release of **medical records** raises Constitutional issues of privacy. Although there is no federal physician-patient privilege, the Constitution protects an individual's privacy right to avoid disclosure of personal information. *Whalen v. Roe, 429 U.S. 589 at 599-600, 51 L. Ed. 2d 64, 97 S. Ct. 869 and 602 at ftn. 28* (1977). The Third Circuit has read Whalen v. Roe to hold that there is a limited right to privacy in **medical records.** *Doe v. Southeastern Pennsylvania Transportation Authority, 72 F.3d 1133, 1137 (3d Cir. 1995); United States v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir. 1980).*

In United States v. Westinghouse, the Court of Appeals for the Third Circuit held that the strong public interest in facilitating research and investigations by OSHA justified its subpoena of Westinghouse's employee **medical records** in its study of a suspected health hazard. However, the court did not deny that Westinghouse's employees had a privacy right in their records:

> There can be no question that an employee's **medical records,** which may contain intimate facts of **[*6]** a personal nature, are well within the ambit of materials entitled to privacy protection. Information about one's body and state of health is matter which the individual is ordinarily entitled to retain within the "private enclave where he may lead a private life." [*Murphy v. Waterfront Commission, 378 U.S. 52, 55, 12 L. Ed. 2d 678, 84 S. Ct. 1594 (1964)].*

*638 F.2d at 577* (internal citation altered).

The Westinghouse court decided that it was required

to weigh the societal interest in disclosure against the privacy interest in the records, considering the specific facts of the case:

> The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*638* [*7] *F.2d at 578.*

In Doe v. SEPTA, the Court of Appeals for the Third Circuit decided that the limited right to privacy in **medical records** extended to records of prescription medications ordered by an employee. *72 F.3d 1133 at 1138.* It used the balancing test described in Westinghouse, applying an intermediate standard of review. *Id. at 1139.* The court concluded that SEPTA's interest in the prescription information furnished by its supplier outweighed the minimal intrusion into Doe's privacy. *Id. at 1143.*

Application of the Westinghouse factors here militates in favor of disclosure of the information Plaintiffs seek, but not of the names and addresses, or any other information, regarding the retired State Troopers.

Specifically, the type of record requested, the information it might contain (if restricted to vision-related material), and the potential for harm in any subsequent nonconsensual disclosure do not weigh heavily in favor of protection. Vision testing is not as intimate as many other kinds of medical information, and it is difficult to see how the retired State Troopers would be harmed if their vision scores became public. The nature of the condition causing [*8] the vision defect, which Defendants fear might include such truly personal ailments as AIDS, is not relevant and need not be

disclosed. Furthermore, Plaintiffs have agreed to enter into a protective order which would provide an adequate safeguard against unauthorized disclosure.

Moreover, the public policies articulated in the **ADA** militate toward allowing Plaintiffs access to this information. See, *42 U.S.C. § 12101* ("Findings and Purpose"). As discussed above, Plaintiffs have also shown a legitimate need for the information regarding visual acuity, color discrimination and stereoscopic vision.

On the other hand, Plaintiffs have no apparent degree of need to see anything in the **medical records** other than vision-related information. It is especially difficult to see any need for the names and addresses of the State Troopers. Plaintiffs are unlikely to obtain "other records not currently in Defendants' possession" without the consent of the State Troopers at issue, and they are not entitled to use employee **medical records** as chum in a fishing expedition.

Aside from these privacy considerations, Defendants may well be right in arguing that nonconsensual disclosure of entrance [*9] examinations would violate the **ADA**. See, *42 U.S.C. § 12112*(4)(C). Accordingly, I find that the Plaintiffs are entitled to the vision-related information that they seek, but that it must be extracted from the **medical records** and disclosed only in the form of tables of information. An appropriate order follows.

III. Conclusion

For the reasons set forth above, I hereby enter the following

ORDER

AND NOW, this 11 day of March, 1999, upon consideration of Plaintiffs' **Motion to Compel** Discovery and Defendants' Response thereto, it is hereby ORDERED that Plaintiffs' Motion is GRANTED insofar as:

1. Within one week of the receipt of this Order, Plaintiffs shall execute an appropriate confidentiality agreement respecting the information to be disclosed as a result of this Order; and

2. Within three weeks of Plaintiffs' execution of the above-referenced confidentiality agreement, Defendants

1999 U.S. Dist. LEXIS 3165, *9

shall disclose to Plaintiffs all information in their possession respecting the measured visual acuity (corrected and uncorrected), color discrimination, and stereoscopic vision of each State Trooper who has applied for, or been granted, a disability pension or long-term disability benefits [*10] due to a condition that affected his or her vision for any time from 1992 to the present. This information may be extracted from the original records and disclosed to Plaintiffs in table or chart form, or in another intelligible way. The names and addresses of the State Troopers need not be disclosed.

