**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN NANCY S. DIETZ,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MAYOR JAMES M. BAKER,** | : | **C.A.No.06-256-SLR** |
| **individually and in his official capacity** | : | |
| **as the Mayor of the City of Wilmington,** | : | |
| **and the CITY OF WILMINGTON, a** | : | |
| **municipal corporation,** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S REDACTED OPENING BRIEF IN SUPPORT OF
HER MOTION FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT**

**THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: July 27, 2007                    Attorneys for Plaintiff

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Two Inspector Vacancies at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Plaintiff's Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.    Counts Two and Three - Race and Gender Discrimination. . . . . . . . . . . . 4

    D.    Defendants' "Legitimate Non-Discriminatory Reason." . . . . . . . . . . . . . . . . . . . 5

    E.    Baker Admitted Using Race as a Motivating Factor in Promoting Gilbert
          Howell to Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    F.    Race is Taken Into Consideration for Every Promotion and Transfer within
          the Wilmington Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    G.    The Wilmington Police Department Uses an Illegal Racial Quota System
          for All Promotions to the Rank of Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.    The Inception of the African-American Inspector Position . . . . . . . . . . . 8

          2.    The Continued Replacement of an African-American Inspector . . . . . . . 9

          3.    The Corresponding White Inspector Position . . . . . . . . . . . . . . . . . . . . 10

          4.    The Fixed Number Quota System . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    H.    To Ensure Conformity with the Racial Quota, Baker Changed the
          Promotion Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.    Historically, the Chief of Police had the Opportunity to Make a
               Meaningful Recommendation for Promotion to the Rank Inspector . . . . 13

          2.    For the First Time Ever, Szczerba's Recommendation for
               Promotion is Given No Weight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

3.    Szczerba Makes a Recommendation and Attempts to Change Baker's Mind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    Plaintiff Learns that She was the Victim of Racial Discrimination Based on an Illegal Racial Quota System in 2001 and 2005 . . . . . . . . . . . . . . . . . . . . 16

J.    Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination . . . . . . . 17

K.    Fuentes Prong 1 - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case . . . . . . . . . . . . . . . . . . . . 19

Attendance Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Disciplinary History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Leadership Skills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Training and Skill Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Character . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Community Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Loyalty to Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Knowledge of the Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.    Rule 56 Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.    Fourteenth Amendment Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 26

II.    DEFENDANTS' RACIAL QUOTA SYSTEM FOR THE RANK OF INSPECTOR VIOLATES BOTH THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE AND 42 U.S.C. §1981 . . . . . . . . . . . . . . . . 26

*ii*

     A.     The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     B.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.     UNDER THE DIRECT EVIDENCE PARADIGM OF <u>PRICE WATERHOUSE v. HOPKINS</u>, RACE PLAYED A MOTIVATING ROLE IN THE DENIAL OF THESE PROMOTIONS . . . . . . . . . . . . . . . . . . . . 28

     A.     The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     B.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.     UNDER A PRETEXT THEORY PLAINTIFF: 1) HAS PROVEN A PRIMA FACIE CASE THAT SHE WAS DENIED TWO PROMOTIONS BECAUSE OF HER RACE AND GENDER; AND 2) HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY UNDER BOTH PRONGS 1 AND 2 OF <u>FUENTES</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     A.     A Prima Facie Case Has Been Proven . . . . . . . . . . . . . . . . . . . . . . . . 32

           1.     This is a Light Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           2.     The Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     B.     Defendants' Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     C.     Plaintiff's Ultimate Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

           1.     Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendants' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

           2.     Prong 2 - The Weight of the Evidence Demonstrates Race or Gender is the Reason Plaintiff Was Not Promoted . . . . . . . . . . 35

V.     THERE IS NO EVIDENCE OF A COMPELLING STATE INTEREST WHICH WOULD JUSTIFY A QUOTA OR THE USE OF RACE OR SEX TO DENY PLAINTIFF A PROMOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **<u>Page</u>**

<u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Boyle v. County of Allegheny, Pa.</u>, 139 F.3d 386 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 25,37

<u>Bray v. Marriott Hotels</u>, 110 F.3d 986 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

<u>City of Richmond v. J.A. Croson Co.</u>, 488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Contractors Assoc. of Eastern Pa., Inc. v. City of Phila.</u>, 91 F.3d 586 (3d Cir. 1996) . . . . . . 35-37

<u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509 (3d Cir. 1992) . . . . . . . . . . . . . 32

<u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335(3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-31

<u>Freeman v. Pitts</u>, 503 U.S. 467 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Fuentes v. Perskie</u>, 32 F.3d 759 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

<u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,35

<u>Gratz v. Bollinger</u>, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Grutter v. Bollinger</u>, 539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28,35-37

<u>Iadimarco v. Runyon</u>, 190 F.3d 151 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Keller v. Oriz Credit Alliance, Inc.</u>, 130 F.3d 1101(3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 33

<u>Korematsu v. U.S.</u>, 323 U.S. 214 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

<u>Lomack v. City of Newark</u>, 463 F.3d 303 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

<u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . 32

<u>Matczak v. Frankford Candy and Chocolate Co.</u>, 136 F.3d 933 (3d Cir. 1997) . . . . . . . . . 32-33

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,32

<u>Messer v. Meno</u>, 130 F.3d 130 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,31

Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1,
       -- U.S. --, 2007 WL 1836531 (June 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Saint Mary's Honor Ctr. v. Hicks 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 32-33

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) . . . . . . . . . . . 32-35

Simpson v. Kay Jewelers, Div. of Sterling, 142 F.3d 639 (3d Cir. 1998) . . . . . . . . . . . . . . . 32

Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995) . . . . . . . . . . . . . . . . . 29-30

Stewart v. Rutgers, The State Univ., 120 F.3d 426 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . 28,32

Taxman v. Board of Educ. of Tp. of Piscataway, 91 F.3d 1547 (3d Cir. 1996) . . . . . . . . . . . 31

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . 32

U.S. v. Virginia, 518 U.S. 515(1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Walden v. Georgia-Pacific Corp., 126 F.3d 506 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 29

Watson v. Fort Worth Bank and Trust, 487 U.S. 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 32

Weberg v. Franks, 229 F.3d 514 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## Constitutions, Statutes, and Rules

U.S. Const., Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,28

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,32

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## NATURE AND STAGE OF THE PROCEEDING

This is a civil action to remedy intentional racial and gender discrimination and an explicit racial quota system used by the current Mayor of the City of Wilmington which proximately led to the failure to promote plaintiff to the position of Uniformed Operations Inspector in the Police Department in February of 2001, and again in October of 2005.

The record includes the depositions of plaintiff Captain Nancy Dietz, defendant Mayor James Baker ("Baker"), Public Safety Director James Mosley ("Mosley"), Chief of Staff William Montgomery ("Montgomery"), Chief of Police Michael Szczerba ("Szczerba"), FOP President George Collins, ("Collins"), Inspector Gilbert Howell ("Howell"), retired Chief of Police Harry Manelski ("Manelski"), interrogatory answers, various personnel records and the Amended Complaint and Answers. (D.I. 30 and 31) (hereinafter "Compl. & Ans.").

This is plaintiff's opening brief and appendix, both sealed and unsealed, in support of her motion for full and/or partial summary judgment.

## SUMMARY OF THE ARGUMENT

1.      For nearly thirty years, the Police Department has been operating under an illegal racial quota system whereby it reserves a fixed number or percentage of Inspector positions for blacks and another for whites and plaintiff was denied promotion because of the quota system.

2.      Under a direct evidence theory, plaintiff has produced direct and circumstantial evidence that discriminatory animus was a motivating factor in an employment decision.  This shifts the burden of proof to defendants who must prove they would have refused to promote plaintiff anyway, even if they had not unlawfully discriminated against her.

3.      Additionally, under a pretext theory, plaintiff has demonstrated a prima

facie case of race and gender discrimination in the two promotions at issue which gives rise to a reasonable inference that race and gender were the reasons she was twice denied promotion to Inspector.  In light of the non-discriminatory reason given there also is overwhelming evidence of pretext on which a jury can rely.

4.     Lastly, there is no evidence of a compelling state interest which would permit defendants to use the suspect classifications of race or gender as a factor in making promotion decisions.

## STATEMENT OF FACTS

**A. Plaintiff.**  Plaintiff is a 27 year veteran of the WPD. (Compl. & Ans. ¶6; A0002,20, 30).  She entered the police academy in 1980 after attaining her four year Bachelor's degree from Pennsylvania State University in Administration of Justice where she was on the dean's list. (Compl. & Ans. ¶9; A0003,20,30).  Plaintiff moved up the ranks from patrol officer in 1980 and was eventually promoted to the rank of captain in 1997. (Compl. & Ans. ¶12; A0003-5,20-21,30-31).  She now serves as the Commanding Officer of the Human Resources Division. (Compl. & Ans. ¶6; A0002,20,30).  Plaintiff was awarded the honor of being only the second female officer in the WPD to ever be promoted to the rank of captain and currently she is the only female captain in the WPD. (Compl. & Ans. ¶7; A0002-3,20,30).  She has a noteworthy performance record, as well as numerous accolades and commendations. (Compl. & Ans. ¶14; Szczerba Ex. 3,5,16-19; Szczerba 127-46; P170-276; A0005,21,31,1323-32,1343-53,162-217,1290-95,40-146).  Current Chief Michael Szczerba testified that plaintiff has an impeccable professional reputation, one of the highest order. (Szczerba 102-4; A1284).  As Montgomery stated, "I've always had a lot of respect for her." (Montgomery 55; A0278).  At all times, plaintiff was a diligent, honest, and loyal employee who performed her job in an exemplary manner. (Szczerba

109; A1285).

