## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,    )
    )
    Plaintiff,    )
    )
    v.    )    C.A. No. 06-256-SLR
    )
JAMES M. BAKER, et al.    )    JURY TRIAL DEMANDED
    )
    Defendants.    )
    )

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Teresa A. Cheek, Esquire (#2657)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Dated: July 27, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 1

STATEMENT OF UNDISPUTED FACTS .............................................................. 2

ARGUMENT ........................................................................................................... 4

    I. Standard for Summary Judgment .............................................................. 4

    II. Dietz's Claims Regarding the Appointment of James Wright Are Time-Barred ...... 5

        A. The Claims Are Subject to Different Statutes of Limitation. ............................... 5

           1. Section 1981 claims are subject to a four-year statute of limitations. ............ 5

           2. Section 1983 Claims are subject to a two-year statute of limitations. ............ 5

        B. All Claims Arising From the Appointment of Wright Are Barred by the
Statutes of Limitations. ........................................................................................ 6

        C. A Failure to Promote Is Not a Continuing Violation That May Extend the
Statute of Limitations ........................................................................................... 7

CONCLUSION ....................................................................................................... 9

# TABLE OF AUTHORITIES

**Cases**                                                     **Page**

*AMTRAK v. Morgan,*
536 U.S. 101 (2002) ......................................................................................... 8

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ......................................................................................... 4

*Bates v. Tandy Corp.,*
186 Fed. Appx. 288 (3d Cir. 2006) .................................................................. 5

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ......................................................................................... 4

*Chardon v. Fernandez,*
454 U.S. 6 (1981) ............................................................................................. 6

*Hanani v. NJ Dep't of Envt'l Prot.,*
205 Fed. Appx. 71 (3d Cir. 2006) ................................................................ 7-8

*Jones v. Donnelly & Sons, Co.,*
541 U.S. 369 (2004) ......................................................................................... 5

*Lake v. Arnold,*
232 F.3d 360 (3d Cir. 2000) ............................................................................ 6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ......................................................................................... 4

*McDowell v. Delaware State Police,*
88 F.3d 188 (3d Cir. 1996) .............................................................................. 6

*Miller v. Beneficial Management Corp.,*
977 F.2d 834 (3d Cir. 1992) ............................................................................ 6

*O'Connor v. City of Newark,*
440 F.3d 125 (3d Cir. 2006) ........................................................................ 6, 8

*Oshiver v. Levin, Fishbein, Sedran & Berman,*
38 F.3d 1380 (3d Cir. 1994) ............................................................................ 7

*Riley v. Delaware River & Bay Authority,*
457 F. Supp. 2d 505 (D.Del. 2006) ................................................................. 5

*Tummala v. Merck Co.*,
1995 U.S. Dist. LEXIS 16920 (D.N.J. Nov. 9, 1995)....................................................... 7

*Valhal Corp. v. Sullivan Assocs., Inc.*,
44 F.3d 195 (3d Cir. 1995).............................................................................................. 4

**Statutes**

U.S. Const., Amend.XIV ........................................................................... passim

28 U.S.C. §1658.......................................................................................... 3, 4, 5

42 U.S.C. §1981 ......................................................................................... passim

42 U.S.C. §1983.......................................................................................... passim

10 *Del. C.* §8119 ......................................................................................... 3, 4, 6

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................. 4

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Captain Nancy S. Dietz ("Dietz" or "Plaintiff") initiated this action on April 20, 2006 by filing a complaint ("Complaint") against the Mayor of the City of Wilmington, James M. Baker, individually and in his official capacity ("Mayor"), and the City of Wilmington ("City," collectively with the Mayor, "Defendants") alleging employment discrimination. (D.I. 1.) The Complaint contains three counts: 1) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 based on an alleged quota system resulting in a failure to appoint Dietz to the position of Inspector in 2001 and 2005; 2) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 relating to the same appointments; and, 3) a claim for sex discrimination pursuant to the Fourteenth Amendment and 42 U.S.C. §1983 relating to the same appointments. (D.I. 1.)

The Mayor and the City filed answers to the Complaint on August 21, 2006 refuting the allegations of discrimination and asserting affirmative defenses. (D.I. 5, 6.) In February, 2007, the City (D.I. 30.) and the Mayor (D.I. 31.) amended their answers to the Complaint.

On October 24, 2006, the Court entered a scheduling order setting the case deadlines. (D.I. 15.) The scheduling order has been twice revised with regard to dispositive motions. (D.I. 46, 60.) The most recent scheduling order, dated July 12, 2007, provides that dispositive motions and opening briefs shall be served and filed on July 27, 2007. (D.I. 60.)

This is Defendants' opening brief in support of their motion for partial summary judgment ("Motion") seeking dismissal of Plaintiff's claims in Counts One through Three of the Complaint relating to the appointment of James Wright in 2001.

1

## STATEMENT OF UNDISPUTED FACTS

Plaintiff's Complaint asserts federal and Constitutional claims for race and sex discrimination arising from the appointment of James Wright to the position of Uniformed Operations Inspector within the Police Department for the City of Wilmington in 2001. (D.I. 1 at ¶¶ 34, 63, 71, 81.)

