IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No.06-256-SLR |
| | : | |
| MAYOR JAMES M. BAKER, | : | |
| individually and in his official capacity | : | |
| as the Mayor of the City of Wilmington, | : | |
| and the CITY OF WILMINGTON, a | : | |
| municipal corporation, | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF'S OPENING BRIEF IN SUPPORT OF
HER MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR A PRELIMINARY INJUNCTION

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: August 1, 2007                    Attorneys for Plaintiff

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Last Inspector Vacancy at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    Plaintiff is Qualified to Serve as Uniformed Operations Inspector . . . . . . . . . . . 5

        Leadership Skills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Disciplinary History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        Training and Skill Levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        Character . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        Community Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        Loyalty to Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        Knowledge of the Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    Baker Admitted Race Was a Motivating Factor in Promoting Gilbert Howell to Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.    The Wilmington Police Department Uses an Illegal Racial Quota System for All Promotions to the Rank of Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The Inception of the African-American Inspector Position . . . . . . . . . . 10

        2.    The Continued Replacement of an African-American Inspector . . . . . . . 12

        3.    The Corresponding White Inspector Position . . . . . . . . . . . . . . . . . . . . . 13

4.     The Fixed Number Quota System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

F.     Plaintiff's Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1.     Counts Two and Three - Race and Gender Discrimination. . . . . . . . . . 15

G.     Defendants' "Legitimate Non-Discriminatory Reason." . . . . . . . . . . . . . . . . . . 16

H.     Race is Taken Into Consideration for Every Promotion and Transfer within the Wilmington Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.     Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination . . . . . . . 18

J.     Fuentes Prong 1 - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case . . . . . . . . . . . . . . . . . . . . 19

K.     Plaintiff is Merely Asking to Maintain the Status Quo Until After Trial . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.     Defendants' Racial Quota System for the Rank of Inspector Violates Both the Fourteenth Amendment Equal Protection Clause and 42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.     The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.     Under the Direct Evidence Paradigm of Price Waterhouse v. Hopkins, Race Played a Motivating Role in the Denial of These Promotions . . . . 23

1.     The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.     Under a Pretext Theory Plaintiff: 1) Has Proven a Prima Facie Case That She Was Denied Two Promotions Because of Her Race and Gender; and 2) Has Sufficient Evidence of Pretext to go to the Jury Under Both Prongs 1 and 2 of Fuentes . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.     A Prima Facie Case Has Been Proven . . . . . . . . . . . . . . . . . . . . . 27

                     a.      The Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          2.      Defendants' Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

          3.      Plaintiff's Ultimate Burden . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                     a.      Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendants' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                     b.      Prong 2 - The Weight of the Evidence Demonstrates Race or Gender is the Reason Plaintiff Was Not Promoted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.     PLAINTIFF WILL BE IRREPARABLY HARMED BY DENIAL OF PRELIMINARY RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      A.     Plaintiff Will Suffer Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . 29

      B.     Irreparable Harm is Also Shown Based on the Probability of Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.    GRANTING PRELIMINARY RELIEF WILL NOT RESULT IN HARM TO INNOCENT THIRD PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    GRANTING PRELIMINARY RELIEF IS IN THE PUBLIC INTEREST . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*iii*

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

Acierno v. New Castle County, 40 F.3d 645 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 29

Brewer v. West Irondequoit Cent. School Dist., 212 F.3d 738 (2nd Cir. 2000) . . . . . . . . . 31-32

Brian B. Ex rel. Lois B. v. Com. Of Pennsylvania Dept. Of Educ.,
    230 F.3d 582 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bryne v. Calastro, 2006 WL 3208283 (3d Cir. Nov. 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 31

Elrod v. Burns, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fakete v. Aetna, Inc., 308 F.3d 335(3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27

Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . 30

Freeman v. Pitts, 503 U.S. 467 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.,
    2006 WL 1792856 (3d Cir. June 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Gratz v. Bollinger, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Grutter v. Bollinger, 539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

Hiraldo-Cancel v. Aponte, 925 F.2d 10 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

In re Lewis, 845 F.2d 624 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101(3d Cir. 1997) (en banc) . . . . . . . . . . . . . . 28

Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . 29,31

Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Lewis v. Delaware State College, 455 F.Supp.239 (D.Del. 1978) . . . . . . . . . . . . . . . . . . . . 31,33

Lomack v. City of Newark, 463 F.3d 303 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Maldonado v. Houstoun, 177 F.R.D. 311 (E.D.Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . 24,27

Messer v. Meno, 130 F.3d 130 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995) (en banc) . . . . . . . . . . . . . . . . . . . . . 24,27

Morton v. Beyer, 822 F.2d 364 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,
      290 F.3d 578 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800 (3d Cir. 1998) . . . . . . . . . . . . 31

Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1,
      -- U.S. --, 2007 WL 1836531 (June 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Ride The Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.,
      2005 WL 1583514 (3d Cir. July 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc) . . . . . . . 28

Squires v. Bonser, 54 F.3d 168 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31

Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . 24-26

Stewart v. Rutgers, The State Univ., 120 F.3d 426 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . 24,27

Taxman v. Board of Educ. of Tp. of Piscataway, 91 F.3d 1547 (3d Cir. 1996) (en banc) . . . . . 26

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . 27

Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,
      212 F.3d 157 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Walden v. Georgia-Pacific Corp., 126 F.3d 506 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 24

Weberg v. Franks, 229 F.3d 514 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Constitutions, Statutes, and Rules**

U.S. Const., Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,24

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,27

**Other Authorities**

Wright, Miller & Kane, 11A *Federal Practice and Procedure: Civil 2nd* § 2948.1 . . . . . . . . 32

## NATURE AND STAGE OF THE PROCEEDING

This is a civil action to remedy intentional racial and gender discrimination and an explicit racial quota system used by the current Mayor of the City of Wilmington which proximately led to the failure to promote plaintiff to the position of Uniformed Operations Inspector in the Police Department in February of 2001, and again in October of 2005.

The record includes depositions, declarations, interrogatory answers, various personnel records and the Complaint and Amended Answers. (D.I. 1,30-31) (hereinafter "Compl. & Ans."). The record is contained in plaintiff's appendices to her summary judgment brief. (D.I.63-64,67-68).

On July 27, 2007, both plaintiff and defendants filed their opening briefs and appendices in support of their respective motions for summary judgment. (D.I.62-70). Trial is scheduled to begin on February 11, 2008. (D.I. 15 p.4).

However, on July 31st the Inspector position at issue in this case became vacant. To preserve plaintiff's claim for instatement, she now requests a temporary restraining order and/or a preliminary injunction to keep the defendants from permanently filling this position with an innocent third party.

This is plaintiff's opening brief in support of her motion for a temporary restraining order and/or a preliminary injunction.

## SUMMARY OF THE ARGUMENT

1.  This is a promotion case seeking instatement, a legally difficult remedy to obtain since there was a sitting incumbent in the sought after position, the comparator who received the disputed position. Plaintiff expected to build a record at trial justifying the instatement remedy due to a litany of performance issues with the incumbent and the fact that his continuance in his

1

job jeopardized the public safety.  However, the comparator has suddenly retired and the City is rushing to fill the position with another individual who will not be plaintiff.  That person once installed will acquire equities as an innocent third party which will be difficult for plaintiff to overcome at trial.  Thus she will in all likelihood lose her opportunity for instatement.

2.  Plaintiff has moved to maintain the status quo, which is the fact that the Inspector position is vacant and, since the prior incumbent was chronically absent from his job, that his duties for quite some time have been performed by officers of lesser rank.  The status quo is that there is no officer permanently performing the duties of Inspector and that officers of the rank of captain have fulfilled the duties of this position since 2005.

3.  Plaintiff seeks an order, through trial and a decision on instatement, baring the defendants from permanently filling this Inspector position and allowing the Chief of Police to appoint whatever captain he wishes to act in the position temporarily, but not permanently.

4.  The legal standards for preliminary injunctive relief have been met.

5.  Eventual success on the merits is highly likely for three reasons on this fully developed post discovery record.  First, the City is operating an illegal racial quota system for the position. Second, under a direct evidence paradigm there is abundant evidence that the City is using a racial criterion to fill the position.  Third, under a pretext theory any justification the City offers for its actions fail under the weight of admissible evidence under prongs one and two of the **Fuentes** test.

