## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN NANCY S. DIETZ,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | FILED UNDER SEAL |
| | : | |
| **MAYOR JAMES M BAKER,** | : | **C.A.No.06-256-SLR** |
| **individually and in his official capacity** | : | |
| **as the Mayor of the City of Wilmington,** | : | |
| **and MAYOR AND COUNCIL OF** | : | |
| **WILMINGTON,** | : | |
| | : | |
| **Defendants.** | : | |

## APPENDIX TO PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT
### (A0001 - 0334)

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: July 27, 2007                    Attorneys for Plaintiff

# TABLE OF CONTENTS

**Item**                                                                                                     **Page**

Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0001

Amended Answer of Defendant City of Wilmington . . . . . . . . . . . . . . . . . . . . . . . . . . . A0019

Amended Answer of Defendant James Baker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0029

Plaintiff's Document Production

      P170-276: Commendations and letters pertaining to Capt. Dietz . . . . . . . . . . . . . A0040

      P361: Letter from Chief Sapp addressed to Nancy Dietz, dated Dec. 21. 1990 . . . A0147

Exhibits from the Deposition of Chief Michael Szczerba, Jan. 25, 2007

      Exhibit 1: WPD 2005 Organizational Chart (P090) . . . . . . . . . . . . . . . . . . . . . . . . A0148

      Exhibit 12: Office of Public Safety Promotion Announcement, Nov. 3, 2005
          (P022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0149

      Exhibit 13: Educational Records of Nancy Dietz (P317-18) . . . . . . . . . . . . . . . . . A0150

      Exhibit 14: Resume of Nancy S. Dietz (P168-69) . . . . . . . . . . . . . . . . . . . . . . . . . A0152

      Exhibit 15: Training Certificates of Nancy Dietz,
          (P327,321-23,335,337,320,319) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0154

      Exhibit 16: Commendations for Nancy Dietz
          (P170-71,179-80,200-01,183,258-59,205) . . . . . . . . . . . . . . . . . . . . . . . . . A0162

      Exhibit 17: Commendations for Nancy Dietz (P262-63,222,221,203) . . . . . . . . . . A0172

      Exhibit 18: Commendation for Nancy Dietz from Guy Sapp (P247-48) . . . . . . . . A0177

      Exhibit 19: Performance Appraisals of Captain Nancy Dietz (P277-316) . . . . . . . A0179

Deposition of George Collins, Feb. 12, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0218

Deposition of James Baker, Feb. 16, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0226

Deposition of James Mosley, Mar. 12, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0248

*i*

Deposition of William Montgomery, Mar. 12, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0264

Deposition of Capt. Nancy Dietz, May 9, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0282

Deposition of Harry Manelski, June 5, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0318

Exhibit 1: Unsworn Declaration of Harry F. Manelski . . . . . . . . . . . . . . . A0333

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,           :
                                  :
          Plaintiff,              :
                                  :
     v.                           :
                                  :
JAMES M. BAKER,                   :          C.A. No.
individually and in his official :
capacity as the Mayor of the      :
City of Wilmington; and MAYOR         :
AND COUNCIL OF WILMINGTON, a          :
municipal corporation,            :          JURY TRIAL
                                  :          DEMANDED
          Defendants.             :


## COMPLAINT

1.  This is a civil action to remedy intentional racial
discrimination and an explicit racial quota system used by the
current Mayor of the City of Wilmington, Delaware which
proximately lead to the failure to promote plaintiff to the
position of Uniformed Operations Inspector in October of 2005.
Plaintiff seeks detailed judicial inquiry under strict
scrutiny  analysis to insure that her personal right to equal
protection of the laws is upheld, that racial discrimination
odious to our nation's principles of equality is halted and an
award of compensatory and punitive damages and injunctive
relief. Defendant Baker passed Plaintiff over for promotion
because she is a white woman and that promotion was given

instead to a less qualified African-American male.

## I. <u>JURISDICTION</u>

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the Fourteenth Amendment to the U.S. Constitution. The cause of action arises under 42 U.S.C. §§ 1981 and 1983. The claim arose in this judicial district.

## II. <u>THE PARTIES</u>

3. Plaintiff is a citizen of the United States.

4. Defendant James M. Baker is currently the Mayor of the City of Wilmington, Delaware. He is sued individually and in his official capacity.

5. Defendant Mayor and Council of Wilmington (the "City of Wilmington") is a municipal corporation organized under the laws of the State of Delaware which operates the City of Wilmington Police Department(the "Police Department")as one of its municipal departments.

## III. <u>FACTS GIVING RISE TO THE ACTION</u>

### A. PLAINTIFF'S QUALIFICATIONS

6. Plaintiff is a 26 year veteran of the Police Department. She currently holds the rank of Captain and is the Commanding Officer of the Human Resources Division.

7. Plaintiff was only the second female officer in the

-2-

A0002

Police Department ever to be promoted to the rank of Captain. Currently, she is the only female holding the rank of Captain.

8.  She is a 1975 graduate of State College High School in State College, Pennsylvania.

9.  Plaintiff is a 1979 graduate of Pennsylvania State University in State College, Pennsylvania where she attained her Bachelor of Science Degree, Administration of Justice, and was on the Dean's List.

10.  She also is a 1987 graduate of the FBI National Academy at the University of Virginia in Quantico, Virginia where she had a GPA of 3.93.  The Chief of Police personally selects those officers to attend the FBI National Academy who he believes are future leaders in the  Police Department.

11.  Currently, plaintiff is enrolled in Wilmington College's Graduate Degree Program for Leadership in Administration of Justice where she has a 4.0 GPA.

12.  Plaintiff has held the following positions with the Police Department:

- Captain, Commanding Officer, Human Resources Division, 2005 to present, where she is responsible for all departmental personnel activities and supervises the Planning, Research and Budgeting Unit, Accreditation, the Training and Academy Unit.

-3-

- Captain, Commanding Officer, Office of Professional Standards, 2001 to 2005, where she was responsible for reviewing all Disciplinary matters, internal investigations and departmental shootings, administering the Substance Abuse testing and conducting ethics and discipline training.
- Captain, Commanding Officer, Criminal Investigations Division, 1997 to 2001, where she commanded two Detective platoons, the Drug, Organized Crime and Vice Unit, the Evidence Detection Unit, the Victim Services Unit, the Safe Streets Unit and served as the Department's Liaison Officer to the local and federal agencies.
- Lieutenant, Commander of Criminal Investigations Platoon, 1995 to 1997, which included supervision of a detective platoon, truancy/school investigations, and the auto theft and financial crimes unit.
- Lieutenant, Deputy Commander of Human Resources Division, 1993 to 1995, which included responsibilities for recruitment, selection and training of the police academy officers and the Accreditation and Research Unit.
- Lieutenant, Commander of Patrol Platoon in Uniformed

-4-

Services, 1991 to 1993, which included responsibilities for about 25 uniformed patrol officers.

- Sergeant, Investigator for the Office of Professional Standards, 1990 to 1991.

- Sergeant, Supervisor of Patrol Platoon Squad in Uniformed Services, 1989 to 1990.

- Patrol Officer/Detective, Investigator in the Criminal Investigations Division, 1984 to 1989.

- Patrol Officer/Detective, Investigator in the Drug, Organized Crime and Vice Division, 1981 to 1984.

- Patrol Officer, Patrol Division, 1980 to 1981.

13. Her achievements are many.

14. She is the recipient of nine Department Medals, 27 Police, Citizen and Organization Commendations and three Resolutions from the Wilmington City Council.

15. Plaintiff served as the elected past-President, Secretary and Treasurer for the F.B.I. National Academy Associates, Maryland/Delaware Chapter.

16. She was sponsored by former Chief Boykin to become a member of the International Association of Police Chiefs where she has been a member for approximately ten years.

17. Plaintiff served as Deputy Commander of the 83rd Wilmington Police Academy and in the summer of 2006 will be the

-5-

A0005

Commanding Officer of the 91st Wilmington Police Academy.

18.  She was selected by U.S. Senator Joseph Biden to serve on the Military Service Academy Selection Committee which is responsible for the selection of recruits to attend the various military academies.

19.  In 1982, plaintiff received the Kiwanis Outstanding Service Award for her undercover drug work.

### B.  THE QUOTA SYSTEM

20.  Historically, since at least 1980,the City of Wilmington has used a racial quota system in selecting qualified persons for promotion to the rank of Inspector.  This quota system has been approved by the Administrative Board of the City of Wilmington as set forth in § 4-200 of the Wilmington City Charter.

21.  Inspector is the second highest rank in the Police Department and reports directly to the Chief.  There are two such Inspectors: Investigations Operations and Uniformed Operations.

22.  The Mayor of the City of Wilmington promotes the Inspector upon the recommendation of the Chief of Police.

23.  In making these promotions the City of Wilmington has always explicitly required that one current Inspector be white and that the other be African-American.

24.  To this end the City has always followed a program in

-6-

which a certain fixed number, proportion or percentage of opportunities are reserved exclusively for certain minority groups, that is, 50% for whites and 50% for blacks.

25. The City has imposed a fixed number, proportion or percentage which always must be attained.

26. Defendant Baker has fully complied with this historic quota system.

27. He has only promoted City Police Inspectors on account of race in accord with these illegal racial quotas.

28. Martin Donahue, a white male, served as the Investigation Operations Inspector prior to defendant Baker taking office and he continues to hold this position.

29. At the time defendant Baker was elected, James Stallings, an African-American male, served as the Uniformed Operations Inspector.

30. In February of 2001, after James Stallings retired as Uniformed Operations Inspector, defendant Baker filled the vacancy by promoting James Wright, an African-American male.

31. Then in October of 2005, after James Wright retired as Uniformed Operations Inspector, defendant Baker filled the vacancy by promoting Gilbert Howell, an African-American male.

32. The Chief of the Police Department is Michael J. Szczerba who has served for over five years.

-7-

A0007

33. Previously in 2001, after African-American James Stallings retired as Uniformed Operations Inspector, because of the operation of the quota system Chief Szczerba was forced to consider only African-Americans for promotion to this position, to the detriment of plaintiff.

34. Acting pursuant to the illegal racial quota system, defendant Baker promoted James Wright, an African American to Uniformed Operations Inspector.  He refused to consider plaintiff.

35. Otherwise there would have been two white Inspectors in the Police Department since Martin Donahue already was white.

36. This would have violated the 50% white, 50% African American racial quota requirement.

37. Subsequently, in October of 2005, after James Wright retired, another vacancy for Uniformed Operations Inspector arose.  Chief Szczerba met with Baker and recommended plaintiff for this promotion.

38. But defendant Baker instead promoted an African-American male, Gilbert Howell.

39. Otherwise there would have been two white Inspectors in the Police Department since Martin Donahue already was white.

40. This would have violated the 50% white, 50% African American racial quota requirement.

-8-

41.  Shortly after plaintiff learned that she was denied this promotion, she arranged a meeting with Public Safety Director James Mosley, an African-American.  Mosley indicated to her that the Uniformed Operations Inspector has always been an African-American, while the Investigation Operations Inspector has always been white.  Consequently, the operation of the racial quota system prevented plaintiff's promotion.

42.  At this time, plaintiff first discovered that she had been the victim of racial discrimination in the 2001 promotion. Prior to this date this fact was inherently unknowable.

### E. DAMAGES

43.  As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff has and will suffer lost wages, earnings and benefits, diminished earning capacity and she will receive less pension and other benefits upon her retirement, decreased employment and earnings opportunities, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, anguish, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and injury.

### IV.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

44.  All the actions of the defendants described in the various Counts set out below were taken pursuant to policies,

-9-

A0009

practices and/or customs of the City of Wilmington and were authorized, sanctioned, implemented, permitted and ratified by officials functioning at a policymaking level.

45. By the policy, practice and/or custom of officials functioning at a policymaking level, the City of Wilmington has denied Plaintiff's constitutional rights under the Fourteenth Amendment to the United States Constitution.

46. The City of Wilmington also has a policy, practice and/or custom of delegating unfettered standardless discretion to the Mayor to appoint Inspectors. This policy has been deliberately crafted by the City of Wilmington in an unlawful attempt to shield itself from municipal liability for its unconstitutional and wrongful acts relating to employee promotions. Specifically, the policy intentionally removes municipal policy makers other than the Mayor from participation and decision-making in such personnel matters and purportedly grants exclusive authority over such decisions to the Mayor, all in a deliberate, but wholly formal and constitutionally inefficacious, attempt to insulate the municipality from responsibility for unconstitutional employee promotions. The City's formal segregation of policymaking officials on the Administrative Board from the process results by practice or custom in a de facto delegation of policymaking authority to

-10-

decisionmaking officials in this subject area.  Piercing the veil of this formal construct, the Mayor is the ultimate policymaker by policy, practice and/or custom on matters affecting promotion to the rank of Inspector.

47.  All personnel decisions made by Mayor regarding promotion to Inspector are authorized, permitted, implemented, sanctioned, ratified and approved under the above referenced policy, practice and/or custom.

48.  The individual defendant's actions violated clearly established federal constitutional rights of which any official would have known, including decades of Third Circuit case law prohibiting racial and/or gender discrimination against public employees.

49.  At all times material hereto the individual defendant participated in, authorized, and sanctioned the federal constitutional deprivations described above.

50.  At all times material hereto the individual defendant and his agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the City of Wilmington.

51.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

-11-

52.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

53.  Their actions were malicious, outrageous, wanton, and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

54.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.

55.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiff.

56.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

57.  The defendants' actions were motivated by bias, bad faith, and improper motive.

58.  The defendants' actions constitute an abuse of governmental power.

59.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

60.  The defendants' actions are not so reasonable as to

-12-

further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

## COUNT I (Illegal Quota System)

61. Plaintiff repeats and realleges paragraphs 1 - 60 set out above.

62. The defendants maintain an illegal racial quota system.

63. Plaintiff was denied promotion to the rank of Inspector in October 2005 and in 2001 because of that illegal quota system.

64. Plaintiff's right to be free of racial discrimination under the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983 has been denied.

## Count II (Promotion, Race Discrimination)

### A. PRETEXT ANALYSIS

65. Plaintiff repeats and realleges paragraphs 1-64 set out above.

66. Plaintiff was qualified for promotion to Uniformed Operations Inspector in October 2005 and also in 2001.

67. At all times material hereto she was a diligent, honest, and loyal employee who always performed her job in an exemplary manner.

68. Plaintiff sought promotion and the Chief of Police recommended her for promotion in 2005.

69. A vacancy twice existed for promotion to Uniformed

-13-

A0013

Operations Inspector.

70.  Plaintiff is white.

71.  The promotion went to a less qualified African-American on both occasions.  For example, Gilbert Howell suffers from chronic absenteeism.

72.  Any legitimate non-discriminatory reason offered by the defendants for their actions is a pretext for intentional and purposeful discrimination based on race.  Any reason offered by the defendants is unworthy of credence since plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that the defendants did not act for the asserted non-discriminatory reason.

73.  Alternatively, plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment actions was the race of the plaintiff.

74.  Plaintiff's right to be free of racial discrimination under the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983 has been denied.

**Count III (Promotion, Sex Discrimination)**

-14-

## A.   PRETEXT ANALYSIS

75.  Alternatively, plaintiff repeats and realleges paragraphs 1-64 set out above.

76.  Plaintiff was qualified for promotion to Uniformed Operations Inspector in October 2005 and in 2001.

77.  At all times material hereto she was a diligent, honest, and loyal employee who always performed her job in an exemplary manner.

78.  Plaintiff sought promotion and the Chief of Police recommended her for promotion in 2005.

79.  A vacancy twice existed for promotion to Uniformed Operations Inspector.

80.  Plaintiff is female.

81.  The promotion went to a less qualified male on both occasions.  For example, Gilbert Howell suffers from chronic absenteeism.

82.  Any legitimate non-discriminatory reason offered by the defendants for their actions is a pretext for intentional and purposeful discrimination based on sex.  Any reason offered by the defendants is unworthy of credence since plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them

-15-

unworthy of credence and hence infer that the defendants did not act for the asserted non-discriminatory reason.

83. Alternatively, plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was the sex of the plaintiff.

84. For example, approximately 85% of the City Police are males (265-270 men) and only 15% are females (25-30 women).

85. No woman has ever held the rank of Inspector in the Police Department.

86. Plaintiff's right to be free of sex discrimination under the Fourteenth Amendment and 42 U.S.C. § 1983 has been denied.

**WHEREFORE**, plaintiff prays that the Court:

I.   Enter judgment against the defendants.

II.  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional rights.

III.   Enter a judgment against the defendants for compensatory damages, including lost wages, back pay, pension and other benefits, for

-16-

future or front pay, loss of earning capacity,

emotional distress, humiliation,

embarrassment, and injury to reputation.

IV.  Enter a judgment against the individual defendant
     for punitive damages.

V.   Issue a mandatory injunction directing defendant
     Baker to promote plaintiff immediately to the rank
     of Uniformed Operations Inspector in the City of
     Wilmington Police Department.

VI.  Award front pay until plaintiff can be promoted.

VII.    Issue a reparative injunction directing that
        upon retirement plaintiff's pension and other
        benefits be calculated as if she had been
        promoted to Uniformed Operations Inspector as
        of either 2001 or 2005.

VIII. Issue a reparative injunction directing that the
      individual defendant place a signed document in
      plaintiff's personnel file indicating that she was
      qualified to be promoted to Uniformed Operations
      Inspector and that but for illegal conduct by the
      defendants she would have been promoted to that
      rank, and apologizing to plaintiff for violating
      her constitutional rights.

-17-

A0017

IX.  Enjoin the defendants from retaliating against
     plaintiff.

X.   Award plaintiff attorney's fees, costs and pre and
     post judgment interest for this action.

XI.  Require such other and further relief as the Court
     deems just and proper under the circumstances.


                    **THE NEUBERGER FIRM, P.A.**


                    /s/ Thomas S. Neuberger
                    **THOMAS S. NEUBERGER, ESQUIRE** (#243)
                    **STEPHEN J. NEUBERGER, ESQUIRE** (#4440)
                    Two East Seventh Street, Suite 302
                    Wilmington, Delaware 19801
                    (302) 655-0582
                    tsn@neubergerlaw.com
                    sjn@neubergerlaw.com

                    Attorneys for Plaintiff


Dated: April 20, 2006
DIETZ/PLEADINGS/COMPLAINT.FINAL




                              -18-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                    )
                                           )
              Plaintiff,                    )
                                           )
       v.                                   )    C.A. No. 06-256-SLR
                                           )
JAMES M. BAKER, individually and in his    )    JURY TRIAL DEMANDED
official capacity as the Mayor of the City of  )
Wilmington; and the CITY OF                )
WILMINGTON, a municipal corporation,       )
                                           )
              Defendants.                    )

**AMENDED ANSWER**

Defendant City of Wilmington ("the City"), by and through its undersigned counsel,

hereby answers the Complaint as follows:

1.      This paragraph states a legal conclusion as to which no response is required. To

the extent to which a response is deemed required, the allegations in this paragraph are denied.

2.      This paragraph states a legal conclusion as to which no response is required.

3.      Admitted.

4.      Admitted that Defendant James M. Baker ("the Mayor") currently holds the office

of Mayor of the City of Wilmington, Delaware. The remainder of this paragraph states a legal

conclusion as to which no response is required. To the extent to which a response is deemed

required, the allegations in this paragraph are denied.

5.      Denied as stated because there is no legal entity called the "Mayor and City

Council of  Wilmington"; by way of further answer, it is admitted that there is a municipal

corporation called the City of Wilmington that is organized under the laws of the State of

Delaware and that the City of Wilmington maintains a police department.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     The allegations included in the first sentence of this paragraph are admitted. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in the second sentence of this paragraph and therefore denies them.

11.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph and therefore denies them.

12.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied, except that Defendant admits the following:

- Plaintiff has been , since 2005, a Captain and the commanding officer of the Wilmington Police Department's Human Resources Division, where she was responsible for the Training Unit, the Police Academy, the Planning Unit, the Budget and Grant Unit, the Personnel Unit and the Accreditation Unit, and the Range.

- From 2001 to 2005, Plaintiff was a Captain and the commanding officer of the Office of Professional Standards, where she supervised the Investigators, the Court Liaison Officer and the Extra Job Coordinator.

- From 1997 to 2001, Plaintiff was a Captain and was assigned to the Criminal Investigations Division.

- From 1995 to 1997, Plaintiff was a Lieutenant and was assigned to the Criminal Investigations Division.

- From 1993 to 1995, Plaintiff was a Lieutenant and was assigned to the Human Resources Division.

- From 1991 to 1993, Plaintiff was a Lieutenant.

- From 1989 to 1991, Plaintiff was a Sergeant.

- From 1980 to 1989, Plaintiff was a Patrol Officer.

13. Due to the vagueness of the allegations in this paragraph, Defendant is without sufficient knowledge or information to form a belief as to their truth and therefore denies them.

14. Due to the vagueness of the allegations in this paragraph, Defendant is without sufficient knowledge or information to form a belief as to their truth and therefore denies them, except that Defendant admits that Plaintiff's personnel file includes records reflecting official commendations and expressions of gratitude for Plaintiff's services in her capacity as a member of the Wilmington Police Department.

15. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph and therefore denies them.

16. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph and therefore denies them.

17. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph and therefore denies them.

18. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph and therefore denies them.

19. Admitted.

20.     Denied.

21.     Denied as stated; by way of further answer, it is admitted that Inspector is the second highest rank in the Police Department and that there are currently two Inspector positions in the Police Department: Inspector for Investigations Operations and Inspector for Uniformed Operations.

22.     Denied as stated; by way of further answer, the Mayor appoints Police Department Inspectors pursuant to and in accordance with the provisions of the Wilmington City Code and personnel policies of the City of Wilmington and he accepts comments, suggestions and recommendations from others, including the Chief of Police, when he appoints inspectors.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Admitted.

29.     Admitted.

30.     Denied as stated; by way of further answer, it is admitted that the Mayor appointed James Wright, who is an African-American male, to the position of Inspector for Uniformed Operations after the retirement of Inspector James Stallings.

31.     Denied as stated; by way of further answer, it is admitted that the Mayor appointed Gilbert Howell, who is an African-American male, to the position of Inspector for Uniformed Operations following the retirement of Inspector James Wright.

32.     Admitted.

33.    Denied.

34.    Denied.

35.    Denied, except that it is admitted that Inspector Martin Donohue is white.

36.    Denied.

37.    Denied, except it is admitted that upon the retirement of Inspector James Wright from the position of Inspector for Uniformed Operations that position was vacant, that the Mayor met with Chief Szczerba regarding the appointment of a new Inspector for Uniformed Operations, and that Chief Szczerba favored the appointment of Plaintiff to the vacant position.

38.    Denied as stated; by way of further answer, it is admitted that the Mayor appointed Gilbert Howell, who is an African-American male, to the position of Inspector for Uniformed Operations following the retirement of Inspector James Wright.

39.    Denied, except that it is admitted that Inspector Martin Donohue is white.

40.    Denied.

41.    Denied.

42.    Defendant is without knowledge or information sufficient to form a belief as to the truthfulness of the allegations of this paragraph regarding Plaintiff's mental impressions, and therefore denies them; otherwise denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied as stated; by way of further answer, the Mayor appoints Police Department Inspectors pursuant to the provisions of the Wilmington City Code and the personnel policies of the City of Wilmington.

47.     Denied as stated; by way of further answer, the Mayor appoints Police

Department Inspectors pursuant to the provisions of the Wilmington City Code and the personnel

policies of the City of Wilmington.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Defendant repeats and realleges paragraphs 1-60 set out above.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Defendant repeats and realleges paragraphs 1-64 set out above.

66.     Admitted.

67.    Defendant is without knowledge or information sufficient to form a belief as to the truthfulness of the allegations of this paragraph and therefore denies them.

68.    Denied as stated; by way of further answer, it is admitted that Plaintiff expressed interest in appointment to the position of Inspector in October 2005 and that the Chief of Police suggested her appointment to the position of Inspector.

69.    Denied; by way of further answer, vacancies for the position of Uniformed Operations Inspector have occurred more than two times.

70.    Admitted.

71.    Denied, except it is admitted that the two individuals most recently appointed to the position of Inspector for Uniformed Operations were African-American males.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Defendant repeats and realleges paragraphs 1-64 set out above.

76.    Admitted.

77.    Defendant is without knowledge or information sufficient to form a belief as to the truthfulness of the allegations of this paragraph and therefore denies them.

78.    Denied as stated; by way of further answer, it is admitted that Plaintiff expressed interest in appointment to the position of Inspector in October 2005 and that the Chief of Police suggested her appointment to the position of Inspector.

79.    Denied; by way of further answer, vacancies for the position of Inspector for Uniformed Operations have occurred more than two times.

80.    Admitted.

81.     Denied, except it is admitted that the two individuals most recently appointed to the position of Inspector for Uniformed Operations were African-American males.

82.     Denied.

83.     Denied.

84.     Denied as stated, but it is admitted that according to the Wilmington Police Department's 2006 Agency Demographics Report, there were 265 sworn male police officers and 26 sworn female officers.

85.     Admitted.

86.     Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

All of Defendant's actions with regard to Plaintiff were taken in good faith and for legitimate non-discriminatory reasons.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim on which relief can be granted.

### THIRD AFFIRMATIVE DEFENSE

The actions and conduct of the Defendant do not rise to the level of a constitutional or statutory violation and, therefore, Plaintiff did not suffer any infringement of her constitutional rights or rights secured by a federal statute.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to punitive damages, nor is the Defendant subject to an award of punitive damages.

### FIFTH AFFIRMATIVE DEFENSE

Defendant City of Wilmington has not authorized or ratified any discriminatory actions in the appointment of Police Department Inspectors.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant exercised reasonable care to prevent and correct any discriminatory or retaliatory treatment, and Plaintiff unreasonably failed to take advantage of these preventative and corrective opportunities or to avoid harm otherwise.

### SEVENTH AFFIRMATIVE DEFENSE

The actions of Defendants are not an actual or proximate cause of any damage or harm suffered by Plaintiff.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred in whole or in part by the doctrine of after-acquired evidence. Defendant reserves the right to raise any defense that becomes known during the course of discovery in this action, including, without limitation, defenses based on the after-acquired evidence doctrine.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the statute of limitations.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of laches.

### ELEVENTH AFFIRMATIVE DEFENSE

The actions and conduct of the Defendant were consistent with the City of Wilmington's equal employment opportunity policy.

A0027

WHEREFORE, Defendant demands that the Complaint be dismissed, with costs assessed against Plaintiff.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

___/s/ _Teresa A. Cheek_____
Teresa A. Cheek, Esquire (No. 2657)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6676
Facsimile: (302) 576-3286
Counsel for Defendant City of Wilmington

Dated: February 12, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,              §
                                     §
            Plaintiff,               §
                                     §
    v.                               §       C.A. No. 06-256 (SLR)
                                     §
JAMES M. BAKER, individually and in his §
official capacity as the Mayor of the City of §
Wilmington; and the CITY OF          §
WILMINGTON, a municipal corporation, §
                                     §
            Defendants.              §

### AMENDED ANSWER

Defendant James M. Baker ("Defendant") individually and in his official capacity hereby responds to the complaint filed by Plaintiff Captain Nancy S. Dietz ("Plaintiff") as follows:

1.      The allegations contained in this paragraph state legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

### I.      JURISDICTION

2.      The allegations contained in this paragraph state legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

### II.      THE PARTIES

3.      Admitted.

4.      Admitted that Defendant currently holds the office of Mayor of the City of Wilmington. The remaining allegations contained in this paragraph state legal conclusions to which no response is required. To the extent a response is required, these allegations are denied.

5.      Denied as stated because there is no legal entity called the "Mayor and City Council of Wilmington"; by way of further answer, it is admitted that there is a municipal

572.001-15253.DOC

A0029

corporation called the City of Wilmington that is organized under the laws of the State of Delaware and the City of Wilmington maintains a police department.

## III.    FACTS GIVING RISE TO THE ACTION

### A.    PLAINTIFF'S QUALIFICATIONS

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    The allegations contained in the first sentence of this paragraph are admitted. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph, therefore these allegations are denied.

11.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied.

12.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied, except that Defendant admits the following:

> Plaintiff has held, since 2005, the rank of Captain and the position of commanding officer of the Wilmington Police Department's Human Resources Division, where she was responsible for the Training Unit, the Police Academy, the Planning Unit, the Budget and Grant Unit, the Personnel Unit, the Accreditation Unit and the Range.

> From 2001 to 2005, Plaintiff held the rank of Captain and the position of commanding officer of the Office of Professional Standards, where she supervised the Investigators, the Court Liaison Officer and the Extra Job Coordinator.

> From 1997 to 2001, Plaintiff held the rank of Captain and was assigned to the Criminal Investigations Division.

572.001-15253.DOC

**A0030**

From 1995 to 1997, Plaintiff held the rank of Lieutenant and was assigned to the Criminal Investigations Division.

From 1993 to 1995, Plaintiff held the rank of Lieutenant and was assigned to the Human Resources Division.

From 1991 to 1993, Plaintiff held the rank of Lieutenant.

From 1989 to 1991, Plaintiff held the rank of Sergeant.

From 1980 to 1989, Plaintiff held the position of Patrol Officer.

13.    Due to the vagueness of the allegations in this paragraph, Defendant is without sufficient knowledge or information to form a belief as to the truth of these allegations, therefore these allegations are denied.

14.    Due to the vagueness of the allegations contained in this paragraph, Defendant is without sufficient knowledge or information to form a belief as to the truth of these allegations, therefore these allegations are denied, except that Defendant admits that Plaintiff's personnel file contains documents reflecting official commendations and expressions of gratitude for Plaintiff's services in her capacity as an officer of the Wilmington Police Department.

15.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied.

16.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied.

17.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied.

18.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph, therefore these allegations are denied.

19.    Admitted.

## B.     THE QUOTA SYSTEM

20.     Denied.

21.     Admitted that Inspector is the second highest rank in the Police Department. Admitted that there are currently two Inspector positions in the Police Department: Inspector for Investigations Operations and Inspector for Uniformed Operations.   All allegations not specifically admitted in this paragraph are denied.

22.     Denied as stated; by way of further answer, the Mayor appoints Inspectors for the Police Department pursuant to and in accordance with the provisions of the Wilmington City Code and the personnel policies of the City of Wilmington and he accepts comments, suggestions and recommendations from others, including the Chief of Police, when he appoints Inspectors.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Admitted.

29.     Admitted.

30.     Denied as stated; by way of further answer, it is admitted that Defendant appointed James Wright, who is an African-American male, to the position of Inspector for Uniformed Operations following the retirement of Inspector James Stallings.

572.001-15253.DOC

31.    Denied as stated; by way of further answer, it is admitted that Defendant appointed Gilbert Howell, who is an African-American male, to the position of Inspector for Uniformed Operations following the retirement of Inspector James Wright.

32.    Admitted.

33.    Denied.

34.    Denied.

35.    Admitted that Inspector Martin Donahue is white.    The remaining allegations contained in this paragraph are denied.

36.    Denied.

37.    Admitted that upon the retirement of James Wright from the position of Inspector for Uniformed Operations that position was vacant.    Admitted that Defendant met with Chief Szczerba regarding the appointment of a new Inspector for Uniformed Operations and admitted that Szczerba favored the appointment of Plaintiff to the vacant position.    All allegations not specifically admitted in this paragraph are denied.

38.    Denied as stated; by way of further answer, it is admitted that Defendant appointed Gilbert Howell, who is an African-American male, to the position of Inspector for Uniformed Operations following the retirement of Inspector James Wright.

39.    Admitted that Inspector Martin Donahue is white.    The remaining allegations contained in this paragraph are denied.

40.    Denied.

41.    Denied.

42.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's knowledge contained in the first sentence of this

572.001-15253.DOC

paragraph, therefore these allegations are denied. The remaining allegations contained in this paragraph are denied.

### E[sic]. DAMAGES

43.    Denied.

### IV.    ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

44.    Denied.

45.    Denied.

46.    Denied as stated; by way of further answer, the Mayor appoints Inspectors for the Police Department pursuant to and in accordance with the provisions of the Wilmington City Code and the personnel policies of the City of Wilmington.

47.    Denied as stated; by way of further answer, the Mayor appoints Inspectors for the Police Department pursuant to and in accordance with the provisions of the Wilmington City Code and the personnel policies of the City of Wilmington.

48.    Denied.

49.    Denied.

50.    Denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

572.001-15253.DOC

**A0034**

58.     Denied.

59.     Denied.

60.     Denied.


## COUNT I (Illegal Quota System)

61.     Defendant incorporates its responses set forth in paragraphs 1 through 60 as if fully set forth herein.

62.     Denied.

63.     Denied.

64.     Denied.

## COUNT II (Promotion, Race Discrimination)

### A.     Pretext Analysis

65.     Defendant incorporates its responses set forth in paragraphs 1 through 64 as if fully set forth herein.

66.     Admitted.

67.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph, therefore these allegations are denied.

68.     Denied as stated; by way of further answer, it is admitted that Plaintiff expressed interest in appointment to the position of Inspector in October 2005 and that the Chief of Police suggested her appointment to the position of Inspector.

69.     Denied as stated; by way of further answer, vacancies for the position of Inspector for Uniformed Operations have occurred more than two times.

70.     Admitted.

572.001-15253.DOC

**A0035**

71.    Denied, except it is admitted that the two most recent appointments to the position of Inspector for Uniformed Operations have been African American males.

72.    Denied.

73.    Denied.

74.    Denied.

### Count III (Promotion, Sex Discrimination)

#### A.    Pretext Analysis

75.    Defendant incorporates its responses set forth in paragraphs 1 through 74 as if fully set forth herein.

76.    Admitted.

77.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph, therefore these allegations are denied.

78.    Denied as stated; by way of further answer, it is admitted that Plaintiff expressed interest in appointment to the position of Inspector in October 2005 and that the Chief of Police suggested her appointment to the position of Inspector.

79.    Denied as stated; by way of further answer, vacancies for the position of Inspector for Uniformed Operations have occurred more than two times.

80.    Admitted.

81.    Denied, except it is admitted that the two most recent appointments to the position of Inspector for Uniformed Operations have been African American males.

82.    Denied.

83.    Denied.

572.001-15253.DOC

84.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph, therefore these allegations are denied.

85.    Admitted.

86.    Denied.

## AFFIRMATIVE DEFENSES

87.    Plaintiff has failed to state a claim on which relief can be granted.

88.    The actions and conduct of the Defendant do not rise to the level of a constitutional or statutory violation and, therefore, Plaintiff did not suffer any infringement of her constitutional rights or rights secured by a federal statute.

89.    Plaintiff's claims are barred in whole or in part by the statute of limitations.

90.    Plaintiff's claims are barred in whole or in part by the doctrine of laches.

91.    Plaintiff is not entitled to punitive damages, nor is the Defendant subject to an award of punitive damages.

92.    Defendant's actions and conduct did not violate any clearly established constitutional or federal statutory rights of which the Defendant should have been reasonably aware, and he therefore is entitled to qualified immunity.

93.    Defendant's actions and conduct, to the extent they occurred as alleged, were undertaken in good faith performance of his official duties, without wantonness or malice, and were therefore privileged under applicable law.

94.    All of Defendant's actions with regard to Plaintiff were taken in good faith and for legitimate non-discriminatory reasons.

95.    The actions of Defendants were not an actual or proximate cause of any damage or harm suffered by Plaintiff.

572.001-15253.DOC

**A0037**

96.     The actions and conduct of the Defendant were consistent with the City of Wilmington's equal employment opportunity policy.

97.     Plaintiff's claims may be barred in whole or in part by the doctrine of after-acquired evidence.  Defendant reserves the right to raise any defense that becomes known during the course of discovery in this action, including, without limitation, defenses based on the after-acquired evidence doctrine.

WHEREFORE Defendant James M. Baker respectfully requests that Plaintiff Captain Nancy S. Dietz's complaint be dismissed in its entirety with prejudice and Defendant Baker be awarded costs, fees and such other and further relief as the Court deems appropriate.

LANDIS RATH & COBB LLP

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Attorneys for James M. Baker, individually
and in his official capacity as Mayor of the
City of Wilmington

Dated: February 14, 2007

572.001-15253.DOC

A0038

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire hereby certify that on this 14th day of February

2007, a true and correct copy of the foregoing AMENDED ANSWER was caused to be served

on the following in the manner indicated:

BY HAND-DELIVERY

Thomas S. Neuberger, Esquire
The Neuberger Firm, P.A.
2 East Seventh Street, Suite 302
Wilmington, DE  19801-3707

BY HAND-DELIVERY

Teresa Ann Cheek, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Rebecca L. Butcher, Esquire (#3816)

572.001-15494.DOC

**A0039**

# *Official* *Commendation*
## City of Wilmington



## **Delaware**
## DEPARTMENT OF POLICE

*Awarded to*

PATROLWOMAN NANCY SPELL

ON OCTOBER 10, 1982, AT 2213 HOURS, PATROLWOMAN NANCY SPELL AND HER PARTNER, WHILE ON PATROL IN THE 500 BLOCK OF GARASCHES LANE, OBSERVED A VEHICLE PARKED ALONG THE SIDE OF A CLOSED BUSINESS.  THE OFFICERS CHECKED THE VEHICLE AND FOUND IT TO BE OCCUPIED BY A MAN, A WOMAN, AND A SMALL CHILD.  FURTHER INVESTIGATION REVEALED THAT THE MALE SUBJECT HAD BROUGHT THE FEMALE TO THAT LOCATION AGAINST HER WILL AND WAS ATTEMPTING TO RAPE HER WHEN THE OFFICERS INTERVENED.

PATROLWOMAN NANCY SPELL'S ALERTNESS AND ATTENTION TO DUTY PREVENTED THE COMPLETION OF THIS RAPE AND CAUSED THE APPREHENSION OF THE PERSON RESPONSIBLE. PATROLWOMAN NANCY SPELL IS OFFICIALLY COMMENDED, IS AWARDED ONE DAY OFF, AND IS AWARDED THE DISTINGUISHED SERVICE RIBBON.

**APPROVED BY**

DENNIS P. REGAN
*CHIEF OF POLICE*



12-22-82  H.C. copies to Comm.
Book, Ribbon Book and Lieut. Monaghan.

DEPARTMENT OF POLICE

WILMINGTON  DELAWARE


DEPARTMENTAL INFORMATION

TO:        Dennis P. Regan
           Chief of Police

FROM:      Captain John G.P. Doherty
           Commanding Officer
           Patrol Division

SUBJECT:   Patrolman Dean Vietri and Patrolwoman Nancy Spell, Recommendation Pursuant
           to General Order 72-15; Departmental Award System.

DATE:      9 December 1982

Sir:

I have the honor to call your attention to meritorious actions on the part of
Patrolman Dean Vietri and Patrolwoman Nancy Spell which occurred on 10 October
1982, and was subsequently reported under complaint number 82-65293.

On 10 October 1982, at 2213 hours, Patrolman Dean Vietri and Patrolwoman Nancy Spell,
while on patrol in the 500 block of Garasches Lane, observed a vehicle parked along
the side of a closed business.  The officers checked the vehicle and found it to be
occupied by a man, a woman, and a small child.  Further investigation revealed that
the male subject had brought the female to that location against her will and was
attempting to rape her when the officers intervened.  Their alertness and atten-
tion to duty prevented a rape from occurring and resulted in the arrest of a felon.

I therefore recommend, that you convene an Inspectors' Review Board to consider
awarding Patrolman Dean Vietri and Patrolwoman Nancy Spell this Department's
"Distinguished Service Ribbon" as provided for by General Order 72-15, Section II,
Paragraph B., "When an officer on or off duty, without being dispatched, makes
or causes the apprehension of a felon during the commission of a felony for one
of the specific crimes listed below . . . B. Rape.

COMMENDATION REQUEST

Date Submitted  11 Oct. 82

Submitted by (Supervisor)  Sgt. Paul M. Cooper #54

Submitted for (Officer(s)  Ptlm. Dean Vietri and Ptlw. Nancy Spell

Incident  Attempted Rape 2nd degree     Complaint No. 82-65293

Date Occured  10 Oct. 82

Time  2213hrs.

Location  500 Block Garasches Lane, Wilm.

Officer(s) Dispatched-Yes, (No)

Officer(s) Notified by Other- Yes, (No)

Explain   On the Above date and time, Officers Dean Vietri and Nancy

Spell were on routine patrol in the 500 blk. of Garasches Lane, when

they observed a vehicle parked along side of Merkin Auto Spring Co.,

(said company was closed and the area was in complete darkness). Upon

(if additional space is needed use reverse side)

further investigation they found said vehicle to be

occupied by a man and woman and a little baby. The female was screaming

and crying. Once they were able to calm the female down they learned

that the male (Samuel L. Hicklen) had driven the victim (Shirley T.

Brooke) to the above location against her will and was in the process

of attempting to rape her when the police officers had pulled up.

As a result of there keen observation, Officers Spell and Vietri

prevented a rape from occuring.,

Commendation                    Approved

                               Denied
Attach a copy of the Incident Report.

RCS-115-9-73

| | 3 VICTIM'S RESIDENCE ADDRESS | | COMMUNITY | CITY |
|---|---|---|---|---|
| 1. POINT OF ENTRY | BROOKS, SHIRLEY | | | |
| T. ILLORAHAO | 2218 NORTH HEALD STREET, Wilm, DE | | | |
| 2 POINT OF ENTRY | 5 VICTIM RACE SEX AGE | 6. RESIDENCE PHONE | DAY | BUSINESS PHONE |
| N/A | BF NH 22 ▉▉▉▉ None | | NIGHT | N/A |

| 24. TYPE OF PREMISE | 7. WHERE VICTIM IS EMPLOYED OR SCHOOL ATTENDS   CITY | 8. VICTIM TO OFFENDER |
|---|---|---|
| Business Parking Lot | Unemployed | AQ |
| 25. NATURE OF INJURIES | 9. LOCATION OF INCIDENT (ADDRESS OR BLOCK NO.) | 10. GRID |
| Swollen Left Face | 500 Block Garasches Lane | |
| 26. WEAPONS OR MEANS OF ATTACK | 11. REPORTED DAY  DATE  TIME | 12. SECTOR | 13. COUNTY |
| Fist | Sun 10 October 82  2213 | 11 | NC |
| 27. VICTIM HOSPITALIZED - WHERE? | 14. OCCURRED DATE  DAY  DATE  TIME | 15. SUPPLEMENT CODE |
| N/A - Refused Treatment | Sun. 10 October 82 TO 2213 | |
| 28. 4-F-14 SENT   DATE | 29. GENERAL BROADCAST | 16. CRIME OR INCIDENT | 17. U.C.R. CLASSIFICATION |
| YES ☐  NO ☒ | YES ☐  NO ☒ | Attempt to commit a crime : | |

| WAS THERE A WITNESS TO THE CRIME? | IF NO, PLACE AN X IN BOX A → | A |
|---|---|---|

INDICATE RELATIONSHIP TO INVESTIGATION: W-1, W-2 WITNESS, NI NOT INTERVIEWED, RP REPORTING PERSON, PC PERSON CONTACTED, P PARENT

| CODE | 30. NAME | RACE-SEX-AGE | RESIDENCE ADDRESS | ADDRESS CONTACTED | PHONE |
|---|---|---|---|---|---|
| RP | SHIRLEY BROOKS BF 22 | | 2218 N HEALD ST, Wilm, De | 500 Blk Garasches | no Phone |

| IS THERE A SIGNIFICANT M.O. PRESENT? | IF NO, PLACE AN X IN BOX B → | B |
|---|---|---|

31. METHODS USED TO COMMIT CRIME
Above victim was driven by the below suspect to the above location involuntarily. Suspect told the victim he was going to "Fuck

34. M.O. CLASS

| IS THERE SIGNIFICANT PHYSICAL EVIDENCE PRESENT? | IF NO, PLACE AN X IN BOX C → | C |
|---|---|---|

| 32 EVIDENCE WORK PERFORMED | PERFORMED BY: | TYPE PROCESSING: |
|---|---|---|
| ☒ YES  ☐ NO  ☐ REFUSED | Mr Guirk | b Photographs / Physical Evidence |

| IS STOLEN PROPERTY TRACEABLE? | IF NO, PLACE AN X IN BOX D → | D |
|---|---|---|

| CODE | 33-1 DESCRIBE PROPERTY TAKEN | REMOVED FROM | IDENTIFICATION NO. | PROPERTY VALUE |
|---|---|---|---|---|
| | 33-2 | | | |
| | 33-3 | N | | |
| | 33-4 | A | | |
| | 33-5 | | | |
| | 33-6 | | | |

TYPE OF PROPERTY CODE... (A) Currency, Notes. etc. (B) Jewelry and Precious Metals (C) Furs (D) Clothing (E) Locally Stolen M. Veh. (F) Miscellaneous (G) Office Equip. (H) Televisions, Radios, Cameras, etc. (I) Firearms (J) Household Goods (K) Consumable Goods (L) Livestock (M) Bicycles (N) No Property Stolen (P) Pending Stolen Property (R) Any Two-way Radios, or Equipment attached thereto Except Aerials (S) Marine Equipment.

| 39. VALUE DAMAGED | 40. VALUE RECOVERED | 41. VALUE STOLEN |
|---|---|---|
| N/A | N/A | N/A |

| CAN SUSPECT BE NAMED? | IF NO, PLACE AN X IN BOX E → | E |
|---|---|---|

| 42. SUSPECT 1. NAME | 43 SUSPECT 2. NAME |
|---|---|
| Samuel L Hicklen (ARRESTED) — Att. Rape II, Kidnap II | |

| CAN SUSPECT BE (F) LOCATED, (G) IDENTIFIED, OR (H) IDENTIFIED? | IF NO, PLACE AN X IN BOX F, G, AND/OR H | F |
|---|---|---|
| BMNH; 9-4-54, dept #A06716, 1305 | | G |
| Dunbar Ct; (LSW: Brown Sweater, Tan | N | H |
| Cords; Blk Leather Jacket, Blk Belt | A | |

| CAN SUSPECT VEHICLE BE IDENTIFIED? | IF NO, PLACE AN X IN BOX I → | I |
|---|---|---|

| 44. REGISTRATION NO. STATE | YEAR | MAKE | BODY MODEL | COLOR(S) | IDENTIFYING CHARACTERISTICS OF VEHICLE |
|---|---|---|---|---|---|
| 162537  DE | 74 | Plymouth | Duster | Blue w/ wt stripes around same | |

| CAN CRIME BE SOLVED WITH A REASONABLE AMOUNT OF INVESTIGATIVE EFFORT? | IF NO, PLACE AN X IN BOX J | J |
|---|---|---|

| CODE | 45. CONTINUATION OF ABOVE ITEMS |
|---|---|
| 31 | - her" and fondled her breast and vaginal area. When victim told |
| 31 | - the suspect she would not "fuck him", suspect punched the |
| 31 | - victim in the face and dragged her out of the vehicle. Incident |
| 31 | - stopped upon the arrival of these officers |
| 16 | to wit. Rape 2nd degree ; 11/531  Kidnap 2nd degree, 11/783 |
| A2 | Penny Loafers ; brown socks, wt gold ring w/Clear Eye |

| ONE OF TWO SOLVABILITY FACTORS PRESENT IN REPORT | 46. REPORTING OFFICER  NO  DIV | 48. STATUS | | IF FOLLOW-UP SOLVABILITY FACTORS SHOULD BE INVESTIGATED | YES-FOLLOW UP | YES-CLOSED | FIELD ST | PC DECISION |
|---|---|---|---|---|---|---|---|---|
| | Nancy Spell 23/358 Pat. | ☒ ARREST ADULT | | | | | ☐ | ☒ |
| | 47. REPORTING PERSONS SIGNATURE | ☐ UNFOUNDED  ☐ ARREST JUV | | C | | | | |
| | Dean Vietri 23/275 Pat. | ☐ PENDING ACTIVE  ☐ EXCEPT. CLEAR | | | | | | |
| | | ☐ PENDING INACTIVE  ☐ SERVICE-CLEAR | | | | | | |

DOC # 45-06-78-06-06   DPD-601

P173

A0043

On 11C while on routine patrol traveling east in the 500 block of Yaroschis Lane, observed the above suspect vehicle parked in the parking lot of 501 Yaroschis Lane (Aitkin Auto Spring). Same vehicle was approximately 100 yards north of Yaroschis Lane and 20 yards east of afore-mentioned business. Same location was completely dark (no outside lighting was present) The rear of said vehicle was facing Yaroschis Lane. These officers, after passing the vehicle, turned our vehicle around, and then proceeded north on the business's drive way approaching the vehicle with our spot light directed at the rear of suspect vehicle. At that time, these officers observed the above victim and suspect standing by the passenger door outside of the vehicle. As these officers approached the vehicle more closely, the above suspect walked quickly around the rear of the vehicle, opened the drivers door, and seated himself in the drivers seat. These officers, after stationing our vehicle behind the suspect vehicle, advised the suspect and the victim to place their hands on the vehicle hood. Above victim placed her hands on the vehicle hood. Above suspect exited the vehicle and also placed his hands on the suspect vehicle. Both suspects and victim were then approached by these officers and frisked for any possible

DOC. # 45 06 78 06 09   DSP 6017

RECORDS

P174

A0044

**CONTINUATION SHEET**

| 18 PAGE 3 OF 6 | 2 COMPLAINT NO. 82-65293 | 46 INVESTIGATING OFFICER Speel / Vietri |
|---|---|---|

weapons. This writing officer, at that time, spoke to the victim, while, Officer Vietri spoke to the above suspect. Officer Vietri, at that time, asked the suspect "What are you doing here". Above suspect replied "We're just talking." Vietri then stated "why is she crying?" (after pointing at the victim) Suspect stated "We just had a disagreement" This writing officer, while approaching the victim, observed that the victim was hysterically screaming and crying. Victim was screaming "He tried to RAPE me." "He hit me because I wouldn't do anything" This officer attempted numerous times to calm the victim down with negative results. This officer, at that time, relayed the victim's statements to Officer Vietri. Hicklen (suspect) was consequently advised that he was under Two-hour detention; was handcuffed; and was advised by Vietri of his constitutional rights two times in succession. Hicklen stated that he did understand his rights. This officer, then, advised Central that we had a possible attempted rape and requested a unit to transport the suspect 16C (Sults and DeHart) responded, at which time, the suspect was placed inside their police vehicle. Officer Vietri again asked Hicklen what had happened and, further stated that the victim's story conflicted with his (suspect)

DOC # 45-06-78 06 09    DSP: 6077

RECORDS

story. Hicklen replied "We were going to DO IT."
Victri stated "What do you mean 'DO IT'?"
Suspect then said "You know - DO IT." Officer
Victri then replied "You mean, with the
baby in the back?" Hicklen then stated
"Well, we were going to do it in the front seat
or on the ground." Hicklen was then transported
to Central by UC, Officer's Jubb and D Hart.
It should be noted, when these officers
approached the suspect vehicle, we observed
a small child (later identified as the victims
child) lying on the vehicle rear seat crying.

Above victim was eventually calmed down
at which time, this officer again asked the
victim what had happened. Victim stated that
the above suspect had driven her and her child
to the 7-11 store and then later drove to the above
location and parked his vehicle. According to
the victim, she then asked the suspect what he
was doing, at which time, the suspect stated
he was going "Fuck her." Victim stated that
she told the suspect she wouldn't "Fuck him",
however the suspect began moving his hands
over her breasts and vagina/area. Victim
claims that she then scratched the suspects
neck, following which, the suspect, using his
right fist, punched the victim. Twice on the
left side of her head. Victim further stated that

DOC = 45 06 78 06 09   DSP 6017

Hickman then exited the vehicle, traveled to the passenger side door, opened same door and grabbed the victim by the neck of the coat and proceeded to drag her out of the car. Victim Brooks stated that the suspect then observed these officers and stopped dragging her and that Hickman told Brooks "We were just talking, right?" Brooks stated she was very scared and did not say anything further to the suspect. Victim further claimed that the suspect had bought marijuana and was smoking a "joint" previous to the aforementioned incident. Aforementioned suspect vehicle was searched by these officers. Located in the vehicle ashtray was one (1) partially burnt rolled cigarette containing a green plant-like material. Same cigarette was taken into custody by Officer Victor. Suspect vehicle was then towed by "B&F Towing" to Old Airport Rd (vehicle held). Impound Form 009871 was completed. Aforementioned partially burnt cigarette was tagged as evidence at Central and placed in the Drug Locker in Records Division in the presence of Lt Hickman.

At Central, written statements were taken by Det J Ingram, in the presence of these officers. For further detail, see same statements and added reports. At Central, above suspect was

P177

A0047

DEPARTMENT

**CONTINUATION SHEET**

| TIB PAGE 6 OF 2 | 2 COMPLAINT NO 87-65X13 | INVESTIGATING OFFICER W White |
|---|---|---|

booked on the above charges. No auto were signed by victim. Suspect was also booked A.O. on Poss of Marijuana. EDU officer, McGuirk responded to the scene and took photographs. At Central, McGuirk also took photographs of the suspects' neck and took fingernail clippings and scrapings from the victim.

It should be noted that Sgt. Paul Cooper (C-2) was notified relative to the investigation, responded to the scene, and later transported Officer Victor and the victim to Central.

Relative to suspect written statement, Hicklen denied all aforementioned accusations.

Suspect was also 10-29P and was booked on a Criminal Mischief Warrant under 82-65307

# *Official Commendation*

# City of Wilmington



# Delaware

## DEPARTMENT OF POLICE

*Awarded to*

PATROLWOMAN NANCY A. SPELL

ON MAY 25, 1983, PATROLWOMAN NANCY A. SPELL AND HER PARTNER RESPONDED TO A REPORTED HEART ATTACK AT 907 KING STREET. THEY DISCOVERED THE VICTIM, A 73-YEAR OLD MAN, IN FULL CARDIAC ARREST. THE OFFICERS INITIATED CARDIOPULMONARY RESUSCITATION AND CONTINUED IT UNTIL RELIEVED BY A PARAMEDIC UNIT. THE PROMPT AND EFFICIENT ACTION OF THESE OFFICERS REVIVED THE VICTIM AND ENABLED HIM TO RECEIVE NECESSARY CARE. PATROLWOMAN NANCY A. SPELL IS OFFICIALLY COMMENDED, IS AWARDED ONE DAY OFF, AND IS AWARDED THE MERIT AWARD RIBBON.



**APPROVED BY**

*Dennis P. Regan*

DENNIS P. REGAN
*CHIEF OF POLICE*

8-23-83 H.C. copies to Comm. Book, Ribbon Book and Capt. Monaghan.

DEPARTMENT OF POLICE

WILMINGTON  DELAWARE

<u>MEMORANDUM</u>

TO:      Dennis P. Regan
         Chief of Police

FROM:    *Capt. John Doherty*
         Captain John G. P. Doherty
         Commanding Officer
         Patrol Division

SUBJECT: Patrolman Dean Vietri and Patrolwoman Nancy Spell; Recommendation
         Pursuant to General Order 72-15, IV (a)

DATE:    14 June 1983

Sir:

    I have the honor to call your attention to meritorious service performed
by Officers Vietri and Spell on 25 May 1983, and to recommend that they be
awarded the "Merit Award Ribbon" as provided for by the captioned General
Order.

    This recommendation is based upon the following event:

    At 0730 hours on 25 May 1983, Officers Vietri and Spell responded to a
reported heart attack at 907 King Street.  They were the first emergency unit
to arrive.  They discovered the victim, a seventy-three (73) year old man, in
full cardiac arrest.  Officers Vietri and Spell immediately started C.P.R.
and continued it until relieved by a paramedic unit.  The victim was revived
and lived until 27 May 1983.

    Dr. Cynthia M. Pronko and Nurse Lorraine Donahue of the Code Blue Team,
who worked on the victim when he arrived at the Wilmington Medical Center,
Delaware Division, stated that the victim would have had no chance to survive
at all but for the prompt and efficient actions of Officers Vietri and Spell.

    I therefore request the convention of an Inspector's Review Board to
consider this recommendation.

JGPD/ld

| | Inspector | Commend. | Day off | Ribbon |
|---|---|---|---|---|
| 1. | DePayne | ✓ | ✓ | ✓ |
| 2. | EJM | ✓ | | ✓ |
| 3. | Daugherty | ✓ | ✓ | ✓ |

**P180**

**A0050**

COMMENDATION REQUEST

Date Submitted _31 MAY 83_

Submitted by (Supervisor) _SGT. JAMES STRAWBRIDGE_

Submitted for (Officer(s) _PTLW. NANCY SPELL_
_____ _PTLM. DEAN VIETRI_

Incident _LIFE SAVING C.P.R._    Complaint No. _No Report_
                                                    _SUBMITTED_
Date Occured _25 MAY 83_

Time _____0730_

Location _VINCENTS BARBER SHOP   907 KING STREET_

Officer(s) Dispatched-Yes, No _____YES_

Officer(s) Notified by Other- Yes, (No) _____

Explain _ON WEDNESDAY, 25 MAY 83 11C, PTLW. SPELL AND_
_PTLM. VIETRI RESPONDED TO VINCENT'S BARBER SHOP, 907_
_KING STREET ON A REPORTED HEART ATTACK. 11C ARRIVED_
_PRIOR TO THE N.C.C. PARA-MEDIC UNIT. SPELL AND VIETRI_

Brief Description (if additional space is needed use reverse side)
_UPON THEIR ARRIVAL, IMMEDIATELY STARTED_
_C.P.R. ON THE VICTIM   JEROME WEBER, WM 2-26-10, OF_
_1761 WEST 10TH STREET (ANTONIAN CENTER). AFTER THE_
_PARA-MEDIC UNIT ARRIVED   MR. WEBER WAS TURN-OVER_
_FOR FURTHER TREATMENT AND TRANSPORTED TO THE DEL._
_DIV. E.R. MR. WEBER SURVIVED UNTIL 27 MAY 83 0515_
_HOURS._
     _MRS. LORRAINE DONAHUE, HEAD NURSE AT THE DEL._
_ER WAS CONTACTED AND STATED THAT THE OFFICERS_

Commendation                    Approved

                                Denied
Attach a copy of the Incident Report.

RCS-115-9-73

AT LEAST A FIGHTING CHANCE OF SURVIVAL AND HE PROBABLY WOULD NOT LIVED THE EXTRA TIME.

PTLW. SPELL AND PTLM. VIETRI'S ACTION IS WELL DESERVING OF A DEPARTMENTAL COMMENDATION BUT IT IS REQUESTED THAT THEY ALSO BE CONSIDERED FOR A DAY OFF AND A DEPARTMENTAL RIBBON FOR THEIR LIFE SAVING ACTION.

— DR. CYNTHIA M. PRONKO, A RESIDENT AT THE DELAWARE DIVISION, WHO ASSISTED IN THE TREATMENT OF MR. WEBER STATED THAT THE OFFICERS ACTION WERE OUTSTANDING AND WAS D. FRIENDLY LIFE SAVING. MR. WEBER WOULD NOT HAVE SURVIVED IF THEY HAD NOT PERFORM C.P.R FOR THE ADDITIONAL TWO DAYS.

PATROLWOMAN NANCY A. SPELL, CURRENTLY ASSIGNED TO THE PATROL DIVISION OF THE WILMINGTON DEPARTMENT OF POLICE, HAS BEEN SELECTED TO RECEIVE THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982. PATROLWOMAN SPELL IS SINGLE, AND RESIDES IN WILMINGTON.

PATROLWOMAN SPELL IS A GRADUATE OF THE PENNSYLVANIA STATE UNIVERSITY, AND HOLDS A BACHELOR OF SCIENCE DEGREE IN ADMINISTRATION OF JUSTICE. SHE WAS APPOINTED TO THE DEPARTMENT OF POLICE ON JANUARY 14, 1980. UPON THE COMPLETION OF HER POLICE ACADEMY TRAINING SHE WAS ASSIGNED TO THE PATROL DIVISION.

FROM APRIL THROUGH SEPTEMBER OF 1981, PATROLWOMAN SPELL WAS ASSIGNED TO WORK UNDERCOVER WITH THE DRUG, ORGANIZED CRIME AND VICE DIVISION. AS A DIRECT RESULT OF UNDERCOVER DRUG BUYS MADE BY HER DURING THIS TIME PERIOD, SEVENTY (70) PERSONS WERE ARRESTED FOR THE ILLEGAL SALE OF DRUGS. HER WORK ALSO RESULTED IN THE SEIZURE OF $83,540 WORTH OF ILLEGAL DRUGS, INCLUDING HEROIN, COCAINE, METHAMPHETAMINES AND MARIJUANA.

ALTHOUGH NOW ASSIGNED TO THE PATROL DIVISION, PATROLWOMAN SPELL HAS CONTINUED TO ASSIST ON UNDERCOVER DRUG INVESTIGATIONS WHEN NEEDED. SHE HAS ALSO ASSISTED GREATLY IN THE DEPARTMENT'S RESPONSE TO PROSTITUTION ACTIVITY IN THE CITY. HER UNDERCOVER WORK IN THIS AREA HAS RESULTED IN THE ARREST OF MANY INDIVIDUALS ON CHARGES OF PATRONIZING A PROSTITUTE, AIDING IN THE CONTROL OF THIS ACTIVITY.

PATROLWOMAN SPELL HAS BEEN TRAINED AS A HOSTAGE NEGOTIATOR, AND FUNCTIONS IN THIS CAPACITY ON THE DEPARTMENT'S CRISIS MANAGEMENT TEAM. SHE HAS CONDUCTED THREE SUCH NEGOTIATIONS TO DATE, THE MOST NOTABLE BEING THAT WHICH OCCURRED ON APRIL 29, 1982 IN CANBY PARK. ON THAT DATE A WOMAN ARMED WITH A RIFLE HELD POLICE OFFICERS AT BAY FOR OVER TWO HOURS BEFORE SURRENDERING.

PATROLWOMAN NANCY SPELL DISPLAYS INITIATIVE AND DEDICATION IN HER WORK, BRINGING CREDIT TO HERSELF AND TO THE DEPARTMENT OF POLICE. HER CONTINUED EXCELLENT PERFORMANCE CERTAINLY MAKES HER DESERVING OF THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982.

# *Official Commendation*

# City of Wilmington



# **Delaware**
## **DEPARTMENT OF POLICE**

### *Awarded to*

PATROLWOMAN NANCY SPELL

ON JANUARY 24, 1984 PATROLWOMAN NANCY SPELL AND HER PARTNER RESPONDED TO A
DWELLING IN THE 600 BLOCK OF WEST SIXTH STREET TO HANDLE A DOMESTIC DISPUTE.
WHILE THERE, THE OFFICERS DEVELOPED INFORMATION FROM THE FEMALE COMPLAINANT
CONCERNING A PURSE SNATCH ROBBERY THAT HER EX-BOYFRIEND HAD SUPPOSEDLY
COMMITTED.  THE TWO OFFICERS FOLLOWED UP ON THIS INFORMATION AND, IN CON-
JUNCTION WITH DETECTIVES, WERE ABLE TO IDENTIFY THE MAN IN CONNECTION WITH
A ROBBERY THAT HAD OCCURRED ON DECEMBER 28, 1983 IN THE UNIT BLOCK OF WEST
SEVENTH STREET.  THIS SUBJECT WAS SUBSEQUENTLY LOCATED AND ARRESTED ON A
CHARGE OF ROBBERY IN THE FIRST DEGREE.

PATROLWOMAN NANCY SPELL'S ATTENTION TO DETAIL IN THIS INVESTIGATION RESULTED
IN THE ARREST OF A FELON AND CLEARED A ROBBERY.  PATROLWOMAN NANCY SPELL IS
OFFICIALLY COMMENDED.

**APPROVED BY**

*Dennis P Regan*

DENNIS P. REGAN
*CHIEF OF POLICE*



5-30-84 H.C., copies to Comm.
Book and Capt. Monaghan.

P184

A0054

COMMENDATION REQUEST

Date Submitted _15 FEB 84_

Submitted by (Supervisor) _SGT. DAVID R. ANDERSON #11_

Submitted for (Officer(s)) _PTLW. NANCY SPELL AND PTLM. CHARLES_
_____ _SAMMONS._

Incident _ROBBERY 1ST_        Complaint No. _83-79667_

Date Occured _28 DEC 83_

Time _0042 HOURS_

Location _UNIT BLK. W. 7TH STREET_

Officer(s) Dispatched-Yes, No _NO_

Officer(s) Notified by Other- Yes, No _NO_

Explain _____

_____

_____

_____

                    (if additional space is needed use reverse side)
Brief Description _ON 24 JAN 84, PTLW. SPELL AND PTLM.G. SAMMONS_
_RESPONDED TO 626 W. 6TH STREET ON A DOMESTIC. WHILE TALKING_
_TO THE FEMALE, SHE STATED THAT HER BOYFRIEND WAS A_
_ROBBER. THE OFFICERS QUESTIONED HER AND LEARNED THAT_
_MICHAEL R. DORSEY HAD BEAT UP A WOMAN, RIGHT AFTER_
_CHRISTMAS AND TAKEN HER MARROON PURSE. THE OFFICERS_
_THEN RESEARCHED HER STATEMENTS AND FOUND THE_
_ROBBERY 1ST OF PATRICIA GREEN UNDER 83-79667. THE_
_OFFICERS THEN NOTIFIED DET. STALLINGS OF THIS (OVER)_

Commendation                    Approved

                                Denied
Attach a copy of the Incident Report.

RCS-115-9-73

| | |
|---|---|
| 20. PERSON NOTIFIED/CRIMINAL INVESTIGATION | 21. REFER TO: |
| Sgt. R. Hargrove | Det. Div |
| 22. POINT OF ENTRY | 23. SCHEDULED INTAKE DATE |
| N/A | N/A |
| 24. TYPE OF PREMISE | |
| City Street | |
| 25. NATURE OF INJURIES | |
| Possible broken nose | |
| 26. WEAPONS OR MEANS OF ATTACK | |
| Physical Force - Fist | |
| 27. VICTIM HOSPITALIZED - WHERE? | |
| Refused | |

1. VICTIM'S NAME (LAST-FIRST-MIDDLE) (FIRM NAME OR BUSINESS)
2. COMPLAINT NO.
3. VICTIM'S RESIDENCE ADDRESS — COMMUNITY — CITY
2 Bedford Dr.  Coatesville PA

4. VICTIM'S RACE-SEX-AGE  5. RESIDENCE PHONE  BUSINESS PHONE
W.F.N.H.  384 1491  ☐ DAY ☐ NIGHT  Unk.

6. WHERE VICTIM IS EMPLOYED OR SCHOOL ATTENDS — CITY
Stetson Middle School  West Chester

7. VICTIM TO OFFENDER
ST

9. LOCATION OF INCIDENT (ADDRESS OR BLOCK NO.)  10. GRID
Unit blk W 7th St ( A )

11. REPORTED DAY DATE TIME
Wed. 28 Dec 83, 0042 hrs

12. SECTOR 16  13. COUNTY 16-E

14. OCCURRED DAY DATE TIME — DAY DATE TIME
Wed. 28 Dec 83, 0042 hrs

16. SUPPLEMENT CODE

28. 4-F-14 SENT ☐ YES ☐ NO  DATE N/A  29. GENERAL BROADCAST ☒ YES ☐ NO #163  16. CRIME OR INCIDENT
Robbery 1st  11/832  17. U.C.B. CLASSIFICATION

WAS THERE A WITNESS TO THE CRIME? — IF NO, PLACE AN X IN BOX A — **A**
INDICATE RELATIONSHIP TO INVESTIGATION: W-1, W-2 WITNESS, NI NOT INTERVIEWED, RP REPORTING PERSON, PC PERSON CONTACTED, P PARENT

| CODE | 30. NAME | RACE-SEX-AGE | RESIDENCE ADDRESS | ADDRESS CONTACTED | PHONE |
|---|---|---|---|---|---|
| RP | | #4 | | #5 | #6 |
| | Sgt. Anderson | | | | |

IS THERE A SIGNIFICANT M.O. PRESENT? — IF NO, PLACE AN X IN BOX B — **B** ☒
31. METHODS USED TO COMMIT CRIME
Suspect struck the victim in the face area with his
fists while taking her handbag from her
34. M.O. CLASS

IS THERE SIGNIFICANT PHYSICAL EVIDENCE PRESENT? — IF NO, PLACE AN X IN BOX C — **C**
32. EVIDENCE WORK PERFORMED  PERFORMED BY:  TYPE PROCESSING:
☒ YES ☐ NO ☐ REFUSED  E.D.U. Boes  Latent Printing

IS STOLEN PROPERTY TRACEABLE? — IF NO, PLACE AN X IN BOX D — **D**

| CODE | 33-1 DESCRIBE PROPERTY TAKEN | REMOVED FROM | IDENTIFICATION NO. | PROPERTY VALUE |
|---|---|---|---|---|
| F | 1 Ladies Handbag, Leather type | Interior/Veh | — | $80.00 |
| A | 33-2 U.S.C approx $1.00 | Handbag | — | 1.00 |
| G | 33-3 Calculator, make, model unk. | Handbag | — | 20.00 |
| | 33-4 Numerous credit cards with | Calculator Holder | — | |
| F | 33-5 1-Men's Leather Wallet, brown in | Handbag | — | $30.00 |
| A | 33-6 U.S.C approx $20.00 | Wallet | — | 20.00 |

TYPE OF PROPERTY CODE — (A) Currency, Notes, etc. (B) Jewelry and Precious Metals (C) Furs (D) Clothing (E)
Locally Stolen M. Veh. (F) Miscellaneous (G) Office Equip. (H) Televisions, Radios, Cameras, etc. (I) Firearms (J)
Household Goods (K) Consumable Goods (L) Livestock (M) Bicycles (N) No Property Stolen (P) Pending Stolen
Property (R) Any Two-way Radios, or Equipment attached thereto Except Aerials (S) Marine Equipment.

39. VALUE DAMAGED 0  40. VALUE RECOVERED 0  41. VALUE STOLEN $151.00

CAN SUSPECT BE NAMED? — IF NO, PLACE AN X IN BOX E — **E** ☒

| 42. SUSPECT 1. NAME | 43. SUSPECT 2. NAME |
|---|---|
| Unk. | |

CAN SUSPECT BE (F) LOCATED, (G) DESCRIBED, OR (H) IDENTIFIED? — IF NO, PLACE AN X IN BOX F, G, AND/OR H — **F** ☒
B.M. 20 yrs, 5'5", slim built dk complex  **G**
wearing short burgundy ski jacket  **H** ☒
N.F.D. victim can possibly identify

CAN SUSPECT VEHICLE BE IDENTIFIED? — IF NO, PLACE AN X IN BOX I — **I** ☒
44. REGISTRATION NO. STATE  YEAR  MAKE  BODY MODEL  COLOR(S)  IDENTIFYING CHARACTERISTICS OF VEHICLE  **K**
Unk.  Unk.  Unk.

CAN CRIME BE SOLVED WITH A REASONABLE AMOUNT OF INVESTIGATIVE EFFORT? — IF NO, PLACE AN X IN BOX J — **J**

CODE  45. CONTINUATION OF ABOVE ITEMS
33-1 Maroon in color, with (2) maroon straps attached to same, N.F.D.
33-3 held with brown vinyl casing, 3"x2" in size
33-4 both victim and husband, Richard name on same, U.S.A,
Mastercard, American Express and etc.

ONE OF THE SOLVABILITY FACTORS PRESENT ON REPORT
46. REPORTING OFFICER  NO.  DIV  48. STATUS  ☐ NO OFFICE  ☐ NO-BUT, FOLLOW-UP NEEDED  ☐ YES-FOLLOW-UP  ☐ YES-CLOSED  FIELD SUPVR. DECISION
Ptln. J. Law 27/252 EPH  ☐ ARREST-ADULT  IF FOLLOW-UP - SOLVABILITY FACTORS SHOULD BE INVESTIGATED?  ☐ OFFICE FOLLOW-UP CLOSED
47. REPORTING PERSONS SIGNATURE  ☐ ARREST-JUV.
Ptln. F. Pyle 27/254 E.P.H.  ☐ UNFOUNDED  ☐ PENDING ACTIVE  ☐ EXCEPT. CLEAR  49. REVIEWER  RCMS /35
 ☐ PENDING INACTIVE  ☐ SERVICE CLEAR

Red 1774 / 28 Dec 83  DOC. # 45-06-78/06 /06  DSP 6014
Stallings / 4 X 12  E.T. Palmatary

CRIMINAL INVESTIGATION

33-5) color, containing.

33-7) numerous type Credit Cards (V.I.S.A-MASTER CARD, Gasoline Credit cards)

33-8) Numerous bottles of prescription medicines with victim's name on same (located in handbag)

Green, who was intoxicated, stated that she had just left the bar at 7th Market St and entered her parked veh, 77 Chev, PA 6D2-026, in the unit blk W 7th St. The above suspect then approached the veh from an unk direction and open the driver's side door, where Green was seated. The suspect requested from Green if she had change for $5.00; Green replied, "No" and started to re-close the door. At this point, the unk subject re-open the door and started to reach across Green in an effort to get to her handbag located on the passenger side of the front seat. As the suspect started to take the handbag, Green reached for same to stop him, at which time a struggle ensued between the two. In an effort to get Green to let go of the handbag, the suspect struck her in the face area with his fist approx (4) times calling her "bitches" in the process. Green then advises that she became enraged and in turn struck the suspect several times as he forced

the hand bag from her grasp.

The suspect was eventually able to get the handbag from Green, leaving behind (1) handle strap, torn from the handbag, during the struggle. Said strap was discovered on the exterior of the veh, laying in the street.

Area search by these Officers and additional units proved neg. for any suspect(s) or proceeds.

These Officers then transported Green to 94-Del relative to a complaint of possible broken nose. While at the Del, this unit responded to another complaint to assistance on a burglary in process. Upon returning to same, these Officers were advised by hospital personnel that Green had became irrate and left without being treated. These Officers unable to show victim possible photographs due to her leaving the hospital.

L-5, Sgt. Hargrove was notified relative to the above.

DOC. # 45-06-78/06/09   DSP-6017

CRIMINAL INVESTIGATION

SUPPLEMENT REPORT

18. Page 1 of 2

19. DATE TIME THIS REPORT
24 Jan 84    00

2. ARRESTEE VICTIM (LAST, FIRST)
Green Patrica

82. NAME (LAST, FIRST)

Complaint No. 83-191607

3. ADDRESS
2 Bedford Drive Wilmington

83. ARREST NO.

[X] ADDED INFO.  [X] FOLLOW - UP

14. DATE — TIME OF ORIGINAL INCIDENT
28 Dec 84    0042

41. ADDITIONAL STOLEN
N/

84. OFFENSE CHANGED FROM
N/A

15. SUPPLEMENT CODE

28. 4 F-14 SENT    DATE
YES [ ] NO [ ]

SUP. SENT
YES [ ] NO [ ]

40. ADDITIONAL RECOVERED
A

16. CORRECT OFFENSE
Robbery 1st

17. U.C.R. CLASSIFICATION
W

SOLVABILITY
FACTOR CODES

A - WITNESS
B - M.O.

C - PHYSICAL EVIDENCE
D - TRACEABLE PROPERTY

E - NAMED SUSPECT
F - LOCATED SUSPECT

G - DESCRIBED SUSPECT
H - IDENTIF. SUSPECT

I - VEHICLE ID
J - SOLVED WITH REAS. EFFORT

SOLVABILITY FACTORS FOR INVESTIGATION

FROM CRIME INVESTIGATION REPORT

NARRATIVE: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION. REPORT ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT. DESCRIBE AND RECORD THE VALUE OF RECOVERED PROPERTY. LIST THE NAME, RECORD NUMBER AND DESCRIPTION OF PERSONS ARRESTED. EXPLAIN CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY.

CODE

These officers responded to 124 W. 6th St on a trespasser complaint. Upon arrival, we spoke to a Terissa Redden. BF 16 years old who resides at that location. Redden was complaining about her ex-boyfriend Michael R. Morey, who was attempting to get in her house and would not leave Redden alone. After speaking to the complainant for several minutes, she mentioned something about knowing that Michael had stolen a purse last month. Redden stated that in late December in the early morning hours, Morey came to her residence and had in his possession a maroon long shaped woman's purse. Morey, according to Redden, was intoxicated and was going through the purse and had stated that he stole same. Redden stated that she saw a license in the purse that had a photograph of a white female, blonde hair, late 30's-40's. Morey told Redden that the female was in a bar

SOLVABILITY FACTORS

ELIMINATED BY INVESTIGATION
NO.    DIV.

DEVELOPED BY INVESTIGATION

46. REPORTING OFFICER
Mauli 23/381 Patrol

48. STATUS
[ ] UNFOUNDED
[ ] PENDING- ACTIVE
[ ] PENDING- INACTIVE

[ ] ARREST- ADULT
[ ] ARREST- JUV.
[ ] EXCEPT. CLEAR
[ ] SERVICE CLEAR

REMAINING FOR INVESTIGATION

49. SUPERVISOR APPROVING
SSA Howe 101/141

DOC #45-06-78 06 06 DSP 6016

CRIMINAL INVESTIGATION

P189

A0059

before he stole her purse. These officers later responded to Detective Division to relay same and spoke to Det Stallings. Upon checking the Rundown Book on felonies, we located Case # 83-79607 relative to a Robbery 1st in the unit block W 7th St. Victim was a white female, blonde hair, late 30's. According to the report, V' had left Oscars Bar on the mall and was getting in her car when the suspect fought and punched her several times and then fled with her purse. Victims purse was described as mauve in color w/ two straps. Suspect was described as a Bm 5'5" thin build, 20 years old.

Upon checking Ident, we located the suspect arrest card ident # 48823. Michael R. Dorsey is a Bm, 5'5"; 125 lbs and fit the above discription. (2509 West St - residence) All the above information was relayed to Det Stallings.

W- Teressa Redden ; BFNH ; 16yrs; 626 W 6th St ; 656-0410

S- Michael R Dorsey ; BMNH ▮▮▮▮▮▮ ident # 48823 ; 2509 West St. 5'5"; 125 lbs.

DOC. # 45-06-78/06/09   DSP-6017

CRIMINAL INVESTIGATION

P190

A0060

# WILMINGTON DEPT. OF POLICE — ARREST REPORT

| 13. CAR NO. | 12. SECTOR | 94. MO CLASS | 1. DEFENDANT'S NAME | 18. PG. 1 OF |
| W 310 | 14 | | Dorsey Michael R | 2. CASE NO. 83-79667 |

| 9. LOCATION OF ARREST | | N S NE NW<br>E W SE SW | 3. DEFENDANT'S ADDRESS | 85. ARREST NO. |
| 2509 West Street | | | 2509 West Street | |

| 24. DESCRIBE TYPE OF PREMISE | 7. PLACE OF EMPLOYMENT | 87. OCCUPATION | 86. IDENT. NO. |
| Dwelling | Unemployed | NA | 48823 |

| 44. VEH. INVOLVED | REG. | STATE | YEAR | 6. RES. PHONE | BUS. PHONE | 10. RPTG. AREA |
| | NA | | | 762-5619 DAY NIGHT | NA | |

| 66. HOLD PLACED ON VECHILE | 65. VEH. TOWED TO | 89. ALIAS OR NICKNAME | 90. PLACE OF BIRTH | 17. CLASSIFI-CATION |
| ☐ YES ☐ NO | | none | | |

| 95. DEFENDANT'S MONEY, PROPERTY | RECEIPT NO. | 4. RACE, SEX, ETHNIC ORIG. | 92. HEIGHT | WEIGHT | HAIR | EYES | COMPLEXION |
| | | B M | 5-8" | 140 | BLK | BRN | med |

| 96. DEFENDANT SEARCHED BY | DATE | TIME | 22. SCARS, MARKS, TATTOES | ☐ RIGHT ☐ LEFT HANDED |
| | | | NONE | |

| 97. DATE/TIME BOOKED | 98. BOOKING OFFICER | 16. CHARGE | TITLE/SECTION | COURT WARRANT NO. |
| | | Robbery 1st | 11832 | MK WS-7784 |

| 99. TRANSPORTING OFFICER | 46. ARRESTING OFFICER | 47. SECOND OFFICER |
| LT Donald Palmatary | G. Stallings 10/165 | NA |

| 42. SECOND OFFICER | 93. PLACE OF CRIME | 14. DATE OF CRIME | 41. DATE/TIME OF ARREST |
| Jean Jones | Unit Blk W 7th Street | 08DEC83 | 11FEB84 |

| 100. VICTIM/COMPLAINANT | ADDRESS | RES. PHONE | BUS. PHONE |
| Patricia Green 2 Bedford Drive Coatsville Penna | | | NA |

| 30. WITNESS | ADDRESS | RES. PHONE | BUS. PHONE |
| Teressa Ricks 626 W 6th Street | | | NA |

| 101. NAME OF PARENT/GUARDIAN/NEXT OF KIN NOTIFIED | DATE/TIME | OFFICER |
| | NA | |

| 102. NEAREST RELATIVE/NEXT OF KIN<br>☐ SPOUSE ☐ FATHER ☐ BROTHER<br>☒ MOTHER ☐ SISTER ☐ OTHER | NAME | ADDRESS | PHONE |
| | Leola Brown | 2509 West Street | 762-5619 |

45. NARRATIVE

(11) 1945 hr

The above subject was booked on a municipal
court warrant signed 10 FEB 84 by the victim Patricia
Green for the above charge. For further details see
the detective investigative report.

RIGHT THUMB PRINT

| 103. WARRANT CHECK<br>☒ CLUES<br>☐ NCIC | ☐ POS.<br>☒ NEG. | 104. DATE OF LAST PHOTO<br>8/82 | 105. PHOTO TAKEN<br>☐ YES ☐ NO | 49. SUPERVISOR |

CRIMINAL INVESTIGATION

DEPARTMENTAL INFORMATION

TO: Dennis P. Regan, Chief of Police

FROM: _Ptl. _____ Hozewski_

SUBJECT: CMT Operation - 82-24068

DATE: 30 April 82

Sir;

The following is an account of the Crisis Management operation conducted at 1900 Prospect Rd., Canby Park, on 29 Apr 82.

At 2010 hours on 29 Apr 82 the Communications Unit received a call from an unknown female caller at 1900 Seneca Rd. The caller stated that she had received a call from her friend, Darcus Covilli of 1900 Prospect Rd. Covilli told her friend that she had a fight with her husband Dan. She further stated that she was armed and intended to kill Dan if he walked through the door.

At this point F19 Ptlm. J. Fogelgren and F2 Sgt. P.K.Smith responded to the area. A visual inspection of the premises revealed that the person in question was armed with an unknown type rifle. According to Sgt. Smith, the entrance to Canby Park was secured and attempts to locate Daniel Covilli were begun.

On the arrival of the watch commander, Lt. Guy Sapp, the decision was made to activate the Crisis Management Team. Several CMT. members were on-duty and responded to begin preparation for their specific functions. Ptlm. C.Adams responded with basic Swat equipment. Ptlm. R.Ayala of the Hostage Negotiation Team responded to the scene in order to make initial verbal contact.

Prior to the arrival of the remainder of the CMT, Lt. Sapp directed the evacuation of people located in the homes which were in the fire zone.

Ptlm. Ayala established telephone contact, however, the suspect refused to talk by telephone. She eventually threw the phone out of the house.

At approximately 2116 hours the command post was finalized and CM operations were begun. Present at the command Post were Captain John Doherty, Inspectors Lawrence Curtis and Eugene Maloney, Chief of Police Dennis P. Regan and Mr.

DEPARTMENTAL INFORMATION

TO: _____

FROM: _____

SUBJECT: ____Page 2_____

DATE: _____

David Singleton.

At 2136 hours Ptlm. Ayala and Sgt. Fletcher reported that the suspect was pointing a weapon out of the window. At this point Capt. Doherty informed "All" SWAT units that they had a red Light. The red light order remained in effect for the remainder of the operation. SWAT spotters continued to report that the suspect was constantly moving from the front of the house to the rear. They also reported she was drinking heavily. At one point the suspect began a line of communications with officers in the rear of the dwelling. This communication only lasted a few moments and then was discontinued.

At 2146 hrs. Capt. Doherty instructed Negotiators J.Tucker and N.Spell to again attempt phone contact. After letting the phone ring for several minutes, however, Ptlm. Ayala reported that the suspect stated she would not answer the phone. This maneuver was then discontinued.

At 2148 hours Capt. Doherty instructed Sgt. R. Kilmon to explore the possibility of moving civilians into Fraims Boys Club if the need arose.

At 2152 hours Central advised the CP that Paramedic units and State Police K-9 Units were on stand-by in the area.

The decision was next made to switch primary negotiators. Officer Spell was moved into position. The communications team began setting up a phone hook up between the negotiators and the CP. Several minutes later the hook up was operative. During the course of negotiations it was reported that the suspect was asking to see or speak to a female known as Angie. Angie was present at the CP.

At 2203 hours it was reported that the suspect was more talkative and that

TO:_____

FROM:_____

SUBJECT:____Page 3_____

DATE:_____

Officer Spell seemed to be making progress.

At 2206 hrs. Angie was moved into a position by Officer Ayala which allowed the suspect visual contact with her. This seems to be a critical point since it was next reported that the suspect was observed crying. Due to the emotional state of both Angie and the suspect, Angie was pulled back from sight.

Following the removal of Angie the negotiators reported the suspect was asking questions about what would happen to her if she came out. During the next several minutes the negotiators felt the situation was deteriorating since the suspect was observed pointing the weapon at herself. A suicide attempt was feared.

At 2234 hours the supect was observed opening the front door and then going back inside. This back and forth continued until 2237 hours when the suspect walked out of the house unarmed and surrendered to Officer Spell. The crime scene investigation was turned over to the Detective Division and the CMT operation was secured.

At 2330 hours a debriefing was conducted in the Dtective Division conference room. Problems discussed which need ironing out include:

1) Revamping of the call out procedure for the CMT. Communications will be provided with an updated list. It was decided that when a CMT member learns of a situation, he/she will respond regardless if they were notified or not.

2) Increased SWAT turnout and the straightening out of the SWAT locker.

3) Training of all possible personnel (CMT) in communications hook up procedures.

TO: _____

FROM: _____

SUBJECT: ___Page 4_____

DATE: _____

4) Re-training of Patrol personnel on the importance of perimeter functions.

Capt. Doherty also instructed Ptlm. J.Randolph to ivestigate ways to deal

with animals (4 legged type) who interfere in CMT operations.

The debriefing was concluded with the general consensus that it was another

fine job done by all.

4-0.

A0065

Case 1:06-cv-00256-SLR — Document 75-2 — Filed 09/01/2007

| 18. | 19. DATE OF REPORT | 2. VICTIM'S NAME (LAST, FIRST, MIDDLE) OR NAME OR BUSINESS | 1. COMPLAINT NO. |
|---|---|---|---|
| PAGE 1 OF 2 | 29 APRIL 82 | COVELLI , DARCUS | 82- 24068 |

| 20. PERSON NOTIFIED IN CRIMINAL INVESTIGATION | 21. REFERRED TO: | 3. VICTIM'S RESIDENCE ADDRESS | COMMUNITY | CITY |
|---|---|---|---|---|
| | | 1900 PROSPECT DRIVE | WILM | |

| 22. POINT OF ENTRY | 23. SCHEDULED INTAKE DATE | 4.VICTIM'S RACE-SEX-AGE | 5. RESIDENCE PHONE ☐ DAY ☐ NIGHT | ☐ BUSINESS PHONE |
|---|---|---|---|---|
| NA | NA | WF 27 | 6525354 | NA |

| 24. TYPE OF PREMISE | 7. WHERE VICTIM IS EMPLOYED OR SCHOOL ATTENDS  CITY | 8. VICTIM TO OFFENDER |
|---|---|---|
| DWELLING | NA | NA |

| 25. NATURE OF INJURIES | 9. LOCATION OF INCIDENT (ADDRESS OR BLOCK NO.) | 10. GRID |
|---|---|---|
| NA | 1900 PROSPECT DRIVE | 25 3001740 |

| 26. WEAPONS OR MEANS OF ATTACK | 11. REPORTED DAY DATE TIME | 12. SECTOR | 13. COUNTY |
|---|---|---|---|
| NA | THURS 29 APRIL 82 2010 | 19 | 311 |

| 27. VICTIM HOSPITALIZED - WHERE? | 14. OCCURRED DAY DATE TIME | DAY DATE TIME | 15. SUPPLEMENT CODE |
|---|---|---|---|
| DEL. DIV | THURS 29 APRIL 82 TO 2010 | | 47 |

| 28. 4-F-14 SENT | DATE | 29. GENERAL BROADCAST | 16. CRIME OR INCIDENT | 17. U.C.R. CLASSIFICATION |
|---|---|---|---|---|
| YES ☐ NO ☐ | | YES ☐ NO ☐ | 72 HOUR COMMITTMENT | 8007 |

WAS THERE A WITNESS TO THE CRIME?  INDICATE RELATIONSHIP TO INVESTIGATION: W-1, W-2 WITNESS, NI NOT INTERVIEWED, RP REPORTING PERSON, PC PERSON CONTACTED, P PARENT  IF NO PLACE AN X IN BOX A

| CODE | 30. NAME | RACE SEX AGE | RESIDENCE ADDRESS | ADDRESS CONTACTED | PHONE |
|---|---|---|---|---|---|
| W1 | KITTY WASIELEWSKI | WF | 1903 LAKEVIEW RD | 1900 PROSPECT RD | NA |

IS THERE A SIGNIFICANT M.O. PRESENT?  IF NO PLACE AN X IN BOX B

31. METHODS USED TO COMMIT CRIME  SUBJECT THREATEN TO KILL HER SELF AND HER HUSBAND AND HELD POLICE AT BAY FOR OVER TWO HOURS

34. M.O. CLASS

IS THERE SIGNIFICANT PHYSICAL EVIDENCE PRESENT?  IF NO PLACE AN X IN BOX C

| 32. EVIDENCE WORK PERFORMED BY | 37. EVIDENCE PROCESSED BY | TYPE PROCESSING |
|---|---|---|
| ☒ YES ☐ NO  ☐ REFUSED | TABOR | PHOTOS AND EVIDENCE |

IS STOLEN PROPERTY TRACEABLE?  IF NO PLACE AN X IN BOX D

| CODE | 33-1 DESCRIBE PROPERTY TAKEN | REMOVED FROM | IDENTIFICATION NO. | PROPERTY VALUE |
|---|---|---|---|---|
| | 33-2 | | | |
| | 33-3 | | | |
| | 33-4 | | | |
| | 33-5 | | | |
| | 33-6 | | | |

38. TYPE OF PROPERTY CODE  (A) Currency, Notes, etc. (B) Jewelry and Precious Metals (C) Furs (D) Clothing (E) Locally Stolen Veh. (F) Miscellaneous (G) Office Equip. (H) Televisions, Radios, Cameras, etc. (I) Firearms (J) Household Goods (K) Consumable Goods (L) Livestock (M) Bicycles (N) No Property Stolen (P) Pending Stolen Property (R) Any Two-way Radios, or Equipment attached thereto Except Aerials (S) Marine Equipment.

| | 39. VALUE DAMAGED | 40. VALUE RECOVERED | 41. VALUE STOLEN |
|---|---|---|---|

CAN SUSPECT BE NAMED?  IF NO, PLACE AN X IN BOX E

| 42. SUSPECT 1. NAME | 43. SUSPECT 2. NAME |
|---|---|

CAN SUSPECT BE (F) LOCATED, (G) DESCRIBED, OR (H) IDENTIFIED?  IF NO, PLACE AN X IN BOX F, G, AND/OR H

CAN SUSPECT VEHICLE BE IDENTIFIED?  IF NO, PLACE AN X IN BOX I

| 44. REGISTRATION NO. STATE | YEAR | MAKE | BODY | MODEL | COLOR(S) | IDENTIFYING CHARACTERISTICS OF VEHICLE |
|---|---|---|---|---|---|---|

CAN CRIME BE SOLVED WITH A REASONABLE AMOUNT OF INVESTIGATIVE EFFORT? IF NO, PLACE AN X IN BOX J

| CODE | 45. CONTINUATION OF ABOVE ITEMS |
|---|---|
| | RELATIVE TO THE ABOVE SUBJECT, POLICE UNITS WERE DISPATCHED TO 1900 PROSPECT RD. RELATIVE TO A WOMEN (COVELLI) BARRICADED IN HER HOUSE ARMED WITH WEAPONS. THE FIRST UNITS SPOKE TO THE ABOVE WITNESS WHO STATED COVILLI HAD A FIGHT WITH HER HUSBAND AND HAD BEEN DRINKING. SHE TOOK OUT SEVERAL GUNS AND STARTED LOADING THEM THREATENING TO KILL HER HUSBAND. THE WITNESS GRABED SEVERAL GUNS AS WELL AS THE ABOVE COVELLIS BABBY AND FLED THE HOUSE |

| 46. REPORTING OFFICER | NO. | DIV. | 48. STATUS | IF FOLLOW UP SOLVABILITY FACTORS SHOULD BE INVESTIGATED | 49. REVIEWER |
|---|---|---|---|---|---|
| | | | ☐ ARREST ADULT | | |
| 47. REPORTING PERSON'S SIGNATURE | | | ☐ UNFOUNDED  ☐ ARREST JUV | | OFFICE FOLLOW UP CLOSED |
| 10/18/91 | | | ☐ PENDING ACTIVE  ☐ EXCEPT. CLEAR | | |
| | | | ☐ PENDING INACTIVE  ☒ SERVICE CLEAR | DOC. # 45-06-78/06/06 | DSP 6014 |

DEPARTMENT WILMINGTON

**CONTINUATION SHEET**

| 18. PAGE 2 OF 2 | 2. COMPLAINT NO. 82-24068 | 46. INVESTIGATING OFFICER DET. P. SAGGIONE |
|---|---|---|

AND CALLED THE POLICE.

THE NEGOTIATING TEAM AS WELL AS THE SWAT TEAM HEADED BY CAPT. DOHERTY RESPONDED. COVELLI WAS DRINKING, THREW THE TELEPHONE OUT THE WINDOW POINTED THE GUN AT HER SELF SEVERAL TIME AND REFUSED TO LAY DOWN THE WEAPONS.

AFTER APPROXIMETLY TWO HOURS AND THIRTY MINUTES SHE WALKED OUT OF THE RESIDENCE AND WAS TRANSPORTED FIRST TO THE DET. DIV. THEN TO THE DEL. DIV. FOR 72HOUR COMMITTMENT.

DOC. # 45-06-78/06/09    DSP-6017

P197

A0067

KIWANIS AWARD

THIRD QUARTER 1982

PATROLWOMAN NANCY A. SPELL, CURRENTLY ASSIGNED TO THE PATROL DIVISION OF THE WILMINGTON DEPARTMENT OF POLICE, HAS BEEN SELECTED TO RECEIVE THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982. PATROLWOMAN SPELL IS SINGLE, AND RESIDES IN WILMINGTON.

PATROLWOMAN SPELL IS A GRADUATE OF THE PENNSYLVANIA STATE UNIVERSITY, AND HOLDS A BACHELOR OF SCIENCE DEGREE IN ADMINISTRATION OF JUSTICE. SHE WAS APPOINTED TO THE DEPARTMENT OF POLICE ON JANUARY 14, 1980. UPON THE COMPLETION OF HER POLICE ACADEMY TRAINING SHE WAS ASSIGNED TO THE PATROL DIVISION.

FROM APRIL THROUGH SEPTEMBER OF 1981, PATROLWOMAN SPELL WAS ASSIGNED TO WORK UNDERCOVER WITH THE DRUG, ORGANIZED CRIME AND VICE DIVISION. AS A DIRECT RESULT OF UNDERCOVER DRUG BUYS MADE BY HER DURING THIS TIME PERIOD, SEVENTY (70) PERSONS WERE ARRESTED FOR THE ILLEGAL SALE OF DRUGS. HER WORK ALSO RESULTED IN THE SEIZURE OF $83,540 WORTH OF ILLEGAL DRUGS, INCLUDING HEROIN, COCAINE, METHAMPHETAMINES AND MARIJUANA.

ALTHOUGH NOW ASSIGNED TO THE PATROL DIVISION, PATROLWOMAN SPELL HAS CONTINUED TO ASSIST ON UNDERCOVER DRUG INVESTIGATIONS WHEN NEEDED. SHE HAS ALSO ASSISTED GREATLY IN THE DEPARTMENT'S RESPONSE TO PROSTITUTION ACTIVITY IN THE CITY. HER UNDERCOVER WORK IN THIS AREA HAS RESULTED IN THE ARREST OF MANY INDIVIDUALS ON CHARGES OF PATRONIZING A PROSTITUTE, AIDING IN THE CONTROL OF THIS ACTIVITY.

PATROLWOMAN SPELL HAS BEEN TRAINED AS A HOSTAGE NEGOTIATOR, AND FUNCTIONS IN THIS CAPACITY ON THE DEPARTMENT'S CRISIS MANAGEMENT TEAM. SHE HAS CONDUCTED THREE SUCH NEGOTIATIONS TO DATE, THE MOST NOTABLE BEING THAT WHICH OCCURRED ON APRIL 29, 1982 IN CANBY PARK. ON THAT DATE A WOMAN ARMED WITH A RIFLE HELD POLICE OFFICERS AT BAY FOR OVER TWO HOURS BEFORE SURRENDERING.

PATROLWOMAN NANCY SPELL DISPLAYS INITIATIVE AND DEDICATION IN HER WORK, BRINGING CREDIT TO HERSELF AND TO THE DEPARTMENT OF POLICE. HER CONTINUED EXCELLENT PERFORMANCE CERTAINLY MAKES HER DESERVING OF THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982.

## POLICEWOMAN OF THE QUARTER - 3RD QUARTER

Name:    Nancy A. Spell

D.O.B.    ████████████

Social Security Number:    ████████████

Address:    1401 Maryland Avenue
            Wilmington, Delaware  19805

Marital Status:  Single

Number of Children:  None

Appointed to the Department:    January 14, 1980

P199

A0069

<u>MEMORANDUM</u>

TO:        Inspector John W. Johnson
           Chief of Staff Inspections

FROM:      Captain Robert L. Longyear
           Commanding Officer, Drug,
           Organized Crime & Vice Division

SUBJECT:   KIWANIS QUARTERLY AWARD

DATE:      24 November 1981

Sir:

In regards to the nominees for the 4th quarter Kiwanis Award
for 1981, I am submitting the name of Patrolwoman Nancy A.
Spell as a candidate for that honor. The following is a resume
of this officers personal history and her accomplishments  while
a member of the Wilmington Department of Police.


Patrolwoman Nancy Anne Spell is a graduate of Penn State Univ-
ersity, where she obtained a Bachelor of Science Degree, major-
ing in Administration of Justice.

Patrolwoman Spell has shown a great interest in improving her-
self in becoming an excellent police officer by volunterring
and completing the following schools:  Hostage Negotiating School,
Anti-Sniper School and Survival School.


A check of Patrolwoman Spells Personnell File showed that on
her yearly probation report that her supervisors in Patrol
Division also feel that she has done"tremendous work"while in
Patrol Division.

Patrolwoman Nancy Spell has reflected great credit on the Wilm-
ington Bureau of Police, by her extreme dedication and outstanding
police work since her date of appointment.


I request,therefore, due to her excellent work, that Patrol-
woman Nancy A. Spell be considered to be the 1st and only
Policewoman to be the recipient of the Kiwanis Award.

# COMMENDATION

## OFFICE OF PUBLIC SAFETY

## Department of Police

## Wilmington, Delaware

*Awarded to*

**DETECTIVE NANCY DIETZ**

ON NOVEMBER 21, 1988 DETECTIVE NANCY DIETZ ALONG WITH HER PARTNER DETECTIVE PATRICK BURKE WERE ON PATROL NEAR TAYLOR AND PINE STREETS WHERE THEY OBSERVED A YOUNG MALE DRIVING A NEW VAN. AS THE OFFICERS ATTEMPTED TO STOP THE VEHICLE THE DRIVER STOPPED AND ATTEMPTED TO EXIT. HE WAS TAKEN INTO CUSTODY AT WHICH TIME IT WAS LEARNED THAT THE VAN HAD JUST BEEN STOLEN FROM WINNER NISSAN IN NEWARK. THE SUSPECT WAS TURNED OVER TO NEWARK POLICE DEPARTMENT WHERE HE WAS BOOKED ON THEFT AND UNRELATED BURGLARY CHARGES.

DUE TO DETECTIVE DEITZ' KEEN OBSERVATION AND DEDICATION TO DUTY, A FELON WAS APPREHENDED AND THE VICTIM'S PROPERTY RETURNED.

DETECTIVE NANCY DIETZ IS HEREBY OFFICIALLY COMMENDED.

RECOMMENDED BY

Guy H. Sapp
Chief of Police

APPROVED BY

Alex J. Smalls
Director of Public Safety



# City of Wilmington
## Delaware

## City Council

### March 24, 1994

**WHEREAS,** Council notes with great approval the actions of **Detective Robert Merrill and Deputy Fire Chief Clifton Armstead** who responded to a crime in progress, even though both were "off duty" at the time; and

**WHEREAS,** former City Councilman Jesse W. Samluk and his wife, Matilda, were enjoying a meal at a Wilmington restaurant, when a man grabbed Mrs. Samluk's purse and fled on foot; and

**WHEREAS,** fortunately for the Samluk's, **Mr. Merrill** and **Mr. Armstead** both happened to be present at the time of the incident and gave chase immediately, and captured the suspect nearby; and

**WHEREAS,** these two gentlemen were able to detain the suspect until the arrival of ~~Police Lieutenant Nancy Dietz~~ who helped make the arrest, despite injuring her hand in the ensuing scuffle with the purse snatcher.

**NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF WILMINGTON** that this Council gratefully acknowledges **Detective Robert Merrill** and **Deputy Fire Chief Clifton Armstead** for their selfless heroism and further recognizes the crucial involvement of **Lieutenant Nancy Dietz** in bringing the suspect to justice and returning the stolen purse intact to its owner.

**FURTHER RESOLVED** that Council commends all three of these distinguished City employees for exemplifying the highest standards of service to the citizens of Wilmington.

_____          _____
Assistant City Solicitor                              City Clerk

# COMMENDATION

## OFFICE OF PUBLIC SAFETY

## Department of Police

## Wilmington, Delaware

### DISTINGUISHED SERVICE AWARD

#### Awarded to

#### SERGEANT NANCY DIETZ

ON 2 JUNE 1990, SERGEANT NANCY DIETZ ON PATROL AT 6TH AND ORANGE STREETS ALONG WITH LIEUTENANT GILBERT HOWELL WHO WAS PRESENT AT THE SAME LOCATION, OBSERVED A MAN RUNNING OBVIOUSLY BEING PURSUED BY ANOTHER SUBJECT. THE TWO OFFICERS IMMEDIATELY TOOK UP PURSUIT AND DETERMINED THAT THE PURSUER HAD JUST BEEN ROBBED BY THE OTHER SUBJECT. BOTH OFFICERS WERE THEN ABLE TO APPREHEND THE SUSPECT AND RECOVER THE VICTIM'S PROPERTY.

DUE TO SERGEANT DIETZ AND LIEUTENANT HOWELL'S KEEN OBSERVATIONS, QUICK ACTIONS AND DEDICATION TO DUTY, A FELON WAS APPREHENDED AND STOLEN PROPERTY RECOVERED.

SERGEANT NANCY DIETZ IS HEREBY OFFICIALLY COMMENDED, IS AWARDED THE DISTINGUISHED SERVICE RIBBON, AND IS AWARDED ONE DAY OFF.

RECOMMENDED BY

Guy H. Sapp
Chief of Police

APPROVED BY

Alex J. Smalls
Director of Public Safety

# COMMENDATION

## OFFICE OF PUBLIC SAFETY

### Department of Police

### Wilmington, Delaware

*Awarded to*

## *Captain Nancy S. Dietz*

On August 5, 1996, Captain Nancy S. Dietz and Sergeant Thomas Spell were off duty and in the area of 4th and Union Streets when they observed two subjects assaulting a third subject. The officers immediately intervened and one of the subjects attempted to flee however was apprehended. Through further investigation it was learned that the officers had interrupted a robbery in progress. Due to the officers keen observations, quick actions and dedication to duty, two felons were apprehended and further injury and property loss prevented to the victim.

Captain Nancy S. Dietz is hereby officially commended, awarded the Distinguished Service Award and one day off with pay.

RECOMMENDED BY

*Michael A. Boykin*

Chief of Police

APPROVED BY

Director of Public Safety

AWARD/COMMENDATION REQUEST

AWARD/COMMENDATION REQUESTED:      Distinguished Service Award

Submitted for [Officer(s)]:        Lt. N. Dietz, Corp. Thomas Spell

Submitted by (Supervisor):         Captain James Lane

Date Submitted:      1/97          Date and time of incident:
                                                          8/5/96

Location: 4th & Union Streets

Officer(s) dispatched?             Yes_____   No_X____

Officer(s) notified by others?     Yes_____   No_X____

On or off duty?                    On_____    Off_X___

Description of incident: Officers while off duty observed a robbery
in progress in the 400 block of Union Street where two males were
assaulting another male. Upon breaking up the parties, one suspect
attempted to flee and was apprehended until WILCOM was notified by
the officers. A follow-up investigation revealed that the victim,
16 years old, was assaulted by the two suspects, one of which
removed his property (a gold chain) valued over 400 dollars. The
victim attempted to resist the suspects when officers intervened.

The case was handled in a trial in family court in May of 1997,
where the suspect was found guilty of Robbery 2nd degree and
Conspiracy 2nd, Judge Chapman's court room.

Note: All supporting documents must be attached.

Review Board Action:

_____Approved        _____Increased to       Insp._____

_____Denied          _____Decreased to       Insp._____

RCS 115-1-8

Capt L—
6-4-97

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

MEMORANDUM

TO:        Samuel D. Pratcher
           Chief of Police
           Wilmington Police Department

FROM:      James Lane
           Commanding Officer
           Criminal Investigation Division

RE:        Distinguished Unit Citation

DATE:      8 Jan 97

     In 1996, members of the Detective Division were faced with the task of investigating the greatest number of violent crimes in the City of Wilmington's recorded history.  That was evidenced by the fact that there were over 100 shootings in which a person was struck and 20 reported cases of homicides. Both numbers were highs for the City of Wilmington.  The previous high for homicides was 18 in 1991.  In 1991, however, there were 32 investigators assigned to the Detective Division.  In 1996, there were only 21 investigators assigned to the Division.  During this past year, the investigators handled the most homicides ever with 34% less investigators.  That was not to mention the continued assignment of other felony crimes. In fact, members of the Detective Division handled the same amount of cases per investigator as the investigators in 1991.  Despite the dramatically increased workload, the members of this Division performed their duties at a high degree of efficiency and professionalism.  The investigations not only included the initial response to the crime scenes but they also included witness interviews, suspect interrogations, locating witnesses, locating suspects, attending autopsies, insuring evidence was properly collected/preserved, insuring that the evidence was transported to the proper crime laboratory for processing, meeting with the Attorney General's Office and preparing for court proceedings. Investigating those homicides required the officers to log tremendous hours of overtime at all hours of the day and night. Because of their dedication, the investigators spent many hours coming to work on their own time [at no cost to the City] to help solve these crimes and make the streets safer for Wilmingtonians. The result was that several dangerous criminals were taken off of the streets within days of the incidents.

     While the record number of homicides in 1996 received much attention, the arrest rate for those incidents did not receive nearly as much attention.  It could be assumed, however, that if the arrest rate was not as exceptional as it was, then the arrest

rate would have received much more notoriety.  Thus, it could have possibly resulted in undeserved criticism of this Department.  Of the 20 homicide investigations during 1996, two were determined by the State of Delaware Attorney General's Office not to be criminal.  That left 18 homicides in the City which we considered to be criminal.  The suspects were identified in 17 of these 18 cases.  Fifteen of those suspects were arrested within days of the incidents and they are currently awaiting trials.  Two others, who it is believed fled the State, were indicted on Murder charges.  They have not yet been taken into custody.  While 17 of 18 suspects were identified in 1996, in 1991, only 15 of 18 suspects were identified.

Many of these case involved uncooperative witnesses who hampered the investigating officer's efforts.  In addition, these investigators, on an individual basis, were involved in many such cases.  Yet, they still produced high quality investigations which made for prosecutable cases.  This was done at a time when the staffing for this Division was substantially lower than previous years when violent crimes were not a prevalent as they are today.  The success the Detective Division had in solving these incidents required a dedication to duty and a cooperative effort on the part of all the investigators above and beyond what was routinely required in the past.  Their efforts only continued the high standards to which this Department has become accustomed.  In essence, in 1996, the members of the detective division did better work with less personnel.  For that reason, those members should be awarded with the Distinguished Unit Citation.


Captain James Lane
Commanding Officer
Criminal Investigation Division


cc:  Inspector John Vignola
     Inspector Michael Boykin

*Rec 14 JAN 91*
*Insp. Michael a Boykin*

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

AWARD / COMMENDATION REQUEST

Award / Commendation requested: Distinguished Unit Citation

Submitted for Officers : Detective Division (A & B Platoons)

Submitted by(Supervisor): Sergeants Elmer Harris and Donald Bowman

Date Submitted : 1 Jan 97    Date/Time of incident:  See Attached
                                                      Reports
Location of incidents:  See Attached Reports

Officers dispatched?              x  Yes        ____ No

Officers notified by others       x  Yes        ____ No

On or Off duty?                   x  On         ____ Off

Description of incident:

1)   On 20 Jan 96, 1330 hrs, patrol officers were dispatched to
2700 Rosemont Ave. in regards to a shooting.  Upon their arrival,
Ernest Coleman was found in prone position on a bedroom floor.  Mr.
Coleman was immediately transported to the Christiana Hospital
where he was later pronounced dead as a result of a gunshot wound
to the stomach area.  Members of the Detective Division were
notified and an investigation was initiated.      Through the
subsequent investigation, Hector Negron was developed as a suspect.
An arrest warrant charging Manslaughter and Possession of a Firearm
During the Commission of a Felony was signed for Mr. Negron.  On 22
Jan 96, Hector Negron was arrested by members of the Detective
Division and booked on the above charges.  At that time, he
confessed to shooting Ernest Coleman.  He pled guilty to Criminally
Negligent Homicide on 17 Jun 96.

2)   On 2 April 96, 1700 hrs, patrol officers were dispatched to
704 Jefferson St. in regards to a possible missing person (Larry
Baltimore).  On 2 April 96, Detectives responded to 708 Jefferson
St.  Upon gaining entry, they discovered Larry Baltimore bound by

an extension cord and apparently strangled to death on the 3rd floor. He was pronounced dead at the scene. The subsequent investigation revealed via a confession from Relando Maxwell that he killed Larry Baltimore. He was arrested by members of the Detective Division and charged with Murder 1st and Felony Theft on 3 April 96. He was indicted by a Grand Jury on the above charges on 28 May 96.

3)   On 13 April 96, 1123 hrs, patrol units were dispatched to 123 S. Justison St. in regards to an assault. On their arrival, they observed Albert Kozubal lying lifeless on the floor of the business. The victim was bleeding from the head and he was obviously suffering from some blunt force trauma to the head. Members of the Detective Division were notified and an investigation was initiated. The victim was transported to the Christiana Hospital where he was pronounced dead as a result of his injuries. The subsequent investigation produced a confession from Gerado Richards that he killed the victim over billing dispute. On 16 April 96, Gerado Richards was arrested by members of the Detective Division and booked on charges of Murder 1st, Robbery 1st and Possession of a Deadly Weapon During the Commission of a Felony He was bound over for trial in Superior Court on 24 April 96.

4)   On 12 Jun 96, 2243 hrs. patrol officers were dispatched to 200 blk. W. 7th St. in regards to a person down complaint. Upon their arrival, the officers found Richard Butler on the ground and bleeding from the chest area. He appeared to be suffering from a stab wound to the chest. He was transported to the Christiana Hospital where he was later pronounced dead as a result of his injuries. Members of the Detective Division were notified and initiated an investigation. During the course of the investigation, Nathaniel Slade was developed as a suspect in this incident through witnesses which were later located. Arrest warrants were generated for Murder 1st and Possession of a Deadly Weapon During the Commission of a Felony. On 18 Jun 96, he was arrested by members of the Detective Division and booked on the aforementioned charges. Mr. Slade was indicted by a Grand Jury on 18 Jul 96.

5)   On 15 June 96, 1506 hrs, patrol officers were dispatched to the Unit blk. E. 23rd St. on a shots fired complaint. On their arrival, the officers found two victims lying in the rear yard of #25 E. 23rd St. They were suffering from gunshot wounds. One of the victim's (Lionel Robinson) was pronounced dead at the scene by paramedics. The second victim (Francis Robinson) was transported to the Christiana Hospital with a gunshot wound to the thigh. Members of the Detective Division were notified and initiated an investigation. During the course of the investigation, Robert Victor who lived on the second floor of the #25 E. 23rd St. was developed as a suspect. He confessed to shooting both victims because of a dispute over money. He was arrested by members of Detective Division on 15 Jun 96 and he was charged with Murder 1st, Attempted Murder 1st and two counts of Possession of a Firearm During the Commission of a Felony. He was indicted on by a Grand

Hospital where he was pronounced dead.  Members of the Detective Division were notified and initiated an investigation.  Through the investigation, it was learned that Lennell Brown had stabbed the victim during a domestic dispute.  On 24 Jul 96, he was charged with Murder 1st and Possession of a Deadly Weapon During the Commission of a Felony.  He was indicted by a Grand Jury on 5 Aug 96.

10)  On 7 Aug 96, 2135 hrs, patrol officers were dispatched to the 300 blk. W. 24th St. in regards to a shooting with a person down. On their arrival, they found a black female named Kalise Rollins lying on the ground and suffering from a gunshot wound to the chest.  She was transported to the Christiana Hospital where she was pronounced dead.  Members of the Detective Division were notified and initiated an investigation.  As a result of the investigation, Dorrell Blake was developed as a suspect through eye witnesses.  He was arrested by members of the Detective Division on 13 Aug 96 and charged with Murder 1st and Possession of a Firearm During the Commission of a Felony.  On 22 Aug 96, the case was bound over for trial in Superior Court.

11)  On 12 Aug 96, 1715 hrs, patrol units were dispatched to 301 W. 21st St. in regards to a stabbing with a person down.  When they arrived, they discovered Russ Carter lying on the ground, bleeding and suffering from numerous stab wound.  He was transported to the Christiana Hospital where he was pronounced dead.  Members of the Detective Division were notified and initiated an investigation. The subsequent investigation revealed that Michael Harris was responsible for stabbing Russ Carter during a domestic related argument.  Arrest warrants charging Murder 1st and Possession of a Deadly Weapon were signed for Michael Harris.  On 15 Aug 96, he was arrested in Philadelphia, PA. on the outstanding warrant. During and interview, conducted by members of the Detective Division, he confessed to stabbing Russ Carter.  Mr. Harris is currently being held in Pennsylvania awaiting extradition.

12)  On 14 Aug 96, 1605 hrs, patrol officers were dispatched to 615 W. 6th St. in regards to a shooting.  Upon their arrival, they discovered Frank Williams lying in a bedroom and suffering from a gunshot wound to the head.  In addition, they found the reporting person (James Dorsey) at the scene.  Mr. Dorsey claimed to have found the body of Frank Williams.  Mr. Williams was transported to the Christiana Hospital where he was pronounced dead.  Members of the Detective Division were notified and initiated an investigation.  During the course of the investigation, the murder weapon was found in the vehicle of James Dorsey.  As a result of that discovery and other findings in the investigation, James Dorsey was charged with Murder 1st, Possession of a Firearm During the Commission of a Felony.  He was arrested on 14 Aug 96 and indicted by a Grand Jury on the above charges on 9 Dec 96.

13)  On 30 Sep 96, 0700 hrs, patrol officers were dispatched to 1330 Lancaster Ave. in regards to a complaint of shots fired.  On their arrival, they discovered Woodrow Wilson lying in a bathtub on

the second floor and suffering from multiple gunshots to the head and torso area. Mr. Wilson was pronounced dead at the scene. Members of the Detective Division were notified and initiated an investigation. Through the investigation, it was learned through witnesses and physical evidence located at the scene that Mary Warden, who was the victim's wife, was responsible for shooting Mr. Wilson. On 30 Sep 96, she was arrested and booked on charges of Murder 1st and Possession of a Firearm During the Commission of a Felony. She was indicted on by a Grand Jury on the above charges on 26 Nov 96.

14) On 2 Oct 96, 0748 hrs, members of the Detective Division received a compliant of a possible murder from Derrick Everett. An investigation was initiated. Through the investigation, it was learned through Derrick Everett that he had accidentally strangled a female to death inside of 1800 N. Broom St. Apt. 606. Upon checking the residence, the body of Stacey Kenney was found. She was pronounced dead at the scene. The cause of death was determined to be asphyxiation. On 2 Oct 96, Mr. Everett was arrested by members of the Detective Division and booked on a charges of Murder 1st. Mr. Everett was indicted by a Grand Jury on the above charges on 28 Oct 96.

15) On 5 Oct 96, 0100 hrs, patrol officers were dispatched to the area of 13th and Claymont St. in regards to a shooting in which a person was down. On their arrival, the patrol officers, found Lakayla Booker on the ground and suffering from a gunshot wound to the chest area. She was transported to the Christiana Hospital where she was pronounced dead as a result of that gunshot wound. Members of the Detective Division were notified and they initiated and investigation. As a result of the investigation, Eric Witherspoon of New York was developed as a suspect. On 5 Oct 96, an arrest warrant was signed for him charging Murder 2nd and Possession of a Deadly Weapon During the Commission of a Felony. He was indicted by a Grand Jury on the above charges on 21 Oct 96. It is believed that he has fled the State and he remains at large.

16) On 6 Dec 96, 1735 hrs, 2108 hrs, patrol officers were dispatched to #36 E. 23rd St. in regards to a shooting inside that residence. On their arrival, they discovered Eugene Warren on the floor of a bedroom. He was suffering from a gunshot wound to the chest area. He was transported to the Christiana Hospital where he was pronounced dead as a result of his injuries. Members of the Detective Division were notified and they initiated an investigation. During their investigation, Lavar Watson was developed as a suspect in this incident as a result of his confession. Mr. Watson stated that he accidentally shot the victim while playing with a handgun. On 6 Dec 96, Lavar Watson was arrested and charged with Manslaughter and Possession of a Deadly Weapon During the Commission of a Felony. He was bound over for trial in Superior Court on the above charges on 16 Dec 96.

17) On 17 Dec 96, 2108 hrs, patrol officers were dispatched to the 1300 blk. E. 27th St. in regards to a shooting in which a person

was down.  Members of the Detective Division also responded to the scene.  On their arrival, they discovered the body of Robert Vice lying in the block.  He was suffering from a gunshot wound to the chest area.  He was transported to the Christiana Hospital where he was pronounced dead on arrival.  During the investigation into this incident, it was learned through witness interviews that Jamar Farnum was responsible for the killing of Mr. Vice.  On 17 Dec 96, arrest warrants were signed for Jamar Farnum charging Murder 1st and Possession of a Deadly Weapon During the Commission of a Felony.  On 17 Dec 96, Mr. Farnum was arrested and booked on the above charges.  He was bound over for trial in Superior Court on the above charges on 30 Dec 96.

**Recommendation:**  In 1996, members of the Detective Division were faced with the task of investigating the greatest number violent crimes in the City of Wilmington's recorded history.  That is evidenced by the fact that there were over 100 shootings in which a person was struck and 20 reported cases of homicides.  Despite the number of investigations, the members performed the duty at a high level as well as with a great degree of professionalism.  Of the 20 homicide cases, two were determined by the State of Delaware Attorney General's Office not to be criminal.  That 18 homicides in the City which were considered criminal.  The suspects were identified in 17 of these homicides.  Fifteen of those suspects were arrested and are currently awaiting trial.  It should be noted that all of the arrests were made within just a few days after each incident.  Many of these cases involved uncooperative witnesses and the cases required an inordinate amount of the investigating officers' time (on and off duty).  Yet, they still produced high quality investigations resulting in arrests.  This was done at a time when number of investigators in the division was down.  This required a dedication to duty and a cooperative effort on the part of all the investigators beyond what was routinely required in the past when staffing in this Division was much higher.  Their efforts only continued the high standards to which this Department has become accustomed.  In essence, in 1996, the members of the Detective Division did better work with less personnel.  For that reason, those members should be awarded with the **Distinguished Unit Citation**.  The members of the Detective Division who either served as a chief investigating officers or were present to assist on the aforementioned cases throughout 1996 are as follows:

Det. Lt. Nancy Dietz
Det. Sgt. Clayton Smith
Det. Sgt. Donald Bowman
Det. Cpl. Patrick Burke
Det. Patrick Conner
Det. Cpl. Steven Elliott
Det. Cpl. Carolyn Hartsky
Det. Cpl. Phyllis Johnson
Det. Cpl. Mark Lemon
Det. Cpl. Raymond Wyatt

Det. Lt. Michael Maggitti
Det. M/Sgt. George Crowley
Det. Sgt. Elmer Harris
Det. Cpl. Rafael Collazo
Det. Kevin Connor
Det. Cpl. Robert Donovan
Det. Anthony Harris
Det. Cpl. Francis Meriggi
Det. Cpl. Paul Reutter
Det. Anthony Roundtree
Det. Cpl. Scot Sowden



# KIWANIS CLUB OF WILMINGTON DELAWARE, INC.

*Charter Granted January 6, 1919*

MEETS EACH WEDNESDAY AT 12:10 P.M. IN THE GOLD BALLROOM AT THE HOTEL DU PONT

Office — 282 Delaware Trust Building — (302) 652-6343

RELEASE:  Noon, September 29, 1982

Roy Sullivan
654-6880

"PATROLWOMAN RECEIVES THIRD QUARTER POLICE AWARD"

The Kiwanis Club of Wilmington Wednesday named Patrolwoman Nancy A. Spell Recipient of the Third Quarter Police Award for 1982 at its luncheon meeting in the Gold Ballroom of the Hotel DuPont.  She is the first woman to be so honored.

Since joining the Wilmington Department of Police in 1980, Patrolwoman Spell has had the opportunity to serve in a wide variety of assignments.  As a trained hostage negotiator, she is a member of the department's Crisis Management Team.  She has conducted three three such negotiations to date, the most notable being one which occurred last April in Canby Park when a woman armed with a rifle held  police at bay for over two hours before surrendering.

Her undercover work with the Brug, Organized Crime and Vice Division is credited with the arrest of 70 persons for the illegal sale of drugs and the seizure of $83,540 of drugs.  Patrolwoman Spell has also assisted in the department's work to curtail prostitution in the city.

Patrolwoman Spell is a graduate of Pennsylvania State University with a Bachelor of Science Degree in Administration of Justice.

#     #     #

EDITORS:  A copy of the official citation detailing Patrolwoman Spell's accomplishments in attached for your information.



March 10, 2006


Captain Nancy Dietz
Wilmington Police Department
300 N. Walnut Street
Wilmington, DE 19801

Dear Captain Dietz:

I would like to extend an additional thank you for your participation in the Women in Criminal Justice seminar held at Wilmington College on May 13, 2005. We received a great deal of positive feedback, which centered on the knowledge and professionalism of the guest speakers. The success of the event was a result of the dynamic interaction between yourself and your fellow panel members. It was obvious that you have a great deal of passion and pride in your chosen career in criminal justice. For your reading pleasure, I have enclosed a copy of the Wilmington College Fall Behavioral Science Newsletter, which features an article on the seminar.

Based on the success of our inaugural seminar, I am proud to announce that on Friday, May 5, 2006, the Wilmington College Criminal Justice program will host the second annual *Women in Criminal Justice Leadership Seminar*. I would like to extend an invitation for you to be our guest at this event. As we are already in the planning stages, we anticipate a variety of nationally and locally known guest speakers and panelists.

I will be sending you additional information on this upcoming event as the date approaches. Thank you again for making this event successful.

Sincerely,

Melissa A. Zebley
Criminal Justice Program Assistant

MAZ:dp
enclosure


**DIVISION OF BEHAVIORAL SCIENCE**
320 N. DuPont Highway, New Castle, Delaware 19720-6491
(302) 328-9401     Fax (302) 328-5614

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

<u>MEMORANDUM</u>

TO:        Michael J. Szczerba
           Chief of Police

FROM:      Captain Nancy S. Dietz
           Commanding Officer
           Office of Professional Standards

RE:        Committee

DATE:      April 20, 2005

In March of this year, I was asked by Carl Schnee and Timothy Brandau, Executive
Director of the YMCA Resource Center, if I would be interested in serving as a board
member for the YMCA. On April 11, 2005, I attended an information meeting at the
Resource Center and received an invitation requesting that I serve on the Board of
Governors. I have since accepted the invitation and wanted to inform the Department of
this position and ensure that there were no potential conflict of interest issues.

The Board of Governors provides the following service to the YMCA:

- Help in determining the overall strategic direction of the Resource Center
- Provide community perspective on issues and programs
- Generate ideas for new programs and new funding sources
- Assist in the annual contributing campaign
- Identify people and organizations to assist or collaborate with the YMCA

*Congratulations and best of luck serving the agency. I do not see any conflict of interest issues.* MJS 4/24/05.



Acknowledging professionalism in law enforcement, this shall certify that

Nancy S. Dietz

is a member of the

INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE

IACP

Executive Director

President

P217

A0087



THE NATIONAL RIFLE ASSOCIATION
OF AMERICA

*This is to certify that*

NANCY SPELL

*has satisfactorily completed the approved course*

*of fire qualifying him as*

POLICE MARKSMANSHIP

98.00

DISTINGUISHED EXPERT

Issued this _5_ day of _JUNE_ 19 _80_

National Rifle Association
Washington, D. C.

Commanding Officer

Firearms Instructor

Secretary



# VOLUNTEER SERVICE AWARD

## Nancy Dietz

is awarded this certificate by the City of Wilmington in recognition of outstanding performance, dedication, and contribution to the Big Brothers Big Sisters Program

James M. Baker
Mayor, City of Wilmington

June 4, 2001
Date

P219

A0089



# Certificate of Appreciation

We Hereby Express Our Sincere Appreciation To

## NANCY DIETZ

In Grateful Recognition Of Your Continuous Support

Of The

Justice Of The Peace Court

_Patricia Griffin_  May 1998

Chief Magistrate          Date



VOLUNTEER SERVICE AWARD

Nancy Dietz

is awarded this certificate by the City of Wilmington in recognition of outstanding performance, dedication, and contribution to the Big Brothers Big Sisters Program

James M. Baker
Mayor, City of Wilmington

June 4, 2001
Date



# VOLUNTEER SERVICE AWARD

## NANCY DIETZ

is awarded this certificate by the City of Wilmington in recognition of outstanding performance, dedication, and contribution to the **Big Brothers/Big Sisters Program**

James M. Baker
Mayor, City of Wilmington

February 10, 2003

Date

SEAL OF THE CITY OF WILMINGTON · DELAWARE

© 1998 GOES 34825
All Rights Reserved

LITHO. IN U.S.A.



# CITY OF PHILADELPHIA

PERSONNEL DEPARTMENT
1530 Municipal Services Building
1401 J. F. Kennedy Boulevard
Philadelphia, PA 19102-1675

LYNDA ORFANELLI
Director

JAMES KIMPSON
Deputy Director

March 17, 2003

(215) 686 – 2331
FAX (215) 686 – 2347

Chief Michael Szczerba
Wilmington Police Department
300 N. Walnut Street
Wilmington, DE 19801

Dear Chief Szczerba:

Please accept our appreciation for permitting Captain Nancy Dietz to come to Philadelphia on March 10th and 11th, 2003, to participate as a subject matter expert in the oral examination process for Police Lieutenant. Captain Dietz demonstrated a significant level of expertise and professionalism while participating in the examination development process.

I hope that Captain Dietz enjoyed her experience as a subject matter expert in this important endeavor.

Once again, I would like to express my appreciation, and thank you for your assistance in supporting this important public service. The City of Philadelphia would be happy to reciprocate should the need arise in your jurisdiction.

Sincerely yours,

James Kimpson
Deputy Personnel Director

cc:    Captain Nancy Dietz

CHIEF'S OFFICE

MAR 2 0 2003



Vincent A. Bifferato, Jr.
Ian Connor Bifferato
Jeffrey M. Gentilotti
Joseph R. Biden, III
David A. Denham
Veronica O. Faust
Catherine Zwolak Kilian
Joseph K. Koury
George T. Lees, III
Garvan F. McDaniel

Alternative Dispute Resolution
—
Vincent A. Bifferato
William Swain Lee
Carl Schnee
—

cs@bgbde.com
Direct Dial:  (302) 254-5372

March 22, 2005

Captain Nancy Dietz
Office of Professional Standards
Wilmington City Police Department
300 Walnut Street
Wilmington, DE   19801

Re:    **Criminal Law Issues**
       **Tuesday, March 8, 2005**

Dear Nancy:

Thank you again for your wonderful presentation at the Academy of Lifelong Learning Criminal Law Class on Tuesday, March 8, 2005. You did a phenomenal job, and I believe that you were already voted "guest lecturer of the year."

Thanks again.

Very truly yours,

Carl Schnee

/mem

Bifferato, Gentilotti & Biden, P.A.
www.bgbde.com
—

200 Biddle Avenue
Suite 203
Newark, DE 19702
Phone: 302 - 429 - 1900
Fax: 302 - 322 - 7640

1308 Delaware Avenue
Wilmington, DE 19806
P.O. Box 2165
Wilmington, DE 19899 - 2165
Phone: 302 - 429 - 1900

701 Rehoboth Avenue
Rehoboth Beach, DE 19971
Phone: 302 - 227- 6600



# Delaware State Police

POST OFFICE BOX 430
DOVER, DELAWARE  19901



Capt. Nancy Dietz
Wilmington Police Dept
300 N Walnut St
Wilmington, DE  19801

62

Nancy,

I wanted to personally thank you for serving on the recent Trial Board for our Division. That assignment is usually not a very pleasant one under any circumstances. This, having been opened to the media, had to be even more difficult. Your professional unbiased demeanor was noted by all who attended. Cpt. Paige stated it was one of the most professional boards he has ever presented a case too.

Once again Thank You

Sincerely
Tom Ma

P226

A0096

U.S. Department of Justice

Federal Bureau of Investigation

---

*Washington, D.C. 20535*

March 20, 1987

Mr. Joseph M. Pennell
Chief of Police
Wilmington, Delaware  19801

Dear Chief Pennell:

Graduation exercises for the 148th Session of the FBI National Academy were held this morning.  I am pleased to advise that Detective Nancy A. Dietz received a diploma at that ceremony signifying successful completion of the course of training.

Subjects selected by each officer for the Session were from the following areas:  Behavioral Science, Constitutional Law, Forensic Science, Education-Communication Arts, and Management Science.  Students were also afforded 30 hours of instruction in various specialized topics.

It was a pleasure to have your agency represented in the National Academy Program, and we hope the training proves beneficial.

Sincerely yours,

James W. Greenleaf
Assistant Director
Training Division

**RECEIVED**

APR 0 1 1987

OFFICE OF PUB. SAF.

Bicentennial of the United States Constitution (1787-1987)

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

MEMORANDUM

TO:        Captain Marlyn W. Dietz
           Western Command

           Lieutenant Ruth Townsend
           Detectives, B Platoon

FROM:      Captain Nancy S. Dietz
           Criminal Investigations Division

RE:        Visit of Morris Dees, October 16

DATE:      October 25, 2000

Attached is a letter from Sally Milbury-Steen, Director of Pacem in Terris, who
organized the event where Mr. Morris Dees spoke in Wilmington on October 16th.
Based on her comments, obviously, the event was well organized and professionally
coordinated by our Department personnel.

Thank you for coordinating your officers for this event and selecting personnel that were
professional and competent during the visit from Mr. Dees. Please convey to your
officers my sincere thanks for a job well done. Those officers who worked the event
were Captain M. Dietz, John Burns, Andrew Brock, Jeffrey Phillips, Maurice Thompson,
Robert Colmery, and Jonathan Hall.

Attachment

cc:        Chief Boykin
           Inspector Stallings
           Inspector Donohue

# pacem in terris                    peace on earth

1304 N. Rodney Street • Wilmington, DE 19806-4227
302-656-2721 • Fax 302-656-2730 • Incorporated 1967
E-mail: pinterris@aol.com

Dr. Sally Milbury-Steen, Executive Director
Donna Irwin, Office Secretary

**Honorary Board Members**
Rev. Albert P. Neilson
Richard H. Rhoads

**Board of Directors**
Rev. Peter Wells
*Chair*

Tim Bayard
*Vice Chair*

Rick Grier-Reynolds
*Secretary*

Adele Baldwin
*Treasurer*

Don R. Kuespert
*Finance Chair*

Virginia Ahrens
Carolyn Bryant
Canon Lloyd Casson
Lillian Jones
Rev. Thomas Kerr
Ruth Kolber
Don Kuespert
Ann H. McKelvie
Dorothy Medeiros
LaVaida Owens-White
Chris Rhoads
Bob Raughley
Leo Robb
Mary Starkweather-White
Bill Taylor

**Ulster Project**
Mr./Mrs. Charles A. Robinson
*Founders,*
*Ulster Project Delaware*

**Ulster Project**
*Co-Chairs*
Chip Sewell
Bobbie Fort

**Other Projects**
Alliance for the
   Restoration of Ex-Offenders
Committee for a Sane Military
   Policy and Budget
Creating the Peaceable Classroom
DE Citizens Opposed
   to the Death Penalty
DE Comm. for Racial Justice
   and Harmony
Economic Justice Committee
Healing Racism Project
Volunteer Service
   Exchange/International

October 19, 2000

Captain Nancy Dietz
Wilmington Department of Police
Public Safety Building
300 N. Walnut Street
Wilmington, DE 19801

Dear Captain Dietz,

On behalf of Pacem in Terris, I wish to thank you and your staff at the Wilmington Department of Police for all of the assistance and security you provided for Morris Dees on Monday, October 16. Without your generous cooperation and professional services, it would have been impossible for us to have had him come.

The plainclothes men and the officers in uniform outside of the church could not have been any more wonderful than they were. They were so competent, cooperative, courteous, and friendly, that I doubt than any of our attenders had ever felt safer in their lives! I am also most grateful for the way they kept me informed about Mr. Dees' flight delay and the time of actual arrival. Their concern and thoughtfulness were greatly appreciated.

Of course, a great pleasure from my point of view, was that our paths should again cross in such a splendid -- non-stalking, distressful way -- as they did in November of 1995. I am still most appreciative of everything you did to help me at that time.

Please convey my sincere gratitude to each officer who was part of the security detail on Monday. Their assistance and their presence lifted so many burdens from our shoulders and did so much to make the entire evening a success. Thank you again.

With all good wishes,

*Sally Milbury-Steen*

Sally Milbury-Steen

Community Peace Education Organization
Cooperating with the Christian Council of Delaware and Maryland's Eastern Shore

P229

A0099



## Academy for Scientific Investigative Training

2142 So. Broad Street • Philadelphia, PA 19145 • (215) 732-3349

June 30, 1989

To Whom It May Concern:

This is to certify that Nancy S. Dietz has satisfactorily completed the 300 hour polygraph examiner curriculum of the ACADEMY FOR SCIENTIFIC INVESTIGATIVE TRAINING, conducted at the Wilmington, Delaware, Police Department.

The ACADEMY FOR SCIENTIFIC INVESTIGATIVE TRAINING is licensed by the Pennsylvania Department of Education, Board of Private Trade Schools, Harrisburg, Pennsylvania.

The curriculum is accredited by the American Polygraph Association.

The course convened on May 15, 1989, and concluded on June 30, 1989.

This certification entitles the above named graduate to enter her Internship in the practice of Polygraph. Internship shall consist of not less than four months, nor more than one year. During this time the Intern will have completed twenty-five polygraph examinations, ten of which will be Specific in nature. These examinations will be reviewed by the Director, or a polygraphist approved by the Director.

Upon successful completion of Internship, the Director will issue certification of completion, which will entitle the graduate into full membership into the profession of Polygraph.

Sincerely,

Nathan J. Gordon
Director

NJG/ld

**P230**

**A0100**



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No. 1-1292

May 5, 1981

Chief Dennis Regan
Department of Police
1000 North French Street
Wilmington, Delaware  19801

Dear Chief,

Enclosed are Certificates of Attendance for officers
assigned to your department reflecting completion of train-
ing in Hostage Negotiation.

As you are aware, these officers received forty hours
of classroom instruction which included negotiation theory,
personality types, and negotiation techniques.  Additionally,
the officers received some hands-on experience through the
use of role playing.

It has been a pleasure to offer your department this
training, and the instructors assigned have commented to me
that the selection of the personnel to attend was excellent
and responded well to the instruction.

Please insure that the officers receive their certificates
with my congratulations.

Sincerely,

Edward D. Hegarty
Special Agent in Charge

By:

Lloyd A. Cubbison
Supervisory Senior
Resident Agent

N. SPEll

Sept 21, 1980

Dear Chief Monelski:
I'd like to thank you and two of your officers for the way in which they handled a potentially dangerous domestic quarrel.

The officers involved were Patrolmen Ashe and Spell.

I realize that your Dept. is often criticized by the Black Community and I think it's time for someone to thank you for trying to protect us.

11-11-80 H.C. &    over

P232

A0102

In many instances the critics fail to realize that most robberies, burglaries, etc that are committed in the Black Community are perpetrated by blacks.

Sincerely

Dean A. Jenkins

April 6, 1992

Chief Regan
Wilmington Police Department
1000 King Street
Wilmington, Delaware 1990?

Dear Chief Regan:

On April 1, 1992, an incident happened in my home that required immediate professional help. My 21 month old daughter, Mary, suffered a seizure brought on by a high fever. She appeared to stop breathing. I called an operator for assistance and began a rather crude attempt at mouth-to-mouth resusitation.

Then, help arrived the patroldomen [illegible] and got my daughter [illegible] and help [illegible] until another officer, I believe his name was Officer Holden, waited for me to get dressed and take me to the hospital.

Needless to say, the experience was terrifying and until I could see for myself that Mary was all right, I really didn't know whether my baby was alive or not. The police officers were constantly reassuring me that everything would be fine and that Officer Spell would know what to do should Mary stop breathing again enroute to the hospital.

Mary is fine. She is still getting over her bout with the flu. On Saturday Officers Holden and Spell stopped in to see how Mary was doing. I can't thank them enough for their quick response to my call and their genuine concern for my child.

Seeing as much negative stories about our police forces as I do, I had to take the time to write and express my families appreciation for your department's action and compassion during our time of need.

Sincerely,

Kathy Kramedas

[illegible address]
[illegible], Delaware 1990?

History Card Jc

# City of Wilmington

Daniel S. Frawley Mayor
City/County Building · 800 French Street
Wilmington, Delaware 19801



November 14, 1986

Detective Nancy ~~Spell~~ *Deitz*
Detective Division
Wilmington Department of Police
Wilmington, Delaware 19801

Dear ~~Detective Spell~~:

I am in receipt of a letter from Mr. Hugh B. Horning relative to a burglary at his residence under Case #86-84581. Mr. Horning expressed his deepest consideration for the "professional" way in which you exhibited yourself in the investigation of this offense.

The successful resolution to this incident was largely due in part to the "team work" utilized in this investigation. Crimes such as these require this type of response by members of our Department.

Once again, I would like to echo the sentiments of Mr. Horning in thanking you for your professionalism, which reflects on you as an individual, and also the department.

Sincerely,

Joseph M. Pennell
Chief of Police

JMP:dab

1703 Lovering St.
Wilmington DE, 19806
October 28, 1986

Joseph M. Pennell, Chief
Department of Police
Wilmington, DE

Case 86-84581
Burglary, etc.

Dear Chief Pennell:

I want to commend the members of your department on the responsive and effective manner in which they solved this case which involved me and member of my family. The offense was a felony, including first degree burglary, conspiracy and possession of a deadly weapon during commission of the crime by so-called "juveniles" with previous records of similar offenses.

Officers who performed in a highly professional manner were Mark Christopher of Patrol Division, William Bowles and William Henry of EDU and in particular Detective Lieut. William Draper, Sgt. Donald Roberts and Detective Nancy Dietz.

From commission of the crime, involving stolen firearms, jewelry and personal papers valued at over $3000, less than a week had passed before the perpetrators were tracked, apprehended and confessed. In the course of the investigation, it was

(more)

very obvious that the officers worked as an effective team and with dedication to their tasks.

What is extremely disturbing to me as a citizen, and active in civic and community affairs, is that "juveniles" of this ilk are permitted to freely roam the streets and intimidate and threaten and harm law-abiding citizens. My wife was asleep in the room which they broke into and stole the various items. It scares me and makes me very angry to think what might have happened.

Please know that I will do all I can to see that the "judicial system" is called upon to bring about justice in regard to these repetitive criminals and other like them.

My family and I greatly appreciate the services that you and your Department provide to the community. All citizens are in your debt.

Sincerely,

Hugh B. Horning

cc | Dir. A. Smalls
   | Insp. D. Payne
   | Capt. D. Palmatary
   | Mayor D. Frawley

**RECEIVED**

OCT 28 1986

OFFICE OF PUB. SAF.

DU PONT
ESTABLISHED 1802

# E. I. DU PONT DE NEMOURS & COMPANY
### INCORPORATED
## WILMINGTON, DELAWARE 19898

November 11, 1985

Joseph M. Pennell
Chief of Police
1000 N. French Street
Wilmington, DE  19801

Dear Chief Pennell:

I want to personally thank you for allowing the following named personnel to attend our seminar on "Rape Prevention", on October 31st.

Captain Bernard F. Walsh
Captain Donald A. Palmatary
Detective Nancy Dietz
Detective Fred Tate
Dr. Claire A. D'Agostino

Their contribution made the seminar a complete success and the Du Pont personnel are very thankful for the knowledge and insight they gained because of their attendance.

Again, Chief, thanks for your assistance regarding this matter. I assure you of my continued support for the department.

Sincerely,

*H. F. Manelski*

H. F. Manelski
Manager-Security

HFM:bcs

BETTER THINGS FOR BETTER LIVING

**P238**

**A0108**



**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**
**STATE OFFICE BUILDING**
**820 N. FRENCH STREET, 8TH FLOOR**
**WILMINGTON, DELAWARE 19801**

CHARLES M. OBERLY, III
ATTORNEY GENERAL

DIRECT DIAL:    571-25'

September 4, 1986

Alex Smalls, Esquire
Director of Public Safety
City of Wilmington
Public Building
10th and King Streets
Wilmington, Delaware  19801

RE:  **STATE v. JAMAL WICKS**
WPD Case No.  86-04198

Dear Alex:

As a former prosecutor in the Rape Unit, you can appreciate the importance of corroborative physical evidence. The Jamal Wicks case is a perfect example of the value of your Evidence Detection Unit.

On January 17, 1986, a young woman was awakened by an intruder carrying a knife. The intruder wore a ski mask which left only his eyes and a small portion of his nose uncovered. Next, the intruder robbed the victim of money and jewelry. Finally, he raped the victim orally and vaginally, and made her lick his testicles and rectum.

Immediately after the report, the Evidence Detection Unit swung into action. Patrolman Nesler videotaped the scene and vacuumed the area for scientific evidence. Sgt. Vignola dusted the scene for fingerprints and preserved shoeprint evidence. Patrolmen Riley and Boles also assisted ably. The results of their hard labor revealed the defendant's pubic hair in the vacuum sample, and several of the defendant's shoeprints at the point of entry. Furthermore, Patrolman McGuirk's examination revealed the defendant's palmprint at the victim's residence.



**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**
**STATE OFFICE BUILDING**
**820 N. FRENCH STREET, 8TH FLOOR**
**WILMINGTON, DELAWARE 19801**

CHARLES M. OBERLY, III
ATTORNEY GENERAL

DIRECT DIAL:
571-2505

September 26, 1986

Chief Joseph Pennell
Wilmington Police Department
10th & French Streets
Wilmington, DE  19801

RE:  <u>Prison Investigation/Nancy Dietz</u>

Dear Chief Pennell:

I want to memorialize the conversation we had last Friday concerning Nancy Dietz's participation in the latest prison investigation. Her work on that case was exemplary, and we simply could not have achieved the results we did without her.

On behalf of the Attorney General I want to thank you for your cooperation in this investigation and for sending us such a qualified police officer.

Very truly yours,

BARTHOLOMEW J. DALTON
Chief Deputy Attorney General

BJD/js

cc:  Stanley Friedman, Director
      Special Investigations Unit
     Charles Burke, Special Investigator

RECEIVED
SEP 29 1986
OFFICE OF PUB. SAF.

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

**MEMORANDUM**

TO:     Kiwanis "Peanut-Day" Volunteers

FROM:   Donald E. Payne
        Chief of Police

DATE:   September 15, 1987

RE:     **September 18, 1987**

Attached is the listing of times and locations for those officers who have volunteered to assist the Wilmington Kiwanis Club with their 1987 Peanut Day Sale.

I would like to thank each of you for agreeing to assist in this worthy endeavor. The Wilmington Kiwanis Club has always been a strong supporter of the Department of Police, and this is a fine opportunity to repay in some small way their assistance to us. I am personally gratified at your show of support.

Officers should report to 10th and Market Streets just prior to their assigned times for supplies and instructions.

DEP/ld
Attachment

WILMINGTON KIWANIS CLUB

PEANUT DAY    SEPTEMBER 18, 1987

W.P.D. ASSIGNMENTS

### 0730 - 0830

| | |
|---|---|
| Sgt. K. Quinn | - 13th & Market Sts. |
| Sgt. J. Burgos | - 11th & Market Sts. |
| Chief D. Payne | - 9th & Market Sts. |
| Capt. G. Esterling | - 10th & Shipley Sts. |
| Ptlm. P. Saggione | - 9th & Shipley Sts. |
| Ptlm. T. Williams | - 9th & King Sts. |
| Ptlm. F. Tate | - 300 Delaware Ave. |

### 0800 - 0900

Sgt. J. Desmond    - 10th & Orange Sts.

### 1100 - 1200

Ptlm. G. Stallings    - 11th & King Sts.

### 1130 - 1230

| | |
|---|---|
| Ptlm. G. Tabor | - 10th & Market Sts. |
| Director A. Smalls | - 9th & Market Sts. |
| Sgt. E. Hazewski | - 10th & Shipley Sts. |

### 1600 - 1700

| | |
|---|---|
| Ptlm. J. Pollinger | - 11th & Market Sts. |
| Ptlw. N. Dietz | - 10th & Market Sts. |

*Please insert copy in folders of officers involved.*

*Sgt. F.T. Monaghan*
*11/4/88*

November 2, 1988

Captain Donald Payne
Wilmington Police Department
1 Safety Square
300 N. Walnut Street
Wilmington, DE  19801

Dear Captain Payne,

I am writing this letter in reference to the incident that occurred on 10/31/88.  The incident was a stabbing that happened at 24th & Jefferson St.

I want to take this time to commend the Police Department and Detective Division of the City of Wilmington for the excellent job they did in handling a situation that could have become unmanageable.

I will never be able to express my gratitude and appreciation to them for sparing us a lot of grief and heartache.

I realize that they were in a situation where their lives were threatened, but rather than react, they acted in a very calm and caring manner.

I would also like to thank Doris DeShields and her daughter, Robin DeShields for assisting Miss Knight in her time of need.

Again I want to thank "WILMINGTON'S FINEST".

Sincerely,

Linda M. DeShields
LMD/coh

xc:  Detective Francis Monahan
     Editor, News Journal
     Doris DeShields
     Robin DeShields
     File

*Sgt. Joseph Durney*
*Det. Donald Clark*
*Det. Patrick Burke*
*Det. Nancy Dietz*

*PtlM. McDonald*
*PtlM. Ciotti*
*PtlM. Moser*
*Others*
*PtlM. Shelton*

*kc 11/16/88*



REVEREND OTIS A. HERRING
603 Rockwood Road
Brandywine Hills
Wilmington, Delaware 19802
(302) 762-3723
(302) 764-0137

**RECEIVED**

· NOV 0 4 1988

OFFICE OF PUB. SAF.

31 October 1988

*Personnel Div.*
*Please File A Copy*
*of this in Personnel*
*folders of all*
*Detectives involved.*
*Thank You.*

*[signature] III*
*15-16-88*

**WILMINGTON POLICE DEPARTMENT**
**1000 KING STREET**
**WILMINGTON, DELAWARE   19801**

Dear Chief Payne:

Your cooperation and services provided by the fine officers of the City's Police Department on the arrival of Reverend Jesse Jackson on Wednesday, October 26 are to be commended.

We sincerely express our gratitude and appreciation for the timely and effective ways in which your duties were performed.

Again, thank you for your usual cooperation and assistance.

Very truly yours,

*[signature]*

OAH:jep

*Capt. F.T. Monaghan,   A. Stoner*
*Lt. John Viguola,*
*Sgt. Howel             Det. G. Tobin*
*Det. Clark             Det. R. Townsend*
*Det. J. Stallings      Det. H. Alfree*
*Det. R. Merrill        Det. C. Stock*
*Det. J. Gubb           Det. N. Dietz*
*Det. T. Williams       Det. R. Emory*
*Det. V. Ayala          Sgt. Scully*
*Det. D. Victor         Det. Burke*
*Sgt. J. Durney         Sgt. Kilmon*
*Det. R. DeCampli       Sgt. Esler*

*hc 11/16/88*

February 1, 1 988

Dear Sir:

Congratulations!

A while back my house was robbed while I was present.
I called the police the minute I could, though with a great
deal of timidity as to what proceedure would ensue.
In retrospect, the entire ordeal was handled with such skill
tact and caring understanding, I m=emerged from it with a feeling
of confidence and security.

So once again, Congratulations!  For having on your staff
detective Nancy Dietz, who handled the matter in a way to inspire
confidence in her ability and integrity.

Officer Dietz has followed the case with me and therefore my
future appearance in court will not be terrifying with her there.

Officer Howell was very kind and attentive and went way out of his
way to reassure me.
Patrolme n G. Murray and C. Smith, who answered my call, were
concerned and caring.

So, as a citizen of Wilmington, Delaware, I feel I may also
congratulate myself for living in a city where Officers such
as Nancy Dietz are given the time and latitude to assist citizens
in so exemplary a manner.

Thank you,
Most Sincerely,

Celia S. MacBride
1505 N. Rodney
19806

RECEIVED
FEB 4 1988
OFFICE OF PUB. SAF.

hc 2/18/88

P245

A0115



STATE OF DELAWARE
## DELAWARE VIOLENT CRIMES COMPENSATION BOARD
1500 EAST NEWPORT PIKE · SUITE 10
WILMINGTON, DELAWARE  19804

TELEPHONE: (302) 995 - 8383

OAKLEY M. BANNING, JR.
EXECUTIVE SECRETARY
BOARD
LEAH W. BETTS
CHAIRMAN
SAXTON C. LAMBERTSON
STEPHEN L. MANISTA
EDWARD STANSKY
CHARLES H. TOLIVER, IV

January 18, 1988

Chief Donald E. Payne, Jr.
Wilmington Police Department
Public Building
10th & King Streets
Wilmington, DE 19801

RE:  Claim No.  1842-87-P
     Claimant: Celia MacBride

Dear Chief Payne:

The Violent Crimes Compensation Board would like to thank you for the cooperation given by the Wilmington Police Department with regard to the above claim.

We would especially like to thank Detective Nancy Dietz for giving of her time to accompany Ms. MacBride to the hearing.  Detective Dietz remained with the victim during the hearing giving her moral support and also giving testimony to the Board as to the incident of April 5, 1987.

I personally would like to commend Detective Dietz for her interest in the Violent Crimes Compensation Board and the innocent victims of violent crimes.

Very truly yours,

Oakley M. Banning, Jr.
Executive Secretary

OMB/bew

cc: Det. Nancy Dietz

**RECEIVED**

JAN 20 1988

OFFICE OF PUB. SAF.



RECEIVED

MAR 10 1989

OFFICE OF PUB. SAF.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**
**STATE OFFICE BUILDING**
**820 N. FRENCH STREET, 8TH FLOOR**
**WILMINGTON, DELAWARE 19801**

CHARLES M. OBERLY, III
ATTORNEY GENERAL

DIRECT DIAL:

571-2055

March 8, 1989

*Riley
Liszkiewicz
Kaczurowski
N. Dietz*

Guy Sapp, Chief of Police
Wilmington Police Department
4th and Walnut Streets
Wilmington, DE 19801

RE:   STATE V. EDWARD ROYAL

Dear Guy:

I recently completed a seven day trial in Superior Court
that resulted in the conviction of Edward Royal for the charge of
Unlawful Sexual Intercourse First Degree, Kidnapping First
Degree, and Burglary Second Degree.  The crimes took place on
August 2, 1988 at Eighth and VanBuren Streets and involved a
twenty six year old female who was attacked in her apartment at
that location.

The successful prosecution was a product of the professional
execution of the duties of your detective division and the
evidence detection/identification people who did an outstanding
job in investigating this case and presenting the evidence to the
jury.

Officers Riley, Liszkiewicz, and Kaczorowski, did an
outstanding job in collecting the evidence at the crime scene and
had it not been for their efforts this crime would have gone
unsolved.  After six to eight hours at the crime scene Officer
Riley was able to obtain a single fingerprint of Mr. Royal and he
was developed as a suspect.

Detective Nancy Dietz, not assigned to the investigation,
reviewed the facts and suggested that Mr. Royal's name be
included as a possible suspect.  A subsequent fingerprint hit was
developed and Mr. Royal was arrested the same day at his
residence.  Through the combined efforts of the evidence
collection and identification personnel of your department Mr.
Edward Royal is now pending sentencing for crimes totalling 110
years.

Guy Sapp,  Chief of Police
March 8, 1989
Page 2
_____

    I wanted to call this matter to your attention and to
express my appreciation for their professional assistance.

                        Sincerely,

                        Peter N. Letang
                        Deputy Attorney General

PNL:pam



LOMAS BANK USA

A member of the
Lomas Financial Group and FDIC
Post Office Box 8656
Wilmington, Delaware 19886-0300
(302) 594-4000

March 29, 1989

Chief Guy Sapp
Wilmington Police Department
4th Walnut Street
Wilmington, DE  19801

Re:  Letter of Appreciation

    Case File:  Dennis Summers
              George Wilmore
              Kingsley John
              Gerry Jackson

Dear Chief Sapp:

This letter is in response to the assistance that Lomas Bank USA has received from the Wilmington Police Detective Division regarding the few arrests that have been made.  It still is a good feeling to obtain the camaraderie that I receive when I ask for assistance.

In part, I would like this letter placed in each Detective's file:

Det. Lt. Ronald Stoner        Det. Randolph DeCampli
Det. Sgt. Richard Kilmon     Det. James Mac Donald
Det. Sgt. Thomas Scully      Det. Victor Ayala
Det. Sgt. William Babby      ~~Det. Nancy Dietz~~
Det. James Stallings         Det. Ronald Ferravantti
Det. Joseph Durney          Det. Dean Vietri
Det. Robert Merrill

If there is anything that I can do, please contact me directly.

Thanks Again,

*Thomas F. Curley*

Thomas F. Curley

RECEIVED

MAR 31 1989

OFFICE OF PUB. SAF.

hc 4/17/89

Three Christina Centre
201 North Walnut Street
Wilmington, Delaware 19801
1-800-622-6587

JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware



PUBLIC SAFETY BUILDING
300 NORTH WALNUT STREET
WILMINGTON, DELAWARE
19801-3936

December 12, 1994

Lt. Nancy Dietz
Wilmington Department of Police
300 N. Walnut Street
Wilmington, DE

Dear Lt. Dietz,

I would like to take this opportunity to thank you for your participation in this year's Salvation Army Kettle Drive. As you are aware, the efforts of the Salvation Army provide a great deal of comfort and support to the citizens of our community.

It is through efforts such as yours that the spirit of the Mission Statement adopted by this Department are fostered. Again, I thank you for your participation.

Sincerely,

Samuel D. Pratcher
Chief of Police

cc: Personnel File

# OFFICE OF PUBLIC SAFETY

## DEPARTMENT OF POLICE

### WILMINGTON, DELAWARE

**MEMORANDUM**

TO:     ~~Lieutenant Nancy Dietz~~
        Personnel and Planning Division

FROM:   Master Sergeant Anatoly Ostrishko
        Accreditation Manager

DATE:   Wednesday, 01 June 94

RE:     Accreditation Static Display and Tour

I would like to extend my appreciation for your participation in the Accreditation Static Display and Tour. Your professionalism and knowledge of your duties and responsibilities established a solid foundation for the begining of the Department's accreditation assessment. As you are aware, the accreditation assessment team will recommend that our Department be "accreditated." This accomplishment would not have been possible without your assistance.

Once again, thank you for your participation.


ATO/als



# Six M Investment Corporation

### Real Estate Investment
603A WEST 18TH STREET
WILMINGTON, DELAWARE 19802

**Marsili**

CARMELA J. CARROLL

ANGELA F. PIANE

BEATRICE A. MARSILI

ELVINA A. BRUCE

REGINA A.M. ALESSANDRINI

June 10, 1993

Chief Samuel Pratcher
City of Wilmington Police Department
300 N. Walnut St.
Wilmington, DE 19801

Dear Chief Pratcher:

My brother-in-law retired Lt. James J. Carroll was buried today. He was one of you, the policemen of the City who quietly go about the business of protecting us every day.

It was truly an honor to be a part of the funeral which he had. All of those who participated in the honor guard, motorcade, 21-gun salute, the playing of taps, and all of the men and women who came from the Wilmington Police Department made Jimmy's last tribute filled with honor, dignity and respect which will never be forgotten. His funeral truly was of awesome proportions.

I loved Jimmy very much. He holds a very special place not only in my heart, but in the hearts of all in my family. We will miss him dearly.

Please extend our sincerest thanks to everyone for their strength and kindness during our time of sorrow.

Sincerely,

Elvina A. Bruce

On behalf of Carmela J. Carroll,
her children, and her family

cc: Capt. Raymond Green, Traffic Division
    Capt. John Vignola, Honor Guard
    Sgt. Morton Dietz, Honor Guard ✓
    Patrolman Joseph Schiavi, Detective Division



# CHATHAM POLICE DEPARTMENT

### Chatham, Massachusetts    02633-2099



OFFICE OF
**BARRY D. ELDREDGE**
CHIEF OF POLICE

JUN 2 1 1993

CHIEF OF POLICE

June 14, 1993

Chief Samuel D. Pratcher
Wilmington Delaware Police Department
1 Safety Square
Wilmington, Delaware  19801

Dear Chief Pratcher;

I would like to express my appreciation for the diligent effort that Lt. Nancy Dietz and Detective Thomas Spell extended to Lt. Michael Walker of my department during his recent visit to your city.

Due to their assistance, a twenty-year old missing person case has been cleared.  The missing person, Miss Emily Jean Vincent, was located in your area and has assumed a new life.  Please convey to these officers my sincere appreciation for the cooperation that they provided Lt. Walker and the Chatham Police Department.

Sincerely,

Barry D. Eldredge
Chief of Police

/kac

P253

A0123



**STATE OF DELAWARE**
OFFICE OF THE GOVERNOR

MICHAEL N. CASTLE
GOVERNOR

September 5, 1991

Sergeant Nancy Dietz
Internal Affairs
Wilmington Police Department
300 N. Walnut Street
Wilmington, DE  19801

Dear Sgt. Dietz:

I am pleased to appoint you as a member of the Task Force on the Homeless as the representative of Wilmington Police Department to serve a term during the pleasure of the Governor.

The Task Force was created by House Joint Resolution No. 7, a copy of which is enclosed for your information.  Also enclosed please find a list of the entire membership of the Task Force.

I have asked Neil Meisler, Director of the Division of Alcoholism, Drug Abuse and Mental Health to be responsible for arranging the initial meeting of the Task Force.  You will be hearing directly from Neil as to the time and place of that meeting.

On behalf of the citizens of Delaware, thank you for your willingness to serve the State on this Task Force.

Sincerely,

Michael N. Castle
Governor

MNC:ehs
Enclosures

OFFICE OF PUBLIC SAFETY

WILMINGTON, DELAWARE

<u>MEMORANDUM</u>

TO:     Lt. Nancy S. Dietz, WPD
        Personnel and Planning Division

FROM:   I. Jaime Figueras, Director of Public Safety

DATE:   March 25, 1993

RE:     <u>F.B.I. National Academy Graduates Luncheon</u>

This memo is overdue, but now that I have found some time to write it, I want to express you my gratitude for having invited me to the F.B.I. National Academy Graduates luncheon on March 12, 1993. I also want to commend you for the excellent job you did in organizing said event, which was a success thanks to the professionalism and dedication displayed by you.

Although I have not had the opportunity to work directly with you, this brief contact with the quality of your work clearly indicates that you have the qualifications of a leader.

Congratulations.

IJF/eo

cc:  Samuel D. Pratcher, Chief of Police
     Insp. William Draper, Investigation Operations
     Insp. Michael Dixon, Uniformed Operations
     Capt. John Vignola, Personnel & Planning Division

P255

A0125

OFFICE OF PUBLIC SAFETY

WILMINGTON DELAWARE

*Personnel Folder*

MEMORANDUM

TO:     Captain Francis T. Monaghan, III
        Commanding Officer
        Internal Affairs Division

FROM:   Karen L. Johnson
        Director of Public Safety

DATE:   April 21, 1992

RE:     Tysheera Cooper Case


Now that we have completed the investigation of the incident involving Tysheera Cooper, I want to take this opportunity to thank you and your investigators, Lieutenant Nancy Dietz and Corporal Gary Tabor, for the work that you did on this case. I realize that this case put a lot of pressure on everybody and that on several nights you and your investigators were required to stay beyond normal working hours in order to complete your investigation. Regardless of the pressure, you all maintained your professionalism and objectivity.  Thank you for a job well done.


KLJ:jcs


cc:  Guy H. Sapp
     Chief of Police

     William J. Draper
     Inspector of Investigative Operations



**MID-ATLANTIC ASSOCIATION OF
WOMEN IN LAW ENFORCEMENT**
P.O. Box 7248 • Norfolk, VA 23509

RECEIVED

JUN 0 6 1989

OFFICE OF PUB. SAF.

Chief Guy H.Sapp
Wilmington Police Department
Public Safety Building
300 North Walnut Street
Wilmington, DE  19801-3936

June 1, 1989

Dear Chief Sapp:

I would like to take this opportunity to thank you for your support in sponsoring the Mid-Atlantic Association of Women in Law Enforcement Training Conference held in Wilmington last week.  The seminar was very professional from the aspect of training, the accommodations,and the detailed organization.  Sergeant Rita Crowley and her staff did a wonderful job planning and hosting the conference.  Appreciation is also expressed to those officers who gave assistance to the fun run, providing transportation,and assisting with the outstanding party at the Delaware Association of Police along with other miscellaneous assignments that assisted the coordinators.

Personally, I enjoyed the opportunity to visit your city, meet the women from the Wilmington Police and enjoy the hospitality that was extended by your entire department.  The success of our conference is a reflection upon the caliber of women and men from your department who regard law enforcement as a profession and are devoted to furthering the general improvement of police services.  I'm sure I needn't tell you how fortunate you are to have these dedicated officers in your department.

Thank you for your interest and support in our conference and of our organization.

Sincerely,

Marie Chiarizia
President, MAAWLE

hc 6/5/89

JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801-3537



**M E M O R A N D U M**

CHIEFS OFFICE

MAR 2 / 1995

TO:     Samuel Pratcher
        Chief of Police

FROM:   S.A. Wayne Crosse
        Director of Personnel

DATE:   March 20, 1995

RE:     **RECRUITMENT FOR THE 83rd WILMINGTON POLICE ACADEMY**

Now that the Police Recruitment Process has been completed, the City of Wilmington and the Department of Personnel wishes to say **thanks** and express our appreciation to Police Officers Lt. Nancy Dietz and Sgt. James Stallings for their outstanding dedication and contribution in making the recruitment process successful. Without their time and dedicated efforts the 83rd Wilmington Police Academy may not have started on schedule.

We especially commend Lt. Dietz for spearheading this initiative with her untiring effort to ensure the recruitment process met the requirements for diversity set by the Police Department, while staying within the EEO Guidelines for recruitment.

Lt. Dietz overcame every obstacle with the same dedication, professionalism, and determination you come to expect from an outstanding police officer, while keeping an eye on our target date of March 6, 1995. Lt. Dietz never wavered from this target even when popular opinion may have indicated otherwise. As a result of her efforts, you now have 25 new and eager diverse police recruits enrolled in the 83rd Wilmington Police Academy.

Again, we offer our sincere thanks to Lt. Dietz and Sgt. Stallings for a job well done.

**P258**

**A0128**

Memorandum
March 20, 1995
Page 2


c:  A. Boswell
    Administrative Assistant to the Mayor

    W. J. Yanonis
    Deputy Director of Personnel

    John Vignola
    Inspector

    Keith Ash
    Captain

    Nancy Dietz
    Lieutenant

    James Stallings
    Sergeant

    Jacqueline Jenkins
    Personnel Administrator

    FILE

A0129

# City of Wilmington
## Delaware

JAMES H. SILLS, JR.
MAYOR

PUBLIC SAFETY BUILDING
300 NORTH WALNUT STREET
WILMINGTON, DELAWARE
19801-3936



June 3, 1997

Captain Nancy Dietz
Wilmington Department of Police
300 North Walnut Street
Wilmington, DE   19801

Dear Captain Dietz:

I would like to personally extend my sincere appreciation for your participation and contribution involving the stand-off situation which occurred on Sunday, May 4, 1997. The collaborative efforts of both law enforcement agencies is just one of the many fine examples of the effectiveness of well organized law enforcement operations.

Fortunately, the situation ended without any fatalities and/or injuries to any citizen or law enforcement officers; however, it could not have been possible without your assistance.

Again, thank you for your unconditional and noteworthy support.

Sincerely,

Michael A. Boykin
Interim Chief of Police

MAB/pap

g:\admin\standoff.ltr



STATE OF DELAWARE
EXECUTIVE DEPARTMENT
CRIMINAL JUSTICE COUNCIL
STATE OFFICE BUILDING – FOURTH FLOOR
820 FRENCH STREET
WILMINGTON, DELAWARE 19801

TELEPHONE (302) 577-3430
FAX (302) 577-3440

December 11, 1996

Chief Samuel Pratcher
Wilmington Police Department
300 N. Walnut Street
Wilmington, DE 19801

Dear Chief Pratcher:

On December 11, 1996, I conducted an on-site inspection of your facility, and examined your juvenile arrest logs dating from November 1, 1994 to November 30, 1995. As a result of this inspection, the Wilmington Police Department has been found to be in full compliance with the Juvenile Justice and Delinquency Prevention Act and House Bill 303.

The Criminal Justice Council Staff would like to personally congratulate your Department on your efforts to establish full compliance of the JJDP Act.

If you have any questions or require further information, please contact me at 577-2641.

Sincerely,

Matt Rubincam
Criminal Justice Planner

MR:aj

cc:    Lt. Nancy Dietz

JAMES H. SILLS, JR.
MAYOR



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537



November 15, 1996

Lieutenant Nancy Dietz
Wilmington Department of Police
Criminal Investigatives Division
300 North Walnut Street
Wilmington, DE    19801

Dear Lieutenant Dietz:

I would like to take this opportunity to personally thank you for the assistance you provided during the African/Caribbean Summit held in our city on October 17 and 18, 1996. Your professionalism and dedication to duty allowed for the summit to be highly successful and incident free.

The Ambassadors and their staff were deeply appreciative of your efforts and were overly impressed by the level of security provided for their personal safety.

Please keep up the excellent work. Your actions reflect well for the Wilmington Department of Police, which I personally consider one of the finest municipal police departments in our country.

Sincerely,

James H. Sills, Jr.
Mayor

JHS/pap

g:\mayorcorresp.summit.ltr

P262

A0132



JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware

LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801-3537

June 23, 1995



Wilmington Department of Police

Dear Lieutenant Dietz:

On behalf of the citizens of Wilmington and this Administration, I would like to congratulate you, as an officer of the Wilmington Department of Police, for your dedication and commitment to Community Policing. Your efforts have resulted in the City of Wilmington receiving an Outstanding Achievement Award in the City Livability Awards competition sponsored by the U.S. Conference of Mayors and Waste Management, Incorporated.

You should know that Wilmington was one of six cities afforded this honor from the 75 submissions received by the Conference. Most noted, remarked one of the judges on the panel, was that our program is, "One of the most comprehensive and finest commitment to community policing as any place I have seen." His words reflect my sentiments about the excellence of the Wilmington Department of Police.

I accepted the award at the Conference's 63rd annual meeting on June 19 in Miami, Florida, and cordially invite you to celebrate our success on Wednesday, June 28 at Noon on Rodney Square. To compensate for the small media coverage we received, particularly from the News Journal, we are staging our own celebration and introducing our 83rd class of police cadets to the general public as well. I hope you will join us in paying tribute to your department, and the many men and women who keep it outstanding in performance.

Again, my congratulations to you and the department for a job truly well done.

Sincerely,

James H. Sills, Jr.
Mayor

# pacem in terris    peace on earth

1304 N. Rodney Street • Wilmington, DE 19806-4227
302-656-2721 • Fax 302-656-2730 • Incorporated 1967
E-mail: pinterris@aol.com

Dr. Sally Milbury-Steen, Executive Director
Donna Irwin, Office Secretary

**Honorary Board Members**
Rev. Albert P. Neilson
Richard H. Rhoads

**Board of Directors**
Rev. Peter Wells
*Chair*

Tim Bavard
*Vice Chair*

Rick Gran-Reynolds
*Secretary*

Adele Baldwin
*Treasurer*

Don R. Kuespert
*Finance Chair*

Virginia Ahrens
Carolyn Bryant
Canon Lloyd Casson
Lillian Jones-Chisholm
Maureen Frey
Rev. Thomas Kerr
Ruth Kozer
Don Kuespert
James G. Lertola
Dorothy Medeiros
Chris Rhoads
Bob Raughley
Mary Starkweather-White
Bill Taylor

**Ulster Project**
Mr/Mrs. Charles A. Robinson
*Founders*
*Ulster Project Delaware*

**Ulster Project**
*Co-Chairs*
Duane Eaton
Jackie Conaty

**Other Projects**
Alliance for the
  Restoration of Ex-Offenders
Committee for a Sane Military
  Policy and Budget
Creating the Peaceable Classroom
DE Citizens Opposed
  to the Death Penalty
DE Comm. for Racial Justice
  and Harmony
Economic Justice Committee
Healing Racism Project
Volunteer Service
  Exchange International

December 7, 2000

Delaware Special Olympics
University of Delaware
Newark, DE 19716-1901

Dear Friends,

The enclosed contribution from Delaware Pacem in Terris is being given to you in honor of Captain Nancy Dietz and her team of officers and plainclothes men at the Wilmington Department of Police.

We have chosen to honor them in this way as an expression of our appreciation for the excellent security they provided for Morris Dees when he came to Wilmington on October 16th to speak at our Annual Dinner. Because of his work at the Southern Poverty Law Center which involves litigation against hate groups in the U.S., Mr. Dees lives under constant death threats.

Everyone who took part in making Mr. Dees' stay in Delaware safe and sound deserves congratulations for their professionalism. Since the Delaware Special Olympics is a charity close to their heart and one to which the Fraternal Order of Police is very devoted, it seemed proper and appropriate to send this contribution of $300 to you as an ideal way to express our thanks.

Could you please see that notification of this gift is sent to:

Capt. Nancy Dietz
Wilmington Department of Police
Public Safety Building
300 N. Walnut Street
Wilmington, DE 19801

Thank you so much for your good work and for your assistance in this matter.

With all good wishes,

Sally Milbury-Steen

Community Peace Education Organization
Cooperating with the Christian Council of Delaware and Maryland's Eastern Shore



## *Special Olympics*
### *Delaware*

December 17, 2000

Captain Nancy Dietz
Wilmington Police Department
Public Safety Building
300 N. Walnut Street
Wilmington, DE 19801

Dear Nancy,

I would like to inform you that we received a $300.00 donation on your behalf and that of your team of Wilmington Police officers who provided security for Pacen in Terris on October 16th.

Special Olympics is a wonderful example of the intrinsic value of sports competition – cooperation, generosity, good sportsmanship and the will to succeed. On the field and off, the dedication and hard work of the athletes, coaches and volunteers associated with Special Olympics serve as an example of what can be accomplished when people work as a team.

Thanks for being a part of our team.

Sincerely,

Ann M. Grunert
Executive Director

*Nancy,*
*I included a copy of the letter*
*I received from Sally. Thank you*
*for thinking of us!*

▼

Mailing Address: University of Delaware/ Newark, DE 19716-1901
Office Locations: 619 S. College Avenue/ Newark, DE 19716 / 302-831-4653 / fax 302-831-3483
546 S. Bedford Street / RM 2125 / Georgetown, DE 19947 / 302-855-0546 / fax 302-855-0547

*Created by the Joseph P. Kennedy, Jr. Foundation for the Benefit of Citizens with Mental Retardation*

P265

A0135

Wilmington, DE 19802
Dec 28, 1998

Dear Chief Boykin,

I am writing to express my thanks to four of your officers for their part in a classroom visit they made to my 5th grade class on Dec. 18th. My class was studying mysteries and criminal investigations and your officers did a fantastic job of explaining what is involved in a criminal investigation. In fact, they set up a mock crime scene so the class got "almost" first hand experience in an investigation.

Again, I would like to thank Nancy Deitz for setting it all up, and Marlin Deitz, George Butler and Fred Filippone for being her "back-up" and "support". They all were great with the class!

Respectfully,
P. Kirin (teacher)
Grade 5   PS duPont

**P266**

**A0136**

I thanked Nancy, but I wanted to let you know how much I appreciated and valued her input and Advice.

Please, call me if you need further Clarification. God Bless!

Sincerely,

Dub Gries

---

February 16, 01

Dear Mike,

I hope things are going well. We, at Catholic Charities, are rooting for you!

I'm writing to share my appreciation for Nancy Dietz's help Yesterday. I needed Advice on a Particular case, called her in the morning and she returned my call at my home as she left work. I really _____ ___. + I ___ help and her quick ___

Capt. N. Dietz



# Crime Free Multi-Housing Program

**Officer Dave Rowe, State Coordinator**
**Instructor Trainer - National Crime Free Program**



Sioux Falls Police Department Crime Prevention Unit • 500 North Minnesota Avenue, Sioux Falls, SD 57104 • (605) 367-7229

March 29, 2001

+PO

Captain Nancy Dietz
Wilmington Police Dept
300 N Walnut
Wilmington DE 19801

Dear Nancy,

Thanks so much for your hospitality, last week!  I was impressed with the group that you folks assembled to learn about the Crime Free Program, and impressed, as well, with the enthusiasm shown by the people that we met with the following day.

I have already received a note from the Weed and Seed people, requesting more information on the program, as if they may want another presentation done for their benefit.

I have included certificates for those who attended and would appreciate you getting these to those people.   Most of these will be the green certificate indicating program attendance.  The blue certificates are for those of you who may be teaching this program.  Basically, we issue these to law enforcement who have sat through the program, indicating that you can teach this program, yourself, based on how you configure it to work locally.

I don't have your email address.  Lt Henry gave me hers and I tried sending you and email, substituting your name for hers, but it didn't go through.  I really appreciate the support your department shows for this program, from the Chief, on down.

Let me know what I can do to help you with any follow up.   If the Weed and Seed people want us to do something for them, I'll keep you posted, in the event your agency would like to be involved in the training, assuming it is held in or around Wilmington.

Sincerely,

Dave Rowe
Crime Free Program Trainer



STATE OF DELAWARE
DEPARTMENT OF PUBLIC SAFETY
DIVISION OF STATE POLICE
P.O. BOX 430
DOVER, DELAWARE 19903

July 5, 2001

Chief Michael Szczerba
Wilmington Police Department
300 N. Walnut St.
Wilmington, Delaware 19801

Dear Chief Szczerba:

I'd like to share with you the success of a cooperative effort between Delaware State Police, Wilmington Police Department, ATF, and the Division of Revenue. Over the past few months, several convenience stores in New Castle County have been victimized by suspects entering the store and removing large quantities of cigarettes during business hours. The suspect's actions were very intimidating and aggressive. During this time, State Police Troop 1's area was victimized seventeen (17) times. An extensive investigation identified two groups that were responsible for the thefts. Upon their arrests and interrogations, the New Garden Chinese Restaurant, 2701 Northeast Blvd, Wilmington, was identified as a major fencing operation for the stolen cigarettes.

On June 21, 2001, Troop 1 executed a search warrant at the restaurant. Our respective tactical teams conducted the high-risk entry in a well-planned joint effort. The search netted 742 cartons of stolen cigarettes, $28,867 USC, and a semi-automatic handgun.

Captain John J. Laird, Troop 1 Commander, and Cpl/2 Steven Mayberry, Case Investigator, have brought this operation to my attention because of the commendable professionalism, cooperation and teamwork demonstrated by your personnel. In particular, we would like to extend our gratitude to Detective John Ciritella, Sergeant Billy Brown, Captain Sean Finnerty, and Captain Nancy Dietz.

If we can be of any assistance to your department in the future, please do not hesitate to contact us.

Very truly yours,

Colonel Gerald R. Pepper, Jr.
Superintendent

GRP: jjl

CHIEF'S OFFICE

JUL 2 0 2001



**City of Wilmington**
**Delaware**



JAMES M. BAKER
MAYOR

WILLIAM T. McLAUGHLIN - PUBLIC SAFETY BUILDING
300 NORTH WALNUT STREET
WILMINGTON, DELAWARE
19801 - 3936

May 5, 2004

Captain Nancy Dietz
Commanding Officer
Office of Professional Standards
300 North Walnut Street
Wilmington, DE  19801

Dear Captain Dietz:

This letter is to thank you for your assistance in the 89th Wilmington Police Academy Oral Board Testing, on the week of April 19, through April 23, 2004.  Due to your vast experience and the knowledge of the other members that assisted, we believe that the candidates were evaluated in a fair and impartial manner.

The City of Wilmington and the Department of Police have greatly benefited from your evaluation of the candidates of the 89th Wilmington Police Academy.

Sincerely,

Michael J. Szczerba
Chief of Police

MJS/wpc

g:\admin\89th Wilmington Police Academy



U.S. Department of Justice

*United States Attorney's Office*
*District of Delaware*

---

Chase Manhattan Centre                    *(302) 573-6277*
1201 Market Street, Suite 1100        *FAX (302) 573-6220*
P.O. Box 2046
Wilmington, Delaware 19899-2046

April 26, 2001

Captain Nancy Dietz
Wilmington City Police
Public Safety Building
300 North Walnut Street
Wilmington, Delaware 19801

Dear Nancy:

  As you may be aware, I am leaving my position as United States Attorney for the District of Delaware as of April 30, 2001. My experience has been a wholly positive one, and I truly appreciate the opportunity of working with you.

  I believe that our Integrated Firearm Reduction Strategy Committee can make a real difference in reducing gun violence, and I certainly wish you, and all the members of the committee, the best of luck in this most worthwhile effort.

With best regards,

CARL SCHNEE
United States Attorney

CS:sf

August 6, 2002

Michael Szczerba
Chief of Police
Wilmington Department of Police
Public Safety Building
300 N. Walnut Street
Wilmington, DE 19801

**Catholic Charities**

*Diocese of Wilmington*



Dear Chief Szczerba: *Mike,*

First, let me thank you for writing a letter of support for the agency's request for proposal on a project to serve male youth from the Division of Youth Rehabilitative Services in the State Children's Department. I will let you know the decision once we receive it.

The remainder of my letter and the reason I am writing is to, once again, commend two of your officers for their help to Catholic Charities. On July 23, I received a call at home about vehicles that were damaged at Catholic Charities headquarters at Fourth and Greenhill. The staff was concerned that there may have been some confusion over whether the police were coming and asked me if I might be able to make a few phone calls. I was able to get in touch with Captain Nancy Deitz at home to ask her if she might look into the situation. (She had graciously given me her home phone number which I will cherish and protect). She did so willingly and without hesitation and then called me back. This was of course on her personal time

I had also left a message on Lt. Mitch Rock's voice mail to call me at 10 a.m. the next day as he had known of some of these neighborhood issues which were indicated at the presentation at Catholic Charities that he and Sergeant Bill Wells conducted on April 2, 2002. I had "jumped the gun" and called him prior to 10 a.m. although he was certainly ready to contact me as I had requested. He was very helpful as well.

Once again, it is my pleasure to describe how refreshing it is to be able to get a timely response from the Wilmington Police Department. Unfortunately, this was not the case several years ago. I know that you will pass on my thanks to both Nancy and Mitch. Please assure them that we take their help and support, as well as yours and the entire Wilmington Police Department's, with the highest regard and confidence.

Please know if there is anything that I or Catholic Charities would be able to do to help you, your officers, or the people whom you serve, please do not hesitate to give me a call.

I look forward to seeing you on September 18 at 12:30 for lunch (promising plenty of potato chips).

Sincerely,

*Barb  Thanks, as always!*

Barbara Grieco, MC, MBA
Deputy Director

BG:asw
cc:    Allan Daul, Executive Director
       BGFile
       Executive Office – Greenhill Security File

- CHIEF'S OFFICE

AUG 21 2002



*United Way*

*COA*
*ACCREDITED*

*Administrative Services*
*Executive Office    Development and Community Relations Office    Finance Office*

2601 W. Fourth Street · P.O. Box 2610 · Wilmington, DE 19805 · 302-655-9624
Executive Office and Development and Community Relations Office Fax: (302) 655-9721
Finance Office Fax: (302) 655-9753

*www.cdow.org*

**Catholic Charities**







CHIEF'S OFFICE

NOV 2 9 2005

*147th*

**POLICE DEPARTMENT**

**ALLAN J. WEBSTER, SR.**
*Chief of Police*

**MARYLAND**

*45th*

**699 W. SALISBURY PARKWAY**
**SALISBURY, MARYLAND 21801**

**410-548-3165**

November 23, 2005

Michael Szczerba
Chief of Police
Wilmington Police Department
300 N. Walnut Street
Wilmington, Delaware 19801

Dear Chief Szczerba:

Captain Nancy Dietz recently assisted this agency by serving on a promotional interview board for the rank of Captain. I would like to extend my personal thanks to Captain Dietz for lending her expertise to our promotional process.

Sincerely,

Allan J. Webster
Chief of Police

cc: Capt. Nancy Dietz

**WILMINGTON DEP.    TMENT OF POLICE**

**Office of Chief Michael J. Szczerba**

| TO: *Capt. N. Dietz* | DIVISION: *H.R.O.* | DATE: *12-15-05* |
|---|---|---|

☐ Inspector/Investigative Operations   ☐ Inspector/Uniformed Operations

| | | | |
|---|---|---|---|
| ☐ | Approved | ☐ | Investigate and Report |
| ☐ | Disapproved | ☐ | Noted |
| ☐ | Comment | ☐ | Recommendation |
| ☐ | File | ☐ | Return |
| ☐ | Commendation | ☐ | See/Call me |
| ☐ | Handle | | |

REMARKS: *Nancy,*

*I appreciate your sharing of your expertise and representing our department in such a positive manner.*

*Sincerely,*

| Signature of Sender: *Chief S.* | Return by: |
|---|---|

/wpc
Cr. 1/01
g:\admin\circulationshoot.frm

✱ *Copy For H.R.O personnel File*

JAMES M. BAKER
MAYOR

# City of Wilmington
## Delaware



WILLIAM T. McLAUGHLIN - PUBLIC SAFETY BUILDING
300 NORTH WALNUT STREET
WILMINGTON, DELAWARE
19801 - 3936

January 20, 2006

Captain Nancy Dietz
William T. McLaughlin Public Safety Building
300 North Walnut Street
Wilmington, DE 19801

Dear Captain Dietz:　*Nancy,*

Thank you for participating in the 2005 "Red Kettle Campaign" of the Salvation Army. This year's group gave fourteen (14) hours of volunteer time and raised a total of $572.63 at the intersection of W. 9th and N. Market Streets, ringing the bell. It is because of working together with one goal in mind, that we were able to help others who were in need. Because of your willingness to stand and brave the cold temperatures, we were able to provide a little joy to those less fortunate than ourselves at Christmastime.

Thank you for your compassion and commitment. Let's do it again next year!

Sincerely,

Michael J. Szczerba
Chief of Police

MJS/lah

cc:　H.R.D. Personnel File

# City of Wilmington
## Delaware

JAMES M. BAKER
MAYOR

WILLIAM T. McLAUGHLIN - PUBLIC SAFETY BUILDING
300 NORTH WALNUT STREET
WILMINGTON, DELAWARE
19801 - 3936



May 5, 2004

Captain Nancy Dietz
Commanding Officer
Office of Professional Standards
300 North Walnut Street
Wilmington, DE 19801

Dear Captain Dietz: *Nancy,*

This letter is to thank you for your assistance in the 89th Wilmington Police Academy Oral Board Testing, on the week of April 19, through April 23, 2004. Due to your vast experience and the knowledge of the other members that assisted, we believe that the candidates were evaluated in a fair and impartial manner.

The City of Wilmington and the Department of Police have greatly benefited from your evaluation of the candidates of the 89th Wilmington Police Academy.

Sincerely,

Michael J. Szczerba
Chief of Police

MJS/wpc

g:\admin\89th Wilmington Police Academy

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON   DELAWARE


MEMORANDUM

TO:        Sergeant Nancy S. Dietz
           Internal Affairs Division

FROM:      Guy H. Sapp
           Chief of Police

DATE:      December 21, 1990

RE:        Internal Investigation


As a result of the investigation that was conducted during the month of August 1990, regarding supervisory problems on "F" Platoon, our assessment of these problems revealed that some deficiencies exist regarding Lieutenant Howell's actions.

The two areas of concern are the management skills and interpersonal skills.  To address these concerns, certain actions have been taken and other steps will be taken in the near future to provide Lieutenant Howell (as well as other members of the department) with the necessary training to enhance managerial, supervisory, and interpersonal skills.

I am confident that the steps we have taken and the scheduled training will eliminate many of the problems we have experienced in the past.


GHS:jcs


P361

**A0147**

# WILMINGTON POLICE DEPARTMENT
## 2005 Organization Chart

CHIEF OF POLICE

**(A)** INSPECTOR Investigative Operations

**(B)** INSPECTOR Uniformed Operations

CAPTAIN Criminal Investigations

CAPTAIN Drug, Organized Crime & Vice

CAPTAIN Office of Professional Standards

CAPTAIN Human Resources

CAPTAIN Special Operations

CAPTAIN Uniformed Services

CAPTAIN Communications & Technology

CAPTAIN Support Services

---

**(A)** INSPECTOR Investigative Operations

**CAPTAIN Criminal Investigations**
- School Resources
- Domestic Violence
- Victim Services
- Youth Aid/ Missing Persons
- Intelligence Unit
- 2 Platoon Investigators
- Special Investigations
- Forensic Services Unit
- Financial Crimes
- Crime Analysis

**CAPTAIN Vice Squad**
- Investigators
- Drug Control Officer
- Safe Streets

**CAPTAIN Office of Professional Standards**
- Investigators
- Court Liaison Officer
- Extra Job Coordinator

**CAPTAIN Human Resources**
- Training Unit
- Police Academy
- Range Officer
- Planning Unit
- Budget & Grant Unit
- Personnel Unit
- Accreditation Unit

**Public Information Officer**
- Spokesperson

---

**(B)** INSPECTOR Uniformed Operations

**CAPTAIN Special Operations**
- Accident Investigation
- Traffic Enforcement
- Hit & Run Investigator
- School Crossing Guard
- P.A.L.
- Crime Prevention
- PFEO's
- K-9 Supervisor

**CAPTAIN Uniformed Services**
- Executive Officer
- 5 Platoons
- Crisis Management Team

**CAPTAIN Communications & Technology**
- Technology Unit
- Radio Room (5 Platoons)
- Tele-Serve Unit
- Camera Watch

**CAPTAIN Support Services**
- Records
- Word Processing
- Evidence Unit
- Property Unit
- Vehicle Maintenance
- Communications Data Specialist

---

Szczerba

EXHIBIT NO. 1

KWP 1-25-07

P090

A0148

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

Szczerba
EXHIBIT NO. 12
KWP/ -25-07

## INFORMATIONAL BULLETIN

TO:        ALL PERSONNEL

FROM:    Michael J. Szczerba

            Chief of Police

DATE:    Thursday, November 03, 2005

RE:        Promotions


The following Departmental Promotions are effective as of *0001 hours, Saturday, 29 October 2005:*

Gilbert R. Howell is appointed to the rank of Inspector;

Jerry L. Custis is promoted to the rank of Captain;

Faheem A. Akil is promoted to the rank of Lieutenant;

Amy L. Rausch is promoted to the rank of Sergeant;

*The following Departmental Promotion was effective and retroactive as of 0001 hours on Saturday, 20 August 2005:*

Donald A. Bluestein is promoted to the rank of Sergeant.


MJS/md/bem/als                      - 1 -                                2005-126



OFFICE OF THE UNIVERSITY REGISTRAR
P.O. BOX 9009
CHARLOTTESVILLE, VA 22906-9009

RECORD ID 095385995
BIRTHDATE
DATE PRINTED 03/08/94

| COURSE NUMBER | COURSE TITLE | GRADE | CREDITS | COURSE NUMBER | COURSE TITLE | GRADE | CREDIT |
|---|---|---|---|---|---|---|---|

COMPLETED COURSES

SPRING 1987 DIVISION OF CONTINUING EDUCATION
*CU 956 CONST CRIM PROCEDURE          A    3.0
*CU 365 CLAS OF FINGERPRINTS          B    1.0
*CU 379 ETHICS/DISCIPLINE             B    1.0
*CU 465 INTERPERSNL VIOLENCE          A    3.0
*CU 501 HUMAN BEHAV IN ORGNS          A    3.0
*CU 521 PROB L E INSTRUCTION          A    3.0
CRIMINAL JUSTICE EDUC
15 HR CERTIFICATE
MARCH 20, 1987
*** PAGE 1 OF 1/ END OF TRANSCRIPT ***

*Scezerba*
EXHIBIT NO. *13*
KWP *1-2587*

ISSUED TO STUDENT
OFFICIAL TRANSCRIPT IF DELIVERED
IN SEALED ENVELOPE

RAISED SEAL NOT REQUIRED
This official university transcript is printed
on secured paper and does
not require a raised seal.

*COURSE NOT COMPUTED IN GRADE POINT AVERAGE.

INTERIM REGISTRAR

A BLACK AND WHITE COPY OF THIS RECORD IS NOT OFFICIAL

CONSENT

AND SHOULD NOT BE RELEASED WITHOUT THE STUDENT'S WRIT

THE INFORMATION CONTAINED IN THIS TRANSCRIPT IS CONFIDEN

# THE·PENNSYLVANIA·STATE·UNIVERSITY

BY·AUTHORITY·OF·THE·BOARD·OF·TRUSTEES·AND·UPON

THE·RECOMMENDATION·OF·THE·FACULTY·AND·OF·THE·SENATE

HEREBY·CONFERS·UPON

## NANCY·ANNE·SPELL

THE·DEGREE·OF

## BACHELOR·OF·SCIENCE

IN·RECOGNITION·OF·THE·COMPLETION·OF·THE·MAJOR·IN

## ADMINISTRATION·OF·JUSTICE

IN·TESTIMONY·WHEREOF·THE·UNDERSIGNED·HAVE·SUBSCRIBED

THEIR·NAMES·AND·AFFIXED·THE·SEAL·OF·THE·UNIVERSITY·THIS

MONTH·OF·NOVEMBER·A·D·1979

PROVOST·OF·THE·UNIVERSITY

DEAN·COLLEGE·OF·HUMAN·DEVELOPMENT



PRESIDENT·OF·THE·BOARD·OF·TRUSTEES

PRESIDENT·OF·THE·UNIVERSITY

Szczerba

EXHIBIT NO. 14

KWP 1-25-67

# NANCY S. DIETZ    300 N. Walnut Street, Wilmington, Delaware 19801 (302) 576-3193

## PROFESSIONAL EXPERIENCE AND ASSIGNMENTS

**1997 – PRESENT**
*Captain*
- Commanding Officer, Human Resources Division
- Commanding Officer, Office of Professional Standards
- Commanding Officer, Criminal Investigations Division

**1991 – 1997**
*Lieutenant*
- Commander of Criminal Investigations Platoon
- Deputy Commander of Human Resources Division
- Commander of Patrol Platoon in Uniformed Services

**1989 – 1991**
*Sergeant*
- Investigator for the Office of Professional Standards
- Supervisor of Patrol Platoon Squad in Uniformed Services

**1980 – 1989**
*Patrol Officer / Detective*
- Investigator in the Criminal Investigations Division
- Investigator in the Drug, Organized Crime & Vice Division
- Patrol Officer in the Patrol Division

## EDUCATION

| | | |
|---|---|---|
| 2005 | *Wilmington College* | New Castle, De. |
| | Currently enrolled in Graduate Degree Program | |
| | Leadership & Administration in Administration of Justice | |
| | | |
| 1975 – 1979 | *Pennsylvania State University* | State College, Pa. |
| | Bachelor of Science Degree, Administration of Justice | |
| | | |
| 1987 | *FBI National Academy* | Quantico, Virginia |
| | University of Virginia | |

## PAST SPECIAL ASSIGNMENTS / POSITIONS

- Commander, 83rd Wilmington Police Academy
- Chairperson, United Way Campaign for Wilmington Police
- Chairperson, Special Olympics Campaign & Torch Run
- Team Leader, Crisis Management Hostage Negotiation Team
- Member, Governor's Task Force for the Homeless
- Representative, Juvenile Justice Advisory Board
- Representative, Child Death Review Commission
- Representative, Children's Advocacy Center
- Representative, Child Abuse Intervention Committee
- Representative, U.S. Attorney's Integrated Firearms Reduction Committee
- Representative, U.S. Attorney's Nuisance Property Committee
- Representative, Governor's Task Force, Operation Safe Streets
- Past President, F.B.I. National Academy Associates, Maryland/De. Chapter
- Past Secretary/Treasurer, F.B.I. National Academy Associates, Maryland/De. Chapter

## CURRENT POSITIONS / MEMBERSHIPS

- YMCA Resource Center, Board Member
- Senator Biden's Military Service Academy Selection Committee
- Big Brother / Big Sister Organization, United Way
- Delaware Council on Crime and Justice
- Delaware Association of Police
- Pennsylvania State University Alumni Association
- International Association of Police Chiefs
- F.B.I. National Academy Associates, Maryland/Delaware Chapter
- Guest Speaker, Wilmington College, Women in Criminal Justice
- Instructor, Wilmington Police Academy
- Guest Instructor, University of Delaware, Continuous Education

## AWARDS

- Kiwanis Outstanding Service Award
- Police Marksmanship Distinguished Shooting Award
- 9 Department Medals
- 27 Police, Citizen and Organization Commendations
- 3 Resolutions from Wilmington City Council

## PERSONAL

Married to Marlyn Dietz, has two children, Katie 17 years old, & Madison, 13 years old.

Sec 7eb62
EXHIBIT NO. 15
KWP/-25-67

# Certificate of Completion

**New York State Police**

Bureau of Criminal Investigation

Colonel Henry F. Williams Homicide Seminar



Be it known that

## Nancy S. Dietz

Is hereby entitled to this certificate of Satisfactory Completion

Of the fourteenth annual Colonel Henry F. Williams Homicide Seminar

Held September 23rd through September 27th, 2000

At the New York State Police Academy, Albany, New York.

In witness whereof this Certificate is
Issued on the 27th day of September, 2000
In the City of Albany, New York.

James W. McMahon
Superintendent of New York State Police





# National Tactical Officers Association

Is pleased to present this Certificate to

**Nancy S. Dietz**

**Wilmington Police Department**

In recognition of your successful completion of the
Incident & Command Post Seminar Course
Conducted at Newark, DE
October 1, 2003

*Larry Glick, Executive Director*

P321

A0155





# New Mexico Tech

## ENERGETIC MATERIALS RESEARCH AND TESTING CENTER

### Nancy S. Dietz

Is hereby awarded this certificate and .4 continuing education units for successfully completing the 4 hour

**Incident Response to Terrorist Bombings Awareness Training Course**

January 11, 2002

Associate Director/Program Manager



**A ★ B ★ L ★ E**

# LAW ENFORCEMENT SEMINARS

**Thomas & Means, L.L.P.**

*Hereby Certifies That*

NANCY DIETZ

*Attended The Program*

Managing Police Discipline – Atlantic City, NJ

*On The Date(s) Of*

May 22-24, 2002    (17 hours/instruction)

Robert F. Thomas, Jr.

*Randolph B. Means*



# U.S. Department of Justice
## Federal Bureau of Investigation
### and
### Baltimore County Police Department

Presents this Certificate

to

NANCY DIETZ
in recognition of attendance at

*Eighteenth Annual*
## Hostage Negotiation Seminar
*Baltimore County, Maryland*
*February 1997*

_Terrence B. Sheridan_
Chief
Baltimore County Police Department

_David R. Knowlton_
Federal Bureau of Investigation
Baltimore Division

P335

A0158




# U.S. Department of Justice
## Federal Bureau of Investigation
### and
## Baltimore County Police Department

Presents this Certificate

to

**NANCY DIETZ**
in recognition of attendance at

*Seventeenth Annual*
*Hostage Negotiation Seminar*
*Baltimore County, Maryland*
*February 1996*

Special Agent in Charge
Federal Bureau of Investigation
Baltimore Division

Chief
Baltimore County Police Department

FBI/DOJ



The F.B.I. National Academy Associates

*Certificate of Attendance*

This is to certify that

*Nancy M. Diesel*

Attended the 2003 Training Conference sponsored by the Maryland/Delaware
Chapter of the FBI National Academy Associates

*May 4th – May 7th, 2003 in Ocean City, Maryland*

**MARYLAND DELAWARE CHAPTER**

Chapter President

Secretary / Treasurer



*This Certificate of Participation is awarded to*

Nancy Dietz

*for 15.0 hours of training and in Recognition of Attendance at the FBI National Academy Associates National Training Conference and Expo*

*July 2-6, 2005*

*Orlando, Florida*

FBINAA 2005
Orlando, Florida
FBI National Academy Associates
National Training Conference/Expo
July 2 - 6, 2005

**Celebrating America...
Securing Our Homeland**

_Szczerba_
EXHIBIT NO. _16_
KWP 1-25-07

# *Official Commendation*

# City of Wilmington



# Delaware
## DEPARTMENT OF POLICE

### *Awarded to*
### PATROLWOMAN NANCY SPELL

ON OCTOBER 10, 1982, AT 2213 HOURS, PATROLWOMAN NANCY SPELL AND HER PARTNER, WHILE ON PATROL IN THE 500 BLOCK OF GARASCHES LANE, OBSERVED A VEHICLE PARKED ALONG THE SIDE OF A CLOSED BUSINESS. THE OFFICERS CHECKED THE VEHICLE AND FOUND IT TO BE OCCUPIED BY A MAN, A WOMAN, AND A SMALL CHILD. FURTHER INVESTIGATION REVEALED THAT THE MALE SUBJECT HAD BROUGHT THE FEMALE TO THAT LOCATION AGAINST HER WILL AND WAS ATTEMPTING TO RAPE HER WHEN THE OFFICERS INTERVENED.

PATROLWOMAN NANCY SPELL'S ALERTNESS AND ATTENTION TO DUTY PREVENTED THE COMPLETION OF THIS RAPE AND CAUSED THE APPREHENSION OF THE PERSON RESPONSIBLE. PATROLWOMAN NANCY SPELL IS OFFICIALLY COMMENDED, IS AWARDED ONE DAY OFF, AND IS AWARDED THE DISTINGUISHED SERVICE RIBBON.



**APPROVED BY**

**DENNIS P. REGAN**
*CHIEF OF POLICE*

12-22-82 H.C. copies to Comm. Book, Ribbon Book and Lieut. Monaghan.

P170

A0162

DEPARTMENT OF POLICE

WILMINGTON DELAWARE

DEPARTMENTAL INFORMATION

TO:      Dennis P. Regan
         Chief of Police

FROM:    _Capt John Doherty_
         Captain John G.P. Doherty
         Commanding Officer
         Patrol Division

SUBJECT: Patrolman Dean Vietri and Patrolwoman Nancy Spell, Recommendation Pursuant
         to General Order 72-15; Departmental Award System.

DATE:    9 December 1982

Sir:

I have the honor to call your attention to meritorious actions on the part of
Patrolman Dean Vietri and Patrolwoman Nancy Spell which occurred on 10 October
1982, and was subsequently reported under complaint number 82-65293.

On 10 October 1982, at 2213 hours, Patrolman Dean Vietri and Patrolwoman Nancy Spell,
while on patrol in the 500 block of Garasches Lane, observed a vehicle parked along
the side of a closed business. The officers checked the vehicle and found it to be
occupied by a man, a woman, and a small child. Further investigation revealed that
the male subject had brought the female to that location against her will and was
attempting to rape her when the officers intervened. Their alertness and atten-
tion to duty prevented a rape from occurring and resulted in the arrest of a felon.

I therefore recommend, that you convene an Inspectors' Review Board to consider
awarding Patrolman Dean Vietri and Patrolwoman Nancy Spell this Department's
"Distinguished Service Ribbon" as provided for by General Order 72-15, Section II,
Paragraph B., "When an officer on or off duty, without being dispatched, makes
or causes the apprehension of a felon during the commission of a felony for one
of the specific crimes listed below . . . B. Rape.

# *Official* **Commendation**

# City of Wilmington



# Delaware
## DEPARTMENT OF POLICE

### *Awarded to*

#### PATROLWOMAN NANCY A. SPELL

ON MAY 25, 1983, PATROLWOMAN NANCY A. SPELL AND HER PARTNER RESPONDED TO A REPORTED HEART ATTACK AT 907 KING STREET. THEY DISCOVERED THE VICTIM, A 73-YEAR OLD MAN, IN FULL CARDIAC ARREST. THE OFFICERS INITIATED CARDIOPULMONARY RESUSCITATION AND CONTINUED IT UNTIL RELIEVED BY A PARAMEDIC UNIT. THE PROMPT AND EFFICIENT ACTION OF THESE OFFICERS REVIVED THE VICTIM AND ENABLED HIM TO RECEIVE NECESSARY CARE. PATROLWOMAN NANCY A. SPELL IS OFFICIALLY COMMENDED, IS AWARDED ONE DAY OFF, AND IS AWARDED THE MERIT AWARD RIBBON.



**APPROVED BY**

*Dennis P. Regan*

**DENNIS P. REGAN**
*CHIEF OF POLICE*

8-23-83 H.C. copies to Comm. Book,
Ribbon Book and Capt. Monaghan. *gp*

P179

A0164

DEPARTMENT OF POLICE

WILMINGTON  DELAWARE

MEMORANDUM

TO:     Dennis P. Regan
        Chief of Police

FROM:   *Capt. John Doherty*
        Captain John G. P. Doherty
        Commanding Officer
        Patrol Division

SUBJECT: Patrolman Dean Vietri and Patrolwoman Nancy Spell; Recommendation
         Pursuant to General Order 72-15, IV (a)

DATE:   14 June 1983

Sir:

    I have the honor to call your attention to meritorious service performed by Officers Vietri and Spell on 25 May 1983, and to recommend that they be awarded the "Merit Award Ribbon" as provided for by the captioned General Order.

    This recommendation is based upon the following event:

    At 0730 hours on 25 May 1983, Officers Vietri and Spell responded to a reported heart attack at 907 King Street.  They were the first emergency unit to arrive.  They discovered the victim, a seventy-three (73) year old man, in full cardiac arrest.  Officers Vietri and Spell immediately started C.P.R. and continued it until relieved by a paramedic unit.  The victim was revived and lived until 27 May 1983.

    Dr. Cynthia M. Pronko and Nurse Lorraine Donahue of the Code Blue Team, who worked on the victim when he arrived at the Wilmington Medical Center, Delaware Division, stated that the victim would have had no chance to survive at all but for the prompt and efficient actions of Officers Vietri and Spell.

    I therefore request the convention of an Inspector's Review Board to consider this recommendation.

JGPD/ld

| Inspector | Concurs. | Day off | Ribbon |
|-----------|----------|---------|--------|
| 1. De Payne | ✓ | ✓ | ✓ |
| 2. E. J. M. | | ✓ | ✓ |
| 3. C. Dougherty | ✓ | ✓ | ✓ |

MEMORANDUM

TO:       Inspector John W. Johnson
          Chief of Staff Inspections

FROM:     Captain Robert L. Longyear
          Commanding Officer, Drug,
          Organized Crime & Vice Division

SUBJECT:  KIWANIS QUARTERLY AWARD

DATE:     24 November 1981

Sir:

In regards to the nominees for the 4th quarter Kiwanis Award
for 1981, I am submitting the name of Patrolwoman Nancy A.
Spell as a candidate for that honor. The following is a resume
of this officers personal history and her accomplishments  while
a member of the Wilmington Department of Police.


Patrolwoman Nancy Anne Spell is a graduate of Penn State Univ-
ersity, where she obtained a Bachelor of Science Degree, major-
ing in Administration of Justice.

Patrolwoman Spell has shown a great interest in improving her-
self in becoming an excellent police officer by volunterring
and completing the following schools:  Hostage Negotiating School,
Anti-Sniper School and Survival School.

A check of Patrolwoman Spells Personnell File showed that on
her yearly probation report that her supervisors in Patrol
Division also feel that she has done"tremendous work"while in
Patrol Division.

Patrolwoman Nancy Spell has reflected great credit on the Wilm-
ington Bureau of Police, by her extreme dedication and outstanding
police work since her date of appointment.

I request,therefore, due to her excellent work, that Patrol-
woman Nancy A. Spell be considered to be the 1st and only
Policewoman to be the recipient of the Kiwanis Award.

PATROLWOMAN NANCY A. SPELL, CURRENTLY ASSIGNED TO THE PATROL DIVISION OF THE WILMINGTON DEPARTMENT OF POLICE, HAS BEEN SELECTED TO RECEIVE THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982. PATROLWOMAN SPELL IS SINGLE, AND RESIDES IN WILMINGTON.

PATROLWOMAN SPELL IS A GRADUATE OF THE PENNSYLVANIA STATE UNIVERSITY, AND HOLDS A BACHELOR OF SCIENCE DEGREE IN ADMINISTRATION OF JUSTICE. SHE WAS APPOINTED TO THE DEPARTMENT OF POLICE ON JANUARY 14, 1980. UPON THE COMPLETION OF HER POLICE ACADEMY TRAINING SHE WAS ASSIGNED TO THE PATROL DIVISION.

FROM APRIL THROUGH SEPTEMBER OF 1981, PATROLWOMAN SPELL WAS ASSIGNED TO WORK UNDERCOVER WITH THE DRUG, ORGANIZED CRIME AND VICE DIVISION. AS A DIRECT RESULT OF UNDERCOVER DRUG BUYS MADE BY HER DURING THIS TIME PERIOD, SEVENTY (70) PERSONS WERE ARRESTED FOR THE ILLEGAL SALE OF DRUGS. HER WORK ALSO RESULTED IN THE SEIZURE OF $83,540 WORTH OF ILLEGAL DRUGS, INCLUDING HEROIN, COCAINE, METHAMPHETAMINES AND MARIJUANA.

ALTHOUGH NOW ASSIGNED TO THE PATROL DIVISION, PATROLWOMAN SPELL HAS CONTINUED TO ASSIST ON UNDERCOVER DRUG INVESTIGATIONS WHEN NEEDED. SHE HAS ALSO ASSISTED GREATLY IN THE DEPARTMENT'S RESPONSE TO PROSTITUTION ACTIVITY IN THE CITY. HER UNDERCOVER WORK IN THIS AREA HAS RESULTED IN THE ARREST OF MANY INDIVIDUALS ON CHARGES OF PATRONIZING A PROSTITUTE, AIDING IN THE CONTROL OF THIS ACTIVITY.

PATROLWOMAN SPELL HAS BEEN TRAINED AS A HOSTAGE NEGOTIATOR, AND FUNCTIONS IN THIS CAPACITY ON THE DEPARTMENT'S CRISIS MANAGEMENT TEAM. SHE HAS CONDUCTED THREE SUCH NEGOTIATIONS TO DATE, THE MOST NOTABLE BEING THAT WHICH OCCURRED ON APRIL 29, 1982 IN CANBY PARK. ON THAT DATE A WOMAN ARMED WITH A RIFLE HELD POLICE OFFICERS AT BAY FOR OVER TWO HOURS BEFORE SURRENDERING.

PATROLWOMAN NANCY SPELL DISPLAYS INITIATIVE AND DEDICATION IN HER WORK, BRINGING CREDIT TO HERSELF AND TO THE DEPARTMENT OF POLICE. HER CONTINUED EXCELLENT PERFORMANCE CERTAINLY MAKES HER DESERVING OF THE KIWANIS AWARD FOR THE THIRD QUARTER OF 1982.

JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801-3537

**M E M O R A N D U M**

CHIEFS OFFICE

MAR 2 / 1995

**TO:**     Samuel Pratcher
             Chief of Police

**FROM:**   S.A. Wayne Crosse
             Director of Personnel

**DATE:**   March 20, 1995

**RE:**     RECRUITMENT FOR THE 83rd WILMINGTON POLICE ACADEMY

Now that the Police Recruitment Process has been completed, the City of Wilmington and the Department of Personnel wishes to say thanks and express our appreciation to Police Officers Lt. Nancy Dietz and Sgt. James Stallings for their outstanding dedication and contribution in making the recruitment process successful. Without their time and dedicated efforts the 83rd Wilmington Police Academy may not have started on schedule.

We especially commend Lt. Dietz for spearheading this initiative with her untiring effort to ensure the recruitment process met the requirements for diversity set by the Police Department, while staying within the EEO Guidelines for recruitment.

Lt. Dietz overcame every obstacle with the same dedication, professionalism, and determination you come to expect from an outstanding police officer, while keeping an eye on our target date of March 6, 1995. Lt. Dietz never wavered from this target even when popular opinion may have indicated otherwise. As a result of her efforts, you now have 25 new and eager diverse police recruits enrolled in the 83rd Wilmington Police Academy.

Again, we offer our sincere thanks to Lt. Dietz and Sgt. Stallings for a job well done.

P258

A0169

Memorandum
March 20, 1995
Page 2


c:  A. Boswell
    Administrative Assistant to the Mayor

    W. J. Yanonis
    Deputy Director of Personnel

    John Vignola
    Inspector

    Keith Ash
    Captain

    Nancy Dietz
    Lieutenant

    James Stallings
    Sergeant

    Jacqueline Jenkins
    Personnel Administrator

    FILE

# COMMENDATION

## OFFICE OF PUBLIC SAFETY

### Department of Police

### Wilmington, Delaware

*Awarded to*

## *Captain Nancy S. Dietz*

On August 5, 1996, Captain Nancy S. Dietz and Sergeant Thomas Spell were off duty and in the area of 4th and Union Streets when they observed two subjects assaulting a third subject. The officers immediately intervened and one of the subjects attempted to flee however was apprehended. Through further investigation it was learned that the officers had interrupted a robbery in progress. Due to the officers keen observations, quick actions and dedication to duty, two felons were apprehended and further injury and property loss prevented to the victim.

Captain Nancy S. Dietz is hereby officially commended, awarded the Distinguished Service Award and one day off with pay.

RECOMMENDED BY

*Michael A. Boykin*

Chief of Police

APPROVED BY

Director of Public Safety

P205

A0171

JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING · CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

*Szczerba*
EXHIBIT NO. *12*
KWP *1-25-07*

November 15, 1996

Lieutenant Nancy Dietz
Wilmington Department of Police
Criminal Investigatives Division
300 North Walnut Street
Wilmington, DE   19801

Dear Lieutenant Dietz:

I would like to take this opportunity to personally thank you for the assistance you provided during the African/Caribbean Summit held in our city on October 17 and 18, 1996. Your professionalism and dedication to duty allowed for the summit to be highly successful and incident free.

The Ambassadors and their staff were deeply appreciative of your efforts and were overly impressed by the level of security provided for their personal safety.

Please keep up the excellent work. Your actions reflect well for the Wilmington Department of Police, which I personally consider one of the finest municipal police departments in our country.

Sincerely,

*Jim Sills*

James H. Sills, Jr.
Mayor

JHS/pap

g:\mayorcorresp.summit.ltr

JAMES H. SILLS, JR.
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801-3537

June 23, 1995

~~Lieutenant Nancy Dietz~~
Wilmington Department of Police

Dear Lieutenant Dietz:

On behalf of the citizens of Wilmington and this Administration, I would like to congratulate you, as an officer of the Wilmington Department of Police, for your dedication and commitment to Community Policing. Your efforts have resulted in the City of Wilmington receiving an Outstanding Achievement Award in the City Livability Awards competition sponsored by the U.S. Conference of Mayors and Waste Management, Incorporated.

You should know that Wilmington was one of six cities afforded this honor from the 75 submissions received by the Conference. Most noted, remarked one of the judges on the panel, was that our program is, "One of the most comprehensive and finest commitment to community policing as any place I have seen." His words reflect my sentiments about the excellence of the Wilmington Department of Police.

I accepted the award at the Conference's 63rd annual meeting on June 19 in Miami, Florida, and cordially invite you to celebrate our success on Wednesday, June 28 at Noon on Rodney Square. To compensate for the small media coverage we received, particularly from the News Journal, we are staging our own celebration and introducing our 83rd class of police cadets to the general public as well. I hope you will join us in paying tribute to your department, and the many men and women who keep it outstanding in performance.

Again, my congratulations to you and the department for a job truly well done.

Sincerely,

James H. Sills, Jr.
Mayor



# VOLUNTEER SERVICE AWARD

## NANCY DIETZ

is awarded this certificate by the City of Wilmington in recognition of outstanding performance, dedication, and contribution to the Big Brothers/Big Sisters Program

James M. Baker
Mayor, City of Wilmington

February 10, 2003
Date

SEAL OF THE CITY OF WILMINGTON DELAWARE



# VOLUNTEER SERVICE AWARD

**Nancy Dietz**

is awarded this certificate by the City of Wilmington in recognition of outstanding performance, dedication, and contribution to the Big Brothers Big Sisters Program

James M. Baker
Mayor, City of Wilmington

June 4, 2001
Date

A0175



# City of Wilmington
## Delaware



## City Council

### March 24, 1994

**WHEREAS,** Council notes with great approval the actions of Detective Robert Merrill and Deputy Fire Chief Clifton Armstead who responded to a crime in progress, even though both were "off duty" at the time; and

**WHEREAS,** former City Councilman Jesse W. Samluk and his wife, Matilda, were enjoying a meal at a Wilmington restaurant, when a man grabbed Mrs. Samluk's purse and fled on foot; and

**WHEREAS,** fortunately for the Samluk's, **Mr. Merrill** and **Mr. Armstead** both happened to be present at the time of the incident and gave chase immediately, and captured the suspect nearby; and

**WHEREAS,** these two gentlemen were able to detain the suspect until the arrival of ████████████████████ who helped make the arrest, despite injuring her hand in the ensuing scuffle with the purse snatcher.

**NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF WILMINGTON** that this Council gratefully acknowledges Detective Robert Merrill and Deputy Fire Chief **Clifton Armstead** for their selfless heroism and further recognizes the crucial involvement of Lieutenant **Nancy Dietz** in bringing the suspect to justice and returning the stolen purse intact to its owner.

**FURTHER RESOLVED** that Council commends all three of these distinguished City employees for exemplifying the highest standards of service to the citizens of Wilmington.



_____        _____
Assistant City Solicitor                              City Clerk



*Szczerba*
EXHIBIT NO. *18*
*KWP 1·25·07*

**RECEIVED**

MAR 1 0 1989

OFFICE OF PUB. SAF.

CHARLES M. OBERLY, III
ATTORNEY GENERAL

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**
**STATE OFFICE BUILDING**
**820 N. FRENCH STREET, 8TH FLOOR**
**WILMINGTON, DELAWARE 19801**

DIRECT DIAL:

571-2055



*Riley*
*Liszkiewicz*
*Kaczorowski*
*N. Dietz*

March 8, 1989

Guy Sapp, Chief of Police
Wilmington Police Department
4th and Walnut Streets
Wilmington, DE 19801

RE:    STATE V. EDWARD ROYAL

Dear Guy:

I recently completed a seven day trial in Superior Court that resulted in the conviction of Edward Royal for the charge of Unlawful Sexual Intercourse First Degree, Kidnapping First Degree, and Burglary Second Degree. The crimes took place on August 2, 1988 at Eighth and VanBuren Streets and involved a twenty six year old female who was attacked in her apartment at that location.

The successful prosecution was a product of the professional execution of the duties of your detective division and the evidence detection/identification people who did an outstanding job in investigating this case and presenting the evidence to the jury.

Officers Riley, Liszkiewicz, and Kaczorowski, did an outstanding job in collecting the evidence at the crime scene and had it not been for their efforts this crime would have gone unsolved. After six to eight hours at the crime scene Officer Riley was able to obtain a single fingerprint of Mr. Royal and he was developed as a suspect.

Detective Nancy Dietz, not assigned to the investigation, reviewed the facts and suggested that Mr. Royal's name be included as a possible suspect. A subsequent fingerprint hit was developed and Mr. Royal was arrested the same day at his residence. Through the combined efforts of the evidence collection and identification personnel of your department Mr. Edward Royal is now pending sentencing for crimes totalling 110 years.

Guy Sapp,  Chief of Police
March 8, 1989
Page 2

    I wanted to call this matter to your attention and to
express my appreciation for their professional assistance.

                Sincerely,

                Peter N. Letang
                Deputy Attorney General

PNL:pam

Szczerba
EXHIBIT NO. _19_
KWP 1-25-07

# CITY OF WILMINGTON

## Executive and Managerial
## Employee Performance Appraisal

Confidential
Performance Record For: CAPTAIN NANCY DIETZ

| JOB TITLE |
|---|
| Captain |
| DEPARTMENT/SECTION Office of Professional Standards |
| EMPLOYEE'S SOCIAL SECURITY NUMBER ▮▮▮▮▮ |
| EVALUATION PERIOD 7-1-03 to 6-30-04 · · · · · DATE OF REVIEW  9/22/04 |

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #1: Works in support of Department of Police objectives.    Weight 20%**

**Performance Objectives:**
- Reduce Part I Crimes by 5%
- Reduce the Illegal Transportation , Sale and Possession of Controlled Dangerous Substances
- Reduce Street Level Drug Activity
- Reduce Traffic Collisions by 5%

**Measurement Criteria:**
- Reduce FY (04) Part I Crimes by 5% compared to FY(03) Part I Crimes
- Increase the number of drug arrests, drug seizures, search warrants and recovered weapons
- Implement drug enforcement strategies to reduce street level drug activity
- Reduce FY (04) traffic collisions by 5% compared to FY (03) traffic collisions

**Results:**
This was the third full year of operations under the re-deployment of the Police Department. The results far exceed expectations. Drug enforcement activities, department wide, continue to be one of the highest priorities.    Significant arrests, drug seizures, search warrants and recovered weapons by members of the Department occurred almost daily. The work of the Office of Professional Standards supports the activities of the operational divisions. OPS maintains the integrity of an aggressive department through design, update and implementation of important department policies. The performance of OPS is documented in their Monthly reports and yearly report. For details, reference these reports. Strategies such as road blocks, assignments to Grid areas, Summer Deployment, and "Jump Out" tactics were used during the year causing slight improvement in the drug picture in Wilmington. Special traffic enforcement initiatives continued by USD and joint operations with neighboring agencies occurred throughout the year. Every Division contributed to these accomplishments. Statistical data from UCR is not available due to well documented data entry issues.

Capt. Dietz's personnel were called upon numerous times during the year to support operational initiatives, taking hundreds of man-hours away from their core function. Specifically, her personnel were detailed to patrol duties during one case of elevated Terrorist Threat Conditions and for the Summer Deployment Initiative.

## Far Above Expectations

A0180

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #3:Manages staff and procedures to achieve Department of Police and Division Objectives while maintaining teamwork and high morale.    Weight 20%**

**Performance Objectives:**
- Case Management: Ensures cases are assigned, investigated thoroughly and in a timely manner, charging decisions are supported by the evidence, and complainants notified of the outcome.
- Prepares, analyzes and disseminates management reports.
- Maintains compliance with CALEA standards.
- Ensures staff is properly trained.
- Researches and responds to staff inquiries.

**Measurement Criteria:**
- Cases are to be distributed equally among staff, investigated thoroughly and in a timely manner, charging decisions are supported by evidence and complainants properly notified.
- Monthly reports are submitted.
- CALEA standards will be in compliance during on-site assessment.
- Identifies and requests training for staff.
- Responds to staff inquiries in a timely manner.

**Results:**

Case management is excellent. Charging decisions are supported by the evidence. Complainants are notified. The 2003 OPS Annual report was submitted. This document is important for identifying application of force issues and issues with other departmental procedures. CALEA standards were in compliance. Good working relationship with the courts and City Solicitors Office. Staff is properly trained. Staff inquiries are completed in a timely manner. Department's representative on JP Court 20, Pilot Project, to facilitate court proceedings.

Assigning deadlines for cases and follow-up on them would improve timeliness of some investigations.

No serious deficiencies was evident regarding management performance.

**Above Expectations**

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #5: Undertakes self initiated actions and projects to improve the Department of Police and division operations to resolve unanticipated problems or challenges.**                                                                **Weight 10%**

**Performance Objectives:**
- Submissions of new programs or initiatives to improve department or division, including grant applications.
- Will solve unanticipated problems and challenges.

**Measurement Criteria:**
- Evaluation and approval of new programs or initiatives, quality and quantity.
- Problem solving of specific problems or challenges.

**Results:**

Captain Dietz updated and implemented policies for Use of Force and Early Warning System. She updated the Substance Abuse Program but implementation has been delayed because of Administrative Board decisions. She designed the policy for Residency Requirement investigations but a legislative agreement has delayed implementation until at least February 2005. Captain Dietz is presently updating our grooming policy as it relates to Homeland Security and the law enforcement use of Personal Protective Equipment.

**Far Above Expectations**

## NUMERICAL EQUIVALENTS

| PERFORMANCE LEVEL | | NUMERICAL EQUIVALENT |
|---|---|---|
| FA | Far Above Expectations | 5.5 |
| A | Above Expectations | 4.5 |
| M | Meets Expectations | 3.5 |
| B | Below Expectations | 2.5 |
| FB | Far Below Expectations | 0 |

## PERFORMANCE APPRAISAL

| Accountabilities | Performance Rating | Numerical Equivalent | * | Weighted Impact % | Weighted =Performance |
|---|---|---|---|---|---|
| #1 | FA | 5.5 | | 20 | 1.1 |
| #2 | FA | 5.5 | | 15 | .825 |
| #3 | A | 4.5 | | 20 | .9 |
| #4 | A | 4.5 | | 15 | .675 |
| #5 | FA | 5.5 | | 10 | .55 |

Numerical Equivalent   x   Weighted Impact %   =   Weighted Performance

Total Weighted Performance of all Accountabilities          4.05

## PERFORMANCE FACTORS

| Performance Factors | Performance Rating | Numerical Equivalent |
|---|---|---|
| #1 | FA | 5.5 |
| #2 | A | 4.5 |
| #3 | FA | 5.5 |
| #4 | A | 4.5 |
| #5 | A | 4.5 |
| #6 | A | 4.5 |
| #7 | A | 4.5 |
| #8 | FA | 5.5 |
| #9 | FA | 5.5 |
| #10 | A | 4.5 |
| #11 | FA | 5.5 |
| #12 | A | 4.5 |
| #13 | A | 4.5 |
| #14 | M | 3.5 |

Total of all Numerical Equivalents _____67_____

Calculations:

Total of all Numerical Equivalents _____67_____

+ _____14_____ (number or Performance Factors graded)

x _____20_____ (% Weight of Performance Factors) = Total Weighted Performance   .96

## OVERALL PERFORMANCE APPRAISAL AND RATING

1. Total Weighted Performance of all Accountabilities          4.05

2. Total Weighted Performance Factors          .96

Total Weighted Value of Overall Performance (sum of 1 & 2)          5.01

CONVERSION SCALE

| Total Weighted Value | = | Overall Performance Rating |
|---|---|---|
| 5.0 to 5.5 | = | Far Above Expectations |
| 4.0 to 4.99 | = | Above Expectations |
| 3.0 to 3.99 | = | Meets Expectations |
| 2.0 to 2.99 | = | Below Expectations |
| Under 2.0 | = | Far Below Expectations |

Using the conversion Scale write in the Overall Performance Rating          Far Above Expectations

# CITY OF WILMINGTON

## Executive and Managerial
## Employee Performance Appraisal

Confidential
Performance Record For: **Captain Nancy Dietz**

| | |
|---|---|
| JOB TITLE        CAPTAIN | |
| DEPARTMENT/SECTION       Office of Professional Standards | |
| EMPLOYEE'S SOCIAL SECURITY NUMBER        ▉▉▉▉▉ | |
| EVALUATION PERIOD    7-1-02 to 6-30-03 | DATE OF REVIEW    9-5-63 |

# CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #1: Works in support of Department of Police objectives.**    **Weight 20%**

**Performance Objectives:**
- Reduce Part I Crimes by 5%
- Reduce the Illegal Transportation , Sale and Possession of Controlled Dangerous Substances
- Reduce Street Level Drug Activity
- Reduce Traffic Collisions by 5%

**Measurement Criteria:**
- Reduce FY (03) Part I Crimes by 5% compared to FY(02) Part I Crimes
- Increase the number of drug arrests, drug seizures, search warrants and recovered weapons
- Implement drug enforcement strategies to reduce street level drug activity
- Reduce FY (03) traffic collisions by 5% compared to FY (02) traffic collisions

**Results:**

    This was the second full year of operations under the re-deployment of the Police Department. The results far exceed expectations. Preliminary statistics indicate that Part I Crime decreased 6% in calendar year 2002. Drug enforcement activities, department wide, continue to be given the highest priority. Significant drug arrests, drug seizures, search warrants and recovered weapons occurred almost daily by the various operational Divisions. Strategies such as road blocks, assignments to Grid areas, and "Jump Out" tactics were used during the year causing slight improvement in the drug picture in Wilmington. Traffic enforcement increased this year. Traffic collisions were reduced xx% during calendar year 2002. Traffic citations increased, DUI enforcement increased which probably contributed to the reduction in accidents. Every Division contributed to these accomplishments.

Capt. Dietz's personnel were called upon numerous times during the year to support operational initiatives. Specifically, OPS personnel were detailed to patrol duties during four cases of elevated Terrorist Threat Conditions and for the Summer Deployment Initiative.

## Far Above Expectations

CITY OF WILMINGTON

Section A-     Performance Appraisal

**Accountability #3:Manages staff and procedures to achieve Department of Police and Division Objectives while maintaining teamwork and high morale.**     **Weight 20%**

**Performance Objectives:**
- Case Management: Ensures cases are assigned, investigated thoroughly and in a timely manner, charging decisions are supported by the evidence, and complainants notified of the outcome.
- Prepares, analyzes and disseminates management reports.
- Maintains compliance with CALEA standards.
- Ensures staff is properly trained.
- Researches and responds to staff inquiries.

**Measurement Criteria:**
- Cases are to be distributed equally among staff, investigated thoroughly and in a timely manner, charging decisions are supported by evidence and complainants properly notified.
- Monthly reports are submitted.
- CALEA standards will be in compliance during on-site assessment.
- Identifies and requests training for staff.
- Responds to staff inquiries in a timely manner.

**Results:**
Case management is excellent. Timeliness of investigations is acceptable. Charging decisions are supported by the evidence. Complainants are notified. The 2002 OPS Annual report needs to be completed and submitted. This document is important for identifying application of force issues and issues with other departmental procedures. CALEA standards were in compliance. Good working relationship with the courts and City Solicitors Office. Staff is properly trained. Staff inquiries are completed in a timely manner.

**Above Expectations**

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #5: Undertakes self initiated actions and projects to improve the Department of Police and division operations to resolve unanticipated problems or challenges.**
                                                                **Weight 10%**

**Performance Objectives:**
- Submissions of new programs or initiatives to improve department or division, including grant applications.
- Will solve unanticipated problems and challenges.

**Measurement Criteria:**
- Evaluation and approval of new programs or initiatives, quality and quantity.
- Problem solving of specific problems or challenges.

**Results:**

Capt. Dietz consistently evaluates the effectiveness of the our disciplinary process and issues related to extra-duty jobs and outside employment. She maintains a good working relationship with the City Solicitors Office and the courts to prevent problems or challenges.

**Above  Expectations**

NUMERICAL EQUIVALENTS

| | PERFORMANCE LEVEL | NUMERICAL EQUIVALENT |
|---|---|---|
| FA | Far Above Expectations | 5.5 |
| A | Above Expectations | 4.5 |
| M | Meets Expectations | 3.5 |
| B | Below Expectations | 2.5 |
| FB | Far Below Expectations | 0 |

PERFORMANCE APPRAISAL

| Accountabilities | Performance Rating | Numerical Equivalent | Weighted Impact % | Weighted Performance |
|---|---|---|---|---|
| #1 | FA | 5.5 | 20 | 1.1 |
| #2 | A | 4.5 | 15 | .675 |
| #3 | A | 4.5 | 20 | .9 |
| #4 | A | 4.5 | 15 | .675 |
| #5 | A | 4.5 | 10 | .45 |

Numerical Equivalent    x    Weighted Impact %    =    Weighted Performance        3.8

Total Weighted Performance of all Accountabilities

PERFORMANCE FACTORS

| Performance Factors | Performance Rating | Numerical Equivalent |
|---|---|---|
| #1 | A | 4.5 |
| #2 | M | 3.5 |
| #3 | A | 4.5 |
| #4 | A | 4.5 |
| #5 | M | 3.5 |
| #6 | A | 4.5 |
| #7 | M | 3.5 |
| #8 | M | 3.5 |
| #9 | A | 4.5 |
| #10 | M | 3.5 |
| #11 | FA | 5.5 |
| #12 | FA | 5.5 |
| #13 | A | 4.5 |
| #14 | M | 3.5 |

Calculations:
        Total of all Numerical Equivalents - 59
        59 ÷ 14 (number or Performance Factors graded) 4.2
        4.2x 20 = .84
                            (% Weight of Performance Factors) = Total Weighted Performance

1.    Total Weighted Performance
      of all Accountabilities                3.8

2.    Total Weighted Performance Factors        .84

      Total Weighted Value of Overall        4.64
      Performance (sum of 1 & 2)

| CONVERSION SCALE | |
|---|---|
| Total Weighted Value | = Overall Performance Rating |
| 5.0 to 5.5 | = Far Above Expectations |
| 4.0 to 4.99 | = Above Expectations |
| 3.0 to 3.99 | = Meets Expectations |
| 2.0 to 2.99 | = Below Expectations |
| Under 2.0 | = Far Below Expectations |

Using the conversion Scale write in the Overall Performance Rating        4.64 ABOVE EXPECTATION

P286

A0188

# CITY OF WILMINGTON

## Executive and Managerial
## Employee Performance Appraisal

Confidential
Performance Record For: **CAPTAIN NANCY S. DIETZ**

| | |
|---|---|
| JOB TITLE    CAPTAIN | |
| DEPARTMENT/SECTION    Office of Professional Standards/Criminal Investigations Division | |
| EMPLOYEE'S SOCIAL SECURITY NUMBER    ███████ | |
| EVALUATION PERIOD    7-1-01 to 6-30-02 | DATE OF REVIEW    8/29/02 |

**EXECUTIVE AND MANAGERIAL**

**INSTRUCTIONS**

Section A:  Performance Plan

o   Complete an Accountability section for each of the major duties performed by the employee by:
1)  Identifying the Accountability;  2)  Listing the job criteria used to measure Performance against the Accountability; and,  3) Assigning a weight to reflect the relative importance of the accountability.

o   Measure and describe in the Results section, the employee's Performance against each Accountability by quantifying and qualifying information regarding accomplishments during this review period.

o   After careful consideration of the above, appraise the employee's performance in achieving each accountability in terms of the following performance ratings:

FA   Far Above Expectations – Performance which continually exceeds and far exceeds that which is expected from experienced, well-qualified employees.  Overall performance at this level leaves little, if anything, to be desired and is rare.  When this rating is utilized, detailed documentation must be provided to support the rating.

A   Above Expectations – This rating applies to performance which is consistently and substantially above the established requirements.  The employee can be counted on to deliver high quality results on more difficult and complex objectives and tasks.  An employee performing at this level evidences no performance deficiencies regarding the duty or responsibility for which he/she is being rated.

M   Meets Expectations – This designation applies to performance at a level expected of a person in the assigned position.  This rating of performance indicates that no serious deficiency was evident regarding the performance of the duties and responsibilities being rated.  Overall results were achieved in a timely and effective manner; however, some strengths as well as some areas requiring further improvement may be noted.

B   Below Expectations – A rating at this level is a warning that the employee needs to improve an important aspect of his/her job performance, given his/her experience and knowledge.  A rating at this level in any duty or responsibility should be accompanied by a specific plan of action for improvement with specific target dates.  Employees continuing to perform at this level on a significant portion of their duties should be placed under corrective action procedures.

FB   Far Below Expectations – This performance rating signifies the employee's failure to achieve the minimum acceptable results.  Immediate corrective action must be taken by the employee and manager to improve work performance.  An overall rating of this level indicates that continued employment is contingent upon improvement within a specific period of time.  When this rating is given, special documentation must be provided to support the rating.

Section B:  Performance Factors

o   Appraise the employee's performance in each area listed using the ratings listed in Section A.

Section C:  Performance Appraisal Summary

# CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #1: Works in support of Department of Police objectives.**    **Weight 20%**

**Performance Objectives:**
- Reduce Part I Crimes by 5%
- Reduce the Illegal Transportation , Sale and Possession of Controlled Dangerous Substances
- Reduce Street Level Drug Activity
- Reduce Traffic Collisions by 5%

**Measurement Criteria:**
- Reduce FY (02) Part I Crimes by 5% compared to FY(01) Part I Crimes
- Increase the number of drug arrests, drug seizures, search warrants and recovered weapons
- Implement drug enforcement strategies to reduce street level drug activity
- Reduce FY (02) traffic collisions by 5% compared to FY (01) traffic collisions

**Results:**

  This was the first full year of operations under the re-deployment of the Police Department. The results far exceed expectations. Part I Crime decreased 16.71% in calendar year 2001. Part I Crime decreased another 7.75% in the first half of 2002. Drug enforcement activities department wide were given the highest priority. Significant drug arrests, drug seizures, search warrants and recovered weapons occurred almost daily by the various operational Divisions. Strategies such as road blocks, assignments to Grid areas, and "Jump Out" tactics were used during the year causing slight improvement in the drug picture in Wilmington. Traffic enforcement increased this year. Traffic collisions were reduced 5.8% during calendar year 2001. Traffic citations increased, DUI enforcement increased which probably contributed to the reduction in accidents. Every Division contributed to these accomplishments.

## Far Above Expectations

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #2: Works in support of assigned Division objectives.   Weight 15%**

**Performance Objectives:**
- Maintain the integrity of the Department of Police through the administration of discipline.

**Measurement Criteria:**
- Administer administrative investigations and Complaint Hearing Boards in a professional manner
- Administer the Comprehensive Substance Abuse Policy according to the Directive
- Conduct inspections, both self-initiated or as directed by the Inspector of Investigative Operations
- Plan and implement the IACP Internal Affairs Automated Case Tracking Software
- Formulate, train, and implement a revised procedure regarding police/citizens contacts to prevent allegations of racial profiling

**Results:**

Captain Dietz was assigned as the Commander of the Office of Professional Standards in October of 2001. Investigations, charging decisions and Complaint Hearings Boards were administered in a very professional manner. Two officers resigned prior to Complaint Hearing Board proceedings for offenses that would have led to dismissal. Captain Dietz and her staff conducted inspections of the platoons and conducted an audit of Megan's Law Compliance during the rating period. The IACP software project was tabled because the project was discontinued. An in-house program was developed and implemented in June. A new Directive regarding Racial Profiling was developed. Training, which will be conducted by OPS personnel, is scheduled for September on the policy. This division is well managed.

Captain Dietz was the commander of the Criminal Investigations Division for 3 months during this rating period. Investigative personnel have the reputation of being persistent and professional in their cases. That division was also managed well.

Captain Dietz must improve in administering the Comprehensive Substance Abuse Program. During this rating period, approximately 100 officers should have been tested. None were. We have discussed this issue and testing will be administered the next rating period.

**Meets Expectations**

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #3: Manages staff and procedures to achieve Department of Police and Division Objectives while maintaining teamwork and high morale.    Weight 20%**

**Performance Objectives:**
- Case Management: Ensures cases are assigned, investigated thoroughly and in a timely manner, charging decisions are supported by the evidence, and complainants notified of the outcome.
- Prepares, analyzes and disseminates management reports.
- Maintains compliance with CALEA standards.
- Ensures court related procedures are reviewed and followed.
- Monitors Extra-duty job procedures department-wide.
- Ensures staff is properly trained.
- Researches and responds to staff inquiries.

**Measurement Criteria:**
- Cases are to be distributed equally among staff, investigated thoroughly and in a timely manner, charging decisions are supported by evidence and complainants properly notified.
- Monthly reports are submitted.
- CALEA standards will be in compliance during on-site assessment.
- Court procedures will be monitored and amended if necessary.
- Extra-duty job procedures will be monitored and amended if necessary.
- Identifies and requests training for staff.
- Responds to staff inquiries in a timely manner.

**Results:**
- Case management is excellent.  Timeliness of investigations is acceptable.  Charging decisions are supported by the evidence.  Complainants are notified.
- Monthly reports are submitted.  Annual report has been changed to calendar year.  Her first annual report is due in the next rating period.
- CALEA standards were in compliance.
- Excellent working relationship with the courts.
- Extra-duty procedures need changing; drafts have been submitted.
- Staff has attended out-of-state training.
- Staff inquiries are completed in a timely manner.

**Above Expectations**

# CITY OF WILMINGTON

Section A-      Performance Appraisal

**Accountability #4: Maintains high ethical and professional standards, both personally and for Department of Police employees.**                    **Weight 15%**

**Performance Objectives:**
- Personally follows all rules and regulations.
- Evaluates staff in accordance with Performance Appraisal policy.
- Disciplines and counsel employees who engage in activity that violates departmental policy.
- Maintains division facilities in proper condition.

**Measurement Criteria:**
- No personal violations of rules and regulations.
- Performance Appraisals will be submitted promptly and reflect subordinates weaknesses.
- Initiates disciplinary action and counseling when necessary.
- Division facilities will be maintained at high standards.

**Results:**
- Capt. Dietz has an excellent disciplinary record, and has maintained high ethical and professional standards.
- The OPS staff are chosen because of their high ethical and professional standards. Capt. Dietz has not had to address disciplinary problems within the OPS staff. Department wide, she was assigned to OPS because of her ability to fairly administer discipline.
- Division facilities are maintained properly.

**Above Expectations**

CITY OF WILMINGTON

Section A-    Performance Appraisal

**Accountability #5: Undertakes self initiated actions and projects to improve the Department of Police and division operations to resolve unanticipated problems or challenges.**

Weight 10%

**Performance Objectives:**

▸    Submissions of new programs or initiatives to improve department or division, including grant applications.

▸    Will solve unanticipated problems and challenges.

**Measurement Criteria:**

▸    Evaluation and approval of new programs or initiatives, quality and quantity.

▸    Problem solving of specific problems or challenges.

**Results:**

Capt. Dietz consistently evaluates the effectiveness of the our disciplinary process and issues related to extra-duty jobs and outside employment. She has established a good working relationship with new members of the City Solicitors Office and works with them to prevent problems or challenges (i.e. hostile work environment allegations). Contributed to formulating a necessary Directive in the aftermath of the CALEA on-site assessment.

**Above Expectations**

CITY OF WILMINGTON

Section B - PERFORMANCE FACTORS

| SECTION B: PERFORMANCE FACTORS | | |
|---|---|---|
| **PERFORMANCE FACTOR** | **PERFORMANCE LEVEL** | **COMMENTS** |
| 1. Decision Making: Appropriateness of decisions after considering all relevant factors and evaluating probable outcome of alternatives. | A | |
| 2. Planning: Forecasting budgeting, scheduling, setting goals based on predicted trends. | M | |
| 3. Problem Analysis: An understanding and identification of the crucial factors in a problem and arriving at sound, practical solutions. | FA | |
| 4. Organizing: Arrangement of work for most effective establishment of work priorities and project flow. | FA | |
| 5. Time Management: Meeting deadlines and utilizing time effectively for maximum output. | M | |
| 6. Leadership: Delegating, motivating, coordinating and prompting innovation in achieving goals. | A | |
| 7. Controlling: Developing performance standards, measuring results and taking corrective action. | M | |
| 8. Cost/Profit Consciousness: Operating efficiently at lowest cost, using good business judgement. | M | |
| 9. Outside Relations: Effectiveness in interpersonal communications at all levels within the community. | A | |
| 10. Developing People: Recognizing growth potential, use of developing opportunities, skill in coaching and resolving difficult personnel problems. | M | |
| 11. Resource Utilization: Optimizing the use of subordinates or other resources available to complete a task. | M | |

| 12. | Communication (Written/Verbal): Quality of written and verbal communication, internal and external. | FA | |
|-----|------|-----|---|
| 13. | Self-Development: An awareness of strengths and weaknesses and a plan to rectify any deficiencies. | A | |
| 14. | Affirmative Action: Achievement of planned staffing and developmental goals for protected group employees. | A | |

Weight 20 %

TOP C - PERFORMANCE APPRAISAL SUMM

NUMERICAL EQUIVALENTS

| | PERFORMANCE LEVEL | NUMERICAL EQUIVALENT |
|---|---|---|
| FA | Far Above Expectations | 5.5 |
| A | Above Expectations | 4.5 |
| M | Meets Expectations | 3.5 |
| B | Below Expectations | 2.5 |
| FB | Far Below Expectations | 0 |

PERFORMANCE APPRAISAL

| Accountabilities | Performance Rating | Numerical Equivalent | Weighted Impact % | Weighted Performance |
|---|---|---|---|---|
| #1 | FA | 5.5 | 20 | 1.1 |
| #2 | M | 3.5 | 15 | .525 |
| #3 | A | 4.5 | 20 | .9 |
| #4 | A | 4.5 | 15 | .675 |
| #5 | A | 4.5 | 10 | .45 |

Numerical Equivalent   x   Weighted Impact %   =   Weighted Performance        3.65

Total Weighted Performance of all Accountabilities

PERFORMANCE FACTORS

| Performance Factors | Performance Rating | Numerical Equivalent |
|---|---|---|
| #1 | A | 4.5 |
| #2 | M | 3.5 |
| #3 | FA | 5.5 |
| #4 | FA | 5.5 |
| #5 | M | 3.5 |
| #6 | A | 4.5 |
| #7 | M | 3.5 |
| #8 | M | 3.5 |
| #9 | A | 4.5 |
| #10 | M | 3.5 |
| #11 | M | 3.5 |
| #12 | FA | 5.5 |
| #13 | A | 4.5 |
| #14 | A | 4.5 |

Total of all Numerical Equivalents = 60

Calculations:
      Total of all Numerical Equivalents - 60
      60 ÷ 14 (number or Performance Factors graded) 4.3
      x 20 = .86            (% Weight of Performance Factors) = Total Weighted
Performance   .86

| | | |
|---|---|---|
| 1. | Total Weighted Performance of all Accountabilities | 3.65 |
| 2. | Total Weighted Performance Factors | .86 |
| | Total Weighted Value of Overall | 4.51 |
| | Performance (sum of 1 & 2) | |

CONVERSION SCALE
Total
Overall
Weighted Value     =
Performance Rating

| | | |
|---|---|---|
| 5.0 to 5.5 | = | Far Above Expectations |
| 4.0 to 4.99 | = | Above Expectations |
| 3.0 to 3.99 | = | Meets Expectations |
| 2.0 to 2.99 | = | Below Expectations |
| Under 2.0 | = | Far Below Expectations |

Using the conversion Scale wt in the Overall Performance Evaluation

P297

A0199

PERFORMANCE

### OBJECTIVES FOR THE NEXT APPRAISAL PERIOD

List objectives mutually established by you and this employee to be undertaken during the next appraisal period.

Per Director Mosley, objectives will be established on a quarterly basis. Goals & Objectives are detailed in separate, quarterly documents that are discussed and distributed to Staff Officers.

### TRAINING AND DEVELOPMENT NEEDS

Based on your appraisal of your employee, list, in priority order, the employee's specific training and development needs and plans.

Incident Command
Legal Updates

### EMPLOYEE COMMENTS

I have read this report and have discussed its contents with my supervisor. I wish to make the following comments:

*I agree with Insp. Donohue's comments regarding the need to administer the Departments Substance Abuse Program. Due to concerns related to employee health & lack of training, I have recommended that the Dept. outsource the collection function to a certified agency. Further research is needed to facilitate this policy*

EMPLOYEE'S SIGNATURE _Nancy S. Dietz_
DATE: 8/29/02

*change which I will address further. Thank you for the positive appraisal.*

### APPROVALS

_Insp. Martin Sol_
(Evaluator's Signature)
(DATE)    (Social Security Number)

8/29/02    ▮▮▮▮▮▮▮

(Title) OFFICE OF INTERNAL OPERATIONS

_____
(Department Head's Signature)
(Date)

(Title)

_____
(Administrative Assistant's Signature)
(Date)

(Title)

P298

A0200

# CITY OF WILMINGTON

## Executive and Managerial Employee Performance Appraisal

Confidential
Performance Record For: CAPTAIN NANCY S. DIETZ

| | |
|---|---|
| JOB TITLE        CAPTAIN NANCY S. DIETZ | |
| DEPARTMENT/SECTION        CRIMINAL INVESTIGATIONS DIVISION | |
| EMPLOYEE'S SOCIAL SECURITY NUMBER        ███████ | |
| EVALUATION PERIOD<br><br>7-1-99 to  6-30-00 | DATE OF REVIEW<br><br>10/11/00 |

CITY OF WILMINGTON

Page 1

**EXECUTIVE AND MANAGERIAL**

## INSTRUCTIONS

**Section A: Performance Plan**

o    Complete an Accountability section for each of the major duties performed by the employee by: 1) Identifying the Accountability; 2) Listing the job criteria used to measure Performance against the Accountability; and, 3) Assigning a weight to reflect the relative importance of the accountability.

o    Measure and describe in the Results section, the employee's Performance against each Accountability by quantifying and qualifying information regarding accomplishments during this review period.

o    After careful consideration of the above, appraise the employee's performance in achieving each accountability in terms of the following performance ratings:

FA    Far Above Expectations - Performance which continually exceeds and far exceeds that which is expected from experienced, well-qualified employees. Overall performance at this level leaves little, if anything, to be desired and is rare. When this rating is utilized, detailed documentation must be provided to support the rating.

A    Above Expectations - This rating applies to performance which is consistently and substantially above the established requirements. The employee can be counted on to deliver high quality results on more difficult and complex objectives and tasks. An employee performing at this level evidences no performance deficiencies regarding the duty or responsibility for which he/she is being rated.

M    Meets Expectations - This designation applies to performance at a level expected of a person in the assigned position. This rating of performance indicates that no serious deficiency was evident regarding the performance of the duties and responsibilities being rated. Overall results were achieved in a timely and effective manner; however, some strengths as well as some areas requiring further improvement may be noted.

B    Below Expectations - A rating at this level is a warning that the employee needs to improve an important aspect of his/her job performance, given his/her experience and knowledge. A rating at this level in any duty or responsibility should be accompanied by a specific plan of action for improvement with specific target dates. Employees continuing to perform at this level on a significant portion of their duties should be placed under corrective action procedures.

FB    Far Below Expectations - This performance rating signifies the employee's failure to achieve the minimum acceptable results. Immediate corrective action must be taken by the employee and manager to improve work performance. An overall rating of this level indicates that continued employment is contingent upon improvement within a specific period of time. When this rating is given, special documentation must be provided to support the rating.

**Section B: Performance Factors**

o    Appraise the employee's performance in each area listed using the ratings listed in Section A.

**Section C: Performance Appraisal Summary**

o    Summarize overall performance by following calculations established on this worksheet.

**Section D: Performance Plan**

o    Consider and establish goals and objectives for the next appraisal period including training and development needs.

CITY OF WILMINGTON

Section A - PERFORMANCE APPRAISAL

Page 2A

| Accountability #1:   Works in support of Department of Police objectives. | Weight 20% |
|---|---|

**Performance Objectives:**

Maintains compliance with assigned CALEA standards (5.1).

Reduce shootings by 20% (1.1).

Reduce street level drug trafficking (1.3).

Revise Police Officers Manual.

**Measurement Criteria:**

On a quarterly basis, assessment of assigned standards will be conducted for compliance.

Quantity/quality of division and department-wide initiatives aimed at reducing shootings.

Comparison of FY99 and FY00 shooting statistics.

Develop and implement department-wide "Drug Suppression Action Plan" aimed at reducing street level drug trafficking by April 30, 2000. Format to be discussed.

Develop written manuals for WRIST, RDET, and WET initiatives by June 30, 2000. Format to be discussed. Quarterly measurement reports to be submitted.

Team comprised of all Captains will submit revisions of Police Officers Manual by October 8, 1999.

**Results:**
Met CALEA standards during a modified on-site assessment.
Contributed to the reduction in shootings by detailing personnel to special details (SPLASH) and integrating the "Most Wanted List" into strategies used department wide. Conducts periodic reviews of shootings for information sharing. Drug Suppression Action Plan is developed and in the beginning stages of implementation.
Revisions to POM are incomplete.

Captain Dietz fully supported the departments initiatives and strategies for reducing shootings, accreditation and reducing street level drug trafficking. The division conducted quality investigations into homicides and shootings and cleared several high profile cases specifically three robbery/homicides. She made changes in the drug unit to improve their performance and their has been an increase in their production since the changes. Accreditation standards are up to date.



| Far Above Expectations FA | Above Expectations A | Meets Expectations M | Below Expectations B | Far Below Expectations FB |
|---|---|---|---|---|

CITY OF WILMINGTON

Section A - PERFORMANCE APPRAISAL

| Accountability #3: Manages staff and procedures to achieve Department of Police and division objectives while maintaining teamwork and high morale | Weight 20% |
|---|---|

**Performance Objectives:**

Develops and implements FTO Program for new investigators.

Develops three (3) seminars for Wilmington Police Department officers (EDU, CID and Drug, Organized Crime and Vice Units).

Identifies training needs and seeks out training opportunities.

Evaluate personnel in a timely manner and in compliance with City of Wilmington and accreditation standards.

Develops and/or updates division SOPs.

Submits monthly and annual reports.

Submits quarterly overtime analysis.

Administers assigned grants.

Recognized achievements of individual staff members and seeks departmental recognition.

Respond to staff inquiries for information and resources.

**Measurement Criteria:**

FTO Program manual for new investigators to be completed by June 15, 2000.

Three (3) seminars for WPD officers will be developed by June 15, 2000, and scheduled for the fall of 2000.

All new investigators have received specialized training or will receive specialized training within three months of transfer.

Will attend Training Committee meetings.

Performance Evaluations submitted to Inspector prior to due date.

SOP Manual completed and submitted to Inspector by January 15, 2000.

Monthly report format submitted to Inspector by January 15, 2000 for approval.

Monthly reports submitted to Inspector by 15th of the following month (January report due by 15th of February, etc.)

Fiscal Year Annual Report submitted by July 31, 2000.

Overtime analysis reports to be submitted quarterly.

All assigned grants will be administered in accordance with issuers guidelines.

Nominates or recognizes personnel for individual or team accomplishments.

Responds to staff inquiries in a timely manner.

CITY OF WILMINGTON

---

ion A - PERFORMANCE APPRAISAL

| Accountability #4: Maintains high ethical and professional standards, both personally and for Department of Police employees. | Weight 15% |

**Performance Objectives:**

Discipline and counsel employees who engage in activity that violates departmental policy.

Follows all rules and regulations.

**Measurement Criteria:**

Weaknesses of subordinates documented in Performance Appraisals.

All discipline and counseling of subordinates reported to the Inspector.

Issuance of non-compliance bulletins.

No personal violations of departmental policy; attends scheduled meetings; arrives on time.

**Results:**
The criminal investigations division conducts thorough and timely investigations regarding crimes committed by police officers and crimes involving the general public. Investigations are done in a professional manner.

Ethics and professionalism have been and remain high. No personal violations of departmental policies.

Addresses problems, department wide, appropriately and professionally. (EPC)

Has initiated disciplinary procedures against subordinates when appropriate.

---

☐ Far Above Expectations FA

X Above Expectations A

☐ Meets Expectations M

☐ Below Expectations B

☐ Far Below Expectations FB

CITY OF WILMINGTON

Page 5

ction B - PERFORMANCE FACTORS

| SECTION B: PERFORMANCE FACTORS | | |
|---|---|---|
| PERFORMANCE FACTOR | PERFORMANCE LEVEL | COMMENTS |
| 1.  Decision Making: Appropriateness of decisions after considering all relevant factors and evaluating probable outcome of alternatives. | A | |
| 2.  Planning: Forecasting budgeting, scheduling, setting goals based on predicted trends. | M | |
| 3.  Problem Analysis: An understanding and identification of the crucial factors in a problem and arriving at sound, practical solutions. | A | |
| 4.  Organizing: Arrangement of work for most effective establishment of work priorities and project flow. | A | Commands the largest division, with various tasks |
| 5.  Time Management: Meeting deadlines and utilizing time effectively for maximum output. | M | Needs to notify when deadlines cannot be met. |
| 6.  Leadership: Delegating, motivating, coordinating and prompting innovation in achieving goals. | A | |
| 7.  Controlling: Developing performance standards, measuring results and taking corrective action. | M | |
| 8.  Cost/Profit Consciousness: Operating efficiently at lowest cost, using good business judgement. | N | |
| 9.  Outside Relations: Effectiveness in interpersonal communications at all levels within the community. | A | |
| 10.  Developing People: Recognizing growth potential, use of developing opportunities, skill in coaching and resolving difficult personnel problems. | M | |
| 11.  Resource Utilization: Optimizing the use of subordinates or other resources available to complete a task. | M | Needs to follow-up on assignments delegated to others. |
| 12.  Communication (Written/Verbal): Quality of written and verbal communication, internal and external. | A | |
| 13.  Self-Development: An awareness of strengths and weaknesses and a plan to rectify any deficiencies. | A | |
| 14.  Affirmative Action:  Achievement of planned staffing and developmental goals for protected group employees. | A | |

Weight 20 %

CITY OF WILMINGTON

Section D - PERFORMANCE PLAN

Page 7

### OBJECTIVES FOR THE NEXT APPRAISAL PERIOD

List objectives mutually established by you and this employee to be undertaken during the next appraisal period.

*TO BE DETERMINED AND DOCUMENTED IN WRITING*

### TRAINING AND DEVELOPMENT NEEDS

Based on your appraisal of your employee, list, in priority order, the employee's specific training and development needs and plans.

*TEAM BUILDING*
*STAFF DEVELOPMENT*

### EMPLOYEE COMMENTS

I have read this report and have discussed its contents with my supervisor. I wish to make the following comments:

EMPLOYEE'S SIGNATURE _Nancy S. Dietz_    DATE: _10/11/00_

APPROVALS

_Martin Sol_    _Inspector_    _10/11/00_
(Evaluator's Signature)    (Title)    (DATE)    (Social Security Number)

_Michael A. Boye_    _Chief of Police_    _10/17/00_
(Department Head's Signature)    (Title)    (Date)

_____    _____    _____
(Administrative Assistant's Signature)    (Title)    (Date)

## PROFESSIONAL AND COMMAND STAFF

## PUBLIC SAFETY DEPARTMENT

### PART I
*(Read Instruction Manual prior to completing this form)*

Dietz, Nancy
**EMPLOYEE'S NAME (Last, First, M.I.)**

Police Lieutenant    11/19/91
**RANK AND DATE OF LAST PROMOTION**

Police/Investigative Functions
**DEPARTMENT/ASSIGNMENT/DIVISION**

████████
**EMPLOYEE'S SOCIAL SECURITY NUMBER**

11/19/94 – 11/19/95
**EVALUATION PERIOD   (From/To)**

1-12-96
**DATE OF REVIEW**

### PART II -- JOB PERFORMANCE

<u>NOTE:</u> *In this section, assign each task a percentage based on the priority of the task. These percentages should total 100 percent. Each task should then be assigned a numerical performance rating based on the following scale:*

(Superior - 5)      (Above Average - 4)      (Average - 3)      (Needs Improvement - 2)      (Unsatisfactory - 1)

| JOB TASK AND RESPONSIBILITIES | COMMENTS |
|---|---|
| 1. Performs Overall Management of I.D. Platoon Including (but not limited to), Scheduling, Discipline, Training, Etc | Lt Dietz Is A Steady, Competent Manager. She Is Protective Of Her Subordinates Interests yet willing to Discipline When Necessary Percentage: 40  Rating: 4 |
| 2. Controls The Assignment Of Cases For Investigation Based On Type Of Crime, Solvability Factors, Investigator's Workload, Seriousness And Amount Of Cases | Lt Dietz Is An Experienced Investigator In Her Own Right And Is Capable Applying That Experience To This Task Percentage: 30  Rating: 4 |
| 3. Takes Direct Supervisory Command Of Major Crime Scenes Insuring Proper Actions Are Taken, Takes First Line Supervision Role Duties On-line As Can I. | This Area Is Lt Dietz's Strongest Asset. She Is Very Capable As An Investigative Operations Supervisor. Percentage: 15  Rating: 5 |
| 4. Reviews And Tracks The Status Of Investigations Already Assigned Insuring Cases Are Not "Forgotten" With No Disposition. | Given The Investigation Hours Available, This Function Is Performed Adequately. Percentage: 7½  Rating: 3 |
| 5. Other Ad Hoc Duties As Directed By Division Commander. | Lt Dietz Is Capable Of Being Given A Task That Requires A Plan And Completing It Without Interruption Percentage: 7½  Rating: 4 |

f:\data\001\601\1\222.1

1-18-96 Orig. to M. Cruz

**7.    Effective Delegation of Appropriate Responsibility**

☐    Delegates authority to subordinates with clear direction and rarely interferes in subordinate appropriate action.

☑    Delegation is normally done clearly without excessive restrictions and seldom interferes.

☐    Delegates very little decision-making authority or includes excessive details, thereby limiting subordinate flexibility.

☐    Rarely delegates any decision-making authority.

**8.    Planning/Organizational Skills**

☑    Demonstrates ability to formulate a unified plan or course of action to achieve a specific result reflecting an assignment or priorities and relevant issue anticipations.

☐    Capable of developing short-range solutions to meet immediate goals, but limited ability to engage in projection planning.

☐    Has some difficulty setting priorities and for achieving goals.

☐    Usually disorganized and often in a crisis due to lack of planning or organization.

**9.    Communication Skills**

☐    Demonstrates ability to analyze abstract concepts and apply them to practical situations; able to communicate effectively both verbally and in written form.

☑    Very articulate; communicates well both verbally and in written form.

☐    Communicates well verbally, but has difficulty with writing assignments.

☐    Has difficulties with both verbally and written communications.

**10.    Cooperation**

☑    Consistently promotes cooperation and good will with the public at large, supervisors, subordinates and co-workers and requires similar behavior of subordinates; recognizes that the public has a legitimate concern regarding many aspects of public employee conduct and performance.

☐    Normally congenial and cooperative; demonstrates a professional manner, but experiences some difficulty balancing the role of the public.

☐    Does not appear interested in developing good working relationships with supervisors, subordinates, co-workers and the public.

☐    Does not work well with others. Frequently loses control in dealing with co-workers, superiors and the public.

**11.    Initiative**

☑    Always finds work to do; never needs to be told.

☐    Needs to be pushed only on rare occasions.

☐    Needs normal supervision (not a self-starter).

☐    Always has to be pushed and requires considerable supervision.

**12.    Attendance/Punctuality**

☑    Always on time and well prepared.

☐    Usually on time but occasionally not prepared.

☐    Needs occasional reminders and usually unprepared.

☐    Often late and work product unacceptable.

f:\data\1\011601\1\1222.1

# CITY OF WILMINGTON

## Public Safety – Employee Performance Evaluation
### Professional and Command Staff

**PART I**

Employee Name (Last, First, MI)

Department *Wilmington Police Dept*

Rank and Date of Last Promotion
*Lieutenant        11/19/91*

Assignment/Division/Duration
*Internal Affairs Division - Jan - Apr 1992*

Employment Anniversary Date
*January 14, 1980*

Date of Evaluation
*25 Sept. 1992*

Highest Level of Education
*Bachelor of Science Degree*

Specialized Training (FBI, Polygraph, etc.)
*FBI National Academy, Hostage Negotiation Training, Polygraph Operator*

**PART II**

### Job Performance

**Note:** In this section, assign each task a percentage based on the priority of the task. These percentages should total 100 percent. Each task should then be assigned a numerical performance rating based on the following scale:

(Superior-5)  (Above Average-4)  (Average -3)  (Needs improvement-2) (Unsatisfactory-1)

### JOB TASK AND RESPONSIBILITIES

1. *Investigation of Internal Affairs Complaints, As assigned by Division Commander.*

2. *Preparation and Presentation of Disciplinary Cases at Complaint Hearing Boards.*

### COMMENTS

*Skilled, knowledgeable investigator. Does a thorough job.*

Percentage **60%** Rating **5**

*Articulate and thorough prosecutor. Presents cogent arguments. Does not get flustered.*

Percentage **15%** Rating **5**

And supervisors

4. Maintains good Relations with Complainants And other Members of the Public. Solicits And Provides Information As Needed.

5. Serves As Acting Division Commander in Absence of Captain.

is Correct But Compassionate in Discipline

Percentage _10%_ Rating _5_

Shows Courtesy And Concern without Compromising Her or Department's Position And Impartiality

Percentage _10%_ Rating _5_

Knows What Needs To Be Done And Carries it out in a Timely Manner.

Percentage _5%_ Rating _5_

## PART III

### Leadership and Managerial Capabilities
### (Check the box that best describe employee)

1) Acceptance of Responsibility

(X) (a) Consistently willing to accept responsibility and additional duties to further the organizational goals. Frequently seeks new challenges.

( ) (b) Generally will accept responsibility but does not usually volunteer; on occasion reluctant to accept responsibility, but will do so if directed.

( ) (c) Gives appearance of accepting responsibility for assignments bu usually assign it to subordinates.

( ) (d) Avoids responsibility for assigned duties and programs. Reluctant to assume additional obligations and duty assignments

2) Adaptability

(X) (a) Effectively handles different situations and circumstances appropriately.

( ) (b) Is able to normally adapt to most situations.

( ) (c) Has difficulty adapting.

( ) (d) Is completely inflexible.

( ) (d) Seldom approaches subordinates to discuss performance or related problems; tends to view most personnel matters from disciplinary prospective.

7) Proper Allocation of Resources

(X) (a) Properly utilizes manpower and other resources to meet the service demands; produces a high quality of work.

( ) (b) Utilizes manpower and resources in a manner to meet the aver: workload with good quality.

( ) (c) Seldom engages in the planning necessary to handle service levels demands; when planning efforts exist, it is always insufficient.

( ) (d) Demonstrate very little concept of resource allocation or priority assignment. Generally, takes the view that there is always insufficient manpower.

8) Planning/Organizational Skills

(X) (a) Demonstrates ability to formulate a unified plan or course of action to achieve a specific result reflecting an assignment priorities and relevant issue anticipations.

( ) (b) Capable of developing short-range solutions to meet immediate goals, but limited ability to engage in projection planning.

( ) (c) Has some difficulty setting priorities and for achieving goal:

( ) (d) Usually disorganized and often in a crisis due to lack of planning or organization.

9) Communication Skills

(X) (a) Analyzes abstract concepts and applies them to practical situations; communicate effectively both verbally and in writt form.

( ) (b) Very articulate; communicates well both verbally and in writte form.

( ) (c) Communicaters well verbally, but has difficulty with writing assignments.

( ) (d) Has difficulties with both verbally and written communications

10) Cooperation

(X) (a) Consistently promotes cooperation and good will with the publi at large, supervisors, subordinates and co-workers and require similar behavior of subordinates; recognizes that the public h a legitimate concern regarding many aspects of public employee conduct and performance.

ADDITIONAL EVALUATOR'S COMMENTS:

EMPLOYEE'S SIGNATURE _Lt. Nancy S. Dietz_    DATE _25 Sept 92_

EVALUATOR'S SIGNATURE/TITLE _Sgt. F.T. Houghton, III_    DATE _25 Sept 92_

EVALUATOR'S S.S. #  ████████

_Insp. SDP 11/20/92_

DEPARTMENT HEAD'S SIGNATURE _Guy D. Sapp_    DATE _12/1/92_

DIRECTOR OF PUBLIC SAFETY _Galen L. Ramson_    DATE _12/1/92_

Employee's signature only signifies that discussion and review was held with
employee and that employee has read the above.

DEPARTMENT OF POLICE

WILMINGTON   DELAWARE

DATE: *September 6, 1990*

## PROBATIONARY REPORT FOR SUPERVISORY OFFICERS

NAME OF PROBATIONARY SUPERVISOR: *Sgt. Nancy Dietz*

PROBATIONARY PERIOD: [  ] 6 MONTHS    [X] 1 YEAR

COMMANDING OFFICER: *Capt. J. Ledman*    DIVISION: *Patrol*

THE PROBATIONARY PERIOD AS INDICATED ABOVE EXPIRES ON THE ABOVE
NAMED SUPERVISOR ON *July 9, 1990* .

PLEASE COMPLETE THIS REPORT AS TO THE CHARACTER AND QUALITY OF THIS
SUPERVISOR'S SERVICE FOR THE PAST 6 MONTHS AND YOUR RECOMMENDATIONS
CONCERNING HIS FUTURE STATUS AS A SUPERVISOR.

## RETURN TO PERSONNEL DIVISION WITHIN 5 DAYS.

*Guy H. Sapp*
GUY H. SAPP
CHIEF OF POLICE

EACH ITEM IS TO BE ANSWERED.   ANSWER "YES" OR "NO" BY
CIRCLING YOUR CHOICE.   IF NEITHER CHOICE DESCRIBES THE MAN, THEN USE
WORD (S) OF YOUR OWN CHOICE IN THE BLANK SPACE TO THE EXTREME RIGHT.
IF YOU WISH TO ELABORATE ON THE ANSWER(S), CIRCLE THE ITEM NUMBER
AND EXPLAIN ON THE LAST SHEET OF THIS REPORT.

DOES HE:

1. Use good judgment  in making decisions?    (Yes)  No    _____

2. Accept criticism without becoming angry?    (Yes)  No    _____

3. Readily accept suggestions?    (Yes)  No    _____

TM

IS HE:

27. Courteous toward the public? — (Yes) No _____

28. Argumentive? — Yes (No) _____

29. Prompt on reporting for assignments? — (Yes) No _____

30. Easily excited? — Yes (No) _____

31. Sarcastic? — Yes (No) _____

32. Mature, in your opinion? — (Yes) No _____

33. Loyal? — Yes (No) _____

ARE HIS:

34. Powers of observation good? — (Yes) No _____

35. Written reports good? — (Yes) No _____

HAS HE:

36. Gained the respect of his subordinates? — (Yes) No _____

37. Accepted the responsibilities of a Supervisor? — (Yes) No _____

38. Shown improvement since the last rating?
    (Do not use on 6 Months Probation) — (Yes) No _____

DO YOU:

39. Feel uneasy or uncomfortable while with him? — Yes (No) _____

**IN YOUR OWN WORDS, STATE WHETHER OR NOT YOU FEEL THIS OFFICER IS QUALIFIED TO FULFILL A SUPERVISORY POSITION:**

THERES NO DOUBT, I FEEL THAT SERGEAN DIETZ IS VERY MUCH
QUALIFIED TO FULFILL OR CONTINUE TO FULFILL " HER POSITION
AS A SUPERVISOR

RATING OFFICER: _Lt. D.R Newell_

A0215

DEPARTMENT OF POLICE

WILMINGTON    DELAWARE

DATE: _December 28, 1989_

## PROBATIONARY REPORT FOR SUPERVISORY OFFICERS

NAME OF PROBATIONARY SUPERVISOR: _Sgt. Nancy Dietz_

PROBATIONARY PERIOD: ☒ 6 MONTHS     ☐ 1 YEAR

COMMANDING OFFICER: _Capt. John Ledman_   DIVISION: _Patrol_

THE PROBATIONARY PERIOD AS INDICATED ABOVE EXPIRES ON THE ABOVE

NAMED SUPERVISOR ON _January 3, 1990_ .

PLEASE COMPLETE THIS REPORT AS TO THE CHARACTER AND QUALITY OF THIS

SUPERVISOR'S SERVICE FOR THE PAST 6 MONTHS AND YOUR RECOMMENDATIONS

CONCERNING HIS FUTURE STATUS AS A SUPERVISOR.

RETURN TO PERSONNEL DIVISION WITHIN 5 DAYS.

_Guy H. Sapp_
GUY H. SAPP
CHIEF OF POLICE

EACH ITEM IS TO BE ANSWERED. ANSWER "YES" OR "NO" BY
CIRCLING YOUR CHOICE. IF NEITHER CHOICE DESCRIBES THE MAN, THEN USE
WORD (S) OF YOUR OWN CHOICE IN THE BLANK SPACE TO THE EXTREME RIGHT.
IF YOU WISH TO ELABORATE ON THE ANSWER(S), CIRCLE THE ITEM NUMBER
AND EXPLAIN ON THE LAST SHEET OF THIS REPORT.

DOES HE:

1. Use good judgment in making decisions?   Yes   No   _yes_

2. Accept criticism without becoming angry?   Yes   No   _yes_

3. Readily accept suggestions?   Yes   No   _yes_

IS HE:

27. Courteous toward the public?    Yes  No  _yes_

28. Argumentive?    Yes  No  _no_

29. Prompt on reporting for assignments?    Yes  No  _yes_

30. Easily excited?    Yes  No  _no_

31. Sarcastic?    Yes  No  _no_

32. Mature, in your opinion?    Yes  No  _yes_

33. Loyal?    Yes  No  _yes_

ARE HIS:

34. Powers of observation good?    Yes  No  _yes_

35. Written reports good?    Yes  No  _yes_

HAS HE:

36. Gained the respect of his subordinates?    Yes  No  _yes_

37. Accepted the responsibilities of a Supervisor?    Yes  No  _yes_

38. Shown improvement since the last rating?    Yes  No  _____
    (Do not use on 6 Months Probation)    _I've never rated her_

DO YOU:

39. Feel uneasy or uncomfortable while with him?    Yes  No  _no_

    IN YOUR OWN WORDS, STATE WHETHER OR NOT YOU FEEL THIS OFFICER
IS QUALIFIED TO FULFILL A SUPERVISORY POSITION:

_Yes, indeed so, Sgt Dietz, sets a fine example in all
aspects of Police Supervision. Her constant strive
to better herself and her subordinates makes her
a very note worthy asset to our department._

RATING OFFICER: _Lt Gilbert Howell_
_Capt W_



# WILCOX & FETZER LTD.

In the Matter Of:

# Deitz

v.

# Baker, et al.

## C.A. # 06C-256-SLR

_____

Transcript of:

George B. Collins

**February 12, 2007**

_____

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

A0218

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,    )
              )
    Plaintiff,     )
            ) Civil Action
v.           ) No. 06C-256-SLR
            )
MAYOR JAMES M. BAKER,    )
individually and in his official  )
capacity as the Mayor of the   )
City of Wilmington, and MAYOR   )
AND COUNCIL OF WILMINGTON,    )
            )
    Defendants.    )

      Deposition of GEORGE B. COLLINS taken
pursuant to notice at The Neuberger Firm, P.A., Two
East Seventh Street, Suite 302, Wilmington, Delaware,
beginning at 10:40 a.m., on Monday, February 12, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

    THOMAS S. NEUBERGER, ESQ.
    THE NEUBERGER FIRM, P.A.
     2 East Seventh Street - Suite 302
     Wilmington, Delaware  19801
     For the Plaintiff

    REBECCA L. BUTCHER, ESQ.
    LANDIS RATH & COBB LLP
     919 Market Street - Suite 600
     Wilmington, Delaware  19899
     For the Defendant Mayor James M. Baker

      WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
       (302) 655-0477
       www.wilfet.com

12762496-61cc-468f-9924-a33c78f11772

A0219

Deitz v. Baker, et al.

Page 2

1  APPEARANCES:  (Cont'd)
2      TERESA A. CHEEK, ESQ.
       YOUNG CONAWAY STARGATT & TAYLOR, LLP
3      The Brandywine Building - 17th Floor
       1000 West Street
4      Wilmington, Delaware  19801
       For the Defendant City of Wilmington
5
   ALSO PRESENT:
6      NANCY S. DIETZ
       CHERYL HERTZOG, ESQ.
7      - - - - -
8          GEORGE B. COLLINS,
9      the deponent herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12          EXAMINATION
13  BY MR. NEUBERGER:
14     Q.   Could you state your full name for the record?
15     A.   George Brian Collins.
16     Q.   George Brian Collins.  What's your rank?
17     A.   Corporal.
18     Q.   You're a corporal.  And how old are you, sir?
19     A.   35.
20     Q.   35.  When were you born?
21     A.   ████████
22     Q.   Have you ever had your deposition taken in a
23  court case before?
24     A.   Yes.  Once before.

Page 3

1      Q.   Once before.  Let me just real quick review the
2  procedures in case you have got any questions.  Okay?
3      A.   Okay.
4      Q.   We both can't talk at the same time so we will
5  just take turns.  I will ask the questions.  You will
6  answer them.  He will take the answers down here and
7  then he will type them up.  And you will have the
8  opportunity to review that if you wish in case you're
9  really 40 years old and you made a mistake or
10  something to correct those kind of inadvertent
11  mistakes or whatever.
12          Do you understand that?
13     A.   Yes.
14     Q.   And then if I ever ask you a question that you
15  don't understand, just ask me to rephrase it and I'll
16  try again.  Okay?
17     A.   Okay.
18     Q.   And I don't want you to guess at any answer so
19  if you just don't know anything, just let me know.
20          Do you understand that?
21     A.   Yes.
22     Q.   You have taken an oath.  You're a police
23  officer.  You understand the significance of that?
24     A.   Yes.

Page 4

1      Q.   Are you taking any medications or anything that
2  would prevent your ability to remember things today?
3      A.   No.
4      Q.   I don't think we're going to be here very long,
5  but if you need a break just let us know.  Okay?
6      A.   Okay.
7      Q.   All right.  Now, where did you go to high
8  school?
9      A.   Salesianum.
10     Q.   When did you graduate?
11     A.   '89.
12     Q.   Did you have any college education?
13     A.   Some.  Some U of D, some Del Tech, about a
14  hundred credits.
15     Q.   Okay.  When did you go to the Police Academy?
16     A.   February 23, 1998.
17     Q.   That would have been the Wilmington Police
18  Academy?
19     A.   Yep.
20     Q.   So you have been an officer since February of
21  1998?
22     A.   Yep.
23     Q.   And what have your assignments been since you
24  graduated from the academy?

Page 5

1      A.   Patrol, community policing, detectives.
2  Actually, I've been in community policing twice.
3  That's about it.
4      Q.   So detectives, I guess that's in the criminal
5  division, right?
6      A.   Yes.  I was an auto theft detective.
7      Q.   Auto theft.  Okay.  Who is your present
8  commanding officer?
9      A.   My present?
10     Q.   Yes.
11     A.   My commanding officer is Captain Dietz.  Right
12  now I'm assigned to HRD.
13     Q.   Now you're in HRD?
14     A.   Yes.
15     Q.   All right.  So you have served in patrol, twice
16  in community policing and detectives and right now
17  you're in the human resources department?
18     A.   Yes.  I was in patrol again after detectives
19  and then now I'm in HRD.
20     Q.   Okay.  Any other assignments that you have had?
21     A.   No.
22     Q.   Now, I believe you may be some sort of union
23  officer or official?
24     A.   Yes.

Wilcox and Fetzer, Ltd.   Registered Professional Reporters          302-655-0477

12762496-61cc-468f-9924-a33c78f11772

A0220

Deitz v. Baker, et al.
George B. Collins

Page 6

1    Q.   What office do you hold right now?
2    A.   I'm the president of FOP Lodge 1.
3    Q.   When did you begin serving as the president?
4    A.   January 7th of this year.
5    Q.   And did you hold any offices before that?
6    A.   Vice president and for four years before that I
7    was a trustee.
8    Q.   So are you saying that you served as a vice
9    president for about four years?
10   A.   No.  I was vice president from October 11th,
11   2005 to January 7th, 2007.
12   Q.   Gotcha.  Before that you were a trustee?
13   A.   Yes.
14   Q.   Now, are you -- let me just show you.
15        Are you aware that around November of 2005
16   it was announced that Captain Gilbert Howell was going
17   to be appointed to the rank of inspector in the
18   Wilmington Police Department?
19   A.   As soon as it was announced, I heard like
20   shortly afterwards.
21   Q.   Let me show you a personnel bulletin that went
22   around.  This was marked as Szczerba Exhibit 12 at an
23   earlier deposition.
24   A.   I remember this memo.

Page 7

1    Q.   Okay.  And does that seem about right?
2    A.   Yeah.
3    Q.   That's around the time when you learned about
4    it?
5    A.   Yeah, that seems correct.
6    Q.   At that time did the mayor of the City of
7    Wilmington hold monthly meetings with any of the FOP
8    officers?
9    A.   Yes.  We still continue to do that.
10   Q.   Would those meetings be -- let's see.  We're
11   talking November of 2005.
12        So you would have been serving as the vice
13   president?
14   A.   Yes.
15   Q.   You just would have started in October of 2005,
16   right?
17   A.   Yes.
18   Q.   And after you became the vice president of the
19   lodge, did you begin attending those monthly meetings
20   with the mayor?
21   A.   Yes.  Myself, Kevin Connor and Bill Montgomery.
22   Q.   So Kevin Connor was the president at that time?
23   A.   Yes, sir.
24   Q.   Had he been serving as the president for how

Page 8

1    long?
2    A.   Since October 11, 2005.  That was the election
3    day.
4    Q.   Okay.
5    A.   He was president.  I was elected as vice
6    president.
7    Q.   Was he like a vice president before that?
8    A.   Yes, he was, for Bob Donovan.
9    Q.   And does he still serve in any capacity?
10   A.   No.  He stepped down January 7th.
11   Q.   Okay.  Is he still a uniform officer?
12   A.   Oh, yes.  Yes.  He's still a member of the FOP.
13   He's just not on the board.
14   Q.   What's his rank?
15   A.   I believe he's a senior corporal.  He may even
16   be a master corporal.
17   Q.   Was there a meeting between you,
18   Mr. Montgomery, Mayor Baker and Kevin Connor where the
19   selection of Gilbert Howell was mentioned?
20   A.   Yes.
21   Q.   Why don't you tell me what you remember about
22   the meeting?
23   A.   It was shortly after this (indicating).  I
24   don't even know if it was days or a month, but it was

Page 9

1    very shortly after this memo came out.
2         The chief just -- no.  I'm sorry.  Not the
3    chief.  The mayor had mentioned that he lets the chief
4    run his department.  He just brought it up out of the
5    blue.  We weren't even there to discuss that.  We were
6    there to discuss other issues.
7         He had brought up that he lets the chief
8    run his, run the police department.  He doesn't pick
9    who he wants to be promoted, but he wanted the
10   inspector to be black.
11   Q.   So at sometime during the meeting Mayor Baker
12   told you that?
13   A.   Yes.
14   Q.   Do you remember anything else that the mayor
15   might have said about the subject of Gilbert Howell?
16   A.   No.  I think he brought it up because I guess
17   some people were talking about it already.  I wasn't
18   expecting it to be brought up, but it was but nothing
19   else after that.
20   Q.   Do you remember anything you might have said in
21   response to him or did you just listen to him?
22   A.   A lot of those meetings when Kevin was in
23   charge I let him do most of the talking.
24   Q.   So Kevin would have been in charge of the

3 (Pages 6 to 9)

12762496-61cc-468f-9924-a33c78f11772

A0221

Deitz v. Baker, et al.
George B. Collins

Page 10

1 meeting?
2   A.  Yes.
3   Q.  Do you remember anything he might have said to
4 the mayor when the mayor made that remark?
5   A.  No.
6   Q.  Do you know if Kevin was in the area and would
7 have had the opportunity to overhear that remark?
8   A.  He was sitting right across the desk from him.
9   Q.  So were you all sitting at a table?
10   A.  It would be me, Kevin in the middle, Bill
11 Montgomery and then the mayor directly across from us.
12   Q.  Would this have been in the mayor's office?
13   A.  Yes.  That's where all of these meetings are.
14   Q.  So he's got a desk?
15   A.  Mm-hmm.
16   Q.  Right?
17   A.  Right.
18   Q.  I haven't been there.
19   A.  It's a nice office.  He has a desk, a nice view
20 and he's got three, actually four chairs set up on the
21 other side of his desk.
22   Q.  So he's sitting behind his desk and you were on
23 the other side?
24   A.  Yes.

Page 11

1   Q.  He made that remark while the other three of
2 were you sitting on the other side of the desk?
3   A.  Yes.
4   Q.  I think you said that he said something like he
5 lets Chief Szczerba run the department?
6   A.  Yeah.  He said, "I don't tell the chief who to
7 promote" and he said that also for the fire
8 department.  He said that before in a couple of
9 different meetings.  He likes to let the chief of the
10 fire department and the chief of the police
11 department, you know, promote their people and pick
12 their people.
13   Q.  But he was saying that in this instance he got
14 involved regarding Gilbert Howell and didn't let the
15 chief --
16   A.  He didn't say Gilbert's name, no.
17   Q.  Okay.  Did he convey the fact that he was not
18 letting the chief make his pick for this position?
19   A.  All he said is he wanted the inspector to be
20 black.
21   Q.  Okay.  That's fine.
22        Have you ever been present in any of those
23 meetings since you have been the vice president or
24 president of the lodge when it was ever discussed that

Page 12

1 one of the inspectors had to be white and another one
2 had to be black?
3   A.  Never at the meeting.
4   Q.  Never at the meeting?
5   A.  No.  I've just -- I've seen it just from being
6 there, but never at the meeting.
7   Q.  I understand that.
8   A.  No.
9   Q.  Have you ever been at a meeting where Wilbert
10 Montgomery attended where the fact that one of the
11 inspectors was white and another one was black was
12 ever discussed?
13   A.  No.
14   Q.  That's been discussed I guess at FOP meetings
15 or things like that?
16   A.  Amongst officers.
17   Q.  Amongst officers.  So, for example, you started
18 in --
19   A.  '98.
20   Q.  -- '98.  And in '98 do you remember -- when you
21 were a patrol officer, inspectors were way high up,
22 right?
23   A.  Yeah.
24   Q.  Do you remember John Murray being an inspector

Page 13

1 back in '98?
2   A.  Yes.
3   Q.  And he was white, right?
4   A.  Yes.
5   Q.  And do you remember a James Stallings being an
6 inspector back in '98?
7   A.  Yeah.  He had just made inspector, I believe.
8   Q.  And he was black, right?
9   A.  Yes.
10   Q.  And then John Murray, do you remember he was
11 replaced by a Ron Huston as inspector?
12   A.  Yes.  Yes.
13   Q.  And Mr. Huston, Inspector Huston was white,
14 right?
15   A.  Yes.
16   Q.  And then Inspector Huston was replaced by
17 Inspector Martin Donohue.  Isn't that right?
18   A.  Yes.
19   Q.  And Martin Donohue was white, right?
20   A.  Yes.
21   Q.  Going back to the other side, you remember
22 James Stallings, right?
23   A.  Yes.
24   Q.  And then he was replaced by an Inspector James

4 (Pages 10 to 13)

12762496-61cc-468f-9924-a33c78f11772

A0222

Deitz v. Baker, et al.
George B. Collins

Page 14

1  Wright.  Do you remember that?
2    A.  Yes.
3    Q.  And Inspector Wright was black, right?
4    A.  Yes.
5    Q.  And then Inspector James Wright was replaced by
6  Inspector Gilbert Howell.  Is that right?
7    A.  Yes.
8    Q.  And Inspector Gilbert Howell is black.  Is that
9  right?
10   A.  Yes.
11   Q.  Okay.
12       MR. NEUBERGER:  Could we just take a
13  recess real quick?  Thanks.
14       (A brief recess was taken.)
15  BY MR. NEUBERGER:
16   Q.  Just a couple more questions.
17       Did you and President Connor after the
18  meeting discuss the remark that the mayor had made?
19   A.  I made a comment in the elevator as we were
20  leaving the building.
21   Q.  Do you remember what you said to him?
22   A.  I said did you -- at that point I started
23  thinking about it.  I asked him if he had heard that
24  comment.  And Kevin just kind of had this look like --

Page 15

1  I'm not even sure what he said.  Sometimes he gets a
2  little scattered brain, but I think he replied that he
3  did.
4    Q.  Now, you mentioned being assigned to HRD under
5  Captain Dietz, right?
6    A.  Yes.
7    Q.  Now, that's a temporary assignment.  Isn't that
8  right?
9    A.  Yes.
10   Q.  You have been put in the HR department to
11  pursue some administrative duties before you go back
12  on the street?
13   A.  Yes.
14   Q.  You haven't been cleared to go back on the
15  street yet, have you?
16   A.  No, I haven't.
17   Q.  That's just a temporary assignment?
18   A.  To my knowledge, yeah.
19   Q.  Right.  You hadn't been working there prior to
20  this temporary assignment?
21   A.  No.  I've been there since January 15th.
22   Q.  Right.  Prior to that you were assigned to
23  detectives?
24   A.  Well, I was detailed from detectives to patrol

Page 16

1  since April 1st, 2005.
2    Q.  So you were doing patrol --
3    A.  Yes.
4    Q.  -- from April of 2005?
5    A.  Yes.
6    Q.  Okay.
7        MR. NEUBERGER:  Counsel, I don't have any
8  more questions.  In case you do?
9        MS. BUTCHER:  No.
10       MS. CHEEK:  No.
11       MR. NEUBERGER:  Do you want to reserve
12  reading and signing?  I mean, he's not anybody's
13  client here, I guess.
14       We have only been here for about fifteen
15  minutes.  You have the right to have the court
16  reporter send you the transcript and review it and
17  sign it or you can waive that right.
18       THE WITNESS:  I'll waive it.
19       MR. NEUBERGER:  It makes it a lot easier.
20       MS. CHEEK:  Actually, we don't want to
21  waive that.
22       MR. NEUBERGER:  You don't want to?
23       MR. CHEEK:  The city, we're not waiving
24  it.

Page 17

1        MR. NEUBERGER:  They will send it to you.
2        (Deposition concluded at 11:00 a.m.)
3        (There were no exhibits marked for
4  identification.)

5 (Pages 14 to 17)

12762496-61cc-468f-9924-a33c78f11772

A0223

Deitz v. Baker, et al.
George B. Collins

Page 18

```
 1
 2
 3
 4
 5        REPLACE THIS PAGE
 6
 7        WITH THE ERRATA SHEET
 8
 9        AFTER IT HAS BEEN
10
11        COMPLETED AND SIGNED
12
13        BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24
```

Page 19

```
 1  State of Delaware   )
                        )
 2  New Castle County   )
 3
 4           CERTIFICATE OF REPORTER
 5
        I, Kurt A. Fetzer, Registered Diplomate
 6  Reporter and Notary Public, do hereby certify that
    there came before me on Monday, February 12, 2007, the
 7  deponent herein, GEORGE B. COLLINS, who was duly sworn
    by me and thereafter examined by counsel for the
 8  respective parties; that the questions asked of said
    deponent and the answers given were taken down by me
 9  in Stenotype notes and thereafter transcribed by use
    of computer-aided transcription and computer printer
10  under my direction.
11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17           Kurt A. Fetzer, RDR, CRR
             Certification No. 100-RPR
18           (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24
```

6 (Pages 18 to 19)

12762496-61cc-468f-9924-a33c78f11772

A0224



**WILCOX & FETZER LTD.**

In the Matter Of:

# Deitz

v.

# Baker, et al.

## C.A. # 06C-256-SLR

Transcript of:

James Baker

February 16, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A0225

Deitz v. Baker, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,          )
                                 )
        Plaintiff;          )
                            ) Civil Action
v.                          ) No. 06C-256-SLR
                            )
MAYOR JAMES M. BAKER,       )
individually and in his official   )
capacity as the Mayor of the City  )
of Wilmington, and MAYOR AND   )
COUNCIL OF WILMINGTON,          )
                            )
        Defendants.         )

        Videotape deposition of JAMES BAKER taken
pursuant to notice at the Law Offices of The Neuberger
Firm, P.A., Two East Seventh Street, Suite 302,
Wilmington, Delaware, beginning at 10:15 a.m. on
Friday, February 16, 2007, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.

        WILCOX & FETZER

    1330 King Street - Wilmington, Delaware 19801

        (302) 655-0477

        www.wilfet.com

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

1bc65c48-58f1-40a0-a857-406489639b92

A0226

## Deitz v. Baker, et al.

Page 2

APPEARANCES:
    THOMAS S. NEUBERGER, Esquire
    STEPHEN J. NEUBERGER, Esquire
    CHERYL A. HERTZOG, Esquire
    THE NEUBERGER FIRM, P.A.
      Two East Seventh Street - Suite 302
      Wilmington, Delaware  19801
      on behalf of the Plaintiff;
    DANIEL B. RATH, Esquire
    LANDIS RATH & COBB, LLP
      919 Market Street - Suite 600
      Wilmington, Delaware  19899
      on behalf of Defendant Mayor James M.
      Baker;

    TERESA A. CHEEK, Esquire
    YOUNG CONAWAY STARGATT & TAYLOR, LLP
      The Brandywine Building - 17th Floor
      1000 West Street
      P.O. Box 391
      Wilmington, Delaware  19899-0391
      on behalf of Defendant City of
      Wilmington.


ALSO PRESENT:

    NANCY S. DIETZ
    ROSE TASSONE, Esquire

Page 3

1     VIDEOTAPE SPECIALIST:  On the video
2  record.
3     VIDEOTAPE SPECIALIST:  This is the
4  videotape deposition of Mayor James Baker, taken in
5  the case of Nancy Dietz versus Mayor James Baker and
6  the Mayor and Council of the City of Wilmington filed
7  in the United States District Court for the District
8  of Delaware.
9     Deposition is being taken on February 16,
10  2007, at 10:00 a.m. at Two East Seventh Street,
11  Wilmington, Delaware.
12     Court reporter is Ann Calligan.
13  Videographer is Robert G. Ritter, Senior.
14     Counsel will now introduce themselves.
15     MR. NEUBERGER:  This is Thomas Neuberger,
16  representing the plaintiff, Captain Nancy Dietz.  With
17  me is -- are my associates, Stephen Neuberger and
18  Cheryl Hertzog, and my client Captain Nancy Dietz.
19     MR. RATH:  This is Daniel Rath
20  representing Mayor Baker.
21     MS. CHEEK:  This is Teresa Cheek
22  representing the City of Wilmington.
23     And for the record, the caption has been
24  changed.  It's no longer the Mayor and Council of the

Page 4

1  City of Wilmington.  It's just the City of Wilmington.
2     MR. NEUBERGER:  Thank you.  And I think we
3  have --
4     MR. RATH:  Also --
5     MR. NEUBERGER:  Yeah.
6     MR. RATH:  Also present on behalf of the
7  City is Rose Tassone.
8     MR. NEUBERGER:  Okay.  Why don't we swear
9  the witness.
10     JAMES BAKER,
11    the witness herein, having first been
12    duly sworn on oath, was examined and
13    testified as follows:
14     EXAMINATION
15  BY MR. NEUBERGER:
16  Q.  Are you Mayor James Baker of the City of
17  Wilmington?
18  A.  Yes.  Yes, I am.
19  Q.  Okay.  Mayor Baker, your deposition has been
20  taken before, haven't you -- hasn't it in cases?
21  A.  In other cases, yes.
22  Q.  Other cases, right.
23  A.  Yeah.
24  Q.  Let me very briefly go over the process just in

Page 5

1  case there's any questions.  I'll ask the questions.
2  You'll answer them.  The court reporter will -- will
3  type that up, and then you'll have an opportunity to
4  review that in case she makes some typographical
5  errors.  For example, you said you are 32 and you're
6  really 33 or something like that.
7  A.  Right.
8  Q.  Do you understand that?
9  A.  Right.
10  Q.  Okay.  And you've taken an oath, and you
11  understand the significance of that, right?
12  A.  Correct.
13  Q.  If I ever ask you a question that you don't
14  understand, just ask me to rephrase it.  I'll be glad
15  to do that.  Is that okay?
16  A.  Sure.  Fine.
17  Q.  And I don't want you to guess.  So if you just
18  don't know an answer to a question, just tell us that.
19  I think that's the better way to do it.  Okay?
20  A.  Right.  Mm-hmm.
21  Q.  And if you need to take a break, let us know.
22  All right?
23  A.  Right.
24  Q.  And are you taking any medications or anything

2 (Pages 2 to 5)

Deitz v. Baker, et al.
James Baker - Neuberger

| | |
|---|---|
| **Page 6** | **Page 8** |

**Page 6**

1  that might prevent you from accurately remembering
2  anything?
3  A.  Not unless the stuff I take for diabetes does
4  it. I don't know.
5  Not that I know of.
6  Q.  All right.  Could I ask how old are you?
7  A.  64.
8  Q.  64?
9  A.  Mm-hmm.
10  Q.  And did you to go high school in the city?
11  A.  No.
12  Q.  Where did you go to high school?
13  A.  Ohio.
14  Q.  Ohio.  Okay.
15  When did you move to Delaware?
16  A.  In 1966.
17  Q.  1966?
18  A.  Mm-hmm.
19  Q.  Where did you go to college?
20  A.  I didn't.
21  Q.  Okay.
22  A.  I went to the Air Force.
23  Q.  You were in the Air Force.  And what rank did
24  you have?

**Page 7**

1  A.  What was it?  Ended up with first class.
2  Q.  All right.  So then you moved to Delaware in
3  1966?
4  A.  Right.  I came for VISTA.
5  Q.  For VISTA?
6  A.  Volunteers in Service to America.  Did our
7  training in New York City and then was assigned to
8  Wilmington, even though I wasn't supposed to go to
9  Wilmington.
10  Q.  All right.  And when did you first start
11  getting involved in elected politics in the City of
12  Wilmington?
13  A.  About 1967 with other candidates, not myself.
14  I did research.  I raised funds for other candidates.
15  Q.  Okay.  And then eventually were you elected to
16  the city council?
17  A.  '73.  Ran in '72.  Sat in '73.
18  Q.  Okay.  And did you serve on the city council in
19  some elected capacity up until you were elected mayor?
20  A.  Yes.
21  Q.  Okay.  And your last position on the city
22  council was the president of city council?
23  A.  President.  That's correct.
24  Q.  And how many years had you served as the

**Page 8**

1  president?
2  A.  Since '84.
3  Q.  Since '84?
4  A.  Right.
5  Q.  Okay.  So you first took your oath of office in
6  city council in probably January of '73, right?
7  A.  That's correct.
8  Q.  Okay.  And you served as a council person
9  for -- was it a particular district?
10  A.  Yeah.  Fourth district.  This district,
11  actually.  Downtown.
12  Q.  Okay.  The fourth district, downtown.
13  A.  Downtown, east side, west side, close to the
14  city, downtown area.
15  Q.  All right.  And then in '84, you were elected
16  as the president of the city council?
17  A.  That's correct.
18  Q.  And then in, I guess, the fall of 2000 you were
19  elected mayor?
20  A.  Took office in '01, though.
21  Q.  Right.  January of '01 you became the mayor,
22  right?
23  A.  Right.
24  Q.  So you served on the city council under Mayor

**Page 9**

1  Maloney.  Would he have been the first mayor you
2  served under?
3  A.  Yeah.  After that.
4  Q.  Or served with.
5  A.  Well, I served with Mayor Haskell first as an
6  aid to Mayor Haskell in the mayor's office.
7  Q.  Oh, okay.  So --
8  A.  And then later on I ran for office in '73.  So
9  I was with the mayor's office from 1969 till when I
10  quit and then ran for office.
11  Q.  Right.  Mayor Haskell began service around --
12  A.  '68.
13  Q.  '68 or '69?
14  A.  About '69.
15  Q.  Right.
16  And he was succeeded by who?
17  A.  He was succeeded by Tom Maloney.
18  Q.  Tom Maloney.
19  A.  Right.
20  Q.  Okay.  And then all the subsequent mayors
21  you've worked with?
22  A.  Right.
23  Q.  Okay.  In an elected capacity.  Okay.
24  And during your time serving on council,

3 (Pages 6 to 9)

1bc65c48-58f1-40a0-a857-406489639b92

**A0228**

Deitz v. Baker, et al.
James Baker - Neuberger

**Page 10**

1  did you ever serve on the public -- public safety
2  committee?
3  A.  No.
4  Q.  No?
5  A.  No.  I haven't served on that committee.
6  Q.  Okay.  What committees did you sort of serve on
7  when you were in council?
8  A.  I served on like the community economic
9  development company, housing committee.  I wanted to
10  be on the money committees.  I didn't want to be on
11  those other committees.
12  Q.  Okay.  Is it fair to say that you consider
13  yourself to be a supporter of civil rights for
14  minorities and women?
15  A.  Oh, yes.  I wrote most of the city laws.
16  Q.  Right.  You came in with VISTA.  Now, VISTA was
17  a program for -- how would you describe VISTA?
18  A.  It was young people volunteering to go into
19  communities to help them deal with poverty or the
20  problems that a community might have.  We were sent to
21  West Center City and Hilltop for the first assignment.
22  Q.  Well, you were here when Martin Luther King
23  died?
24  A.  Yes.  Right.

**Page 11**

1  Q.  Did you ever participate in any of the great
2  civil rights marches?
3  A.  Oh, yeah.  The housing was the main thing at
4  that time.  Open housing and the -- well, there
5  was just demonstrations all over the place.
6  Q.  Were you involved in trying to keep peace on
7  the city streets after --
8  A.  When the riots started -- well, there were two
9  riots.  There's one in '70 -- 1967 and one in '68.  So
10  we had -- my job was working with youth.  So we had to
11  try to calm them down in both cases.  '68 was the
12  worst.
13  Q.  And you were here during the service of the
14  National Guard in the streets of Wilmington?
15  A.  Yeah.  For nine months.
16  Q.  Nine months.  Okay.
17  A.  Right.
18  Q.  From something you just said, did you sponsor
19  legislation within the City of Wilmington for women
20  and minorities?
21  A.  Yeah.  The DB -- DBD program for disadvantaged
22  businesses, the program to allow women to enter the
23  private men's clubs, the affirmative action policy for
24  the city.  I rewrote it actually.  Most of the

**Page 12**

1  programs dealing with access, I wrote those.
2  Q.  So the city, for example, has -- has ordinances
3  that prohibit discrimination in city employment on the
4  basis --
5  A.  Sexual orientation and all that, I put those
6  bills in years ago.
7  Q.  Right.  Race, religion --
8  A.  Right.
9  Q.  -- those kinds of things?
10  A.  Mm-hmm.
11  Q.  Okay.  And today that even includes sexual
12  orientation you're saying?
13  A.  Right.  I wrote that one also.
14  Q.  You're African-American?
15  A.  Yes.
16  Q.  So you understand that, for example, there
17  are laws that say the City can't deny employment to a
18  person, or promotion or appointment to a person
19  because of where they to go church?
20  A.  Right.
21  Q.  I'm sorry?
22  You understand that the City can't deny
23  employment to a person because of the newspaper they
24  read in the morning?

**Page 13**

1  A.  Right.
2  Q.  You understand that the City can't deny a
3  person a position in the City because of their race?
4  A.  Correct.
5  Q.  And then lastly, you understand that the City
6  can't deny a person a position on the payroll of the
7  City because of their gender?
8  A.  Correct.
9  Q.  You understand that the United States
10  Constitution, our highest law, prohibits
11  discrimination on the basis of race or gender?
12  A.  Right.
13  Q.  You understand that there are federal laws that
14  prohibit discrimination in employment on the basis of
15  race and gender?
16  A.  That's correct.
17  Q.  Okay.  The City has its own laws that prohibit
18  discrimination on the basis of race and gender, right?
19  A.  That's correct.
20  Q.  And then, lastly, you know that the State of
21  Delaware has laws that prohibit discrimination on the
22  basis of race and gender?
23  A.  Oh, yeah.  That's correct.
24  Q.  Aside from your understanding of that, you

4 (Pages 10 to 13)

1bc65c48-58f1-40a0-a857-406489639b92

**A0229**

Deitz v. Baker, et al.
James Baker - Neuberger

Page 14

1  probably have attended seminars or things like that
2  over the years that have pointed out the importance of
3  those laws.  Is that a fair statement?
4    A.  Yeah.  We do our own, and there's -- every once
5  in a while there's different kind of seminars on
6  sexual harassment or discrimination.
7    Q.  Right.  Okay.
8        This lawsuit that's been filed, I think
9  you understand, deals with two appointments --
10   A.  Right.
11   Q.  -- to the position of inspector in the City of
12  Wilmington that occurred during your term of office,
13  is that right?
14   A.  Mm-hmm.
15   Q.  One of which was -- went to an Inspector
16  Howell; you realize that, right?
17   A.  Right.
18   Q.  Okay.  Now, is it true that you, as the mayor,
19  made the final decision on the selection of then
20  Captain Howell?
21   A.  Yes.
22   Q.  Okay.  And is it true that you're the person
23  who had the final authority as far as the selection of
24  Captain Howell?

Page 15

1    A.  Yes.
2    Q.  And is it true that no committee had the power
3  to choose or select --
4    A.  No.
5    Q.  -- Captain Howell?
6    A.  No.
7    Q.  Right.
8        Is it true you were the final decision
9  maker for the city in that regard?
10   A.  We had input from other people, but, yeah, the
11  final decision had to be made by me.
12   Q.  Right.  You didn't have to clear that with the
13  administrative board of the City of Wilmington, did
14  you?
15   A.  No.  No.
16   Q.  There were no ordinances or regulations of the
17  City of Wilmington that required you to clear that
18  decision with the administrative board, was there?
19   A.  No.
20   Q.  Right.  The city charter, city ordinances, city
21  rules and regulations placed the authority for making
22  that decision with regard to Inspector Howell in your
23  bailiwick, right?
24   A.  That's correct.

Page 16

1    Q.  Okay.  And you, in the last quarter of the year
2  2005, deliberately chose Captain Howell for that
3  inspector position, is that right?
4    A.  That's correct.
5    Q.  Okay.  It wasn't an accident or mistake your
6  selecting him, right?
7    A.  No.  It wasn't -- it wasn't an accident.
8    Q.  You knew you were doing?
9    A.  It wasn't a mistake.
10   Q.  Correct.
11   A.  Correct.
12   Q.  You knew what you were doing, right?
13   A.  Yes.
14   Q.  Okay.  Thanks.
15       What does the mayor of the City of
16  Wilmington earn a year?  What's the salary in the
17  ordinances for the mayor approximately, if you know?
18   A.  I think it was now -- well, with the car, it's
19  about 100 -- 101,000 because I have to pay taxes on
20  the car also.
21   Q.  Okay.  And I think you live -- you live down
22  near on Adams Street or something like that?
23   A.  Up on Harrison, just off of Harrison -- I mean
24  on Harrison just off Eighth Street.

Page 17

1    Q.  Do you rent or own that?
2    A.  Rent.
3    Q.  You rent.
4    A.  Mm-hmm.  Not a big fan of owning anything.
5    Q.  Okay.  All right.  Thank you.
6        Now, I want to show you a chart that I
7  made up that was marked as Szczerba Exhibit Number 2
8  at the deposition of Chief Szczerba a little while ago
9  in this case.  Let me just ask you to look that over
10  for a second.
11       MR. RATH:  Do you have some of these for
12  us?
13       MR. NEUBERGER:  I gave them out at the
14  original deposition.  If you want, you can just --
15       MR. RATH:  Yeah, can I?
16       MR. NEUBERGER:  Sure.  Just take a moment
17  and look it over.
18       MR. RATH:  Thanks.
19       THE WITNESS:  Mm-hmm.
20       MS. CHEEK:  And as I did -- I think I may
21  have done at the earlier deposition, I don't think --
22  I'm going to object on the grounds that this in not a
23  complete list of the inspectors since 1978.
24       MR. NEUBERGER:  Okay.  And for the record,

5 (Pages 14 to 17)

1bc65c48-58f1-40a0-a857-406489639b92

A0230

Deitz v. Baker, et al.
James Baker - Neuberger

Page 18

1  we have an interrogatory out that's asking for those,
2  that information.
3  BY MR. NEUBERGER:
4  Q.  Mayor Baker, I've made up a chart here of the
5  people who have occupied the position of uniformed
6  operations inspector and investigative operations
7  inspector in the Wilmington Police Department over the
8  years.  Okay?
9  A.  Mm-hmm.  I see.  Yeah.
10  Q.  Let's just look at the far right-hand column
11  there.  Okay?  It says "the uniform operations
12  inspector."  Do you see that?
13  A.  Right.
14  Q.  Okay.  Now, you know there is a such a position
15  as uniformed operations inspector in the police
16  department, is that right?
17  A.  Right.
18  Q.  Okay.  And the present occupant of that
19  position since the last quarter of 2005 is Inspector
20  Gilbert Howell, is that correct?
21  A.  That's correct.
22  Q.  And he's a black male, is that correct?
23  A.  That's correct.
24  Q.  And do you recall that his -- the predecessor

Page 19

1  in that position was an Inspector James Wright?
2  A.  That's correct.
3  Q.  Okay.  Gilbert Howell replaced Inspector James
4  Wright, is that correct?
5  A.  That's correct.
6  Q.  Okay.  And James Wright was a black male, is
7  that correct?
8  A.  Yes.  That's correct.
9  Q.  Okay.  And do you recall that the uniformed
10  operations inspector before Inspector Wright was a
11  James Stalling?
12  A.  Yes.  I knew him too.
13  Q.  Okay.  He was a black male too, right?
14  A.  Right.
15  Q.  And do you recall that the inspector prior to
16  James Stalling was a Keith Ash?
17  A.  I knew him.
18  Q.  And he was a black male, right?
19  A.  Right.
20  Q.  Okay.  And do you -- you remember Chief Boykin
21  eventually, right?
22  A.  Oh, yes.  Mm-hmm.
23  Q.  And do you recall that Chief Michael Boykin a
24  little bit earlier in his career was Inspector Michael

Page 20

1  Boykin, the uniformed operations inspector of the
2  police department?
3  A.  I know he was an inspector, but you know.
4  Q.  Okay.  But you don't whether he was uniformed
5  or investigative?
6  A.  No.  Most of these people up until recently I
7  knew they were inspectors.  I don't know what they
8  did, but...
9  Q.  Right.  So you didn't know whether they were
10  uniformed or investigative?
11  A.  No.
12  Q.  Okay.  So let's just -- Michael Boykin was an
13  inspector, and he was a black male, right?
14  A.  Right.
15  Q.  Michael Dixon was an inspector, is that
16  correct?
17  A.  That's correct.
18  Q.  And he was a black male, right?
19  A.  Right.
20  Q.  Samuel Pratcher, you remember him?
21  A.  Yes.
22  Q.  Now, he was an inspector at one time in his
23  career, is that right?
24  A.  Yes, he was.

Page 21

1  Q.  And he was a black male too, right?
2  A.  Mm-hmm.
3  Q.  Do you remember Preston Hickman being an
4  inspector?
5  A.  Well, I remember him.  I don't -- I didn't know
6  what his rank, full rank was that he made, but I know
7  him, yes.
8  Q.  Okay.  But you don't remember whether he
9  attained the rank of inspector or not?
10  A.  He could have.  I just don't remember.
11  Q.  I understand.  No.  No.  I --
12  A.  Yeah.
13  Q.  We're only asking --
14  A.  I knew him.  I did not know him like I did the
15  others.
16  Q.  Was he a black male too?
17  A.  Yes.  Mm-hmm.
18  Q.  And do you remember, going back now the early
19  eighties, okay?
20  A.  Right.
21  Q.  Do you remember whether there was in the police
22  department an Officer John Johnson?
23  A.  Oh, yes.  Yes.
24  Q.  Do you remember if he was an inspector?

6  (Pages 18 to 21)

1bc65c48-58f1-40a0-a857-406489639b92

A0231

Deitz v. Baker, et al.
James Baker - Neuberger

Page 22

1    A.  Yes, he was.
2    Q.  Okay.  And he was a black male?
3    A.  Yes, he was.
4    Q.  And then the -- at least the last one in my
5    list was an Kenneth Miles.  Do you remember him?
6    A.  Oh, yes.  Mm-hmm.
7    Q.  And do you remember whether he had the rank of
8    inspector?
9    A.  Yes, he had.
10   Q.  And was he a black male?
11   A.  Yes.  Mm-hmm.
12   Q.  Okay.  Now, looking on the other side, I'm
13   going to ask you some of these other names.  Okay?
14   Martin Donahue, he's currently an inspector, right?
15   A.  Yeah.  Right.
16   Q.  Do you know that he's the investigative
17   operations inspector?
18   A.  I know now, yes.  Mm-hmm.
19   Q.  Do you remember that he was -- that before him
20   there was an Inspector Ronald Huston who served?
21   A.  Oh, yes.  I know him very well.
22   Q.  Now, both those guys were white males, right?
23   A.  Yes.  Mm-hmm.
24   Q.  Before Ronald Huston, do you remember Inspector

Page 23

1    John Murray?
2    A.  Really not.
3    Q.  Okay.  Do you remember an Inspector John
4    Vignola?
5    A.  I knew him.
6    Q.  Okay.  Was he a white male?
7    A.  Yes.  Mm-hmm.
8    Q.  Do you remember John Murray at all as an
9    officer or anything?
10   A.  I just can't picture him.  Usually these
11   people, I can see their faces, but no.
12   Q.  Do you remember Bill Draper, Inspector Bill
13   Draper?
14   A.  Just the name.
15   Q.  You don't know -- remember his race then; you
16   just remember a name?
17   A.  Just the name.
18   Q.  Okay.  How about a Richard LaFashia, Inspector
19   Richard LaFashia?
20   A.  No.  I don't remember.
21   Q.  Well, you remember Guy Sapp, don't you?
22   A.  Oh, yes.
23   Q.  Okay.  Now, Guy Sapp was a white male, right?
24   A.  Yes, he was.

Page 24

1    Q.  He eventually was the chief, right?
2    A.  Correct.
3    Q.  And he was inspector earlier in his career?
4    A.  Yes, he was.  Mm-hmm.
5    Q.  Do you remember Don Payne?
6    A.  Yes.
7    Q.  Okay.  He was a white male?
8    A.  Yes.
9    Q.  And was he an inspector, do you remember?
10   A.  As far as I -- I really can't remember these
11   guys as to what their ranks -- actually, I remember
12   Guy Sapp as a lieutenant, not as an inspector.
13   Q.  All right.  Charles Dougherty, do you remember
14   him?
15   A.  Yes.
16   Q.  Do you remember whether he was a white male?
17   A.  Yes.  He was.
18   Q.  Do you remember whether he was an inspector?
19   A.  No.
20   Q.  Okay.  And lastly, John Doherty, do you
21   remember --
22   A.  Yes.
23   Q.  -- him?
24   A.  Mm-hmm.

Page 25

1    Q.  Was he a white male?
2    A.  Yes.
3    Q.  Do you remember whether he was an inspector or
4    not?
5    A.  Yes.  Mm-hmm.
6    Q.  Okay.  Thank you.  That was helpful.  And we
7    will wait for the City's answers to our
8    interrogatories.
9        Would you agree that, since at least 1981,
10   that the person who's occupied the position of
11   uniformed operations inspector in the Wilmington
12   Police Department has been an African-American?
13   A.  Well, by this chart, but you got to remember,
14   up until 2000 or up until about two -- 1999 or 2001 --
15   take that back.  1993 or '94, there were four
16   inspectors.
17   Q.  Well, let's go back on that.
18   A.  It wasn't two.
19   Q.  Right.  Right.  There was a time -- you
20   definitely remember there was a time when there were
21   four inspectors?
22   A.  That's correct.
23   Q.  Okay.  And I think the City's records will
24   show -- and we'll have to look.  Okay? -- that I think

7 (Pages 22 to 25)

Deitz v. Baker, et al.
James Baker - Neuberger

Page 26

1  it was some time in the late seventies or the first
2  two or three years of the eighties that they went --
3  they retrenched and went to two inspectors. Does that
4  jog your memory any, or you think it was the nineties?
5     A. I thought it was the nineties we eliminated the
6  four because the study had been done. We had the
7  $11 million deficit, and there needed to be changes.
8  And we were told that our manpower was -- for rank was
9  over -- was loaded. There was too many. We could do
10 with less. So the two positions were eliminated.
11        The only other position that was
12 eliminated earlier was the commissioner of police or
13 public safety commissioner was eliminated. But that
14 was under Bill McLaughlin.
15    Q. Once again, we'll have to check the records.
16 Okay. You're saying your memory is sometime in the
17 early nineties the Wilmington Police Department still
18 had four inspectors.
19    A. Yes.
20    Q. And we are contending in this court case it was
21 sometime -- they had only had two since the early
22 eighties. We will have to defer to the records.
23    A. My memory is there were four up until then. It
24 could have been earlier.

Page 27

1     Q. But you'd stand to be corrected if we look
2  at --
3     A. If the records show that, yeah.
4     Q. Sure. Okay.
5        There's never been a female inspector in
6  the City of Wilmington Police Department. You agree
7  with that, don't you?
8     A. Oh, yes. There hasn't been, to my knowledge
9  anyways.
10    Q. And today there are just two inspector
11 positions, investigative and uniformed, is that right?
12    A. That's correct.
13    Q. Okay. Now, I want to -- are you aware that
14 Chief Michael Szczerba -- I took his deposition the
15 end of January in this case?
16    A. Mm-hmm.
17    Q. You are -- you do know that?
18    A. Well, I know sometime he did a deposition.
19    Q. Have you --
20    A. When I don't know.
21    Q. Have you seen the transcript of his deposition
22 and read it?
23    A. No.
24    Q. Okay. At his deposition he testified as to

Page 28

1  some conversations he's had with the public safety
2  director?
3     A. Mm-hmm.
4     Q. I want to ask you if you have any knowledge of
5  that. Okay?
6     A. I know they had discussions, yeah.
7     Q. Right. There's a public safety director of the
8  City of Wilmington, right?
9     A. He represents us really on the department.
10    Q. Right. And his name is Mosley?
11    A. Jim Mosley.
12    A. Jim Mosley.
13    A. Forgot his name for a moment.
14    Q. That wasn't a trick question.
15    A. Yeah.
16    Q. Okay.
17    A. Jim Mosley.
18    A. Jim Mosley. Okay.
19    A. Yeah. Mm-hmm.
20    Q. I've never met him. Is he African-American?
21    A. Yes. Mm-hmm.
22    Q. Okay. Now, Chief Szczerba testified that, with
23 reference to every transfer Chief Szczerba has made
24 within the Wilmington Police Department, Public Safety

Page 29

1  Director Mosley asked him specifically about the race
2  of the person being transferred.
3     A. He might have. I don't know.
4     Q. Have you ever -- are you aware of the fact
5  that --
6     A. No. Because we try to, as far as I was
7  concerned, to stay away from that because the previous
8  administration asked for pictures and all of that and
9  we didn't want to get into that.
10    Q. Okay. Would you have any basis to dispute
11 Chief Szczerba's assertion that Mosley does do that?
12    A. No. He might have. I mean, I really don't
13 know because on the bands, you don't know. You just
14 have a name.
15    Q. Right.
16    A. Unless you know him personally.
17    Q. And for some of the -- for promotion to certain
18 levels within the police department you know they use
19 a banding system, right?
20    A. Right.
21    Q. And that means, after testing and everything,
22 you could be on an A or a B or a C band, right?
23    A. Right. Right.
24    Q. And then, when there's a vacancy, people are

8 (Pages 26 to 29)

1bc65c48-58f1-40a0-a857-406489639b92

A0233

Deitz v. Baker, et al.
James Baker - Neuberger

Page 30

1  selected from the A band before you get to the B?
2  A.  They have to select from the bands, right.
3  Q.  I think Chief Szczerba testified that, whenever
4  they are making a selection for a promotion from the
5  bands --
6  A.  Mm-hmm.
7  Q.  -- that Public Safety Director Mosley asked him
8  the race of the people --
9  A.  He might --
10  Q.  -- on the band?
11  A.  -- have.  I mean, we've asked all department
12  heads to be conscious of diversity and affirmative
13  action.  I mean, we've done it -- I mean, that's been
14  a standing policy for years that you try to diversify
15  your work force based upon the diversity of your
16  community, not just solely go down the line and say,
17  well, this is my friend, I'll put them in, or
18  something.
19  Q.  So the City of Wilmington has an affirmative
20  action plan out there?
21  A.  Yes.
22  Q.  Right?
23  A.  Mm-hmm.  Correct.
24  Q.  Okay.  And once again, I think we probably

Page 31

1  asked for that in our documents that should be coming.
2  A.  It's probably just a policy statement.
3       MS. CHEEK:  We've already given it to you.
4       MR. NEUBERGER:  You have?  Okay.  Thank
5  you.
6  BY MR. NEUBERGER:
7  Q.  In fact, you've been involved in earlier drafts
8  of the affirmative action plan?
9  A.  Right.  Right.
10  Q.  Okay.  And are you telling me that, in making a
11  promotion from a band, that the affirmative action
12  plan requires the decision makers to be aware of the
13  race of the person who's being promoted?
14  A.  It doesn't require it, no.
15  Q.  Okay.
16  A.  They should be aware of the fact that they
17  should be concerned about the diversity of the rank
18  and file for the police or fire or our regular
19  employees on the other side.
20  Q.  Okay.
21  A.  These are all contractual anyway, so who's ever
22  in the band, if the person is not qualified by
23  whatever it calls for --
24  Q.  Testing?

Page 32

1  A.  -- or this person scores higher or whatever,
2  usually that's the person that's going to get it in
3  the band because that's with the contractual
4  agreements.
5  Q.  Well, are you telling me that diversity plays a
6  role in the decision-making process when people are
7  being selected off the bands for promotion in the --
8  A.  I think they are.
9  Q.  Okay.  Your affirmative action plan, would you
10  agree that it encourages recruitment of candidates for
11  the police department and other departments from a
12  diverse --
13  A.  Background.
14  Q.  -- no.  Diverse places.
15  A.  Oh.  Well, I don't --
16  Q.  Let me say that again.  You don't just put in
17  the News Journal, do you?
18  A.  No.
19  Q.  You would put in black newspapers that you need
20  people?
21  A.  Hispanic.
22  Q.  Yes.
23  A.  African-American.
24  Q.  Right.  You want to cast your net as wide as

Page 33

1  you can, right?
2  A.  Right.  Mm-hmm.
3  Q.  You don't want to limit yourself to old
4  fashioned or traditional recruitment sources, right?
5  A.  It doesn't work.  That's why.
6  Q.  Right.  Okay.
7       You want to make known to as great a
8  segment of the population as you can that employment
9  opportunities exist?
10  A.  Right.
11  Q.  Right?
12  A.  Mm-hmm.
13  Q.  Okay.
14       That helps fulfill a goal of diversity
15  that the City of Wilmington probably has in its plan,
16  right?
17  A.  Yeah.  I think that's the idea is to diversify
18  all the departments at all levels.
19  Q.  Okay.  But in making a selection between two
20  qualified candidates for a position, hypothetically
21  one being white and another being black --
22  A.  Mm-hmm.
23  Q.  -- your decision makers under your plan are not
24  supposed to consider the race of the two candidates,

9 (Pages 30 to 33)

1bc65c48-58f1-40a0-a857-406489639b92

A0234

Deitz v. Baker, et al.
James Baker - Neuberger

---

Page 34

1  are they or --
2      A.  In the band.  I don't know what the contractual
3  agreement says in terms of how they determine that,
4  but it's just like the fire department.  They do
5  consider, if you got two equal candidates, they can
6  still consider the issue of diversity, especially if
7  you have all whites.
8      Q.  Gotcha.  Gotcha.
9      A.  We want to have some break up of that.
10     Q.  Right.  So you're saying, for example, if two
11 candidates are equal --
12     A.  Yeah.
13     Q.  -- the fact of wanting to diversify the
14 department comes into play in making a decision?
15     A.  Oh, I think so.  I think so.  I think that's in
16 any department.
17     Q.  Do you know Greg Chambers?
18     A.  Yes.
19     Q.  I think his --
20     A.  What's Greg?
21     Q.  The former affirmative action guy?
22     A.  Oh, from the state.
23     Q.  For the state.
24     A.  Right.

---

Page 35

1      Q.  He was a -- I think way back in his background
2  he was a City of Wilmington employee.
3      A.  Yes, he was.
4      Q.  Right.  In the area of affirmative action,
5  wasn't he?
6      A.  I'm not sure what he did.
7      Q.  Who is -- who in the City of Wilmington is
8  their most experienced and skilled person in
9  navigating all the rules, laws, and regulations
10 relating to affirmative action?
11     A.  That would probably be Monica Gillespie
12 Gonzales who's the head of personnel.  She might have
13 somebody under her who's better or knowledgeable than
14 she is, but she would be the first person I would go
15 to if there's a question.  We always tell departments,
16 if you have a question, go to personnel or go to law.
17     Q.  Okay.  And if you have two candidates who are
18 of equal -- equal strength, one's a man, one's a
19 female, the desire to diversify the work force could
20 come into play in making that kind of decision?
21     A.  In promotions, that probably would.
22     Q.  Okay.  Okay.
23          And when I ask you that, that kind of a
24 question, I'm asking you that as a person who's been

---

Page 36

1  involved in city government since the late 1960s up to
2  the present, your present capacity.  Okay?
3      A.  Oh, yeah.
4      Q.  Do you understand that?
5      A.  Right.
6      Q.  I mean, you have a lot of experience in the
7  city --
8      A.  Yes.
9      Q.  -- government?
10     A.  A lot of women on my staff.
11     Q.  Right.  And there may have been a time when you
12 were actively involved in writing affirmative action
13 plans and dealing with regulations, right?
14     A.  Right.
15     Q.  Right now you're the mayor.
16     A.  Correct.
17     Q.  You probably can't be as active --
18     A.  No.
19     Q.  -- in those things because you have other
20 responsibilities, right?
21     A.  Correct.
22     Q.  I mean, what's the population of the City of
23 Wilmington these days?
24     A.  About 73,000.

---

Page 37

1      Q.  73,000?
2      A.  Right.
3      Q.  Okay.  And aside from that population base,
4  Wilmington is still the economic hub of the state of
5  Delaware?
6      A.  Oh, it is.
7      Q.  Right?
8      A.  Right.
9      Q.  You have a lot of responsibilities as a mayor,
10 right?
11     A.  Oh, that's correct.  Yeah.
12     Q.  Okay.  Okay.
13          And if Public Safety Director Mosley is
14 asking about race with reference to transfers in the
15 police department, with reference to promotions within
16 the police department, or with reference to picking
17 people from bands, you believe it's because of these
18 kinds of desires you've explained about diversity?
19     A.  That, and also that, you know, we've come
20 through a lot of suits over discriminatory practices.
21 And so they've come from both sides, black and white.
22 So it's -- he has to navigate between if the charge
23 is, well, these guys are going over on this side, they
24 get this promotion, they get that, whatever.  So there

---

10 (Pages 34 to 37)

1bc65c48-58f1-40a0-a857-406489639b92

A0235

Deitz v. Baker, et al.
James Baker - Neuberger

Page 38

1  is a tightrope involved that he has to do in terms of
2  trying to make sure that they are not violating any
3  particular laws or requirements or whatever they
4  might have been.
5   Q.  Okay.  And are there times under the city
6  charter or the city code when you make things that are
7  called appointments?
8   A.  Yes.  Mm-hmm.  All the time.
9   Q.  Okay.  And do you use race or gender in
10  selecting people when you make appointments.
11   A.  Usually not.  I just can't remember a time that
12  that was the priority of getting somebody just because
13  of their race or their gender.  Most of the people
14  that I try to get, I hope that they're the best at
15  what they do.  We -- the way it's done is different.
16  There's -- we have advertise in magazines for certain
17  positions, depending on the specialty.  Sometimes we
18  get recommendations from other people, from council
19  members.  So, I mean, there's a variety of ways that
20  we receive names or candidates for a position before
21  we make a decision.
22   Q.  Okay.  So, would you agree that, since the city
23  went to two inspectors in the police department,
24  whenever that was, nineties or earlier -- let's focus

Page 39

1  on that time, just when there's two inspectors.  Okay?
2   A.  Mm-hmm.
3   Q.  Would you agree that, during that period of
4  time, one of the inspectors has always been
5  African-American and the other inspector has always
6  been a Caucasian?
7   A.  I didn't pay it very much mind, but since I see
8  this, yes.
9   Q.  Okay.  And I'm asking, aside from what I've
10  shown you, I'm just asking you to think back as far as
11  the nineties.  You're taking us at least in your
12  memory back to the nineties.  You would agree that,
13  during that period of time, that there's always been a
14  one-to-one ratio between the inspectors?
15   A.  The two?
16   Q.  Of the two.
17   A.  Since the nineties, yes.
18   Q.  Of the two, at least one, 50 percent, has
19  been -- 50 percent has always been occupied by a
20  Caucasian and 50 percent's always been occupied by an
21  African-American?
22   A.  Well, since the nineties, yeah.
23   Q.  Yes.
24   A.  Mm-hmm.

Page 40

1   Q.  Okay.  Would you agree that that has been a
2  deliberate choice by the decision makers of the City
3  of Wilmington to keep that racial balance because it's
4  felt to be necessary because of the racial composition
5  of the population?
6   A.  I don't know.  I don't know about anybody else.
7  I pick people because I like them and I think they are
8  going to do a good job.  That's all.
9   Q.  Well, okay, but before you became mayor you
10  were the president of council.
11   A.  Correct.
12   Q.  Since at least I think it was '84?
13   A.  '84.
14   Q.  '84.  Okay.  And so you've observed a lot of
15  things on the legislative side.
16   A.  Yeah.
17   Q.  Okay.  And I'm sort of -- I'm asking questions
18  about what's happening on the executive side.
19   A.  Oh, okay.  Mm-hmm.
20   Q.  And I'm asking you, if you believe it's an
21  accident that for that period of time, 50 percent of
22  the inspectors have been white and 50 percent have
23  been black, or whether that's been a deliberate choice
24  by the decision makers on the executive side.  What's

Page 41

1  your observation?
2   MS. CHEEK:  Objection to form.
3   MR. RATH:  I'm also going to object
4  because I think you have asked that and answered it
5  twice.
6   MR. NEUBERGER:  Okay.
7  BY MR. NEUBERGER:
8   Q.  You have to answer the question.
9   A.  Oh.  Okay.
10   Q.  I'm sorry.  Do you remember?  Do you want to
11  have it read back to you?
12   A.  You just say that it's deliberate, and I have
13  no idea how they made their decisions.  You could say
14  there's a pattern, but I can't say for a fact because,
15  in any of the previous mayors' decisions on
16  appointments, it had no -- I was not part of the
17  discussions, or did it make any difference to me at
18  the time who the mayor appointed.  The mayor appointed
19  the appointed.  We lived with whatever the appointment
20  might be.  So we really didn't -- I can't remember
21  even recommending a candidate for anything to any of
22  the mayors.  So I don't really know what their
23  thinking was or who they discussed it with or how they
24  went about their decision, so...

11 (Pages 38 to 41)

1bc65c48-58f1-40a0-a857-406489639b92

A0236

Deitz v. Baker, et al.
James Baker - Neuberger

Page 42

1    Q.  I appreciate that.  Okay?  And I'm only asking
2  based on if you did hear it in a conversation with a
3  mayor or had some firsthand knowledge.  You're saying
4  you don't have a present memory of having someone in
5  the position of authority tell you that that's what
6  they were doing?
7        MS. CHEEK:  Objection to form.
8        MR. NEUBERGER:  Let me rephrase it.
9  BY MR. NEUBERGER:
10   Q.  Are you telling me you don't have a memory of
11  someone in authority telling you that they were using
12  a 50/50 ratio in making their decision?
13   A.  No.  I never had any discussions with
14  anybody -- any of the mayors, no.
15   Q.  Okay.  And I'll just cast that net a little
16  wider, you know, people on their executive -- the
17  mayor's executive staff or things like that.
18   A.  No, because usually I dealt directly with the
19  mayor.  And when I was president of council anyways, I
20  dealt directly with the mayor, and very rarely did I
21  even speak to their AAs, but when we did, generally
22  they were in meetings like this with the AA and his
23  department heads or whatever.
24   Q.  Okay.  Well, we're looking at that Szczerba

Page 43

1  Exhibit 2 in front of you.  Just looking back through
2  the nineties.  Do you think it's just chance that
3  there's been this 50/50 ratio?
4        MS. CHEEK:  Objection to form.
5        MR. RATH:  Objection.
6  BY MR. NEUBERGER:
7    Q.  How would you explain what appears to be a
8  50/50 ratio?
9    A.  Well, like I say, I don't know -- if you look
10  at the name James Wright, that was a recommendation
11  from Chief Szczerba.  He was asked to make a
12  recommendation to me.  And I had already another
13  person in mind, which was Gilbert Howell.  I made no
14  secret about that.  But after discussing it with the
15  chief -- I had just appointed him not too long, and I
16  said, okay, I'll concede to your candidate.  And so
17  James Wright became the inspector.  But I didn't pick
18  James Wright.  The chief did.
19   Q.  Okay.  I understand what you said there, and
20  you know, I'll go into that in a little bit more
21  detail later.
22        That's how you'd explain James Wright
23  being an inspector.  And you'd say that his being
24  African-American is just coincidence; he wasn't picked

Page 44

1  because of his race?
2        MR. RATH:  Objection.
3    A.  Knowing Chief Szczerba, I don't think so.  But
4  he's never been racial in my experience with him.
5  Now, I can't answer for him, but that's been my
6  experience with him.
7  BY MR. NEUBERGER:
8    Q.  James Wright aside, how -- as a participant in
9  city government for all these years --
10   A.  Mm-hmm.
11   Q.  -- what other explanation would you give for
12  the fact that there is a 50/50 ratio?
13   A.  Well, I could just argue --
14        MS. CHEEK:  Objection.
15        MS. RATH:  Objection.  You've asked this
16  question now probably four different times and you've
17  gotten the same answer.  I'm not sure how many more
18  times I am --
19        MS. CHEEK:  You're calling for
20  speculation.  It's not his job to explain it.
21  BY MR. NEUBERGER:
22   Q.  Okay.  They have their objections.  I'm asking
23  you as a participant in city government --
24   A.  Mm-hmm.

Page 45

1    Q.  -- as a legislator all those years and as the
2  mayor from 2001 forward, what -- (intercom message) --
3  I'm sorry -- what explanation can you give for the
4  50/50 ratio for all those positions aside from James
5  Wright?
6        MR. RATH:  Objection.  Not only is it
7  repetitive of the same question that's been asked four
8  or five times, it's now extremely cumulative.  But to
9  the extent that you can answer, we'll answer it one
10  final time.
11   A.  The best I could give you is that they were
12  looking at affirmative action and wanted a diverse
13  group.  That's all.
14  BY MR. NEUBERGER:
15   Q.  Okay.  And you do have some familiarity with
16  the City's affirmative action plans over the years?
17   A.  Correct.
18   Q.  Right.  Could I ask, when the City adopts an
19  affirmative action plan, is that something that gets
20  approved by the council?
21   A.  Yes.  Mm-hmm.
22   Q.  Okay.  So you'd, aside from --
23   A.  I can have an executive order, which does not
24  go through.  There is an executive order on

12 (Pages 42 to 45)

1bc65c48-58f1-40a0-a857-406489639b92

A0237

Deitz v. Baker, et al.
James Baker - Neuberger

1 affirmative action, which I rewrote, but -- and there
2 is the laws in the code on affirmative action policy.
3 So it goes both ways.
4 Q. Okay. All right. That's helpful.
5     I want to ask you something about Public
6 Safety Director Mosley again.
7 A. Mm-hmm.
8 Q. Whether you're privy to a conversation he might
9 have had. Okay?
10 A. Okay.
11 Q. After Inspector Howell was -- after Captain
12 Howell was elevated to an inspector position, I think
13 my client will testify that she had a meeting with
14 Public Safety Director Mosley about the inspector
15 position and that at that time inspector -- Public
16 Safety Director Mosley indicated that the uniformed
17 operations inspector in the City of Wilmington has
18 always been an African-American, while the
19 investigative operations inspector has always been a
20 Caucasian. Okay?
21 A. Mm-hmm.
22 Q. Did -- were you privy to that conversation in
23 any way?
24 A. No. No.

1 Q. Has Public Safety Director Mosley ever advised
2 you of that historic assertion?
3 A. No.
4 Q. No? Okay.
5     We are going to leave Szczerba Exhibit 2
6 there. Okay? But let's -- before we leave it --
7 okay? -- you can see it has two positions indicated
8 there, and it shows that one position has always been
9 held by a white and another position by an
10 African-American, right?
11 A. That's what it shows.
12 Q. Right. That's what that shows. Right.
13 A. Okay.
14 Q. We agreed a little bit earlier that, without
15 looking at the city records, there's no way for just
16 an observer in the city to even know that that could
17 be -- that it was happening?
18     MR. RATH: Objection.
19     MS. CHEEK: Objection to form.
20 BY MR. NEUBERGER:
21 Q. Would you agree with me, as the mayor and a
22 person who has been the council president and a
23 council member, that, without looking at the records
24 of the Wilmington Police Department, there is no way

1 for anyone to know whether or not those positions have
2 been held one for a white, one for a black?
3 A. As far as I -- like I didn't pay it any mind,
4 so I didn't even know it. So unless I saw it like
5 here, whatever it shows, that kind of pattern, but --
6 but I didn't think about it and I don't think anybody
7 else did know of it.
8 Q. Right. Thank you. Thank you.
9     Mayor Baker, are you -- do you know
10 Corporal George P. Collins of the Wilmington Police
11 Department?
12 A. Oh, yes. Mm-hmm.
13 Q. Okay.
14 A. He's with the FOP.
15 Q. I think -- yeah. I think currently he's the
16 president of the FOP, is that right?
17 A. Currently.
18 Q. And they're the bargaining agent for the police
19 officers, right?
20 A. That's correct.
21 Q. Okay. And do you remember that before that he
22 was the vice-president of the FOP?
23 A. Yes. Mm-hmm.
24 Q. And since you were elected mayor and took

1 office in January of 2001, has it been your practice
2 to, about once a month, meet with the -- those two
3 officers of the FOP to discuss matters?
4 A. We meet with all the union leaders on a monthly
5 basis.
6 Q. Are they all in the same meeting or do you --
7 A. No.
8 Q. -- still meet separately?
9 A. They are separate meetings with each of the
10 unions.
11 Q. Okay. And so, since you've taken office as
12 mayor, you've met monthly with the FOP leaders?
13 A. Correct.
14 Q. Okay. Now, Inspector Howell was selected for
15 his position in the last quarter of 2005. Do you
16 remember that?
17 A. Sometime around there, yes.
18 Q. Okay. I'm going to ask you to pass that back.
19 We are done with that.
20     When --
21     MR. RATH: Are we -- pardon me. Are we
22 not going to attach that document as an exhibit to the
23 deposition?
24     MR. NEUBERGER: It's already attached to

13 (Pages 46 to 49)

1bc65c48-58f1-40a0-a857-406489639b92

A0238

Deitz v. Baker, et al.
James Baker - Neuberger

Page 50

1  the Szczerba deposition, so we're just referring it to
2  as being in the record already in the Szczerba
3  deposition.
4          MR. RATH:  So we are not going to attach
5  it as exhibit 2 to the deposition?
6          MR. NEUBERGER:  No.  It's exhibit 2 to the
7  Szczerba deposition.  Would you like it attached?
8  I'll make a copy.
9          MR. RATH:  No.  My only concern is, for
10 accuracy of the record, I think we actually have to
11 use the exact document that's attached to the Szczerba
12 deposition, or there's no -- I mean -- do you
13 understand what I'm saying?
14         MR. NEUBERGER:  We'll make a copy of it
15 and give it to everybody.
16         MR. RATH:  I think it's probably worth
17 just to attach it.
18         MR. NEUBERGER:  Sure.  Let's do that.
19 BY MR. NEUBERGER:
20    Q.  I think I was saying the last quarter of 2005
21 is when Inspector Howell was selected.  Do you
22 remember that?
23    A.  Yes.
24    Q.  Okay.  And Corporal George Collins testified, I

Page 51

1  think, within the last week when I did his deposition
2  that he had been meeting with you monthly with the
3  president of the union since he became the
4  vice-president of the union in the last quarter of
5  2005.  Would you disagree with that?
6          MS. CHEEK:  Objection to form.
7  BY MR. NEUBERGER:
8     Q.  Would you disagree with that?
9     A.  Would you please --
10    Q.  Sure.  He said, once he became vice-president
11 of the union in the last quarter of 2005, he started
12 meeting with you and the president on a monthly basis.
13    A.  He probably did.  I mean, like I say, we meet
14 every month with the union leadership, whoever they
15 might be.
16    Q.  Right.  So you wouldn't disagree with his
17 assertion that, once he became a union leader, he
18 would participate in those meetings?
19    A.  Oh, no.  I won't disagree with you.
20    Q.  Right.  Okay.
21         He testified the other day that, at one of
22 those monthly meetings with you in the last quarter of
23 2005, the subject of Inspector Howell's selection came
24 up.

Page 52

1          MS. CHEEK:  Objection to form.
2     A.  No, it didn't.
3  BY MR. NEUBERGER:
4     Q.  Okay.  So you don't remember that happening?
5     A.  Not remember.  It didn't.
6     Q.  Okay.  He testified the other day that, sitting
7  on the other side of your desk with, I think, himself,
8  the union president, and your chief of staff,
9  Mr. Montgomery --
10    A.  Right.
11    Q.  -- that, with reference to the Howell position,
12 you stated that you wanted the inspector to be black?
13         MR. RATH:  Objection.
14 BY MR. NEUBERGER:
15    Q.  Did you say that?
16    A.  No.
17    Q.  Okay.  So do you disagree with his assertion of
18 that?
19    A.  There was no discussion about Inspector Howell
20 and the appointment with any union leader.
21    Q.  Okay.  So you're saying that you never told any
22 union leader at a meeting in your office or at any
23 other time that you wanted that inspector position to
24 be black?

Page 53

1     A.  No.
2     Q.  Okay.  Do you believe Corporal Collins is
3  mistaken?
4     A.  Mistaken I would say, but...
5          MR. RATH:  May -- I want to just
6  correct -- I want to just do our best, just correct
7  the record.  Your question was stated in the negative,
8  and I believe the mayor answered in the negative,
9  which is going to come out incorrect on the
10 transcript.  If you go back and reread the answer to
11 his question.
12         MR. NEUBERGER:  Why don't we stop and
13 reread the answer.
14         MR. RATH:  It might be helpful to do that.
15         MR. NEUBERGER:  Okay.  I didn't catch
16 that.
17         MR. RATH:  Okay.
18         MR. NEUBERGER:  And then we'll take the
19 break, I guess, because it's an hour, I guess, for
20 them.  Go ahead.
21         MR. RATH:  I believe the question started
22 with "you never."  So it was asked in the negative and
23 then he answered a "no" as opposed to -- I just want
24 to make sure that we're getting it accurate.

14  (Pages 50 to 53)

1bc65c48-58f1-40a0-a857-406489639b92

**A0239**

Deitz v. Baker, et al.
James Baker - Neuberger

Page 54

1    MR. NEUBERGER: Okay. Now I have it.
2  Okay. Let me just try to say it.
3  BY MR. NEUBERGER:
4    Q.  Have you ever had stated to any of the union
5  members in a meeting in your office or elsewhere that
6  you wanted the inspector position at that time to
7  being granted to a black person?
8    A.  No.  That never would have come up at any of
9  those meetings.
10   Q.  Okay.
11       MR. RATH: I believe that helps with the
12  record for clarity purposes.
13       MR. NEUBERGER: Okay.
14   A.  We take very detailed notes on what they say to
15  us as their problems, and that's what we deal with.
16  BY MR. NEUBERGER:
17   Q.  Oh, okay.  So are you saying that you have --
18  you would have records of any meeting -- the
19  conversations of any meetings you had with the union
20  leaders in the last quarter of 2005?
21   A.  I don't, no.
22   Q.  Hmm?
23   A.  The AA takes notes as to whatever issues come
24  up.

Page 55

1    Q.  Okay.  So Mr. Montgomery would -- he doesn't
2  have verbatim notes; he just makes some notes of the
3  meetings?
4    A.  Only of those issues that we're addressing
5  because that's the purpose of the meeting.
6    Q.  Okay.
7    A.  They bring their issues to us, it's not a
8  general conversation or anything.
9    Q.  Okay.  And I think, if we looked at the
10  deposition of Corporal Collins, it would indicate that
11  the inspector position was not a topic for the
12  meeting.  He just said -- he said, I think, that you
13  just volunteered it before the meeting even began.
14   A.  No.  That never happened.
15   Q.  Okay.
16       I want to review some things that Chief
17  Szczerba told us about meetings he had with you about
18  the inspector position in 2005 and see what your
19  memory and recollection of that might be?
20   A.  Sure.
21   Q.  Okay?  Inspector Szczerba told us at his
22  deposition that there were -- he remembered two times
23  when Gilbert Howell was discussed in a meeting with
24  you, Mr. Montgomery, and I believe he said the public

Page 56

1  safety director.  Does that sound about right?
2        MS. CHEEK:  Did you say Inspector
3  Szczerba? I think you said Inspector Szczerba.
4        MR. NEUBERGER: I meant Chief Szczerba.
5    A.  It could have been.
6    Q.  Okay.
7    A.  I know we did have at least one discussion.
8    Q.  Okay.  You appointed Chief Szczerba?
9    A.  That's correct.
10   Q.  Okay.  And you meet with him regularly, don't
11  you?
12   A.  Yes.  With him and other members of the force
13  on a regular basis, or sometimes just he.  But to
14  discuss updating crime and what's going on and what
15  they're doing.  So it's a regular --
16   Q.  Have you found him to be a truthful person?
17   A.  Oh, yeah.
18   Q.  Have you known him to lie?
19   A.  Not to me, no.
20   Q.  Okay.  I apologize if I'm repeating.  I think
21  he says he remembers Mr. Montgomery and the public
22  safety director and you being present on about two
23  occasions.  You're saying that could happen -- could
24  have happened?

Page 57

1    A.  Sure.
2    Q.  Okay.  Those kinds of meetings aren't recorded,
3  are they?
4    A.  No.
5    Q.  Okay.  Do you recall, prior to Inspector Howell
6  being selected, whether you or other staff members had
7  any meetings with then Captain Howell with the chief
8  not being present?
9    A.  Oh, yes.  I had one with Inspector Howell.
10   Q.  Okay.  And who was present at that meeting?
11   A.  Just he and I for breakfast.
12   Q.  For breakfast?
13   A.  Right.
14   Q.  Okay.  And what was the purpose of that
15  meeting?
16   A.  There was two rumors that were circulating,
17  which I wanted to make sure how he felt or what was
18  going on.  One, his health.  And the second was that
19  he would accept a promotion -- not a promotion but an
20  appointment but he would only serve six months and
21  then step down.  And I don't want to ever appoint a
22  person just to help them get more money on their
23  retirement pension.  And that had happened before in a
24  previous administration where the mayor didn't like

15  (Pages 54 to 57)

1bc65c48-58f1-40a0-a857-406489639b92

A0240

Deitz v. Baker, et al.
James Baker - Neuberger

Page 58

1  this -- whatever the reason -- big conflict, and that
2  person was promoted and then retired in six months.
3  So I had a meeting with him to discuss those two
4  issues with him.  And he denied that, one, he said he
5  did not want to have in and out for retirement.  He
6  wanted to serve and that he thought he could do a good
7  job.
8          And the second issue of his health, he
9  said he passed the departmental health requirements
10 and that he was under a doctor's care for diabetes and
11 for high blood pressure.  And so I said -- I asked him
12 whether he thought that would affect his performance
13 and he said, no, that he wanted to do the job and he
14 thought he would be good at it.  So that was pretty --
15 all we discussed.  I told him there hadn't been any
16 decision made on who the person would be, but I
17 certainly didn't want anybody to get appointed and
18 then hasta la vista in six months.
19 Q.   Okay.  So at this breakfast meeting, you had
20 that kind of a discussion with him?
21 A.   Right.
22 Q.   And that's before you made up your decision on
23 who you were going to select?
24 A.   That's correct.

Page 59

1  Q.   Okay.  Did you have breakfast meetings with any
2  of the other people who might be eligible for that
3  position?
4  A.   Yeah.  Captain Dietz.
5  Q.   Okay.  Was that before or after the decision
6  was made?
7  A.   That was before the decision.  Director Mosley
8  came to me and said that Captain Dietz wanted to meet
9  with me because she felt she was being overlooked and
10 that she wanted to meet to discuss that.  And so I had
11 a meeting with her at the hotel, same place, and we
12 just discussed in general that there hadn't been any
13 decision and she, you know, just in general said, I
14 believe, that she was interested in that position.
15 Q.   Do you have records that would indicate when
16 that breakfast was held?
17 A.   Cheryl could probably tell you.  She has all
18 the records of that, but it was --
19 Q.   Cheryl like your calendar person?
20 A.   It was before Chief Szczerba came to me to tell
21 me who he was recommending.
22 Q.   It was before?
23 A.   Before.
24 Q.   And who's Cheryl, so I know?

Page 60

1  A.   That was scheduling secretary.
2  Q.   Scheduling?
3  A.   Right.  Cheryl Mitchell.
4          THE VIDEOTAPE SPECIALIST:  Excuse me, sir.
5  We need to go off the record.
6          MR. NEUBERGER:  Okay.
7          THE VIDEOTAPE SPECIALIST:  Off video
8  record.
9          (Pause.)
10         THE VIDEOTAPE SPECIALIST:  On video
11 record.
12 BY MR. NEUBERGER:
13 Q.   Just to follow up on one thing you said, Mayor,
14 a moment ago, you're talking about this breakfast
15 meeting with Gilbert Howell.
16 A.   Mm-hmm.
17 Q.   Okay.  And you said you heard some rumors about
18 his leaving, maybe only serving for six months and
19 then retiring or health issues or whatever.
20 A.   Right.
21 Q.   Where would you have heard those things?
22 A.   Well, it came from all kinds of sources.  I
23 know it came from staff members.  I think the only
24 thing that the chief mentioned was his health.  The

Page 61

1  chief did mention he thought his health was not good.
2  But it was all over the map.  Once the appointive
3  process starts, you get all kind of people coming at
4  you with either recommendations -- because we had
5  quite a few recommendations.
6          So, once the rumors started, it just goes
7  all over.  The police have more rumors than any
8  organization in the city government.
9  Q.   I heard that about all police departments.
10 A.   Yeah.
11 Q.   They are gossips.
12 A.   All right.
13 Q.   Okay.
14         I think you indicated a little earlier
15 that when it came to, in the first six months of your
16 term, selecting Inspector Wright --
17 A.   Okay.
18 Q.   Okay -- that you let the chief make that
19 decision?
20 A.   Eventually, yes.
21 Q.   And I think the chief -- the chief has
22 testified that, with reference to the Wright
23 selection --
24 A.   Mm-hmm.

16 (Pages 58 to 61)

1bc65c48-58f1-40a0-a857-406489639b92

A0241

Deitz v. Baker, et al.
James Baker - Neuberger

Page 62

1   Q.  -- and all the promotions within his department
2  up till the time of Captain Howell, that you had let
3  him make those decisions?
4   A.  That's correct.
5       MR. RATH:  Object to the form.
6   A.  I did let him.
7       MR. NEUBERGER:  Right.  Okay.
8   A.  Because most of them were bands, which I had
9  nothing to do with.  There was only the one position
10  that I had a say over in reality, and that was the
11  inspector position.  The rest are all by contracts or
12  promotions where you got to go through tests and all
13  this other kind of thing.  So I had nothing to do with
14  that.  That's all the chief.
15  BY MR. NEUBERGER:
16   Q.  Well, within a band, let's say there's three
17  people in A band and there's a selection to be made,
18  any one of the three people can be selected; you
19  understand that?
20   A.  That's correct.
21   Q.  Right.
22   A.  But I didn't get involved in that.
23   Q.  Right.
24   A.  That was his because it was under contract.

Page 63

1  He's supposed to make those decisions.  But the
2  inspector's a deputy chief like all the departments
3  have deputies, deputy fire or deputy directors.  I
4  make those kind of decisions.
5   Q.  Right.  And so you're saying you don't
6  interfere with the selection from the banding process?
7   A.  No.
8   Q.  You let the chief operate the department?
9   A.  Only -- only issue we've always said we wanted
10  diversity in the choices that they make, but nothing
11  of involvement in what they -- who they pick or
12  whatever.
13   Q.  Okay.  And for the first inspector selection in
14  the first six months of your term in office, you let
15  the chief make that decision?
16   A.  Eventually.  I had Captain Howell as my
17  candidate then, and he had James Wright.  And we had
18  discussions on it, and I said eventually, I'll let you
19  pick this inspector.
20   Q.  Okay.  But when it came to the position that
21  eventually went to Captain Howell --
22   A.  Mm-hmm.
23   Q.  -- the chief has testified that he was advised
24  by the director of public safety that this time it

Page 64

1  would be different from before with the inspector
2  position, that the mayor wants to make this
3  appointment this time.  Would you disagree with that?
4       MR. RATH:  Objection.  Are we -- this is a
5  quote from the record?
6       MR. NEUBERGER:  Yeah.  It's page 201 of
7  the record.
8       MR. RATH:  Thank you.
9   A.  I wouldn't disagree.  I told him that I was
10  going to get involved because I said, I gave up the
11  last one for the chief to make a selection.  This time
12  I want to be involved in the selection of that
13  candidate.
14  BY MR. NEUBERGER:
15   Q.  Okay.  So you're indicating that you made it
16  clear that you would be the person making the
17  selection this time?
18   A.  I think I did.
19   Q.  I think the chief says at page 201 that the
20  "mayor wanted it to be made clear that he would be the
21  person making the selection and not the chief"?
22   A.  No question that's true.
23   Q.  Did you relay that to the director of public
24  safety to then tell the chief?

Page 65

1   A.  Yes.
2   Q.  The first time around for Inspector Wright, I
3  think you're telling us that you suggested that the
4  chief consider Inspector Howell at that time back --
5  Captain Howell back in 2001?
6   A.  That's correct.
7   Q.  Okay.  And at that time you didn't tell the
8  chief that you were going to make the selection?
9   A.  Not at that time, no.
10   Q.  Right.
11       Okay.  Now, just to try to focus on any
12  meetings the chief would have been in, when you either
13  were discussing who you were going to select or
14  informed him -- okay?
15   A.  All right.
16   Q.  Once again, the chief is sort of saying he
17  thinks there were two meetings.  You say that might be
18  right or whatever?
19   A.  That might be, but ordinarily the meeting I
20  remember -- the first meeting was he giving his
21  recommendation.
22   Q.  Right.  So let's focus on that one because I
23  think he gave a recommendation.  His recommendation
24  was Captain Nancy Dietz.

17 (Pages 62 to 65)

1bc65c48-58f1-40a0-a857-406489639b92

A0242

Deitz v. Baker, et al.
James Baker - Neuberger

Page 66

1   A.  That's correct.
2   Q.  You remember that?
3   A.  Correct.
4   Q.  And I think he went in to some detail at his
5   deposition of the kinds of things he pointed out to
6   you, her experience in patrol, internal affairs, human
7   resources, criminal investigations.
8   A.  We didn't go that far, but he told me that he
9   thought she was very competent and thought she would
10  be very good for it.
11  Q.  Okay.  He was definitely saying that?
12  A.  Right.
13  Q.  Okay.  Yes?
14  A.  Yes.
15  Q.  Did he mention her educational background, do
16  you remember?
17  A.  No.
18  Q.  Okay.  After he communicated all that to you,
19  were you telling him that you were going to select
20  Captain Howell --
21       MR. RATH:  Objection.
22  Q.  -- at that meeting?
23       MR. RATH:  Communicated all what?  I think
24  there's a disagreement between what the Mayor just

Page 67

1   said was said versus what you said was said.
2       MR. NEUBERGER:  Sure.
3   BY MR. NEUBERGER:
4   Q.  At that meeting did you eventually tell him
5   that you were going to select Captain Howell?
6   A.  No.  What I told him was that I had a
7   candidate, as I had before -- that was Captain
8   Howell -- and that we would make a decision at -- I
9   would make a decision at a certain point because we
10  had other recommendations.  I also felt strongly about
11  Captain Finnerty.  I thought he was -- I liked his
12  demeanor, his way of doing policing.  I think he'd go
13  through a tank if he had to.  I liked his approach.
14      And the other was Lieutenant Brock.  And
15  the reason is I met with them on a regular basis with
16  the chiefs, so I got to know them more in discussing
17  policing or anything else.  Of course, I discussed it
18  with Captain Howell also.  But there are other people
19  that were being recommended.  Ayala, Captain Ayala was
20  recommended, and Captain Cummings was recommended.  So
21  we had different people that were on the table at that
22  time.
23      So I just -- whether or not -- even though
24  Howell was my number 1 candidate, I still thought

Page 68

1   Finnerty would do an excellent job.
2   Q.  Okay.  Eventually you selected Howell?
3   A.  That's correct.
4   Q.  And why did you select him?
5   A.  Well, because I thought he would make a good
6   candidate.  In discussing with him, I liked his ideas
7   about gathering up people and putting together special
8   teams and going out and attacking our problem areas.
9   And I took him for his word in the sense that he
10  really wanted the position, that he was going to do
11  the best that he could in it, and I thought, with the
12  recommendations from members of council -- there was
13  actually community members that recommended him.  So
14  he came highly recommended also.
15      I looked at the resumes of both.  They
16  both have great resumes.  But I also told Captain
17  Howell -- and I told Captain Dietz this -- is I think
18  we have plenty of people who could do the job within
19  the police department, who could do the job of
20  inspector.  We had good people, but I finally made a
21  decision that, yeah, I still like Howell, so let's go
22  with him.
23  Q.  Okay.  And are those the reasons why you
24  selected Howell --

Page 69

1   A.  Yes.
2   Q.  -- that you just told us?  Okay.
3   A.  Mm-hmm.
4   Q.  I think the chief remembered your communicating
5   to him that you'd received recommendations from the
6   community on --
7   A.  Right.
8   Q.  -- Captain Howell, and I think you mentioned
9   about community members.
10  A.  Yeah, and council members.
11  Q.  And council members you added?
12  A.  Right.
13  Q.  Okay.
14  A.  Mm-hmm.
15  Q.  And you mentioned he had -- he had some ideas
16  for the police department on special teams and problem
17  areas in the city?
18  A.  Right.
19  Q.  Okay.
20  A.  Mm-hmm.
21  Q.  Had he conveyed those ideas to you when you had
22  that breakfast meeting with him?
23  A.  Just briefly.  We really didn't have a long
24  discussion.  I just wanted him to clear up those two

18 (Pages 66 to 69)

1bc65c48-58f1-40a0-a857-406489639b92

A0243

Deitz v. Baker, et al.
James Baker - Neuberger

Page 70

1  issues. So we -- I had already discussed his ideas
2  about the attack format of the streets, and I felt
3  that that would work.
4  Q.  The chief remembered that you had characterized
5  it as his having -- he was a good -- he had a good
6  street sense. He's a street person, a street cop.
7  Would that be a variant of what you're trying to say
8  here about these programs --
9  A.  Similar.
10  Q.  -- for the street?
11  A.  He knew every bad guy out on the street
12  possible. I know that. I know he knew them. He knew
13  where they were. But, you know, I think that he
14  really could have done that well in tackling these
15  guys.
16  Q.  Okay.
17      MR. RATH:  Again, there's a reference to
18  the record. If you could just give --
19      MR. NEUBERGER:  Sure. That was at
20  page 218 of his deposition.
21      MR. RATH:  Thank you. Okay.
22  BY MR. NEUBERGER:
23  Q.  Did you ever write down your reasons for
24  selecting him?

Page 71

1  A.  No.
2  Q.  Did you ever -- did you put him in a letter to
3  Captain Howell or anything like that?
4  A.  No.
5  Q.  Okay.
6  A.  They get a letter, a formal letter saying they
7  are appointed, but that's just a formality letter. I
8  sign. They must sign to accept.
9  Q.  Okay. Have we covered all the reasons you
10  selected him?
11  A.  Pretty much so, correct.
12  Q.  Thank you. Do you remember any more today?
13  A.  Only that I liked him. Well, I had a lot of --
14  we have a lot of commonalities in discussions that --
15  about everything under -- under this earth, beyond
16  just policing, but -- but I thought he would do a good
17  job.
18  Q.  Okay. Anything else?
19  A.  No.
20  Q.  Thank you.
21      And do you recall the chief letting you
22  know that he thought there would be issues with the
23  selection of Captain Howell such as his attendance,
24  things like that?

Page 72

1  A.  Actually, no.
2  Q.  No?
3  A.  I don't remember discussing other than health.
4  I know that the chief mentioned health, but the other
5  issues, no.
6  Q.  Okay. What kind of things did council members
7  tell you about?
8  A.  Pretty much the same, that he was a good guy,
9  that he was very street wise, he knew what the
10  problems were. He knew these communities because he
11  knew most of the people in them. He'd make an
12  excellent choice. So I think that came through
13  from --
14  Q.  Yeah, because --
15  A.  -- residents and it came through from council
16  members and it also came just what I believed also.
17  Q.  Do you remember any of the names of any of the
18  council members?
19  A.  Well, Councilman Brown. Council Member Bolden
20  actually had two candidates. She was talking about
21  Captain Cummings and/or Gilbert Howell, but Gilbert
22  Howell was her first choice. And then Cummings would
23  be the second, if Howell was not the person.
24      Councilman Potter also gave support for

Page 73

1  that. I don't know if there were any others --
2  Q.  Okay.
3  A.  -- that I can remember.
4  Q.  Okay. So I think you said Councilman Brown,
5  Councilwoman Bolden --
6  A.  Mm-hmm.
7  Q.  -- and Councilman Potter, right?
8  A.  Right.
9  Q.  The three of them, they're all
10  African-Americans, right?
11  A.  Yes. Mm-hmm.
12  Q.  Okay. And then you said you got some community
13  input?
14  A.  Mm-hmm.
15  Q.  Do you remember what the nature of that was?
16  A.  Just from the northeast area basically.
17  Q.  Northeast?
18  A.  People who have the NPC over in that area felt
19  he would be good. I guess they had dealt with him
20  before. I don't know.
21  Q.  Are you saying that from some community
22  organization or organizations?
23  A.  Well, they were just people of that
24  organization there. It wasn't like a formal

19 (Pages 70 to 73)

1bc65c48-58f1-40a0-a857-406489639b92

A0244

Deitz v. Baker, et al.
James Baker - Neuberger

Page 74

1 organizational letter or support thing.
2 Q. Okay. And which organization was it you were
3 mentioning that they were members of?
4 A. People I think came out of northeast, if I
5 remember correctly. The neighborhood NPC out of
6 northeast, Neighborhood Planning Council.
7 Q. Isn't it true that various community
8 organizations that Inspector Howell has worked with in
9 the past have strongly communicated their
10 dissatisfaction with him when he works with them? Are
11 you aware of that?
12 A. No.
13 Q. You've never heard any of that?
14 A. No.
15 Q. Okay. You never got that kind of feedback?
16 A. No.
17 Q. Okay. And then eventually, after you made your
18 decision, it was communicated in some way to the
19 chief?
20 A. Yeah. The director.
21 Q. Could it have been --
22 A. It could have --
23 Q. -- in passing in another meeting with him, the
24 director, Mr. Montgomery, and you?

Page 75

1 A. It could have been, but I don't remember that.
2 I know I told the director. And I don't know if we
3 had -- we probably would have had a formal sit-down
4 with the chief as well as the director.
5 Q. Okay. Are there any sections of the Wilmington
6 city code -- I'm sorry. No. The charter --
7 A. Mm-hmm.
8 Q. -- that affected your discretion in appointing
9 Captain Howell?
10 A. I think -- yeah. In the section under the
11 powers --
12      MR. RATH: I'm going to object.
13      That's okay. You can answer.
14 A. Under the powers of the mayor for appointments.
15 Q. Okay. Does it specifically identify inspectors
16 in that section?
17 A. No, it doesn't.
18 Q. Okay. Are there any city ordinances that deal
19 with the selection of inspectors for the --
20 A. Not inspectors. Deputies, boards, commissions,
21 and department heads.
22 Q. Okay. Were there any city personnel policies,
23 rules, or regulations that applied to the selection of
24 Captain Howell for that decision that you are aware

Page 76

1 of?
2 A. Only the usual.
3 Q. Non-discrimination?
4 A. Non-discrimination, those kind of things.
5 Q. Okay. Is there a city code provision, section
6 9-209 that says, "No person be shall be appointed...or
7 in any way favored or discriminated against with
8 respect to employment by the City because of race,
9 color, religion, sex, national origin, or political
10 options"?
11 A. That's in the code.
12 Q. That's in the code, right?
13 A. Right.
14 Q. Is there any sort of a form that you would have
15 had to fill out for the administrative board in making
16 this selection of --
17 A. No.
18 Q. -- Inspector Howell?
19 A. No.
20 Q. For making the selection of Inspector Wright?
21 A. No.
22 Q. Was there any sort of form?
23      No?
24 A. No.

Page 77

1 Q. Okay. Is there any sort of provision enacted
2 by the administrative board that says that, in making
3 the selection for inspector of the police department,
4 that the race or gender of the applicants can be
5 considered?
6 A. Unless it's in the law of affirmative action, I
7 don't -- the administrative board would -- would not
8 have done that except the recommendation to city
9 council. City council would have had to pass a bill
10 to create that. They can't just do it by fiat.
11 Q. Right. The board couldn't do that; they would
12 have to go to the council?
13 A. Right.
14 Q. Okay.
15 A. And I don't remember such bill being passed.
16 Q. Do you have any documents that you can -- were
17 there any written records or documents personnel
18 documents, for example, that you reviewed prior to
19 making the selection of Gilbert Howell?
20 A. The only documents that I looked at were the
21 bios of both the two final candidates. I did not look
22 at biographies of the others, but I did for Captain
23 Dietz and Captain Howell. I just read through what we
24 had given to us. He gave me a copy which I -- I

20 (Pages 74 to 77)

1bc65c48-58f1-40a0-a857-406489639b92

A0245

Deitz v. Baker, et al.
James Baker - Neuberger

Page 78

1  can't -- I don't know. We tried to look for it. I
2  just don't know what happened with all those -- those
3  two resumes. But we did have his one when he applied
4  for chief.
5  Q. Okay. So you are saying beforehand you looked
6  at a resume of Gilbert Howell and Captain Dietz?
7  A. Yes, I did.
8  Q. Okay. But you don't know where your copies of
9  that -- of those documents are today?
10  A. No. We looked and they -- they usually are put
11  in file, but I don't know why it didn't show up
12  because they usually do very well in filing what --
13  they come in and just raid my desk. So I don't know
14  where it wound up at.
15  Q. Okay. And you don't remember looking at any
16  other documents beside those resumes?
17  A. No. I didn't.
18  Q. Okay. Are you a person who uses a computer for
19  e-mails and things like that?
20  A. No. No, I don't. Any time -- any e-male, if
21  it doesn't go to John, it doesn't come to me. I don't
22  know how to use those things. If it isn't written or
23  typed or telephone, I'm in trouble. So I don't use
24  them.

Page 79

1  Q. I think earlier you told me you're in your
2  middle sixties or something?
3  A. Yeah. It's just not my era of dealing with
4  those things.
5  Q. Okay. So --
6  A. If they crash, you lose everything. Right?
7  Q. I agree.
8  A. I'd rather have a hard copy so I know what --
9  what was it.
10  Q. Okay. So what I'm trying to get at is, would
11  you have communicated by e-mail about anybody during
12  the process of selecting Inspector Howell?
13  A. No.
14  Q. Okay. I'm trying to see, would you have
15  created any documents on a computer that would
16  indicate your thinking when you selected Inspector
17  Howell?
18  A. No.
19  Q. I think you're telling me that you just do not
20  use a computer for communication or document
21  production?
22  A. No, I don't. They took it out of my office
23  because they know it just sat there collecting dust
24  because only time I would turn it on would be to look

Page 80

1  at something. Other than that, it just didn't serve a
2  purpose.
3  Q. Okay. Then some people use wireless devices to
4  send messages to people. There are devices where you
5  can send 100, 125 letters or things like that. You
6  know, it's like a big -- they call them Blackberries
7  or Arch Tech messaging systems. Do you use any of
8  those kinds of things?
9  A. No. I barely use a cell phone. Only time they
10  can call me is if it's important. I told them don't
11  bother me unless it's important. Otherwise, I'll see
12  you in the office.
13  Q. Okay.
14  A. I don't want to be bothered by a whole bunch of
15  cell phones or they used to have -- we used to have
16  carry two cell phone and the -- what is it? -- the
17  pager. I don't -- no. It takes -- that's invasion of
18  my time. So if it isn't done in the office, or you
19  can't get me at home, forget it.
20  Q. Okay. So, for example, you wouldn't have sent
21  some sort of a text message to Mr. Montgomery or
22  Captain Howell saying, I've chosen Captain Howell
23  because he's got street smarts?
24  A. No.

Page 81

1  Q. Right. You don't deal in those kinds of
2  technologies?
3  A. No. Uh-huh.
4  Q. Okay. Those two final lists you mentioned, who
5  was the second one?
6  A. For the position?
7  Q. For the position that went to Inspector Howell.
8  A. Well, it's Captain Dietz and Captain Howell.
9  Q. Okay. So is it fair to say that meant that you
10  felt she could have ably performed the position?
11  A. Oh, there's no question about that.
12  Q. I mean, you've interacted with her over the
13  years?
14  A. Yes. Mm-hmm.
15  Q. Correct? Okay.
16  You're aware that she's worked with
17  various community organizations?
18  A. Yes. Mm-hmm.
19  Q. In fact, I think you've even given her some
20  certificates that are in the record?
21  A. Mm-hmm. Oh, yeah. Right.
22  Q. Right? Okay.
23  Did you consult anybody in making your
24  decision to select Gilbert?

21 (Pages 78 to 81)

1bc65c48-58f1-40a0-a857-406489639b92

A0246

Deitz v. Baker, et al.
James Baker - Neuberger

Page 82

1       MR. RATH: Objection. Asked and answered.
2   BY MR. NEUBERGER:
3   Q. I'm not talking about who he had meetings with.
4   I'm saying, you know, did you -- well, I understand
5   you said council people, things like that.
6   A. Yeah.
7   Q. Did you sit down with Mr. Montgomery, you know,
8   and have a debate of the, you know, the pros and cons,
9   that kind of a consultation?
10   A. Just briefly with Bill Montgomery. He felt
11   that, when I told him my person that I was favoring at
12   the time -- this was before the decision was made, and
13   he said, well, you know, there's other people that
14   might be considered that are very good for this also.
15   So that kind of discussion, but not really a whole lot
16   of discussion on the candidates because I had to get
17   all of that together and then decide on how I wanted
18   to proceed.
19   Q. Okay.
20   A. There was six candidates, not just two at the
21   time.
22   Q. So initially in the pool of people that were
23   available you had six people?
24   A. Right. Not available, but they were the people

Page 83

1   that rose up to name.
2   Q. Yeah. Okay.
3       Aside from Mr. Montgomery, anybody else
4   you would have had that kind of a meeting, you know,
5   debate the pros and cons?
6   A. Maybe with Mosley in discussion of that. I
7   don't really think there was any major discussions
8   with any of them actually.
9       MR. NEUBERGER: Okay.
10       Okay. Why don't we take a break? I might
11   just be done. I want to just check.
12       THE VIDEOTAPE SPECIALIST: Off the video
13   record.
14       (Recess taken.)
15       THE VIDEOTAPE SPECIALIST: On video
16   record.
17       MR. NEUBERGER: Okay. I don't have any
18   other questions. How about council?
19       MR. RATH: We'll read and sign.
20       MR. NEUBERGER: Okay. No question. Okay.
21   That's it. Thank you. This deposition is concluded.
22       THE VIDEOTAPE SPECIALIST: Off the video
23   record.
24       (Deposition ended at approximately 12:01 p.m.)

Page 84

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 85

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 16th day of February,
2007, the deponent herein, JAMES BAKER, who was duly
sworn by me and thereafter examined by council for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction;
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness;
    I further certify that I am not council,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

DATED: March 5, 2007

22 (Pages 82 to 85)

1bc65c48-58f1-40a0-a857-406489639b92

A0247

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,          )
                                 )
          Plaintiff,             )
                                 ) Civil Action
v.                               ) No. 06C-256-SLR
                                 )
MAYOR JAMES M. BAKER,            ) CONFIDENTIAL
individually and in his official ) PAGES 53-57
capacity as the Mayor of the     )
City of Wilmington, and MAYOR    )
AND COUNCIL OF WILMINGTON,       )
                                 )
          Defendants.            )


        Deposition of JAMES N. MOSLEY taken
pursuant to notice at The Neuberger Firm, P.A., Two
East Seventh Street, Suite 302, Wilmington, Delaware,
beginning at 2:50 p.m. on Monday, March 12, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

    THOMAS S. NEUBERGER, ESQ.
    RAEANN WARNER, ESQ.
    THE NEUBERGER FIRM, P.A.
     2 East Seventh Street - Suite 302
     Wilmington, Delaware  19801
     For the Plaintiff

    REBECCA L. BUTCHER, ESQ.
    LANDIS RATH & COBB LLP
     919 Market Street - Suite 600
     Wilmington, Delaware  19899
     For the Defendant Mayor James M. Baker

        WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com

Page 2

```
1  APPEARANCES:  (Cont'd)
2     TERESA A. CHEEK, ESQ.
      YOUNG CONAWAY STARGATT & TAYLOR, LLP
3     The Brandywine Building - 17th Floor
      1000 West Street
4     Wilmington, Delaware  19801
      For the Defendant City of Wilmington
5
   ALSO PRESENT:
6     NANCY S. DIETZ
7        - - - - -
8        JAMES N. MOSLEY,
9     the deponent herein, having first been
10    duly sworn on oath, was examined and
11    testified as follows:
12            EXAMINATION
13 BY MR. NEUBERGER:
14  Q.  Could you state your full name for the record?
15  A.  Sure.  My names is James Nelson Mosley.
16  Q.  How old are you, sir?
17  A.  60.
18  Q.  60.  And have you ever had your deposition
19 taken before in a court case?
20  A.  Yes.
21  Q.  Once or twice you mean?
22  A.  I think it's one time before.
23  Q.  Well, let me just go over a few of the basics.
24 Okay?
```

Page 3

```
1         You have taken an oath to tell the truth
2  and you understand the importance of that, right?
3   A.  Yeah.
4   Q.  And I'll be asking you questions.  The court
5  reporter here will take them down and then it's typed
6  up in a format for you to review.
7         Do you understand that?
8   A.  Okay.
9   Q.  If he's made a mistake and you said you were 60
10 and he put 40 down, you could point that out and make
11 that kind of correction.
12        Do you understand that?
13  A.  Mm-hmm.
14  Q.  And if you're called as a witness in trial in
15 this case and you're asked a question that you were
16 asked at the deposition and you gave an answer
17 different from what you said today, I would be free to
18 point that change out to the judge and jury.
19        Do you understand that?
20  A.  I understand.
21  Q.  And if I ever ask you a question today that you
22 don't understand, just let me know and I'll be glad to
23 rephrase it.  Okay?
24  A.  Okay.
```

Page 4

```
1   Q.  If there's a question I ask you that you feel
2  you might have to guess in answering, just let me know
3  and I'll rephrase that.  Okay?
4   A.  Okay.
5   Q.  I don't want you to be making any guesses.  I
6  just need you to testify as to what you remember.
7         Do you understand that?
8   A.  I understand.
9   Q.  Are you taking any medicines that would
10 interfere with your ability to remember things?
11  A.  No.
12  Q.  And if you need to take a break, just let us
13 know and we will take a break.
14  A.  All right.
15  Q.  How long have you been working with the City of
16 Wilmington?
17  A.  November will be nine years.
18  Q.  Okay.  So when did you first start?
19  A.  I started in 1998.
20  Q.  And what position did you hold in '98?
21  A.  I was the commissioner of licensing and
22 inspection.
23  Q.  Oh, okay.  Are you the commissioner who came
24 from Philadelphia?
```

Page 5

```
1   A.  No.  No.
2   Q.  That was somebody else.
3         So you started, from '98 you started with
4  Wilmington as the commissioner of licensing and
5  inspection.  How long did you serve there?
6   A.  I stayed in that position until January of '01.
7   Q.  And in January of '01 what position did you
8  assume?
9   A.  Director of public safety.
10  Q.  And have you held that position since then?
11  A.  Yes.
12  Q.  Where were you born?
13  A.  Milford, Delaware.
14  Q.  So you're another one from Delaware?
15  A.  I'm from Delaware.
16  Q.  Okay.  All right.  Where did you go to high
17 school?
18  A.  William Henry High School in Dover.
19  Q.  William Henry.  Okay.  I'm sorry.  I don't --
20  A.  It was an all-black school.
21  Q.  Okay.
22  A.  One of the few that remained.
23  Q.  Well, I'm 60 and up here we would play Howard
24 and I went to Salesianum and we would play Howard or
```

2 (Pages 2 to 5)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0249

Page 6

1  whatever, but I don't remember ever coming down your
2  way.
3     A.  Yes.  I was at William Henry.
4     Q.  Did you attend the University of Delaware or
5  any other place?
6     A.  Delaware State University I had my
7  undergraduate degree from.
8     Q.  You got your undergraduate work from Delaware
9  State in what?
10    A.  Business.
11    Q.  All right.  And do you have any graduate
12 experience?
13    A.  I have a master's degree.
14    Q.  In what field?
15    A.  Administration of justice.
16    Q.  It's called administration of justice?
17    A.  Yes.
18    Q.  And did you flow right into the master's
19 program after college or did you take some time off?
20    A.  No.  I was in the Army when I got my master's
21 degree so, no, it wasn't.
22    Q.  When did you enlist in the Army or drafted or
23 whatever?
24    A.  I enlisted.

Page 7

1     Q.  Okay.
2     A.  It's confusing.  I went in the Army the first
3  time in 1965.
4     Q.  '65.
5     A.  I spent three years.  I got out and went back
6  in in I think '76.
7     Q.  For how long?
8     A.  I had a total of 26 years.
9     Q.  Really?
10    A.  Mm-hmm.
11    Q.  So did you stay in the Army until you started
12 at licensing and inspection?
13    A.  Yes.
14    Q.  Okay.  What rank did you progress to?
15    A.  Lieutenant colonel.
16    Q.  Lieutenant colonel?
17    A.  Mm-hmm.
18    Q.  Good for you.
19        Where were some of the places you were
20 stationed?
21    A.  Various places throughout the U.S.  I was in
22 Cuba, Belgium, Germany, Vietnam.
23    Q.  Sure.
24    A.  Most of it was within the continental United

Page 8

1  States.
2     Q.  Okay.
3     A.  Coast to coast.
4     Q.  What kind of a function were you performing?
5     A.  I was in the military police corps.
6     Q.  Military police.  Did you retire from the Army?
7     A.  Yes.
8     Q.  When you retired you were a lieutenant colonel
9  in the military police corps?
10    A.  Yes.
11    Q.  Did you spend your whole career in the military
12 police corps?
13    A.  Well, the Army has what they call an
14 alternative program.  You have to go out for three
15 years and I spent three years as a comptroller.  What
16 they were trying to do is the Army wanted all their
17 officers to be dual tracked.
18        The primary field for me was military
19 police and they chose my alternate field where
20 wherever there was a shortage they put you there.  So
21 they chose this other field that I had to get some
22 training in, so I stayed there for three years.
23    Q.  Okay.  You retired and came back home to
24 Delaware?

Page 9

1     A.  Yes.
2     Q.  Is that a fair statement?
3     A.  Yes.
4     Q.  And how would you describe your job duties as
5  director of public safety with the City of Wilmington?
6  What's it entail?
7     A.  It entails getting a strategic plan from the
8  mayor as to how he wants to deal with what he sees as
9  his vision for addressing crime and other related
10 public safety issues.  And from that I get with the
11 chief of fire, chief of police and the emergency
12 management director and from that we develop a
13 tactical plan to attack his strategic plan, to address
14 his strategic plan.
15    Q.  Okay.  So the Wilmington Police Department and
16 Wilmington Fire Department and then Wilmington
17 emergency services, they report to you?
18    A.  Yes.
19    Q.  And they are your responsibility?
20    A.  Yes.
21    Q.  When you started in '98 did you come in under
22 Mayor Jim Sills?
23    A.  Yes, I did.
24    Q.  Are you computer literate?

3 (Pages 6 to 9)

1   A.  Somewhat.
2   Q.  Okay.  Can you communicate and use e-mail?
3   A.  Yes.  Yes.
4   Q.  Do you use a BlackBerry?
5   A.  Yes.
6   Q.  William Montgomery, the mayor's chief of staff,
7   do you know him?
8   A.  Yes.
9   Q.  Does he use e-mail?
10  A.  Yes.
11  Q.  Does he use a BlackBerry?
12  A.  I know he has one, but I'm not sure what he
13  uses it for, if it's just his calendar or if he
14  communicates with it.  I don't recall ever getting any
15  written communication from him.  I honestly don't
16  know.
17  Q.  Okay.  So you don't recall ever receiving
18  e-mails from him?
19  A.  Via his BlackBerry.
20  Q.  Via the BlackBerry.  Okay.
21  A.  Yeah.
22  Q.  But from his desktop computer have you received
23  e-mails from him?
24  A.  Sure.

1   Q.  And do you send e-mails to his desktop
2   computer?
3   A.  Yes, I do.
4   Q.  Do you send e-mails to his BlackBerry?
5   A.  Not directly to his BlackBerry.
6   Q.  How long have you been using a BlackBerry in
7   your job with the City of Wilmington?
8   A.  Maybe a year or more.
9   Q.  Your e-mails, are they backed up on the State
10  of Delaware system?
11  A.  Yes.
12  Q.  Your BlackBerry, is there a way to back up its
13  messages?  Are they preserved in any way?
14  A.  I think I can save them on my BlackBerry, but I
15  typically do not.  I save them to my computer once in
16  a while.
17  Q.  Just so I understand you, because I don't use a
18  BlackBerry, you send an e-mail on your BlackBerry and
19  you were just telling me you believe there's a way
20  they get saved.  Is that what you just said?
21  A.  The sent messages?
22  Q.  The sent message, yes.
23  A.  I think you have a choice when you send a
24  message on the BlackBerry whether you want a copy of

1   it sent to your sent file or not.
2   Q.  Okay.  And do you in using your BlackBerry
3   normally send copies to your sent file?
4   A.  No.  No.  I think I did for a while, but I
5   discontinued it.  It's just too much traffic.
6   Q.  But your desktop computer when you use e-mail,
7   do you use Outlook Express?
8   A.  Yes.
9   Q.  And that contains your sent messages.  Is that
10  right?
11  A.  Most of the time.
12  Q.  So in the year 2001 if there were any e-mails
13  that you sent to William Montgomery, for example,
14  about the selection of James Wright to be inspector,
15  the rank of inspector for the Wilmington Police
16  Department, any such e-mail would have gone into your
17  sent messages file?
18      MS. CHEEK:  Objection to form.
19  Q.  You can answer the question.
20  A.  Perhaps.
21  Q.  Perhaps?
22  A.  Perhaps.  Because again on that computer, just
23  like the BlackBerry, I have the option of saying put a
24  copy in my sent file.  In 2001 I don't remember if I

1   had copies going to my sent file or not.
2   Q.  Well, normally since you have been operating in
3   your director of public safety function, do your
4   e-mails get copied somewhere, your sent e-mails?
5   A.  The majority do not.
6   Q.  The majority do not?
7   A.  Do not.
8   Q.  So what happens to them?  They just get
9   deleted?
10  A.  I think they just go and if you don't ask for a
11  copy to be sent to your sent file, it just doesn't go
12  there.
13  Q.  In the year 2005 when Gilbert Howell was
14  selected to be an inspector in the Wilmington Police
15  Department, were you still communicating with William
16  Montgomery by e-mail in that year?
17  A.  I'm sure I was.
18  Q.  And if you sent any e-mails to William
19  Montgomery about the selection of Gilbert Howell,
20  would they have been preserved?
21      MS. CHEEK:  Objection to form.
22  A.  Perhaps.
23  Q.  If William Montgomery sent you any e-mails
24  about the selection of Gilbert Howell in 2005 to be an

4  (Pages 10 to 13)

Page 14

1  inspector, would they be preserved in your in box?
2      MS. CHEEK:  Objection to form.
3      A.  Perhaps.
4      Q.  Do you get junk e-mail like the rest of the
5  world?
6      A.  Yeah.  At some point it gets loaded and I just
7  delete a lot of it.
8      Q.  How frequently does your computer get backed
9  up?
10     A.  I don't know that it gets backed up.  I look at
11 at it some point and if it's over 60 days old,
12 depending on how important it is, I delete it.  It
13 doesn't get backed up necessarily.
14     Q.  I'm sorry.  I didn't mean clogged up or
15 anything like that.
16         Your hard drive gets backed up on the
17 state system.  We established that a little bit
18 earlier, right?
19     MS. CHEEK:  Objection to form.
20     A.  I'm now -- maybe I misunderstood your question.
21         I understood your question to be does my
22 e-mail come through the state system?  To that I say
23 yes.
24     Q.  Right.  Now, how about your backups?

Page 15

1      A.  I don't know if the state backs up my e-mail or
2  not.
3      Q.  So you don't manually do backups for your
4  system, do you?
5      A.  Not to the state I don't.
6      Q.  Well, to anywhere?
7      A.  Again, given my limited knowledge here, to the
8  best of my knowledge what I save I save on my
9  computer.
10     Q.  Did William Montgomery in 2005 communicate with
11 you by e-mail about the need to select a new inspector
12 for the Wilmington Police Department due to a
13 retirement that was upcoming?
14     A.  I don't recall.
15     Q.  Is it possible that he sent you an e-mail?
16     A.  It's possible.
17     Q.  Do you recall whether you communicated with
18 William Montgomery about the need to select a new
19 inspector for the Wilmington Police Department?
20     A.  Via e-mail?
21     Q.  Yes.
22     A.  It's possible.
23     Q.  Do you recall whether you communicated with him
24 by any written means other than e-mail, letters, for

Page 16

1  example?
2      A.  I don't recall.  But, again, it's possible.
3      Q.  And would you have any files in your office
4  relating to the selection of Gilbert Howell to be an
5  inspector in the year 2005?
6      MS. CHEEK:  Objection to form.
7      A.  Not that I recall.
8      Q.  Do you have any files in your office relating
9  to attendance issues that have arisen since Gilbert
10 Howell was selected for inspector in 2005?
11     A.  Yes.
12     Q.  Where are those files kept?
13     A.  I'm sure my secretary has them.
14     Q.  Do you have a file that's labeled the Gilbert
15 Howell file or some other designation?
16     A.  I don't know how she labels them.
17     Q.  You just don't know?
18     A.  Yeah.  I ask the chief to give me the
19 information.
20     Q.  Right.  So the chief sends you some reports on
21 his attendance.  Is that what you're saying?
22     A.  Yes.
23     Q.  Yes?
24     A.  Yes.

Page 17

1      Q.  And how your secretary files them away is a
2  little bit beyond your knowledge?  Is that what you're
3  telling me?
4      A.  Again, she files them.  She is able to get them
5  when I need them, so she has them under some heading.
6  I don't know what it is
7      Q.  And I'm asking if you know whether she has any
8  records for the year 2005 relating to Gilbert Howell
9  and his selection to be the inspector?
10     A.  I don't know.  I honestly don't know.
11     Q.  So she may or may not have records?  Is that
12 what you're telling me?
13     A.  She may or may not, yeah.  I honestly don't
14 know what it would be, unless, like I said, it's
15 possible we communicated via e-mail in 2005, but we --
16 I don't recall.  I honestly don't.
17     Q.  Mayor Baker has told me that he's not into
18 computers and he doesn't communicate by e-mail.  Is
19 that your impression too?
20     A.  I haven't seen any from him ever.
21     Q.  So you don't send him e-mails?
22     A.  No, I do not.
23     Q.  You just communicate with Mr. Montgomery, who
24 is his chief of staff, by e-mail?

5  (Pages 14 to 17)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

Page 18

1  A.  Right.

2  Q.  Early in your tenure as the director of public

3  safety an inspector had to be selected in the second

4  half of the year 2001.

5  Do you remember that?

6  A.  Yes.

7  Q.  And that was Captain Wright who was selected at

8  that time?

9  A.  It was Captain Wright, yes.

10  Q.  It was Captain Wright.  Do you remember why

11  Captain Wright was selected for the position of

12  inspector?

13  A.  Why he was?

14  Q.  Yes.  I am going to ask you what was the

15  process, how he was selected, what were the reasons he

16  was selected.

17  Why don't we just go back in time?  Do you

18  remember any process that was followed to select him?

19  A.  The typical process is we look at all

20  eligibles, in this case it was for inspector so it

21  would be all captains.  And I'm sure we discussed all

22  eligibles, all captains at that point.

23  And, again, we talked about many names,

24  but Jim Wright's name came up.  I know I supported Jim

Page 19

1  Wright's nomination, as did the chief, but the final

2  decision was the mayor's.

3  Q.  Okay.  So your recollection is during the

4  process various captains of the Wilmington Police

5  Department were considered?

6  A.  I'm sure at one point all the captains were

7  mentioned, yeah.

8  Q.  By "mentioned," I think are you trying to tell

9  me that during the process the captains were discussed

10  individually?

11  A.  Yes.  I'm sure we did.

12  Q.  And would there have been a meeting or meetings

13  where this process was entered into?

14  MS. CHEEK:  Objection to form.

15  A.  I will tell you that it probably -- it may have

16  happened at a scheduled meeting.  It may also have

17  happened at just general discussion, just in passing

18  or some unrelated meeting.  That is not uncommon.

19  Q.  Well, the people who would have discussed the

20  need to select an inspector, would that have included

21  you, Mr. Montgomery, Mayor Baker and Chief Szczerba at

22  the time?

23  MS. CHEEK:  Objection to form.

24  A.  Yes.

Page 20

1  Q.  Did the people who discussed the selection

2  include those four people?

3  A.  Not during every discussion.  I mean, I could

4  have bumped into Bill Montgomery in passing and we

5  talked about it or the mayor or somebody.  Every time

6  we talk about it, there wasn't the same four people

7  there at every meeting, no.  Those are the four folks

8  that have primary input to recommending to the mayor.

9  Q.  Are you saying that sometimes all four might

10  not have been present when it came up?

11  A.  True.  True.

12  Q.  Besides those four people, were there any other

13  people in the loop during those discussions?

14  A.  In the loop?

15  Q.  People who participated in the discussions.

16  A.  Oh, I'm sure everyone had an opinion.  With me,

17  very little.  I don't know about the mayor.  Probably

18  more with the mayor than with me.

19  I mean, I'm sure certain council members

20  had some opinion and maybe other people.  They don't

21  always tell me what they tell the mayor.

22  Q.  Right.  You're telling me the mayor may have

23  talked to other people like people on city council?

24  A.  Possibly, yes.

Page 21

1  Q.  Sure.

2  A.  Right.

3  Q.  Right.  But the position was in the department

4  that you bore responsibility for?

5  A.  Yes.

6  Q.  The police department, right?

7  A.  Yes.

8  Q.  And the position would have been, in effect,

9  deputy chief of the police department?

10  MS. CHEEK:  Objection to form.

11  A.  Yes.

12  Q.  And the mayor was the person who had the final

13  authority to make the selection.  Is that your

14  understanding?

15  A.  Yes.

16  Q.  And Mr. Montgomery is the chief of staff to the

17  mayor.  Is that your understanding?

18  A.  Yes.

19  Q.  So are you telling me that you at least

20  remember the four of you discussing it on at least one

21  occasion?

22  A.  Yes.  I'm sure we did.

23  Q.  Was it on more than one occasion where the four

24  of you discussed it?

6  (Pages 18 to 21)

Page 22

1    A.  I do not recall specifically, but I'm sure we
2  did.
3    Q.  Do you recall whether anyone made any records
4  of your discussions or any recordings of your
5  discussion?
6    A.  I don't recall anyone recording anything.
7    Q.  Eventually did the mayor decide to select
8  Captain Wright for that position?
9    A.  Yes.
10    Q.  The mayor, did he have the authority to make
11  that selection?
12        MS. CHEEK:  Objection to form.
13    A.  From what I understand, he's the only one who
14  has the authority to appoint.
15    Q.  Right.  You couldn't select Captain Wright to
16  be the inspector, could you?
17    A.  Can I select?  No.
18    Q.  I think you mentioned it was an appointment,
19  right?
20    A.  Yes.
21    Q.  Under the city charter, the mayor has the
22  authority to appoint the two inspectors who now serve
23  in the police department.  Is that correct?
24        MS. CHEEK:  Objection to form.

Page 23

1    A.  Yes.
2    Q.  And Chief Szczerba, he did not have the
3  authority to appoint James Wright to be the inspector
4  in the year 2001, did he?
5        MS. CHEEK:  Objection to form.
6    A.  His authority, input is probably the better
7  word, is the same as mine.  He can recommend.
8    Q.  Right.  Are you telling me that you recommended
9  to the mayor that James Mosley ultimately be selected?
10    A.  No.
11    Q.  I'm sorry.  I didn't hear you.
12    A.  No.  James Wright.
13    Q.  I'm sorry.  James Wright.  Yes.
14    A.  James Wright was the recommendation that I made
15  to the mayor, yes.
16    Q.  Did Chief Szczerba also recommend James Wright?
17    A.  Chief Szczerba agreed with Wright, yes, yeah.
18    Q.  Did Chief Szczerba agree with your
19  recommendation of James Wright?
20    A.  No, not in the form that this is my
21  recommendation and he agreed or disagreed with it.  I
22  think of the folks that were recommended, the chief
23  agreed that, agreed with Wright, not because it was my
24  recommendation, no.

Page 24

1    Q.  You're saying that he independently agreed that
2  Wright would be a good selection?
3    A.  Yes.
4    Q.  So you felt that Wright would be a good
5  selection and the chief felt that Wright would be a
6  good selection.  Is that correct?
7    A.  Yes.
8    Q.  And how about William Montgomery, did he
9  express an opinion on whether James Wright would be a
10  good selection?
11    A.  I honestly don't recall.  I don't recall him
12  objecting.
13    Q.  And then the decision had to be made.  Is that
14  a fair statement?
15    A.  Yes.
16    Q.  As to who to select, right?
17    A.  Yes.
18    Q.  And Mayor James Baker made the decision to
19  appoint Captain Wright to be the inspector for uniform
20  operations?
21    A.  Mm-hmm.
22    Q.  Then we jump forward.  It's the year 2005 and
23  James Wright at some point in time was indicating that
24  he was going to retire.

Page 25

1        Is that a fair statement?
2    A.  Yes.
3    Q.  And did you learn from him that he was going to
4  retire?
5    A.  Yes.
6    Q.  And that would have created a vacancy in the
7  position of inspector for uniform operations.  Is that
8  correct?
9    A.  Correct.
10    Q.  Were there any meetings or discussions held
11  about how to select someone the second time around?
12    A.  About how to?
13    Q.  Let me rephrase that.  Okay?
14    A.  Okay.
15    Q.  Was there a process that was followed this time
16  around to select someone to be the inspector?
17    A.  I would tell you we did pretty much the same
18  thing we did before.  All the captains were
19  considered.  Of those, only two came to me personally
20  and said they wanted to be considered.  One was
21  Captain Dietz and the other one was Gilbert Howell.
22    Q.  So are you saying that before the decision was
23  made as to who to select, you had an opportunity to
24  speak with Captain Dietz?

7  (Pages 22 to 25)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0254

1    A.  Yes.

2    Q.  And before the decision was made as to who to

3    select, you had an opportunity to speak with Gilbert

4    Howell?

5    A.  Yes.

6    Q.  Well, by this time you had been serving over

7    four years in your position, right?

8    A.  Yes.

9    Q.  And during that period of time did you have

10   occasion to interact with Captain Dietz in any way and

11   observe her performance?

12   A.  Minimally.

13   Q.  Minimally.

14        How about Gilbert Howell, what were your

15   opportunities to interact with him and observe his

16   performance?

17   A.  Probably less than Nancy.

18   Q.  Less?

19   A.  Less, yes.

20   Q.  During that period of time are you the person

21   who would have signed off in some way on any

22   performance evaluations of theirs?

23   A.  If I sign -- I do recall signing performance

24   evaluations but not as a rater.  I'm not the person in

1    either case that sits down and writes that I have

2    firsthand knowledge of their performance, how they

3    perform and that type of thing.

4        I sign as the, if you will, verifier of

5    the chief and/or inspector, whomever rated them kind

6    of deal.  So my signature would not be as a rater, nor

7    was my position as an observer/rater of them.

8    Q.  And we could look at the actual documents to

9    see if your signature is on any of them.  Is that a

10   fair statement?

11   A.  I'm sure you can, yes.

12   Q.  If you would sign such a document, would you

13   have read it over before you signed it?

14        MS. CHEEK:  Objection to form.

15   A.  I would like to think I did.

16   Q.  Let's just go back.

17        If your signature is on any performance

18   evaluation of Gilbert Howell or Nancy Dietz, did you

19   read the document over before you signed it?

20        MS. CHEEK:  Objection to form.

21   A.  Again, I would hope I did, but it's possible I

22   didn't read it in its entirety.

23   Q.  As a matter of your normal business practices,

24   do you read over such documents before you sign them?

1    A.  Everything I sign completely?

2    Q.  No.  I'm talking about performance evaluations.

3    A.  Entirely?  No.

4    Q.  The last page there where there's the summary

5    of what your numerical values are and different

6    categories and all, do you look those things over?

7    A.  I'm sure I did.  But they're not my numbers.

8    Q.  No.  Somebody else logged the numbers.

9    A.  Okay.

10   Q.  Right.  So I think you told us that the four

11   people involved in the process to select an inspector

12   in 2005 included yourself, the chief, William

13   Montgomery and Mayor Baker.

14        Is that a fair statement?

15   A.  Yes.

16   Q.  The mayor may have heard from other people.

17   Would you agree with that?

18   A.  I'm sure he may have.  Bill may have.  The

19   chief may have.

20   Q.  Did you discuss the need to select someone on

21   more than one occasion in 2005?

22        MS. CHEEK:  Objection to form.

23   A.  With the other three?

24   Q.  Yes.  I'm talking about the other three

1    people --

2    A.  Did we discuss it more than once?

3    Q.  Yes.

4    A.  Oh, I'm sure we did.

5    Q.  Were there any written records of any of those

6    discussions?

7    A.  Not that I recall.

8    Q.  Were there any recordings made of any of those

9    discussions?

10   A.  Voice recordings?

11   Q.  Yes.

12   A.  Not to my knowledge.

13   Q.  And did you eventually make a recommendation to

14   the mayor about who should be selected in 2005 to be

15   inspector?

16   A.  Yes.

17   Q.  And who was your recommendation?

18   A.  It was three, three names that had not been

19   considered.

20   Q.  Okay.  What were the names of those three

21   people?

22   A.  Captain Ayala, Captain Maggitti and Captain

23   Finerty.

24   Q.  Did you say, "Finnery"?

1   A.  Finerty.  Finerty.
2   Q.  Finerty, how do you spell that?
3   A.  F-i-n-e-r-t-y, I think.
4   Q.  Are you telling me you recommended three names
5   to the mayor to make a selection from?
6   A.  Well, there was already names on the table.
7   These were three names that were not or had not been
8   discussed.
9   Q.  So you brought them into the discussion also?
10  A.  I asked -- well, as I do in all cases, I opened
11  it up in hopes that he will consider all things and
12  all people, but yeah.  I guess the answer -- what was
13  the question again?
14  Q.  Why don't I ask him to read it back so we can
15  get it accurately?
16       (The reporter read back the pending
17  question.)
18       THE WITNESS:  Yes.  Yes.
19  BY MR. NEUBERGER:
20  Q.  Who were the other people who were being
21  discussed?
22  A.  Captain Dietz and Captain Howell.
23  Q.  Did you eventually settle on someone on who you
24  would recommend to the mayor as the best-qualified

1   person for the job?
2   A.  Did I?
3   Q.  Yes.  Did you?
4   A.  No.
5   Q.  No?
6   A.  No, I did not.
7   Q.  Now, did William Montgomery ever eventually
8   identify for you the person he thought was best
9   qualified for the job?
10  A.  Not that I recall, no.
11  Q.  How about Chief Szczerba, did he make a
12  recommendation to the mayor about who was the best
13  person for the job?
14  A.  Yes.
15  Q.  And who was that?
16  A.  Captain Dietz.
17  Q.  Captain Dietz?
18  A.  Capital Dietz.
19  Q.  Did Chief Szczerba give reasons why he thought
20  Captain Dietz was the best person for the job?
21  A.  In so many words that she had proven herself.
22  I mean, he went through, I recall him talking about
23  all of the positions that she's held and having done a
24  good job in his opinion and she had proven herself

1   worthy.
2   Q.  So is it fair to say that he reviewed her work
3   history and assignments within the force?
4   A.  Yeah.  Yes.  Yes.
5   Q.  And did he identify personality traits or other
6   kinds of characteristics that he thought were a plus
7   that she would bring to the job?
8   A.  As I recall him referring to Nancy, he referred
9   to her as a total, as a total person and I'm sure,
10  although I don't remember specifically, personality.
11  I mean he referred to her as being a well-rounded,
12  qualified person.
13  Q.  He didn't recommend Gilbert Howell, did he?
14  A.  No.
15  Q.  Did he discuss any concerns he had about
16  Gilbert Howell's performance in the past?
17  A.  I don't recall performance as much as I do --
18  well, I guess you could call it performance.  It was
19  probably centered more around his health.
20  Q.  His health?
21  A.  His health, which certainly relates to
22  performance.
23  Q.  Up until that time in the fall of 2005, what
24  kind of issues had he demonstrated relating to his

1   health or his attendance?
2   A.  Like I said, I didn't see -- I didn't have any
3   immediate direct contact with Gilbert.  I didn't see
4   him -- in fact, mostly in passing.  I don't know that
5   I can make a fair assessment of his performance.
6   Q.  But you do have a recollection of the chief
7   identifying some issues relating to his, relating to
8   Gilbert Howell that he was concerned with?
9   A.  Yes.
10  Q.  And did the mayor indicate that he was inclined
11  to select Gilbert Howell for the position during this
12  discussion?
13       MS. CHEEK:  Objection to form.
14  A.  At the end of the process, yes.
15  Q.  Let me go back.
16       Was it on just one occasion or more than
17  one occasion that you remember the four of you
18  discussing the ultimate selection?
19  A.  Well, I don't remember how many times we
20  discussed it.
21  Q.  You sort of said at the end of the process the
22  mayor was going to select Howell and I'm just trying
23  to figure out did that all happen around the table one
24  day?

9 (Pages 30 to 33)

Page 34

1    A.  No.  I didn't say he was going to select
2  Howell.  I said at the end of the process he told us
3  what his decision was.
4    Q.  Oh, okay.  Let me frame it this way:  You
5  remember definitely one discussion among the four of
6  you.  Is that correct?
7    A.  Yes.
8    Q.  Was it at a later time that the mayor said what
9  his decision was?
10   A.  It was after he interviewed Nancy, looked at
11 her resume and he interviewed Captain Howell and
12 looked at his resume and listened to what I and the
13 others had to say and at the end of that he made his
14 decision as to who would get the position.
15   Q.  Okay.  So are you telling me that the mayor
16 eventually interviewed Gilbert Howell?
17   A.  Yes.
18   Q.  Before he was selected?
19   A.  Yes.
20   Q.  Are you telling me that the mayor eventually
21 interviewed Nancy Dietz before she was selected?
22   A.  Yes.
23   Q.  I mean before Gilbert Howell was selected.
24   A.  I understand.

Page 35

1    Q.  Are you telling me that the mayor reviewed the
2  resume of each of those people?
3    A.  Yes.
4    Q.  And did the meetings with Nancy Dietz and
5  Gilbert Howell occur sometime after this meeting we
6  have been discussing among the four of you, the next
7  day, the next week, something like that?
8    A.  As I recall, certainly once we knew there was
9  going to be a vacancy, the four of us started talking
10 and every time we talked it wasn't the four of us
11 again.
12   Q.  I understand.
13   A.  But we talked I'm sure on certainly more than
14 one occasion.  And it was subsequent to their
15 identified need to select another inspector that the
16 mayor interviewed Captain Dietz and Captain Howell,
17 yes.
18   Q.  And it's your understanding that the mayor did
19 interview those people?
20   A.  Yes.
21   Q.  And then the mayor selected Gilbert Howell to
22 be the inspector of the Wilmington Police Department?
23   A.  Yes.
24   Q.  Did you agree with that selection?

Page 36

1    A.  No.
2    Q.  Who would you have selected?
3    A.  Again, I didn't identify one person.  I gave
4  three names that I suggested that we consider also.  I
5  did not have one name that stood out there that I
6  suggested to the mayor.
7    Q.  But am I correct in understanding that you did
8  not feel that Gilbert Howell was the best candidate
9  for the job?
10   A.  No, I did not.
11   Q.  So if you were making the decision, you are
12 saying that you would not have selected Gilbert
13 Howell?
14   A.  Correct.
15   Q.  You believe the mayor should have selected
16 another one of the captains who were possibilities?
17   A.  I won't say what the mayor should have done.
18 But if the question is would I have selected Gilbert
19 Howell?  No.
20        Did I recommend?  Again, I recommended
21 three other names that he consider.
22   Q.  Those three names are the ones you told me
23 earlier, right?
24   A.  Yes.

Page 37

1    Q.  Did you ever hear the mayor -- well, did the
2  mayor ever say in your presence that he selected
3  Gilbert Howell because he was an African-American?
4    A.  He selected him because he was an
5  African-American?
6    Q.  Because he was an African-American, yes.
7    A.  No.
8    Q.  Did he ever indicate that the fact that he was
9  an African-American played a role in his decision?
10   A.  No.
11   Q.  Did he ever indicate that maintaining
12 diversity, racial diversity in the two inspector
13 positions in the Wilmington Police Department was a
14 factor in his decision?
15   A.  No.
16   Q.  No?
17   A.  No.
18   Q.  Okay.  Well, there came a time when you learned
19 the mayor was selecting Gilbert Howell.  Is that
20 right?
21   A.  Yes.
22   Q.  And did the mayor identify the reasons why
23 Gilbert Howell was selected?
24   A.  As I recall, he -- again, by comparison I have

10  (Pages 34 to 37)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0257

Page 38

1  been here a very short period of time.  Gilbert has
2  been on the police department for 30 years and the
3  mayor has been around for a long time.  I don't know
4  what kind of relationship -- I'm gathering from his
5  conversation they had a personal or professional
6  relationship long before me.  I don't know if it's
7  friendship or what.  And the mayor also had expressed
8  that he had confidence in Gilbert.
9        So did he say one specific thing?  No.
10  Q.  No.  I'm just trying to identify what you might
11  remember.
12        I've asked the mayor and this morning
13  William Montgomery, I asked him his recollection of
14  what the mayor may have said or indicated and I'm just
15  trying to find out from you what memory you might
16  have.  Okay?
17  A.  Yeah.
18  Q.  So as far as factors that the mayor might have
19  indicated played a role in his decision, you have said
20  he had a long-term relationship with Gilbert Howell;
21  he knew him for many years.
22  A.  No.  No.  No.  What I said is he may have.
23  They both have been around long.  I wasn't here.  I
24  don't know what kind of relationship they had.

Page 39

1        Your question was -- I understood your
2  question as being do I know what went into his
3  decision-making basically, aside from race?
4  Q.  If he said it.
5  A.  No.  Again, my response is I don't know.  I
6  don't know what kind of relationship they had.  I
7  don't know.
8  Q.  All right.  You also indicated that the mayor
9  had confidence in Gilbert Howell.
10        Was that based on something the mayor said
11  or things that he had indicated to you at that time?
12  A.  As I recall, the mayor had said that he had
13  some ideas about moving forward that he liked.
14  Q.  Is there anything else you recall at this time
15  that the mayor said back then that indicated the
16  reasons why he was selecting Gilbert Howell?
17  A.  I don't know.  I don't know if it was mentioned
18  about the campaign.  I don't know.  I don't recall.
19  Q.  So you're telling me you don't recall any other
20  reasons?
21  A.  I don't, I don't recall.
22  Q.  That's fine.  Thank you.
23  A.  The specifics anyway.
24  Q.  After the selection was made, do you recall

Page 40

1  Captain Dietz then coming to you and having a
2  discussion about the selection of Gilbert Howell with
3  you?
4  A.  Yes.  Before and after.
5  Q.  Right.  Before I think you explained a few
6  minutes ago, right?
7  A.  Well, before was when Nancy said that she
8  wanted to be considered and I recommended to her that
9  she let that be known to the mayor.
10  Q.  Right.  Then there came a time when it was
11  either announced or the word was out that Gilbert
12  Howell was going to be selected.
13        Is that fair to say?
14  A.  Yes.
15  Q.  And did Nancy Dietz come to see you a second
16  time?
17  A.  Yes.
18  Q.  And did she ask why Gilbert Howell had been
19  selected?
20  A.  I don't recall.  She probably did.
21  Q.  Do you recall what she was saying to you when
22  she met with you?
23  A.  I recall the conversation of her wanting to be
24  considered for this thing and we talked about

Page 41

1  preparing a resume, meeting with the mayor and we set
2  a meeting up and had breakfast I think sometime after
3  that.
4        The subsequent conversation, I'm sorry, I
5  know there was one, but I don't remember exactly what
6  was said in it.
7  Q.  You don't have any notes of the meeting with
8  her, do you?
9  A.  No, I don't have any notes of the meeting.
10  Q.  Was it just you and her who met privately?
11  A.  As I recall, yes.
12  Q.  And do you recall her asking why Gilbert Howell
13  was selected?
14        MS. CHEEK:  Objection to form.
15  Q.  Let me strike that.
16        Do you recall her asking what reasons you
17  knew as to why he was selected?
18  A.  And I don't know if it was that subsequent
19  conversation or one prior to that.  Nancy asked me a
20  question, if the mayor wanted to put another minority
21  in that position.  And, again, it may have been after
22  the selection.  It may have been before.  I honestly
23  do not remember.  And I think that's where this is
24  going.

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0258

Page 42

1    And my response to her was "It's been a
2  minority there since I've been here, but I don't know,
3  I don't know what Jim Baker is going to do, what Mayor
4  Baker is going to do."
5    Q.  So you have some recollection of that kind of a
6  conversation?
7    A.  Oh, I remember saying it.
8    Q.  At sometime?
9    A.  Yes.
10   Q.  And you had been with the city since 1998,
11  right?
12   A.  With the city, yes.
13   Q.  Right.  What was your last duty assignment
14  before you left the military?
15   A.  I was the director of public safety at an Army
16  post in Arizona.
17   Q.  In Arizona?
18   A.  Yes.
19   Q.  Was it the beginning of '98, the end of '98?
20  When did you join the city?
21   A.  November of '98.
22   Q.  November of '98?
23   A.  Yes.
24   Q.  When you're recalling this statement to Nancy

Page 43

1  about that position being held by a minority since
2  you've been here, were you referring to November of
3  '98 or January 2001 when you started?
4    A.  Since I've been there.  What?  '01?
5    Q.  Right.  And so --
6    A.  And I honestly don't know who the inspectors
7  were prior to my going down there.
8    Q.  So you weren't referring back to when you were
9  in licensing and inspection?
10   A.  Oh, God.  No.  I don't know.
11   Q.  You're telling me you probably didn't know who
12  the inspectors were when you were with licensing and
13  inspection?
14   A.  (Witness shakes head).
15   Q.  You have to say yes or no.
16   A.  I'm sorry.  No.  No.
17   Q.  All right.  Do you recall telling Captain Dietz
18  anything else about why she may not have been
19  selected?
20   A.  Why she may not have been selected?
21   Q.  Why she may not have been selected, yes.
22   A.  I don't know what it would have been.  I don't
23  know enough about why she wasn't selected to tell her
24  too much, to be honest with you.

Page 44

1    Q.  I'm just trying to get a memory of your
2  conversation.  You told me what you remember.  Is
3  there anything else?
4    A.  I don't -- I can't today tell you why she
5  wasn't selected.
6    Q.  I would have to ask the mayor that, right?
7    A.  I don't know.
8    Q.  I would have to ask the mayor?
9    A.  Yeah.  I honestly don't know.
10   Q.  Are you telling me you have never had a
11  conversation with the mayor where he said, "I did not
12  choose Nancy Dietz for the following reasons"?
13   A.  No.  No, I have never had that conversation.
14   Q.  When you did have that conversation with her
15  and made that remark about the position being held by
16  a minority since you have been there, I want to focus
17  on that.  Okay?
18   A.  Okay.
19   Q.  Is it possible that you told Captain Dietz that
20  you had been told that one of the inspector slots has
21  always been for a Caucasian employee and one for an
22  African-American employee?
23       MS. CHEEK:  Objection to form.
24   A.  Always?  That's something that I don't know.

Page 45

1    Q.  Yes.  I'm saying did you state to her that you
2  had been told by someone that one of the inspector
3  slots had always been for a white and one for a black?
4    A.  I don't recall saying that.
5    Q.  You don't recall saying that?
6    A.  No.  No.
7    Q.  Is it possible that you said that?
8       MS. CHEEK:  Objection to form.
9    A.  I don't know why.  I don't know that to be, I
10  don't know that to be true.  I never recall being told
11  that.
12   Q.  You're telling me today that you don't recall
13  anyone having said that to you.  Is that what you're
14  saying?
15   A.  I mean, no, I don't recall anyone saying that.
16  And I'm hesitating because I don't know how old this
17  department is.  I don't know.  I don't have any idea
18  who the inspectors were.  I think I may remember the
19  guy's name before I got there.  Well, I don't remember
20  his name.
21       But, anyway, I don't know enough about --
22  there's no way in the world that I can say that
23  there's going to be a minority or a black and a white
24  put in these positions because that's...

12 (Pages 42 to 45)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0259

Page 46

1  Q.  Who was your predecessor?
2  A.  Dave Bostrom.
3  Q.  Mr. Bostrom.  He's the one that -- was he a
4  professor at Harvard or went to Harvard?
5  A.  He came from Washington.  He held some rank in
6  Washington P.D., Washington, D.C. Police Department.
7  Q.  Washington, D.C.
8       Did you ever have any conversations with
9  David Bostrom before you took over his job?
10 A.  Before I took over his job?
11 Q.  Yes.
12 A.  I don't recall having any conversation with
13 Dave before I took over his job.
14 Q.  After you took over his job, did you ever
15 have --
16 A.  We talked on a couple of occasions afterwards,
17 yes.
18 Q.  Do you recall whether he ever told you that one
19 of the inspector slots had always been held for an
20 African-American officer?
21 A.  Do you know what?  I don't recall anyone ever
22 telling me that that's been reserved for a minority.
23 Q.  Let's talk about Mayor Sills.  You remember
24 Mayor Sills?

Page 47

1  A.  Yes.
2  Q.  He hired you as the head of the licensing and
3  inspection department, right?
4  A.  Yes.
5  Q.  You're aware he had a long history and
6  involvement in the City of Wilmington?
7  A.  Yes.
8  Q.  Do you know that?
9  A.  Yes.
10 Q.  And do you recall Mayor Sills ever telling you
11 that one of the inspector slots had always been held
12 for an African-American captain?
13 A.  No.
14 Q.  No?
15 A.  I don't recall that.  I don't know why he would
16 ever say anything to me about public safety.
17      And if I may?
18 Q.  Go ahead.  Yes.
19 A.  Your other question or my comment about since I
20 have been here it's been a black, that's only one
21 inspector.
22 Q.  Right.  That would have been Inspector
23 Stallings?
24 A.  That would have been Jim Wright.  Stallings

Page 48

1  never served under me.
2  Q.  I'm sorry.  No.  No.  You're right.
3  A.  Jim Wright is the only one that was there
4  during my tenure.
5  Q.  Yes.  I understand that's what you're saying.
6       Do you recall when you did have the
7  meeting with Captain Dietz after Gilbert Howell was
8  selected whether you told her at that time that you
9  had argued strongly against the selection of Gilbert
10 Howell to the mayor?
11      MS. CHEEK:  Objection to form.
12 A.  Do I recall saying that?
13 Q.  Saying that to her, yes.
14 A.  I don't recall saying it, but it's true.
15 Q.  Do you recall attending a breakfast meeting
16 with Mayor Baker and Captain Dietz in the Green Room
17 at the Hotel du Pont?
18 A.  Yes.
19 Q.  Was that before or after Inspector Howell was
20 selected?
21 A.  It was before.
22 Q.  Before.  Okay.  And did she give the mayor a
23 resume at that time?
24 A.  Yes.

Page 49

1  Q.  Did you ever see Gilbert Howell's resume that
2  was given to the mayor?
3  A.  Yes.
4       MR. NEUBERGER:  Excuse me a second.
5       (Discussion off the record.)
6  BY MR. NEUBERGER:
7  Q.  You don't have a copy of that resume he
8  submitted at that time, do you?
9  A.  The mayor asked me to get -- I told him that
10 Nancy was interested and he asked me to get resumes
11 from both of them and I got them and I think I gave
12 him copies in advance of the breakfast and then they
13 brought a copy to the breakfast.
14      No.  Do I have a copy of it?  No.
15 Q.  Okay.  Thanks.
16      MR. NEUBERGER:  Could we take a break?  We
17 may be almost done.  We'll be back.
18      (A brief recess was taken.)
19 BY MR. NEUBERGER:
20 Q.  Just to wrap this up.  Since Gilbert Howell was
21 selected to be the inspector, is it true that there
22 hasn't been any written job evaluations of him
23 performed?
24 A.  I don't know.

13 (Pages 46 to 49)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0260

Page 50

1    Q.  Okay.  So you don't know one way or the other?
2    A.  I honestly do not know.
3    Q.  The inspectors are supposed to be evaluated in
4    writing once a year.  Isn't that true?
5    A.  Yes.  But as I understand the system, and I may
6    have it wrong, the year would have ended, the calendar
7    year -- I don't know if we go on a calendar year or
8    FY.
9    Q.  Well, one calendar, one full calendar year
10   passed for Gilbert Howell --
11   A.  Yeah.
12   Q.  -- in 2006, right?
13   A.  Yes.
14   Q.  We're now in March of 2007, right?
15   A.  Yeah.
16   Q.  And if no evaluation has been done, we're past
17   one calendar year.  Isn't that right?
18   A.  I do not know if an evaluation has been done.
19   Q.  And if they're running on a fiscal year basis,
20   we have passed one fiscal year also, right?
21   A.  We passed, yes.
22   Q.  That leads to this last follow-up question:  Is
23   it true that you have investigated Gilbert Howell on
24   some of these sick days that he takes?

Page 51

1    A.  Investigated him?
2    Q.  Yes.  You went to his house one day.  Let's
3    talk about that.
4    A.  Never.
5    Q.  You never went to his house one day after he
6    called in sick?
7    A.  No.
8    Q.  You didn't knock on his door and didn't find
9    him home?
10   A.  No.  That's not my job.
11   Q.  He's been sick over fifty days a year.  Is that
12   a fair statement?
13   A.  I don't know if it is.  There's a lot.  It's
14   probably true.
15   Q.  Without putting it on the record, and you can
16   just write it down, is there an illness or something
17   that you're aware of that he has, a disease that can
18   be attributed to him that causes him to have these
19   many sick days?
20       MS. CHEEK:  If you want him to answer
21   questions about Inspector Howell's medical condition,
22   then I think we ought to put it in a confidential --
23       MR. NEUBERGER:  We have a protective order
24   in place.

Page 52

1        Why don't we just stop on that page and
2    you will just put these last few questions marked
3    confidential and we'll seal them separately.
4        Do you understand that?
5        (Discussion off the record.)
6        - - - - -
7
8        (Pages 53 through 57, respectively, were
9    deemed confidential by counsel and are contained in
10   the sealed envelope stamped CONFIDENTIAL attached to
11   the back of the transcript.)
12
13       - - - - -
14
15
16
17
18
19
20
21
22
23
24

Page 53

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0261

Page 54

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 55

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 56

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 57

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16         MR. NEUBERGER:  I don't have any other
17   questions.  Thanks for coming in today.
18         MS. CHEEK:  Read and sign.
19         (Deposition concluded at 4:10 p.m.)
20         (There were no exhibits marked for
21   identification.)
22
23
24
```

15  (Pages 54 to 57)

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0262

Page 58

```
 1
 2
 3
 4
 5          REPLACE THIS PAGE
 6
 7          WITH THE ERRATA SHEET
 8
 9          AFTER IT HAS BEEN
10
11          COMPLETED AND SIGNED
12
13          BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24
```

Page 59

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4           CERTIFICATE OF REPORTER
 5
         I, Kurt A. Fetzer, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on Monday, March 12, 2007, the
 7   deponent herein, JAMES N. MOSLEY, who was duly sworn
     by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24
```

98f2a6bf-d8c9-4ee5-a3f6-488e36f0edf1

A0263

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,   )
           )
    Plaintiff,    )
         ) Civil Action
v.        ) No. 06C-256-SLR
         )
MAYOR JAMES M. BAKER,    )
individually and in his official  )
capacity as the Mayor of the    )
City of Wilmington, and MAYOR   )
AND COUNCIL OF WILMINGTON,    )
         )
    Defendants.    )


      Deposition of WILLIAM S. MONTGOMERY
taken pursuant to notice at The Neuberger Firm, P.A.,
Two East Seventh Street, Suite 302, Wilmington,
Delaware, beginning at 10:05 a.m., on Monday,
March 12, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

    THOMAS S. NEUBERGER, ESQ.
    RAEANN WARNER, ESQ.
    THE NEUBERGER FIRM, P.A.
     2 East Seventh Street - Suite 302
     Wilmington, Delaware 19801
     For the Plaintiff

    REBECCA L. BUTCHER, ESQ.
    LANDIS RATH & COBB LLP
     919 Market Street - Suite 600
     Wilmington, Delaware 19899
     For the Defendant Mayor James M. Baker

      WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
       (302) 655-0477
       www.wilfet.com

Page 2

1  APPEARANCES:  (Cont'd)
2      TERESA A. CHEEK, ESQ.
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
3        The Brandywine Building - 17th Floor
         1000 West Street
4        Wilmington, Delaware  19801
         For the Defendant City of Wilmington
5
   ALSO PRESENT:
6      NANCY S. DIETZ
7            - - - - -
8        WILLIAM S. MONTGOMERY,
9      the deponent herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12              EXAMINATION
13  BY MR. NEUBERGER:
14    Q.  Could you state your full name for the record,
15  sir?
16    A.  Yes.  William S. Montgomery.
17    Q.  Mr. Montgomery, I've never taken your
18  deposition before, I don't think.
19    A.  No.
20    Q.  Have you been so fortunate in your long career
21  as to have your deposition taken in a court case
22  before?
23    A.  This is the third one, yes.
24    Q.  Third one.  Okay.  Only three?  You have been

Page 3

1  okay then.
2    A.  The third time's a charm I understand.
3    Q.  Let me go over the process then a tiny bit.
4        I'll be asking the questions.  The court
5  reporter will take them down here and in the end the
6  questions and answers will be typed up and you will
7  have a chance to review them to see if he was
8  inaccurate in taking down any of your responses.
9        Do you understand that?
10    A.  Sure.
11    Q.  You have taken an oath to tell the truth and
12  you understand the significance of that.  Is that
13  correct?
14    A.  Yes.
15    Q.  And if I ever ask you a question today that you
16  don't understand, just let me know and I'll be glad to
17  rephrase it.
18        Is that all right?
19    A.  Sure.  Thank you.
20    Q.  And if in answering a question you feel like
21  you have to guess or something like that, just let me
22  know that also and I'll try to rephrase it because I
23  don't want you to be guessing at anything.
24        Do you understand that?

Page 4

1    A.  Absolutely.
2    Q.  Okay.  Are you under any medications or
3  anything that might interfere with your ability to
4  remember things today?
5    A.  No.
6    Q.  No.  And I don't think we're going to go very
7  long, but if we need a break just let us know and
8  we'll take a break.  Okay?
9    A.  Okay.  Thank you.
10    Q.  All right.  And if you ever need me to repeat a
11  question because you can't hear it or anything, just
12  let me know.  Okay?
13    A.  Yes.
14    Q.  Just for the record, how old are you?
15    A.  54.
16    Q.  54.  So that means you were born in what year?
17    A.  '53.
18    Q.  1953.  Where were you born?
19    A.  Wilmington Hospital.
20    Q.  So you were born in Wilmington?
21    A.  14th and Washington.
22    Q.  You're one of the few native Delawareans.
23    A.  There's a few of us.
24    Q.  All right.  Where did you go to school?

Page 5

1    A.  Red Clay School District, Marshallton, McKean
2  School District and University of Delaware, bachelor's
3  in business.
4    Q.  Okay.  In what department down at Delaware?
5    A.  Sociology undergrad and public administration
6  graduate school.
7    Q.  Was that Professor Boyer back then or who was
8  it?
9    A.  I ran across him, but he wasn't mine.  A bunch
10  of different guys.
11    Q.  All right.  I believe you've been working in
12  government for quite a few years.  Is that a fair
13  statement?
14    A.  My whole professional career since college.
15    Q.  How about just starting off from college or
16  graduate school, why don't you just go back then and
17  sort of take us forward what you have been doing
18  professionally?
19    A.  Right after college I was a social worker first
20  in economic services or welfare, later in child
21  welfare.  And then I was a prevention specialist in
22  the children's department working in child sexual
23  abuse, other areas like that.
24    Q.  That would have been the State of Delaware?

47807b95-748d-4f69-acb2-2d827f9863b0

Page 6

1    A.   State of Delaware, yes, for the first, oh --
2  God, I forget.  Anyway, the first seven or so years of
3  my career.
4        Then I did ten years with the city as
5  what's now called chief of staff for city council and
6  then it was called -- I forget.  But in any case, the
7  chief, cook and bottle washer for city council for ten
8  years from '85 to '95.
9        And then I went to work for the
10 legislature from '95 to late in 2000 as the director
11 of legislative council, which is --
12   Q.   Down in Dover?
13   A.   Yes.  Which is the research and administrative
14 arm for the legislature.
15   Q.   And you were the director down there?
16   A.   Yeah.
17        And then came back to be chief of staff
18 for Mayor Baker in January 2001.
19   Q.   Could you just give me an approximate year when
20 you were starting out with the state with the child
21 abuse function?
22   A.   '77, I think, somewhere in that range.
23   Q.   Around '77?
24   A.   Mm-hmm.

Page 7

1    Q.   All right.  So you spent five or five to seven
2  years there and then you were the chief of staff for
3  the Wilmington city council for about ten years?
4    A.   Yeah.
5    Q.   And then you headed up the office of
6  legislative council down in Dover for five years?
7    A.   Mm-hmm.  Something like that.
8    Q.   Something like that.  And then with the
9  election of Mayor Baker, you have been --
10   A.   Back to the city.
11   Q.   -- serving as his chief of staff?
12   A.   Yes.
13   Q.   How would you describe the job duties of the
14 chief of staff?
15   A.   Pretty much as the charter does, I guess.  The
16 charter has all of the department heads reporting to
17 me, me reporting to the mayor.  So on a day-to-day
18 basis I'm sort of the chief operating officer I guess
19 you might say.  That's what they call it in the
20 county.
21   Q.   You're the equivalent of the chief operating
22 officer with the county?
23   A.   Yeah.  I think that's -- or in other cities the
24 deputy mayor or the city manager in the town manager

Page 8

1  system, but it's basically the person that reports to
2  the chief executive and carries out his program.
3    Q.   And it is a position that's identified in the
4  city charter?
5    A.   Yes.
6    Q.   I have seen some organizational charts and, as
7  you say, everybody reports up and through you?
8    A.   Yes.
9    Q.   Does the city solicitor report through you too
10 or is that --
11   A.   The city solicitor and the auditor are the two
12 exceptions.  They report, because they have to be
13 proposed and then approved by council, they report to
14 both the mayor and council.  On a day-to-day basis
15 they report to me.  I still meet with them monthly and
16 do a staff meeting with them and find out what they're
17 doing or whatever, but they have the ability to go
18 directly to the mayor if they need to.
19        So technically they report to both
20 branches of government.
21   Q.   But on the executive side of Wilmington city
22 government, you've only been serving on the executive
23 side since around January 2001?
24   A.   Right.  Yeah.

Page 9

1    Q.   And you were involved with the legislative
2  function from '85 to '95 for the City of Wilmington?
3    A.   Right.
4    Q.   And as the chief of staff for the Wilmington
5  city council in that period of time, would you
6  interact with members of the executive in any fashion?
7    A.   All the time, yeah.  That position is more the
8  shuttled diplomat, if you will, between the council
9  and administration.  So I spent most of my time
10 dealing with people who have the job that I have now,
11 Tom Capano and Gary Fullman.  Different administrative
12 assistants to the mayor were my sort of close
13 counterpart across the hall.
14   Q.   And who would have been the mayors who served
15 at that time between '85 and '95?
16   A.   Dan Frawley was eight years and then a couple,
17 a year and a half or so of Jim Sills and then I went
18 off to Dover.
19   Q.   Right.  Okay.
20   A.   So I was there throughout the Frawley years.
21   Q.   Who would have been the police chiefs during
22 those years, if you recall?
23   A.   Various chiefs.  I don't remember them all or
24 in the order, but Guy Sapp is the one that sticks out

47807b95-748d-4f69-acb2-2d827f9863b0

A0266

Page 10

1 the most, the one that I had most contact with along
2 the way.
3    Q.   Okay.  Thank you.
4         The present public safety director of the
5 City of Wilmington, his name is?
6    A.   Jim Mosley.
7    Q.   And how long has he been serving in that
8 position?
9    A.   Since the administration started, 2001.  Prior
10 to that, he served the Sills administration as the
11 director of licensing or commissioner of licensing and
12 inspection.
13    Q.   Is that right?
14    A.   Mm-hmm.
15    Q.   All right.  Now, organizationally the chief
16 reports to him and then he reports to you.  Is that
17 correct?
18    A.   Yeah.
19    Q.   And then you report to the mayor about the
20 public safety function?
21    A.   Right.
22    Q.   Right.  Now, have you ever had any
23 conversations with him where he would discuss
24 promotions that were being contemplated within the

Page 11

1 police department?
2    A.   Yes.
3         MS. CHEEK:  Objection to form.
4    Q.   Between your taking your position in January of
5 2001 through the present date, have you had
6 conversations with him about potential promotions
7 within the police department?
8         MS. CHEEK:  Objection to form.  "Him"?
9         MR. NEUBERGER:  Oh, Mr. Mosley.  All
10 right.  Thank you.
11    A.   Yes, I have.
12    Q.   On occasion would you and he have discussions
13 about transfers between assignments that are being
14 contemplated within the Wilmington Police Department?
15    A.   Transfers?  Maybe once or twice.  More on
16 promotions than transfers, yeah.  Transfers happen and
17 I find out about them after the fact usually.
18    Q.   But you said just a very few occasions?
19    A.   Yes, I would say.  Mm-hmm.
20    Q.   But there have been more than a few occasions
21 where you have discussed promotions with him?
22    A.   Yeah.  Generally any time there's a promotion
23 in the fire or the police, he will brief me on who's
24 being promoted and who's being proposed, yeah.

Page 12

1    Q.   When those kinds of discussions were occurring,
2 is it true that he would report to you about the race
3 of the individuals who were being contemplated for
4 promotion?
5    A.   He would report on the layout of the bands and
6 who's in what band, whatever.  We would talk about the
7 demographics, race, sex and whatever, sure.
8    Q.   And for some promotions within the police
9 department there's a banding process used, right?
10    A.   Yes.  Most.
11    Q.   Okay.  Well, for promotion to sergeant they use
12 a banding process, banding and testing?
13    A.   Mm-hmm.
14    Q.   Is that correct?
15    A.   I believe so.
16    Q.   And for lieutenant they use a testing and
17 banding process.  Is that correct?
18    A.   I believe so.
19    Q.   Do they do that for captain?
20    A.   I am not sure.
21    Q.   Right.  And the person who would know then
22 would be Chief Szczerba.  Is that correct?
23    A.   Yes.
24    Q.   He would be the person with firsthand knowledge

Page 13

1 about the testing process, right?
2    A.   Yes.
3    Q.   You only know one or two steps removed.  Is
4 that right?
5    A.   Yes.  Generally.  I mean, I'm not intimately
6 involved with it on any daily basis or anything.
7    Q.   Sure.  And, in fact, I think someone has
8 testified in -- let me just go back.
9         You understand there's a case where
10 Captain Nancy Dietz has filed a lawsuit against the
11 city and the mayor over a selection for the position
12 of inspector in the city, right?
13    A.   Yes.
14    Q.   And I'm asking you questions about things that
15 might relate to that case.  You understand that?
16    A.   Sure.
17    Q.   You don't think there's a testing and banding
18 process for captain.  Is that what you just told me?
19    A.   I'm not sure if there is.
20    Q.   And for inspector there's no testing or banding
21 process.  Is that correct?
22    A.   That's correct.
23    Q.   And I think you're telling me that when people
24 were under consideration for promotions, Public Safety

4 (Pages 10 to 13)

47807b95-748d-4f69-acb2-2d827f9863b0

Page 14

1 Director Mosley would let you know about the
2 demographics of the people who were in the bands if we
3 were dealing with sergeants or lieutenants. Is that
4 correct?
5    A. He would really -- his purpose was to let me
6 know who had been picked for those positions.
7 Sometimes we would talk about the demographics more as
8 a check and balance to make sure that there wasn't
9 anything untoward happening there. And I've never had
10 any reason to believe that there ever has been. It's
11 more to ask about okay, you know, what were the
12 options there, who, how many people were in the band
13 and that sort of thing.
14        We've never gone back on anything that the
15 chief has done in either the chief of fire or police
16 and questioned who they put in there or asked them to
17 change who they put in. Every promotion has been the
18 chief's in those levels, captain and on down.
19    Q. Right. And I'll come back to that.
20    A. Okay.
21    Q. I think you were just telling me that there
22 were occasions when Mr. Mosley would report to you
23 about promotions that had been made?
24    A. Yes.

Page 15

1    Q. And I think from an earlier answer you gave me
2 there were discussions you and he had on occasion
3 about promotions before the selection may have been
4 made. Was that a correct statement?
5    A. Not promotions. Usually in answer to my
6 questions of who was in the bands and, you know,
7 wanting to make sure that fairness was achieved there.
8 I never had, I have never had any reason to believe it
9 wasn't in any of them, any of the promotions that our
10 chief has made.
11    Q. Right. So I think you're saying that sometimes
12 you had discussions with him before a promotion was
13 made about whether a fair process was being followed?
14    A. No. I had discussions with him before
15 promotions were announced, so I guess you could say
16 before they were made. It depends on how you look at
17 it. Before they were announced.
18        But, again, I had never intervened in the
19 decision of the chief.
20    Q. I understand.
21        There comes a time when a promotion
22 becomes official, a selection is official?
23    A. Yes. An announcement is made to the troops,
24 yes.

Page 16

1    Q. And before those official announcements are
2 made to the troops, you and Public Safety Director
3 Mosley have had conversations about who was going to
4 be selected?
5    A. Yeah. As a courtesy, he would inform me that
6 there are certain openings; these are the folks that
7 the chief has selected, right.
8    Q. And during those conversations you're telling
9 me you would ask him questions about -- well, you
10 would ask him questions about the demographics of the
11 people in the bands?
12    A. Sure. I think that's a fair assessment, yes.
13    Q. And he would report to you on the demographics
14 of the people in the bands?
15    A. Yes.
16    Q. And before those promotions were made, he would
17 report to you on the race or gender of the person who
18 was being selected for the promotion?
19    A. On some occasions. If I asked that question,
20 sure, yeah.
21    Q. I'm trying to get a little bit beyond your
22 asking the question. Let me focus on that. Okay?
23        When he would be discussing with you
24 selections, would he always report to you on the

Page 17

1 demographics of the person being selected?
2    A. I can't with certainty say always. You know, I
3 just can't say that with that level of certainty.
4    Q. Okay. But you definitely recall yourself
5 asking about the demographics on occasions?
6    A. Sure.
7    Q. And is it a fair statement that you recall him
8 reporting to you on the demographic of the person
9 being selected at least on occasion?
10    A. At least on occasion, yes.
11    Q. Sure. And I think you're telling me that with
12 reference to the public safety function, that includes
13 two departments, fire and police, right?
14    A. Yeah. And a subunit, if you will, of emergency
15 management. Those three functions are directly under
16 Jim.
17    Q. And you're telling me that within the police
18 department function since Mayor Baker took office he
19 has allowed the chief of police to make the selections
20 for promotion within his department?
21        MS. CHEEK: Objection to form.
22    Q. Chief of Police Szczerba to make the selections
23 for promotion within his department?
24    A. Up to and including the captain's level, yes.

5 (Pages 14 to 17)

47807b95-748d-4f69-acb2-2d827f9863b0

A0268

1   Q.  I think you're saying that with reference to
2   the fire department, you have allowed or Mayor Baker
3   has allowed the chief of the fire department to be
4   making the promotions within his department?
5        MS. CHEEK:  Objection to form.
6   Q.  Do you know the fire chief's name?
7   A.  The old one and the new one.
8   Q.  What were their names?
9   A.  The current one is Willie Patrick.  The former
10  is Jim Ford.
11       Yeah, in those cases it's a similar
12  situation where the chief makes the recommendations
13  and actually makes the promotions.  The only area
14  where we have had more discussions would be on the
15  deputy chiefs which we equate with the inspectors in
16  the police department.
17  Q.  And you're telling me that Chief Szczerba in
18  the police department has been able to make selections
19  for captain without the mayor having to approve them?
20  A.  Yes, sir.
21  Q.  And for captains you don't believe there's a
22  testing and banding process that's been used?
23  A.  I don't know if there is.  I'm just -- I can't
24  say with certainty.

1   Q.  Right.  And there came a time when there was a
2   Captain James Wright early in the Baker administration
3   in 2001 who was selected for the position of
4   inspector.  Is that correct?
5   A.  Correct.
6   Q.  And is it correct that the chief was allowed to
7   make the selection of James Wright for that inspector
8   position?
9        MS. CHEEK:  Objection to form.
10  A.  He made a recommendation.
11  Q.  Okay.  And did the mayor interfere with that
12  recommendation?
13       MS. CHEEK:  Objection to form.
14  A.  It wasn't a question of interfering.  The mayor
15  concurred with that and made the appointment.  But I
16  have to disagree with your analysis of it there.  I
17  think he made a recommendation and the mayor in that
18  case was supportive of that recommendation or
19  ultimately went along with that recommendation, yes.
20  Q.  Okay.  I don't want to get hung up on words, so
21  we don't have to call it a promotion.  We will call it
22  an appointment, whatever you're comfortable with.
23       But the point is the mayor went along with
24  and agreed with the selection of James Wright by the

1   chief at that time?
2        MS. CHEEK:  Objection to form.
3   A.  In my way of looking at it, the mayor appointed
4   James Wright at that time.  So I think we do have to
5   look at the words.
6        I look at it as an appointment, so it's
7   clear.
8   Q.  Okay.  And the person who was nominated for the
9   position was James Wright and it was Chief Szczerba
10  who recommended him for the position?
11  A.  Among others who recommended him, yes.
12  Q.  And then there came a time when a Gilbert
13  Howell was selected for the position of inspector in
14  the police department?
15  A.  Yes.
16  Q.  And is it fair to say that the chief was told
17  early in that process that a different procedure would
18  be followed for that position?
19       MS. CHEEK:  Objection to form.
20  A.  No.  I don't believe that's fair to say at all.
21  Q.  The chief recommended somebody for that
22  position.  Isn't that true?
23  A.  The chief's recommendation differed from the
24  mayor's appointment, yes.

1   Q.  So the mayor when it came to James Wright
2   followed the chief's recommendation.  Is that correct?
3   A.  He agreed with it.  I don't know that he
4   followed it.
5   Q.  He agreed with his recommendation.  Is that
6   right?
7   A.  Or the chief concurred.  The chief's agreement
8   or the chief's recommendation was in agreement with
9   the mayor's appointment.  You know, there it does get
10  into semantics.
11  Q.  But when it came to the position when Gilbert
12  Howell was selected, the chief recommended Captain
13  Nancy Dietz.  Is that correct?
14  A.  Yes, he did.
15  Q.  And the mayor did not agree with that
16  recommendation.  Is that correct?
17  A.  The mayor had someone else that he --
18  Q.  In mind?
19  A.  -- that he appointed, yes.
20  Q.  Right.  He appointed Gilbert Howell?
21  A.  Right.
22  Q.  And Gilbert Howell is an African-American?
23  A.  Yes.
24  Q.  And James Wright is an African-American?

6  (Pages 18 to 21)

Page 22

1  A.  Yes.
2  Q.  And Gilbert Howell was replacing James Wright.
3  Is that correct?
4  A.  Yes.
5  Q.  This matter of looking at the demographics of
6  who is on the bands or who is being selected that you
7  talked about -- do you remember that a few minutes
8  ago?
9  A.  Sure.
10  Q.  Why do you look or why are you interested in
11  the demographics of who's being selected or who's on
12  the bands?
13  A.  I would be interested to try to make sure that
14  different groups within the police department were
15  being afforded an opportunity to move up through the
16  promotion process.  And that could be women,
17  Hispanics, blacks, whites, it could be anybody, but
18  just to make sure that there's some fairness in the
19  process.
20  Q.  Have you observed there to be any problems with
21  the testing process in the police department since you
22  took your job in 2001?
23  A.  Not really.  I think it's run smoother.  I was
24  more intimately involved with problems in my first

Page 23

1  tour of duty when I worked for the council and we had
2  people come in and validate the testing and stuff back
3  then in I would say the late eighties somewhere.
4        And, no, I have not been aware of problems
5  lately.  There's always criticisms from different
6  quarters, city council or what have you, not council
7  as a whole, but the chief is always under the
8  microscope, both chiefs are, but I think our chiefs
9  have done a good job.
10  Q.  Right.  By that I think you're saying since
11  2001 the chiefs during your tenure in office have been
12  doing a good job on the testing process?
13  A.  Yeah, I think on the testing and the selection.
14  I think they've promoted good people and have
15  maintained a diverse leadership structure in the
16  process and still have promoted very good, qualified
17  people.
18        So I don't have any, you know, criticism
19  of any of the chiefs we have got in either the police
20  or fire in this administration.
21  Q.  Right.  I think you're telling me that the
22  chief, meaning Chief Szczerba, has maintained a
23  diverse leadership structure during his term in
24  office?  Is that what you just told me?

Page 24

1  A.  Yeah.  I think he has within the constraints of
2  the bands and whatever.  He's done a good job and he's
3  selected some good people.
4  Q.  And is it one of the goals of the Baker
5  administration to maintain a diverse leadership
6  structure within the police and fire departments?
7  A.  I think it's a goal of the city in general to
8  promote diversity throughout the work force and
9  fairness.  So it's built, built into the personnel
10  code, built into the whole way we operate in the city.
11  Q.  And would you agree that the race and the
12  gender of individuals being considered for promotion
13  within the police and fire departments, their race and
14  gender, it plays a role in the selection process?
15        MS. CHEEK:  Objection to form.
16  A.  No, I don't believe it plays a role in the
17  selection process.  I believe it's something that just
18  has to be monitored.  You have to look for adverse
19  impacts sort of after the fact, I think.
20  Q.  Well, wasn't Gilbert Howell selected by the
21  mayor because he was an African-American?
22  A.  I don't believe that was -- that may have been
23  one of the factors, of course, but I don't believe
24  that's, no, that's not an accurate statement.

Page 25

1        MR. NEUBERGER:  I'm sorry.  Could you read
2  the end of that answer?  Just read that answer back.
3        My mind wandered at the end of the
4  response.
5        (The reporter read back the last answer.)
6  BY MR. NEUBERGER:
7  Q.  Did you observe and have conversations with the
8  mayor about why he was selecting Gilbert Howell?
9  A.  We had discussions about the selection and the
10  whole process, yes.
11  Q.  Okay.  What were the reasons why the mayor
12  selected Gilbert Howell?
13  A.  I think the mayor selected Gilbert for, one, he
14  is aware of his capabilities and, you know, knows his
15  reputation, selected him also to some extent to go
16  ahead and have some diversity in the work force.
17  There's no doubt about that.  But he also had
18  confidence in his abilities.
19  Q.  Okay.  Just bear with me for a second.
20  A.  Mm-hmm.
21  Q.  You have identified the mayor was confident in
22  the abilities of Gilbert Howell.  Is that correct?
23  A.  I believe so, yes.
24  Q.  You identified that he was aware of Gilbert

7  (Pages 22 to 25)

Page 26

1  Howell's capabilities, right?
2  A.  Yeah.  The same.
3  Q.  You've also indicated that by his selection he
4  would have some diversity in the work force?
5  A.  In the higher or upper echelon of the police
6  department, yes.  That's hard to argue against.
7  Q.  And that the mayor was aware of Gilbert
8  Howell's reputation?
9  A.  Yeah.
10  Q.  I think that's what you said.
11  A.  His capabilities, reputation, yeah, sure.  He
12  has known him I guess over the years, sure.
13  Q.  And I guess you're talking about reputation as
14  a police officer?
15  A.  Yes.
16  Q.  Right.  And what did you understand his
17  reputation as a police officer to be?
18  A.  I don't have a whole lot of knowledge of
19  Gilbert.  I didn't know him as well as some other
20  officers, but I know him to be a competent, decent
21  person and, you know, somebody very into police work.
22      I think most of our people are, so that's
23  not unusual.
24  Q.  So I think you're saying the mayor understood

Page 27

1  that he had a good reputation as a police officer.  Is
2  that a fair statement?
3  A.  I believe so.  I believe so, yeah.
4  Q.  Besides these reasons for selecting Gilbert
5  Howell, are there any other reasons that you're aware
6  of that the mayor had when he selected him?
7  A.  I think those are the basics, yeah.
8  Q.  Thank you.
9      Well, when we talk about the higher
10  leadership in the police department, let's focus on
11  that, so in Wilmington we have a chief and then there
12  are two inspectors presently who work under the chief,
13  right?
14  A.  Who generally we look at as deputy chiefs, if
15  you will, but yeah.
16  Q.  I guess on the fire department there actually
17  are, they call them deputy chiefs?
18  A.  One is fire marshal, one is chief of operations
19  but, yeah, the same idea, yeah.
20  Q.  Right.  Is it fair to say that in selecting
21  persons for the positions of inspector -- well, let's
22  go back.
23      Let's go back to '85.  You started working
24  for the city in '85, right, in '85 to 95 you told us,

Page 28

1  right?
2  A.  Mm-hmm.
3  Q.  And is it true back then there were just two
4  inspectors, in the period '85 to '95?
5  A.  I honestly don't know.  I would have to -- I
6  don't want to assume.  So I think so, but I don't
7  know.
8  Q.  Without looking at the records, you wouldn't be
9  able to tell me how many inspectors there were back
10  then?
11  A.  Yeah.  I know that there was a change at one
12  point.  I know in fire there was a change where there
13  were more at one point.  I think there may have been
14  in police, but I don't recall.
15  Q.  So without looking at records, you couldn't
16  tell me how many there were?
17  A.  Yes.  That's true, yes, to be accurate, yes.
18  Q.  For purposes of maintaining diversity, did you
19  observe in that '85 to '95 time frame that the City of
20  Wilmington tried to keep, tried to ensure that there
21  was at least one black inspector?
22  A.  I don't know that that was -- you know, it may
23  have been a practice.  I don't know.  I don't know
24  that it was any hard-and-fast rule.

Page 29

1      I think the way I look at diversity is
2  much broader, that the chief executive in that case
3  way back then, Dan Frawley, tried to have a diverse
4  cabinet.  You would look at all of those people as
5  part of a whole as a cabinet, not so much pigeonholed
6  within the departments.
7  Q.  Well, let's just talk from 2001 forward then
8  during your watch.
9  A.  Sure.
10  Q.  Okay.  Is it true that the City of Wilmington
11  is trying to maintain a balance in the inspector
12  position of always having an African-American in the
13  position?
14  A.  That has been the practice by virtue of the
15  fact that that's been the way it is, so that's how the
16  appointments have come down.  I wouldn't say that
17  that's -- you know, it's not a hard-and-fast rule.
18  It's not written anywhere and it's not...
19  Q.  No.  I --
20  A.  That's been the result of the appointments,
21  yes.
22  Q.  We will use your word.  It's not a hard-
23  and-fast rule, right?
24  A.  Yeah.

8  (Pages 26 to 29)

Page 30

1   Q.   That's been the practice while Mayor Baker has
2   been the mayor of the city.  Is that correct?
3   A.   It's been the result of his several
4   appointments, yes.
5   Q.   There's no rule, no written rule or regulation
6   that requires that?
7   A.   Certainly not, not that I'm aware of, no.
8   Q.   Do you remember a time between 1985 and 1995
9   when there was not an African-American inspector in
10  the Wilmington Police Department?
11  A.   I just don't remember back, nor have I taken
12  the time to research back so, no, I don't really
13  remember who were the various inspectors at that time.
14  Q.   Right.  So you --
15  A.   I remember a few here and there.
16  Q.   You don't have a present recollection?
17  A.   No.  No.
18  Q.   And without looking at the city records, you
19  couldn't tell me whether or not there was an
20  African-American inspector during that time?
21  A.   No, not without looking at the records, no,
22  especially back in that time period.
23  Q.   Sure.  My client will testify that after Captain
24  Howell was selected for the inspector position, she

Page 31

1   had a conversation with Public Safety Director Mosley
2   about why she wasn't selected.  Okay?  I'm trying to
3   see if you have any knowledge of any conversation that
4   happened between them.  Okay?
5        She's going to testify that Public Safety
6   Director Mosley indicated to her that the position of
7   uniform operations inspector had always been held by
8   an African-American and the position of investigation
9   operations inspector had always been held by a
10  Caucasian.
11       Have you ever had any such conversation
12  with Public Safety Director Mosley?
13  A.   No.  And I was back there quite a ways back,
14  '85 to '95.  I don't even remember.  I don't know how
15  he would have that specific knowledge.  Maybe he does.
16  I don't know.
17  Q.   Maybe he does.  Okay.  We can ask him.
18       But my question is:  Have you ever had any
19  such conversation with Public Safety Director Mosley
20  where he made such a statement?
21  A.   No.  That there's a --
22  Q.   One-to-one ratio between these two positions?
23  A.   And specific assignments and different -- no.
24  I can't, no.

Page 32

1   Q.   Did you ever hear the mayor say that he
2   selected Gilbert Howell for the position because he
3   was an African-American?
4   A.   No.
5   Q.   Does the mayor and you have monthly meetings
6   with the leadership of the Fraternal Order of Police?
7   A.   We attempt to.  They don't always keep them.
8   There have been periods where they have been active
9   and not active, but we try to, yeah.  We try to meet
10  with every union once a month, not to negotiate but
11  simply to head off problems and hear about concerns or
12  whatever.
13       So we certainly try to meet with each of
14  the four major unions monthly.
15  Q.   And the present president of FOP Lodge No. 1
16  for the Wilmington officers is who?
17  A.   George Collins.
18  Q.   George Collins.  And before that he was the
19  vice president of the FOP.  Is that correct?
20  A.   I guess so.  I know he was in the leadership,
21  but I don't know the specific position, yeah.
22  Q.   Do you remember, do you have any memory at all
23  of any meetings he and the president had with the
24  mayor and you at any time during September, October,

Page 33

1   November or December of 2005?
2   A.   Yes.  I believe I presented my handwritten
3   notes from any meetings we had in that time period.
4   Q.   And aside from your handwritten notes, do you
5   today have any present memory of any conversations
6   that you or the mayor had with those individuals in
7   that four-month time period?
8   A.   I remember basically the meetings we've had,
9   sure.
10  Q.   What do you remember of the meetings?  I mean,
11  you said you had meetings.  I'm asking do you remember
12  any specific conversations?
13  A.   Yeah.  Mostly I would say the biggest issue we
14  have been talking about lately has been the chief's
15  deployment plan and the FOP's interest in having that
16  amended some.  That's probably been the major issue
17  we've discussed.
18       We discussed just about any other thing,
19  if they don't feel there are enough cars on the
20  street, if there are too many two-man cars, different
21  issues.
22  Q.   Those meetings would take place in the mayor's
23  office?
24  A.   Yeah, generally right in his office.

9 (Pages 30 to 33)

47807b95-748d-4f69-acb2-2d827f9863b0

A0272

Page 34

1    Q.  Would the mayor be sitting at his desk when
2  those meetings occurred at that time?
3    A.  Yeah.  Generally, either at his desk or
4  sometimes around the -- he has a coffee table.
5  Sometimes we will be there.  But generally if he's at
6  his desk when we walk in -- I'll wait until whoever is
7  there and bring them in.
8         If he's at his desk, we just sit around
9  there, yes.
10   Q.  I think George Collins has testified that at
11 meetings the mayor would sit behind his desk and then
12 the three of you would sit on the other side of the
13 desk in three separate chairs --
14        MS. CHEEK:  Objection to form.
15   Q.  -- in this four-month time period?
16   A.  Probably so, yeah.
17   Q.  Do you recall the mayor at one of those
18 meetings at that time period leaning over to George
19 Collins and telling him about the Gilbert Howell
20 selection and his stating that he wanted the inspector
21 to be black for that selection?
22        MS. CHEEK:  Objection to form.
23   A.  No, sir, I do not.
24   Q.  So you don't recall hearing that said?

Page 35

1    A.  No.
2    Q.  George Collins has given his testimony in this
3  case under oath and he has testified that at a meeting
4  in October of 2005, October or November of 2005, the
5  mayor said to him that he wanted the inspector to be
6  black.
7         MS. CHEEK:  Objection to form.
8    Q.  This is at page 11 of his deposition.
9         Do you have any reason to believe that
10 George Collins isn't being truthful when he makes that
11 statement?
12   A.  I don't have any reason to know one way or the
13 other.  I have only known George briefly since he's
14 started coming to those meetings.
15        In fact, in the early meetings there were
16 two Georges and I never knew which was which until the
17 last, I'll say the last four or five months.
18   Q.  Well, he's --
19   A.  I have gotten to know him better since then.
20   Q.  He's the president of FOP Lodge No. 1, right?
21   A.  Right.
22   Q.  And do you know him not to be a truthful
23 person?
24   A.  No, sir, certainly not.

Page 36

1    Q.  In fact, police officers are expected to be
2  honest in everything they say both on and off duty.
3         Are you aware of that rule that they have?
4    A.  I am aware that they're held to a very high
5  standard and I generally find most of the police
6  officers that I deal with to be of that character,
7  sure.
8    Q.  Right.  Are you aware that a police officer can
9  be terminated for a violation of their dishonesty
10 rule?
11   A.  We've had a few of those, I'm well-aware of
12 them, yes.
13   Q.  Right.  By that you mean you are aware that
14 police officers have been fired in the past for
15 violating the dishonesty rule?
16   A.  Yes.
17   Q.  And I'm asking you do you believe that George
18 Collins was not being truthful when he attributes that
19 statement to the mayor at that time?
20        MS. CHEEK:  Objection to form.
21   A.  I can't know that.  I don't believe him to be a
22 dishonest person.  I don't know whether he
23 misunderstood something he heard or whatever.  I mean,
24 there could be other explanations other than straight

Page 37

1  truthfulness and what have you.
2         So I can't opine on that.  I just don't
3  know.
4    Q.  Okay.  All I'm asking you is are there any
5  facts that you could point to that would indicate that
6  he is mistaken when he recounts that conversation?
7    A.  I don't recall the conversation, so it's a
8  little hard for me to even put it into context.  I
9  don't recall any statement like that.
10   Q.  But you do agree that the mayor and you try to
11 monthly hold meetings with the leadership of the FOP?
12   A.  Yes.
13   Q.  And you do agree that those meetings did take
14 place in the mayor's office?
15   A.  Yes.
16   Q.  You agree that George Collins did participate
17 in meetings when he was either the vice president or
18 the president of the FOP?
19   A.  Yes.
20   Q.  You agree that the mayor on occasion would sit
21 behind his desk?
22   A.  Yes.
23   Q.  You agree that you and the other two FOP
24 members would on occasion sit on the other side of the

10 (Pages 34 to 37)

47807b95-748d-4f69-acb2-2d827f9863b0

A0273

Page 38

1  desk?
2  A.  Two or three.  I mean, there are different
3  numbers that have come in, yeah.
4  Q.  Okay.  Thank you.
5      Now, just going back to the selection of
6  Gilbert Howell, the mayor never wrote his reasons down
7  for selecting Gilbert Howell, did he?
8  A.  Not that I'm aware of, no.
9  Q.  You're aware I took the mayor's deposition in
10 this case?
11 A.  I assumed you would.  I'm not aware whether
12 he's given it or not given it.
13 Q.  No.  He's already given it.
14 A.  Okay.
15 Q.  By your answer, you haven't read his
16 deposition?
17 A.  Absolutely not.  I don't want to.
18 Q.  Okay.
19 A.  I believe I'm not supposed to.
20 Q.  I think the mayor has told me that he didn't
21 write down the reasons.
22 A.  That wouldn't surprise me.
23 Q.  And that he's told me, he's explained verbally
24 the reasons for his selection.

Page 39

1  A.  Okay.
2  Q.  Okay.  And, by the way, he also says he's not a
3  computer person.  Is that a fair statement?
4  A.  That's a real fair statement.
5  Q.  And you didn't write down the reasons why the
6  mayor selected Gilbert?
7  A.  No, sir.  I don't believe so.
8  Q.  And today a little earlier I asked you to
9  identify what you understood to be the reasons and you
10 tried, right?
11 A.  Yes.
12 Q.  And are there any other reasons that you can
13 remember today?
14 A.  No, not really.
15 Q.  And is it true that there wasn't some written
16 process that you or some others had conceived of that
17 had to be followed when it came to selecting Gilbert
18 Howell?
19 A.  That's true.  There was no written process.
20 Q.  Right.  There was no testing process?
21 A.  No.
22 Q.  There was no banding process?
23 A.  No.
24 Q.  The mayor wasn't required to look at the

Page 40

1  personnel files of Gilbert Howell or any of the other
2  people who would be considered eligible?
3  A.  In six-and-a-half years, I don't think he's
4  ever seen a personnel file of any city employee,
5  uniformed or not.
6  Q.  We're just talking about when people are
7  selected for appointments or promotions, however you
8  want to characterize that.
9  A.  No.  I never have seen a police personnel file
10 up on the 9th floor of city hall.  So it's nothing
11 that we would ever ask for.
12 Q.  Okay.  So for the selection of Gilbert Howell
13 you did not, you yourself didn't look at any personnel
14 files?
15 A.  No, sir.
16 Q.  And if we jump back when James Wright was
17 selected, neither you, nor the mayor looked at any
18 personnel files at that time?
19 A.  No.  That's correct.  We did not.
20 Q.  Were there any meetings that were held when the
21 mayor would have discussed his thinking leading up to
22 the selection of Gilbert Howell?
23 A.  I can't remember anything specifically leading
24 up.  I remember the actual meeting where the chief and

Page 41

1  Director Mosley and the mayor and I talked about not
2  only that position but the other positions that were
3  open at that time.  There were two or three other
4  vacancies.
5  Q.  Okay.  So you remember a meeting when the chief
6  was there with Public Safety Director Mosley?
7  A.  Yes.
8  Q.  And then you and the mayor were there?
9  A.  Yes.
10 Q.  Was anybody else there?
11 A.  No.  Just the four of us.
12 Q.  And did you keep any notes of that meeting?
13 A.  Yes, I did.
14 Q.  That's been turned over to us, I believe?
15 A.  Yes, I did.
16 Q.  And I think the chief has explained to us -- I
17 took his deposition and I believe he's explained to us
18 his memory of the meeting.  Okay?
19 A.  Okay.
20 Q.  And I believe I would have asked the mayor his
21 memory of the meeting also.  Do you understand that?
22 A.  Yes.
23 Q.  So why don't I ask you what your memory of the
24 meeting is.  Okay?  When would that meeting have

11 (Pages 38 to 41)

47807b95-748d-4f69-acb2-2d827f9863b0

A0274

Page 42

1  happened?
2   A.  I'd have to rely on the notes that were
3  supplied on dates and whatever.  I don't have that off
4  the top of my head.  I believe the meeting took place
5  after a regularly scheduled police update meeting.  At
6  the time I think we were calling them open air drug
7  meetings.  Now we have changed.  We had meetings where
8  we have the vice captain and the chief and others.
9       I believe we, to the best of my
10  recollection on that meeting, we finished that meeting
11  and then held an impromptu meeting with the chief and
12  Director Mosley.  That's not unusual.  If you know
13  both gentlemen are going to be up in the building, you
14  piggyback meetings.  I believe we piggybacked that
15  meeting onto an existing meeting, though the
16  secretaries would have to tell me if I'm correct on
17  that.
18   Q.  So you go into this meeting.  So what do you
19  recall about it?
20   A.  It was fairly brief.  We simply, the four of
21  us, sat down.  I believe the mayor asked the chief, he
22  said, "I know we have got these openings.  Why don't
23  you tell me what you think?"
24       And he went through his recommendations

Page 43

1  for not just the inspector position but two or three
2  others, I'll say three others.
3   Q.  Okay.  What did the chief say about the
4  inspector position?
5   A.  His recommendation was Captain Dietz, Nancy
6  Dietz.
7   Q.  And did he explain why he was recommending
8  Captain Nancy Dietz?
9   A.  I don't recall all the -- you know, I can't
10  quote him on anything.  I'm sure he gave some, some
11  explanation and talked about her good qualities and
12  her record and that sort of thing.  I'm sure he did
13  some of that.  I just can't recall the specifics of
14  what he said.
15   Q.  Okay.  So since you can't recall the specifics,
16  we would be better off asking him if he recalls?
17  Would you agree with that?
18   A.  Yeah.  I would imagine, sure.  He made it very
19  clear that Nancy was his recommendation, absolutely.
20   Q.  I think you just said that he identified
21  reasons why?
22   A.  I believe he did.
23   Q.  Is that fair?
24   A.  I can't -- you know, he talked a little bit

Page 44

1  about each of the recommendations, who they were and
2  what they had done, that sort of thing, so in that
3  context, yeah.
4   Q.  Did he talk about other people who would be
5  considered to be in the pool of potential people to be
6  the inspector?
7   A.  I can't recall if we talked about a lot of
8  other names or not.  We may have talked about some of
9  the other captains, perhaps, but I don't specifically
10  recall discussions about different ones.
11   Q.  Do you recall if he talked about Captain
12  Howell?
13   A.  The mayor made clear that at that point that's
14  who his recommendation or his selection would probably
15  be, yes.
16   Q.  And in response to that, did the chief identify
17  issues he would have with the selection of Captain
18  Howell?
19   A.  I don't recall specific issues he would have
20  with him.  I think he focuses more on the positive and
21  I think his issues were more why he had selected
22  Captain Dietz.
23   Q.  Well, let me see if this jogs your memory.
24       Do you remember him talking about the

Page 45

1  absenteeism problems that Captain Howell had over many
2  years?
3   A.  I do not specifically recall at that meeting,
4  no, sir.
5   Q.  Are you aware that he has absenteeism issues?
6   A.  I've been aware of absenteeism issues since his
7  appointment, yes, and I've dealt with the chief and
8  the public safety director about that issue, yes.
9   Q.  Right.  Is it fair to say that his attendance
10  has been a problem since he was appointed to be the
11  inspector?
12   A.  I think it's fair to say he hasn't had the
13  attendance that we might like, but he's also had
14  medical issues.  So to be fair, I think there can be
15  underlying reasons for some of that, but...
16   Q.  But I think you're telling me you don't
17  remember whether Chief Szczerba at that meeting warned
18  the mayor about the past existence of attendance
19  problems?
20   A.  I do not recall that, no, I don't.  Sorry.
21   Q.  And I think you're saying you just don't recall
22  one way or the other if Chief Szczerba warned the
23  mayor about other issues that the selection of Gilbert
24  Howell would cause to arise?

12 (Pages 42 to 45)

47807b95-748d-4f69-acb2-2d827f9863b0

A0275

1    A.  I just don't recall anything that rises to that
2    level of warning or whatever.  I don't really recall
3    what he said about Gilbert, if anything.
4    Q.  And after Chief Szczerba made his
5    recommendation, you do recall the mayor explaining
6    what you just told us a moment or two ago about
7    Howell?
8    A.  Yeah.  That he was likely to appoint Captain
9    Howell, yes.
10   Q.  Is there anything else that you remember the
11   chief saying?
12   A.  Yeah.  I asked the chief a pointed question at
13   that juncture because he had also, he had gone through
14   his whole litany of recommendations and the other
15   positions and I said, "If the mayor goes with someone
16   other than your recommendation for the inspector, does
17   that change your thinking on any of the other
18   positions?"  And he said, "Absolutely not."
19       So he made clear that those were his, you
20   know, his picks and no discussion really about any of
21   those folks beyond that point.
22   Q.  And then after that meeting did there come a
23   time when the mayor did make his choice?
24   A.  Yeah.  I think pretty quickly right after.  I

1    forget the timing, but I would say within days the
2    appointment was announced, yeah.
3    Q.  Were there any other meetings with Chief
4    Szczerba that the chief was able to discuss his
5    recommendation before the selection was made?
6    A.  Not that I recall, no.
7    Q.  So you recall there being the one occasion when
8    the chief was able to explain his recommendation?
9    A.  Yeah.  I think so.
10   Q.  Do you recall anything the mayor or you said to
11   the chief as to why it would be handled different this
12   time than it was handled with reference to Captain
13   Wright when he was selected for inspector in 2001?
14       MS. CHEEK:  Objection to form.
15   A.  No, I don't recall because I don't believe it
16   was handled any differently.  In both cases the
17   appointment was the mayor's appointment and I'm not
18   sure I see a difference.
19   Q.  Okay.  I think you told us a little earlier
20   your thinking on that.
21       I think the mayor has told us at his
22   deposition that he explained to Chief Szczerba that it
23   would be handled differently than the selection of
24   Captain Wright.  Do you have any memory of any

1    conversation like that with the mayor?
2        MS. CHEEK:  Objection to form.
3    A.  No, I don't.
4    Q.  No.  Okay.  So concerning Inspector Wright in
5    2001, it's your testimony that it was the mayor who
6    selected and appointed Captain Wright for the position
7    of inspector?
8        MS. CHEEK:  Objection to form.
9    A.  He made the appointment, yes.
10   Q.  What were the reasons why the mayor selected
11   James Wright in 2001?
12   A.  That's a long way back.  I don't recall all.  I
13   do recall at that point Inspector Wright, Captain
14   Wright I guess at that point had a strong
15   recommendation from the chief, I believe from Director
16   Mosley and also myself.  All three of us thought very
17   highly of him.  I still do to this day.  He was a
18   great policeman.
19   Q.  So you remember one of the reasons why he was
20   selected was the fact that he was being strongly
21   recommended by the chief, Public Safety Director
22   Mosley and even yourself?
23   A.  Yes.
24   Q.  Is another reason the fact that his selection

1    for that position would have ensured diversity in the
2    work force?
3        MS. CHEEK:  Objection to the form.
4    A.  I can't recall if diversity was even discussed
5    at that point, but it would have had the impact after
6    the fact, I guess, yeah.
7    Q.  But right now you don't recall whether or not
8    it was discussed before the fact?
9    A.  I don't recall specifically, no.
10   Q.  Since you had a strong recommendation of
11   Captain Wright, is it correct that you had had some
12   discussions with Public Safety Director Mosley
13   beforehand to gain that appreciation of his abilities?
14   A.  Again, it's so far back, Counselor, I don't
15   recall specific conversations.  I know that when we
16   got down to the basics of the appointment that was a
17   name that was out there and I know they were all very
18   comfortable with Captain Wright.
19   Q.  But you don't recall how you came to that
20   conclusion?  That's what you're telling me today?
21   A.  No, not really.  I honestly don't.
22   Q.  Well, you had been away from the city for about
23   five years or so, right?
24   A.  Yes.

13 (Pages 46 to 49)

Page 50

1    Q.  And you just came back into the city in
2  January, right, of 2001?
3    A.  Of 2001, right.
4    Q.  And the selection of James Wright was made in
5  the latter half of 2001.  Is that correct?
6        MS. CHEEK:  Objection to form.
7    A.  I believe so, yeah.
8        MR. NEUBERGER:  Let's take a break.  I
9  think we're almost done.  Let me just check with my
10  client.
11       (A brief recess was taken.)
12  BY MR. NEUBERGER:
13   Q.  We're back on the record.  And I just went and
14  pulled an e-mail from Saturday, March 10th from
15  counsel Teresa Cheeks sending me five pages of
16  documents that I'm looking at here.
17       I think you told us there was a meeting of
18  you, the chief, Mosley and the mayor following another
19  meeting in October?
20   A.  I believe so, yes.
21   Q.  Right.  I'm just going to show you what was
22  marked as D03179 which was produced by your counsel in
23  this case.
24   A.  Yes.  These are my notes.

Page 51

1    Q.  Those are notes of your meeting.  So I think
2  you said this meeting took 30 minutes, 45 minutes or
3  something?
4    A.  I didn't say.  I can't recall.  I think it was
5  a fairly brief meeting, maybe fifteen minutes.
6    Q.  Maybe fifteen minutes?
7    A.  Yeah.
8    Q.  So this fifty words or so here is not a
9  verbatim record of whatever was discussed at the
10  meeting?
11   A.  No.  I'm an old social worker and that's not a
12  process recording.  I tend to put down what I think
13  are salient points --
14   Q.  Right.
15   A.  -- of meetings I'm in.
16   Q.  This here identifies four people that the chief
17  in your words was picking, right?
18   A.  Yeah.
19   Q.  And then you wrote a four-line note at the
20  bottom.  Could you read that into the record, please?
21   A.  "Mayor appoint inspector, if different do
22  chief's promotions stand?  SZ," meaning Szczerba,
23  "yes, no changes regardless of mayor's appointment."
24   Q.  That's consistent with something you told us a

Page 52

1  few minutes ago, right?
2    A.  Yes, sir.
3    Q.  Your note here indicated that the chief was
4  picking Nancy Dietz for the inspector position.  Is
5  that right?
6    A.  That's the word I used and, you know, those are
7  his recommendations for sure.  It's a lot quicker to
8  write picks than --
9    Q.  Right.  The point is in your handwriting you
10  put the word picks?
11   A.  I've testified that inspector or for the
12  inspector position he was recommending Captain Dietz,
13  absolutely.
14   Q.  And Nancy Dietz was a white female?
15   A.  Yes.  Still is.
16   Q.  And then he picked somebody for the captain
17  position, J. Custis.  Is that right?
18   A.  Yes.
19   Q.  And that's an African-American.  Is that right?
20   A.  Yes.
21   Q.  African-American male, right?
22   A.  Yes.
23   Q.  Then he picked someone for the lieutenant
24  position, Fahim Akil.  Is that correct?

Page 53

1    A.  African-American, yes.
2    Q.  Who was African-American also?
3    A.  Yes.
4    Q.  Then he picked a Sergeant Amy Rausch?
5    A.  Rausch.
6    Q.  Rausch?
7    A.  Yes.
8    Q.  And what's --
9    A.  White female.
10   Q.  She was a white female?
11   A.  Yes.  I know that after the fact.  I didn't
12  know her at the time.  She was the one that I didn't
13  know of that group.
14   Q.  And the only one of the four the mayor didn't
15  accept was Nancy Dietz, right?
16   A.  The recommendation was not accepted, yes.
17   Q.  And did you advise the mayor that perhaps he
18  ought to be looking at other people in the pool
19  besides Gilbert Howell?
20   A.  There were -- and I can't remember where or
21  when.  There were certainly some discussions of other
22  captains and, you know, I know all of the captains got
23  mentioned at one point or another.  I don't remember
24  if it was in that meeting or it might have been in

14  (Pages 50 to 53)

1  another meeting with the mayor.  I just don't recall.
2       Certainly other captains were discussed
3  during that time frame.
4    Q.  Well, when we're talking about October of 2005,
5  you had been serving in your position for over four
6  years by that time, right?
7    A.  Mm-hmm.
8    Q.  And you had worked with Captain Dietz on
9  various matters during that four-year period of time?
10   A.  Some, yes.
11   Q.  In fact, you even have worked with her since
12 October of 2005?
13   A.  Probably more since October of 2005 than in the
14 previous and it all depends on the assignments that
15 they are in but, yes, we both agree we work well
16 together.
17   Q.  Right.  Last week you were working on Police
18 Academy matters, I think?
19   A.  Mm-hmm.
20   Q.  Yes?
21   A.  Yes.
22   Q.  And up until then in 2005 how much had you
23 worked with Gilbert Howell?
24   A.  Off and on.  Again, I can't specify different

1  things, but different issues would come up and
2  different captains will come in and address them in
3  our monthly meetings, that sort of thing.  So probably
4  on about the same frequency as Nancy.
5       I would imagine in the previous years
6  leading up to that -- it's hard to say.  I don't
7  remember specifics.
8    Q.  Was there any doubt in your mind that she was
9  qualified to be an inspector in the Wilmington Police
10 Department?
11   A.  I think she's qualified to be an inspector or a
12 chief in the Wilmington Police Department, yes.
13   Q.  And since October of 2005 and up to the
14 present, has anything occurred that would change your
15 opinion that she's qualified to be an inspector or the
16 chief of the department?
17   A.  No.  I've always had a lot of respect for her
18 and continue to.
19   Q.  Right.  Would you agree that in retrospect,
20 because of everything that you have learned from 2005
21 through the present, that she was more qualified for
22 appointment to the inspector position than Gilbert
23 Howell?
24       MS. CHEEK:  Objection to form.

1    A.  I can't state that.  I think she's qualified.
2  I think he's qualified.  I think they're both
3  qualified to serve in that role.
4    Q.  So the absentee problems that Gilbert Howell
5  has had since he was appointed that you alluded to
6  earlier -- do you remember that?
7    A.  Yes, I do.
8    Q.  You don't think they affect his ability to
9  perform as an inspector of the Wilmington Police
10 Department?
11       MS. CHEEK:  Objection to form.
12   A.  Again, I think there can be different reasons
13 for absenteeism and I know he's had a number of
14 medical issues.
15       So would you like any of your people to be
16 out absent for whatever reason?  No.  But I don't take
17 that, I don't hold that against him personally.
18   Q.  Gilbert Howell has been absent on an average of
19 at least fifty times a year I think the records would
20 show.
21       If that's a correct characterization, does
22 that interfere negatively with the efficiency and
23 operation of the Wilmington Police Department?
24       MS. CHEEK:  Objection to form.

1    A.  I don't have knowledge of the specifics.  I
2  know that he's been out at different times.  I don't
3  know if it's five or fifty, but I know it's enough
4  that it's been discussed with the chief and the public
5  safety director and I.
6       So, yes, certainly when any of us are out
7  in high-ranking positions like that, it has an impact,
8  yes.
9    Q.  The chief gives monthly reports to the public
10 safety director on the absenteeism of Gilbert Howell.
11 Isn't that correct?
12   A.  I'm not aware of that, no.
13   Q.  But you did just explain that you and the chief
14 and the public safety inspector have had meetings to
15 discuss the absenteeism of Gilbert Howell?
16   A.  We have had one specific meeting at my
17 initiation.  I would have to tell you when it was, but
18 it was sometime in the past year down at the Iron Hill
19 Brewery and we had lunch together and we discussed a
20 number of topics, but that was one.
21   Q.  Is it true that you have directed the chief not
22 to complete a written performance evaluation of
23 Gilbert Howell since he's been appointed to the
24 inspector position?

15  (Pages 54 to 57)

47807b95-748d-4f69-acb2-2d827f9863b0

A0278

Page 58

1    A.   That is not true.
2    Q.   Are you aware of whether or not there has been
3    a written performance evaluation of Gilbert Howell
4    since his appointment?
5    A.   I do not believe there has been, but that's to
6    the best of my knowledge sitting here right now.
7    Q.   You're familiar with the fact that employees
8    are supposed to receive written performance
9    evaluations once a year.  Isn't that policy?
10   A.   Yes.
11   Q.   So Gilbert Howell was appointed inspector
12   sometime in October of 2005.  Does that sound about
13   right?
14   A.   I believe so, yeah.  October, November, yeah,
15   in that time frame, mm-hmm.
16   Q.   And we're about 18 months into his serving as
17   the inspector of the police department.  Is that
18   right?
19   A.   Correct.
20   Q.   And you agree there has been no written
21   performance evaluation on him?
22   A.   I'm not sure.  I wouldn't see that.  It
23   wouldn't come up to me.
24   Q.   You would never see that evaluation rising up

Page 59

1    of an inspector?
2    A.   No.  I've never seen one that I'm aware of.
3    I'm trying to remember if I have.  I don't believe I
4    see those.
5         I see the chief's evaluation, things like
6    that.  I see some of the other people that Director
7    Mosley would, you know, George Giles' evaluation, that
8    kind of thing.
9    Q.   Did you agree with the selection of Gilbert
10   Howell by Mayor Baker?
11   A.   I supported the mayor's decision, yes.
12   Q.   I understand you supported it because you're
13   his appointee, aren't you?
14   A.   Yes, sir.
15   Q.   And my question is:  You certainly had
16   conversations with the mayor about the need to select
17   someone to be the inspector for the Wilmington Police
18   Department upon the resignation or retirement of James
19   Wright?  Is that right?
20   A.   Yes.
21   Q.   And during those conversations you learned that
22   the mayor wanted to appoint Gilbert Howell.  Is that
23   correct?
24   A.   Yes.

Page 60

1    Q.   In those conversations did you express an
2    opinion to the mayor that you disagreed with that
3    selection?
4    A.   I thought there were other -- the short answer
5    is yes.  And I thought there were other captains, not
6    all of them by any means, but others in the captain
7    ranks that could also do the job.
8    Q.   Right.  In that pool of people you believed
9    there were people who were more qualified than Gilbert
10   Howell to be the inspector.  Is that correct?
11   A.   I would say at least equally qualified.
12   Q.   Okay.  And those people equally qualified
13   included Captain Dietz?
14   A.   Absolutely.  Yes.
15   Q.   Who else?
16   A.   And her husband.  To name a few, not to go
17   through the whole list, but three that come to mind
18   would be Captain Dietz, her husband Marlyn Dietz and
19   Captain Finerty are the three people that I have had
20   maybe more contact with and who have been in the
21   positions for some length of time.
22   Q.   And those people were all Caucasian?
23   A.   Yes.
24   Q.   In that pool of people that you have

Page 61

1    identified, four people, there was one African-
2    American?
3    A.   Right.
4    Q.   And that was Gilbert Howell?
5    A.   Right.
6    Q.   And I think you're saying that you felt that
7    all four of those people were qualified to be the
8    inspector?
9    A.   Yes.  And possibly some of the others as well.
10   You know, we didn't get into great detail on that, but
11   yeah.
12   Q.   Doesn't the City of Wilmington strive to
13   appoint the most-qualified person to positions within
14   the City of Wilmington?
15   A.   You try and appoint the best people you can to
16   all of those positions, especially in the cabinet,
17   yes.
18   Q.   So if Gilbert Howell was as qualified as Nancy
19   Dietz or these two other people, what was the
20   distinguishing characteristic that pushed Gilbert
21   Howell over the top?
22        MS. CHEEK:  Objection to form.
23   Q.   That you observed the mayor to be articulating?
24   A.   I don't know that I could pick the

16  (Pages 58 to 61)

47807b95-748d-4f69-acb2-2d827f9863b0

A0279

Page 62

1 distinguishing characteristic that the mayor chose
2 there.
3    Q. Well, earlier on today you mentioned the
4 reasons why the mayor selected Gilbert Howell. Do you
5 remember that?
6    A. Yeah.
7    Q. Okay. So is it fair to say these are reasons
8 that pushed Gilbert Howell over the top that led to
9 his selection versus the others?
10        MS. CHEEK: Objection to form.
11    A. I am not sure. You're asking me to get inside
12 the mayor's head on that and I just can't.
13    Q. No. No. You're the mayor's right-hand man,
14 right?
15    A. Yes.
16    Q. You're his chief operating officer?
17    A. Right.
18    Q. Everybody in the city reports through you to
19 the mayor except the auditor and the city solicitor.
20 Is that right?
21    A. Yes. That's true.
22    Q. You're his chief of staff, for want of a better
23 word?
24    A. Mm-hmm.

Page 63

1    Q. Right?
2    A. That's the title, yes.
3    Q. Right. And you're telling me you don't know --
4 well, you did tell me earlier today you knew why the
5 mayor selected Gilbert Howell. You gave four reasons.
6        Do you remember that?
7    A. Yes. I gave some reasons, three, four,
8 whatever, whatever the record should show there, yes.
9    Q. Right. Right. And one of those reasons was
10 that having Gilbert Howell would contribute to
11 diversity in the work force. Is that correct?
12    A. Yes. Yes, sir.
13    Q. And at that time when the mayor was trying to
14 appoint someone to the inspector position, there was
15 another inspector, Martin Donohue. Is that correct?
16    A. Yes.
17    Q. Martin Donohue was a white male. Is that
18 correct?
19    A. Yes.
20    Q. If Nancy Dietz was appointed to be the
21 inspector, there would be a white male and a white
22 female serving in the two inspector positions. Is
23 that correct?
24    A. That's true.

Page 64

1    Q. And if Nancy Dietz was selected, there would be
2 no African-American serving in the inspector position.
3 Is that correct?
4    A. That is correct. But there would be a woman
5 serving in the position, so I think diversity could
6 have been served through her appointment as well.
7    Q. Okay. But a woman wasn't selected for the
8 position?
9    A. Not in this go-round, no.
10    Q. No woman has ever been selected to be an
11 inspector in the City of Wilmington Police Department.
12 Isn't that correct?
13        MS. CHEEK: Objection to form.
14    A. To the best of my knowledge, yes. I believe
15 the highest rank thus far has been captain, unless I'm
16 mistaken.
17    Q. That's right. Okay.
18        But we agree that one of the reasons the
19 mayor chose Gilbert Howell was that it was promoting
20 diversity in the work force?
21    A. I do believe that is certainly one of the
22 reasons and that's something that we look at when we
23 look for anyone to serve in an appointed position,
24 yes.

Page 65

1    Q. And I think lastly I'm asking you do you agree
2 that Gilbert Howell was the best choice for the
3 position in October of 2005?
4        MS. CHEEK: Objection to the form.
5    A. That's not my personal belief, no.
6    Q. Thank you.
7        I think you're saying it's not your
8 personal belief that he was the best choice for the
9 position in October of 2005?
10        MS. CHEEK: Objection to form.
11    Q. Is that what you're saying?
12    A. I think what I'm trying to say is, to be clear
13 what I am saying is I think there are others who could
14 have done the job as well, could have maybe done
15 it better and at least there are others as
16 well-qualified. I certainly believe that.
17        We have good officers throughout the ranks
18 but especially in the upper ranks and the captain
19 ranks we have some really good people.
20        MR. NEUBERGER: I think that's the end of
21 my questioning.
22        Does anybody else have any questions?
23        Do you waive reading and signing or not?
24        MS. CHEEK: No, we're not waiving reading

17 (Pages 62 to 65)

47807b95-748d-4f69-acb2-2d827f9863b0

A0280

Page 66

1  and signing.
2          MS. BUTCHER:  No.
3          MS. CHEEK:  We're not waiving.
4          (Deposition concluded at 11:45 a.m.)
5          (There were no exhibits marked for
6  identification.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 67

1
2
3
4
5          REPLACE THIS PAGE
6
7          WITH THE ERRATA SHEET
8
9          AFTER IT HAS BEEN
10
11          COMPLETED AND SIGNED
12
13          BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24

Page 68

1  State of Delaware   )
                        )
2  New Castle County   )
3
4          CERTIFICATE OF REPORTER
5
6      I, Kurt A. Fetzer, Registered Diplomate
   Reporter and Notary Public, do hereby certify that
   there came before me on Monday, March 12, 2007, the
7  deponent herein, WILLIAM S. MONTGOMERY, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10 under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17          Kurt A. Fetzer, RDR, CRR
            Certification No. 100-RPR
18          (Expires January 31, 2008)
19
20 DATED:
21
22
23
24

47807b95-748d-4f69-acb2-2d827f9863b0

A0281

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,    )
                           )
     Plaintiff,            )
                           )
     v.                    )  C.A. No. 06-256 (SLR)
                           )
JAMES M. BAKER,            )
individually and in his    )
official capacity as the   )
Mayor of the City of       )
Wilmington; and MAYOR AND  )
COUNCIL OF WILMINGTON, a    )
municipal corporation,      )
                           )
     Defendants.           )

          Deposition of NANCY S. DIETZ taken pursuant
to notice at the law offices of Landis Rath & Cobb, LLP,
919 Market Street, Suite 600, Wilmington, Delaware,
beginning at 10:05 a.m., on Wednesday, May 9, 2007,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiff

          REBECCA L. BUTCHER, ESQUIRE
          LANDIS RATH & COBB, LLP
            919 Market Street - Suite 600
            Wilmington, Delaware 19801
            for the Defendant James M. Baker

cont'd....

          WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477
                www.wilfet.com

1  APPEARANCES (cont'd):

2

3      TERESA A. CHEEK, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
4      The Brandywine Building - 17th Floor
        1000 West Street
5      Wilmington, Delaware 19801
        for the Defendant Mayor and Council
6      of Wilmington

7          - - - - -

8

9          NANCY S. DIETZ,
10     the witness herein, having first been
11     duly sworn on oath, was examined and
12     testified as follows:
13  BY MS. BUTCHER:
14     Q.   Can you please state your full name for the
15  record?
16     A.   Nancy S. Dietz, D-i-e-t-z.
17     Q.   Have you ever had your deposition taken before?
18     A.   Yes.
19     Q.   Recently?
20     A.   I'd say about a year ago I did.
21     Q.   Just a couple things to go over and reminders
22  since it has been a little while.
23          Please make all your responses verbal.  If
24  you do not hear or understand a question, feel free to

1  ask me to repeat it, clarify it.
2          If you need a break, just let me know.
3          Please wait until I finish the question to
4  respond and I will try and wait until you finish an
5  answer, too, so we're not interrupting each other,
6  because that makes it very difficult for the court
7  reporter.
8          Have you taken any medication or do you
9  have any medical conditions that would prevent you from
10  recalling events today?
11     A.   No.
12          MS. BUTCHER:  Are you going to take the
13  opportunity to read and sign the deposition?
14          MR. NEUBERGER:  Yes, I think so.
15  BY MS. BUTCHER:
16     Q.   Let's start by discussing the claims in your
17  complaint.  You have three claims in the complaint,
18  correct?  One that there is a racial quota system with
19  regard to appointment of inspectors, one that you have
20  twice been denied a promotion on the basis of your race,
21  and that you have twice been denied a promotion
22  appointment on the basis of your sex.  Correct?
23     A.   Correct.
24     Q.   I ask you to take a look at this document.

1  It's Bates DO2241 through 43.
2     A.   (Complied.)
3     Q.   Is this a copy of your resume?
4     A.   Yes.
5     Q.   Was this document prepared by you?
6     A.   Yes, it was.
7          MS. BUTCHER:  Go ahead and mark that as
8  Dietz Exhibit 1.
9          (Dietz Deposition Exhibit No. 1 was marked
10  for identification.)
11  BY MS. BUTCHER:
12     Q.   I have a couple of documents in front of you
13  all at the same time, just to make things easier.
14          Do you recognize this document?
15     A.   Yes, I do.
16     Q.   Could you identify it?
17     A.   It is the 2005 organizational chart for the
18  Wilmington Police Department.
19     Q.   You produced this document, correct, in
20  discovery?
21     A.   Yes.
22          MS. BUTCHER:  Please mark that as Dietz
23  Exhibit 2.
24          (Dietz Deposition Exhibit No. 2 was marked

1  for identification.)
2  BY MS. BUTCHER:
3     Q.   Do you recognize that document?
4     A.   Yes, I do.
5     Q.   Can you identify it, please?
6     A.   It's Directive 3.0 and Directive 3.3 from our
7  police officers' manual entitled, "The Inspector of
8  Uniformed Operations and Inspector of Investigative
9  Operations."
10     Q.   You produced that document in discovery,
11  correct?
12     A.   Yes.
13          MS. BUTCHER:  Can you please mark that as
14  3?
15          (Dietz Deposition Exhibit No. 3 was marked
16  for identification.)
17  BY MS. BUTCHER:
18     Q.   Going back to Exhibit 2, the organizational
19  chart, the Criminal Investigations Division; Drug,
20  Organized Crime and Vice Division; Office of Professional
21  Standards; and Human Resources Division are all under the
22  direction and the authority of the inspector of
23  Investigative Operations, correct?
24     A.   That is correct, yes.

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

1    Q.    The Special Operations Division, Uniformed
2    Services Division, Communications and Technology
3    Division, and Support Services Division are all under the
4    direction of the inspector of Uniformed Operations,
5    correct?
6    A.    That's correct, yes.
7    Q.    If we can turn to your resume for a moment,
8    Exhibit 1.  Beginning at the patrol officer/detective
9    rank, you have three assignments, correct?  Patrol
10   officer in the Patrol Division, investigator in the Drug,
11   Organized Crime and Vice Division, and investigator in
12   the Criminal Investigations Division; is that correct?
13   A.    Yes.
14   Q.    You were a patrol officer for approximately a
15   year, correct?
16   A.    No, that's not correct.
17   Q.    That's not correct?  Those dates aren't right?
18   A.    Well, the dates are right.  There was actually
19   a time when I was a patrol officer in the Patrol
20   Division.  I was actually detailed to do undercover work
21   for the Drug, Organized Crime and Vice Division, and then
22   I went back to the Patrol Division.  So those were just
23   assignments I had during that time period, but it doesn't
24   include the total amount of time that I spent in each

1    division.
2    Q.    Approximately for how long were you detailed as
3    an investigator in the Drug, Organized Crime and Vice
4    Division?
5    A.    I believe it was around 10 months.
6    Q.    And then you returned to Patrol?
7    A.    Yes.
8    Q.    You were an investigator in the Criminal
9    Investigations Division in '84; is that correct?
10   A.    That's correct, yes.
11   Q.    For how long were you an investigator in the
12   Criminal Investigations Division?
13   A.    Approximately five years.
14   Q.    Once promoted to sergeant in July of 1989, you
15   had two assignments at that rank:  Supervisor of a patrol
16   platoon squad and Uniformed Services and an investigator
17   for the Office of Professional Standards.  Is that
18   correct?
19   A.    That's correct.
20   Q.    You were supervisor of the patrol platoon squad
21   for approximately a year, a little over?
22   A.    About a year and a half, yes.
23   Q.    Then you were an investigator for the Office of
24   Professional Standards for approximately another year; is

1    that correct?
2    A.    That's correct.
3    Q.    Then you were promoted to lieutenant in
4    November of '91 and had three assignments at that rank:
5    Commander of patrol platoon and Uniformed Services,
6    deputy commander of the Human Resources Division, and
7    commander of the Criminal Investigations.  Is that
8    correct?
9    A.    That's correct.
10   Q.    The commander of the patrol platoon assignment
11   lasted for a little over a year?
12   A.    About a year and a half, yes.
13   Q.    The assignment as deputy commander of Human
14   Resources lasted for a little over two years?
15   A.    Yes, about two and a half years.
16   Q.    You were commander of a criminal investigations
17   platoon for approximately another two years, a little
18   less?
19   A.    That's correct, yes.
20   Q.    Upon promotion to captain, you had three
21   assignments:  Commanding officer of the Criminal
22   Investigations Division, commanding officer of the Office
23   of Professional Standards, and commanding officer of the
24   Human Resources Division.  Is that correct?

1    A.    That's correct, yes.
2    Q.    Your position as commanding officer of the
3    Criminal Investigations Division lasted for four and a
4    half years, approximately?
5    A.    That's correct, yes.
6    Q.    Your assignment as commanding officer of the
7    Office of Professional Standards lasted for four years.
8    A.    That's correct, yes.
9    Q.    You continue to hold the position of commanding
10   officer of the Human Resources Division, correct?
11   A.    Yes.
12   Q.    Of your assignments at the patrol
13   officer/detective level, only the time spent as a patrol
14   officer in the Patrol Division, which was approximately,
15   I guess, part of three years, would fall under the
16   direction of the inspector of Uniformed Services.  Is
17   that correct?
18   A.    Well, back when I was patrol officer, the
19   organizational chart was not the same in the police
20   department.  So it was different back then.  So I
21   can't -- unless I have an organizational chart back
22   then -- things have definitely changed during that time
23   period since I have been on the department.
24   Q.    Has the Office of Professional Standards always

3  (Pages 6 to 9)

1 been under the inspector of Investigative Operations, or
2 has it at some point been under the inspector of
3 Uniformed Operations?
4    A.   Actually, the titles have changed several times
5 in the last 28 years that I have been on the department,
6 so I cannot tell you for sure.  But the titles of
7 Investigative Operations and Uniformed Operations were
8 not the previous titles.  At one point there was four
9 inspectors and there was three inspectors and then it
10 went down to two inspectors.  So where that department
11 fell under during that time period I couldn't tell you.
12    Q.   Since you have been a captain, your commanding
13 officer positions, have the Division of Criminal
14 Investigations and the Office of Professional Standards
15 and the Human Resources Division, have they all been
16 under the inspector of Investigative Operations during
17 the time you were commanding officer of them?
18    A.   Yes.  Can I just point out that the Criminal
19 Investigations Division when I was in charge was
20 different than it is currently as of now.  When I was the
21 commanding officer, it also included some other
22 divisions.  So there was a change in the organization of
23 the department.
24    Q.   What other divisions were included in the

1 Criminal Investigations Division when you were the
2 commanding officer?
3    A.   The Operation Safe Streets fell under that,
4 which is uniformed officers signed up with probation
5 officers.  The Drug, Organized Crime and Vice Division
6 was merged with the Criminal Investigations Division.  So
7 it was actually two divisions that were merged during
8 that time.  The Victim Services Division was part of CID.
9 The Evidence Detection Unit, which is uniformed officers,
10 was also assigned to Criminal Investigations during that
11 time period.
12    Q.   Is Operation Safe Streets still operating?
13    A.   Yes.
14    Q.   Whose direction is it under currently?
15    A.   Now it's under the Drug, Organized Crime and
16 Vice captain, Captain Finerty.
17    Q.   And the Drug, Organized Crime and Vice Division
18 had its own division as opposed to being part of the
19 Criminal Investigations Division?
20    A.   That's correct, yes.
21    Q.   Victim Services, that's no longer under
22 Criminal Investigations.  What division is that under?
23    A.   No, that is still under.  That stayed under the
24 Criminal Investigations Division.

1    Q.   I'd like to briefly discuss --
2        MR. NEUBERGER:  Are we done with those
3 exhibits?
4        MS. BUTCHER:  Yes.  We may go back to the
5 resume at some point, but unlikely we will go back to the
6 other.
7 BY MS. BUTCHER:
8    Q.   I hand you a document.  It's Bates numbered
9 DO2727 through 2737.  If you could read that for me,
10 please.
11    A.   (Complied.)
12        Okay.
13    Q.   Do you recognize these documents?
14    A.   Yes.
15        MR. NEUBERGER:  Are we going to mark it as
16 an exhibit?
17        MS. BUTCHER:  Yes.  We're going to mark it
18 as Dietz 4.
19 BY MS. BUTCHER:
20    Q.   Are these documents from, I guess it would be,
21 your Office of Professional Standards file?
22    A.   Yes, they are.
23    Q.   Are they related to a summary punishment that
24 you received?

1    A.   Yes, they are.
2    Q.   That punishment was two hours for an infraction
3 for failing to notify the parent of a juvenile that he
4 had been detained; is that correct?
5    A.   Yes.
6        (Dietz Deposition Exhibit No. 4 was marked
7 for identification.)
8 BY MS. BUTCHER:
9    Q.   Do you recognize these documents?
10    A.   Yes, I do.
11    Q.   Can you identify them for me, please?
12    A.   The documents are a written reprimand that I
13 had my sergeant submit on November 6, 2003.  Second page
14 is a summary punishment offer that Sergeant Elliott typed
15 up for my inspector.  And then the third page is my
16 report, reporting that I was not able to find my pager.
17    Q.   This note, I guess it looks like there's a
18 Post-It on here, "Steve, please submit WR2 for me from
19 Donohue.  I will accept and I'll have him sign."
20        You were asking your sergeant to write up
21 the written reprimand?
22    A.   That's correct, yes.
23    Q.   In the memo describing the incident, you
24 stated: "I still believe that my pager is somewhere in

4 (Pages 10 to 13)

Page 14

1 the house. Due to the fact that I'm apparently suffering
2 from early stages of memory loss, I cannot locate my
3 departmental pager."
4         Is that correct?
5    A.   That's correct. I did find it.
6    Q.   Where was it?
7    A.   It was somewhere in the boxes. I had moved
8 from actually one house to another, and during the move I
9 misplaced it. But I did locate it actually shortly after
10 that.
11        MR. NEUBERGER: So that was Exhibit 5, for
12 the record?
13        MS. BUTCHER: Exhibit 5.
14        (Dietz Deposition Exhibit No. 5 was marked
15 for identification.)
16 BY MS. BUTCHER:
17    Q.   Do you recognize this document?
18    A.   Yes, I do.
19    Q.   Could you tell me what it is, please?
20    A.   This is forms that we maintain in the Office of
21 Professional Standards whenever documents are purged
22 after a certain time period.
23    Q.   Why are, I guess, documents purged from records
24 in the Office of Professional Standards?

Page 15

1    A.   Typically they're complaints that were not
2 substantiated or incidents that go through the reporting
3 system of Professional Standards. For example, at one
4 point, if you ever displayed your handgun, you had to
5 write a report. All those reports came to Internal
6 Affairs if you were involved in a use-of-force incident
7 where you had to use your asp or your CapStun.
8 Regardless if there is a complaint or not, a report was
9 taken and sent to Internal Affairs. If you were involved
10 in a vehicle pursuit, it was reviewed by Internal
11 Affairs.
12        They weren't necessarily complaints, but
13 complaints and incidents, unsubstantiated complaints and
14 incidents, certain incidents went through the paperwork
15 process of the Internal Affairs Division.
16    Q.   So these would reflect either reports or
17 incidents in which a complaint was made but was
18 unsubstantiated, no punishment was --
19    A.   Not necessarily. Probably most of them are not
20 complaints. Probably most of them are incidents, like I
21 said, being involved in a force incident, being involved
22 in a vehicle pursuit. Most of the time they didn't
23 result in complaints, but they had to be reported and
24 they had to go through Internal Affairs for tracking

Page 16

1 purposes.
2         MS. BUTCHER: That's all with regard to
3 that. We will mark that as Dietz 6.
4         (Dietz Deposition Exhibit No. 6 was marked
5 for identification.)
6 BY MS. BUTCHER:
7    Q.   In the complaint you asserted that you were
8 more qualified for the position of inspector of Uniformed
9 Operations than both Captain Howell and Captain Wright,
10 then captains who were appointed inspectors.
11        Do you believe that any of the other pool
12 of captains were qualified for the position of inspector
13 at the time of those appointments?
14    A.   Yes.
15    Q.   In relation to the appointment of
16 Captain Howell, would you say that Captain Mike Maggitti
17 was qualified for the position of inspector of Uniformed
18 Operations?
19    A.   In my opinion, he would have been more
20 qualified than Captain Howell, yes.
21    Q.   Do you believe that Captain Finerty -- and I'm
22 not asking you to make a comparison. I'm just asking you
23 to assess the qualification. Do you believe that
24 Captain Finerty was qualified for the position of

Page 17

1 inspector of Uniformed Operations?
2    A.   Yes.
3    Q.   Do you believe that Captain Marlyn Dietz was
4 qualified for the position of inspector of Uniformed
5 Operations?
6    A.   Yes.
7    Q.   Do you believe that Captain Maggitti was
8 qualified for the position of inspector of Uniformed
9 Operations?
10    A.   Yes.
11    Q.   Do you believe that Captain Victor Ayala was
12 qualified for the position of inspector of Uniformed
13 Operations?
14    A.   Are you referring to both positions, because
15 some of those people were not in the position to be --
16    Q.   I'm talking about in 2005.
17    A.   Yes.
18    Q.   Do you believe that Captain Bobbie Cummings was
19 qualified for the position of inspector of Uniformed
20 Operations?
21    A.   Yes.
22    Q.   Back in 2001 who were the other captains at
23 that time? I know Victor Ayala was brought up to captain
24 when Captain Wright was appointed as inspector. Do you

5 (Pages 14 to 17)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0286

1 recall?
2   A.   I'm trying to think of who retired.  I think
3 Captain Lane may have been there then.  I'm not sure, to
4 be honest with you.  I'd have to go back and check the
5 records on who was there and who retired since then.
6   Q.   Can you identify this document, please?
7   A.   Yes.
8   Q.   Can you identify the document for me, please?
9   A.   This was a report that the Chief of Police
10 asked me to submit as a result of a conversation he said
11 he had with Director Mosley.
12       MS. BUTCHER:  We will go ahead and mark
13 this as Dietz 7.
14       (Dietz Deposition Exhibit No. 7 was marked
15 for identification.)
16 BY MS. BUTCHER:
17   Q.   How did the request arise from the Chief?
18   A.   In person.
19   Q.   What was it related to?  Had there been a
20 complaint?  Had there been --
21   A.   I can tell you what the Chief told me directly.
22 I don't know what was really behind it.  But the Chief
23 informed me that Director Mosley had some concerns
24 regarding diversity in the Office of Professional

1 Standards.  I being the commanding officer of
2 Professional Standards was asked to write a report.
3   Q.   The report was simply to address who the
4 current personnel were in the Office of Professional
5 Standards and the methods for identifying persons to the
6 Office of Professional Standards?
7   A.   Yeah, basically I was -- I just summarized from
8 when I was transferred there who was assigned to the
9 division, who had left the division, who had put in a
10 request to come to the division, and just basically why
11 people were chosen and the reasoning behind it.
12   Q.   Shortly after this report was written you were
13 transferred to the Human Resources Division; is that
14 correct?
15   A.   That's correct.
16   Q.   Was that initiated at your request or was that
17 transferred to the Human Resources Division?  How did
18 that come about?
19   A.   As I understand it, the transfers occurred in
20 other divisions as well, and that the director basically
21 wanted to mix things up and move some of the captains
22 around.
23   Q.   Did you have any opportunity to request which
24 position you were transferred to, or was it simply

1 assigned?
2   A.   Actually, I was asked where I would like to go.
3   Q.   Did you request to go to Human Resources?
4   A.   Yes, I did.  Other divisions were not included
5 in my choice.
6   Q.   You only had certain options?
7   A.   Yes.  Two division commanders had just changed
8 positions, so they were pretty much off the possibles.
9 The captain of the vice squad at that time was in the
10 middle of a wiretap that the inspector didn't feel that
11 he should be moved at that time.  So I was given the
12 other positions that were available at that time.  I
13 believe three of the positions were on one side and then
14 one position was on the other side of the department.
15   Q.   Which side were the three positions?
16   A.   The three positions that were available were
17 the Special Operations Division, the Support Services
18 Division, and the Human Resources Division were the only
19 three I believe that were available.  Two would work for
20 Inspector Howell and the other position would work for
21 Inspector Donohue.
22   Q.   Please review that for me.
23   A.   (Complied.)
24   Q.   Can you identify that document for me, please?

1   A.   This is the old training records that the
2 Personnel Division maintained for officers.
3       MS. BUTCHER:  We will go ahead and mark
4 that as Dietz 8.
5       (Dietz Deposition Exhibit No. 8 was marked
6 for identification.)
7 BY MS. BUTCHER:
8   Q.   The Personnel Department no longer maintains
9 these records?
10   A.   Well, they do, but they keep them on a computer
11 now.  So there's a lot more information that's not here.
12 This doesn't encompass everybody's training.  For
13 anybody.
14   Q.   I assume you had not ceased training in '92.
15 But those computer records are not regularly, I guess,
16 kept as part of the HR files, or they're part of a
17 computer file, but not kept as paper?
18   A.   That's correct.  People occasionally come up
19 and ask for that information, and the training officer
20 will provide it to them.
21   Q.   Are police officers required to attend a
22 certain number of hours of training --
23   A.   Yes.
24   Q.   -- in any given year?

6 (Pages 18 to 21)

Page 22

1   A.  Yes.
2   Q.  How many?
3   A.  Sixteen hours.
4   Q.  That's considered, I guess, continuing
5 education, something along that line?
6   A.  In addition to that, they are also required to
7 complete their firearms qualifications. They have to be
8 certified and up-to-date on their agency PR training as
9 well. So the 16 hours is in addition to the mandatory
10 training required by the Council on Police Training.
11   Q.  Do officers have the option of picking and
12 choosing what those 16 hours consist of? Are there any
13 other requirements for those 16 hours? Do they need to
14 be in certain areas of police work or anything like that?
15   A.  It depends on your current assignment.
16 Obviously, if it's a specialized assignment, then it's a
17 requirement for you to attend some kind of training in
18 that area of expertise. So it really depends on your
19 assignment. Sometimes officers make requests, sometimes
20 their supervisors make requests. Just because you
21 request training doesn't necessarily mean you're going to
22 get it.
23   Q.  Are all training opportunities approved through
24 the department?

Page 23

1   A.  Yes.
2   Q.  Looking at your records on page DO2576 and
3 2578, there are several trainings that you took that are
4 listed related to hostage negotiation?
5   A.  Yes.
6   Q.  Was that related to a particular assignment or
7 was it more of a particular area of interest?
8   A.  I was actually a member of the hostage
9 negotiation team and the team leader for the hostage
10 negotiation team for about nine years.
11   Q.  What area does the hostage negotiation team
12 fall under on that organizational chart?
13   A.  Falls under Special Operations. Crisis
14 management tactical team includes the hostage negotiation
15 team, which falls under Special Operations.
16   Q.  Crisis management tactical team, is that --
17   A.  SWAT.
18   Q.  That's what I thought.
19      MR. NEUBERGER: Just so I understand, I'm
20 back at Exhibit 2, what were you saying the hostage
21 negotiator and the SWAT team, where are they located?
22      THE WITNESS: Under Special Operations.
23      MR. NEUBERGER: Special Operations under
24 the inspector of Uniformed Operations?

Page 24

1      THE WITNESS: Right.
2      MR. NEUBERGER: Thank you.
3 BY MS. BUTCHER:
4   Q.  Has the SWAT team always been under Special
5 Operations or has it been one of those areas that has
6 moved around to different divisions as they have been
7 renamed?
8   A.  I believe at one point it was under the Patrol
9 Division/Uniformed Services. And then it moved to
10 Special Operations. The last reorganization of the
11 department, it's always been under the uniformed side,
12 but I believe it was under what was the old Patrol
13 Division, which is now Uniformed Services.
14   Q.  You said you were the head of the hostage
15 negotiation team and the team leader for seven years, but
16 your, I guess, assignment as team leader encompassed you
17 being in several different departments?
18   A.  That's not a full-time position. It's a
19 position that, when you get called out, you train with
20 the team. You go away to train, obviously, but you train
21 collectively with the SWAT team. Go out on actual
22 scenarios, actual incidents, negotiation incidents. All
23 of those incidents initiated come through the Patrol
24 Division, but it's not something that you do all the

Page 25

1 time. It's really based on the need for the team. Just
2 like people that are part of the SWAT team are also
3 members of other divisions as well. It's not a full-time
4 position.
5   Q.  Can you identify that document for me, please?
6   A.  Yes.
7   Q.  What is that?
8   A.  This is a request to hold outside employment
9 form. Any time an officer works outside of their
10 position on the department, they're required to fill out
11 a request which has to go through the chain of command
12 for approval.
13      MS. BUTCHER: Can we please mark that as
14 Dietz 9?
15      (Dietz Deposition Exhibit No. 9 was marked
16 for identification.)
17 BY MS. BUTCHER:
18   Q.  This request for employment was to be employed
19 by the DuPont Company; is that correct?
20   A.  That's correct.
21   Q.  Your supervisor at the DuPont Company was
22 Harry Manelski?
23   A.  That's correct, yes.
24   Q.  Is that former Chief Manelski?

7 (Pages 22 to 25)

Page 26

1    A.    Yes.
2    Q.    How did the employment come about?
3    A.    Actually, I was approached by then -- he was a
4  retired captain of the Criminal Investigations Division,
5  Don Palmateri, who asked me if I would be interested in
6  helping them out at the DuPont Company.  They had various
7  dignitaries coming in and out of Wilmington and
8  occasionally needed some extra security assistance or
9  transporting people from one point to another.  He
10  actually had asked me if I would be interested in helping
11  out.  Other officers were also part of this detail for
12  many years, actually.
13    Q.    Approximately how many officers did they have
14  assisting them in this manner, do you remember how many?
15    A.    I don't know, because I worked separately.  I
16  didn't work in conjunction with anybody else.
17    Q.    Each officer was working their own assignment?
18    A.    That's correct.
19    Q.    The supervisor was former Chief Manelski?
20    A.    Yes.
21    Q.    Do you recognize this document?
22    A.    Yes.
23    Q.    Can you identify it for me, please?
24    A.    It's the same document that I previously

Page 27

1  described, a request to hold outside employment.
2    Q.    This is for the year -- on the second page I
3  think it says 1995.  Is that correct?
4    A.    That's correct.
5    Q.    Whereas, the prior exhibit was for 1994.  The
6  prior exhibit was for, I believe, 1994.
7    A.    That's correct.
8    Q.    Once again, your supervisor was Chief Manelski,
9  former Chief Manelski?
10    A.    That's correct, yes.
11    Q.    Was he your main contact for this outside job?
12    A.    Not usually.  It was usually Captain
13  Donald Palmateri.
14    Q.    Former Captain Palmateri, he was a former
15  captain at the time, not a current officer?
16    A.    That's correct, yes.  He was my captain when I
17  was assigned to the Criminal Investigations Division.
18        MS. BUTCHER:  We will mark this as
19  Dietz 10.
20        (Dietz Deposition Exhibit No. 10 was marked
21  for identification.)
22  BY MS. BUTCHER:
23    Q.    Can you identify the document?
24    A.    It's the same document, except it's dated in

Page 28

1  1996.
2    Q.    You were doing essentially the same job?  Your
3  job didn't change very much from year to year for these,
4  or did your duties change?
5    A.    Actually, my duties really -- I hardly worked
6  for them at all during that time period, but I was
7  available if they needed some extra help.
8    Q.    Former Chief Manelski was still the supervisor
9  in 1996?
10    A.    He was in charge of security for all of DuPont
11  at that time.
12        (Dietz Deposition Exhibit No. 11 was marked
13  for identification.)
14  BY MS. BUTCHER:
15    Q.    Do you recognize this document?
16    A.    Yes.
17    Q.    Can you identify it for me, please?
18    A.    It's the same document, a request to hold
19  outside employment.
20    Q.    It's dated?
21    A.    1997.  Well, actually, one signature has
22  January 30th, '96, and one has a signature of
23  January 30th of '97.
24    Q.    Given that you signed it in '97, we would

Page 29

1  probably be safe in assuming it's 1997?
2    A.    I would think so, yes.
3        MS. BUTCHER:  Go ahead and mark this as
4  Dietz 12.
5        (Dietz Deposition Exhibit No. 12 was marked
6  for identification.)
7  BY MS. BUTCHER:
8    Q.    Was this essentially the same position, doing
9  security details for the DuPont Company?
10    A.    Yes.
11    Q.    But the supervisor had changed.  It was no
12  longer former Chief Manelski.  It was Bill Draper?
13    A.    Yes.  Well, Bill Draper was a supervisor for
14  DuPont security.  I don't recall if Manelski had moved on
15  to another job or not.  There was different supervisors.
16  Bill Draper and Don Palmateri were the two people I
17  interacted with the most.
18    Q.    Bill Draper was also a former --
19    A.    Inspector.
20    Q.    In your work for DuPont, did you get to know
21  Chief Manelski through that work, former Chief Manelski?
22    A.    Well, Chief Manelski actually hired me on the
23  department, so I knew him previously as the chief of
24  police.

8 (Pages 26 to 29)

Page 30

1    Q.   He was the chief of police when you first
2  joined the department?
3    A.   Yes, when I first came on the department in
4  1980.
5    Q.   How did you end up at the Wilmington Police
6  Department, because you went to Penn State University,
7  correct?
8    A.   Correct.
9    Q.   You didn't grow up in Wilmington, correct?
10   A.   That's correct.
11   Q.   How did you end up down here?
12   A.   I actually applied to probably eight different
13 police departments.  I wanted to go to a city department,
14 so I applied to Baltimore, Washington, Wilmington,
15 Philadelphia, Pittsburgh, and I think Harrisburg, and I
16 believe Pennsylvania State Police as well.
17        When I came to Wilmington, it was at the
18 very end of the selection process, so timing-wise I was
19 offered a job fairly quickly.  Other departments I was
20 still in the process, the application process, going
21 through the various testing procedures.  So fairly
22 quickly I went through the Wilmington Police process and
23 was given a job offer I'd say within a month or two from
24 graduating from college.

Page 31

1    Q.   You indicated that Chief Manelski was the chief
2  at the time you were hired.  What was your, I guess,
3  interaction with him during the employment process?
4    A.   The final phase of the selection process?  You
5  had a meeting with the chief.
6    Q.   When you started in patrol, did you have much
7  interaction with Chief Manelski?
8    A.   No.
9    Q.   Turning back to Dietz 1 for a minute, which you
10 may not need it in responding to my questions, you have
11 never served full-time in the military; is that correct?
12   A.   That's correct.
13   Q.   Have you ever served in the reserves?
14   A.   No.
15   Q.   Have you ever served in the National Guard?
16   A.   No.
17   Q.   You received a Kiwanis quarterly award; is that
18 correct?
19   A.   Yes.
20   Q.   You have not received the Kiwanis annual award;
21 is that correct?
22   A.   That's correct.
23   Q.   In the complaint you indicated that you had
24 received 27 citizen, community, and departmental

Page 32

1  commendations; is that correct?
2    A.   That's correct.
3    Q.   Is this document before you one of those
4  commendations?
5    A.   Yes.
6    Q.   Would this be qualified as a citizen
7  commendation?
8    A.   Yes.
9        MS. BUTCHER:  We will mark this as
10 Dietz 13.
11        (Dietz Deposition Exhibit No. 13 was marked
12 for identification.)
13 BY MS. BUTCHER:
14   Q.   This document is a letter from a citizen
15 expressing appreciation to the officers in the department
16 that handled a complaint, break-in I guess?
17   A.   Yes.
18   Q.   Both you and Inspector Howell, now
19 Inspector Howell, are mentioned in this commendation; is
20 that correct?
21   A.   Yes.  I was the detective who handled the case
22 and he assisted me.
23   Q.   Do you recognize this document?
24   A.   Yes.

Page 33

1    Q.   This is an official commendation and
2  distinguished service award awarded by the department; is
3  that correct?
4    A.   That's correct.
5    Q.   Both you and now Inspector Howell are mentioned
6  as being involved in the pursuit and detention of a
7  suspect in this commendation; is that correct?
8    A.   Yes.
9    Q.   That would be considered a departmental
10 commendation?  When you're talking about citizen
11 commendations, department commendations, and community
12 commendations, that would be considered a departmental
13 commendation, correct?
14   A.   Correct.
15   Q.   Can you identify this document for me, please?
16   A.   A letter written to then Chief Payne in October
17 of 1988, thanking the officers for their assistance in a
18 visit by Reverend Jesse Jackson.
19   Q.   Would this be considered a community
20 commendation?
21   A.   Yes.
22        MS. BUTCHER:  Go ahead and mark this as
23 Dietz Exhibit 14.
24        (Dietz Deposition Exhibit No. 14 was marked

9  (Pages 30 to 33)

1  for identification.)
2  BY MS. BUTCHER:
3    Q.   Are both you and now Inspector Howell listed as
4  recipients of this commendation?
5    A.   Yes.
6    Q.   Can you identify this document for me, please?
7    A.   This is a letter written to then Chief of
8  Police Joe Pennell from the assistant director of the FBI
9  National Academy, advising him that I had successfully
10  completed the training for the 140A session in spring of
11  1987, along with transcripts of the grades I received
12  when I was assigned there.
13    Q.   You were currently an investigator in the
14  Criminal Investigations Division at the time you attended
15  the FBI academy; is that correct?
16    A.   I believe so, yes.
17    Q.   It was prior to your promotion to sergeant?
18    A.   Yes.
19    Q.   What was the duration of this program?
20    A.   It's changed over the years, but I believe it
21  was three months back then.  Three to four months.
22    Q.   Were you attending the program full-time?
23    A.   Yes.
24    Q.   How does the department deal with that in terms

1  of is it considered -- I wouldn't assume it would be
2  considered vacation time because you're training.  How
3  does the department handle the time that you're down at
4  the academy in terms of -- is it considered full-pay
5  time, paid full-time training?
6    A.   I'm not sure I understand.
7         MR. NEUBERGER:  She's saying, do you have
8  to work while you're down in school.
9         THE WITNESS:  No.  It's full-time.  You're
10  a full-time live-in student at the FBI National Academy,
11  the training academy.
12  BY MS. BUTCHER:
13    Q.   The records seem to be coming through the
14  University of Virginia.  Is the FBI National Academy at
15  the university --
16    A.   No.
17    Q.   Is it at Quantico?
18    A.   No, but I believe that the instructors at the
19  FBI National Academy, their classes that they teach are
20  certified through the University of Virginia.
21    Q.   Where is the academy actually located?
22    A.   Quantico, Virginia.
23    Q.   It's at Quantico?
24    A.   Yes.  It's the same academy where all the FBI

1  agents and DEA agents attend as well.
2    Q.   Is there a physical training component to that?
3    A.   Yes.
4    Q.   Are there any other current captains who have
5  attended the FBI academy, do you know?
6    A.   Yes.
7    Q.   And who are they?
8    A.   Captain Marlyn Dietz, Captain James Jubb,
9  Captain Bobbie Cummings, Captain Jerry Custis.  I think
10  that's it.
11         (Dietz Deposition Exhibit No. 15 was marked
12  for identification.)
13         MR. NEUBERGER:  Can we take a break?
14         MS. BUTCHER:  Yes.
15         (A recess was taken.)
16         (Mr. Rath entered the room.)
17  BY MS. BUTCHER:
18    Q.   Turning to some of the allegations that are set
19  forth in the complaint, you allege that, at the time of
20  his appointment, you were more qualified than
21  James Wright for the position of inspector of Uniformed
22  Operations.  Do you believe that he was qualified for
23  that position?
24    A.   Yes.

1    Q.   You also allege in the complaint that, at the
2  time of his appointment, you were more qualified than
3  Gilbert Howell for the position of inspector of Uniformed
4  Operations.  Do you believe that Gilbert Howell was
5  qualified for that position?
6    A.   I believe that he was qualified, yes.
7    Q.   Earlier we had discussed the captains at the
8  time of Howell's appointment and whether or not they were
9  qualified for the position of Uniformed Operations
10  inspector.  I'm trying to make sure I'm not mixing the
11  inspectors up.
12         You had stated that Jimmy Jubb was
13  qualified and Victor Ayala and Marlyn Dietz and Finerty
14  were qualified, but you still believe that you should
15  have been -- out of that pool of qualified applicants,
16  you should have been the captain that was selected for
17  that position.
18    A.   I believe I was the most qualified, yes.
19    Q.   What made you the most-qualified applicant for
20  the position over all of the other qualified applicants?
21    A.   I believe that I had the leadership skills
22  necessary for that position.  I believe that my previous
23  experience has made me more qualified.  I believe that
24  the Chief of Police, who is the chief executive officer

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

1  of the department, made it very clear that he thought I
2  was qualified for the position. And for the second
3  promotion he had actually asked for me for that position.
4  I believe that the education background. I believe I
5  have commendations. I believe I have the experience, the
6  knowledge, the skills, and the abilities to do that job
7  and do it well.
8      Q.  Certainly everything that you have listed makes
9  you qualified for the position, but I guess what is it
10  about you that you believe sets you above the other
11  applicants in terms of what is the distinguishing factor
12  that makes you the most qualified?
13     A.  I don't think it's one factor. I think it's
14  many factors. I think my background on the department, I
15  think my previous performance evaluations, my attendance
16  on the department, my leadership abilities, my leadership
17  qualities, how I'm perceived on the department, my
18  community involvement. I think it's really a variety of
19  reasons that makes me stand above the other candidates.
20     Q.  If we can take, I guess, some of those aspects
21  one by one. What about your community involvement do you
22  believe is so much above what any of the other captains
23  may have been doing within the community?
24     A.  Frankly, I don't know of any other captain

1  that's as involved in the community as I have been. I'm
2  on the YMCA Resource Center Board of Directors. I have
3  been a Big Sister to a little sister from the city of
4  Wilmington for over 20 years. I have been involved in
5  the United Way campaign and spearheaded it years ago and
6  then again this year when we doubled the contributions
7  from the police department. I'm involved in a Read Aloud
8  program at the women's prison where I go in and volunteer
9  my time to have female inmates tell stories to their kids
10  which I send to their homes.
11         Many of the things that I have listed in my
12  resume are community-involved activities. I could really
13  go on and on about the different activities, and I
14  honestly don't know anybody who's as involved as I have
15  been. I'm on the committee to select candidates for the
16  Military Academy, which are kids throughout the state of
17  Delaware that try to get into West Point, the Naval
18  Academy, the Air Force Academy.
19     Q.  Are there any other police officers who are on
20  that committee?
21     A.  No.
22     Q.  You also stated that your awards and
23  commendations set you apart from the other candidates.
24  Why is that?

1      A.  Again, it's really the totality of the full
2  picture. It's not just one thing. It's a combination of
3  many things.
4          MR. NEUBERGER: Excuse me. I apologize.
5  You mentioned commendations and awards. I don't think
6  that was in her list. But you did cover it earlier.
7  Just for the record. The record will say whatever it
8  says, but do you want to question her on her
9  commendations and awards?
10         MS. CHEEK: She did actually mention that.
11         MR. NEUBERGER: She did?
12         MS. CHEEK: Yes.
13         MR. NEUBERGER: Go ahead.
14  BY MS. BUTCHER:
15     Q.  You mentioned that as a factor that sets you
16  apart from or a factor to be considered in the
17  qualifications of other candidates. So if other
18  candidates had more commendations and awards, would that
19  be something that you would think would be a valuable
20  thing to consider in determining who was the most
21  qualified candidate?
22     A.  Again, I think it's a combination of all those
23  factors. It's not just one thing in and of itself. You
24  have to look at the total package. And I think it should

1  be based on the recommendations of the Chief of Police.
2      Q.  Why is that?
3      A.  Because he is in charge of the police
4  department, and the person who is assigned as the
5  inspector works directly for the Chief of Police.
6      Q.  And the Chief of Police is appointed by the
7  Mayor, correct?
8      A.  That's correct.
9      Q.  Currently, as the rules and regulations are
10  established, the Mayor also appoints the inspectors who
11  are essentially deputy chiefs of police; is that correct?
12     A.  Yes.
13     Q.  But you don't believe that the Mayor should be
14  allowed to make that appointment?
15     A.  I believe that the Mayor should consider the
16  recommendations of the individual responsible for running
17  the police department and that should be a strong
18  consideration.
19     Q.  Yet you have asserted that the appointment of
20  Inspector Wright was discriminatory; is that correct?
21     A.  Yes.
22     Q.  However, in that case Chief Szczerba did
23  recommend, as he testified at his deposition,
24  Inspector Wright for that position?

1    A.   That's correct.

2    Q.   So you just told me that you think that that is

3    something that should be taken into a strong

4    consideration.

5    A.   I think it should be a consideration, yes.

6    Q.   But in this case it was wrong for the Mayor to

7    have listened to that recommendation by the Chief?

8    A.   That's not what I said.

9    Q.   You have alleged that it's discriminatory.

10   A.   That's based on the information that I found

11   since I sat down and talked to the Chief in January of

12   2006.  Since that time a lot of information came as a

13   result out of hiring an attorney and researching the

14   background of this position, the fact that there's been

15   an obvious quota system in place since at least the

16   1980s, and basing that opinion on a lot of

17   considerations, including the depositions that were

18   given, which you were present for.  I'm basing it on the

19   records that we had the opportunity to go back and

20   review.  I'm basing it on comments that were made by

21   different individuals that have given depositions in this

22   case.

23        So it's based on a number of factors that I

24   believe that race was a factor in why I didn't receive

1    this position.

2    Q.   At which point?  I was talking about the

3    appointment of Inspector Wright.  Are you addressing that

4    specifically, or are you talking about both appointments?

5    A.   Both appointments.

6    Q.   If we can just turn to the appointment of

7    Inspector Wright for a moment.  You had stated that you

8    thought the Mayor should listen to the recommendation of

9    the Chief.  In that case in that appointment the Chief

10   had recommended that Wright be appointed, yet you're

11   still alleging that that decision was discriminatory.

12   What is leading you, I guess, to that decision based on

13   what you have said?

14   A.   Based on all the information that I have found

15   since January of 2006, based on the Chief informing me

16   that this was always a black position, based on the

17   comments that were made to the vice president of the FOP,

18   it's based on all the factors that I know and I sat down

19   and gone through and responded in our interrogatories.

20   There's a wide variety of information that I'm basing

21   that on.  It's not just one thing in particular.

22   Q.   This was also in your interrogatory responses,

23   that in response to the Mayor's interrogatory No. 9, you

24   stated that you had a conversation with Chief Szczezerba

1    after his deposition in the Boyd case regarding his

2    recommendation of you for appointment to the inspector of

3    Uniformed Operations.  I'm quoting from that response.

4    You stated, "Szczezerba stated Baker's appointment was

5    based on race only and it had nothing to do with you

6    personally or your qualifications.  His explanation was

7    simply that it was a black position."

8         MR. NEUBERGER:  Do you know where that was?

9         MS. BUTCHER:  It was in response to

10   interrogatory No. 9.

11        MR. NEUBERGER:  Do you understand what she

12   was saying?

13        THE WITNESS:  Yes.

14        MR. NEUBERGER:  It's in there somewhere.

15        THE WITNESS:  Yes.

16        MR. RATH:  Is this an exhibit?

17        MS. BUTCHER:  No.

18        MR. RATH:  Mark it.

19        MS. BUTCHER:  I'll be right back.

20        (Dietz Deposition Exhibit Nos. 16 and 17

21   were marked for identification.)

22   BY MS. BUTCHER:

23   Q.   As you had stated in that response, you

24   indicated that Chief Szczezerba had stated that Baker's

1    appointment was based on race only and had nothing to do

2    with you personally or your qualifications and that it

3    was simply a black position.

4         Do you remember when that conversation took

5    place?

6    A.   It was the end of January 2006.  It took place

7    in the Chief's office.  I recall that I had to drop off a

8    report to him that he had requested from my office.  And

9    when I was in his office, he told me about -- or

10   basically said he wanted me to know that he had recently

11   given a deposition in a case involving Officer Ken Boyd

12   and that he was asked during the deposition about who he

13   had recommended for the inspector's position, and he

14   wanted me to know firsthand from him that he had

15   recommended me.

16   Q.   He wanted you to know firsthand that he had

17   recommended you.  Did he state -- this is a direct

18   quote -- to the best of your recollection that it was

19   simply a black position?  How did that become part of the

20   discussion if he was discussing that he had recommended

21   you for the appointment when Howell had been appointed?

22   A.   It was really in response to questions I was

23   asking him.  For example, was he aware of any reason why

24   they didn't consider me for that position, was there

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 46

1  something I had done, was there some reason. And he
2  reassured me that, no, it had nothing to do with me or my
3  qualifications and that it was simply a black position.
4      Q.   At that meeting did you discuss the appointment
5  of Inspector Wright?
6      A.   No.
7      Q.   Has the Chief ever said anything to you that
8  indicated that James Wright was not his choice to be
9  appointed to that position at that time?
10     A.   No.
11     Q.   After the appointment of Inspector Howell, did
12 you have any other conversations with the Chief, with
13 Director Mosley, with the Mayor about the appointment?
14     A.   Specifically about the appointment?
15     Q.   Yes.
16     A.   Since the actual promotion?
17     Q.   Since the actual promotion.
18     A.   Well, I had the conversation with the Chief.
19     Q.   Right.
20     A.   In January.
21     Q.   Other than that.
22     A.   I don't believe so.
23        MR. NEUBERGER:  I think you were asking the
24 Mayor, also?  Did you say the Mayor or the Chief?

Page 47

1        MS. BUTCHER:  Yes.  The Mayor or the Chief
2  or Director Mosley.
3        THE WITNESS:  I don't believe so.
4  BY MS. BUTCHER:
5      Q.   You discussed one of the bases for your belief
6  that there's been discriminatory conduct that there is a
7  quota system within the inspector ranks.  Other than the
8  employment records indicating who has held that position,
9  do you have any other document or oral evidence of the
10 existence of the quota system?
11     A.   Other than what the Chief had told me that it
12 was a black position?  There was comments made by
13 Director Mosley that it was his understanding that there
14 was always one white and one black inspector.  There was
15 clear evidence in the personnel records that, whenever a
16 black inspector left the position, a black inspector took
17 his place, and the same for a white inspector.
18        There was comments by George Collins where
19 he gave a deposition about what the Mayor had said to
20 him.  In addition to that, what the Chief said in his
21 deposition regarding race coming up in transfers and all
22 promotions since he's been in his position.  As best as I
23 can recall, that's the primary reasons.
24     Q.   You raised some testimony that was given by

Page 48

1  George Collins, and he's a corporal; is that correct?
2      A.   George Collins?  Yes.  He's currently the
3  president of the FOP.
4      Q.   He was called by you based on his attendance at
5  a meeting.  How did you learn of his, I guess, attendance
6  at that meeting and statements that were made there?
7      A.   Actually, I learned about it through my
8  husband, who had spoken with him.
9      Q.   When did your husband speak with him?
10     A.   I believe it was during the St. Anthony's
11 festival.
12     Q.   Have you ever supervised Corporal Collins?
13     A.   I guess technically, yes, because now he's
14 assigned in-house duty.  He's on administrative duty.  So
15 technically right now he's assigned to Human Resources.
16 Anybody who's assigned to in-house duty falls under my
17 command.  I'm trying to think when he was in Detectives
18 if I was assigned there.  I don't believe he's ever
19 worked directly for me.
20     Q.   At the time of Inspector Stallings' retirement,
21 you were a captain, correct?
22     A.   Correct.
23     Q.   Were you still with Criminal Investigations or
24 had you moved to the Office of Professional Standards?

Page 49

1      A.   I believe I was still in charge of Criminal
2  Investigations.
3      Q.   Did you discuss your interest in the position
4  of inspector of Uniformed Operations with the Chief at
5  that time?
6      A.   No.  I was never asked.
7      Q.   Did you discuss it with Director Mosley at that
8  time?
9      A.   No.
10     Q.   With the Mayor?
11     A.   No.
12     Q.   With Inspector Donohue?
13     A.   No.  I didn't find out about that position
14 being filled till after it was filled.
15     Q.   After it was filled did you have any
16 discussions with anyone about the reasons why
17 Inspector Wright was appointed?
18     A.   I recall that the Chief came into my office
19 when I was in charge of Criminal Investigations to inform
20 me that he wanted me to know before the word came out
21 that Inspector Wright had been selected as the new
22 inspector, and he wanted me to know that personally
23 before the information got out.  He knew that I was
24 probably going to be disappointed, but he really couldn't

13  (Pages 46 to 49)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0294

Page 50

1  give me much more information other than to be patient.
2      Q.   Why did he believe you were going to be
3  disappointed, to the best of your knowledge?
4      A.   I don't know.  You would have to ask him.
5      Q.   Has the Chief ever stated to you that you were
6  more qualified for the position of inspector of Uniformed
7  Operations than James Wright?
8      A.   Has he ever told me?  No.
9      Q.   Can you identify this document for me, please?
10     A.   This is a report submitted to my attorney,
11 Thomas Neuberger, submitted by Tom Borzilleri?  Am I
12 saying that right?
13         MR. NEUBERGER:  Yes.
14         MS. BUTCHER:  Go ahead and mark this as
15 Dietz 18.
16         (Dietz Deposition Exhibit No. 18 was marked
17 for identification.)
18 BY MS. BUTCHER:
19     Q.   You have economic damages.  Is this the report
20 that you're offering in support of your economic damages
21 that you alleged in the complaint?
22     A.   Yes.
23         (Mr. Rath exited the room.)
24

Page 51

1  BY MS. BUTCHER:
2      Q.   Are you offering anything else in support of
3  strictly your economic damages?
4          MR. NEUBERGER:  For the record, I'll
5  stipulate this is it.  We're using an economist.  We're
6  not throwing in any lost overtime jobs or St. Anthony's
7  jobs were denied or anything like that.  Whatever this
8  says about wages or pensions, we're limiting ourselves to
9  whatever is in here.
10         MS. BUTCHER:  Yes.  That's all I wanted to
11 know.
12         THE WITNESS:  Nothing else?
13         MS. BUTCHER:  That's it.  No, I'm not going
14 to make you go through this report.
15         Hold on for just a moment.  I'll be right
16 back.
17         (Discussion off the record.)
18 BY MS. BUTCHER:
19     Q.   Can you identify this document?
20     A.   This is plaintiff's supplemental answer and
21 objections to defendant City of Wilmington's first set of
22 interrogatories.
23     Q.   Does this include a description of the
24 emotional damages that you allege you suffered as a

Page 52

1  result of the allegations contained in the complaint?
2      A.   Yes.
3          MR. NEUBERGER:  Excuse me.  Off the record.
4          (Discussion off the record.)
5  BY MS. BUTCHER:
6      Q.   Since you were not appointed to inspector, you
7  allege you have experienced increased anxiety; is that
8  correct?
9      A.   That's correct.
10     Q.   Increased irritability; is that correct?
11     A.   According to my husband, yes.
12     Q.   Not according to you.
13     A.   I would say that I'm more irritable, yes.
14     Q.   A lack of energy; is that correct?
15     A.   Yes.
16     Q.   Forgetfulness; is that correct?
17     A.   Sometimes.
18     Q.   Difficulty sleeping; is that correct?
19     A.   Yes.
20     Q.   It says in here that you saw a doctor for the
21 sleep issues.  What doctor is that?
22     A.   Dr. Willey and Dr. Kelly.  They have a practice
23 together.
24     Q.   Are they primary care physicians?

Page 53

1      A.   Yes.  Family physicians.
2      Q.   Have you had any night sweats as part of this?
3      A.   I may have.  I know I have woken up a lot more
4  during the night.
5      Q.   Have you had any hot flashes?
6      A.   No.
7      Q.   Have you consulted with a physician about
8  whether any of these symptoms would be attributable
9  possibly to the onset of menopause?
10     A.   Well, that's always in the back of my mind.
11 But whether or not I have sought treatment for that, no,
12 I don't think so.
13     Q.   Have you had any irregular periods?
14     A.   No.
15     Q.   You will be celebrating your 50th birthday this
16 year; is that correct?
17     A.   Yes.
18     Q.   Other than consulting with Dr. Willey and
19 Dr. Kelly with regard to sleep issues, have you received
20 any medical treatment for any physical manifestations?
21     A.   No.
22     Q.   Have you consulted with a psychiatrist or a
23 psychologist in regard to the increased anxiety, the
24 irritability?

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 54

1    A.   Actually, yes, I did.
2    Q.   Who did you consult with?
3    A.   I met with a gentleman who's part of the
4    Employee Assistance Program for the City of Wilmington.
5    His name is Don Lapin.  I had one meeting with him
6    basically to describe the anxiety and the sleeping
7    issues, to reassure that I was doing all the things that
8    I should be doing to cope with that.
9    Q.   You only saw him the one time?
10   A.   Just the one time, yes.  I felt pretty
11   confident after I spoke to him that I was taking all the
12   steps that I needed to to make sure that I was doing
13   okay.
14   Q.   Did he recommend that you seek counseling?
15   A.   He certainly offered that.  I didn't think it
16   was really necessary.
17   Q.   For the sleep issues, were you issued any
18   prescriptions?
19   A.   Yes.
20   Q.   What were you issued?
21   A.   Ambien.
22   Q.   Do you remember the dosage?
23   A.   Not offhand, no.
24   Q.   Have you been taking that regularly?

Page 55

1    A.   Yes.
2    Q.   Are you still taking that?
3    A.   Yes.
4    Q.   Have you found that the Ambien helps with the
5    symptoms?
6    A.   I have found that Ambien helps you get to sleep
7    quicker, but not that the quality of your sleep is really
8    improved.
9    Q.   In the complaint you asserted a list of
10   damages, and I just want to go through each one to make
11   sure that they are still part of your emotional damages
12   package.
13        Are you still asserting that you have
14   emotional pain with relation to this?
15   A.   Absolutely, yes.
16   Q.   Suffering?
17   A.   Yes.
18   Q.   Disappointment?
19   A.   Yes.
20   Q.   Anger?
21   A.   Yes.
22   Q.   Inconvenience?
23   A.   Yes.
24   Q.   Mental anguish?

Page 56

1    A.   Yes.
2    Q.   Loss of enjoyment of life?
3    A.   To some degree, yes.
4    Q.   Mental pain?
5    A.   Yes.
6    Q.   Physical pain?
7    A.   Yes.
8    Q.   And the physical pain is as a result of the not
9    sleeping or is it other --
10   A.   It's almost all associated with not sleeping.
11   It's grinding my teeth at night.  I'm waking up more
12   frequently.  The quality of the sleep is not as good.  I
13   wake up with headaches.  According to my husband, I grind
14   my teeth at night and it wakes him up.  So I'm assuming
15   that's what the headaches are a result of.  Just
16   basically the quality of my sleep has totally changed.
17   Q.   Humiliation?
18   A.   Yes.
19   Q.   Embarrassment?
20   A.   Yes.
21   Q.   Injury to reputation?
22        MR. NEUBERGER:  No, we're not claiming
23   injury to reputation.  We have abandoned that.
24

Page 57

1    BY MS. BUTCHER:
2    Q.   How would you quantify your damages, your
3    emotional damages, monetarily over and above what you
4    have asserted in regard to the economic damages?
5    A.   I'm not sure that I understand the question.
6    Q.   I guess in terms of what kind of recovery would
7    you feel would compensate you for these damages?
8        MR. NEUBERGER:  Excuse me.  Just an unusual
9    question since we're not allowed by court rules to ask
10   for anything -- identify a figure for emotional distress
11   or injury of reputation or humiliation and court rules
12   bar -- it's barred by the Superior Court rule, and the
13   Federal Court has a similar rule.  I don't know how this
14   helps you.
15        MS. BUTCHER:  I'm just trying to --
16   BY MS. BUTCHER:
17   Q.   Would receiving the position be sufficient to
18   compensate you for these damages?  If you were given the
19   position of inspector of Uniformed Operations, would you
20   consider that to be an appropriate compensation for what
21   you have gone through at this point?
22   A.   I don't think you can take back anything that's
23   already occurred.  Certainly I think that I'm qualified.
24   I'm still qualified now, before, and in the future.  I

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0296

1  don't know that you can say that that would take away
2  what's already occurred.  But certainly I still feel that
3  I'm qualified and should be given that opportunity.
4      Q.   I may be getting close to done, though I'm sure
5  that Teri has a few more questions.  Just give me a
6  moment.
7          Recently you submitted an unsworn
8  declaration by former Chief Manelski with regard to
9  events that occurred while he was chief of police.  How
10  did that come about?  What was that the result of?  Did
11  you have conversations with him about the lawsuit where
12  he brought it up?
13      A.   Yes.  We were on our way down to an FBI
14  function.  I believe it was in Maryland.  And he had
15  contacted, actually, my husband and asked if he could
16  hitch a ride with us because it was like a
17  two-and-a-half, three-hour drive, and he lives in North
18  Wilmington.  Throughout the years, whenever we have
19  attended functions, we have given him and other retired
20  people rides.  And on that particular time, he had
21  mentioned -- he had brought up the lawsuit, actually, and
22  had mentioned what had transpired when he was chief.
23      Q.   Did you ask him to make a declaration?  Did he
24  offer to make a declaration?

1      A.   Both, actually.
2      Q.   You said he was attending an FBI function with
3  you.  Is that for graduates of the FBI National Academy?
4      A.   It was actually graduates who were previous
5  presidents.  I'm not positive.  I have to go back and
6  check, because there's functions throughout the year.
7  But I believe it was the time when he was attending a
8  past presidents' luncheon.  My husband was a past
9  president, I'm past president, he was past president of
10  the National Academy years ago.  So all the past
11  presidents are invited to this luncheon once a year.  I
12  believe that was the function that we were all going to.
13      Q.   Just a couple of clean-up details.
14          When were you born?
15      A.   November 1st, 1957.
16      Q.   You were born in?
17      A.   Pittsburgh, Pennsylvania.
18      Q.   You attended high school at?
19      A.   State College High School.
20      Q.   You graduated June 6, 1975; is that correct?
21      A.   Correct.
22      Q.   Then you attended Pennsylvania State
23  University?
24      A.   Yes.

1      Q.   You graduated with a degree in administration
2  of justice; is that correct?
3      A.   That's correct.
4      Q.   Graduated November 1979; is that correct?
5      A.   Yes.
6      Q.   You are married to Captain Marlyn Dietz, who's
7  also an officer in the City of Wilmington Police
8  Department?
9      A.   That's correct, yes.
10      Q.   You were married on September 27th, 1985; is
11  that correct?
12      A.   Yes.
13      Q.   Do you have any other family members who are
14  police officers in the City of Wilmington Police
15  Department?
16      A.   Yes.
17      Q.   Are they current officers?
18      A.   Yes.
19      Q.   Who is that?
20      A.   My brother.
21      Q.   What is his current rank?
22      A.   He's a sergeant in the Criminal Investigations
23  Division.
24      Q.   When did he join the force, do you remember?

1      A.   I think he's close to 20.  So almost 20 years
2  ago.  Not quite, but almost.
3          MS. BUTCHER:  That's all I have for now.
4  I'm going to reserve my right to think up a few more
5  things while Teri's talking.
6          MR. NEUBERGER:  Do you think we should take
7  a lunch break?
8          MS. CHEEK:  Let's take lunch, because it's
9  12:30.
10          MR. NEUBERGER:  Why don't we come back at
11  1:30, then.
12          MS. CHEEK:  That's fine.
13          (A lunch recess was taken at 12:30 p.m.)
14          (The deposition resumed at 1:20 p.m.)
15          (Dietz Deposition Exhibit Nos. 19 and 20
16  were marked for identification.)
17  BY MS. CHEEK:
18      Q.   Good afternoon, Captain Dietz.
19      A.   Good afternoon.
20      Q.   Teri Cheek.  I represent the City of
21  Wilmington.
22          Have you discussed this deposition with
23  anyone other than your attorneys?
24      A.   Yes.

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 62

1  Q.  Who have you talked to about it?
2  A.  Pretty much anybody in my immediate family, my
3  children, my mother, sisters, siblings.
4  Q.  How many siblings do you have?
5  A.  I have one brother and three sisters.
6  Q.  Your brother's name is what?
7  A.  Thomas Spell, S-p-e-l-l.
8  Q.  He's the one that works for the City?
9  A.  Yes.
10  Q.  In the police department as well?
11  A.  Yes.
12  Q.  Are any of your sisters police officers?
13  A.  No.
14  Q.  Have you talked to anyone besides family
15  members about the deposition?
16  A.  General conversations --
17      MR. NEUBERGER:  Excuse me.  You mean
18  today's deposition or the case?
19      MS. CHEEK:  I'm talking about the
20  deposition right now.
21      THE WITNESS:  Have I talked about the
22  deposition today?  No.
23  BY MS. CHEEK:
24  Q.  You have talked to many people about the case?

Page 63

1  A.  I have had a lot of people say things to me
2  since the promotions.
3  Q.  What sort of things do they say?
4  A.  General comments about qualifications.
5  Q.  For example?
6  A.  That I should have been promoted kind of
7  comments.
8  Q.  Expressing sympathy for your side of the case?
9  A.  Yes.  And comments referring to, I'm glad
10  somebody's finally doing something about it.
11  Q.  Has anyone who's a member of a racial minority
12  said anything like that to you?
13  A.  Yes.
14  Q.  Can you tell me who?
15  A.  A lot of people.  I really have to think.  I
16  heard a lot of comments.  A retired major from Delaware
17  State Police.
18  Q.  Who's that?
19  A.  His name is Baylor.  Retired captain from
20  Wilmington Police, George Chambers; my lieutenant who
21  works for me.
22  Q.  Who is that?
23  A.  Lieutenant Townsend.  More of the comments have
24  been directed towards Inspector Howell not coming to work

Page 64

1  and things of that sort.  I'm sure if I thought about it,
2  many other people would come to mind.
3  Q.  Have you attended all of the depositions in
4  this case?
5  A.  Yes.  I believe so, yes.
6  Q.  Have you reviewed any of the deposition
7  transcripts?
8  A.  I wouldn't say word-for-word.  I know I
9  received them from my attorney, but I don't think I
10  reviewed them word-for-word.
11  Q.  Where do you currently live?
12  A.  I live at -- do you want my address?
13  Q.  Yes.
14  A.  101 Pennfield Drive, P-e-n-n-f-i-e-l-d Drive,
15  Kennett Square, Pennsylvania.
16  Q.  How long have you lived there?
17  A.  About seven years now.
18  Q.  Where did you live before that?
19  A.  Well, for 21 years I lived in the city, city of
20  Wilmington, at 3407 Franklin Place.  That's in the city
21  of Wilmington.  Although I lived at other places in the
22  city prior to that.  I didn't live there for 20 years.
23  Most of it was on Franklin Place.
24  Q.  You're currently married; is that right?

Page 65

1  A.  That's correct.
2  Q.  Your spouse is Marlyn Dietz?
3  A.  Yes.  M-a-r-l-y-n.
4  Q.  He works for the City of Wilmington, also?
5  A.  Yes.
6  Q.  For the police department?
7  A.  Yes.
8  Q.  He's also a captain?
9  A.  Yes.
10  Q.  Are you currently under a doctor's care for any
11  reason?
12  A.  Well, I have a general practitioner, and I have
13  regular physicals, and I go to an gynecologist on a
14  regular basis.  But what do you mean by under care?  Like
15  for a specific problem?
16  Q.  Right.
17  A.  Specialist?  No, not a specialist.
18  Q.  When was the last time you saw your doctor or
19  one of your doctors?
20  A.  It's been a couple months.
21  Q.  Are you taking Ambien every night?
22  A.  Sometimes I do, sometimes I don't.  If I'm the
23  duty officer, I don't like to take it because it
24  obviously makes you drowsy and I have to be available and

17 (Pages 62 to 65)

Page 66

1  on call.
2          I actually try to split the tablets because
3  I don't like to take the full dosage. I really try not
4  to take it all the time, but sometimes I just feel like I
5  have to.
6      Q.  Is Ambien the only prescription medication that
7  you're taking?
8      A.  Yes. That's it.
9      Q.  In the past five years, say, have you ever
10  taken any antidepressant medication?
11      A.  No.
12      Q.  You've testified, I think, that you had
13  consulted an EAP person?
14      A.  Yes.
15      Q.  Lapin?
16      A.  Don Lapin.
17      Q.  Do you know how to spell that?
18      A.  I think it's L-a-p-i-n.
19      Q.  Do you know what Don Lapin's credentials are?
20  Is he --
21      A.  I don't know.
22      Q.   -- a social worker?
23      A.  He's actually the person who's the captain of
24  Human Resources. He's the person that I contact to give

Page 67

1  employee referrals to. And when I spoke to him, you
2  know, I kind of told him about the sleeping and I was
3  having problems sleeping. I said I'm doing all
4  the right things. I met with him one time more or less
5  to, I guess, recognize that there wasn't anything else I
6  could or should be doing.
7      Q.  Right. Did you say he was the captain of HR?
8      A.  I am.
9      Q.  As the captain --
10      A.  As the captain I contacted him. I refer people
11  to him.
12      Q.  Do you know whether he's a psychologist or a
13  psychiatrist?
14      A.  I believe he's a psychologist, but I honestly
15  don't know.
16      Q.  You don't know if he's got a Ph.D.?
17      A.  No. I just know that he's the person that I
18  contact. And he will meet with people and then make
19  referrals. So I think he's more or less like the initial
20  person. And I contacted him to explain the Employee
21  Assistance Program to all the new recruits. So he came
22  in and talked to all the recruits and their families. So
23  he's more or less their main contact with the police
24  department, I believe.

Page 68

1      Q.  When did you have this discussion with him?
2      A.  A year ago. I'm not positive. I'd have to
3  check my calendar. I'm thinking it was about a year ago.
4      Q.  Does he work for the City?
5      A.  He works for the Employee Assistance Program,
6  which is HMS. You're going to ask me what that stands
7  for, and I don't recall.
8      Q.  That's all right. Could you give me a
9  description of your current duties?
10      A.  Currently I'm the commanding officer of the
11  Human Resources Division. I'm responsible for all the
12  hiring, for the promotion system on the department, for
13  coordinating that. I'm responsible for the accreditation
14  function, which includes all the policy and procedures
15  for the entire department, all the rules and regulations.
16  I'm responsible for the budget and the grant functions of
17  the department. I'm responsible for the --
18          MR. NEUBERGER: By "department," did you
19  mean the Wilmington Police Department or just your
20  division?
21          THE WITNESS: For the department, the
22  entire department.
23          I'm responsible for the range, the police
24  shooting range. Firearms instruction falls under my

Page 69

1  command. I'm responsible for the planning. Planning and
2  accreditation actually go hand-in-hand. I'm responsible
3  for all the recruitment and the entire training unit for
4  the police department. So any training, including the
5  police academy, when we have one in session -- we just
6  graduated one. We're getting ready to start hiring
7  another one -- that all falls under me as well.
8      Q.  Record-keeping?
9      A.  All personnel records are maintained in my
10  division and all the training records are maintained in
11  my division. I have a clerical person who's responsible
12  for maintaining those files.
13      Q.  What kind of information is kept on computer as
14  opposed to in paper form these days?
15      A.  Well, when I came back to the division, I was
16  there as a lieutenant and ran an academy years ago, all
17  of that information was -- used to be kept in our Human
18  Resources personnel files. And they started changing the
19  training records to a computer program. I'm thinking it
20  was the late '90s. I think it was the late '90s they
21  started keeping that on computer.
22      Q.  Is anything else kept on computer?
23      A.  As far as personnel records?
24      Q.  Yes.

18 (Pages 66 to 69)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0299

1    A.   Well, actually, yes, because large pieces of
2 information are maintained by different people that work
3 for me.  So we regularly keep a seniority list that gets
4 updated whenever people retire or get hired.
5    Q.   Is that in the form of a spreadsheet?
6    A.   Yes.  All of the comp. time records are
7 maintained by my division in the spreadsheet form.  Sick,
8 vacation balances are maintained by the same individual.
9    Q.   Who handles that?
10   A.   Her name is Marsha Ash.
11   Q.   A-s-h?
12   A.   A-s-h.
13   Q.   Anything else kept on computer?
14   A.   That's all I can recall right now.
15        MR. NEUBERGER:  Those were what kinds of
16 records?
17        MS. CHEEK:  Personnel.
18        THE WITNESS:  Personnel records.
19        MR. NEUBERGER:  Personnel.  We're not
20 talking about police academy records or training records
21 or stuff like that?
22        THE WITNESS:  Other than the training
23 records, we do keep some training records on the
24 computer, yes.  The police academy records are not -- are

1 maintained separately in our division, but not --
2 BY MS. CHEEK:
3    Q.   Are you responsible for performance,
4 coordinating performance evaluations for the department?
5    A.   Actually, performance evaluations used to come
6 through City Personnel, and City Personnel on their
7 anniversary date would send the performance evaluations
8 down through my office.  That was always done on a
9 regular basis.  When I came back to the division, I found
10 that they were not maintaining that on a regular basis
11 anymore, and, in fact, I just had the same civilian
12 contact them to get all that information out again,
13 because they had fallen behind.
14   Q.   By "the same civilian," you mean Marsha Ash?
15   A.   Marsha Ash, yes.  So that was something that
16 originated in City Personnel, but we have sort of taken
17 the ball on it, picked up the ball on it, because it was
18 lagging behind.  Also accreditation requires performance
19 evaluations as well.  So that's another reason why we
20 started doing it.
21   Q.   In the chain up from you where you are now, you
22 report to whom?
23   A.   Inspector Martin Donohue.
24   Q.   And Donohue reports to?

1    A.   Chief Szcezerba.
2    Q.   How many people do you supervise currently?
3    A.   Can you give me a minute here?  Thirteen, plus
4 the police academy, plus however many are in the academy.
5 The last academy was 32.  This academy coming up will
6 probably be about 45.
7    Q.   So the people that are enrolled in the academy
8 are reporting to you as their commanding officer?
9    A.   Yes.
10   Q.   I'm looking for your resume that was Dietz 1.
11 Looking at that resume, I just wanted you to confirm that
12 everything on there is entirely accurate.
13   A.   I believe that it should be accurate, except
14 that there's some things that are missing from there
15 that, last night when I was reviewing it, I went through
16 and realized there was quite a few things missing as far
17 as past assignments, current positions.  And in the
18 Wilmington College, I got an A minus in one of my
19 classes.  So I believe now my GPA is a 3.97.  So that
20 might have changed.  I'd have to pull the transcript.
21 But it's not a 4.0.  And I believe the dates are
22 accurate, but I'd really have to check my personnel
23 records to make sure that it's all exactly the same.
24   Q.   Let me test your memory here a little bit.

1        When you were a patrol officer, tell me
2 what your duties were in that role.
3    A.   Handling calls for service.
4        MR. NEUBERGER:  I'm sorry.  What did you
5 say?
6        THE WITNESS:  Handling calls for service.
7        MR. NEUBERGER:  I'm sorry.  I didn't hear
8 you.
9        THE WITNESS:  That's the primary.  There's
10 lots of other duties, but that's the primary duty.
11 BY MS. CHEEK:
12   Q.   To whom did you report?
13   A.   I reported to a sergeant.
14   Q.   Do you remember who it was?
15   A.   I worked for several sergeants in patrol.  I
16 worked for Jack Sines I worked for Ron Stewart, I worked
17 for Ed Head I worked for Paul Cooper, I worked for
18 Richard Spencer.
19   Q.   I'll stop you there because we will have to
20 spell all these.
21        Do you remember who the inspector was that
22 was in charge of the Patrol Division when you were in it
23 back in 1980 and 1981?
24   A.   Well, there were four inspectors when I came

19 (Pages 70 to 73)

Page 74

1  out of the academy, I believe, and I believe it was
2  Inspector Maloney, but I don't know for sure.
3  Q.  So he was over the Patrol Division?
4  A.  I'm not sure.
5  Q.  Was Miles one of the inspectors when you came
6  out of the academy?
7  A.  I believe he was an inspector, yes.
8  Q.  Was he inspector of services?
9  A.  Again, this was 28 years ago, but I believe he
10  was in charge of Community Services, which was a separate
11  division.
12  Q.  What did Community Services do?
13  A.  I think the Youth Aid Division, the GREAT.
14  That's an acronym.  Like a gang resistance officer.  And
15  the DARE school officers fell under Community Services.
16  Crime prevention, I believe.
17  Q.  Anything else that you remember?
18  A.  No.
19  Q.  Do you remember there being an inspector of
20  Administration?
21  A.  I'm not sure what their titles were.  They have
22  changed over the years several times.  We went from four
23  inspectors down to three, then down to two.  And even
24  during the time that there was two inspectors, they have

Page 75

1  also changed titles over the years.
2  Q.  Do you remember there being an inspector of
3  Staff Inspections?
4  A.  I believe so, yes.
5  Q.  Do you have any idea what the chief of Staff
6  Inspections did?
7  A.  That would have been Internal Affairs and maybe
8  something else.  I don't recall.
9  Q.  From 1980 to 1989, would you say that you
10  spent -- how much time altogether would you say you spent
11  actually on the street patrolling?
12  A.  As a patrol officer.  Three years.
13  Q.  From 1980 to 1989?
14  A.  Well --
15  Q.  In that time period?
16  A.  Yeah.  I'm kind of piecing it together, because
17  I was detailed to the Drug, Organized Crime and Vice
18  Division while I was actually assigned to the Patrol
19  Division as an officer.  So it was a detail, it wasn't
20  actually a transfer.  And then I went back to patrol
21  after I did that detail.  I'm thinking it was about
22  three -- maybe three and a half years that I spent in the
23  Patrol Division in uniform.
24  Q.  When you were in the Drug, Organized Crime and

Page 76

1  Vice Division, what kind of work were you doing?
2  A.  All I did was undercover work and bought drugs
3  throughout the city.
4  Q.  Then when you went to Criminal Investigations,
5  what kind of work was that?
6  A.  I was a detective.
7  Q.  And today that's the function that reports to
8  Investigative Operations?
9  A.  Today, yes.  I don't know what it was back
10  then.  I think there was a separate inspector, actually,
11  that was in charge of Investigations.
12  Q.  There was a Criminal Investigations --
13  A.  I think there might have been.
14  Q.  -- inspector?
15  A.  Something similar to that.  It might have
16  fallen under Operations.  At one point I remember the
17  department was split along administrative duties and
18  operation duties, and operations included patrol,
19  detectives, and the vice squad.  And that Human
20  Resources, Internal Affairs, support services,
21  administrative duties fell under another side.  And like
22  I said, I'd have to go back and look at how the
23  department was divided, but that's changed quite a few
24  times since I have been on the department.

Page 77

1  MS. CHEEK:  Let me get this marked.
2  (Dietz Deposition Exhibit No. 21 was marked
3  for identification.)
4  BY MS. CHEEK:
5  Q.  You have got in front of you Dietz 21, which
6  was the document that was marked at the Szcezerba
7  deposition as Exhibit 2.  Then you have got Dietz 20,
8  which I'll represent to you is my attempt to make a list
9  of the inspectors since about 1980 through the present.
10  A.  Okay.
11  Q.  Let me ask you about Dietz 21 to start with.
12  Did you put together this particular list of inspectors?
13  A.  Yes.
14  Q.  So this wasn't created by your attorney, it was
15  created by you?
16  A.  It was created by me by going through some old
17  seniority lists.
18  Q.  So you looked at seniority lists?  Did you go
19  to any of these individuals' personnel files to look at
20  their file jackets to see what their actual assignment
21  was or title?
22  A.  No.  I would think that their personnel files
23  would be more accurate.
24  MS. CHEEK:  Have you received the personnel

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 78

1  file documents relating to these --
2        MR. NEUBERGER: Go ahead.
3        MS. CHEEK: -- related to this list?
4        MR. NEUBERGER: This here? This
5  Exhibit 20?
6        MS. CHEEK: No.
7        MR. NEUBERGER: Exhibit 21?
8        MS. CHEEK: No. I'm talking about the
9  underlying personnel file documents. I'm asking whether
10 we sent them over to you or not.
11       MR. NEUBERGER: No.
12       MS. CHEEK: We haven't?
13       MR. NEUBERGER: We're off the record.
14       (Discussion off the record.)
15 BY MS. CHEEK:
16    Q.  You would concede that this Szcezerba Exhibit 2
17 and also Dietz 21 is not an entirely accurate and
18 complete picture of who the inspectors were and what they
19 did?
20    A.  Well, it looks like your list is more
21 encompassing. You have more people. So I think you went
22 back further than this other list reflects. So you
23 definitely have more people.
24    Q.  I don't really think there are more people. I

Page 79

1  think some of the people had more than one assignment.
2  So in other words, Doherty was inspector of Services and
3  then inspector of Staff Inspections. He was two. He was
4  inspector twice over two different --
5        MR. NEUBERGER: Is yours alphabetical?
6        MS. CHEEK: It's alphabetical.
7        THE WITNESS: I don't see Maloney on mine.
8        MS. CHEEK: You're right.
9        THE WITNESS: I don't see Charlie Bryan.
10       MR. NEUBERGER: Charlie who?
11       THE WITNESS: Charles Bryan. I don't have
12 Lawrence Curtis. I don't have Stan Friedman. And I
13 don't have -- I think that's it.
14 BY MS. CHEEK:
15    Q.  At some point we will be able to come to some
16 sort of agreement as to who is who.
17       Then it looks like in '89 -- I'm looking
18 now at Dietz 1, your resume. From '89 to '90 you were in
19 the Uniformed Services area again as a supervisor? Is
20 that correct?
21    A.  Yes.
22    Q.  What were your duties in that role?
23    A.  I was the platoon squad sergeant in charge of
24 all the officers assigned to the east side of Wilmington.

Page 80

1    Q.  You were in that for a little over a year, year
2  and a halfish?
3    A.  Yes.
4    Q.  To whom did you report at that time?
5    A.  To the patrol lieutenant.
6    Q.  Do you remember who the inspector was at that
7  time for your area?
8    A.  I don't recall.
9    Q.  Then you went to the Office of Professional
10 Standards after that?
11   A.  Yes.
12   Q.  You were an investigator there?
13   A.  Yes.
14   Q.  For how long?
15   A.  For about a year.
16   Q.  What were your duties in that role?
17   A.  I investigated complaints against police
18 officers, and I investigated any reports coming through
19 Internal Affairs regarding use of force, use of deadly
20 force, high-speed pursuit, traffic accidents.
21   Q.  To whom did you report?
22   A.  When I first was there, I reported to, I think
23 it was, Captain Michael Alfree and then it changed to
24 Captain John Lednum.

Page 81

1    Q.  In 1989, when you went back to the patrol
2  platoon squad, was that at that point that you were
3  promoted to sergeant? Were you sergeant at that time?
4    A.  Which time are you referring to?
5    Q.  Supervisor of --
6    A.  Yes, I was a sergeant.
7    Q.  Then late '91 to early '93 you were in
8  Uniformed Services again?
9    A.  Yes.
10   Q.  What were your duties at that point?
11   A.  I was the commander of a patrol platoon. It
12 was F platoon.
13   Q.  Was that a geographical sort of assignment?
14   A.  No. I was the watch commander. Pretty much
15 from 4 o'clock in the evening to 8 o'clock the following
16 morning, you're responsible for the entire city from a
17 patrol function.
18   Q.  What was your rank at that point?
19   A.  Lieutenant.
20   Q.  Who was your supervisor?
21   A.  I don't recall. I can take a guess, but it
22 would only be a guess. It might have changed during that
23 time period as well.
24   Q.  Then after that you went to HR, Human

21 (Pages 78 to 81)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 82

1  Resources, correct?
2      A.   Yes.
3      Q.   What did you do when you were in HR at that
4  time?
5      A.   I commanded a police academy. I was in charge
6  of the hiring process of the 83rd police academy.
7      Q.   Anything else?
8      A.   I was in charge of the training, the training
9  function of the department. Actually, there were only
10  two lieutenants in Human Resources then. Now there's
11  two. But anything that I mentioned as a captain also
12  fell under me as a lieutenant. I was just -- I reported
13  to the captain.
14      Q.   Who was the captain?
15      A.   The captain was John Vignola.
16      Q.   Was there a reorganization of the department at
17  around that time, 1993, do you remember?
18      A.   I remember that there was a reorganization in
19  '95 and '96 because I ended up commanding two divisions
20  as opposed to one, and that was because of a
21  reorganization. I believe that the inspectors during
22  those years at different times commanded different
23  divisions. It always hasn't been the same. In other
24  words, what the inspectors are in charge of now I know

Page 83

1  has changed over the years. I couldn't tell you when.
2      Q.   Let's look at 3, Dietz 3, which you should
3  have.
4      A.   Okay.
5      Q.   Down at the bottom it says, 22nd of November,
6  1993.
7      A.   Right.
8      Q.   On both of these pages.
9      A.   Right.
10      Q.   Were these the only inspector positions as of
11  November 22nd, 1993?
12      A.   I don't know, because the dates on the bottom,
13  the changes could have been that the divisions changed,
14  the changes could have been the content of the directive,
15  the changes could have been update in a title.
16      Q.   You're talking about the --
17      A.   The date down here.
18      Q.   The date down here?
19      A.   Yeah.
20      Q.   If this had been revised since then, would
21  there be a different date at the bottom?
22      A.   Any time there's a revision to a directive, it
23  should be reflected on the date of the page, because
24  sometimes you go through and you may change only two

Page 84

1  pages of a directive. At one point that's what they did.
2  They would come in and you could see what page 2 is a
3  different date and page 3 is a different date, which told
4  you that they only changed those pages.
5      Q.   So this would be the last revision date down
6  here at the bottom of the page on P11?
7      A.   It could have changed since then, too. I don't
8  know.
9      Q.   I guess what I'm asking is these two documents
10  are P11 and P12 and were produced by you. Do you know
11  whether these are the most recent versions of these
12  directives?
13      A.   To my knowledge, this is the most recent, but I
14  can tell you that, looking at it, there have been
15  changes. For example, Internal Affairs is no longer
16  called Internal Affairs. Personnel Planning is no longer
17  called Personnel Planning.
18      Q.   It's HR now, Human Resources?
19      A.   Yes. We don't have a Traffic Division anymore,
20  which is on directive 3.0. We don't have a Community
21  Services Division anymore.
22      Q.   Anything else?
23      A.   Can I read them?
24      Q.   Sure.

Page 85

1      A.   Those are the main things that stand out.
2      Q.   So the Human Resources area is part of what is
3  now Investigative Operations; is that right?
4      A.   Yes.
5      Q.   You went back to the investigations area from
6  June '95 through October 2001?
7      A.   Yes.
8      Q.   That's part of what's now the Investigative
9  Operations side?
10      A.   Now it is, yes.
11      Q.   Office of Professional Standards is also on
12  that same side?
13      A.   Now it is, yes.
14      Q.   Human Resources Division is also now on that
15  same side?
16      A.   Yes.
17      Q.   Would you agree that most of your experience
18  has been in what is now the Investigative Operations side
19  of the department?
20      A.   Well, depending on what my assignment was at
21  the time. I mean, a lot of your experience really flows
22  on both sides of the department.
23      Q.   But in terms of the functions that you were
24  performing and what is now the Investigations side as

22 (Pages 82 to 85)

Page 86

1  opposed to what is now Uniformed Operations, most of your
2  experience has been on the Investigations side?
3     A.  Yes, I would say that.
4     Q.  Have you ever examined Gilbert Howell's history
5  with the police department in terms of his assignments
6  and experience?
7     A.  Other than listening to his deposition, no, not
8  really.
9     Q.  Have you ever looked through his personnel
10  file?
11     A.  No. I'm sorry. Can I correct that?
12     Q.  Sure.
13     A.  When I was the captain of Internal Affairs, I
14  actually did review his personnel file because of an
15  investigation that I handled.
16     Q.  What investigation was that?
17     A.  An investigation where he failed to complete
18  his firearms training.
19     Q.  That was in 2005? End of 2004, beginning of
20  2005? Or was it later?
21     A.  I don't recall the exact date.
22     Q.  Do you recall whether it was before he was
23  promoted to inspector or appointed to inspector?
24     A.  It was before.

Page 87

1     Q.  What brought that to your attention?
2     A.  I was in charge of Internal Affairs and a
3  complaint was referred to IA for a list of officers who
4  didn't complete their firearms training. So at the end
5  of every training cycle, the range officer will report
6  who didn't complete their firearms training. The captain
7  of Human Resources, who was Captain Maggitti, then
8  referred his complaint to me. Because it was another
9  captain, I investigated it myself. I would not have
10  referred it to a sergeant. Part of that investigation
11  included reviewing personnel files.
12     Q.  So this was a referral from Captain Maggitti,
13  who was chief of Human Resources at that time?
14     A.  Commanding officer, yes.
15     Q.  Had you ever previously been involved in any
16  kind of investigation into conduct by Gilbert Howell?
17     A.  Yes.
18     Q.  Can you tell me about that?
19     A.  When I was a sergeant, there was an
20  investigation on his platoon where myself, the other
21  sergeants, and I believe everybody on the platoon were
22  interviewed by the captain of Internal Affairs and I
23  believe the captain of the Patrol Division regarding then
24  Lieutenant Howell's conduct as the commander of the

Page 88

1  platoon.
2     Q.  What sort of conduct was at issue?
3     A.  There was conduct regarding his ability to
4  lead. It was conduct or complaints about certain
5  officers getting preferential treatment. There was a
6  complaint about him, meaning Lieutenant Howell, referring
7  to Asian people as "chinks." There was a complaint about
8  how he referred to female officers as "hon" or
9  "sweetheart." There was a complaint about him advising
10  myself, who was a sergeant, and another female to leave
11  roll call so he could tell a dirty joke. That's the most
12  I can recall right now.
13     Q.  Do you know what the outcome of that
14  investigation was?
15     A.  I know he was removed from his command and
16  reassigned to another platoon. I later received a letter
17  saying that he was sent to supervisory training and I'm
18  thinking like diversity training or something to that
19  effect, and that it was handled on a training basis.
20     Q.  Where did the letter come from?
21     A.  I believe it was the Chief, Chief Sapp I
22  believe is the one that sent the letter.
23     Q.  Do you still have a copy of that letter?
24     A.  I may have. I'd have to look for it.

Page 89

1     Q.  Do you know whether you produced it already in
2  this --
3     A.  No.
4         MR. NEUBERGER: I don't think I have seen
5  it. If you will just send me an e-mail to remind me, we
6  will try to send that to you.
7  BY MS. CHEEK:
8     Q.  Do you know when that was?
9     A.  It would have been 1989, I believe. '88, '89.
10     Q.  Have there been any other occasions when you
11  have been involved in an investigation into
12  Gilbert Howell's conduct?
13     A.  Not that I recall. But I was in Internal
14  Affairs for quite a while, so there is a possibility that
15  something else came through the office during that time.
16  Nothing stands out in my mind right now.
17     Q.  Were you ever involved in any cases in which
18  you investigated or handled in any way complaints
19  regarding James Wright?
20     A.  Yes.
21     Q.  Can you tell me about that?
22     A.  I know that -- I believe two of his
23  failing-to-supervise complaints occurred either when I
24  worked with him or when I was in Internal Affairs. I

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0304

1  believe I was in Professional Standards for at least one
2  of those complaints, and I know he was charged. I was
3  not the investigating officer, but I sat in and assisted
4  then Sergeant Stallings, who handled the investigation.
5     Q.   Anything else that you recall with regard to
6  Wright?
7     A.   I know I wasn't directly involved in any of his
8  investigations. I'm not sure if I had any outside
9  responsibility. It may have been when I was assigned
10  there. I just don't recall.
11    Q.   With regard to the records and the purging of
12  records in Professional Standards, also known as IAD, why
13  are records purged?
14    A.   Well, we actually have a directive that covers
15  that about how long complaints are kept, and if a
16  complaint is unsubstantiated, it's not kept in your
17  permanent file after five years. It's destroyed. I
18  believe that's also by state law and the police officers'
19  bill of rights. But most of the records that are
20  destroyed are not complaints as people may think Internal
21  Affairs handles. A lot of them are reports of like a
22  traffic accident. Any time an officer is involved in an
23  accident, if they're disciplined and they're found at
24  fault, then it goes in their substantiated file. So it

1  would never be destroyed. But if somebody else,
2  civilian, ran a red light and hit the officer, we would
3  maintain that report for a certain time period, and then
4  after a while it would be destroyed.
5         So a lot of those records that are expunged
6  or destroyed, they're not actual complaints as most
7  people refer to them.
8     Q.   I understand. As you said, they're instances
9  of display of a firearm or use of force?
10    A.   Things that are monitored by Internal Affairs.
11    Q.   So the effect of purging a violation is that
12  the documents are removed and destroyed, removed from the
13  file and destroyed?
14    A.   Yes.
15    Q.   There are types of records that cannot be
16  purged?
17    A.   Substantiated complaints.
18    Q.   They stay in the file permanently?
19    A.   Yes.
20    Q.   Does the IAD, or now the OPS, concern itself
21  with failures of officers to satisfy the residency
22  requirement?
23    A.   Yes.
24    Q.   Does that get recorded on the punishment log?

1     A.   Well, actually the log regarding residency has
2  changed over the years. So I guess it would depend on
3  what time period you're referring to. At one point it
4  was not investigated by Internal Affairs. At other times
5  it was investigated by Internal Affairs. And actually,
6  the law changed within probably the last five years.
7     Q.   In what respect did it change?
8     A.   Well, the City of Wilmington had a Residency
9  Review Board that was responsible for investigating any
10  allegations of any city employees that were not residing
11  in the city limits. I believe a grievance was filed by
12  the FOP, claiming that any investigation involving an
13  officer per the bill of rights should be investigated by
14  another officer as opposed to a civilian. Some
15  compromise was reached between the FOP and the city
16  administration to refer complaints, residency complaints,
17  back to Internal Affairs.
18    Q.   That's been within the last five years?
19    A.   Yes. But previously -- earlier in my career
20  Internal Affairs handled those complaints as well. I
21  couldn't tell you the exact time period.
22    Q.   So if someone was disciplined for not meeting
23  the residency requirement, maybe it would be in the
24  punishment log and maybe it wouldn't, depending on

1  whether the IAD was then enforcing it or not?
2     A.   Can you repeat that?
3     Q.   I'm asking you about would that explain why
4  perhaps a violation of a residency requirement would not
5  be in the punishment log? Is this something that always
6  gets put in the punishment log?
7     A.   I guess if it was investigated outside of
8  Internal Affairs, it may have been excluded. When you
9  talk about the punishment log, are you referring to the
10  entire file or are you referring to --
11    Q.   I'm talking about the list. There's a list of
12  infractions with the punishment next to it.
13    A.   I'm not sure.
14         (Dietz Deposition Exhibit No. 22 was marked
15  for identification.)
16  BY MS. CHEEK:
17    Q.   You have been handed Dietz Exhibit 22, which is
18  Bates numbered beginning at P38 and ending at P42. Do
19  you recognize these pages?
20    A.   Yes.
21    Q.   Can you tell us what they are?
22    A.   It is Chapter 2 of the Personnel Department of
23  the City of Wilmington. It has various sections about
24  the personnel code.

Page 94

1    Q.   Is this something that you're familiar with
2  because of your HR function?
3    A.   Yes.
4    Q.   These are from the city charter?  From the
5  municipal code, correct?
6    A.   Yes.
7    Q.   There are nondiscrimination provisions in here,
8  correct?
9    A.   Yes.
10    Q.   In your function as commander of the Human
11  Resources function for the police department, do you play
12  any role in enforcing the city's nondiscrimination
13  policies?
14    A.   I play a role as far as for making the training
15  for city personnel.  Any complaints are typically
16  referred to Internal Affairs if an employee wants to take
17  that route.
18    Q.   If somebody came to you and said, I feel I have
19  been discriminated against based on race or gender or
20  religion or whatever, you would refer that to Internal
21  Affairs?
22    A.   It depends on whether it's a sworn officer,
23  civilian.
24    Q.   If it was a sworn officer, you would refer it

Page 95

1  to Internal Affairs?
2    A.   It would depend on who they're complaining
3  against.
4    Q.   Sworn officer complaining about another sworn
5  officer, you would send them to Internal Affairs?
6    A.   That could be a possibility.
7    Q.   What would another possibility be?
8    A.   They could report it to City Personnel.  They
9  can make an official complaint.  I believe there's an
10  option of making a complaint directly to the Chief if
11  it's somebody in your chain of command.
12    Q.   Anything else, any other options for people
13  that have complaints about discrimination?
14    A.   They can file suit and/or seek legal guidance.
15    Q.   When you came to the realization or the belief
16  that you had been discriminated against yourself, what
17  were the options available to you?
18    A.   In my opinion, the only option that was
19  reasonable at that point was to get legal guidance.
20    Q.   Did you have any understanding as to whether
21  you could file a discrimination charge with the state
22  Department of Labor or the United States Equal Employment
23  Opportunity Commission?
24    A.   At that point I really didn't -- I really

Page 96

1  hadn't decided anything.  I just wanted to speak with
2  somebody, which is why I contacted Mr. Neuberger, and
3  really depended on his guidance on how the matter should
4  be handled.  I know there's various ways that any type of
5  legal issue can be handled, but I'm not really the best
6  person to make that decision.  It's something I felt I
7  needed some additional guidance from Mr. Neuberger, which
8  is why I contacted him.
9    Q.   Was it a deliberate decision on your part not
10  to file a discrimination charge?
11    A.   Again, I sought the advice of an attorney on
12  what was the best avenue to take to remedy what I thought
13  was an obvious case of discrimination.
14    Q.   Have you actually provided training regarding
15  the city's discrimination policies?
16    A.   No.
17    Q.   Have you ever received any training on the
18  city's discrimination policies?
19    A.   Yes.
20    Q.   Can you tell me about the training that you've
21  received?
22    A.   It was quite a while ago.  I believe it was
23  somebody from City Personnel came down, and everybody was
24  required to attend some training.  I don't believe it

Page 97

1  was -- I think it was training on how to make a report,
2  and training on performance evaluations might have been
3  part of it as well.  It was pretty brief.  It wasn't
4  really detailed.
5    Q.   Are you aware of any policy, any written
6  policy, of the City of Wilmington or of the Wilmington
7  Police Department that says that appointments or
8  promotions should be made based on race?
9    A.   Should be made?
10    Q.   Yes.
11    A.   Based on race?
12    Q.   Yes.
13        MR. NEUBERGER:  She's saying a written
14  policy.
15    A.   To my knowledge, no.
16    Q.   In fact, it says just the opposite, correct?
17    A.   I believe so, yes.
18    Q.   The same goes for gender?
19    A.   Yes.
20    Q.   Has anyone ever told you that you should make
21  an employment decision based on gender or a hiring or
22  promotion decision, for example?
23    A.   Maybe an assignment to search a female
24  prisoner, but other than that, no.

25  (Pages 94 to 97)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0306

1    Q.   Has anyone ever told you that you should base
2  an employment decision on race?
3    A.   No.
4    Q.   Have you ever told anybody to make a decision,
5  an employment-related decision, based on race?
6    A.   No.
7    Q.   Or on gender?
8    A.   No.
9    Q.   Are you claiming that the denial of appointment
10 that we have been talking about today to the inspector
11 position are based on sex?
12   A.   Yes.
13   Q.   Who do you claim discriminated against you
14 based on sex?
15   A.   Mayor Baker.
16   Q.   Anyone else?
17   A.   No.
18   Q.   Has Mayor Baker ever made any comments to you
19 that you interpreted as demonstrating gender bias against
20 you?
21   A.   No.
22   Q.   Has anyone ever told you about comments made by
23 Mayor Baker that you interpreted as manifesting gender
24 bias?

1    A.   No.
2    Q.   Have you ever heard Chief Szcezerba make any
3  comments that you viewed as demonstrating gender bias?
4    A.   No.
5    Q.   What about Bill Montgomery?
6    A.   No.
7    Q.   How about James Mosley?
8    A.   No.
9    Q.   With regard to the race discrimination claim
10 that you were denied appointment to the inspector
11 position when James Wright was appointed and when
12 Gilbert Howell was appointed, are you claiming that only
13 Mayor Baker was the person discriminating against you?
14   A.   I believe that he definitely discriminated
15 against me, because he was the ultimate decision maker.
16 Whether or not he received any other guidance from
17 anybody else, I don't know.
18   Q.   You talked earlier in response to questions
19 that what made you think you were the victim of race
20 discrimination, that it was a variety of factors,
21 including conversations and documents that you reviewed.
22       Have you produced all of the documents to
23 us that you reviewed in reaching that conclusion?
24       MR. NEUBERGER:  You have got all our

1  documents.  We don't have any documents --
2        MS. CHEEK:  That's not my question, because
3  I don't know whether there are other documents perhaps
4  she didn't have the ability --
5        MR. NEUBERGER:  That she hasn't given me
6  yet?
7        MS. CHEEK:  Yes.
8    A.   The only thing that I can't find is my
9  calendar, but other than that, I'm pretty sure I have
10 been able to locate everything.  I still feel I'm going
11 to be able to find my calendar.
12   Q.   Has Mayor Baker ever made any comments to you
13 that you interpreted as demonstrating racial bias against
14 you or against anyone else?
15   A.   Other than his deposition?  No.
16   Q.   You think that at his deposition he made
17 comments that demonstrated racial bias?
18   A.   Yes.
19   Q.   What?
20   A.   His comments about all things equal, that he
21 would consider race.
22   Q.   Anything else?
23   A.   I think his comments about Gilbert Howell being
24 more competent indicates to me that race is a

1  consideration.
2    Q.   What's the connection?
3    A.   What do you mean by "the connection"?
4    Q.   You said he thought Gilbert Howell was more
5  competent and, therefore, race must be a consideration.
6  Is that what you're saying?
7    A.   I'm saying that the evidence is clear that he
8  is not as qualified as I am.  And based on the totality
9  of all the issues, information from the records,
10 information from depositions, information gathered
11 through documents, I think all of that collectively is an
12 indication that he discriminated based on race or gender.
13   Q.   Would you think that was true even if he had
14 never looked at all the documents that you have looked
15 at?
16   A.   Well, I believe he said that he reviewed
17 resumes.  I believe he said he -- I know he told me that
18 he was impressed by the qualifications of all the
19 staff --
20       MS. CHEEK:  Do you want to take a little
21 break?
22       (A recess was taken.)
23 BY MS. CHEEK:
24   Q.   The question that you were in the process of

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

1 answering, and I don't know whether you were finished or
2 not, was things that Mayor Baker had said that you
3 interpreted as demonstrating bias based on race. So I
4 think you had said he reviewed the resumes, he told you
5 he was impressed by the qualifications of all staff.
6 Anything else?
7    A.  Based on his comments to George Collins, based
8 on comments made regarding consideration given to people
9 if all things were equal, based on the fact that the
10 Chief of Police explained in detail why I was more
11 qualified, based on the fact that he chose to ignore that
12 information, based on the fact that he didn't take the
13 opportunity to review my record or anybody else's.
14    Q.  Anything else? I was actually just asking
15 about comments that he made. This is still things that
16 he said at his deposition?
17    A.  Again, it's really the totality of it. It's
18 not one particular thing. It's really a combination.
19    Q.  Outside of his deposition, he did not make any
20 comments to you that demonstrated racial bias?
21    A.  No.
22    Q.  What about Bill Montgomery, has he ever made
23 any comments that you interpreted as demonstrating racial
24 bias?

1    A.  I believe in his deposition he also said that
2 all things equal, that diversity would be something that
3 he thought the Mayor would consider. I believe he said
4 that -- I think he said that regarding Director Mosley as
5 well about asking questions about people's race and
6 gender whenever a promotion or transfer was made.
7    Q.  Do you consider diversity to be the equivalent
8 of discrimination; in other words, if someone's trying to
9 achieve diversity, do you consider that the same thing as
10 discrimination?
11    A.  No, absolutely not.
12    Q.  Can you explain that to me? Because when I
13 asked you about racial bias, you said that
14 Bill Montgomery said that diversity would be considered
15 by Mayor Baker.
16    A.  I'm referring to my case. I'm not referring to
17 other incidents. I'm referring to me.
18    Q.  So you don't view the appointment of
19 Gilbert Howell or James Wright to have anything to do
20 with diversity. Is that what you're saying?
21    A.  I don't know the reasons why they were
22 promoted. I can't answer that question. I can tell you
23 that I believe I'm more qualified for the job, that I
24 wasn't considered, and I think that there's been a

1 long-standing history of a quota system. I'm not
2 included in that system.
3    Q.  What makes you think that you weren't
4 considered?
5    A.  I think it's very obvious I wasn't considered.
6 Again, it would be the totality of all the information
7 that I know, based on what the Chief told me. The Chief
8 said it was a black position. So that tells me I wasn't
9 considered.
10    Q.  What made the Chief think that it was a black
11 position?
12    A.  I don't know. You'd have to ask him.
13    Q.  So you're saying the Chief said to you, this is
14 a black position?
15    A.  When I asked him if there was something about
16 my qualifications or something, some reason why I was not
17 considered, his response was it had nothing to do with
18 you or your qualifications, it was always a black
19 position. That's what the Chief told me.
20    Q.  Let's talk a little bit about how you found out
21 about the promotion, what happened around that period of
22 time.
23         How did you find out about the opening that
24 Gilbert Howell eventually filled for the inspector job?

1    A.  It was announced.
2    Q.  How was it announced?
3    A.  A memorandum was sent to all personnel.
4    Q.  What did the memo say?
5    A.  Effective whatever the date was, that
6 Gilbert Howell received the position.
7    Q.  I'm talking about the opening. How did you
8 find out about the opening?
9    A.  Well, everybody knew there was an opening when
10 Jimmy Wright announced that he was retiring. That
11 automatically told people there was an opening.
12    Q.  What did you do after you found out about
13 Wright's retirement?
14    A.  Actually, I went on a surprise anniversary trip
15 with my husband right after he had announced, and when I
16 came back to work, which would have been towards the end
17 of October, everybody in the building was talking that
18 Gilbert Howell had been selected to the position. It was
19 really all over the department in great detail.
20    Q.  What do you mean when you say "great detail"?
21    A.  I mean details such as Bobbie Cummings was
22 going to Support Services to take this position, details
23 about him telling people directly before it was announced
24 that he was told that he had the position, people that

27 (Pages 102 to 105)

1  worked for him in Support Services telling people that he
2  was telling people that he had the position. It was all
3  over the department. Everybody was talking about it.
4      Q.    What was your reaction?
5      A.    Well, first I couldn't believe that he would be
6  picked for that position. I was surprised, disappointed.
7      Q.    So what did you do?
8      A.    Well, initially I don't recall exactly what I
9  did when I heard it, but I spoke to the Chief and asked
10 him if the rumors were true. He informed me that -- he
11 really didn't tell me exactly if he was or wasn't, but he
12 informed me that he really didn't have much to say about
13 the promotion, and he made that really clear to me. And
14 he asked me if I wanted to talk to the director, and I
15 said, yes, I would. And he said, "Well, he has an
16 open-door policy, so just call his administrative
17 assistant and schedule an appointment." That's what I
18 did.
19          At that point it was, like I said, all over
20 the building that the promotion was already -- the
21 decision had already been made.
22     Q.    So then did you make an appointment with
23 Mosley?
24     A.    Yes.

1      Q.    Can you tell me about the appointment?
2      A.    Basically I asked him the same type of
3  information, it was all over the building that
4  Gilbert Howell had been told that he was going to be the
5  new inspector, I addressed my concerns that there was an
6  individual that basically had been burning up his sick
7  time for the last three years, that other people were not
8  given that same opportunity, that there were other
9  qualified people, and that the rumor was that he got the
10 position because he was black. And that's what was
11 circulating around the department.
12          I think it was obvious to people that that
13 would not have been the choice that the Chief would have
14 made.
15     Q.    So what did Mosley say?
16     A.    Mosley said that he had asked the Chief for his
17 first, second, and third choice and that the Mayor had
18 picked somebody, but that the final decision hadn't been
19 made. Director Mosley said that he vehemently argued
20 against whoever that candidate was. So he never openly
21 confirmed that it was Gilbert Howell.
22     Q.    He said he openly argued against the candidate
23 favored by the Mayor?
24     A.    Yes.

1      Q.    But he didn't confirm that it was Gilbert?
2      A.    I don't believe he referred to him by name.
3  But it was in response to my comments that it was all
4  over the building that he had received notice that he was
5  getting the position and that he was telling people in
6  the building that he had received the position, and that
7  he even had said that Bobbie Cummings was going to be
8  replacing him in his position as the captain of Support
9  Services.
10          I addressed my concerns with the director
11 about the issue that race was supposed to be a factor,
12 that it was a black position. I addressed my concerns
13 that obviously that excludes other people as candidates,
14 women, Hispanics, Asians. The director informed me that
15 it was his understanding that there had always been one
16 black and one white. Again, I clearly informed him that
17 I didn't think it was fair and that other people should
18 also be given the opportunity. He suggested that I talk
19 to the Mayor and asked me if I wanted to do that.
20     Q.    What did you say?
21     A.    I said, yes, absolutely. He said he would
22 schedule a meeting.
23     Q.    You said that you mentioned to Mosley that
24 Gilbert Howell had been burning up sick time for the last

1  three years, or not?
2      A.    I believe I did.
3      Q.    How did you know that?
4      A.    Everybody knew that.
5      Q.    Everybody knew that --
6      A.    Gilbert Howell didn't come to work. It was
7  common knowledge.
8      Q.    Had you initiated any sort of investigation
9  into his use of sick time?
10     A.    Well, as I stated previously, I investigated
11 him not meeting his training requirements, and I actually
12 wrote a report and referred it to my inspector, who I
13 understand referred it to Inspector Wright to look into.
14     Q.    When you say "my inspector," you're talking
15 about Martin Donohue?
16     A.    Yes.
17     Q.    When you say you investigated him regarding
18 meeting the training requirement and you wrote a report
19 about the training requirement or about sick time?
20     A.    Well, originally, like I stated earlier, he
21 failed to complete his firearms qualifications. The
22 complaint came to me as the commander of Professional
23 Standards. I looked into it. Part of his reasoning for
24 not completing his training was that he was off sick. So

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

1  as part of my normal follow-up, I checked his attendance
2  to see if, in fact, there wasn't or was a time that he
3  could have completed his training.
4  Q.  What did you find?
5  A.  That there were dates he could have done his
6  training and that he used a lot of sick time over the
7  last couple years.  I can tell you that was common
8  knowledge.  That wasn't from -- I didn't need to go to
9  his personnel files to know that he had been burning sick
10  time up.  It was obvious to anybody who worked for him or
11  with him that he wasn't coming to work.
12  Q.  You're saying that the rumors around the
13  department were that Gilbert Howell was selected because
14  of his race?
15  A.  Yes.
16  Q.  So do you remember anything else about your
17  discussion with Mosley?
18  A.  I can't think of anything at this time.
19  Q.  Director Mosley suggested that you meet with
20  the Mayor?
21  A.  Yes.
22  Q.  Did you follow up to arrange a meeting?
23  A.  Yes.  He scheduled the meeting, actually, and
24  then called me and let me know.

1  Q.  Director Mosley scheduled the meeting?
2  A.  Yes.  And then called and let me know that I
3  could meet with the Mayor I believe it was October 27th
4  or 28th, I think it was the 27th, at the Hotel DuPont.
5  It was pretty early, like 7:00 or 7:30 in the morning.
6  Q.  Who attended that meeting?
7  A.  Mayor Baker, Director Mosley, and myself.
8  Q.  Can you tell me what you recall about the
9  meeting?
10  A.  I recall we were seated at the far corner by
11  the window of the Green Room and I sat to the right of
12  Mayor Baker and the director sat across from me.  The
13  Mayor ordered breakfast; ate his breakfast.  I had
14  coffee.  During his meal, he and Director Mosley
15  conversed back and forth.  It was really just general
16  conversation between the two of them.  Every once in a
17  while I would interject something, but it was really
18  their conversation more than it was mine.
19      When the Mayor was done eating, he said
20  that he understood that I had requested to meet with him.
21  I told him that the offer was made by Director Mosley, so
22  of course I wanted to take the opportunity to give him my
23  resume.  I advised him --
24  Q.  Had you actually given him your resume?

1  A.  I actually gave one to Director Mosley, but I
2  brought another one to the breakfast meeting, and I gave
3  it to the Mayor as well.
4      I advised him that I appreciated the
5  opportunity for me to speak with him, that I didn't work
6  directly for him, so he really didn't know about my work
7  performance, that I hoped he would consider me for a
8  candidate for the inspector rank, that I had the
9  experience, that I had the versatility in my background,
10  I had all the qualifications to be considered for the
11  job, that I felt like I had a lot to offer to the
12  department, and that I would appreciate if he would
13  consider me for the position.
14      He responded by saying that he was
15  surprised -- pleasantly surprised that all the staff had
16  such good qualifications, and he said that several times,
17  I recall, during the breakfast meeting.  At least twice.
18  He kept saying that people -- he was surprised at how
19  qualified the staff were.
20      We chitchatted about the reputation of the
21  police department and how I felt we needed to make more
22  of an effort to sell ourselves with the community and
23  with the media instead of taking shots all the time,
24  doing more positive things with the community.  Basically

1  that was it.
2  Q.  About how long was the meeting?
3  A.  Maybe 40, 45 minutes.  I wouldn't say it was
4  actually a meeting.  It was really he and the director
5  that spoke most of the time.
6  Q.  Were there any follow-up discussions between
7  you and the director or you and the Mayor or you and the
8  Chief before the announcement was made that
9  Gilbert Howell had been selected?
10  A.  Not that I recall.
11  Q.  Did you have any discussions with the Mayor at
12  the Hotel DuPont about Gilbert Howell's qualifications or
13  lack of qualifications?
14  A.  I don't believe we discussed Gilbert Howell.
15  Q.  Did you talk to the Mayor about your concerns
16  about race being a factor?
17  A.  No.
18  Q.  Once you found out that Gilbert Howell had been
19  selected for the job, did you have any discussions about
20  that with the Chief, other than what you have already
21  described?
22  A.  I don't believe so.
23  Q.  Did you have any discussions with
24  Director Mosley after Gilbert Howell was selected about

29  (Pages 110 to 113)

Page 114

1 the selection?
2    A.   I don't recall, no.
3    Q.   No further discussions with the Mayor?
4    A.   No.
5    Q.   Any discussions with Bill Montgomery about the
6 selection of Gilbert Howell?
7    A.   I don't believe so, no.
8    Q.   Is this lawsuit the first time that you have
9 ever asserted a claim of discrimination against the City?
10    A.   Yes.
11    Q.   Are you aware of any past or current claims of
12 race discrimination asserted by Wilmington Police
13 Department officers?
14    A.   Yes.
15    Q.   Can you tell me what you're aware of?
16    A.   I know there's been various suits filed through
17 the years.
18    Q.   Can you tell me about any that you recall?
19       MR. NEUBERGER:  As we said in the
20 interrogatory answer, we're not asserting or offering any
21 evidence of other acts against other individuals by the
22 Mayor or by the City of Wilmington.
23       MS. CHEEK:  You can still answer the
24 question.

Page 115

1       MR. NEUBERGER:  I want you to understand,
2 we're not going down that road.
3    A.   I'm sorry.  Can you repeat it?
4    Q.   I asked you to tell me about any other claims
5 of race discrimination that you're aware of.
6    A.   I already referred to one.  I know that there
7 was a lawsuit filed by Kenny Boyd.
8    Q.   Did you give a deposition in that lawsuit?
9    A.   No, I didn't give a deposition, but I gave like
10 a statement.  No.  Other people have made those claims.
11 Some of them was when I was in Internal Affairs, because
12 we would have to pull records, discipline records.  Some
13 of them when I was a lieutenant in Human Resources, I
14 remember having to pull records.  Yesterday I had one of
15 my employees pull the personnel files of 10 officers as a
16 result of a suit.  I don't really know particulars.  I
17 know that a suit was filed when Gilbert Howell was the
18 captain about excluding white officers from working an
19 extra job at DuPont's.  The previous promotion systems
20 have been challenged off and on in the 28 years I have
21 been on the department.
22    Q.   Are you aware of any claims of sex
23 discrimination asserted by a Wilmington Police Department
24 officer?

Page 116

1    A.   I'm aware of complaints about hostile work
2 environment involving female officers.  I'm not sure that
3 they were sexual harassment complaints.  I know of
4 another female in Detectives that complained about some
5 coworkers previously.  That was years ago.  I don't
6 recall any details.  Not that I can recall anymore.
7    Q.   Have you ever supervised Gilbert Howell?
8    A.   No.
9    Q.   He has supervised you, though?
10    A.   Yes.
11    Q.   How many times?
12    A.   Just one time.
13    Q.   That culminated in the complaint about him
14 calling you and others "hon" and "sweetheart" and that
15 sort of thing?
16    A.   Yes.
17    Q.   How long did he supervise you?
18    A.   I think close to a year.  I don't recall
19 exactly.
20    Q.   Have you worked side by side with him as peers
21 in the same functional unit?
22    A.   Yes.
23    Q.   In what unit?
24    A.   Criminal Investigations Division.

Page 117

1    Q.   What was your opinion of his performance as an
2 officer when you worked with him in that unit?
3    A.   Honestly I didn't think too highly of him.
4    Q.   Do you know anything about his philosophy of
5 policing?
6    A.   No.
7    Q.   Do you have any information regarding
8 allegations that Gilbert Howell worked extra-duty jobs
9 while on sick status?
10    A.   No.  I understand that when he was off on
11 bereavement, that he worked some jobs.
12    Q.   What's the source of that information?
13    A.   I don't recall who said it.  It was a general
14 comment that, when his brother was off -- his brother had
15 passed away, that he took some time off, came in and
16 worked some jobs, and then took time off again.  I don't
17 recall the source.
18    Q.   How recent was this?
19    A.   Couple months ago.
20    Q.   That's when this supposedly happened?
21    A.   Yeah.  It was more of a rumor.  I don't know if
22 it happened or not.  I never looked into it.
23    Q.   Would there be records reflecting that that had
24 happened if, in fact, it had happened?

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0311

Page 118

1    A.   Yeah.
2    Q.   Would you have access to those records in your
3  role as --
4    A.   Some of them I would have access to.  I would
5  know if somebody was off on sick leave or if they took
6  time for the death of a family member.  I wouldn't know
7  if they worked any extra jobs.
8    Q.   When you say "extra jobs," what does that mean?
9    A.   Outside employment or the department hires
10  officers to work special events, which is usually
11  coordinated out of the Special Operations Division.
12  Extra jobs is usually coordinated by the extra job
13  coordinator where private companies hire officers to
14  work.
15    Q.   And the extra job coordinator is where?
16    A.   Professional Standards.
17    Q.   Who's the extra job coordinator right now?
18    A.   Sergeant John O'Connor.
19    Q.   Do you have any information about
20  Gilbert Howell reporting or not reporting for the post
21  emergency management drill draining?
22    A.   Yes.
23    Q.   Can you tell me about that?
24    A.   All the training comes through my division.

Page 119

1  When somebody doesn't -- first of all, I was advised by
2  my superior to ensure that everybody on the department
3  received a certain level of training, emergency
4  management training.  The importance of that being that
5  we would not be eligible to receive federal funding if
6  everybody on the department was not properly trained in
7  incident command or NIMS, National Incident Management
8  System.  The priority was to have all supervisors receive
9  the training and then eventually all officers on the
10  department as well.
11        Then Inspector Howell was scheduled at
12  least five times to go to that training.  I believe the
13  first time he just didn't show up.  It was scheduled down
14  in the DEMA center in Dover.  I believe he was
15  rescheduled by the training officer and either didn't
16  show up or called in sick.
17    Q.   Who was the training officer?
18    A.   Al Hicks.  And Al Hicks as the training officer
19  would have to submit reports about who was attending, who
20  wasn't attending, which I would forward to
21  Inspector Donohue.  Most of the time people didn't attend
22  because of some other work commitment.  They would call
23  ahead of time and let us know so we could fill the slot
24  with somebody else, because there were a limited number

Page 120

1  of positions that we could fill, because other police
2  agencies were also included in the training.  So if we
3  only had five positions and somebody didn't show up, then
4  we lost that position if we didn't call ahead of time to
5  reschedule somebody else.
6    Q.   Okay.  The first time he was a no-show.  Second
7  time he called in sick or something.
8    A.   I know he was scheduled several times.  I don't
9  know the exact number.  He either didn't show up or he
10  called in sick for several of the training sessions.  I
11  know eventually he did show up for the last one that was
12  scheduled.
13    Q.   When was that last one, do you recall?
14    A.   No.
15    Q.   Approximately.
16    A.   Six months ago.
17    Q.   So he did eventually go?
18    A.   He did eventually go, yes.
19    Q.   Was this a full day of training?
20    A.   Yes.
21    Q.   Is there anything else pertaining to the
22  emergency management function that you have information
23  about?
24    A.   No.

Page 121

1    Q.   There was an emergency drill, correct?  Wasn't
2  there some sort of drill or exercise that the City went
3  through?
4    A.   Yes.  That was previous to this training.  Yes.
5    Q.   It was before this training?
6    A.   Yes.
7    Q.   Was there training before the drill?
8    A.   Yes.
9    Q.   Did Inspector Howell attend that training?
10    A.   Yeah, all the upper command, staff had
11  previously attended training, incident command training.
12  There's a national system that all police departments are
13  supposed to follow.  It's called a National Incident
14  Management System.  Everybody on the department, at least
15  I believe captains and above, had previously received the
16  training, Inspector Howell included.  The training that
17  occurred afterwards was a result of some recommendations
18  after the exercise.
19    Q.   Was one of the recommendations that
20  Inspector Howell go to the training, go to another
21  training?
22    A.   I don't know that he was named specifically.  I
23  know that there was a report that indicated that the
24  incident command system was not followed, that the

31 (Pages 118 to 121)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0312

1  incident commander at the scene did not identify himself
2  and take responsibility for the scenario. The report was
3  probably 25 pages long. That was only part of it.
4     Q.  Did other people also go to this post drill
5  training from the City?
6     A.  Everybody did. It became mandated for
7  everybody to go through a higher level and/or refresher
8  course.
9     Q.  Do you have any information about whether
10  Inspector Donohue and Inspector Howell have any problems
11  getting along with each other?
12     A.  I don't know.
13     Q.  What's Dr. Willey's first name?
14     A.  I think it's Kathleen.
15     Q.  Probably already -- is this already --
16        MR. NEUBERGER: I think so.
17        THE WITNESS: Bonnie Kelly.
18        MS. CHEEK: I'm getting close to the end.
19        MR. NEUBERGER: Good.
20  BY MS. CHEEK:
21     Q.  You mentioned that you had your deposition
22  taken about a year ago. What case was that for?
23        MR. NEUBERGER: I think she said she
24  testified at trial, but there wasn't a deposition.

1  BY MS. CHEEK:
2     Q.  Is that what you said? Because I thought the
3  question had been was your deposition ever taken before.
4        MR. NEUBERGER: That's another matter.
5  BY MS. CHEEK:
6     Q.  Has your deposition ever been taken?
7     A.  Yes.
8     Q.  And that was in what case?
9     A.  I believe I had a deposition taken like in an
10  old traffic case where somebody was suing somebody else.
11  I don't think the City was involved. I know I gave a
12  statement regarding the Kenny Boyd matter, but it wasn't
13  an actual deposition. It was a statement that she put
14  together and I signed later on, actually testified in
15  that case as well.
16     Q.  Have you testified at any other civil cases?
17     A.  I think I have, but it's been a while.
18     Q.  Have you testified in any other discrimination
19  cases besides the Boyd case?
20     A.  I don't believe so, no.
21     Q.  You were testifying earlier about when there
22  was a shuffling of the captains after the appointment of
23  Gilbert Howell, and there were three options open I think
24  you said, Special Operations, Support Services, and HR,

1  and you chose HR. Is that right?
2     A.  Let me make sure that I have them all right.
3  Communications and Uniformed Services had just switched
4  previously. So those two were out. Because of a wiretap
5  that was going on, CID and Vice Squad was out of the mix.
6  So that left Support Services, Human Resources, and
7  Special Operations. Of course, I was in Internal Affairs
8  or Professional Standards. So that was not an option
9  since I was already there. So that left three other
10  divisions. Two of them I worked for Inspector Howell and
11  one of them worked for Inspector Donohue.
12     Q.  Right. What was the reason for your choosing
13  Human Resources as opposed to Special Ops or Support
14  Services?
15     A.  I felt at that time that was the best place for
16  me to work.
17     Q.  Why did you feel that was the best place for
18  you to work?
19     A.  Well, Support Services is really a clerical
20  command position, which is not very challenging to me. I
21  don't believe that Special Operations is another division
22  that is as challenging. Human Resources is probably the
23  busiest captain's job on the department. It has the most
24  responsibility. And I think that the future of the

1  department really is important -- with a lot of officers
2  retiring, that it's important that we get good quality
3  police recruits. And I think the job is the most
4  challenging of the three.
5     Q.  Following up on some questioning earlier about
6  the FBI academy, you said it was a full-time training
7  that you went to for three months?
8     A.  Yes.
9     Q.  So three months you were living down there at
10  Quantico?
11     A.  Yes.
12     Q.  Or at least during the week. Were you on full
13  pay while you did that?
14     A.  Yes.
15     Q.  Was there tuition that had to be paid?
16     A.  No.
17     Q.  Going back for a couple minutes to this
18  conversation with the Chief where he said that the
19  position inspector of Uniformed Services was a black
20  position, did he say that anyone had told him that?
21     A.  No.
22     Q.  Going back to the conversation that Marlyn told
23  you about with George Collins, you said that was during
24  the St. Anthony's festival?

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

Page 126

1  A.  Yes.
2  Q.  So that was in the spring of --
3  A.  June.
4  Q.  June of 2006?
5  A.  Yes.
6  Q.  Did you have any conversations yourself with
7  George Collins?
8  A.  I did follow up with it, and I spoke to him
9  about it that I understood from my husband that he had a
10 conversation with the Mayor.  He told me the same thing.
11 I asked him if he would ever have to testify, would he be
12 willing to do that.
13 Q.  And he said he would?
14 A.  Yes.
15 Q.  There was another FOP person at that meeting as
16 well.  Is that your understanding?
17 A.  Yes.
18 Q.  That was Kevin Connor.  Did you ever speak to
19 Kevin Connor?
20 A.  I did.  Kevin Connor -- yes, I did speak with
21 him.
22 Q.  What did he say?
23 A.  He said there was a meeting in the Mayor's
24 office that he was talking to Bill Montgomery and that

Page 127

1  when the meeting first started, the Mayor seemed very
2  irritated about people questioning him about his
3  promotion of Gilbert Howell, and Kevin said he was sort
4  of surprised by it because he immediately started out the
5  conversation about if anybody had a problem with this
6  promotion, they could come to him, and that the name that
7  Chief Szcezerba gave was unacceptable.  "Unacceptable"
8  was the term he used.
9       Basically that was his extent of the
10 conversation.  And then after the meeting he talked to
11 George Collins in the elevator and George Collins said
12 something to the effect of, I can't believe he said that.
13 And then George told him about the comment that the Mayor
14 had made to him.
15 Q.  So Kevin said what he heard the Mayor say was
16 the name that Szcezerba gave him was unacceptable, but he
17 did not hear what George said he heard?
18 A.  No.  He said there were two different
19 conversations going on at the time.
20 Q.  So when George was hearing the Mayor say this,
21 Kevin didn't hear it because he was talking to
22 Bill Montgomery?
23 A.  I believe so, but I couldn't be sure.
24 Q.  But Kevin said he did hear the Mayor make a

Page 128

1  comment about the name that the Chief gave was
2  unacceptable?
3  A.  Yes.
4  Q.  When you had a conversation or conversations
5  with former Chief Manelski about this whole issue, your
6  case and the appointment of Gilbert Howell, did he
7  express any opinion about -- did he think it was
8  justified to have an African-American in a high-level
9  position in the police department?  Evidently he thought
10 it was to satisfy community pressure?
11 A.  I really didn't discuss what he thought at the
12 time.
13 Q.  So he just related what happened and you didn't
14 discuss it any further?
15 A.  Actually, he related more when we were in the
16 office.  I really didn't get into any great detail with
17 him previous to the meeting that we had at
18 Mr. Neuberger's office.  So he really didn't go into any
19 great detail.  But he indicated that there was a quota
20 system going back to the '80s.
21 Q.  Is what Chief Manelski said?
22 A.  I'm not sure if he used the word "quota
23 system," but something along those lines.
24 Q.  Can you recall what words he used?

Page 129

1  A.  Specifically I can't exactly recall the words
2  he used.  I know he made clear he didn't think
3  Gilbert Howell should have been promoted.  What exactly
4  he said I don't know, but he was obviously displeased
5  with that selection based on his knowledge of
6  Gilbert Howell and his performance.  He made that clear.
7  But outside of that, I couldn't tell you exactly what he
8  said.
9  Q.  Do you think that diversity is a desirable goal
10 for a city to have with regard to its police department?
11 A.  I think diversity is something that should be
12 considered.
13 Q.  Why do you think it should be considered?
14 A.  I think it's important to be inclusive, and
15 that's part of diversity is being inclusive to all people
16 regardless of their gender or race or religion.  But not
17 to be exclusive to be inclusive.
18 Q.  Do you view it as one of your missions to try
19 to help the Wilmington Police Department achieve
20 diversity in its ranks?
21 A.  I think part of my goals is to include people
22 in the hiring process and not to discriminate against
23 anybody who's interested in becoming a police officer;
24 that everybody should be given equal opportunity to

33 (Pages 126 to 129)

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0314

Page 130

1  pursue employment, promotion, whatever the case may be.
2       (Dietz Deposition Exhibit No. 23 and 24
3  were marked for identification.)
4       THE WITNESS: These look the same to me.
5       MS. CHEEK: Are they?
6       THE WITNESS: Yes.
7       MS. CHEEK: They shouldn't be.
8  BY MS. CHEEK:
9       Q.  You have in front of you or will have in a
10  second in front of you Dietz Exhibits 23 and 24.  23 is a
11  collection of documents pertaining to Gilbert Howell.  I
12  don't think I'm going to read off all the Bates numbers.
13  And Dietz 24 is a collection of documents regarding
14  James Wright.
15       Looking at 23, are you familiar with any of
16  these documents?
17       A.  I know they're department commendations.  Other
18  than that, no.
19       Q.  The department commendations, for example, the
20  first page that says, Department Commendation City of
21  Wilmington," that's a department commendation, correct?
22       A.  Correct.
23       Q.  Is this the kind of thing you refer to in your
24  resume as a department medal?

Page 131

1       A.  Commendations don't necessarily provide medals.
2  Some are just written.  Some actually you're awarded a
3  day off and a medal.
4       Q.  If it says that you got a day off, then that
5  means it's a medal?
6       A.  Sometimes.  Sometimes not.  Some have medals,
7  some have days off, some are just official commendations.
8       Q.  How would we tell?  How would you know?  For
9  example, when you said in your resume that you have nine
10  department medals, how did you know that?  Are you
11  wearing them all now?
12       A.  No, not all of them.  Going through my own
13  records, I keep my own personal records, as well as
14  occasionally checking my Human Resources information,
15  because sometimes I might have an award or a letter and
16  it for some reason is not in my Human Resources and my
17  personnel jacket.  So I kind of keep copies of both.
18       Q.  To make sure that your personnel file is
19  up-to-date and complete?
20       A.  Right.
21       Q.  Looking at these papers that are in Dietz 23
22  and Dietz 24, there's no way for us to tell which, if
23  any, of these resulted in a medal?
24       A.  I know that the Kiwanis award is a medal.

Page 132

1  There's one -- D1709 that says at the end a distinguished
2  service ribbon.  D1730 says merit award ribbon.
3       Q.  Is ribbon something different than a medal?
4       A.  No.  It's basically the same.  Those are the
5  only two in this packet that had medals actually written
6  in the commendation.
7       Q.  Is there somewhere else that you would look to
8  to determine how many medals someone had?
9       A.  Well, when you get a ribbon or a commendation
10  or a day off, especially if you get the day off, you
11  always make a copy of that because then it would be in
12  your file.  So your supervisor won't take your word for
13  it unless you have a commendation.  So you make a copy of
14  that.
15       You should make a copy of everything.
16  Realistically that's not always done, but most people try
17  to maintain their files, ensure that any letters, any
18  commendations, any medals they receive, that a copy is
19  put in their personnel file, and most people keep their
20  own file as well.
21       Q.  I'm trying to understand how you know what is a
22  medal and -- is medal a higher-level award than a
23  commendation?  It says 9 department medals and 27 police
24  citizen organization commendations.

Page 133

1       A.  I could probably tell you what they were if you
2  want me to go through them with you for myself.  I can't
3  really comment on --
4       Q.  I'm not going to go through these 36 things.
5  I'm just trying to understand whether there's sort --
6       A.  If you save someone's life, a medal for
7  life-saving.  I know I have had two life-saving medals.
8  I know you usually get a medal -- again, it's really up
9  to the discretion of the inspectors that review the
10  commendation requests.  So there's a panel that decides,
11  okay, this guy should get a day off, this girl should get
12  a ribbon.  It's really decided by -- usually the two
13  inspectors are the ones that sit down and go through the
14  commendation requests.
15       I know one of them you referred to earlier
16  a robbery in progress.  I know I had a robbery in
17  progress on Pennsylvania Avenue with a retired councilman
18  that was mugged outside the restaurant there.  I know I
19  got a commendation for a rape in progress where a woman
20  was being assaulted.  These would be examples of cases
21  where you were not dispatched, where you actually go out
22  and find these things on your own.  So somebody's not
23  calling you and sending you.
24       Q.  You just happen to be there and see something.

34  (Pages 130 to 133)

Page 134

1    A.   Yes.

2    Q.   Sort of above and beyond.

3    A.   Right.  I know I received a commendation for a

4 Kiwanis award.  I had a commendation for like a

5 distinguished unit award in Detectives because my platoon

6 handled the most homicides the department had ever

7 experienced and solved every case.

8    Q.   So are these all medals that you're talking

9 about now or have you been describing sort of a mix of

10 commendations and medals?

11    A.   It's a mix of both, yes.

12    Q.   But there's nowhere I can go where I will find

13 for each person in the department here's the medals that

14 this person has gotten?

15    A.   You would really have to go through their

16 files.  Most of that information should be in there.

17    Q.   But there's no list --

18    A.   No.

19    Q.   -- like boiled down, for example, the way that

20 there is the punishment log, there's a list of

21 punishments, they're sort of summarized?

22    A.   There's not a medal list anymore.  No.

23       MS. CHEEK:  I think that's all I have.

24       MR. NEUBERGER:  I don't have any questions.

Page 135

1 That will be it.

2       (Deposition concluded at 3:55 p.m.)

3      - - - - -

4

5     T E S T I M O N Y

6

7 DEPONENT:  NANCY S. DIETZ         PAGE

8

9 BY MS. BUTCHER................................ 2

10 BY MS. CHEEK................................ 61

11

12     E X H I B I T S

13

14 DIETZ DEPOSITION EXHIBIT NO.      MARKED

15

16 1 - Resume.................................... 4

17 2 - Organization chart........................ 4

18 3 - Directive 3.0 and Directive 3.3........... 5

19 4 - Documents from an Office of Professional

    Standards file................................ 13

20

    5 - Written reprimand, summary punishment

21 offer, and report............................ 14

22 6 - Forms maintained in the Office of

    Professional Standards........................ 16

23

    7 - Report.................................... 18

24

    8 - Training records.......................... 21

    8 - Training records.......................... 21

Page 136

1     E X H I B I T S (cont'd)

2 DIETZ DEPOSITION EXHIBIT NO.      MARKED

3 9 - Request to hold outside employment form... 25

4 10 - Request to hold outside employment form.. 27

5 11 - Request to hold outside employment form.. 28

6 12 - Request to hold outside employment form.. 29

7 13 - Commendation............................. 32

8 14 - Letter from a citizen.................... 33

9 15 - Letter to Chief Payne dated October 31,

    1988......................................... 36

10

    16 - Interrogatory answers....................44

11

    17 - Document dated January 2006.............. 44

12

    18 - Report of Thomas C. Borzilleri, Ph.D..... 50

13

    19 - Interrogatory answers....................61

14

    20 - List of names and titles................. 61

15

    21 - List of inspector ranks................. 77

16

    22 - Chapter 2 of the Personnel Department

17 of the City of Wilmington.................... 93

18 23 - Documents pertaining to Gilbert Howell...130

19 24 - Documents pertaining to James Wright.... 130

20

21

22

23

24

Page 137

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

A0316

Page 138

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                )
NEW CASTLE COUNTY)

    I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 9th day of May,
2007, the deponent herein, NANCY S. DIETZ, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
    I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                     _Kimberly A. Hurley_

        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)

DATED:

eb5c921f-fb7b-4a3e-a359-f9997732cf1d

**A0317**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Deitz

v.

# Baker, et al

## C.A. # 06C-256-SLR

——————————————————

Transcript of:

Harry F. Manelski

June 5, 2007

——————————————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A0318

Deitz v. Baker, et al

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,        : CIVIL ACTION
            Plaintiff         :
                              :
        -v-                   :
                              :
MAYOR JAMES M. BAKER,         :
individually and in his       : NO. 06C-256-SLR
official capacity as the      :
Mayor of the City of          :
Wilmington, and MAYOR AND     :
COUNCIL OF WILMINGTON,        :
            Defendants        :


          Deposition of HARRY F. MANELSKI, taken
before Elaine Gallagher Parrish, RPR, CRR, at Landis,
Rath & Cobb, LLP, 919 Market Street, Suite 600,
Wilmington, Delaware on June 5, 2007, commencing
approximately at 2:00 p.m.


APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        The Neuberger Firm. P.A.
            2 East Seventh Street, Suite 302
            Wilmington, Delaware 19801
            for the Plaintiff,

        REBECCA L. BUTCHER, ESQ.
        Landis Rath & Cobb, LLP
            919 Market Street, Suite 600
            Wilmington, Delaware 19899
            for the Defendant, Mayor James M. Baker



        WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
            (302)655-0477
            www.wilfet.com

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0319

Deitz v. Baker, et al

Page 2

1  APPEARANCES:(Ctd.)
2       TERESA A. CHEEK, ESQ.
        Young Conaway Stargatt & Taylor, LLP
3         The Brandywine Building
          1000 West Street, 17th Floor
4         Wilmington, Delaware 19899-0391
          for Defendant, City of Wilmington
5
6  ALSO PRESENT:
7       CAPTAIN NANCY S. DIETZ
8              - - -
9
10      HARRY F. MANELSKI,
11 having been first duly sworn according to law, was
12 examined and testified as follows:
13             - - -
14 BY MS. BUTCHER:
15  Q.  Good afternoon, Chief Manelski.
16  A.  Good afternoon.
17  Q.  Have you ever had your deposition taken before?
18  A.  Yes.
19  Q.  When was the last time you had your deposition
20 taken?
21  A.  The last deposition was with Tom.
22  Q.  And when was that?
23      MR. NEUBERGER:  That would be when I
24 interviewed you you mean?

Page 3

1       THE WITNESS:  Oh, no.  That was just an
2  interview.
3       MR. NEUBERGER:  I guess he considered that
4  a deposition.
5       THE WITNESS:  No.  My last deposition has
6  been quite awhile.
7  BY MS. BUTCHER:
8   Q.  I'll just go over a few ground rules.  Please
9  make all of your responses verbal.
10  A.  Yes.
11  Q.  So nodding, she can't write down head nods, et
12 cetera.  If you do not understand something or don't
13 hear something that I say, please ask me to repeat it.
14  A.  Okay.
15  Q.  If you need a break, just let me know.  Try to
16 wait until I finish the question to respond and I will
17 try and wait until you have finished your answer to
18 respond so the Court Reporter isn't trying to take us
19 both down at the same time.
20  A.  Just tell me I didn't respond.
21  Q.  Have you taken any medication or do you have any
22 medical conditions that would prevent you from recalling
23 information today?
24  A.  No.

Page 4

1   Q.  Can you state your full name for the record,
2  please?
3   A.  Harry F, as in Francis, Manelski,
4  M-a-n-e-l-s-k-i.
5   Q.  Your current address?
6   A.  3305 Coachmen Road, Wilmington, Delaware, 19803.
7   Q.  And your date of birth?
8   A.  ████████
9   Q.  Are you currently employed?
10  A.  Part-time.
11  Q.  And where are you working?
12  A.  At Winterthur.
13  Q.  What do you do there?
14  A.  I'm a security officer, public safety officer.
15  Q.  And I guess what does that entail being a public
16 safety officer?
17  A.  I'm responsible for driving the chairman to the
18 airports and back, and train stations and back, and my
19 other responsibility is protecting the assets of
20 Winterthur.
21  Q.  Prior to being employed at Winterthur, when was
22 your last full-time employment?
23  A.  My last full-time employment was with
24 Mr. Rollins at the Brandywine Town Center.  I was

Page 5

1  vice-president of security.
2   Q.  And you were previously employed by the
3  Wilmington Police Department, correct?
4   A.  Yes.
5   Q.  What year did you join the Wilmington Police
6  Department?
7   A.  1961.  I'm sorry.  1961.
8   Q.  And when did you leave the Wilmington Police
9  Department?
10  A.  March of 1981.
11  Q.  What rank were you when you retired from the
12 Wilmington Police Department?
13  A.  I was Chief of Police.
14  Q.  You were Acting Chief of Police from December of
15 1976 until January of 1977, is that correct?
16  A.  That is correct.
17  Q.  And then your tenure as Chief of Police was from
18 January, 1977 until March of 1981, is that correct?
19  A.  That's correct.
20  Q.  Are you aware of I guess some of the background
21 of the allegations that have been made in the complaint
22 filed by Captain Nancy Dietz?
23  A.  Yes.
24  Q.  Do you have any personal knowledge of actions

2  (Pages 2 to 5)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0320

Deitz v. Baker, et al

HARRY MANELSKI

---

Page 6

1  taken by Mayor Baker as alleged by Captain Nancy Dietz?
2     A.  No, I'm not.
3     Q.  Have you ever had any discussions with the Mayor
4  about any reasons for promotions to inspector that he
5  has made?
6     A.  No.
7     Q.  Mayor Baker that is?
8     A.  No.
9     Q.  Have you discussed the allegations in the
10  complaint with Captain Nancy Dietz?
11    A.  Yes.
12    Q.  When did you have those discussions with her?
13    A.  Several times, the latest time being interviewed
14  by Tom.
15    Q.  Were there, other than the conversation you had
16  with Mr. Neuberger, were there ever other persons
17  present when you were discussing the allegations with
18  Nancy?
19    A.  Please repeat.
20    Q.  Other than the discussion you had with
21  Mr. Neuberger, were there any other people present
22  during those discussions that you were having with
23  Captain Dietz about the allegations in the complaint?
24    A.  Yes.

---

Page 7

1     Q.  Who was present?
2     A.  Her husband.
3     Q.  That would be Captain Marlyn Dietz?
4     A.  Marlyn Dietz.
5     Q.  What were the substance of those discussions?
6     A.  Conversation was in general we were attending an
7  FBI business meeting in Maryland, both Nancy and I are
8  graduates of the FBI Academy, and we're still very
9  active in the retirees association, and I had called and
10  asked for a ride down with them because I wasn't sure
11  where I was going.  And during our ride down we had a
12  discussion relative to this situation.
13    Q.  During that discussion did your tenure as Chief
14  of Police, was that part of the discussion?
15    A.  Yes.
16    Q.  In your years in the police department did you
17  ever directly supervise Captain Nancy Dietz?
18    A.  As Chief of Police I supervised everybody
19  indirectly.
20    Q.  Did you have much direct working contact with
21  Captain Nancy Dietz while you were Chief of Police?
22    A.  Not --
23    Q.  Or during, while you were in the police
24  department?

---

Page 8

1     A.  No, I had inspectors, captains, lieutenants and
2  sergeants under me that had that responsibility, but I
3  was fully aware of her performance.
4     Q.  Have you ever supervised Captain Nancy Dietz in
5  employment outside the police department?
6     A.  No.
7     Q.  I am going to show you a document.  If you could
8  please review it for me.
9         (Manelski Deposition Exhibit No. Manelski-1
10  was marked for identification.)
11  BY MS. BUTCHER:
12    Q.  Do you recognize this document?
13    A.  Yes.
14    Q.  Can you identify it for me, please?
15    A.  Yes.  This was an interview with Mr. Neuberger
16  in his office relative to this situation that occurred
17  in March of 2007.
18    Q.  In paragraph five of your declaration you
19  indicated that an inspector position was created
20  specifically to be filled by an African-American
21  officer?
22    A.  Yes.
23    Q.  Is that correct?  How did that come about
24  exactly?

---

Page 9

1     A.  When I was appointed chief I promoted an
2  individual who was white to captain.  There was some
3  unrest and some problems within the community over
4  black/white relations.  We were still trying to mend a
5  bad relationship we had had since the riots in the 60s
6  and early 70s.  And I had a meeting, I was summoned to a
7  meeting with the Mayor and the administrative assistant,
8  several councilmen and some black representatives from
9  the community relative to not having a high-ranking
10  black in the Wilmington Police Department.  At that
11  particular time there was one captain and one
12  lieutenant, the highest rank in the department.
13    Q.  And what occurred at that meeting?
14    A.  It was decided -- at that particular time there
15  were three inspectors who were inspectors when I was
16  promoted to chief.  They had been promoted previously
17  and they were white.  At that meeting there were
18  requests that a fourth inspector be appointed and that
19  he be African-American.  At the particular time there
20  was no position available for a fourth inspector.
21    Q.  So at the meeting they were seeking to have that
22  position created, it did not exist at that time?
23    A.  Yes.
24    Q.  How was that position created?

---

3 (Pages 6 to 9)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0321

Deitz v. Baker, et al

HARRY MANELSKI

Page 10

1    A.   A resolution was introduced in City Council to
2  pass the resolution to add a fourth inspector and also
3  appropriate funding for that position.
4    Q.   Once the position was created did you have
5  additional meetings regarding who would be appointed to
6  that position?
7    A.   No.
8    Q.   It was already decided prior to the creation of
9  the position who the appointment --
10   A.   Yes.
11   Q.   -- would go to?
12   A.   There was only one black captain so there was no
13  other choice but that captain.
14   Q.   And that captain was Captain Miles?
15   A.   Yes.
16   Q.   And I believe you stated, if I'm reading this
17  right in your declaration, that you believe Captain
18  Kenneth Miles was qualified to be an inspector?
19   A.   Yes.
20   Q.   When Captain Miles was promoted to inspector do
21  you remember who replaced him as captain?
22   A.   Lieutenant John Johnson who was
23  African-American.
24   Q.   How many captains were there at that time?

Page 11

1    A.   I believe seven.
2    Q.   With the creation of the fourth inspector
3  position and the appointment of an African-American
4  officer to fill that position, were you instructed that
5  any further promotions to that position needed to be
6  filled by African-American officers?
7    A.   No, just the inspector's position.
8    Q.   After the promotion of Inspector Miles you made
9  two more promotions to inspector, is that correct, do
10  you remember?
11   A.   I promoted Stan Friedman to inspector, Charles
12  Bryan to inspector.
13   Q.   Eugene Maloney wasn't inspector when you were
14  appointed?
15   A.   He was previously appointed by Chief McCool.
16   Q.   And he remained an inspector after you retired,
17  is that correct?
18   A.   Pardon?
19   Q.   And he remained an inspector after your tenure
20  as police chief?
21   A.   I don't understand what you mean.
22   Q.   He was an inspector when you became Chief of
23  Police?
24   A.   Yes.

Page 12

1    Q.   And remained inspector?
2    A.   Until I retired.  He stayed after I retired.
3  I'm sorry.
4    Q.   That's okay.
5    A.   There was also another inspector, Inspector Ed
6  Mort who was inspector when I made chief and Inspector
7  Valiante was an inspector when I made chief.
8    Q.   When Ed Mort retired was he replaced by
9  Inspector Bryan or Inspector Friedman?
10   A.   Inspector Friedman.
11   Q.   And you said there was another inspector?
12   A.   Charles Bryan.
13   Q.   Right, and he replaced Valiante, is that
14  correct?
15   A.   Inspector Valiante.
16   Q.   Were you ever told by the Mayor or the City
17  Council that the fourth inspector position could only be
18  held by an African-American going forward?
19       MR. NEUBERGER:  What was your last two
20  words?
21  BY MS. BUTCHER:
22   Q.   Going forward, after the appointment of Kenneth
23  Miles, to the inspector position, fourth inspector
24  position that was created, were you ever told by the

Page 13

1  Mayor or by the City Council that that position could
2  only be held by an African-American in the future?
3    A.   No.  In the future?
4    Q.   Right.
5    A.   No.  I promoted two inspectors that were white
6  after Inspector Miles.
7        MR. NEUBERGER:  Excuse me.  I don't know if
8  he understood your question.  Were you asking him if all
9  inspectors in the future had to be black, is that your
10  question?
11       MS. BUTCHER:  No.  That wasn't what I was
12  asking.  I was asking if the particular fourth inspector
13  position if anyone ever told you that that position
14  should always be held by an African-American officer?
15       THE WITNESS:  No.
16  BY MS. BUTCHER:
17   Q.   Kenneth Miles was still an inspector when you
18  retired, is that correct?
19   A.   Yes.
20   Q.   And so his replacement happened with another
21  Chief of Police?
22   A.   Yes.
23       MS. BUTCHER:  Okay.  Those are my only
24  questions.  I think Terry probably has some questions.

4 (Pages 10 to 13)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0322

## Deitz v. Baker, et al
## HARRY MANELSKI

Page 14

1    MR. NEUBERGER: Sure.
2  BY MS. CHEEK:
3    Q.  I have a few questions. Who were the people at
4  this meeting? You said the Mayor. I'm looking at
5  paragraph five of your declaration.
6    A.  It was the Mayor, the chief of staff, who was
7  referred to as the administrative assistant to the
8  Mayor, David Singleton.
9    MR. NEUBERGER: Just for the record, who
10 was the Mayor at that time?
11    THE WITNESS: Mayor McLaughlin. I'm sorry,
12 Mayor McLaughlin.
13 BY MS. CHEEK:
14    Q.  And he was white, is that right?
15    A.  Yes.
16    Q.  And David Singleton was what race?
17    A.  White.
18    Q.  Okay. And the city solicitor?
19    A.  Jeff Goddess, white.
20    Q.  Yourself, you're white, right, just for the
21 record?
22    A.  Yes, I am.
23    Q.  Okay. And you said several African-American
24 politicians and community representatives. Who were

Page 15

1  they?
2    A.  The councilmen were Councilman Baker, Councilman
3  White and Councilman Brooks.
4    MR. NEUBERGER: Was that Jim Baker?
5    THE WITNESS: Yes.
6    MR. NEUBERGER: The present Mayor?
7    THE WITNESS: Yeah. He was then City
8  Council.
9    MR. NEUBERGER: Okay.
10 BY MS. CHEEK:
11    Q.  And community representatives?
12    A.  Al Plant who was black, Ray Evans who was black,
13 Hicks Anderson, William H. Anderson who was black,
14 community activist.
15    Q.  And at that point you said it was agreed that I
16 would select an African-American officer for the
17 inspector position. Was - I'm paraphrasing a little bit
18 - was it then the practice for the Chief of Police to
19 make the selection for the inspector positions?
20    A.  Absolutely.
21    Q.  After this point in time, this meeting which was
22 when?
23    A.  It was in 1977, late in the year, as I recall.
24 You're taking me back a long way.

Page 16

1    Q.  But it was, in any event, a short time before
2  the appointment of Kenneth Miles?
3    A.  Yes.
4    Q.  Okay. Since that time have you ever had any
5  discussion with any mayors about the appointment of
6  anyone to any inspector position?
7    A.  Yes.
8    Q.  Okay. Can you tell me about that?
9    A.  Mayor Frawley called me many times when there
10 were police issues and asked my advice. I was also
11 called in by the Mayor to recommend a replacement for
12 Chief Dennis Regan, and Mayor Frawley also appointed me
13 to blue ribbon commission headed by Judge Quinlen(sic)
14 to look into problems in the police department and make
15 recommendations to improve the overall operation of the
16 department.
17    Q.  Under judge?
18    A.  Quinlen(sic), Bill Quinlen(sic), William
19 Quinlen(sic).
20    MR. NEUBERGER: Quillen, is that what you
21 mean?
22    THE WITNESS: Quillen, I'm sorry. Not
23 Quinlen. Quillen. Thank you.
24 BY MS. CHEEK:

Page 17

1    Q.  So these discussions that you have just
2  described were all with Mayor Frawley?
3    A.  Yes.
4    Q.  And do you know when they were, when was Mayor
5  Frawley mayor?
6    A.  In the 80s. I believe '82, I believe it was '82
7  when Frawley was elected mayor.
8    Q.  Was he one term or two terms?
9    A.  One term.
10    Q.  One term, '82 to '86 then about?
11    A.  Yes.
12    Q.  And other than Mayor Frawley have you ever had
13 any discussions with any mayors about police matters?
14    A.  No, ma'am.
15    Q.  Did Mayor Frawley ever talk to you about
16 appointments to the position of inspector --
17    A.  No.
18    Q.  -- of police?
19    A.  Only chief.
20    Q.  Have you had any discussions since late 1997 or
21 since you were on retirement with any other chiefs of
22 police about appointments to inspector?
23    A.  No.
24    Q.  You said at the beginning of the deposition that

5 (Pages 14 to 17)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0323

Deitz v. Baker, et al
HARRY MANELSKI

Page 18

1  you had supervised Nancy Dietz indirectly while you were
2  the Chief of Police and that you were fully aware of her
3  performance?
4      A.  Yes.
5      Q.  Can you explain to me why you were fully aware
6  of her performance?  She was new at that point, wasn't
7  she?
8      A.  Well, I appointed her to the police academy in
9  1980 while I was Chief of Police and I was very
10 impressed with her interview and her background and
11 ability.  I therefore appointed her to the police
12 academy.
13     Q.  Did you know her before you had met her through
14 the --
15     A.  No.
16     Q.  -- application interview process?
17     A.  No.
18     Q.  At that time was there any sort of physical
19 ability requirement to be admitted to the police
20 academy?
21     A.  Yes.
22     Q.  Can you tell me what it was, what the
23 requirements were?
24     A.  It was a physical agility test where you had to

Page 19

1  run a mile in so many minutes, do so many pushups, so
2  many situps, so many pullups.  I don't recall the exact
3  number.  I don't remember the rest.
4      Q.  Do you know whether any of the female applicants
5  had any trouble meeting those physical requirements?
6      A.  Not that I recall.
7      Q.  Who supervised the administration of the
8  physical ability test?
9      A.  It would have been under the leadership of the
10 captain of the personnel and training division, and the
11 physical agility tests were conducted by two sergeants,
12 Captain Longyear was the commanding officer of the
13 personnel and training division, Sergeant Samuel
14 Chickadel was the Director of the Academy.  There was
15 another sergeant and I seem to think it might have been
16 Ben Walsh, but I'm not sure.
17     Q.  And do you have any knowledge of whether Nancy
18 Dietz had any trouble satisfying the physical agility
19 requirement?
20     A.  She passed it.
21     Q.  Are you aware of whether she had any trouble
22 passing it?
23     A.  No trouble as I recall.  If she had any trouble
24 she wouldn't have went further in the process.

Page 20

1      Q.  So as far as you know no rules were bent for her
2  benefit?
3      A.  Absolutely not.
4      Q.  Were you present when the physical agility test
5  was administered?
6      A.  No.
7          MS. CHEEK:  I don't think I have anything
8  else.
9  BY MR. NEUBERGER:
10     Q.  Chief, I am going to ask you some questions.
11 You can turn sideways, make it a little easier for us
12 all so we can hear.  Okay.  Miss Butcher asked you about
13 your work history but she may have forgotten to ask you
14 about DuPont.  After you left the City of Wilmington as
15 the chief were you hired by DuPont?
16     A.  Yes.
17     Q.  And how many years did you work for DuPont?
18     A.  About 18.
19     Q.  About 18 and what was your job title at DuPont?
20     A.  I was a managing director of corporate security
21 and executive protection.
22     Q.  Were there people who worked under you?
23     A.  Yes.
24     Q.  Did you have any responsibility for DuPont

Page 21

1  plants here in Delaware, for example?
2      A.  Yes, under the corporate security.
3      Q.  And would you have to go overseas and provide
4  protection for DuPont executives?
5      A.  Yes.
6      Q.  In foreign countries?
7      A.  Under the executive protection program the
8  reason I was hired was to start an executive protection
9  program because the chairman at the time, Mr. Shapiro's
10 life had been threatened and there was reason to believe
11 that there was going to be an attempt to assassinate him
12 because of his figure as chairman of the DuPont Company
13 and the fact that he was chairman of the DuPont Company
14 and Jewish and president of the World Jewish Federation.
15     Q.  Was it Mr. Shapiro who in the end hired you?
16     A.  Yes.
17     Q.  Did Mr. Shapiro take selecting someone to
18 protect himself and the other executives seriously?
19     A.  Yes.
20     Q.  And that was a job you held for over almost 20
21 years you said?
22     A.  17, 18 years, thereabouts.
23     Q.  And while you held that job would on occasion
24 Wilmington police officers be hired for extra duty

6 (Pages 18 to 21)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0324

Deitz v. Baker, et al

HARRY MANELSKI

Page 22

1 assignments while they were still on the active force?
2    A.   Yes.
3    Q.   Was Nancy Dietz hired on occasion that way?
4    A.   Yes.
5    Q.   Okay.  Were you her direct supervisor whenever
6 she was hired?
7    A.   No.
8    Q.   So there would be different levels of
9 supervision?
10    A.   There was a supervisor between me and what we
11 classified as executive security officers.
12    Q.   Would your name be on her payroll records?
13    A.   Yes.
14    Q.   Before you started with Wilmington was that your
15 first police job?  Was Wilmington your first police job?
16    A.   Yes.
17    Q.   Were you in college before then?
18    A.   Yes.
19    Q.   Where did you go to college?
20    A.   University of Maryland.
21    Q.   What years?
22    A.   '57, '58 and part of '59.
23    Q.   Did you graduate from there?
24    A.   No.

Page 23

1    Q.   Okay.  Did you play football?
2    A.   Yes.  I was on a football scholarship.
3    Q.   Okay.  Before that where did you go to high
4 school?
5    A.   Salesianum.
6    Q.   Okay.  Now, the declaration that's in front of
7 you, okay, this is the Manelski exhibit number 1, do you
8 have that in front of you?
9    A.   Yes.
10    Q.   And that's your signature on the second page
11 there?
12    A.   Yes.
13    Q.   Did you sign that on March 22nd, 2007 in my
14 office?
15    A.   Yes.
16    Q.   Okay.  I want to go over a couple things in
17 there.  Okay.  Paragraph two, let's go to the front, you
18 were asked about the years you were at the police
19 department as either the acting chief or the chief.  Do
20 you see that in the first sentence?
21    A.   Yes.
22    Q.   And those dates are correct, is that right?
23    A.   Yes.
24    Q.   And then was it Mayor William McLaughlin who

Page 24

1 appointed you?
2    A.   Yes.
3    Q.   Now, let's go to paragraph three.  Could you
4 just read that quietly to yourself?
5    A.   Okay.
6    Q.   Now, did you serve in the City of Wilmington on
7 the police force in 1968?
8    A.   Yes.
9    Q.   Okay.  Were there race riots in the City of
10 Wilmington in 1968 after Dr. Martin Luther King was
11 assassinated?
12    A.   Yes.
13    Q.   Okay.  '68 you would have been on the force
14 about seven years, is that right?
15    A.   Yes.
16    Q.   What would your rank have been when the riots
17 occurred?
18    A.   I was a patrolman.
19    Q.   You were a patrolman, so were you on the streets
20 during the riots?
21    A.   Yes.
22    Q.   Were you in the Valley, for example?
23    A.   Yes.
24    Q.   Were you in other places?

Page 25

1    A.   Yes.
2    Q.   Okay.  Just for the sake of the record, do you
3 recall how many days of rioting there was in Wilmington
4 at that time when Dr. King died?
5    A.   Seven to ten, full riot.
6    Q.   Seven to ten?  Okay.  Were there any deaths in
7 Wilmington?
8    A.   Not that I recall.  There were many injuries.
9    Q.   Many injuries.  Okay.  And was there a situation
10 where the Governor brought in the National Guard?
11    A.   Yes.
12    Q.   Did that happen immediately after the riots or
13 during the riots?  When did that --
14    A.   It happened during the riots.  The first people
15 called in were the Delaware State Police, and then the
16 Mayor -- Governor Terry, as I recall, said that we do
17 not have control of the situation in Wilmington and send
18 in the National Guard.
19    Q.   So the rioting situation was such that the
20 Governor of the State of Delaware felt that the
21 Wilmington police force wasn't able to control the
22 situation?
23    A.   Yes.
24    Q.   Did the Governor indicate that the Wilmington

7 (Pages 22 to 25)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0325

Deitz v. Baker, et al
HARRY MANELSKI

Page 26

1  police force wasn't able to restore order?
2  A.  I believe he did.
3  Q.  Okay.  And how long --
4  A.  You have to remember I'm only a patrolman.  I'm
5  taking orders at this time.
6  Q.  No, I understand.  But you were living here at
7  that time?
8  A.  Oh, yes.
9  Q.  And how long did the National Guard stay on
10  board helping the city police?
11  A.  I believe nine months.
12  Q.  The riots, did they happen in -- what parts of
13  the city was the rioting happening?
14  A.  May I start from the beginning?
15  Q.  Yeah.  Sure.
16  A.  Immediately after the assassination of Dr. King
17  there was a rally in Rodney Square several days after
18  his assassination and all the schools released their
19  students to attend the rally.  There also were activists
20  and members of the Black Panther party were present and
21  some other activist organizations.  The rally started to
22  turn ugly, and I was working day work at that time, and
23  we were sent to Market Street, two officers to every
24  block south and north to protect the stores and the

Page 27

1  owners.  The rally broke up rather hurriedly and very
2  large groups began running south on Market Street
3  breaking out windows, looting, assaulting --
4  Q.  You say going south on Market?
5  A.  From Rodney Square --
6  Q.  Going south, gotcha.
7  A.  Came south on Market and began breaking out
8  store windows, looting stores.  I had bricks and bottles
9  thrown at me.  I was in the 800 block of Market, and all
10  the officers assigned to duty were physically assaulted
11  by various bricks and bottles.  We called in for help,
12  officers in trouble, at which time other police officers
13  were dispatched and that started.
14  Q.  The riots spread you mean?
15  A.  Escalated to a uncontrollable point very, very
16  rapidly.
17  Q.  So was there rioting, looting and burning in the
18  City of Wilmington?
19  A.  Yes.
20  Q.  And for example, did, if we take where I95 is
21  now and we go from Market west to 95, was there rioting
22  looting and burning in that area?
23  A.  The whole area.
24  Q.  Some people call that the Valley down there on

Page 28

1  Madison and everything, right?
2  A.  Yeah.  That's correct.
3  Q.  And for more than one day was there rioting and
4  looting and burning in that area?
5  A.  Absolutely.
6  Q.  And as we go east from Market towards the river,
7  there was rioting and looting and burning in those
8  areas, too?
9  A.  Yes.
10  Q.  As we go north on Market up to 18th and 23rd and
11  things like that, were those areas in danger, too?
12  A.  They were minimal.  However north of the city
13  and east of the city, Riverside erupted.
14  Q.  They what?
15  A.  Riverside erupted into civil unrest and then
16  Southbridge erupted into civil unrest.
17  Q.  Were these minority members who were rioting?
18  A.  Yes.
19  Q.  Were these African-American citizens who were
20  rioting?
21  A.  Yes.
22  Q.  And Dr. King was a black African-American leader
23  who had been murdered, right?
24  A.  Yes.

Page 29

1  Q.  And the State Police came in to help the
2  Wilmington Police you say?
3  A.  Yes.
4  Q.  And then the Delaware National Guard came in to
5  help also?
6  A.  Yes.
7  Q.  And who was the Mayor at the time of the
8  rioting?
9  A.  Mayor John Babiarz.
10  Q.  John Babiarz?
11  A.  Yes.
12  Q.  And then in paragraph three you say eventually
13  through a Mayor Haskell and a Chief McCool, do you see
14  that there?
15  A.  Yes.
16  Q.  Was Mayor Haskell mayor while you were still
17  serving on the police force?
18  A.  Yes.
19  Q.  And was Chief McCool a chief you served under?
20  A.  Yes.
21  Q.  And you indicated there that at the time of the
22  riots there were two inspectors and they were white, do
23  you remember that?
24  A.  Yes.

8 (Pages 26 to 29)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0326

Deitz v. Baker, et al
HARRY MANELSKI

| | |
|---|---|
| Page 30 | Page 32 |

**Page 30**

1　Q.　And then a third inspector position was created
2　around 1969, do you see that?
3　A.　Yes.
4　Q.　Is that your recollection?
5　A.　Yes.
6　Q.　Okay.　And the man who filled that third
7　inspector position, the officer, his name was Andrew
8　Turner, is that correct?
9　A.　Yes.
10　Q.　And was he an African-American?
11　A.　Yes.
12　Q.　Okay.　And by the -- you indicated that
13　eventually he retired?
14　A.　Yes.
15　Q.　At the time of the retirement there were three
16　inspector positions?
17　A.　Yes.
18　Q.　And then you indicated that when he retired he
19　was replaced by a white officer as inspector, is that
20　right?
21　A.　Yes.
22　Q.　Now, you flip the page of your declaration and
23　go to paragraph four, you indicate in the first sentence
24　that when you were chief all three of the inspectors

**Page 31**

1　were white, right?
2　A.　Yes.
3　Q.　And then you had promoted someone to the rank of
4　captain, right?
5　A.　Yes.
6　Q.　Did you promote the person you thought was most
7　qualified to be captain at that time?
8　A.　Yes.
9　Q.　What was his or her name?
10　A.　Robert Longyear.
11　Q.　Robert Longyear?
12　A.　L-o-n-g-y-e-a-r.
13　Q.　Okay.　Then you indicate in your declaration
14　that your promotion of this individual caused opposition
15　in the African-American community?
16　A.　Yes.
17　Q.　Did that really happen?
18　A.　Yes.
19　Q.　And you say you were even picketed?
20　A.　Yes.
21　Q.　Because of your selection of Officer Longyear?
22　A.　Yes.
23　Q.　Okay.　Were there black members of City Council
24　at that time?

**Page 32**

1　A.　Yes.
2　Q.　Was, for example, James Baker, the current
3　Mayor, was he a member of City Council at that time?
4　A.　Yes.
5　Q.　And was there a city councilman who was black by
6　the name of White at that time?
7　A.　Yes.
8　Q.　Was there a city councilman at that time by the
9　name of Brooks, was he black?
10　A.　Yes.
11　Q.　Were you getting flak from those black city
12　councilmen because you had promoted this white officer
13　to the rank of captain?
14　A.　Yes.
15　Q.　Okay.　Were community activists saying things in
16　the community in opposition to your promotion of this
17　white to the position of captain?
18　A.　It wasn't so much in opposition that I appointed
19　Longyear to captain.　It was as much as they wanted more
20　black representation at the higher echelon of the
21　department.
22　Q.　Okay.　So was the message that you perceived
23　that was coming from Councilman Baker and Councilman
24　White and Councilman Brooks that there ought to be more

**Page 33**

1　black representation at the highest levels of the police
2　department?
3　A.　Yes.
4　　　MS. CHEEK:　Objection to form.
5　　　MR. NEUBERGER:　Is that what you understood
6　the message they were sending to you?
7　　　THE WITNESS:　Yes.
8　BY MR. NEUBERGER:
9　Q.　They were elected officials at the time, those
10　three councilmen?
11　A.　Yes.
12　Q.　There were community activists, you, for
13　example, mentioned the names of - well, Al Plant, was he
14　a State Representative at that time or community
15　activist?
16　A.　No.　Community activist.
17　Q.　And Mr. Anderson, he was a community activist,
18　right?
19　A.　Right.
20　Q.　Ray Evans, he was a community activist?
21　A.　Right.　And one I forgot to mention was - I
22　don't remember his first name - was Skinny Wilson.
23　Q.　Skinny Wilson?
24　A.　He was president of the Longshoremen's

9 (Pages 30 to 33)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0327

Deitz v. Baker, et al
HARRY MANELSKI

|  | Page 34 |
|---|---|

1  Association.
2  Q.  And he was an African-American?
3  A.  Yes.
4  Q.  And was he also a community activist?
5  A.  Yes.
6  Q.  And were they making demands for more
7  representation of African-Americans at the highest
8  levels of the police department?
9  A.  Yes.
10      MS. CHEEK: Objection to the form. I would
11  like you to stop leading.
12  BY MR. NEUBERGER:
13  Q.  Did you understand them to be sending that kind
14  of a message?
15  A.  They told me, yes.
16  Q.  Okay. They told you that. Okay. Then you say
17  there was this eventually there was this meeting held
18  with the Mayor during the year 1977, right?
19  A.  Right.
20  Q.  Okay. That was Mayor William McLaughlin. He
21  was an elected official of the city, right?
22  A.  Yes.
23  Q.  The city solicitor wasn't elected, right?
24  A.  He was appointed.

|  | Page 35 |
|---|---|

1  Q.  He was appointed. And the Mayor's chief
2  administrative person, Mr. Singleton, was he elected?
3  A.  He was appointed.
4  Q.  And you indicated that several politicians were
5  there at this meeting, and you gave their names
6  earlier --
7  A.  Yes.
8  Q.  -- right? That included the then present -- the
9  fellow who is Mayor now, James Baker?
10  A.  He was a councilman at the time.
11  Q.  And you weren't asked if -- you weren't asked
12  what those African-American politicians were saying or
13  demanding at the meeting. What do you remember them
14  saying or demanding at the meeting?
15  A.  The primary concern there was no
16  African-American representation in the top echelon of
17  the police department. Their second concern was that
18  white officers could not relate to the problems in the
19  streets of Wilmington as could black --
20      (Inaudible to reporter)
21  Q.  As could black officers, is that what you said?
22      (Record Read)
23      THE WITNESS: With the black community, as
24  would as black officers could.

|  | Page 36 |
|---|---|

1  BY MR. NEUBERGER:
2  Q.  So those are the types of concerns that
3  were being conveyed by the black community
4  representatives as well as the black politicians who
5  were there?
6  A.  Yes.
7  Q.  And they were relaying these, let's call them
8  petitions for want of a better word, to the Mayor and
9  some of his executive staff?
10  A.  Yes.
11  Q.  All right. And you were at this meeting when
12  this was going on?
13  A.  Yes. Not all the time, but one particular time
14  I was.
15  Q.  Okay. So they were having the meeting and you
16  were excluded?
17  A.  When they first started talking about the
18  situation I was not included until a recent point with
19  the Mayor, and Mr. Singleton wanted me there because I
20  had the responsibility of the entire police department
21  and making promotions, et cetera, and I attended the one
22  meeting where I agreed.
23  Q.  Okay. Are you saying that there was a meeting
24  going on one day among all those people and then you

|  | Page 37 |
|---|---|

1  were brought into it or are you saying that there were
2  meetings on other days?
3  A.  There were meetings on other days where this was
4  the topic of conversation and I had been informed by the
5  administrative assistant about the concern of the black
6  representatives relative to blacks in higher echelon in
7  the department and then another meeting was set up
8  subsequent to the prior meeting of which I was invited
9  to attend and that's the meeting I'm referring to.
10  Q.  So you attended a meeting on a particular day
11  that all of these people were present?
12  A.  Yes.
13  Q.  And you learned that day that there had been
14  earlier meetings among those people, is that a fair
15  statement?
16  A.  No. I knew before I went to that meeting that
17  there had been previous -- previous meetings with these
18  officials.
19  Q.  Okay. And when you had the meeting that you
20  were brought to, did you learn that there was going to
21  be a fourth inspector position created?
22      MS. CHEEK: Objection to form.
23      THE WITNESS: I -- I knew well before I
24  went into that meeting what the topic was going to be

10  (Pages 34 to 37)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0328

Deitz v. Baker, et al
HARRY MANELSKI

Page 38

1  because the councilmen were not bashful to walk into my
2  office any time of the day or calling me at home
3  requesting many things relative to police work, one of
4  which is the subject we're talking about.
5  BY MR. NEUBERGER:
6      Q.  So did Councilman Baker call you at home or go
7  to your office and tell you that he wanted a fourth
8  inspector position to be filled by a black?
9      A.  I don't think he did but Councilman Brooks and
10 Councilman White did.
11     Q.  Okay.
12     A.  I don't recall Mayor Baker coming or Councilman
13 Baker coming into my office but Councilman Brooks and
14 Councilman White did many times.
15     Q.  Then the meeting was held with the Mayor
16 Singleton and those other people, people you have
17 identified?
18     A.  We all -- yes.
19     Q.  And a fourth position, was it discussed at this
20 meeting?
21     A.  Yes.
22     Q.  A fourth inspector position was discussed, is
23 that what you're saying?
24     A.  Yes.

Page 40

1  there or other captains?
2      A.  There were white captains, right.
3      Q.  Right.
4      A.  Yes.
5      Q.  But do you remember about how many captains were
6  serving under you?
7      A.  Five to seven.
8      Q.  So about five to seven captains, one of which
9  was black, is that what you're saying?
10     A.  Yes.
11     Q.  And that was Kenneth Miles?
12     A.  Yes.
13     Q.  Okay.  And was it your understanding that if he
14 was qualified he was the person you have to promote?
15     A.  Yes.
16     Q.  Okay.  Then that created a vacancy in the
17 captain position that Miles held?
18     A.  Yes.
19     Q.  Okay.  And I think you indicated that that was
20 -- his replacement was a officer I guess it would be a
21 Lieutenant John Johnson at the time?
22     A.  Yes.
23     Q.  And was he African-American?
24     A.  Yes.

Page 39

1      Q.  And that would have to be created by action of
2  the City Council?
3      A.  Yes.
4      Q.  And was the Mayor willing to push the creation
5  of such a position?
6      A.  Yes.
7      Q.  Did the black representatives indicate that they
8  were willing to push the creation of a fourth position?
9      A.  Yes.
10     Q.  Did it have to be funded and put into the
11 budget, is that right?
12     A.  Yes.
13     Q.  And were you told of any restraints that were
14 put on you as far as filling that position?
15     A.  No.
16     Q.  Okay.  What was -- in your affidavit, in your
17 declaration, you talked about Captain Miles being
18 discussed; how did that come about?
19     A.  He was the only person eligible for the position
20 of inspector because he was the only black captain.
21     Q.  Okay.
22     A.  And at that particular time we were not allowed
23 to jump rank.
24     Q.  Okay.  Well, he was the only black captain, but

Page 41

1      Q.  So Miles was replaced by an African-American?
2      A.  Yes.
3      Q.  Okay.  That was during your tenure there?
4      A.  Yes.
5      Q.  Then eventually you retired?
6      A.  Yes.
7      Q.  Right?  And eventually Miles retired?
8      A.  Yes.
9      Q.  And John Johnson who was a captain and an
10 African-American he replaced Inspector Kenneth Miles?
11     A.  Yes.
12     Q.  Okay.  Let me see --
13     A.  After I retired.
14     Q.  After you retired.  Then there were these
15 questions by Attorney Cheek about the physical
16 requirements to become a Wilmington police officer --
17     A.  Uh-huh.
18     Q.  -- back in those days.  And you indicated that
19 you were the person who had interviewed Nancy Dietz and
20 had decided to hire her?
21     A.  Yes.
22     Q.  And I'm a little unfamiliar with what the hiring
23 requirements would have been for Wilmington back then.
24 I have got lots of information on the State Police and

11 (Pages 38 to 41)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0329

## Deitz v. Baker, et al
## HARRY MANELSKI

Page 42

1  everything.  Do you do background checks on people?
2      A.  Yes.
3      Q.  Do you take their fingerprints and stuff like
4  that?
5      A.  Yes.
6      Q.  And you run those through the FBI databases?
7      A.  Yes.
8      Q.  Did you have like psychological or psychiatric
9  testing?
10     A.  Yes.
11     Q.  You have to determine whether a person is
12  mentally stable enough to be able to carry a weapon?
13     A.  Yes.
14     Q.  So you went through that kind of stuff?
15     A.  Yes.
16     Q.  And then would there be like, for want of a
17  better word, intelligence testing or stuff to measure do
18  you have the ability to fill out reports and understand
19  rules and regulations, that kind of testing, or
20  screening, let's call it that?
21     A.  Yeah, screening.  Screening.
22     Q.  Screening.  Had she graduated from anywhere?
23     A.  She graduated from Penn State University, as I
24  recall, and I believe her degree was in criminal

Page 43

1  justice.
2      Q.  Do you recall whether it was just average or
3  less than average or good or anything like that?
4      A.  I don't recall.
5      Q.  Okay.  Okay.  Then there is -- well, at that
6  time there were -- you were asked about physical agility
7  testing?
8      A.  Yes.
9      Q.  You talked about running the mile, pushups and
10  things like that, right?
11     A.  Yes.
12     Q.  You were asked if you bent the rules so that
13  Nancy Dietz could become a Wilmington police officer, do
14  you remember being asked that?
15     A.  Yes.
16     Q.  And you said no, you didn't?
17     A.  Absolutely not.
18     Q.  Was there any reason why you felt she couldn't
19  pass the physical agility testing?
20     A.  I didn't know her at the time, but I would not
21  bend the rules for anybody.
22     Q.  Okay.  Well, was she a 200-pound overweight
23  person at that time --
24     A.  No.

Page 44

1      Q.  -- who didn't look like she could do the mile?
2      A.  No.
3      Q.  Do you recall whether you observed her to be a
4  healthy-looking individual?
5      A.  I did not attend the physical agility tests.  I
6  had to rely on what the officers told me.
7      Q.  But you did interview her?
8      A.  That's the last part of the process.
9      Q.  So you don't get to the interview unless you
10  pass the agility?
11     A.  You have to pass everything until you get to the
12  Chief's office.
13     Q.  So you had people, and you identified some
14  names, who would have administered these agility tests?
15     A.  Yes.
16     Q.  Okay.  And at the time they were thought to be
17  good measures of the things you needed to be to be a
18  police officer?
19     A.  Well, the captain would report to me the results
20  of the testing and how many were going forward and how
21  many did not make it.
22     Q.  Right.  And there are people who don't make it?
23     A.  Oh, there was quite a few.
24     Q.  Right.  So you're saying you remember quite a

Page 45

1  few being washed out on the physical agility tests?
2      A.  Yes.
3      Q.  And then you would have seen people who had
4  passed the physical agility tests?
5      A.  Yes.
6      Q.  Now you're interviewing Nancy Dietz, okay, do
7  you remember about observing her that would
8  indicate to you that she didn't have the ability to
9  physically perform the job?
10     A.  No.
11     Q.  As a police officer?
12     A.  I had the results in front of me of her testing.
13     Q.  Oh, okay.  So when you did the interview you
14  would have written documents in front of you showing how
15  she did in the physical agility tests?
16     A.  Every test, including physical agility.
17     Q.  You'd have the mental testing?
18     A.  Yes.
19     Q.  The psychological testing?
20     A.  Yes.  Every report.
21     Q.  Every report.  Okay.  Do you remember if there
22  were many women officers on the force at that time?
23     A.  When I was the captain of personnel and training
24  I believe two -- I was instrumental in recommending to

12 (Pages 42 to 45)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0330

Deitz v. Baker, et al
HARRY MANELSKI

Page 46

1  the chief to appoint two females.  I believe it was Rita
2  Draper and Melissa Wimmer, as I recall, and they both
3  made it through the academy and were appointed full-time
4  patrol officers.
5     Q.  And I know the Draper name.  She had a career,
6  didn't she?
7     A.  I think she retired as a captain.
8     Q.  Right.  I don't know the other name.  Do you
9  know how long she served?
10    A.  She only -- she stayed, as I recall, six or
11  seven years.
12    Q.  Were women applicants for the Wilmington Police
13  force in those days asking for special treatment?
14    A.  No.
15    Q.  Were women applicants in the police force in
16  those days asking that the rules be bent to allow them
17  to try to be police officers?
18    A.  No.
19    Q.  Were women applicants when you were the chief
20  held to the same standard that the male applicants were
21  held to?
22    A.  Yes.
23    Q.  Were all applicants for the Wilmington Police
24  force, be it a male or female, be it black or white,

Page 47

1  held to the same standards?
2     A.  Yes.
3     Q.  Were the standards changed or bent for any group
4  to give them a privilege?
5     A.  No.
6        MR. NEUBERGER:  Okay.  I don't have any
7  other questions, Chief.  Maybe counsel will have some
8  more questions.
9  BY MS. CHEEK:
10    Q.  I have a couple.  Did you say that I think you
11  were asked how many women officers there were in
12  Wilmington Police Department at the time.  I don't know
13  what the time was specifically, but you named two female
14  officers appointed I believe you said when you were
15  captain of personnel and training?
16    A.  Yes.
17    Q.  Are you saying that those were the first two?
18    A.  There was an officer by the name of Golden
19  Wilson who was an African-American and she was a
20  sergeant, she was the only female that was on the
21  department at the time.  And I believe if I remember
22  correctly, Rita Draper and Melissa Wimmer were the first
23  two female officers appointed since Golden Wilson was
24  on.

Page 48

1     Q.  Can you tell us when that was Anita Draper --
2     A.  I believe it was 1975, '76, probably '75.
3  That's the year I made captain.
4     Q.  So the physical requirements for female
5  applicants were the same as those for male applicants at
6  that time?
7     A.  Yes.
8     Q.  And are they still the same?
9     A.  I don't know that.
10    Q.  Were you under any pressure to increase the
11  number of female officers when you were in charge of --
12    A.  I felt it was necessary to have female officers
13  in the police department when I was a captain of the
14  training division.  In many conversations with Chief
15  McCool we both agreed that there was a place in policing
16  for females and that they were needed.
17    Q.  Why did you feel that way?
18    A.  Feel what way, ma'am?
19    Q.  Why did you believe that it was necessary to
20  have female police officers?
21    A.  Because of certain aspects of police work, in
22  dealing with different kind of crimes, we felt that
23  female police officers could relate better and --
24    Q.  What kinds of crimes would they be?

Page 49

1     A.  Rape, crimes involving youth, sexual
2  molestation, domestic problems.  Really to be honest
3  with you all phases of police work.  It was absolutely
4  time.  At that time there weren't many police
5  departments around that had female police officers and I
6  believe in that era there was a lot of conversation
7  about the necessity, this is country wide, necessity for
8  females to start joining the police departments.  So
9  they were responsible for performing all phases of
10  police operations as well as any male, that is ride the
11  patrol car, walk a beat, they were treated equal and
12  they performed equal.
13    Q.  And did you communicate your philosophy about
14  that, about needing women in the department to your
15  subordinates, the sergeants that were running the
16  academy?
17    A.  As I stated earlier, I had many conversations
18  with Chief McCool and we both agreed that it had become
19  time, that females need to be a part of the police
20  operations and I did communicate that with my
21  subordinates.
22    Q.  And did that continue to be the case from 1975
23  through 1981?
24    A.  During my tenure, yes.

13 (Pages 46 to 49)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0331

Deitz v. Baker, et al
HARRY MANELSKI

Page 50

1     MS. CHEEK: Okay. That's all I have.
2 BY MS. BUTCHER:
3     Q.   When you went back to talking about the meeting
4 with the Mayor, the chief of staff or administrative
5 assistant, city solicitor, African-American counsel
6 members and African-American community advocates, you
7 indicated that they expressed a concern about diversity,
8 inclusion of African-American officers in the upper
9 echelons of the police department.  Were the other lower
10 ranks were there representative amounts of
11 African-Americans in those ranks at that time?  Were
12 they discussing incoming police academies or --
13     A.   No.  Only the upper echelon, top ranking
14 positions.
15     Q.   They didn't raise any issues with regard to
16 patrol officers?
17     A.   No.
18     Q.   Sergeants, lieutenants?
19     A.   No.
20     Q.   What was the title of the fourth inspector
21 position that was created?
22     A.   Community relations.
23     Q.   Community relations.
24     A.   Which went back to fulfill the needs as a result

Page 51

1 of that meeting when I stated previously that
2 representatives from the black community didn't feel as
3 though a white officer could relate to community
4 problems as well as the black officer.  So Mr. Turner,
5 Andy Turner was Inspector of Community Relations.
6     Q.   Might it have also been called Inspector of
7 Community Services?
8     A.   Yes.
9     Q.   That's it.
10     A.   Thank you.
11     MS. BUTCHER:  Okay.  I don't have any more
12 questions.  Thank you.
13     MR. NEUBERGER:  You have the opportunity to
14 read this over and see if she put you down as 45 instead
15 of 55 or something like that or we can just let it go.
16 I'd recommend that you just waive it.
17     THE WITNESS:  I'll just waive it.
18     (Whereupon the Deposition concluded at
19 approximately 3:05 p.m.)
20
21
22
23
24

Page 52

1
2                    I N D E X
3 DEPONENT:  HARRY F. MANELSKI              PAGE
4 Examination by Ms. Butcher          2
  Examination by Ms. Cheek           14
5 Examination by Mr. Neuberger        20
  Examination by Ms. Butcher         47
6 Examination by Ms. Cheek           50
7            E X H I B I T S
8 HARRY F. MANELSKI DEPOSITION EXHIBITS     MARKED
9 1  Unsworn declaration of Harry Manelski    8
10 CERTIFICATE OF REPORTER          PAGE 53
11
12
13
14
15
16
17
18
19
20
21
22
24

Page 53

State of Delaware)
2                 )
New Castle County)
3
          CERTIFICATE OF REPORTER
4     I, Elaine G. Parrish, Registered
5 Professional Reporter and Notary Public, do hereby
  certify that there came before me on the 5th day of
6 June, 2007, the deponent herein, HARRY F. MANELSKI, who
  was duly sworn by me and thereafter examined by counsel
7 for the respective parties; that the questions asked of
  said deponent and the answers given were taken down by
8 me in stenotype notes and thereafter transcribed into
  typewriting under my direction.
9
      I further certify that the foregoing is a
10 true and correct transcript of the testimony given at
  said examination of said witness.
11
      I further certify that reading and signing
12 of the deposition were waived by the deponent and
  counsel.
13      I further certify that I am not counsel,
  attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16      Elaine G. Parrish
17      Certification No. 170-RPR
18      (Expires January 31, 2009)
19
  DATED:  June 12, 2007
20
21
22
23
24

14  (Pages 50 to 53)

4e1a1f94-9d63-40a8-90d5-b20a5bf79d10

A0332

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                    :
                                           :
        Plaintiff,                         :
                                           :
    v.                                     :
                                           :
MAYOR JAMES M BAKER,                       :        C.A.No.06-256-SLR
individually and in his official capacity  :
as the Mayor of the City of Wilmington,    :
and the CITY OF WILMINGTON, a              :
municipal corporation,                     :
                                           :
        Defendants.                        :

## UNSWORN DECLARATION OF HARRY F. MANELSKI
## UNDER 28 U.S.C. § 1746

I, Harry F. Manelski, hereby depose and state as follows:

1. I have personal knowledge of the facts contained in this declaration and, if called as a witness, I am competent to testify as to those facts.

2. I was the Acting Chief of the Wilmington, Delaware Police Department from December 1976 to January 1977, and the Chief from January 1977 to March 1981. I served under and was appointed by Mayor William McLaughlin.

3. After the race riots in Wilmington in 1968 there were community pressures for the appointment of a African-American police inspector. There were two inspectors at the time and they both were White. Then under Mayor Hal Haskell a third inspector position was created and an African-American was selected for the rank of inspector by Chief John T. McCool around the year 1969, by the name of Andy Turner. He was the first person of his race selected for this position. He later retired and was replaced by a White inspector, so all three inspectors then were



White.

4. When I was Chief all three inspectors were White. I then promoted a White officer to the rank of Captain. This caused opposition in the African-American community and I was even picketed in opposition because of the race of my selection.

5. A meeting then was held with the Mayor, his chief of staff, the city solicitor, myself and several African-American politicians and community representatives. It was agreed at that meeting that a fourth inspector position would be created for Community Relations and that I would select an African-American officer for that position. I refused to do so unless the person was qualified. I was asked whether Captain Kenneth Miles was qualified and I agreed he was. Then I selected an African-American to be historically the second inspector of his race in the WPD and promoted Kenneth Miles to be our fourth inspector.

6. He served into 1982. Then he was replaced by another African-American named John Johnson, after I had retired.

_Harry F. Manelski_
**Harry F. Manelski**

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 22, 2007.

BIII 2/ Pleadings Manelski Declaration

2

A0334

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

July 27, 2007, I sent this **Appendix** to the following by the means indicated:


Teresa A. Cheek, Esquire
Young, Conaway, Stargatt, & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
tcheek@ycst.com
(by Hand Delivery)

Rebecca Butcher, Esq.
Dan Rath, Esq.
Landis, Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801
butcher@lrclaw.com
(by Hand Delivery)


/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ.**


Dietz / Appendix / SJOB Appendix / Dietz - SJOB App. TOC