In all other respects, Plaintiffs **Motion to Compel** Discovery is **DENIED.**

BY THE COURT:

JACOB P. HART

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT

# B



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Deitz

## v.

# Baker, et al.

## C.A. # 06C-256-SLR

---

## Transcript of:

## Baker, James (2/16/2007)

## February 16, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Deitz v. Baker, et al.
James Baker - Neuberger

Page 57

1      A.    Sure.

2      Q.    Okay.   Those kinds of meetings aren't recorded,

3    are they?

4      A.    No.

5      Q.    Okay.   Do you recall, prior to Inspector Howell

6    being selected, whether you or other staff members had

7    any meetings with then Captain Howell with the chief

8    not being present?

9      A.    Oh, yes.   I had one with Inspector Howell.

10     Q.    Okay.   And who was present at that meeting?

11     A.    Just he and I for breakfast.

12     Q.    For breakfast?

13     A.    Right.

14     Q.    Okay.   And what was the purpose of that

15   meeting?

16     A.    There was two rumors that were circulating,

17   which I wanted to make sure how he felt or what was

18   going on.   One, his health.   And the second was that

19   he would accept a promotion -- not a promotion but an

20   appointment but he would only serve six months and

21   then step down.   And I don't want to ever appoint a

22   person just to help them get more money on their

23   retirement pension.   And that had happened before in a

24   previous administration where the mayor didn't like

Deitz v. Baker, et al.
James Baker - Neuberger

Page 58

1  this -- whatever the reason -- big conflict, and that

2  person was promoted and then retired in six months.

3  So I had a meeting with him to discuss those two

4  issues with him.  And he denied that, one, he said he

5  did not want to have in and out for retirement.  He

6  wanted to serve and that he thought he could do a good

7  job.

8          And the second issue of his health, he

9  said he passed the departmental health requirements

10 and that he was under a doctor's care for ███████ and

11 for ████████████████.  And so I said -- I asked him

12 whether he thought that would affect his performance

13 and he said, no, that he wanted to do the job and he

14 thought he would be good at it.  So that was pretty --

15 all we discussed.  I told him there hadn't been any

16 decision made on who the person would be, but I

17 certainly didn't want anybody to get appointed and

18 then hasta la vista in six months.

19     Q.    Okay.  So at this breakfast meeting, you had

20 that kind of a discussion with him?

21     A.    Right.

22     Q.    And that's before you made up your decision on

23 who you were going to select?

24     A.    That's correct.

Deitz v. Baker, et al.
James Baker - Neuberger

Page 60

1    A.    That was scheduling secretary.

2    Q.    Scheduling?

3    A.    Right.  Cheryl Mitchell.

4          THE VIDEOTAPE SPECIALIST:  Excuse me, sir.

5    We need to go off the record.

6          MR. NEUBERGER:  Okay.

7          THE VIDEOTAPE SPECIALIST:  Off video

8    record.

9          (Pause.)

10         THE VIDEOTAPE SPECIALIST:  On video

11   record.

12   BY MR. NEUBERGER:

13   Q.    Just to follow up on one thing you said, Mayor,

14   a moment ago, you're talking about this breakfast

15   meeting with Gilbert Howell.

16   A.    Mm-hmm.

17   Q.    Okay.  And you said you heard some rumors about

18   his leaving, maybe only serving for six months and

19   then retiring or health issues or whatever.

20   A.    Right.

21   Q.    Where would you have heard those things?

22   A.    Well, it came from all kinds of sources.  I

23   know it came from staff members.  I think the only

24   thing that the chief mentioned was his health.  The

Deitz v. Baker, et al.
James Baker - Neuberger

Page 61

1   chief did mention he thought his health was not good.

2   But it was all over the map.  Once the appointive

3   process starts, you get all kind of people coming at

4   you with either recommendations -- because we had

5   quite a few recommendations.

6          So, once the rumors started, it just goes

7   all over.  The police have more rumors than any

8   organization in the city government.

9   Q.   I heard that about all police departments.

10  A.   Yeah.

11  Q.   They are gossips.

12  A.   All right.

13  Q.   Okay.

14         I think you indicated a little earlier

15  that when it came to, in the first six months of your

16  term, selecting Inspector Wright --

17  A.   Okay.

18  Q.   Okay -- that you let the chief make that

19  decision?

20  A.   Eventually, yes.

21  Q.   And I think the chief -- the chief has

22  testified that, with reference to the Wright

23  selection --

24  A.   Mm-hmm.