Plaintiff was qualified for promotion to Uniformed Operations Inspector in February of 2001 and October of 2005. (Compl. & Ans. ¶¶66,76; Baker 81; Szczerba 97,108-9,204-5; Montgomery 55-6,60; A0013,15,24-25,35-36,246,1282,1285,1309,278-79). In fact, in 2005, Szczerba recommended her for promotion to Uniformed Operations Inspector as she was the most qualified person for that job. (Szczerba 97,108-9,214-15; Compl. & Ans. ¶¶68,78; Montgomery 21,42-43; Mosley 31-32; A1282,1285,1312,13,15,25,35-36,269,275,256). Szczerba thought plaintiff was clearly "the best candidate." (Szczerba 108; A1285). However, she was denied promotion because she is a white female.

**B. The Two Inspector Vacancies at Issue.** In February of 2001, a vacancy for Uniformed Operations Inspector was created after James Stallings retired. (Compl. & Ans. ¶30; Baker 18-19; Szczerba 202-3; Defendants' Inter. Resp.[1] #1 p.3-4 and p.4-5; City's Supp. Inter. Resp.[2] #1 p.3-7; Dietz Ex. 20; A0007,22,32,231,1309,337-38,419-20,376-80,1441-42). James Wright, a black male, was promoted to fill this vacancy. (Compl. & Ans. ¶30; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Szczerba 22,64,202-3; Baker 19; Mosley 18,24; A0007,22,32,337-38,419-20,376-80,1441-42,1264,1274,1309,231,253-54). Then, in October of 2005, a subsequent vacancy for Uniformed Operations Inspector opened when Wright retired. (Compl. & Ans. ¶31; Szczerba 200,206; Mosley 24-5; A0007,22, 32,1308,1310,254). Plaintiff was included in the pool of qualified candidates for both of these vacancies. (Szczerba 97,108-9,204-5; Baker 81; Montgomery 55-56,60; Compl. & Ans. ¶¶66,76; A1282,1285,1309,246,278-79,13,15,25,35-36). In 2005, she actively sought promotion and was

[1] See D.I. 33 and 37.

[2] See D.I. 59.

3

recommended to Mayor Baker for promotion by Szczerba. (Szczerba 97,214-17,221-22; Baker 65-66; Compl. & Ans. ¶¶68,78; Montgomery 21,42-43; Mosley 25,31-32,40; A1282,1312-14,243,13,15,25,35-6,269,254-56,258). However, Baker appointed Gilbert Howell, a black male, instead. (Compl. & Ans. ¶31; Szczerba Ex. 12; Dietz Ex. 20; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Baker 16,149,49; Szczerba 22,27,75,96-97; Montgomery 20-2; Mosley 35; A0007,22,33,149, 1441-42,337-38,419-20,376-80,230,238,1263-64,1282,269-70,257). On both occasions the promotions went to less qualified African-American males. (Szczerba 97,108-9,214-15; Dietz Ex. 20; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; A1282,1285,1312,1441-42,337-38,419-20,376-80).

**C. Plaintiff's Prima Facie Case.**

**1. Counts Two and Three - Race and Gender Discrimination.** Plaintiff can easily prove a prima facie case for race or gender discrimination. She is a white female. (Compl. & Ans. ¶¶70,80; <u>see</u> Szczerba 214; A0014-15,25,35-36,1312). Admittedly, plaintiff was qualified for the position of Uniformed Operations Inspector both in 2001 and 2005. (Szczerba 204-5,214; Baker 81; Montgomery 55,60; Compl. & Ans. ¶¶66,76; A1309,1312,246,278-79,13, 15,24-25,35-36). In fact, Szczerba testified that in 2005 she was the most qualified person for the job and, in his mind, was more qualified for the position than Howell. (Szczerba 97,108-9, 204-5,213-14; A1282,1285,1309,1311-12). Plaintiff was denied promotion to Inspector in 2001 and again in 2005 when the positions were ultimately given to Wright and Howell, both African-American males. (Compl. & Ans. ¶71; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Szczerba 22,64,96-7,202-5; Baker 16,18-19,49; Montgomery 19-22; Mosley 18,24,35,40; A0014,25,36,337-38,419-20,376-80,1441-42,1264,1274,1282,1309, 230-31,238,269-70,253-54,257-58). Notably, a white female has never held the rank of Inspector

in the WPD. (Compl. & Ans. ¶85; Szczerba 23-24; Baker 27; Montgomery 64; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A0016,26,37,1264, 280,337-38,419-20,376-80,1441-42).

   **D.  Defendants' "Legitimate Non-Discriminatory Reason."**  Baker claims he promoted Howell because he "thought he would make a good candidate." (Baker 68; A243).  Baker stated he received recommendations for Howell to be promoted from community members of the Northeast section of the City, as well as from members of City Council. (Baker 72-74,68; Szczerba 224; A0243-45,1314).  He further explained that based on a breakfast meeting he had with then Captain Howell, he liked his ideas. (Baker 68; Mosley 39; A0243,258).  "I took him for his word in the sense that he really wanted the position, that he was going to do the best that he could in it..." (Baker 68; A0243).  Additionally, Szczerba testified Baker also promoted Howell because he had "good street sense" and "street smarts." (Szczerba 218,224; Baker 70; A1313-14, 244).  Supposedly, Baker was confident in his abilities and knew his reputation. (Montgomery 25-27; Mosley 37-39; A0270-71,258).

   Baker claims he promoted Wright to Uniformed Operations Inspector in 2001 based on Szczerba's recommendation that he was the more qualified individual. (Baker 63-64; Szczerba 206; Montgomery 48-49; Mosley 18-19; A0242,1310,276,253).

   There were no preexisting written orders, policies, restrictions or guidelines whatsoever regarding the exercise of Baker's discretion in determining who to promote. (Baker 14-15,75-77; Szczerba 242-44; Montgomery 39-40; A0230,245,1319,274).  However, Baker has admitted to allowing diversity to play a role in promotion decisions. (Baker 33-34; Montgomery 11-14,16,62-64; A0234-35,268,280).  In fact, he encourages department decision makers to take diversity into consideration in promoting individuals. (Baker 29-35; A0233-35).  This is in direct violation of

the City's affirmative action plan as well as federal and state laws concerning discrimination on the basis of race and gender. (Baker 11-13; Szczerba 227-28; A0229,1315).

**E.  Baker Admitted Race Was the Reason He Promoted Howell to Inspector.**  In October of 2005, the same month Howell was appointed, Baker held a routine monthly meeting with the Fraternal Order of Police President and Vice-President. (Collins 7-8; Baker 51; Montgomery 32-33,37; A0221,239,272-73).  At this meeting, in a comment which came "out of the blue," Baker admitted to then Vice-President George Collins that while he lets the Chief run the police department "[h]e doesn't pick who he wants to be promoted, ... he wanted the Inspector to be black." (Collins 9,11; A0221-22).  As Chief of Staff William Montgomery also testified, the fact that Howell was an African-American was one of the factors leading to his promotion since Baker wanted to promote diversity in the work force. (Montgomery 24-26,64; A0270,280).  Clearly, Baker's most important, if not only, consideration in appointing Howell was that he is an African-American.  Unfortunately for plaintiff, she was white and did not meet Baker's sole criterion.

**F.  Race is Taken Into Consideration for Every Promotion and Transfer within the Wilmington Police Department.**  Admittedly, race is taken into consideration for every other promotion and transfer within the WPD. (Szczerba 209; Montgomery 11-14,16; A1310,267-68). Chief Szczerba stated that before he can make a promotion or transfer, he must report the proposed names to Public Safety Director James Mosley. (Szczerba 241; A1318).  Then Mosley reports these names to Montgomery who then gives the ultimate "go-ahead." (Szczerba 241-42; Montgomery 11,16; A1318-19,267-68).  Every time Szczerba meets with Mosley to discuss these promotions and transfers, once he discloses the names of the officers, Mosley follows up with a question about their race. (Szczerba 209; A1310).  It is the only qualifier stated. (Szczerba 208;

A1310).  Further, when Mosley discusses the promotions at issue with Montgomery, diversity is

considered. (Montgomery 12-14,16-17; A267-68).

 When asked to explain Mosley's overwhelming concern about the race of individuals,

Baker stated that it has been a "standing policy for years that you try to diversify your workforce

based upon the diversity of your community." (Baker 30; A234).  The City of Wilmington's plan

is "to diversify all the departments at all levels." (Baker 33; <u>See</u> Montgomery 24; A0234, 270).