Inspector James Stallings ("Stallings") held the position of Uniformed Operations Inspector prior to the election of the Mayor. (D.I. 1 at ¶29; D.I. 6, 31 at ¶29.) In February, 2001, Stallings announced his retirement from the Police Department. (D.I. 1 at ¶30.) Michael Szczerba, Chief of the Police Department ("Chief") recommended then Captain James Wright ("Wright") to fill the vacancy created by Stallings' retirement. (Szczerba Dep. 206, 215, Jan. 25, 2007, (Ex. A).) The Director of Public Safety, James Mosley and the Mayor's Chief of Staff, William Montgomery agreed with the Chief's recommendation. (Mosley Dep. 18-19, Mar. 12, 2007, (Ex. B); Montgomery Dep. 48, Mar. 12, 2007 (Ex. C).) Wright was appointed to the position of Uniformed Operations Inspector to fill the vacancy created by Stallings' retirement effective February 17, 2001. (D.I. 1 at ¶30; D.I. 31 at ¶30; City's Supp. Am. Resp. to Pl.'s Interrog. 6 (Ex. D).)

Plaintiff filed her Complaint on April 20, 2006, more than 5 years after the February 17, 2001 appointment of James Wright to the position of Uniformed Operations Inspector. (D.I. 1.) Count One of the Complaint alleges that Plaintiff was denied a "promotion to the rank of Inspector" in 2001 because of an illegal racial quota system. (D.I. 1 at ¶¶ 63, 64.) Plaintiff alleges this failure to promote violated her "right to be free of racial discrimination under the Fourteenth Amendment and 42 U.S.C. §§1981 and 1983." (D.I. 1 at ¶ 64.)

Count Two of the Complaint alleges that a vacancy existed for the position of Uniformed Operations Inspector in both 2001 and 2005. (D.I. 1 at ¶¶66, 69.) Plaintiff alleges that on both occasions the position was given to a less qualified African-American officer. (D.I. 1 at ¶71.) Plaintiff alleges that both promotions violated her "right to be free of racial discrimination under the Fourteenth Amendment and 42 U.S.C. §§1981 and 1983." (D.I. 1 at ¶74.)

Count Three of the Complaint alleges that a vacancy existed for the position of Uniformed Operations Inspector in both 2001 and 2005. (D.I. 1 at ¶¶76, 79.) Plaintiff alleges that on both occasions the position was given to a less qualified male. (D.I. 1 at ¶81.) Plaintiff alleges that both promotions violated her "right to be free of sex discrimination under the Fourteenth Amendment and 42 U.S.C. §1983." (D.I. 1 at ¶86.)

Both the Mayor and the City deny all of Plaintiff's allegations of discrimination. (D.I. 6, 31 at ¶¶63, 64, 71, 74, 81, 86; D.I. 5, 30 at ¶¶63, 64, 71, 74, 81, 86.) Further, the Mayor and the City have asserted numerous affirmative defenses including the defense that Plaintiff's claims are barred by the statute of limitations. (D.I. 6, 31 at ¶89, D.I. 5, 30 at Ninth Aff. Def.)

Plaintiff was aware of the appointment of Wright to the position of Inspector in February 2001. (N. Dietz Dep. 49, May 9, 2007 (Ex. E).) Plaintiff failed to file her complaint until April 2006, more than five years after Wright's appointment. (D.I. 1.) All claims related to Wright's appointment are barred by the two-year statute of limitations set forth in 10 *Del. C.* §8119 applicable to Dietz's §1983 and the four-year statute of limitations as set forth in 28 U.S.C. §1658 applicable to Dietz's §1981 claims.

## ARGUMENT

Dietz's claims in Counts One through Three relating to Wright's appointment to Inspector of Uniformed Operations are barred by the statutes of limitations set forth in 10 *Del. C.* §8119 and 28 U.S.C. §1658. Pursuant to 28 U.S.C. §1658, claims for race discrimination pursuant to 42 U.S.C. §1981 must be brought within four years of the injury alleged. Pursuant to 10 *Del. C.* §8119, claims for race and sex discrimination pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment must be brought within two years of the injury alleged. In this case, since more than five years elapsed from the appointment of Wright until the filing of the Complaint, Dietz's claims under all three counts of the Complaint as they pertain to the appointment of James Wright should be dismissed with prejudice.

## I.    **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether there is a triable issue of material fact a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *See Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 200 (3d Cir. 1995). However, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587.

4

## II.  Dietz's Claims Regarding the Appointment of James Wright Are Time-Barred

As a matter of law Dietz's claims pursuant to the Fourteenth Amendment, 42 U.S.C. §§1981 and 1983 for race and sex discrimination arising from the appointment of James Wright to the position of Uniformed Operations Inspector in February 2001 are barred by the applicable statutes of limitations.

### A.    The Claims Are Subject to Different Statutes of Limitation.

The claims at issue arise under three provisions of law: the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1981 and 42 U.S.C. §1983.  Recent decisions dictate different statutes of limitations for the claims.