6.  Under the case law the harm to plaintiff in finally losing her opportunity to lead and shape the performance of the much maligned WPD constitutes irreparable harm.  Her harm is not measured by lost pay but by the lost opportunity to serve and protect the citizens of Wilmington. Being deprived of the opportunity to advance into the upper echelon of the WPD, as well as pass

on her knowledge and skill to younger officers to help them become better officers and thus

better serve the City of Wilmington, is an intangible injury for which an award of front pay

cannot substitute.

7.  No innocent third parties will be harmed by filling the position with only an acting

officer, since no incumbent is being bumped or removed from the position.

8.  Last, the public interest is served by preserving the opportunity for instatement in a

case that cries out for a fully adequate remedy by means of instatement when the defendants have

for 29 years been openly defying the mandates of the Equal Protection Clause.  The quota in

place is the product of racial politics which have no place in our polity.

## STATEMENT OF FACTS

**A.  Plaintiff.**  Plaintiff is a 27 year veteran of the WPD. (Compl. & Ans. ¶6; A0002,20,

30[1]).  Current Chief Michael Szczerba testified that she has an impeccable professional

reputation, one of the highest order. (Szczerba 102-4; A1284).  As Chief of Staff William

Montgomery stated, "I've always had a lot of respect for her." (Montgomery 55; A0278).  She

entered the police academy in 1980 after attaining her four year Bachelor's degree from

Pennsylvania State University in Administration of Justice where she was on the dean's list.

(Compl. & Ans. ¶9; A0003,20,30).  Plaintiff moved up the ranks and was eventually promoted to

captain in 1997. (Compl. & Ans. ¶12; A0003-5,20-21,30-31).  She now serves as the

Commanding Officer of the Human Resources Division and the Police Academy.  She previously

commanded Criminal Investigations and Internal Affairs. (Compl. & Ans. ¶6; A0002,20,30).

Plaintiff was the second female officer ever promoted to the rank of captain. (Compl. & Ans. ¶7;

---

[1] All references are to Plaintiff's Sealed Appendices in Support of her Summary
Judgment Motion. (D.I.64-65,67-68).

A0002-3,20,30).  She has a noteworthy performance record, as well as numerous accolades and

commendations. (Compl. & Ans. ¶14; Szczerba Ex. 3,5,16-19; Szczerba 127-46; P170-276;

A0005,21,31,1323-32,1343-53,162-217,1290-95,40-146).

In 2005, Szczerba recommended her for promotion to Uniformed Operations Inspector as

she was the most qualified person for that job. (Szczerba 97,108-9,214-15; Compl. & Ans.

¶¶68,78; Montgomery 21,42-43; Mosley 31-32; A1282,1285,1312,13,15,25,35-36,269,275,256).

Szczerba thought plaintiff was clearly "the best candidate." (Szczerba 108; A1285).  She was

qualified for promotion both in February of 2001 and October of 2005. (Compl. & Ans. ¶¶66,76;

Baker 81; Szczerba 97,108-9,204-5; Montgomery 55-6,60; A0013,15,24-25,35-36,246,1282,

1285,1309,278-79).  However, she was denied promotion because she is a white female.

**B.  The Last Inspector Vacancy at Issue.**  In October of 2005, a  vacancy for Uniformed

Operations Inspector opened when James Wright, a black male, retired. (Compl. & Ans. ¶31;

Szczerba 200,206; Mosley 24-5; A0007,22, 32,1308,1310,254).  Plaintiff was included in the

pool of qualified candidates for this vacancy. (Szczerba 97,108-9,204-5; Baker 81; Montgomery

55-56,60; Compl. & Ans. ¶¶66,76; A1282,1285,1309,246,278-79,13,15,25,35-36).  She actively

sought promotion and was recommended to Mayor Baker for promotion by Chief Szczerba.

(Szczerba 97,214-17,221-22; Baker 65-66; Compl. & Ans. ¶¶68,78; Montgomery 21,42-43;

Mosley 25,31-32,40; A1282,1312-14,243,13,15,25,35-6,269,254-56,258).  However, Baker

appointed Gilbert Howell, a black male, instead. (Compl. & Ans. ¶31; Szczerba Ex. 12; Dietz

Ex. 20; Defendants' Inter. Resp. #1 p.3-4 and p.4-5 [2]; City's Supp. Inter. Resp. #1 p.3-7; Baker

16,149,49; Szczerba 22,27,75,96-97; Montgomery 20-2; Mosley 35; A0007,22,33,149, 1441-

42,337-38,419-20,376-80,230,238,1263-64,1282,269-70,257).  The Chief testified that Howell

---

[2] See D.I. 33 and 37.

4

was less qualified. (Szczerba 97,108-9,214-15; A1282,1285,1312).

Howell retired on July 31st creating another vacancy for the position for which plaintiff seeks instatement in this case. (See D.I.1 - Complaint Wherefore Clause - V; A0017 ) and the defendants are actively seeking to fill the position quickly. (Declaration of Nancy S. Dietz ¶3[3]).

**C.  Plaintiff is Qualified to Serve as Uniformed Operations Inspector.**  Admittedly, plaintiff is qualified for the position. (Szczerba 204-5,214; Baker 81; Montgomery 55,60; Compl. & Ans. ¶¶66,76; A1309,1312,246, 278-79,13,15,24-25,35-36).  In fact, Szczerba testified that in 2005 she was the most qualified person for the job and, in his mind, was more qualified for the position than Howell. (Szczerba 97,108-9, 204-5,213-14; A1282,1285,1309,1311-12).  Plaintiff has twice been denied promotion to Inspector in 2001 and again in 2005 when the positions were ultimately given to African-American males. (Compl. & Ans. ¶71; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Szczerba 22,64,96-7,202-5; Baker 16,18-19,49; Montgomery 19-22; Mosley 18,24,35,40; A0014,25,36,337-38,419-20,376-80,1441-42,1264,1274,1282,1309, 230-31,238,269-70,253-54,257-58).  Notably, a white female has never held the rank of Inspector. (Compl. & Ans. ¶85; Szczerba 23-24; Baker 27; Montgomery 64; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A0016,26,37,1264, 280,337-38,419-20,376-80,1441-42).

In making his recommendation for promotion, Szczerba attempted to set forth the reasons why plaintiff would make an excellent Inspector, while also pointing out to the mayor potential problems the department would face if Howell was appointed. (Szczerba 216-17,221-22; Baker 65-66,71-72; Montgomery 44-46; Mosley 32; A1312-14,242-44,275-76,256).  He explained in detail various factors explaining how plaintiff surpassed Baker's selection in terms of

---

[3]  Filed contemporaneously with Plaintiff's Motion and this Brief.

qualifications for this promotion. (Szczerba 221-22; A1313-14).  These reasons help to prove

that plaintiff is more than qualified for this position and also proves pretext.

## Leadership Skills

1. Szczerba testified that plaintiff's demonstrated leadership skills made her qualified for the job. (Szczerba 99; A1283).

2. Szczerba also explained that he recommended plaintiff for promotion to Inspector because she was the "best candidate" who he "believe[d] that the men and women [of] the WPD would best follow." (Szczerba 108; A1285).  As Szczerba testified, leadership is an important quality for the highest ranking managers to have in the WPD. (Szczerba 38; A1268).

3. One supervisor noted that "[plaintiff] sets a fine example in all aspects of police supervision" and "is a very noteworthy asset to [the] department." (Szczerba 146; Szczerba Ex. 19 p. 39[P316]; A1295,217).

## Performance

1. Szczerba testified that plaintiff's performance made her qualified for the job. (Szczerba 100,222; A1283,1314).  Plaintiff always performed her job in an exemplary manner. (Szczerba 109; Szczerba Ex. 3,5,19; A1285,1323-32,1343-53,179-217).

2. When Szczerba explained to Baker his reasons for selecting plaintiff in 2005, he pointed out that he had "firsthand knowledge and experience" in working with her and was well aware of "her work ethic." (Szczerba 222; A1314).

3. Plaintiff's last two performance evaluations for July of 2003 through June of 2004, were excellent.  She  received an overall weighted rating of 5.01 and the highest possible rating of "far above expectations." (Szczerba Ex. 3 p.9; Szczerba 30-31; A1331,1266).  As Szczerba testified, this last performance evaluation made her qualified for the job. (Szczerba 99; A1283).