Thus, when two equal candidates are being considered for promotion, decision-makers are to

consider the issue of diversity. (Baker 34-5; A0235).

> Q: ...But in making a selection between two qualified candidates for a position,
> hypothetically one being white and another being black –
>
> A:  Mm-hmm.
>
> Q:  –your decision maker under your plan are not supposed to consider the
> race of the two candidates, are they or –
>
> A:  ...if you got two equal candidates, *they can still consider the issue of diversity,
> especially if you have all whites*.
>
>  * * *
>
> Q: Right. So you're saying, for example, if two candidates are equal –
>
> A:  Yeah.
>
> Q:  – the fact of wanting to diversify the department comes into play in making a
> decision?
>
> A:  Oh, I think so. I think so. I think that's in any department.

(Baker 33-34; A0234-35) (emphasis added).

 **G.  The Wilmington Police Department Uses an Illegal Racial Quota System for All
Promotions to the Rank of Inspector.**  Historically, since 1978, the City has used a racial quota

system in promoting individuals to the rank of Inspector.  Inspector is the second highest rank in

the WPD. (Compl. & Ans. ¶21; Szczerba Ex. 1; A0006,22,32,148).  In the past, depending on the time frame, there have been either three or four Inspectors within the WPD. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 21; Baker 25-26; Dietz Ex. 20; A0337-38,419-20,376-80,1263,232-3,1441-42).  Currently, there are only two Inspector positions: Investigations Operations and Uniformed Operations. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 21; Baker 26-27; Compl. & Ans. ¶21; Dietz Ex. 20; A0337-38,419-20,376-80,1263,233,0006,22,32,1441-42).

       **1.  The Inception of the African-American Inspector Position.**  After the race riots of 1968 in Wilmington (Howell 74; A1409), there were community pressures directed toward Mayor Hal Haskell and Chief John McCool for the appointment of a black Inspector. (Manelski 9,29-30; Manelski Ex. 1 ¶3; A321,326-27,333).  As a result, in 1969 they selected Andy Turner, an African-American, for promotion to the rank of Inspector. (Howell 75; Manelski 30; Manelski Ex.1 ¶3; A1409,327,333).  Inspector Turner was the first black ever to be promoted to the rank of Inspector. (Manelski Ex. 1 ¶3; A0333).  Upon his retirement, he was replaced by a white Inspector making all three Inspectors white again. (Manelski 30; Manelski Ex. 1 ¶3; A0327,333).

       Upon Harry Manelski's ascension to acting Chief of Police in 1976, all Inspectors were white. (Manelski 9, 30-31; Manelski Ex. 1 ¶4; A0321,327,334).  This fact, along with the promotion of a white captain, prompted an uproar in the black community which picketed Chief Manelski. (Manelski 31-33; Manelski Ex. 1 ¶4; A327,334).  Several African-American politicians and community representatives were upset that a white was promoted to captain and made it known that "they wanted more black representation at the higher echelon of the department." (Manelski 32; A0327).  Most importantly, defendant Baker who served on the City

Council at that time (Baker 8; A0228), was one of the councilmembers raising these racial concerns and demanding racial balancing. (Manelski 14-15,32-33; A0323,327).

Accordingly, in 1978, a meeting was held with Mayor William McLaughlin, his chief of staff, the city solicitor, Chief Manelski, the African-American politicians, including Baker, and community representatives. (Manelski 9,14-15,34-35; Manelski Ex. 1 ¶5; A0321,323,328,334). At this meeting, it was agreed that a fourth Inspector position would be created for community relations and it would be filled by a black. (Manelski 9-11; Manelski Ex. 1 ¶5; A0321-22,334). Thus, in July of 1978 Chief Manelski promoted Kenneth Miles, the sole African-American captain, to the rank of Inspector. (Manelski 10,39-40; Manelski Ex. 1 ¶5; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A0322,329, 334,337-38,419-20,376-80,1441-42). Subsequently, the WPD also promoted Stanley Friedman in 1978 and Charles Bryan in 1979 to join Eugene Maloney in the rank of Inspector, all white males. (Manelski 11; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A0322,337-38,419-20,376-80,1441-42). As a result, there were now four Inspectors, three of whom were white, and one black. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A337-38,419-20,376-80,1441-42).

**2. The Continued Replacement of an African-American Inspector.** In 1982, black Inspector Kenneth Miles retired and was replaced by John Johnson, another black male. (Manelski 40-41; Manelski Ex. 1 ¶6; Szczerba 23; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex.20; D03391; A0329,334,1264,337-38,419-20,376-80,1441-42,1257). From the time Kenneth Miles was appointed to the rank of Inspector in July of 1978 continuing to present day, anytime a black Inspector retires, he is automatically replaced by another African-American. (D03391; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's

9

Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A1257,337-38,419-20,376-80,1441-42). **[Sealed].** The evidence makes it overwhelmingly clear that one Inspector position has exclusively been held by and reserved for a black male. (D03391; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Szczerba 212; A1257,337-38,419-20,376-80,1441-42,1311). The chronological progression is quite telling.

| African-American Inspectors | | |
|---|---|---|
| **Name** | **Promotion Date** | **Retirement Date[3]** |
| Kenneth Miles | 7/6/78 | 10/13/81 |
| John Johnson | 10/14/81 | 7/31/87 |
| Preston Hickman | 9/30/87 | 7/7/89 |
| Samuel Pratcher | 7/3/89 | 1/7/93 |
| R. Michael Dixon | 2/5/93 | 9/22/95 |
| Michael Boykin | 11/4/95 | 3/6/97 |
| Keith Ash | 3/7/97 | 2/20/98 |
| James Stallings | 2/20/98 | 2/16/01 |
| James Wright | 2/17/01 | 10/28/05 |
| Gilbert Howell | 10/29/05 | current |

(Dietz Ex. 20; D03391; A1441-42,1257).

  **3. The Corresponding White Inspector Position.** Likewise, since 1978 anytime a white Inspector retires, he is automatically replaced by another white. (D03391; Dietz Ex. 20; A1257,1441-42). **[Sealed].**

  From 1978 to 1989, three of the four Inspector positions were consistently held by white

---

[3] Retirement date refers to the date of actual retirement and/or date of appointment to Chief of Police. (Defendant City of Wilmington Inter. Resp. #1 p.3 n.2; A0337). Retirement date may not reflect the Inspector's last working day. (Plaintiff's Inter. Resp. to Baker #4 p.9 n.1; A1451; see D.I. 41A). Instead it may reflect when he was no longer on the payroll. (Id.)

males. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A337-38,419-20,376-80,1441-42). Then when Inspector Donald Payne, a white male, retired in 1987, the WPD eliminated one Inspector position, leaving only three individuals with the rank of Inspector - Charles Dougherty, William Draper, both white, and Preston Hickman, a black. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 18,20-21,23; Baker 21,24; Dietz Ex. 20; A337-38,419-20,376-80,1263-64,231-32,1441-42). Subsequently, in 1989, upon Charles Dougherty's retirement, the WPD reduced the number of Inspectors to only two, William Draper, a white, and Samuel Pratcher, a black. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Baker 25-26; A337-38,419-20,376-80,1441-42,232-33). Since 1989, one of the two remaining Inspector positions has been exclusively limited to a white male. (Szczerba 211-12; Baker 38-39; Collins 11-14; Dietz Ex. 20; A1311,236,222-23,1441-42). The chronological progression of white Inspectors is also quite telling.

| White Inspectors | | |
|---|---|---|
| **Name** | **Promotion Date** | **Retirement Date** |
| Eugene Maloney | 10/16/73 | 7/1/83 |
| Charles Bryan | 12/15/78 | 9/28/81 |
| Stanley Friedman | 4/3/79 | 6/30/83 |
| Lawrence Curtis | 10/14/81 | 4/29/83 |
| John Doherty | 1/29/83 | 6/6/86 |
| Donald Payne | 5/16/83 | 9/13/87 |
| Charles Dougherty | 7/2/83 | 6/30/89 |
| Guy Sapp | 9/30/87 | 12/21/88 |
| Richard LaFashia | 2/8/89 | 5/12/89 |

| | | |
|---|---|---|
| William Draper | 5/8/89 | 10/28/94 |
| John Vignola | 10/29/94 | 3/7/97 |
| John Murray | 3/23/97 | 5/26/99 |
| Ronald Huston | 5/27/99 | 7/30/99 |
| Martin Donohue | 7/31/99 | current |

(Dietz Ex. 20; D03249,03364,03391; A1441-42,1255-57). This chart, **[sealed]**, illustrates that from 1978, no matter how many Inspector positions existed, if a white Inspector retired, another white Inspector was promoted.