#### 1.    Section 1981 claims are subject to a four-year statute of limitations.

The Supreme Court in *Jones v. Donnelly & Sons, Co.*, 541 U.S. 369 (2004) ruled that race discrimination claims arising under §1981 are subject to a four year statute of limitations if those claims are made possible by amendments to §1981 by the Civil Rights Act of 1991. [1] *See Bates v. Tandy Corp.*, 186 Fed. Appx. 288, 292 (3d Cir. 2006); *Riley v. Delaware River & Bay Authority*, 457 F. Supp. 2d 505, 512 (D.Del. 2006).  The *Riley* court applied this four year statute of limitations to §1981 claims arising from a failure to promote. *See Riley*, 457 F. Supp. 2d at 513.  Therefore, Plaintiff's §1981 race discrimination claims, arising from the appointment of Wright to Inspector, are subject to a four-year statute of limitations.

#### 2.    Section 1983 Claims are subject to a two-year statute of limitations.

Plaintiff's claims for violation of her Fourteenth Amendment right to equal protection are raised pursuant to 42 U.S.C. §1983 which provides a cause of action for the "deprivation of any

---

[1]  In 1990 Congress passed 28 U.S.C. §1658 which provided that all civil actions arising under federal statutes enacted after December 1, 1990 had a four-year statute of limitations. *See* 28 U.S.C. §1658 (1990).  Because 42 U.S.C. §1981 was amended in 1991 by the Civil Rights Act of 1991, the Supreme Court concluded that causes of action under the 1991 amendments were subject to a four year statute of limitations. *See Jones*, 541 U.S. at 383.

rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. §1983. A claim for race or sex discrimination pursuant to §1983 is subject to the state statute of limitations on personal injury. *See O'Connor v. City of Newark*, 440 F.3d 125, 126 (3d Cir. 2006); *Lake v. Arnold*, 232 F.3d 360, 368 (3d Cir. 2000). The Delaware limitations period for personal injury, and hence the statute of limitations for §1983 claims arising in Delaware is two years. *See* 10 *Del. C.* §8119; *McDowell v. Delaware State Police*, 88 F.3d 188, 190 (3d Cir. 1996). Dietz's race and sex discrimination claims pursuant to §1983 are subject to a two-year statute of limitations.

**B.     All Claims Arising From the Appointment of Wright Are Barred by the Statutes of Limitations.**

Wright was appointed to the position of Uniformed Operations Inspector effective February 17, 2001. Dietz had two years from that date to bring claims pursuant to §1983 and the Fourteenth Amendment. She had four years from that date to bring claims pursuant to §1981. Dietz did not file her discrimination claims under either statute until April 2006, five years following the alleged harm.

In employment discrimination actions, the limitations period begins to run at the "time of the discriminatory act." *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 842 (3d Cir. 1992) (citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981)). The limitations period related to Wright's appointment, the allegedly discriminatory act at issue, began to run on February 17, 2001. Unless Plaintiff can offer some reason to extend the limitations period, Plaintiff's §1983 claims have been time-barred since February 18, 2003 and her §1981 claims have been barred since February 18, 2005, long before the filing of her Complaint in April 2006.

Dietz alleged in her Complaint that she did not discover that she was the victim of race discrimination with regard to the Wright promotion until 2005. (D.I. 1 at ¶42.) However, even if

that allegation is assumed for purposes of this motion to be true, it does not alter the accrual date of Dietz's causes of action, because "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness this injury constitutes a legal wrong." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994). Failure to promote causes of action accrue when the plaintiff becomes aware that the promotion was received by another individual. *See, e.g., Tummala v. Merck Co.*, No. 93-3812, 1995 U.S. Dist. LEXIS 16920, *12 (D.N.J. Nov. 9, 1995). The statute of limitations begins to run on the date the plaintiff knows the discriminatory act occurred not on the date plaintiff becomes aware of the discriminatory motive for the act. *See Oshiver*, 38 F.3d at 1386. Dietz has been aware since February 2001 that the appointment to the vacant position of Uniformed Operations Inspector was received by Wright, an African-American male. There are no allegations, nor can there be, that either the vacancy or the appointment was concealed from Dietz. All claims relating to Wright's appointment are time-barred.

## C. A Failure to Promote Is Not a Continuing Violation That May Extend the Statute of Limitations

Dietz has alleged that the failure to promote her in 2001 and 2005 was part of a pattern or practice of discrimination. This allegation does not extend the statutes of limitations for her claims related to Wright's appointment. The appointment of Wright in 2001 and the appointment of Gilbert Howell in 2005 are discrete acts that each triggered the running of the statutes of limitations for any claims related to those individual acts. The fact that Dietz was not appointed to the same position on two separate occasions does not affect the applicable statutes of limitation.