4. On this same evaluation, plaintiff far exceeded expectations for undertaking self-initiated actions and projects to improve the WPD. (Szczerba Ex. 3 p.7; A1329).

5. Also, out of 14 performance factors, plaintiff received 5 of the highest rating - "far above expectations," 8 of the second highest rating - "above expectations," and 1 of the middle rating - "meets expectations." (Szczerba Ex. 3 p. 8; Szczerba 37; A1330,1267).

6. Likewise, plaintiff's performance evaluations from July of 1999 through June of 2000 also prove she is qualified.  Plaintiff received 3 of the second highest

ranking - "above expectations," and 2 of the third highest ranking - "meets expectations." (Szczerba 55; Szczerba Ex. 5 pp. 3-8; A1272,1345-50).

7.    Additionally, plaintiff received an overall weighted score of 4.07 and a rating of "above expectations," (Szczerba 54-55; Szczerba 5 p. 10; A1272,1352).

8.    In her last performance evaluation, plaintiff excelled in areas such as decision-making, problem analysis, leadership, controlling, cost/profit consciousness, outside relations, resource utilization, and self-development. (Szczerba Ex. 3 p. 8; Szczerba 37-40; A1330,1267-68).

9.    Plaintiff has consistently maintained an excellent performance record always receiving the top three ratings on her performance evaluations. (Szczerba 139-146; Szczerba Ex. 19; A1293-95,179-217). In fact, as one supervisor commented on her performance evaluation, she "gained the respect of her subordinates," "she is very much qualified to fulfill her position," "she uses good judgment in making decisions," "she's courteous to the public," and she's "loyal." (Szczerba 144-46; Szczerba Ex. 19 pp.36-39[P312-16]; A1294-95,214-17).

## Disciplinary History

1.    Szczerba testified that plaintiff's disciplinary history made her qualified for the job. (Szczerba 100,222; A1283,1314).

2.    Plaintiff has an excellent disciplinary record. (D02720-48; Szczerba 41,47,139,222; Szczerba Ex. 3 p. 6; Szczerba Ex. 19 p. 16 [P292]; A1218-46,1268,1270,1293, 1314,1328,194). In stark contrast to other individuals who have been promoted to Inspector, plaintiff's disciplinary record contains a mere 29 pages. (Szczerba 160; A1298). This record only consists of two minor infractions:

   •    January 1981 - summary punishment for failure to notify the parents of a juvenile who had been detained and failure to submit a timely report regarding this issue. (D03169; Dietz Ex. 4; Szczerba 159; A1247,1419-36,1298).

   •    September 2003 - reprimand for failure to properly care for assigned equipment when she lost her department issued pager. (Dietz Ex. 5; D03169; Szczerba 159; A1437-39,1247,1298). As an honest employee, plaintiff self reported this incident. (Dietz Ex. 5 p.3; Szczerba 159; A1439,1298).

## Training and Skill Levels

1.    Szczerba testified that plaintiff demonstrated through her training and skill levels that she was qualified for the job. (Szczerba 101,126-27, Szczerba Ex. 15;

A1283,1290,154-61). Plaintiff has always been conscientious in maintaining her training and skill levels. (Szczerba 101; A1283).

2.   Plaintiff was recommended by the WPD to attend the FBI Academy in 1987. (Szczerba Ex. 14 p. 1; A0152). Only those officers with the highest promise are chosen to attend the FBI Academy. (Szczerba 110; A1286). As Szczerba testified, the WPD only makes the recommendations to the FBI which then makes an independent decision based on the candidates record. (Szczerba 111; A1286). The FBI ultimately decided that plaintiff was qualified and deserved to attend the Academy where she performed extremely well receiving all A's and one B. (Szczerba Ex. 13 p. 1; A0150).

3.   Szczerba testified that when he explained to Baker his reasons for selecting plaintiff in 2005, he pointed out that plaintiff was a graduate of the FBI Academy. (Szczerba 222; A1314).

## Character

1.   Szczerba testified that plaintiff's character made her qualified for the job. (Szczerba 101; A1283).

2.   Additionally, Szczerba stated that the ethical qualities plaintiff demonstrated while serving as commander of Internal Affairs makes her qualified. (Szczerba 103; A1284).

## Community Involvement

1.   Szczerba testified that one of the reasons he considered plaintiff qualified was her involvement with the community. (Szczerba 107; A1285). It makes her a "full-rounded candidate." (Szczerba 108; A1285). No other WPD captain has as much community involvement as plaintiff. (Dietz 38-39; A0292).

2.   Additionally, Szczerba testified that when he explained to Baker his reasons for selecting plaintiff in 2005, he pointed out her "community involvement." (Szczerba 222; A1314).

3.   Plaintiff has an extensive background in community involvement for which she has been commended numerous times. (Szczerba Ex. 17; A0172-76). For example, in 1995, plaintiff received a commendation from then Mayor Sills for her dedication and commitment to Community Policing which led to the City of Wilmington receiving an Outstanding Achievement Award in the City Livability Awards. (Szczerba Ex. 17 p. 2; Szczerba 133; A0173,1291).

4.   Plaintiff is also active in many community outreaches and her philosophy of reaching out to the community has been reflected in the police academy which she commands. (Szczerba 107; A1285).

5.   Baker himself has presented plaintiff with awards in 2001 and 2003 for her volunteer work with the Big Brothers/Big Sisters program. (Szczerba Ex. 17 p. 3-4; Szczerba 133-35; see Baker 81; A0174-75,1291-92,246).  Baker obviously considers this an outstanding accomplishment as he has publically stated he wants police officers to be involved with the children of the community. (Szczerba 134,136; A1292).

## Experience

1.   Szczerba testified that plaintiff's experience in the various assignments she has held with the WPD makes her qualified for the job. (Szczerba 100,222; A1283,1314).

2.   Szczerba also testified that when he explained to Baker his reasons for selecting plaintiff, he pointed out her "diversified work experience." (Szczerba 222; A1314).

3.   Additionally, plaintiff has operational experience in the chain of command for Uniformed Operations Inspector. (Szczerba 118-19; A1288).

## Loyalty to Department

1.   Szczerba testified that plaintiff's loyalty to the department made her a good selection for the position. (Szczerba 98; A1283).

## Disposition

1.   Szczerba testified that plaintiff's disposition made her qualified for the job. (Szczerba 98; A1283).

## Knowledge of the Department

1.   Szczerba testified that plaintiff's knowledge of the department made her qualified for the job. (Szczerba 99; A1283).

**D.  Baker Admitted Race Was a Motivating Factor in Promoting Gilbert Howell to Inspector.**  In October of 2005, the same month Howell was appointed, Baker held a routine monthly meeting with the Fraternal Order of Police President and Vice-President. (Collins 7-8; Baker 51; Montgomery 32-33,37; A0221,239,272-73).  At this meeting, in a comment which came "out of the blue," Baker admitted to then Vice-President George Collins that while he lets

the Chief run the police department "[h]e doesn't pick who he wants to be promoted, ... he

wanted the Inspector to be black." (Collins 9,11; A0221-22). As Montgomery also testified, the

fact that Howell was an African-American was one of the factors leading to his promotion since

Baker wanted to promote diversity in the work force. (Montgomery 24-26,64; A0270,280).

Clearly, Baker's most important, if not only, consideration in appointing Howell was that he is an

African-American. Unfortunately for plaintiff, she was white and did not meet Baker's sole

criterion.

**E. The Wilmington Police Department Uses an Illegal Racial Quota System for All Promotions to the Rank of Inspector.** Historically, since 1978, the City has used a racial quota

system in promoting individuals to the rank of Inspector. Inspector is the second highest rank in

the WPD. (Compl. & Ans. ¶21; Szczerba Ex. 1; A0006,22,32,148). In the past, depending on the

time frame, there have been either three or four Inspectors within the WPD. (Defendants' Inter.

Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 21; Baker 25-26; Dietz Ex.

20; A0337-38,419-20,376-80,1263,232-3,1441-42). Currently, there are only two Inspector

positions: Investigations Operations and Uniformed Operations. (Defendants' Inter. Resp. #1

p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 21; Baker 26-27; Compl. & Ans.

¶21; Dietz Ex. 20; A0337-38,419-20,376-80,1263,233,0006,22,32,1441-42).