      **4. The Fixed Number Quota System.** The two progression charts and defendants' progression chart proves plaintiff's claim that since 1978, the WPD has effectively operated under a fixed quota system where 50, 33 or 25% of the positions had to be filled by a black, while the other available positions were filled by whites. Subsequently, when the WPD limited the Inspectors to only two in 1990, it has been operating under a fixed number quota system where 50% is reserved for whites, and the other 50% is reserved for blacks. (Szczerba 211-12; Baker 38-39; Collins 11-14; Dietz Ex. 20; A1311,236,222-23,1441-42). As Szczerba testified he "always was aware that, within the Inspector rank, there was an African-American and a Caucasian." (Szczerba 211; see Baker 39; A1311,236). "Whether it's four, three, or two [I]nspectors, they were never all the same race." (Szczerba 212; A1311). Chief Manelski's testimony explains that this result was intended since the WPD intentionally created one Inspector position to be held by a black. (Manelski 9-11; Manelski Ex.1 ¶5; A0321-22,334). Further, both Montgomery and Mosley testified that since Baker took office in 2001, the "result of the appointments" has been to maintain a racial balance of one white and one black Inspector. (Montgomery 29-30; See Mosley 41-43; See Baker 8; A0271-72,258-59,228).

      Furthermore, defendants also admit that since 1997 the Uniformed Operations Inspector

position has only been filled by a black male, while the Investigative Operations Inspector has

only been filled by a white male. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter.

Resp. #1 p.3-7; Dietz Ex. 20; D03391; A337-38,419-20,376-80,1441-42,1257).

**H.  To Ensure Conformity with the Racial Quota, Baker Changed the Promotion**

**Process.**

**1.  Historically, the Chief of Police had the Opportunity to Make a**

**Meaningful Recommendation for Promotion to the Rank Inspector.**  In January of 2001,

Baker appointed Szczerba as Chief. (Szczerba 7-8,202; Baker 56; A1260,1309,240).

Approximately five months later, Szczerba learned that then Inspector Stallings a black was

retiring as Uniformed Operations Inspector and he would have to make a recommendation to fill

this vacancy. (Szczerba 202-3; A1309).  Historically, the process was such that the Chief of

Police would make a meaningful recommendation to the mayor based on who he thought was

most qualified. (Szczerba 203-05; A1309).  Accordingly, in 2001, Szczerba began looking at the

pool of available captains. (Szczerba 203-4; A1309).  During this time, however, the mayor

suggested to Szczerba that he consider Howell, a black, for promotion. (Szczerba 203,206; Baker

63,65; A1309-10,242).  However, Howell was not at the top of Szczerba's list of qualified

candidates, which did include Wright and plaintiff. (Szczerba 204-5; A1309).  Eventually

Szczerba recommended Wright for the promotion. (Szczerba 206; A1310).  Montgomery and

Mosley also recommended to Baker that Wright be promoted. (Montgomery 48; Mosley 22-24;

A276,254).  Based on these recommendations, Baker ultimately appointed Wright as Uniformed

Operations Inspector. (Baker 43,63; Montgomery 19-21; Mosley 18-19,22; Szczerba 205;

A0237,269,253,1309).

**2.  For the First Time Ever, Szczerba's Recommendation for Promotion is**

**Given No Weight.** However, in 2005 when Wright announced his retirement, the process changed. (Szczerba 205-7; A1308-10). Mosley approached Szczerba and advised him "that this time it would be different." (Szczerba 201; Baker 63-64; A1308,242). Mosley relayed to Szczerba that Baker wanted to make it clear, "this is the mayor's appointment." (Szczerba 201; see Baker 64; A1308,242). It became obvious to Szczerba that Baker was going to promote who he wanted regardless of his input.

This change in the promotion process was unprecedented. (Szczerba 207; Baker 61-62; A1310,241-42). In 2001, Szczerba made a recommendation to fill the vacant Inspector position and was only advised by the mayor to consider a certain black candidate. (Szczerba 203-05; Baker 65; A1309,242). Yet in 2005, Szczerba discovered Baker was adamant about making the selection himself regardless of Szczerba's recommendation. Upon learning this, Szczerba inquired as to whether he would even be allowed to make a recommendation. (Szczerba 202; A1309). He was told that he could "do what [he] wanted to, but the mayor would be making the decision." (Szczerba 202; A1309).

Notably, in 2005, Szczerba made no secret of the fact that he wanted to promote plaintiff to replace Wright. (Szczerba 97,214-17,221-22; Baker 65-66; Montgomery 21,43; Mosley 31; A1282,1312-14,242-43,269,275,256). However, this would have violated the racial quota system that had been in operation since 1978. For the first time since the quota system had begun, two whites would have occupied both Inspector positions. (Szczerba 214; Montgomery 63-64; A1312,280). Furthermore, for the first time, a female would have been promoted to Inspector. (Szczerba 23-24; Baker 27; A1264,233). Since Baker could not let the quota system he initiated be disrupted, he disregarded the Chief's recommendation concerning his own department and made the decision himself. (Szczerba 201-05; Montgomery 53; Mosley 31-35;

14

See Baker 63-64; A1308-9,277,256-57,242).

### 3. Szczerba Makes a Recommendation and Attempts to Change Baker's

**Mind.** Despite Baker's clear message that Baker would be making the appointment regardless of

the Chief's input, Szczerba made a recommendation for the position based on who he felt was

most qualified, much like he did in 2001. (Szczerba 97,108-09,202; A1282,1285,1309).

Approximately 30 days prior to the November 2005 official announcement that Howell was

being promoted, Szczerba met with Baker, Montgomery and Mosley at least twice. (Szczerba

198; Mosley 29; A1308,255).  The first meeting was held after an update meeting and was

limited in attendance to Szczerba, Baker, Montgomery and Mosley. (Szczerba 216; Montgomery

41-42; A1312,274).  Szczerba took this opportunity to discuss with Baker the reasons he selected

plaintiff for promotion and why she was more than qualified for the position including, among

other reasons, her diversified work experience, education, lack of a disciplinary record, work

ethic, and community involvement. (Szczerba 216-17,221-22; Baker 65-66; Montgomery 43;

Mosley 31-32; A1312-14,242-43,275,256).  At this time, Montgomery agreed plaintiff was a

"very fine officer, fine supervisor, fine representative of the department." (Szczerba 220; A1313).

However, Baker did not respond. (Szczerba 229; A1315).

Further, at this same meeting, Szczerba discussed with Baker potential problems the

department would face if Howell was appointed. (Szczerba 221; Mosley 32-33; A1313,256).

Szczerba specifically questioned Howell's health, his capacity to handle the job, performance,

attendance and other factors dealing with his disciplinary history. (Szczerba 221; Baker 72;

Mosley 32-33; A1313,244,256).  But these factors never swayed Baker's decision, he refused to

accept Szczerba's recommendation. (Montgomery 53; Mosley 33; A277,256).

During this meeting, the only reasons supplied by Baker for his selection of Howell were

that he has "good street sense" and that he had received support for Howell from members of the community. (Szczerba 218,224,228; Baker 68-70; A1313-15,243-44). Baker never reviewed job evaluations, attendance records, or disciplinary records in arriving at his decision to promote Howell. (Szczerba 218-19; Baker 77-78; Montgomery 39-40; A1313,245-46,274). Baker did however admit to reviewing two "biographies" of plaintiff and Howell. (Baker 77-78; Mosley 34-35; Szczerba Ex. 14; D03174-6; A245-46,257,152-53,1252-54). Despite Szczerba's assertions of the problems promoting Howell would bring and confronting Baker with plaintiff's exemplary history and qualifications to do the job, Baker was adamant that he was going to promote Howell, a black male. (Szczerba 217,221-4; Montgomery 44,46; A1312-14,275-76). Interestingly, Montgomery and Mosley both testified that they too made other recommendations and disagreed with Baker's selection of Howell, but Baker refused to change his mind. (Szczerba 217,220-1,224; Montgomery 60-61,65; Mosely 29,35-36,48; A1312-14,279-80,255,257,260). As Szczerba testified, "[i]t was done at that point." (Szczerba 220; A1313).

The second meeting occurred after a breakfast meeting with county leadership in the lobby of the Doubletree hotel. (Szczerba 217; A1312). This meeting was "pretty much a rerun" and Szczerba did not try to reargue the decision because he "knew it was a made decision." (Szczerba 217,230; A1312,1316). At this meeting, however, it was decided that Baker and Mosley would meet directly with Howell. (Szczerba 198,217,230; A1308,1312,1316). As Szczerba testified, "[o]nce I was advised that Captain Howell was going to be the appointment for the [I]nspector spot, I was out of the conversation at that point and it was handled either directly with the mayor or directly with the director of public safety." (Szczerba 199; A1308).