When discriminatory conduct constitutes a "continuing violation, the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the

first." *Hanani v. NJ Dep't of Envt'l Prot.*, 205 Fed. Appx. 71, 76 (3d Cir. 2006).  However, the theory does not apply to promotions.  Each instance of an employer failing to promote an employee is considered a discrete act.  *See AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002); *O'Connor*, 440 F.3d at 127.  As the *Morgan* court instructed "(d)iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision creates a separate actionable 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 114.  The appointment of Wright in 2001 and the appointment of Howell in 2005 are separate events that cannot be aggregated to save Plaintiff's untimely claims related to Wright's appointment.  Dietz's claims related to Wright's appointment are time-barred.

**CONCLUSION**

Based on the foregoing, Defendants Mayor James M. Baker and the City of Wilmington respectfully request that they be granted partial summary judgment on Plaintiff's claims under all three counts of the Complaint as related to the appointment of James Wright in 2001. These claims are time-barred as a matter of law and should be dismissed with prejudice.

YOUNG CONAWAY STARGATT &  
TAYLOR LLP

_____/s/ Teresa A. Cheek_____  
Teresa A. Cheek, Esquire (#2657)  
The Brandywine Building, 17th Floor  
1000 West Street  
Wilmington, Delaware 19801  
(302) 571-6676

Attorneys for Defendant the City of Wilmington

LANDIS RATH & COBB LLP

Daniel B. Rath, Esquire (#3022)  
Rebecca L. Butcher, Esquire (#3816)  
919 Market St., Suite 600  
Wilmington, Delaware 19801  
(302) 467-4400

Attorneys for Defendant Mayor James M. Baker

# EXHIBIT A



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

## In the Matter Of:

# Dietz

# v.

# Baker

---

## Transcript of:

# Michael J. Szczerba

## January 25, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

CONFIDENTIAL               Dietz v. Baker
Michael J. Szczerba

<table>
<tr><td colspan="2">202</td></tr>
</table>

1  advised him that he would be making the selection, not
2  you?
3     A.  Right.
4     Q.  At that time did you start identifying for him
5  problems that you foresaw if it was Gilbert Howell?
6     A.  No, I did not.  I just asked a question, well,
7  will I be able to make a recommendation?  I was told
8  that I can do what I wanted to, but the mayor would be
9  making the decision.
10    Q.  You decided you would make a recommendation?
11    A.  Yes, I did.
12    Q.  When Inspector Wright was selected in 2001,
13 let's go back to him, the mayor takes office the
14 beginning of January in 2001, it's announced that you
15 are going to be the chief when he's the mayor elect
16 after the November election, there's a process and
17 you're identified as the person who is going to be the
18 chief.
19    A.  Yes.
20    Q.  Early on in the year there's the vacancy and
21 it's going to have to be filled; right?  Was it the
22 first six months, nine months of the year?
23    A.  Within the first five months.
24    Q.  First five months?

**203**

1     A.  I believe as early as March, I believe.
2     Q.  Did the mayor's office let you know that it
3  wanted you to be selecting Gilbert Howell at that
4  time?
5     A.  It was suggested that I consider him.
6     Q.  Okay.
7     A.  I wasn't told that it was him.
8     Q.  I understand.  Right.  It was suggested that
9  you consider Gilbert Howell for the selection at that
10 time?
11    A.  Yes.
12    Q.  Gilbert Howell wasn't your first choice by any
13 stretch of the imagination, was he?
14    A.  No.
15    Q.  Gilbert Howell had attendance problems back
16 then; right?
17    A.  Yes.  And the same issues.
18    Q.  Same kinds of issues.  Okay.
19        He demonstrated the same kinds of qualities
20 that we reviewed earlier on this morning?
21    A.  Right.
22    Q.  There was a pool of other available captains at
23 that time; right?
24    A.  Right.

**204**

1     Q.  You had just been selected by the mayor to be
2  the chief about five months earlier; right?
3     A.  Yes.
4     Q.  You were asked to consider Gilbert Howell;
5  right?
6     A.  Yes.
7     Q.  He would have been your last choice; isn't that
8  correct?
9     A.  It's a possibility he wouldn't have been at the
10 top of the list.
11    Q.  It's fair to say Gilbert Howell would not have
12 been at the top of the list?
13    A.  Right, because there were some fairly new,
14 inexperienced captains at that point, too, so he and
15 experience may have put them further down the list,
16 but I don't know if he would have been the last on the
17 list.
18    Q.  I understand what you are saying.
19    A.  Okay.
20    Q.  But the people at the top of the list would
21 have included Captain Wright?
22    A.  Yes.
23    Q.  And the people at the top of the list would
24 have included Nancy Dietz at that time?

**205**

1     A.  Yes.
2     Q.  You had received this mention of Gilbert
3  Howell; right?
4     A.  Yes.
5     Q.  Then you were allowed to select the inspector
6  at that time, weren't you?
7     A.  The inspector that I selected ended up being
8  the one appointed.
9     Q.  You weren't told at that time that the mayor
10 was going to make the selection?
11    A.  No.
12    Q.  The public safety director didn't convey to you
13 that there's an inspector vacancy open and the mayor
14 is going to make that decision on his own?
15    A.  No, I was not told that.
16    Q.  But for the second time around in 2005 you were
17 told that?
18    A.  Yes.
19    Q.  So the procedure changed, didn't it?
20    A.  Yes.
21    Q.  When you were faced with the selection of
22 someone in 2001, you were told you were going to be
23 allowed to make the selection; right?
24    A.  Yes.