**1. The Inception of the African-American Inspector Position.** After the race

riots of 1968 in Wilmington (Howell 74; A1409), there were community pressures directed

toward Mayor Hal Haskell and Chief John McCool for the appointment of a black Inspector.

(Manelski 9,29-30; Manelski Ex. 1 ¶3; A321,326-27,333). As a result, in 1969 they selected

Andy Turner, an African-American, for promotion to the rank of Inspector. (Howell 75;

Manelski 30; Manelski Ex.1 ¶3; A1409,327,333). Inspector Turner was the first black ever to be

promoted to the rank of Inspector. (Manelski Ex. 1 ¶3; A0333). Upon his retirement, he was replaced by a white Inspector making all three Inspectors white again. (Manelski 30; Manelski Ex. 1 ¶3; A0327,333).

Upon Harry Manelski's ascension to acting Chief of Police in 1976, all Inspectors were white. (Manelski 9, 30-31; Manelski Ex. 1 ¶4; A0321,327,334). This fact, along with the promotion of a white captain, prompted an uproar in the black community which picketed Chief Manelski. (Manelski 31-33; Manelski Ex. 1 ¶4; A327,334). Several African-American politicians and community representatives were upset that a white was promoted to captain and made it known that "they wanted more black representation at the higher echelon of the department." (Manelski 32; A0327). Most importantly, defendant Baker who served on the City Council at that time (Baker 8; A0228), was one of the councilmembers raising these racial concerns and demanding racial balancing. (Manelski 14-15,32-33; A0323,327).

Accordingly, in 1978, a meeting was held with Mayor William McLaughlin, his chief of staff, the city solicitor, Chief Manelski, the African-American politicians, including Baker, and community representatives. (Manelski 9,14-15,34-35; Manelski Ex. 1 ¶5; A0321,323,328,334). At this meeting, it was agreed that a fourth Inspector position would be created for community relations and it would be only filled by a black. (Manelski 9-11; Manelski Ex. 1 ¶5; A0321-22,334). Thus, in July of 1978 Chief Manelski promoted Kenneth Miles, the sole African-American captain, to that job. (Manelski 10,39-40; Manelski Ex. 1 ¶5; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A0322,329, 334,337-38,419-20,376-80,1441-42). Subsequently, the WPD also promoted Stanley Friedman in 1978 and Charles Bryan in 1979 to join Eugene Maloney in the rank of Inspector, all white males. (Manelski 11; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7;

Dietz Ex. 20; A0322,337-38,419-20,376-80,1441-42).  As a result, there were now four

Inspectors, three of whom were white, and one black.  (Defendants' Inter. Resp. #1 p.3-4 and

p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A337-38,419-20,376-80,1441-42).

      **2. The Continued Replacement of an African-American Inspector.**  In 1982,

black Inspector Kenneth Miles retired and was replaced by John Johnson, another black male.

(Manelski 40-41; Manelski Ex. 1 ¶6; Szczerba 23; Defendants' Inter. Resp. #1 p.3-4 and p.4-5;

City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex.20; D03391; A0329,334,1264,337-38,419-20,376-

80,1441-42,1257).  From the time Kenneth Miles was appointed to the rank of Inspector in July

of 1978 continuing to our present day, anytime a black Inspector retires, he is automatically

replaced by another African-American. (D03391; Defendants' Inter. Resp. #1 p.3-4 and p.4-5;

City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A1257,337-38,419-20,376-80,1441-42).  This

lineage is confirmed in a chart produced by the defendants which sets forth the dates Inspectors

were hired, when they retired, and who replaced them. (D03391; A1257).  Next to each

Inspector's name is a "W" or "B" obviously pointing out the race of the Inspector. (Id.)  In every

situation, each time a black Inspector retires, another black Inspector is promoted. (Id.)  The

evidence makes it overwhelmingly clear that one Inspector position has exclusively been held by

and reserved for a black male. (D03391; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's

Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Szczerba 212; A1257,337-38,419-20,376-80,1441-

42,1311).  The chronological progression is quite telling.

| African-American Inspectors | | |
| --- | --- | --- |
| **Name** | **Promotion Date** | **Retirement Date[4]** |
| Kenneth Miles | 7/6/78 | 10/13/81 |
| John Johnson | 10/14/81 | 7/31/87 |
| Preston Hickman | 9/30/87 | 7/7/89 |
| Samuel Pratcher | 7/3/89 | 1/7/93 |
| R. Michael Dixon | 2/5/93 | 9/22/95 |
| Michael Boykin | 11/4/95 | 3/6/97 |
| Keith Ash | 3/7/97 | 2/20/98 |
| James Stallings | 2/20/98 | 2/16/01 |
| James Wright | 2/17/01 | 10/28/05 |
| Gilbert Howell | 10/29/05 | current |

(Dietz Ex. 20; D03391; A1441-42,1257).

     **3. The Corresponding White Inspector Position.**  Likewise, since 1978 anytime a white Inspector retires, he is automatically replaced by another white. (D03391; Dietz Ex. 20; A1257,1441-42).  This lineage is confirmed in the same chart produced by the defendants which shows that when a white Inspector retires, another white is promoted. (D03391; A1257).

     From 1978 to 1989, three of the four Inspector positions were consistently held by white males. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; A337-38,419-20,376-80,1441-42).  Then when Inspector Donald Payne, a white male, retired in 1987, the WPD eliminated one Inspector position, leaving only three individuals with the rank of Inspector - Charles Dougherty, William Draper, both white, and Preston Hickman, a black.

---

[4] Retirement date refers to the date of actual retirement and/or date of appointment to Chief of Police. (Defendant City of Wilmington Inter. Resp. #1 p.3 n.2; A0337).  Retirement date may not reflect the Inspector's last working day. (Plaintiff's Inter. Resp. to Baker #4 p.9 n.1; A1451; see D.I. 41A). Instead it may reflect when he was no longer on the payroll. (Id.)

(Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Szczerba 18,20-21,23; Baker 21,24; Dietz Ex. 20; A337-38,419-20,376-80,1263-64,231-32,1441-42). Subsequently, in 1989, upon Charles Dougherty's retirement, the WPD reduced the number of Inspectors to only two, William Draper, a white, and Samuel Pratcher, a black. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; Baker 25-26; A337-38,419-20,376-80,1441-42,232-33). Since 1989, one of the two remaining Inspector positions has been exclusively limited to a white male. (Szczerba 211-12; Baker 38-39; Collins 11-14; Dietz Ex. 20; A1311,236,222-23,1441-42). The chronological progression of white Inspectors is also quite telling.

| White Inspectors | | |
|---|---|---|
| **Name** | **Promotion Date** | **Retirement Date** |
| Eugene Maloney | 10/16/73 | 7/1/83 |
| Charles Bryan | 12/15/78 | 9/28/81 |
| Stanley Friedman | 4/3/79 | 6/30/83 |
| Lawrence Curtis | 10/14/81 | 4/29/83 |
| John Doherty | 1/29/83 | 6/6/86 |
| Donald Payne | 5/16/83 | 9/13/87 |
| Charles Dougherty | 7/2/83 | 6/30/89 |
| Guy Sapp | 9/30/87 | 12/21/88 |
| Richard LaFashia | 2/8/89 | 5/12/89 |
| William Draper | 5/8/89 | 10/28/94 |
| John Vignola | 10/29/94 | 3/7/97 |
| John Murray | 3/23/97 | 5/26/99 |
| Ronald Huston | 5/27/99 | 7/30/99 |
| Martin Donohue | 7/31/99 | current |

(Dietz Ex. 20; D03249,03364,03391; A1441-42,1255-57). This chart, as well as the chart

produced by defendants (D03391; A1257), illustrates that from 1978, no matter how many Inspector positions existed, if a white Inspector retired, another white Inspector was promoted.