**I. Plaintiff Learns that She was the Victim of Racial Discrimination Based on an Illegal Racial Quota System in 2001 and 2005.** In January of 2006, plaintiff first discovered

16

that she was the victim of racial discrimination for promotion to the rank of Inspector both in 2001 and 2005. After giving deposition testimony in another lawsuit, Szczerba explained to plaintiff that in October of 2005, he had specifically recommended her to Baker for promotion to Uniformed Operations Inspector. (Szczerba 237; Dietz 45; Plaintiff's Inter. Resp. to Baker #9 p.15; Dietz Ex. 17; Szczerba deposition testimony in Boyd v. Wilmington Police Department, 05-178-KAJ, January 23, 2006, p.5-6; A1317,293,1457,1440,1478-79). Plaintiff then inquired as to why she did not receive the promotion. (Dietz 45-46,104; Plaintiff's Inter. Resp. to Baker #9 p.15; Dietz Ex. 17; A293-94,1457,1440). Szczerba stated Baker's appointment was based on race only and it had nothing to do with her personally or her qualifications. (Dietz 45-46,104; Plaintiff's Inter. Resp. to Baker #9 p.15; Dietz Ex. 17; A293-94,308,1457,1440). His explanation was that it was simply a black position. (Dietz 45-46,104; Plaintiff's Inter. Resp. to Baker #9 p.15; Dietz Ex. 17; A293-94,308,1457,1440).

It was at this time that plaintiff realized she had been discriminated against. (Dietz 45-46,104; Plaintiff's Inter. Resp. to Baker #9 p.15; Dietz Ex. 17; A293-94,308,1457,1440). It was not until then that plaintiff learned Szczerba had specifically recommended her and Baker blatantly chose a black instead, and that a quota system had effectively operated to exclude her both in 2005 and in 2001. (Dietz 42-43,104; A293,308). Prior to this time, it was inherently unknowable to plaintiff that she was denied the promotions on the basis of her race and gender. (Szczerba 210-11; Baker 39,47-48; A1311,236,238).

**J. Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination.** Through Baker's own admissions and testimony of those who worked closely with him during the time the promotion decisions at issue were made, the record contains abundant evidence which a reasonable jury can accept to conclude that the denial of these two promotions were

17

discriminatory.  Both circumstantial and direct evidence of illicit intent exists, such as:

1.  Baker admitted to then FOP Vice-President George Collins in October of 2005 that the Inspector position had to be given to a black. (Collins 9,11; A221-22).

2.  Szczerba testified that Public Safety Director James Mosley inquires into the race of every candidate for promotion and with regard to any transfers. (Szczerba 208-9; A1310).  Baker admits Mosley may be inquiring into the race of these candidates to promote diversity in the workforce. (Baker 30,37; Montgomery 24; A0234-36).

3.  Baker admits that department decision makers are to consider diversity when promoting candidates who are of equal caliber, especially when the existing positions are filled by all whites. (Baker 33-35; Montgomery 11-17; A0234-35,267-68).

4.  Baker admits that he took into consideration various recommendations from the community and City Council members in appointing Howell to Inspector. (Baker 72-74; A0244).  However, Baker also admitted that the recommendations for Howell came from the northeast area of Wilmington, which is predominately black, and the City Council members who recommended Howell were all African-American. (Baker 72-74; A0244).

5.  Since 1978, there have never been Inspectors all of the same race.  The WPD has historically reserved one Inspector position for an African-American male. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391; Szczerba 211; Manelski Ex. 1 ¶¶5-6; see Baker 39; A337-38,419-20,376-80,1441-42,1257,1311,334,236).  Likewise, all other Inspector positions have been limited to white males. (Id).  Thus, when a vacancy is created by a white male, the position is filled by another white male and when a vacancy is created by a black male, the position is automatically filled by a black male.

6.  Since 1990, when the WPD decreased the number of Inspectors to two, it has  operated under a fixed number quota where 50% is reserved for whites and 50% is reserved for blacks. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391; A337-38,419-20,376-80,1441-42,1257,).  Further, since Baker took office in 2001, this has been the consistent result of his appointments to the rank of Inspector. (Montgomery 29-30; Mosley 41-43; see Baker 8; A0271-72,258-59,228).

7.  Szczerba testified that the procedure for promoting Howell in 2005 was procedurally irregular and unprecedented. (Szczerba 207; A1310).  In 2001, Szczerba was able to make a meaningful recommendation to the mayor for the promotion to Uniformed Operations Inspector. (Szczerba 202-6; A1309-10).  However, in 2005, when Szczerba was going to recommend a white female for promotion to Inspector, Baker made it exceedingly clear to Szczerba, that he would be making the decision regardless of Szczerba's recommendation. (Szczerba 201-2,205; Baker 64; A1308-9,242).

8.  A white female has never held the rank of Inspector in the WPD. (Compl. & Ans. ¶85;

18

Szczerba 23-24; Baker 27; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391;A0016,26,37,1264,233,337-38,419-20,376-80,1441-42,1257).

**K.  Fuentes Prong 1 - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case.**

An extremely telling **weakness** and **contradiction** in defendants' claimed reason for promoting Howell is that Montgomery testified Baker promoted Howell to promote diversity. (Montgomery 24-26;62-64; A0270-71,280).  Montgomery admitted that Howell's race "may have been one of the factors" and Baker selected Howell, among other reasons, to "have some diversity in the work force." (Mongtomery 24-25; A0270).   "I do believe [diversity] is certainly one of the reasons and that's something that we look at when we look for anyone to serve in an appointed position." (Mongtomery 64; A0280).  Baker also told the then FOP Vice-President that he selected Howell because he was "black." (Collins 9,11; A0221-22).

Yet perhaps the most telling **weakness** and **contradiction** in the defendants' non-discriminatory reason for promoting Howell in 2005 is that Baker's own Public Safety Director, James Mosley, and Chief of Staff, William Montgomery, did not agree with the appointment of Howell. (Montgomery 6,10,60,65; Mosley 5,35-36,48; A0266-67,279-80,249,257,260). Additionally, the Chief of Police, whom Baker himself appointed, argued against the appointment of Howell. (Szczerba 8,193,217,221; Baker 71-72; A1260,1306,1312-13,244). Interestingly, three of the four people who met to discuss the Inspector vacancy did not want Howell to be appointed. (Szczerba 193,217,220-21; Montgomery 40-41,60,65; Mosley 28,35-36; A1306,1312-13,274,279-80,255,257).  It is **implausible** that Baker promoted Howell because he was the most qualified individual in light of the fact that Mosley, Montgomery and Szczerba did not feel he deserved or was capable of serving in that capacity.

19

In making his recommendation for promotion, Szczerba attempted to set forth the reasons why plaintiff would make an excellent Inspector, while also pointing out to the mayor potential problems the department would face if Howell was appointed. (Szczerba 216-17,221-22; Baker 65-66,71-72; Montgomery 44-46; Mosley 32; A1312-14,242-44,275-76,256).  He explained in detail various factors explaining how plaintiff surpassed Howell in terms of qualifications for this promotion. (Szczerba 221-22; A1313-14).  These reasons help to prove that defendants' non-discriminatory reasons for promoting Howell, as well Wright in 2001, are merely pretexual.

### Attendance Records

1.  The claim that Howell was promoted because he was more qualified is **weak** because Howell **[sealed].**

2.  This claim is also **weak** because unlike Howell, plaintiff has **[sealed].**

3.  Defendants' claim that Howell was more qualified is further **contradicted** by Szczerba's testimony that he brought Howell's attendance record to the attention of Baker prior to his appointment. (Szczerba 193,221; A1306,1313).

4.  Defendants' claim is **weak** in light of evidence **[sealed].**  It is "common knowledge" that Howell does not come to work. (Dietz 109; A0309).

### Disciplinary History

*Howell:*

1.  The claim that Howell was promoted because he was more qualified is **weak** because **[sealed].**

2.  This claim is also **weakened** and **contradicted** by Szczerba's testimony that plaintiff's disciplinary history made her better qualified for the job than Howell. (Szczerba 100,222; A1283,1314).

3.  This claim is especially **weak** and **implausible** given that Howell **[sealed].**

4.  This claim is further **weakened** by the fact that in March of 2005, only six months before he was appointed to Inspector, Howell **[sealed].**

5.  This claim is further **weakened** because in June of 1999, Howell was **[sealed].**

6.  In 1989, plaintiff was a sergeant in the Patrol Platoon Squad in Uniformed Services which was under the command of then Lt. Howell. (Dietz 87; Dietz Ex. 1 p.1;

A0304,1416).  During this time, **[sealed].**

7.   This claim is also **weakened** by Howell's **[sealed].**

*Wright:*
8.   The claim that Wright was promoted because he was more qualified is **weak** because **[sealed].**

9.   This claim is especially **weak** and **implausible** since Wright **[sealed].**

10.  This claim is also **weakened** by Wright's **[sealed].**

*Plaintiff:*
11.  Also, the claim that either of these two individuals were more qualified is further **weakened** and **contradicted** by the fact that plaintiff has an excellent disciplinary record. (D02720-48; Szczerba 41,47,139,222; Szczerba Ex. 3 p. 6; Szczerba Ex. 19 p. 16 [P292]; A1218-46,1268,1270,1293,1314,1328,194).  **[Sealed].**

<u>**Performance**</u>

*Howell:*
1.   The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's performance made her better qualified for the job than Howell. (Szczerba 100,222; A1283,1314).  Plaintiff always performed her job in an exemplary manner. (Szczerba 109; Szczerba Ex. 3,5,19; A1285,1323-32,1343-53,179-217).