CONFIDENTIAL                  Dietz v. Baker
Michael J. Szczerba

---

**206**

1    Q. Gilbert Howell's name was specifically
2  mentioned from the mayor's office; right?
3    A. Yes.
4    Q. You selected James Wright?
5    A. That's correct.
6    Q. James Wright, is it fair to say in your
7  judgment James Wright was a more qualified person for
8  that position than Gilbert Howell?
9    A. Yes.
10    Q. Was it fair to say in your judgment that you
11  felt that if Gilbert Howell was selected at that time,
12  that the same kinds of problems you are having to deal
13  with today you would have had to have been facing in
14  2001?
15    A. I considered that as a distinct possibility,
16  yes.
17    Q. That's one of the reasons why you didn't select
18  him?
19    A. That's correct.
20    Q. So now we are back to 2005 and you are telling
21  me that James Wright has announced he is retiring or
22  whatever and there's going to have to be an inspector
23  selected; right?
24    A. Yes.

---

**207**

1    Q. You are told that you, as the chief of police
2  of the Wilmington Police Department, will not be
3  making that selection?
4    A. Correct.
5    Q. Did the public safety director tell you why
6  that was going to occur?
7    A. No, he did not.
8    Q. During your two meetings with the mayor and
9  Mr. Montgomery where all four of you were present, did
10  Montgomery, the mayor, or the public safety director
11  tell you why you weren't going to be allowed to make
12  the selection?
13    A. No.
14    Q. Did anyone ever tell you why you weren't going
15  to be allowed to make the selection?
16    A. No.
17    Q. So during your reign, your term in office as
18  the chief, this was unprecedented for them to tell you
19  you could not make the selection?
20    A. Correct.
21    Q. There have been occasions, haven't there, when
22  you've had to make selections for lower positions
23  below inspector when the public safety director has
24  told you that he was displeased with the selection you

---

**208**

1  were going to make?
2    A. Yes. In a roundabout way, yes.
3    Q. There have been occasions where he has pushed
4  for somebody other than the person you've selected?
5    A. Correct.
6    Q. That's happened on more than one occasion,
7  hasn't it?
8    A. Yes.
9    Q. On those occasions, the public safety director
10  has voiced concern over the race of the person under
11  consideration?
12    A. Yes.
13    Q. On those occasions, for example, you might have
14  selected a white employee for promotion and he has
15  told you he would have preferred an African-American
16  employee?
17    A. Yes, and that was the only qualifier that he
18  stated.
19    Q. He has recited that kind of a qualifier on more
20  than one occasion concerning a promotion; isn't that
21  true?
22    A. Yes. It's one-time dealing with the same
23  promotion in a one-on-one meeting with myself and the
24  director, and then there was a follow-up meeting in

---

**209**

1  the mayor's office.
2    Q. Without using any names or anything like that,
3  what ranks might have been involved?
4    A. Lieutenant's rank at that time.
5    Q. So on two occasions that came up with a
6  lieutenant's rank?
7    A. Yes. And it actually comes up any time I make
8  my selection for promotions. I will come in and give
9  the names of the officers, and that's usually followed
10  up with a question from the director as to their race.
11    Q. You're saying, first of all, whenever you're
12  making promotions, are you telling me you met then
13  with the public safety director?
14    A. Yes, and also transfers. That did not start
15  initially when I came in as a chief, but I also bring
16  transfers to them.
17    Q. When you're making a promotion, the public
18  safety director will ask you what the race of the
19  individual being promoted is?
20    A. Yes.
21    Q. And he also asks you that in regard to
22  transfers?
23    A. Yes, and will also ask the race of the people
24  remaining on the band in our promotional system.

---

53 (Pages 206 to 209)

CONFIDENTIAL                Dietz v. Baker
Michael J. Szczerba

214

1  A. Right.
2  Q. -- versus Gilbert Howell; right?
3  A. Yes.
4  Q. I think you told me this morning you felt she
5  was the most qualified person for the position?
6  A. Yes.
7  Q. And if allowed to make the promotion, you would
8  have promoted a white female?
9  A. Yes.
10  Q. That would have resulted in two Caucasian
11  officers being the inspectors in the Wilmington Police
12  Department?
13  A. Correct.
14  Q. If the 20-year history we went over this
15  morning is correct, that would have been the first
16  time in 20 some years when two people of the same race
17  held the rank of inspector?
18  A. That's correct.
19  Q. So that was the situation that the mayor's
20  office was facing when Inspector Wright retired?
21  A. Correct.
22  Q. If you were allowed to make it, you would have
23  selected a white female?
24  A. Yes. I was allowed to select the best

215

1  candidate I thought for that position as I did in
2  2001. That's the same way I thought in 2005. Race or
3  gender had no play in my mind. I want to put the best
4  person in that position. People might question my
5  decisions, but that's what I should be able to do as
6  chief of police. As one of the citizens of
7  Wilmington, I want the chief of police to have that
8  authority.
9      So, you know, I put a blindfold on as far
10  as anyone's characteristics. I wanted the best person
11  for that position.
12  Q. You are not saying you recommended Nancy Dietz
13  because she was a female?
14  A. Not because she's female. Not because she's
15  white. I did not select James Wright because he was
16  African-American or because he was male. I wanted to
17  put the best person I thought at that time to put in
18  that position.
19  Q. You are saying you wouldn't have selected Nancy
20  Dietz because she was white and you wanted to have two
21  white inspectors?
22  A. Most definitely not.
23  Q. But the point is you were told you weren't
24  going to be making the decision?