**4. The Fixed Number Quota System.**  The two progression charts and defendants' progression chart proves plaintiff's claim that since 1978 the WPD has effectively operated under a fixed quota system where 50, 33 or 25% of the positions had to be filled by a black, while the other available positions were filled by whites.  Subsequently, when the WPD limited the Inspectors to only two in 1990, it has been operating under a fixed number quota system where 50% is reserved for whites, and the other 50% is reserved for blacks. (Szczerba 211-12; Baker 38-39; Collins 11-14; Dietz Ex. 20; A1311,236,222-23,1441-42).  As Szczerba testified he "always was aware that, within the Inspector rank, there was an African-American and a Caucasian." (Szczerba 211; see Baker 39; A1311,236).  "Whether it's four, three, or two [I]nspectors, they were never all the same race." (Szczerba 212; A1311).  Chief Manelski's testimony explains that this result was intended since the WPD purposefully created one Inspector position to be held by a black. (Manelski 9-11; Manelski Ex.1 ¶5; A0321-22,334).  Further, both Montgomery and Mosley testified that since Baker took office in 2001, the "result of the appointments" has been to maintain a racial balance of one white and one black Inspector. (Montgomery 29-30; See Mosley 41-43; See Baker 8; A0271-72,258-59,228).

Furthermore, defendants also admit that since 1997 the Uniformed Operations Inspector position has only been filled by a black male, while the Investigative Operations Inspector has only been filled by a white male. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391; A337-38,419-20,376-80,1441-42,1257).

**F. Plaintiff's Prima Facie Case.**

**1. Counts Two and Three - Race and Gender Discrimination.**  Plaintiff can

15

easily prove a prima facie case for race or gender discrimination.  She is a white female. Compl.
& Ans. ¶¶70,80; see Szczerba 214; A0014-15,25,35-36,1312).  Admittedly, plaintiff was
qualified for the position of Uniformed Operations Inspector both in 2001 and 2005. (Szczerba
204-5,214; Baker 81; Montgomery 55,60; Compl. & Ans. ¶¶66,76; A1309,1312,246,278-79,13,
15,24-25,35-36).  In fact, Szczerba testified that in 2005 she was the most qualified person for
the job and, in his mind, was more qualified for the position than Howell. (Szczerba 97,108-9,
204-5,213-14; A1282,1285,1309,1311-12).  Plaintiff was denied promotion to Inspector in  2005
when the position was given to Howell, an African-American male. (Compl. & Ans. ¶71;
Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20;
Szczerba 22,64,96-7,202-5; Baker 16,18-19,49; Montgomery 19-22; Mosley 18,24,35,40;
A0014,25,36,337-38,419-20,376-80,1441-42,1264,1274,1282,1309, 230-31,238,269-70,253-
54,257-58).

**G.  Defendants' "Legitimate Non-Discriminatory Reason."**  Baker claims he promoted
Howell because he "thought he would make a good candidate." (Baker 68; A243).  Baker stated
he received recommendations for Howell to be promoted from community members of the
Northeast section of the City, as well as from members of City Council. (Baker 72-74,68;
Szczerba 224; A0243-45,1314).  He further explained that based on a breakfast meeting he had
with Howell, he liked his ideas. (Baker 68; Mosley 39; A0243,258).  "I took him for his word in
the sense that he really wanted the position, that he was going to do the best that he could in it..."
(Baker 68; A0243).  Additionally, Szczerba testified Baker also promoted Howell because he had
"good street sense" and "street smarts." (Szczerba 218,224; Baker 70; A1313-14, 244).
Supposedly, Baker was confident in his abilities and knew his reputation. (Montgomery 25-27;
Mosley 37-39; A0270-71,258).

There were no preexisting written orders, policies, restrictions or guidelines whatsoever regarding the exercise of Baker's discretion in determining who to promote. (Baker 14-15,75-77; Szczerba 242-44; Montgomery 39-40; A0230,245,1319,274).  However, Baker has admitted to allowing diversity to play a role in promotion decisions. (Baker 33-34; Montgomery 11-14,16,62-64; A0234-35,268,280).  In fact, he encourages department decision makers to take diversity into consideration in promoting individuals. (Baker 29-35; A0233-35).  This is in direct violation of the City's affirmative action plan as well as federal and state laws concerning discrimination on the basis of race and gender. (Baker 11-13; Szczerba 227-28; A0229,1315).

**H.  Race is Taken Into Consideration for Every Promotion and Transfer within the Wilmington Police Department.**  Admittedly, race is taken into consideration for every other promotion and transfer within the WPD. (Szczerba 209; Montgomery 11-14,16; A1310,267-68).  Chief Szczerba stated that before he can make a promotion or transfer, he must report the proposed names to Public Safety Director James Mosley. (Szczerba 241; A1318).  Then Mosley reports these names to Montgomery who then gives the ultimate "go-ahead." (Szczerba 241-42; Montgomery 11,16; A1318-19,267-68).  Every time Szczerba meets with Mosley to discuss these promotions and transfers, once he discloses the names of the officers, Mosley follows up with a question about their race. (Szczerba 209; A1310).  It is the only qualifier stated. (Szczerba 208; A1310).  Further, when Mosley discusses the promotions at issue with Montgomery, diversity is considered. (Montgomery12-14,16-17; A267-68).

When asked to explain Mosley's overwhelming concern about the race of individuals, Baker stated that it has been a "standing policy for years that you try to diversify your workforce based upon the diversity of your community." (Baker 30; A234).  The City of Wilmington's plan is "to diversify all the departments at all levels." (Baker 33; see Montgomery 24; A0234, 270).

17

Thus, when two equal candidates are being considered for promotion, decision-makers are to consider the issue of diversity. (Baker 34-35; A0235).

> Q:  But in making a selection between two qualified candidates for a position, hypothetically one being white and another being black –
>
> A:  Mm-hmm.
>
> Q:  –your decision maker under your plan are not supposed to consider the race of the two candidates, are they or –
>
> A:  ...if you got two equal candidates, *they can still consider the issue of diversity, especially if you have all whites*.
>
>   * * *
>
> Q:  Right. So you're saying, for example, if two candidates are equal –
>
> A:  Yeah.
>
> Q:  – the fact of wanting to diversify the department comes into play in making a decision?
>
> A:  Oh, I think so. I think so. I think that's in any department.

(Baker 33-34; A0234-35) (emphasis added).

**I.  Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination.**  Through Baker's own admissions and the testimony of those who worked closely with him during the time the promotion decisions at issue were made, the record contains abundant evidence which a reasonable jury can accept to conclude that the denial of these two promotions were discriminatory.  Both circumstantial and direct evidence of illicit intent exists, such as:

1.  Baker admitted to then FOP Vice-President George Collins in October of 2005 that the Inspector position had to be given to a black. (Collins 9,11; A221-22).

2.  Szczerba testified that Public Safety Director James Mosley inquires into the race of every candidate for promotion and with regard to any transfers. (Szczerba 208-9; A1310).  Baker admits Mosley may be inquiring into the race of these candidates to promote diversity in the workforce. (Baker 30,37; Montgomery 24; A0234-36).

3.  Baker admits that department decision makers are to consider diversity when promoting candidates who are of equal caliber, especially when the existing positions are filled by all whites. (Baker 33-35; Montgomery 11-17; A0234-35,267-68).

4.  Baker admits that he took into consideration various recommendations from the community and City Council members in appointing Howell to Inspector. (Baker 72-74; A0244). However, Baker also admitted that the recommendations for Howell came from the northeast area of Wilmington, which is predominately black, and the City Council members who recommended Howell were all African-American. (Baker 72-74; A0244).

5.  Since 1978, there have never been Inspectors all of the same race. The WPD has historically reserved one Inspector position for an African-American male. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391; Szczerba 211; Manelski Ex. 1 ¶¶5-6; see Baker 39; A337-38,419-20,376-80,1441-42,1257,1311,334,236). Likewise, all other Inspector positions have been limited to white males. (Id). Thus, when a vacancy is created by a white male, the position is filled by another white male and when a vacancy is created by a black male, the position is automatically filled by a black male.

6.  Since 1990, when the WPD decreased the number of Inspectors to two, it has operated under a fixed number quota where 50% is reserved for whites and 50% is reserved for blacks. (Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391; A337-38,419-20,376-80,1441-42,1257,). Further, since Baker took office in 2001, this has been the consistent result of his appointments to the rank of Inspector. (Montgomery 29-30; Mosley 41-43; see Baker 8; A0271-72,258-59,228).

7.  Szczerba testified that the procedure for promoting Howell in 2005 was procedurally irregular and unprecedented. (Szczerba 207; A1310). In 2001, Szczerba was able to make a meaningful recommendation to the mayor for the promotion to Uniformed Operations Inspector. (Szczerba 202-6; A1309-10). However, in 2005, when Szczerba was going to recommend a white female for promotion to Inspector, Baker made it exceedingly clear to Szczerba, that he would be making the decision regardless of Szczerba's recommendation. (Szczerba 201-2,205; Baker 64; A1308-9,242).