2.   This claim is also **weak** in light of Szczerba's testimony that when he explained to Baker his reasons for selecting plaintiff, he pointed out that he had "firsthand knowledge and experience" in working with her and was well aware of "her work ethic." (Szczerba 222; A1314).

3.   This claim is further **weakened** and **contradicted** by Howell's prior performance evaluations.  Comparing plaintiff and Howell's last two performance evaluations for July of 2003 through June of 2004, plaintiff's performance was far superior.  Howell only received an overall weighted rating of <u>4.76</u> and a rating of  "<u>above expectations</u>." (Szczerba Ex. 4 p. 9; Szczerba 30; A1341,1266).  Plaintiff received an overall weighted rating of <u>5.01</u> and the highest possible rating of "<u>far above expectations</u>." (Szczerba Ex. 3 p.9; Szczerba 30-31; A1331,1266).  As Szczerba testified, this last performance evaluation made her better qualified for the job. (Szczerba 99; A1283).

4.   On this same evaluation, **[sealed].**

5.   Furthermore, the claim that Howell was more qualified than plaintiff is again **weakened** and **contradicted** by comparing plaintiff and Howell's performance evaluations from July of 1999 through June of 2000.  **[Sealed].**

6.  Additionally, while plaintiff received **[sealed]** Howell only received **[sealed]**.

7.  Defendants' claim is further **weakened** by the fact that in their last performance evaluations, plaintiff exceeded Howell in areas such as **[sealed]**.

8.  Additionally, this claim is **inconsistent** because as a captain, Howell was rated **[sealed]**.

*Wright:*

9.  Defendants claim that Wright was promoted in 2001 because he was more qualified is **weak** because **[sealed]**.

10.  Likewise, during this time period, **[sealed]**.

11.  The claims that either Howell or Wright were more qualified than plaintiff are also **weak** because plaintiff has consistently maintained an excellent performance record always receiving the top three ratings on her performance evaluations. (Szczerba 139-146; Szczerba Ex. 19; A1293-95,179-217).  In fact, when Howell completed a performance evaluation of plaintiff he stated plaintiff "gained the respect of her subordinates," "she is very much qualified to fulfill her position," "she uses good judgment in making decisions," "she's courteous to the public," and she's "loyal." (Szczerba 144-46; Szczerba Ex. 19 pp.36-39[P312-16]; A1294-95,214-17).

## Leadership Skills

*Howell:*

1.  The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's demonstrated leadership skills made her better qualified for the job than Howell. (Szczerba 99; A1283).

2.  The claim that Howell was more qualified is **contradicted** by Szczerba's statement that he recommended plaintiff for promotion to Inspector because she was the "best candidate" who he "believe[d] that the men and women [of] the WPD would best follow." (Szczerba 108; A1285).  As Szczerba testified, leadership is an important quality for the highest ranking managers to have in the WPD. (Szczerba 38; A1268).

3.  This claim is **contradicted** by the fact that Howell **[sealed]**.

4.  This claim is weak in light of the fact that in **[sealed]**.

5.  This claim is also **contradicted** by Howell's **[sealed]**.

*Wright:*

6.  The claim that Wright was promoted because he was more qualified is **contradicted** by the **[sealed]**.

7.  These claims are further **weakened** by the fact that **[sealed]**.  To use Howell's own words, "[plaintiff] sets a fine example in all aspects of police supervision" and "is a very

22

noteworthy asset to [the] department." (Szczerba 146; Szczerba Ex. 19 p. 39[P316]; A1295,217).

## Training and Skill Levels

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff demonstrated through her training and skill levels that she was more qualified than Howell. (Szczerba 101,126-27, Szczerba Ex. 15; A1283,1290,154-61). Plaintiff has always been conscientious in maintaining her training and skill levels. (Szczerba 101; A1283).

2. This claim is **weak** because plaintiff was recommended by the WPD to attend the FBI Academy in 1987. (Szczerba Ex. 14 p. 1; A0152). Only those officers with the highest promise are chosen to attend the FBI Academy. (Szczerba 110; A1286). As Szczerba testified, the WPD only makes the recommendations to the FBI which then makes an independent decision based on the candidates record. (Szczerba 111; A1286). The FBI ultimately decided that plaintiff was qualified and deserved to attend the Academy where she performed extremely well receiving all A's and one B. (Szczerba Ex. 13 p. 1; A0150).

3. This claim is also **weak** in light of Szczerba's testimony that when he explained to Baker his reasons for selecting plaintiff, he pointed out that plaintiff was a graduate of the FBI Academy. (Szczerba 222; A1314).

4. This claim is also **weak** because Howell **[sealed].**

5. There are only three or four schools where outstanding law enforcement officers around the county attend to receive high level police training. These schools include the FBI Academy, the University of Louisville, and two other schools located in Chicago and south Florida. (Szczerba 111-12; A1286). Defendants' claim is **contradicted** by the fact that Howell **[sealed].**

## Character

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's character made her more qualified for the job than Howell. (Szczerba 101; A1283).

2. This claim is also **weakened** and **contradicted** by Szczerba's testimony that the ethical qualities plaintiff demonstrated while serving as commander of Internal Affairs were better than those of Howell. (Szczerba 103; A1284).

3. This claim is further **weakened** and **contradicted** by Howell's **[sealed].**

## **Community Involvement**

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that one of the reasons he considered plaintiff more qualified than Howell was her involvement with the community. (Szczerba 107; A1285). It makes her a "full-rounded candidate." (Szczerba 108; A1285). No other WPD captain has as much community involvement as plaintiff. (Dietz 38-39; A0292).

2. This claim is also **weak** in light of Szczerba's testimony that when he explained to Baker his reasons for selecting plaintiff, he pointed out her "community involvement." (Szczerba 222; A1314). Szczerba was not even aware of the kinds of community activities, if any, Howell is involved in. (Szczerba 136-37; A1292).

3. Defendants' claims that Wright and Howell were promoted because they were more qualified is also **weak** since plaintiff has an extensive background in community involvement which she has been commended upon numerous times. (Szczerba Ex. 17; A0172-76). For example, in 1995, plaintiff received a commendation from then Mayor Sills for her dedication and commitment to Community Policing which led to the City of Wilmington receiving an Outstanding Achievement Award in the City Livability Awards. (Szczerba Ex. 17 p. 2; Szczerba 133; A0173,1291).

4. These claims are also **weak** given that plaintiff is active in many community outreaches and her philosophy of reaching out to the community has been reflected in the police academy which she commands. (Szczerba 107; A1285).

5. These claims are also **weak** because Baker himself has presented plaintiff with awards in 2001 and 2003 for her volunteer work with the Big Brothers/Big Sisters program. (Szczerba Ex. 17 p. 3-4; Szczerba 133-35; see Baker 81; A0174-75,1291-92,246). Baker obviously considers this an outstanding accomplishment as he has publically stated he wants police officers to be involved with the children of the community. (Szczerba 134,136; A1292).

## **Experience**

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's experience in the various assignments she has held with the WPD made her better qualified for the job than Howell. (Szczerba 100,222; A1283,1314).

2. This claim is also **weak** in light of Szczerba's testimony that when he explained to Baker his reasons for selecting plaintiff, he pointed out her "diversified work experience." (Szczerba 222; A1314).

3. This claim is **weakened** by the fact that plaintiff has operational experience in the chain of command for Uniformed Operations Inspector. (Szczerba 118-19; A1288).

24

### Loyalty to Department

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's loyalty to the department made her a better selection than Howell. (Szczerba 98; A1283).

### Disposition

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's disposition made her better person for the job than Howell. (Szczerba 98; A1283).

### Knowledge of the Department

1. The claim that Howell was promoted because he was more qualified is **weakened** and **contradicted** by Szczerba's testimony that plaintiff's knowledge of the department made her better qualified for the job than Howell. (Szczerba 99; A1283).

### ARGUMENT

## I.    STANDARD OF REVIEW.

**A. Rule 56 Standard.** A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c). The substantive law will identify which facts are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. Id. "[I]f a moving party satisfies its initial burden of proving a prima facie case for summary judgment, the opposing party must do more than simply show that there is some metaphysical doubt as to material facts." Boyle, 139 F.3d at 393. "[I]f the evidence is merely colorable or not significantly probative, summary judgment should be granted." Id.

**B. Fourteenth Amendment Requirements.**  In the Fourteenth Amendment Equal Protection context, the "standard of review ... is not dependent on the race of those burdened or benefitted by a particular classification." Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (internal punctuation omitted).

> [A]ll racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny.  This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.  Absent searching judicial inquiry into the justification for such race-based measures, we have no way to determine what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.  We apply strict scrutiny to all racial classifications to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool.

Grutter v. Bollinger, 539 U.S. 306, 326 (2003) (internal quotation marks and citations omitted) (emphasis added).  "[A]ll governmental action based on race - a group classification long recognized as in most circumstances irrelevant and therefore prohibited - should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." Id. (internal quotation marks omitted) (emphasis added).

Similarly, gender based classifications require an "exceedingly persuasive justification" by the state.  U.S. v. Virginia, 518 U.S. 515, 531-33 (1996).