216

1  A. That's right.
2      MR. NEUBERGER: So let's take our break
3  right here and we'll reconvene in ten minutes. Okay?
4      THE WITNESS: Okay.
5      (A recess was taken at this time.)
6  BY MR. NEUBERGER:
7  Q. We were on the meetings. Why don't you tell me
8  the first meeting you were at. I think you've told me
9  that it was indicated that you weren't going to be
10  making the decision, you want to say something, say
11  it.
12      So then did the first meeting occur?
13  A. No. That was the initial meeting between
14  myself and Director Mosley.
15  Q. Mosley told you that. Then after that, one of
16  the two meetings with the mayor Mosley and Montgomery
17  happened?
18  A. Yes.
19  Q. Go ahead. What happened in that first meeting?
20  A. It was after an update meeting with the mayor.
21  We met again almost immediately after this update
22  meeting, but it was different. It was just -- then it
23  was limited to myself, the mayor, Mr. Montgomery, and
24  the director. There was some brief discussions to my

217

1  selection and the mayor listened to that. There
2  wasn't really much of a meeting there.
3      You know, it was still -- at that point the
4  mayor was going to recommend or was appointing
5  Inspector Howell -- or Captain Howell to the rank of
6  inspector and pretty much just left it at that. I was
7  spoken out on the subject. I stated my feelings and
8  anticipation of what that could bring about.
9      Then the next meeting was after a meeting
10  with the county leadership, a breakfast meeting which
11  occurred at the -- it's now the Doubletree, and we met
12  out in the lobby after that meeting with the county
13  officials. It was pretty much a rerun. At that point
14  it was agreed upon that the director and mayor would
15  be meeting with Captain Howell.
16  Q. So you are saying at the first meeting, this is
17  a meeting for other purposes --
18  A. Yes.
19  Q. -- and the vacancy comes up?
20  A. Right.
21  Q. Are you the one that brings it up or did they
22  bring it up?
23  A. I didn't bring it up. It may have been brought
24  up by either Mr. Montgomery or the director.

55 (Pages 214 to 217)

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,    )
             )
    Plaintiff,   )
             ) Civil Action
v.            ) No. 06C-256-SLR
             )
MAYOR JAMES M. BAKER,    ) CONFIDENTIAL
individually and in his official ) PAGES 53-57
capacity as the Mayor of the  )
City of Wilmington, and MAYOR  )
AND COUNCIL OF WILMINGTON,   )
             )
    Defendants.  )


    Deposition of JAMES N. MOSLEY taken
pursuant to notice at The Neuberger Firm, P.A., Two
East Seventh Street, Suite 302, Wilmington, Delaware,
beginning at 2:50 p.m. on Monday, March 12, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

   THOMAS S. NEUBERGER, ESQ.
   RAEANN WARNER, ESQ.
   THE NEUBERGER FIRM, P.A.
    2 East Seventh Street - Suite 302
    Wilmington, Delaware  19801
    For the Plaintiff

   REBECCA L. BUTCHER, ESQ.
   LANDIS RATH & COBB LLP
    919 Market Street - Suite 600
    Wilmington, Delaware  19899
    For the Defendant Mayor James M. Baker

      WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
       (302) 655-0477
       www.wilfet.com



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters



James N. Mosley

18

1    A.    Right.

2    Q.    Early in your tenure as the director of public

3    safety an inspector had to be selected in the second

4    half of the year 2001.

5            Do you remember that?

6    A.    Yes.

7    Q.    And that was Captain Wright who was selected at

8    that time?

9    A.    It was Captain Wright, yes.

10    Q.    It was Captain Wright.  Do you remember why

11    Captain Wright was selected for the position of

12    inspector?

13    A.    Why he was?

14    Q.    Yes.  I am going to ask you what was the

15    process, how he was selected, what were the reasons he

16    was selected.

17            Why don't we just go back in time?  Do you

18    remember any process that was followed to select him?

19    A.    The typical process is we look at all

20    eligibles, in this case it was for inspector so it

21    would be all captains.  And I'm sure we discussed all

22    eligibles, all captains at that point.

23            And, again, we talked about many names,

24    but Jim Wright's name came up.  I know I supported Jim

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

 1   Wright's nomination, as did the chief, but the final

 2   decision was the mayor's.