8.  A white female has never held the rank of Inspector in the WPD. (Compl. & Ans. ¶85; Szczerba 23-24; Baker 27; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; Dietz Ex. 20; D03391;A0016,26,37,1264,233,337-38,419-20,376-80,1441-42,1257).

**J.  Fuentes Prong 1 - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case.**

An extremely telling **weakness** and **contradiction** in defendants' claimed reason for

promoting Howell is that Montgomery testified Baker promoted Howell to promote diversity. (Montgomery 24-26;62-64; A0270-71,280).  Montgomery admitted that Howell's race "may have been one of the factors" and Baker selected Howell, among other reasons, to "have some diversity in the work force." (Mongtomery 24-25; A0270).   "I do believe that [diversity] is one of the reasons and that's something that we look at when we look for anyone to serve in an appointed position." (Mongtomery 64; A0280).  Baker also told the then FOP Vice-President that he selected Howell because he was "black." (Collins 9,11; A0221-22).

Yet perhaps the most telling **weakness** and **contradiction** in the defendants' non-discriminatory reason for promoting Howell in 2005 is that Baker's own Public Safety Director, James Mosley, and Chief of Staff, William Montgomery, did not agree with the appointment of Howell. (Montgomery 6,10,60,65; Mosley 5,35-36,48; A0266-67,279-80,249,257,260). Additionally, the Chief of Police, whom Baker himself appointed, argued against the appointment of Howell. (Szczerba 8,193,217,221; Baker 71-72; A1260,1306,1312-13,244). These three sole advisors who met to discuss the Inspector vacancy unanimously opposed Howell. (Szczerba 193,217,220-21; Montgomery 40-41,60,65; Mosley 28,35-36; A1306,1312-13,274,279-80,255,257).  It is **implausible** that Baker promoted Howell because he was the most qualified individual in light of the fact that Mosley, Montgomery and Szczerba did not feel he deserved or was capable of serving in that capacity.

In making his recommendation for promotion, Szczerba attempted to set forth the reasons why plaintiff would make an excellent Inspector, while also pointing out to the mayor a myriad of problems the department would face if Howell was appointed. (Szczerba 216-17,221-22; Baker 65-66,71-72; Montgomery 44-46; Mosley 32; A1312-14,242-44,275-76,256).  He explained in detail various factors explaining how plaintiff surpassed Howell in terms of

qualifications for this promotion. (Szczerba 221-22; A1313-14).  These reasons help to prove

that defendants' non-discriminatory reasons for promoting Howell, as well as Wright in 2001, are

merely pretexual.

Those reasons and analysis of Howell's record are found in Plaintiff's Sealed Opening

Summary Judgment Brief which was filed on July 27th. (D.I.63 pp.20-27).

**K.  Plaintiff is Merely Asking to Maintain the Status Quo Until After Trial.**  Prior to

Howell being promoted, Szczerba warned the mayor, the mayor's chief of staff, and the public

safety director that serious problems would arise if Howell was selected. (Szczerba 221; Mosley

32-33; A1313,256).  Among these problems was Howell's excessive absenteeism. (Szczerba

221; A1313).  Szczerba warned that Howell's absenteeism would make it difficult for the

department to operate. (Szczerba 190-91; A1306).  However, he was reassured by  Montgomery

to simply have other officers "pick up the slack." (Szczerba 192-94; A1306-7).

 Howell was chronically absent in the three years prior to his promotion.(Szczerba 170-

72; Szczerba Ex. 21; A1301,1375-77).  After being promoted, he continued his pattern of chronic

absenteeism. (Szczerba 174; A1302).  Yet despite Howell's chronic absenteeism, the department

managed to function, mostly due to the fact that Inspector Donohue as well as other captains

have "picked up the slack," such as attending meetings in his absence. (Szczerba 190; A1306;

Declaration of Nancy S. Dietz ¶4).  Also, when paperwork piled up as a result of his failure to

report to work, Capt. Bobby Cummings took on the task of signing off on the paperwork so

requests could be processed. (Szczerba 191; A1306; Declaration of Nancy S. Dietz ¶5).

These facts prove the status quo can be maintained by allowing the Chief to temporarily

appoint a captain to Howell's position, since various captains have been picking up the slack for

almost two years.

## ARGUMENT

### I.   STANDARD OF REVIEW.

The test for a Temporary Restraining Order or a Preliminary Injunction is well known. Plaintiff must show a probability of success on the merits, that irreparable harm will result if relief is denied, that no innocent third parties will be injured, and that the public interest will not be harmed. Brian B. Ex rel. Lois B. v. Com. Of Pennsylvania Dept. Of Educ., 230 F.3d 582, 585 (3d Cir. 2000).

### II.   PLAINTIFF HAS SHOWN A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS.

**A.  Defendants' Racial Quota System for the Rank of Inspector Violates Both the Fourteenth Amendment Equal Protection Clause and 42 U.S.C. §1981.**

**1.  The Basics.**  "[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment [ ] also violate[s] [42 U.S.C.] §1981.  Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003); Grutter v. Bollinger, 539 U.S. 306, 343( 2003).

A "quota is a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups."  Grutter, 539 U.S. at 335 (internal punctuation omitted).  They "impose a fixed number or percentage which must be attained."  Id.  In Grutter v. Bollinger the Supreme Court explained that quotas are forbidden under the Fourteenth Amendment.  Any government attempt to set aside "some specified percentage" of a benefit for a particular racial group "merely because of its race" "amount[s] to outright racial balancing, which is patently unconstitutional."  Id. at 329-30.  A governmental hiring or promotional program which uses a quota can never be narrowly tailored and thus cannot survive the Fourteenth Amendment strict scrutiny requirements for race based classifications.  Id. at 334. "Racial balance is not to be achieved for its own sake,"  Freeman v. Pitts, 503 U.S. 467, 494

22

(1992), and Baker's "diversity" policy violates this precept.

    **2  Discussion.**  Despite the Supreme Court's admonitions to the contrary, for nearly thirty years defendants have used an explicit racial quota system at the rank of Inspector, a system that defendant Baker helped develop and institute in 1978.  As set forth in section E of the Facts above, since 1978 the City of Wilmington has operated a racial quota system which reserves a certain "fixed number or percentage," <u>Grutter</u>, 539 U.S. at 335, of Inspector positions for blacks and another for whites.  Originally, the requirement was that one of the four positions be black and the other three be white.  As review of the factual record reveals, a white never replaced a black and a black never replaced a white.  As time went on and the number of Inspectors positions were reduced to two, one was the 'black position' and the other the 'white position,' and so it has remained.

    "Racial balancing, and that is what this is, simply cannot be achieved by means of a racial classification without running afoul of the Equal Protection Clause of the Constitution." <u>Lomack v. City of Newark</u>, 463 F.3d 303, 311 (3d Cir. 2006) (creating racially diversified fire companies through involuntary transfers or denied transfer requests violates the Equal Protection Clause).  Defendants' longstanding practice of setting aside one position for whites and another for blacks is a blatant racial quota system and is "patently unconstitutional." <u>Grutter</u>, 539 U.S. at 330.  The system is simply illicit "racial politics." <u>Id.</u> at 326.  Accordingly, there is no question judgment should be entered for plaintiff on the merits of this case and a Temporary Restraining Order should issue.

   **B.  Under the Direct Evidence Paradigm of <u>Price Waterhouse v. Hopkins</u>, Race Played a Motivating Role in the Denial of These Promotions.**

    **1.  The Basics.**  There also is direct evidence that plaintiff was discriminated

against because of her race. Under the "mixed motive" or "direct evidence" framework of <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), when an employee presents "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision," <u>Id.</u> at 277 (O'Connor, J., concurring),[5] the employee no longer need satisfy the "pretext" or "indirect evidence" framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Just as the <u>McDonnell Douglas</u> evidentiary framework applies to claims brought under §1981 and §1983, <u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 432 (3d Cir. 1997), the <u>Price Waterhouse</u> framework applies as well. <u>See</u> <u>Weberg v. Franks</u>, 229 F.3d 514, 522 (6th Cir. 2000).