**II.    DEFENDANTS' RACIAL QUOTA SYSTEM FOR THE RANK OF INSPECTOR VIOLATES BOTH THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE AND 42 U.S.C. §1981.**

**A. The Basics.**  "[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment [ ] also violate[s] [42 U.S.C.] §1981.  Gratz, 539 U.S. at 276 n.23; Grutter, 539 U.S. at 343.

A "quota is a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups." Grutter, 539 U.S. at 335 (internal punctuation

omitted).  They "impose a fixed number or percentage which must be attained."  Id.  In Grutter v.

Bollinger the Supreme Court explained that quotas are forbidden under the Fourteenth

Amendment.  Any government attempt to set aside "some specified percentage" of a benefit for a

particular racial group "merely because of its race" "amount[s] to outright racial balancing,

which is patently unconstitutional."  Id. at 329-30.  A governmental hiring or promotional

program which uses a quota can never be narrowly tailored and thus cannot survive the

Fourteenth Amendment strict scrutiny requirements for race based classifications.  Id. at 334.

"Racial balance is not to be achieved for its own sake."  Freeman v. Pitts, 503 U.S. 467, 494

(1992).

**B. Discussion.**  Despite the Supreme Court's admonitions to the contrary, for nearly

thirty years defendants have used an explicit racial quota system at the rank of Inspector, a

system that defendant Baker helped develop and institute in 1978.  As set forth in section G of

the Facts above, since 1978 the City of Wilmington has operated a racial quota system which

reserves a certain "fixed number or percentage," Grutter, 539 U.S. at 335, of Inspector positions

for blacks and another for whites.  Originally, the requirement was that one of the four positions

be black and the other three be white.  As review of the factual record reveals, a white never

replaced a black and a black never replaced a white. (Dietz Ex. 20; Defendants' Inter. Resp. #1

p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; A1441-42,337-38,419-20,376-80).  As time

went on and the number of Inspectors positions were reduced to two, one was the 'black

position' and the other the 'white position,' and so it has remained. (Id.)

"Racial balancing, and that is what this is, simply cannot be achieved by means of a racial

classification without running afoul of the Equal Protection Clause of the Constitution."  Lomack

v. City of Newark, 463 F.3d 303, 311 (3d Cir. 2006) (creating racially diversified fire companies

through involuntary transfers or denied transfer requests violates the Equal Protection Clause).

Defendants' longstanding practice of setting aside one position for whites and another for blacks

is a blatant racial quota system and is "patently unconstitutional." Grutter, 539 U.S. at 330. The

system is simply illicit "racial politics." Id. at 326. Accordingly, judgment should be entered for

plaintiff.

### III.   UNDER THE DIRECT EVIDENCE PARADIGM OF PRICE WATERHOUSE v. HOPKINS, RACE PLAYED A MOTIVATING ROLE IN THE DENIAL OF THESE PROMOTIONS.

A. The Basics. There also is direct evidence that plaintiff was discriminated against

because of her race. Under the "mixed motive" or "direct evidence" framework of Price

Waterhouse v. Hopkins, 490 U.S. 228 (1989), when an employee presents "direct evidence that

decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their

decision," Id. at 277 (O'Connor, J., concurring),[4] the employee no longer need satisfy the

"pretext" or "indirect evidence" framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973). Just as the McDonnell Douglas evidentiary framework applies to claims brought under §

1981 and § 1983, Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997), the

Price Waterhouse framework applies as well. See Weberg v. Franks, 229 F.3d 514, 522 (6th Cir.

2000).

Once a plaintiff produces direct evidence that discriminatory animus was a motivating

factor in an employment decision, the burden of persuasion on the issue of causation shifts, and

the employer must prove that it would have made the same employment decision, even if it had

not considered the illicit factor. Fakete, 308 F.3d at 338. The burden shifts only upon a showing

---

[4]  The Third Circuit has recognized that Justice O'Connor's concurring opinion "represents the holding of the fragmented Court in Price Waterhouse." Fakete v. Aetna, Inc., 308 F.3d 335, 337 n.2 (3d Cir. 2002).

that the "evidence is sufficient to permit the fact finder to infer *that a discriminatory attitude was more likely than not a motivating factor in the employer's decision*." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) (internal punctuation omitted) (emphasis added).  The Third Circuit, en banc, has explained that in the Price Waterhouse mixed motive context, "the plaintiff ... need show only that the forbidden motive *played a role*" to satisfy the "motivating factor" requirement.  Miller v. CIGNA Corp., 47 F.3d 586, 597 n. 9 (3d Cir. 1995) (en banc) (double emphasis added).  "In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of 'but for' cause or cause in fact."  Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995).  Thus, if a plaintiff comes forward with direct evidence of discriminatory intent, the burden of proof shifts to the defendants.

In addition to direct evidence, certain types of circumstantial evidence also can trigger Price Waterhouse analysis.  As the Third Circuit has observed, the word "'direct' is imprecise because certain circumstantial evidence is sufficient . . . if that evidence can fairly be said to *directly reflect the alleged unlawful basis for the adverse employment decision*."  Fakete, 308 F.3d at 339 (internal punctuation omitted) (emphasis added).  Plaintiff must be able to point to "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude."  Starceski, 54 F.3d at 1096.  Thus, either conduct or words will suffice if they directly reflect the unlawful basis for the employment decision.  This type of evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision."  Fakete, 308 F.3d at 338 (internal quotations omitted).

One form of evidence sufficient to shift the burden under Price Waterhouse is "statements of a person involved in the decisionmaking process that reflect a discriminatory ... animus of the

type complained of in the suit." <u>Fakete</u>, 308 F.3d at 339; <u>see</u> <u>Starceski</u>, 54 F.3d at 1096 (either conduct or statements suffice).  These statements are sufficient even if they "are not made at the time of the adverse decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motived the decision." <u>Fakete</u>, 308 F.3d at 339.

**B. Discussion.**  The direct evidence in this case is remarkable.  First, Baker admitted to then FOP Vice-President Collins that he "wanted the Inspector to be black."  (Collins 9,11; A0221-22).  Thus, the decisionmaker's own contemporaneous words "directly reflect the [ ] unlawful basis for the adverse employment decision" not to promote plaintiff.  <u>Id.</u>

Second, as described in Argument II above, defendants have operated a blatant racial quota system for political reasons since 1978 and, despite her overwhelming qualifications, plaintiff was twice denied promotion when she repeatedly applied for the 'black position.' Baker's use of such a blatantly illegal tool, which he helped develop in 1978, for the sake of racial gerrymandering "directly reflect[s]" the use of race in the process.  <u>Fakete</u>, 308 F.3d at 339.

Third, all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process) in the WPD.  As both the police chief and public safety director explained, the race of the officer being promoted is always discussed. (Szczerba 207-09; Montgomery 11-14,16-17,24; A1310,267-68,268,270).  Discovery also revealed an internal WPD/City document containing explicit racial tallying of individuals in Inspector positions which shows that when a white retires he is replaced by a white and when a black retires he is replaced by a black.  (Dietz Ex. 20; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; ; A1441-42,337-38,419-20,376-80).  This evidence also "directly reflect[s]" the use of race in the process.  <u>Starceski</u>, 54 F.3d at 1096.

Fourth, defendant Baker goes so far as to proudly admit and embrace a 'diversity' policy

identical to one which the Third Circuit struck down as illegal more than 10 years ago. He admits that when two equal candidates are being considered for a position, the race of the candidate is the determinative factor. (Baker 33-35). In Taxman v. Board of Educ. of Tp. of Piscataway, 91 F.3d 1547, 1563-65 (3d Cir. 1996) (en banc), the Court held that a state actor violates the civil rights laws when he applies an affirmative action plan which results in the use of race as the determinative factor between two equally qualified individuals. As the Supreme Court recently explained, "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1, -- U.S. --, 2007 WL 1836531, *18 (June 28, 2007); see Messer v. Meno, 130 F.3d 130, 136 (5th Cir. 1997) ("Diversity programs, no matter how well-meaning, are not constitutionally permissible absent a specific showing of prior discrimination, because 'good intentions' alone are not enough to sustain a supposedly 'benign' racial classification.") (internal punctuation omitted). These admissions from defendant Baker himself, as well as other key City policymakers, demonstrate that race at the very least "played a role" in all promotions which took place. Miller, 47 F.3d at 597 n.9. They are "statements of a person involved in the decisionmaking process that reflect a discriminatory animus of the type complained of in the suit." Fakete, 308 F.3d at 339.

Accordingly, plaintiff is entitled to partial summary judgment and the burden of proof shifts to defendants to prove by a preponderance of the evidence that they would have refused to promote plaintiff anyway, even if they had not unlawfully discriminated against her. Fakete, 308 F.3d at 338.