 3     Q.   Okay.  So your recollection is during the

 4   process various captains of the Wilmington Police

 5   Department were considered?

 6     A.   I'm sure at one point all the captains were

 7   mentioned, yeah.

 8     Q.   By "mentioned," I think are you trying to tell

 9   me that during the process the captains were discussed

10   individually?

11     A.   Yes.  I'm sure we did.

12     Q.   And would there have been a meeting or meetings

13   where this process was entered into?

14               MS. CHEEK:  Objection to form.

15     A.   I will tell you that it probably -- it may have

16   happened at a scheduled meeting.  It may also have

17   happened at just general discussion, just in passing

18   or some unrelated meeting.  That is not uncommon.

19     Q.   Well, the people who would have discussed the

20   need to select an inspector, would that have included

21   you, Mr. Montgomery, Mayor Baker and Chief Szczerba at

22   the time?

23               MS. CHEEK:  Objection to form.

24     A.   Yes.



# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,          )
                                   )
           Plaintiff,        )
                                   )  Civil Action
v.                                )  No. 06C-256-SLR
                                 )
MAYOR JAMES M. BAKER,        )
individually and in his official  )
capacity as the Mayor of the    )
City of Wilmington, and MAYOR    )
AND COUNCIL OF WILMINGTON,     )
                                 )
          Defendants.       )

           Deposition of WILLIAM S. MONTGOMERY
taken pursuant to notice at The Neuberger Firm, P.A.,
Two East Seventh Street, Suite 302, Wilmington,
Delaware, beginning at 10:05 a.m., on Monday,
March 12, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

      THOMAS S. NEUBERGER, ESQ.
      RAEANN WARNER, ESQ.
      THE NEUBERGER FIRM, P.A.
        2 East Seventh Street - Suite 302
        Wilmington, Delaware  19801
        For the Plaintiff

      REBECCA L. BUTCHER, ESQ.
      LANDIS RATH & COBB LLP
        919 Market Street - Suite 600
        Wilmington, Delaware  19899
        For the Defendant Mayor James M. Baker

             WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
             (302) 655-0477
             www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



William S. Montgomery

48

1    conversation like that with the mayor?

2              MS. CHEEK:   Objection to form.

3    A.    No, I don't.

4    Q.    No.   Okay.   So concerning Inspector Wright in

5    2001, it's your testimony that it was the mayor who

6    selected and appointed Captain Wright for the position

7    of inspector?

8              MS. CHEEK:   Objection to form.

9    A.    He made the appointment, yes.

10   Q.    What were the reasons why the mayor selected

11   James Wright in 2001?

12   A.    That's a long way back.   I don't recall all.   I

13   do recall at that point Inspector Wright, Captain

14   Wright I guess at that point had a strong

15   recommendation from the chief, I believe from Director

16   Mosley and also myself.   All three of us thought very

17   highly of him.   I still do to this day.   He was a

18   great policeman.

19   Q.    So you remember one of the reasons why he was

20   selected was the fact that he was being strongly

21   recommended by the chief, Public Safety Director

22   Mosley and even yourself?

23   A.    Yes.

24   Q.    Is another reason the fact that his selection

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )   C.A. No. 06-256-SLR
                                       )
JAMES M. BAKER, et al.                 )   JURY TRIAL DEMANDED
                                       )
            Defendants.                )

## DEFENDANT CITY OF WILMINGTON'S SUPPLEMENTAL AND AMENDED RESPONSES AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANTS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant City of Wilmington, by its undersigned attorneys, hereby answers and serves the following answers to Plaintiff's First Set of Interrogatories.

## GENERAL OBJECTION

Defendant objects to Plaintiff's First Set of Interrogatories on the ground that they violate paragraph 2(b) of the Rule 16 Scheduling Order in this case, which provides that each party may not propound more than 50 interrogatories to any other party. Interrogatory No. 1 consists of seven subparts. Interrogatory No. 4 consists of 22 subparts because it asks Defendant to provide two categories of information (that is, (1) state names and addresses of all persons with knowledge of certain facts, and (2) describe all documents recording or referring to such facts) for each of the 11 affirmative defenses in Defendant's City of Wilmington's Answer to the Complaint. Plaintiff's Interrogatory No. 8, as amended in accordance with an email message from counsel for Plaintiff, consists of 90 subparts because it asks Defendant to provide two categories of information (that is, (1) describe all persons with knowledge of certain facts, and (2) describe all documents recording or referring to such facts) for each of the 45 denials in

| Staff Inspections Inspectors | | | |
|---|---|---|---|
| **Name** | **Title** | **Dates of Duty** | **Race** |
| John W. Johnson | Inspector of Staff Inspections | 10/14/81 to 6/16/85 | African-American |
| John G.P. Doherty | Inspector of Staff Inspections | 6/17/85 to 6/6/86 | White |