Once a plaintiff produces direct evidence that discriminatory animus was a motivating factor in an employment decision, the burden of proof on the issue of causation shifts, and the employer must prove that it would have made the same employment decision, even if it had not considered the illicit factor. <u>Fakete</u>, 308 F.3d at 338. The burden shifts only upon a showing that the "evidence is sufficient to permit the fact finder to infer *that a discriminatory attitude was more likely than not a motivating factor in the employer's decision*." <u>Walden v. Georgia-Pacific Corp.</u>, 126 F.3d 506, 513 (3d Cir. 1997) (internal punctuation omitted) (emphasis added). The Third Circuit, en banc, has explained that in the <u>Price Waterhouse</u> mixed motive context, "the plaintiff ... need show only that the forbidden motive *played a role*" to satisfy the "motivating factor" requirement. <u>Miller v. CIGNA Corp.</u>, 47 F.3d 586, 597 n. 9 (3d Cir. 1995) (en banc) (double emphasis added). "In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of 'but for' cause or cause in fact." <u>Starceski v.</u>

---

[5] The Third Circuit has recognized that Justice O'Connor's concurring opinion "represents the holding of the fragmented Court in <u>Price Waterhouse</u>." <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 337 n.2 (3d Cir. 2002).

Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995). Thus, if a plaintiff comes forward with direct evidence of discriminatory intent, the burden of proof shifts to the defendants.

In addition to direct evidence, certain types of circumstantial evidence also can trigger Price Waterhouse analysis. As the Third Circuit has observed, the word "'direct' is imprecise because certain circumstantial evidence is sufficient . . . if that evidence can fairly be said to *directly reflect the alleged unlawful basis for the adverse employment decision*." Fakete, 308 F.3d at 339 (internal punctuation omitted) (emphasis added). Plaintiff must be able to point to "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." Starceski, 54 F.3d at 1096. Thus, either conduct or words will suffice if they directly reflect the unlawful basis for the employment decision. This type of evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision." Fakete, 308 F.3d at 338 (internal quotations omitted).

One form of evidence sufficient to shift the burden under Price Waterhouse is "statements of a person involved in the decisionmaking process that reflect a discriminatory ... animus of the type complained of in the suit," Fakete, 308 F.3d at 339; see Starceski, 54 F.3d at 1096 (either conduct or statements suffice), such as Baker's admission his appointee had to be black.

**2. Discussion.** The direct evidence in this case is remarkable. First, Baker admitted to then FOP Vice-President Collins that he "wanted the Inspector to be black." (Collins 9,11; A0221-22). Thus, the decisionmaker's own contemporaneous words "directly reflect the [ ] unlawful basis for the adverse employment decision" not to promote plaintiff. Id.

Second, as described in Argument A above, defendants have operated a blatant racial quota system for political reasons since 1978 and, despite her overwhelming qualifications,

plaintiff was twice denied promotion when she repeatedly applied for the 'black position.' Baker's use of such a blatantly illegal tool, which he helped develop in 1978, for the sake of racial gerrymandering "directly reflect[s]" the use of race in the process. Fakete, 308 F.3d at 339.

Third, all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process) in the WPD. As both the police chief and public safety director explained, the race of the officer being promoted is always discussed. (Szczerba 207-09; Montgomery 11-14,16-17,24; A1310,267-68,268,270). Discovery also revealed an internal WPD/City document containing explicit racial tallying of individuals in Inspector positions which shows that when a white retires he is replaced by a white and when a black retires he is replaced by a black. (D03391; Dietz Ex. 20; Defendants' Inter. Resp. #1 p.3-4 and p.4-5; City's Supp. Inter. Resp. #1 p.3-7; ; A1257,1441-42,337-38,419-20,376-80). This evidence also "directly reflect[s]" the use of race in the process. Starceski, 54 F.3d at 1096.

Fourth, defendant Baker goes so far as to proudly admit and embrace a 'diversity' policy *identical* to one which the Third Circuit struck down as illegal more than 10 years ago. He admits that when two equal candidates are being considered for a position, the race of the candidate is the determinative factor. (Baker 33-35). In Taxman v. Board of Educ. of Tp. of Piscataway, 91 F.3d 1547, 1563-65 (3d Cir. 1996) (en banc), the Court held that a state actor violates the civil rights laws when he applies an affirmative action plan which results in the use of race as the determinative factor between two equally qualified individuals. But this is exactly what the City does under the code word and cloak of "diversity" whenever a black and white are equally qualified. This is blatantly illegal! As the Supreme Court recently explained, "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Parents Involved in Community Schools v. Seattle Sch. Dist.

26

No. 1, -- U.S. --, 2007 WL 1836531, *18 (June 28, 2007); see Messer v. Meno, 130 F.3d 130,

136 (5th Cir. 1997) ("Diversity programs, no matter how well-meaning, are not constitutionally

permissible absent a specific showing of prior discrimination, because 'good intentions' alone are

not enough to sustain a supposedly 'benign' racial classification.") (internal punctuation

omitted).  These admissions from defendant Baker himself, as well as other key City

policymakers, demonstrate that race at the very least "played a role" in all promotions which took

place.  Miller, 47 F.3d at 597 n.9.  They are "statements of a person involved in the

decisionmaking process that reflect a discriminatory animus of the type complained of in the

suit."  Fakete, 308 F.3d at 339.

      Once the burden of proof shifts to the defendants there is no evidence they would have

promoted Howell anyway.  Thus it is highly likely plaintiff will prevail on the merits of this

theory also.

      **C.  Under a Pretext Theory Plaintiff Will Prevail With the Jury Because of Her**
**Overwhelming Evidence of Pretext Under Both Prongs 1 and 2 of Fuentes.**

           **1.  A Prima Facie Case Has Been Proven.**  Under the first step of the three step

"pretext" or "indirect evidence" framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), and Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), the record

demonstrates that plaintiff has proven a prima facie case that she was denied promotion because

of her race and gender.  The McDonnell Douglas framework applies to claims brought under

§1983.  Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997).

           **a.  The Elements.**  In our case, plaintiff must prove the following

elements: (1) she is white or that she is female; (2) she was qualified for the position; (3) she did

not receive the promotions at issue; and (4) the positions were ultimately filled by a black or a

male.  See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996)

(en banc).  That burden has been met. (See Facts at F above).

   **2.  Defendants' Burden.**  Once plaintiff's prima facie showing is made, "the employer

[i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Id. at

1066.  Baker appears to claim that he promoted the most qualified candidate for the positions.

(See Facts at G above).

   **3.  Plaintiff's Ultimate Burden.**  "[W]hen the defendant answers the plaintiff's

prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must

point to some evidence, direct or circumstantial, from which a factfinder could reasonably either

(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan, 100 F.3d at

1067.  Here, plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at

764, which were reaffirmed twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067,

and in Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

   **a. Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies,**

**Incoherencies, and Contradictions in Defendants' Case.**  On our record, there are abundant

weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the defendants'

version of the case, such that a reasonable fact-finder will find it unworthy of belief.  (See Facts

at section J above).

   **b.  Prong 2 - The Weight of the Evidence Demonstrates Race or**

**Gender is the Reason Plaintiff Was Not Promoted.**  In the same way, the record is overflowing

with evidence from which a jury can conclude that plaintiff's race or gender is the reason she was

not promoted.  In addition to the evidence set forth in Arguments A and B above, this evidence is

set forth above in the Facts at section above. (See also D.I. 63).  So on this third legal theory

ultimate success is also highly likely.

## II.     PLAINTIFF WILL BE IRREPARABLY HARMED BY DENIAL OF PRELIMINARY RELIEF.

"[T]he touchstone of [civil rights] remedies is to make persons whole for injuries suffered

on account of unlawful employment discrimination."  Kunda v. Muhlenberg College, 621 F.2d

532, 549 (3d Cir. 1980) (internal punctuation omitted); see also Squires v. Bonser, 54 F.3d 168,

171-72 (3d Cir. 1995) (discussing the remedial requirement of make-whole relief and stating that

"the denial of a make-whole remedy must be supported by reasons which, if applied generally,

would not frustrate the central [ ] purposes of eradicating discrimination . . . and making persons

whole for injuries suffered through past discrimination.") (internal punctuation omitted).