**IV.    UNDER A PRETEXT THEORY PLAINTIFF: 1) HAS PROVEN A PRIMA FACIE CASE THAT SHE WAS DENIED TWO PROMOTIONS BECAUSE OF HER RACE AND GENDER; AND 2) HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY UNDER BOTH PRONGS 1 AND 2 OF FUENTES.**

31

**A. A Prima Facie Case Has Been Proven.** Under the first step of the three step "pretext" or "indirect evidence" framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981), the record demonstrates that plaintiff has proven a prima facie case that she was denied promotion because of her race and gender. The <u>McDonnell Douglas</u> framework applies to claims brought under §1983. <u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 432 (3d Cir. 1997).

**1. This is a Light Burden.** "The burden of establishing a prima facie case ... is not onerous." <u>Burdine</u>, 450 U.S. at 253.[5] Indeed, disputes over its elements are deferred to the pretext stage of the analysis. <u>See</u> <u>Matczak v. Frankford Candy and Chocolate Co.</u>, 136 F.3d 933, 938-39 (3d Cir. 1997); <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 163 (3d Cir. 1999). The favorable treatment of merely one non-protected employee can be enough to meet the prima facie burden. <u>Simpson v. Kay Jewelers, Div. of Sterling</u>, 142 F.3d 639, 645-46 (3d Cir. 1998). An "initial presumption of discrimination arises from the plaintiff's prima facie case of discrimination because [the court] presume[s such] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." <u>Sheridan</u>, 100 F.3d at 1069 (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)) (internal punctuation omitted).

Moreover, when the employer's criteria for the position are subjective in nature as with Baker's explanations (see Facts at section D above), a prima facie analysis of such subjective qualities "is better left to the later stage of the <u>McDonnell Douglas</u> analysis." <u>Matczak</u>, 136 F.3d at 938; <u>accord</u> <u>Sempier</u>, 45 F.3d at 729 (the question of whether an employee possesses a

---

[5] <u>Accord</u> <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 986 (1988); <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1084 (3d Cir. 1996) (en banc); <u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497, 508 (3d Cir. 1996); <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 728 (3d Cir. 1995); <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 523 (3d Cir. 1992).

subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason ... is pretext.") (internal punctuation omitted). "The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage." Matczak, 136 F.3d at 938 (internal punctuation omitted).

       **2. The Elements.**  In our case, plaintiff must prove the following elements: (1) she is white or that she is female; (2) she was qualified for the position; (3) she did not receive the promotions at issue; and (4) the positions were ultimately filled by a black or a male. See Sheridan, 100 F.3d at 1066 n.5.  That burden has been met.  (See Facts at C above).

       **B. Defendants' Burden.**  Once plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Id. at 1066.  Baker appears to claim that he promoted the most qualified candidate for the positions. (See Facts at D above).

       **C. Plaintiff's Ultimate Burden.**  "[W]hen the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan, 100 F.3d at 1067.  Here, plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764, which were reaffirmed twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067, and in Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

       Under prong one plaintiff proceeds with a "credibility" or "unworthy of credence case."

Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).  Here to make the case a "plaintiff

must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 764-65.  The

second prong requires evidence that "allows the factfinder to infer that discrimination was more

likely than not a motivating or determinative cause of the adverse employment action."  Id. at

762.

  "In deciding the 'ultimate question' of whether the employer unlawfully discriminated . . .

the factfinder's disbelief of the reasons put forward by the defendant ... may, together with the

elements of the prima facie case, suffice to show intentional discrimination." Sheridan, 100 F.3d

at 1067 (quoting Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).  In other words,

"[i]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered

reasons, to survive summary judgment the plaintiff need not also come forward with additional

evidence of discrimination beyond his or her prima facie case." Fuentes, 32 F.3d at 764;

Sheridan, 100 F.3d at 1071.  Rather, "no additional proof of discrimination is required." Hicks,

509 U.S. at 511;  Sheridan, 100 F.3d at 1066, 1071.

  Regarding the effect of the falsity of a defendant's stated reason or other evidence, the

Third Circuit has said,"a party's falsehood . . . in the preparation and presentation of his cause,

his fabrication or suppression of evidence by bribery or spoliation, is receivable against him as an

indication of his consciousness that his case is a weak or unfounded one; and from that

consciousness may be inferred the fact itself of the cause's lack of truth and merit." Sheridan,

100 F.3d at 1069.  Importantly, there the en banc court also declared "[w]e routinely expect that a

party give honest testimony in a court of law; there is no reason to expect less of an employer

charged with unlawful discrimination."  Id.

"Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration . . . ." Sheridan, 100 F.3d at 1069 (citing Furnco Constr. Corp., 438 U.S. at 577).

**1. Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendants' Case.**  On our record, there are abundant weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the defendants' version of the case, such that a reasonable fact-finder could find it unworthy of belief.  (See Facts at section K above).

**2.  Prong 2 - The Weight of the Evidence Demonstrates Race or Gender is the Reason Plaintiff Was Not Promoted.**  In the same way, the record is overflowing with evidence from which a jury can conclude that plaintiff's race or gender is the reason she was not promoted. In addition to the evidence set forth in Arguments II and II above, this evidence is set forth above in the Facts at section J above.

**V.    THERE IS NO EVIDENCE OF A COMPELLING STATE INTEREST WHICH WOULD JUSTIFY A QUOTA OR THE USE OF RACE OR SEX TO DENY PLAINTIFF A PROMOTION.**

"Context matters when reviewing race-based governmental action under the Equal Protection Clause." Grutter, 539 U.S. at 327.  Only three times before has the Supreme Court ever found a compelling state interest, strong enough to justify the intentional use of race by the government.  First, in a remedial setting to remedy identified past or present discrimination in which the government took part.  See Grutter, 539 U.S. at 326-28; City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989) (plurality opinion); Contractors Assoc. of Eastern Pa., Inc.

v. City of Phila., 91 F.3d 586, 596-7 (3d Cir. 1996).  Second, is graduate school admissions in order to attain a diverse student body.  Grutter, 539 U.S. at 328-33.  Third, requires national security concerns in time of war.  Korematsu v. U.S., 323 U.S. 214 (1944).

Given that the record is barren of national security concerns supporting defendants and that they are not within the special realm of education, the only compelling state interest defendants can pin their hopes on is that of remedying identified past or present discrimination in which the government took part.  See Croson, 488 U.S. at 493.  But "a court cannot conduct the strict scrutiny review required by Croson without first identifying with specificity the discrimination allegedly giving rise to the compelling state interest."  Contractors Assoc., 91 F.3d at 599 (emphasis added).  The government must establish that this compelling state interest exists by a "strong basis in evidence" and whether or not they have met this burden is a question of law.  Id. at 596 (emphasis added).

To meet this compelling governmental interest, "judicial, legislative, or administrative findings of constitutional or statutory violations must be made."  Croson, 488 U.S. at 497 (internal punctuation omitted) (emphasis added).  Mere "societal discrimination" is not sufficient to allow race-conscious classifications, id., nor is a "generalized assertion that there has been past discrimination in an entire industry."  Id. at 498.

"Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice."  Id. at 500.[6]  "[T]he mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight."  Id. at 500 (citation omitted).

[W]hen a legislative body chooses to employ a suspect classification, it cannot rest upon a

---

[6] Historically, in the area of remedial racial preferences, they are imposed by legislative bodies, not by executive fiat, as in our case.  See e.g. Croson, 488 U.S. at 477; Contractors Assoc., 91 F.3d at 591.

generalized assertion as to the classification's relevance to its goals. A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists. The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.

Id. at 500-501 (internal citations omitted). Because of their inherently suspect nature

it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate[ because] racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.

Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 236 (1995) (internal punctuation and citation omitted).

Our record is clear on the compelling state interest issue - there is none. The record is barren of any basis of historical discrimination which could be "identif[ied] with specificity" and thus give rise to a compelling state interest. Contractors Assoc., 91 F.3d at 599.

Accordingly, the evidence in the record demonstrates only "simple racial politics." Grutter, 539 U.S. at 326. There is no evidence of a compelling state interest which would justify the use of either a quota or race to deny plaintiff a promotion. Nor have defendants made any effort to meet the showing required to justify gender based classifications. See U.S. v. Virginia, 518 U.S. at 531-33. Accordingly, as a matter of law, summary judgment should be granted to plaintiff on these issues. Boyle, 139 F.3d at 393.

## CONCLUSION

For the reasons discussed above, summary judgment should be entered for plaintiff on liability under the quota theory and the Court should order a trial on damages and instatement alone. Under the mixed motive theory, partial summary judgment should be entered on liability and the burden of proof should be shifted to defendants to demonstrate the same decision anyway affirmative defense under Price Waterhouse. Under the pretext theory, partial summary judgment

37

should be entered in that a prima facie case has been established and that there is sufficient

evidence to go to the jury under both prongs of <u>Fuentes</u>.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: July 27, 2007                    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

July 27, 2007, I electronically filed this **Redacted Brief** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:

Teresa A. Cheek, Esquire
Young, Conaway, Stargatt, & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
tcheek@ycst.com

Rebecca Butcher, Esq.
Dan Rath, Esq.
Landis, Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801
butcher@lrclaw.com

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ.**

Dietz, Nancy \ Briefs \ Dietz - SJOB - redacted.final