| Operations/Uniformed Operations Inspectors | | | |
|---|---|---|---|
| **Name** | **Title** | **Dates of Duty** | **Race** |
| Charles E. Bryan, III | Inspector of Operations | 12/15/78 to 9/28/81 | White |
| Lawrence H. Curtis | Inspector of Operations | 10/14/81 to 4/29/83 | White |
| Donald Payne | Inspector of Operations | 5/16/83 to 8/11/85 | White |
| John W. Johnson | Inspector of Uniformed Services | 8/12/85 to 3/29/87 | African-American |
| Donald Payne | Inspector of Operations | 3/30/87 to 9/13/87 | White |
| Guy Sapp | Inspector of Operations | 9/30/87 to 12/21/88 | White |
| Preston J. Hickman | Inspector of Operations | 12/28/88 to 7/7/89 | African-American |
| Samuel D. Pratcher | Inspector of Operations | 7/3/89 to 1/7/93 | African-American |
| R. Michael Dixon | Inspector of Uniformed Operations | 2/5/93 to 9/22/95 | African-American |
| John P. Vignola | Inspector of Uniformed Operations | 11/4/95 to 3/7/97 | White |
| Keith Ash | Inspector of Uniformed Operations | 3/7/97 to 2/20/98 | African-American |
| James Stallings | Inspector of Uniformed Operations | 2/20/98 to 2/16/01 | African-American |
| James Wright | Inspector of Uniformed Operations | 2/17/01 to 10/28/05 | African-American |
| Gilbert Howell | Inspector of Uniformed Operations | 10/29/05 to present | African-American |

6

## VERIFICATION

STATE OF DELAWARE   )
                   )     SS.
NEW CASTLE COUNTY   )

William Montgomery, being duly sworn according to law, deposes and states that he has

read the foregoing Defendant City Of Wilmington's Supplemental And Amended Responses

And Answers To Plaintiff's First Set Of Interrogatories Directed To Defendants and is familiar

with the contents thereof; that the foregoing has been assembled by counsel representing

Defendant City of Wilmington, and that to the best of his knowledge, information and belief, the

foregoing Answers are true and correct.

_William S. Montgomery_
William Montgomery

SWORN TO AND SUBSCRIBED before me this _12th_ day of ~~June~~, 2007.

Notary Public
My Commission Expires: _Donna L. Kellam_

DONNA L. KELLAM
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Sept. 3, 2010

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,          )
                                 )
        Plaintiff,               )
                                 )
        v.                       ) C.A. No. 06-256 (SLR)
                                 )
JAMES M. BAKER,                  )
individually and in his          )
official capacity as the         )
Mayor of the City of             )
Wilmington; and MAYOR AND        )
COUNCIL OF WILMINGTON, a         )
municipal corporation,           )
                                 )
        Defendants.              )

            Deposition of NANCY S. DIETZ taken pursuant
to notice at the law offices of Landis Rath & Cobb, LLP,
919 Market Street, Suite 600, Wilmington, Delaware,
beginning at 10:05 a.m., on Wednesday, May 9, 2007,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff

        REBECCA L. BUTCHER, ESQUIRE
        LANDIS RATH & COBB, LLP
          919 Market Street - Suite 600
          Wilmington, Delaware 19801
          for the Defendant James M. Baker

cont'd....

                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**ORIGINAL**

1   George Collins, and he's a corporal; is that correct?

2       A.   George Collins?  Yes.  He's currently the

3   president of the FOP.

4       Q.   He was called by you based on his attendance at

5   a meeting.  How did you learn of his, I guess, attendance

6   at that meeting and statements that were made there?

7       A.   Actually, I learned about it through my

8   husband, who had spoken with him.

9       Q.   When did your husband speak with him?

10      A.   I believe it was during the St. Anthony's

11  festival.

12      Q.   Have you ever supervised Corporal Collins?

13      A.   I guess technically, yes, because now he's

14  assigned in-house duty.  He's on administrative duty.  So

15  technically right now he's assigned to Human Resources.

16  Anybody who's assigned to in-house duty falls under my

17  command.  I'm trying to think when he was in Detectives

18  if I was assigned there.  I don't believe he's ever

19  worked directly for me.

20      Q.   At the time of Inspector Stallings' retirement,

21  you were a captain, correct?

22      A.   Correct.

23      Q.   Were you still with Criminal Investigations or

24  had you moved to the Office of Professional Standards?

49

1       A.      I believe I was still in charge of Criminal

2    Investigations.

3       Q.      Did you discuss your interest in the position

4    of inspector of Uniformed Operations with the Chief at

5    that time?

6       A.      No.  I was never asked.

7       Q.      Did you discuss it with Director Mosley at that

8    time?

9       A.      No.

10      Q.      With the Mayor?

11      A.      No.

12      Q.      With Inspector Donohue?

13      A.      No.  I didn't find out about that position

14   being filled till after it was filled.

15      Q.      After it was filled did you have any

16   discussions with anyone about the reasons why

17   Inspector Wright was appointed?

18      A.      I recall that the Chief came into my office

19   when I was in charge of Criminal Investigations to inform

20   me that he wanted me to know before the word came out

21   that Inspector Wright had been selected as the new

22   inspector, and he wanted me to know that personally

23   before the information got out.  He knew that I was

24   probably going to be disappointed, but he really couldn't