**A. Plaintiff Will Suffer Irreparable Harm.**  To demonstrate irreparable harm, a

plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable

remedy following a trial."  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994)

(citations and internal quotations omitted).  This requirement is met only when one "cannot

adequately be compensated after the fact by monetary damages."  Adams v. Freedom Forge

Corp., 204 F.3d 475, 485 (3d Cir. 2000) (citation omitted).   Irreparable harm is that "which

cannot be repaired, retrieved, put down again, [or] atoned for."  Acierno, 40 F.3d at 653

(citations omitted); Morton v. Beyer, 822 F.2d 364, 372 (3d Cir. 1987) ("[While] [t]his Court has

recognized that the fact that the payment of monies is involved does not automatically preclude a

finding of irreparable injury[,] we have emphasized that the injury must be of a peculiar nature,

so that compensation in money cannot atone for it.").  "[T]he injury created by a failure to issue

the requested injunction must be of a peculiar nature, so that compensation in money cannot

atone for it." <u>Acierno</u>, 40 F.3d at 653 (citations and internal quotations omitted).

     From day one of this suit, plaintiff has sought to be promoted to the Inspector position which she was illegally denied. (<u>See</u> D.I.1 - Complaint Wherefore Clause - V; A0017).  Plaintiff has wanted to be police officer since childhood.  She geared her collegiate study towards becoming a police officer and has since strived to be an example to those with whom she serves and protects.  She loves her job as a Wilmington Police officer and has passed not only her knowledge and skill onto the recruits at the Academy, but also her devotion and drive to better the community. (<u>See</u> Szczerba 107; A1285).  A review of her last written performance evaluation reveals she far exceeds expectations for self initiating actions and projects to improve the policing function. (Szczerba Ex. 2 p.7; A1329).  She also excels in leadership. (Szczerba Ex. 3 p.8; Szczerba 37-40; A1330,1267-68).  Money cannot substitute for the lost opportunity to lead the Uniformed Operations of the WPD, to improve its morale, efficiency and effectiveness, and to initiate new projects.  She has worked her whole career to rise to this level and reap the intangible psychic reward of a job well done at the Inspector level.  Being deprived of this opportunity to rise into the upper echelon of the WPD, as well as passing on her knowledge and skill onto younger officers to help them become better and well-rounded and thus better serve the City of Wilmington, is an intangible injury for which an award of front pay cannot compensate her.  As the Third Circuit has stated,

> When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole.  The psychological benefits of work are intangible, yet they are real and cannot be ignored.

<u>Squires</u>, 54 F.3d at 173; <u>accord</u> <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1338 (11th Cir. 1999); <u>Hiraldo-Cancel v. Aponte</u>, 925 F.2d 10, 13 (1st Cir. 1991); <u>In re Lewis</u>, 845 F.2d 624, 630 (6th Cir. 1988).  Likewise, intangible injuries in other legal contexts have been deemed

sufficient to establish irreparable harm. <u>Pappan Enters., Inc. v. Hardee's Food Sys., Inc.</u>, 143 F.3d 800, 805 (3d Cir. 1998) (Loss of control of reputation, loss of trade, and loss of good will all constitute irreparable harm); <u>Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.</u>, 212 F.3d 157, 169 (3d Cir. 2000) (the potential damage to a company's reputation or goodwill or likely confusion between parties' marks is irreparable injury); <u>see also</u> <u>Bryne v. Calastro</u>, 2006 WL 3208283, *4 (3d Cir. Nov. 7, 2006).  Accordingly, in order to make plaintiff whole, she must be promoted to the position which she was illegally denied - the positions of Inspector in the WPD.  <u>Kunda</u>, 621 F.2d at 549; <u>Squires</u>, 54 F.3d at 171-72.

**B.  Irreparable Harm is Also Shown Based on the Probability of Success on the Merits.**  Plaintiff's strong showing of probable success on the merits of her equal protection claims that she has been deprived of her constitutional rights to be free from racial and gender discrimination is also sufficient to establish the likelihood of irreparable harm. <u>Lewis v. Delaware State College</u>, 455 F.Supp.239, 251 (D.Del. 1978).  Preliminary injunctive relief is appropriate "in cases where a deprivation of constitutional rights has been alleged and a strong probability of success on the merits has been established without requiring additional proof of irreparable harm." <u>Id.</u>; <u>see</u>  <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (The loss of First Amendment freedoms constitutes irreparable injury); <u>Maldonado v. Houstoun</u>, 177 F.R.D. 311, 333 (E.D.Pa. 1997) ("Plaintiffs can demonstrate irreparable harm based on the sole fact that they will be deprived of their constitutional right to the equal protection of law in the absence of an injunction.").

The Second Circuit has held that First Amendment constitutional violations are not the only type of constitutional violation where monetary damages may be an insufficient remedy. <u>Brewer v. West Irondequoit Cent. School Dist.</u>, 212 F.3d 738, 744-45 (2nd Cir. 2000).  In <u>Brewer</u>,

the court stated it could see no justification for a rule that equal protection violations are not also difficult to compensate monetarily. Id.  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Wright, Miller & Kane, 11A *Federal Practice and Procedure: Civil 2nd* § 2948.1, at pg. 161.  The Eastern District of Pennsylvania held in Maldonado that plaintiffs would endure irreparable harm in the absence of injunctive relief based solely on a likelihood of success on the merits of their equal protection claim. 177 F.R.D. at 333.  Thus if a plaintiff can establish that she is being denied a constitutional right, she is entitled to relief. Lewis v. Kugler, 446 F.2d 1343, 1350 (3d Cir. 1971).  Once this occurs, "it can no longer be seriously contended that an action for money damages will serve" as an adequate remedy. Id.

As discussed at length above, plaintiff is able to show a reasonable probability of success on three merits theories.  "In deciding a motion for a preliminary injunction, a district court must weigh the appropriate factors, rather than mechanically apply them." GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp., 2006 WL 1792856, *3 (3d Cir. June 29, 2006) (emphasis omitted).  However, "'the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor.'" Ride The Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc., 2005 WL 1583514, *3 (3d Cir. July 6, 2005) (quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002).  While plaintiff is able to show irreparable harm through the intangible, non-monetary losses she has endured and will continue to endure by being denied this promotion, this factor supports her probability of success on the merits.

## III.    GRANTING PRELIMINARY RELIEF WILL NOT RESULT IN HARM TO INNOCENT THIRD PARTIES.

This factor is moot in light of the fact that the Inspector position at issue is currently

32

vacant.  Therefore no innocent third party is accumulating vested rights.

## IV.    GRANTING PRELIMINARY RELIEF IS IN THE PUBLIC INTEREST.

The public interest is served by allowing plaintiff to receive her chance at being promoted to Inspector, a position that was wrongfully denied to her in direct violation of her constitutional rights.  It is not in the public interest to allow those in power to operate a racially unconstitutional quota system and to discriminate against highly qualified people by excluding them from jobs as public servants.  The public has a strong interest in seeing that constitutional rights are respected.  See Ride the Ducks, 2005 WL 1583514 at *3.  "The public interest would be disserved if such flagrant disregard for an individual's constitutional rights were tolerated for even a minimal period of time." Lewis v. Delaware State College, 455 F.Supp.at 252.  The public interest lies in allowing plaintiff her day in court to prove that she deserves this position.

## CONCLUSION

Equitable relief is more than appropriate.  The first factor, the merits, is very heavily in plaintiff's favor.  Judgment will be entered for plaintiff for three separate reasons now established after full discovery.  Measured by the psychological intangible benefits of lost leadership opportunity, irreparable harm also cannot be denied.  No innocent third party is involved, and the public interest clearly is in favor of ending the lawless use of a quota system.  Balancing all these factors results in the need for immediate injunctive relief.

A Temporary Restraining Order or Preliminary Injunction should be granted baring the defendants from permanently filling the position of Uniformed Operations Inspector until after trial and a decision instatement.  The Chief should be permitted to maintain the status quo and appoint any captain he wishes to act temporarily to fill the Uniformed Operations Inspector position.

33

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
_____
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: August 1, 2007            Attorneys for Plaintiff

34

### CERTIFICATE OF SERVICE

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

August 1, 2007, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Teresa A. Cheek, Esquire
Young, Conaway, Stargatt, & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
tcheek@ycst.com

Rebecca Butcher, Esq.
Dan Rath, Esq.
Landis, Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801
butcher@lrclaw.com

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ.**

Dietz, Nancy \ Briefs \ Dietz - TRO-PI brief.final