# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                         :
                                                :
      Plaintiff,                           :
                                                :
  v.                                           :    **FILED UNDER SEAL**
                                                :
MAYOR JAMES M BAKER,                            :    C.A.No.06-256-SLR
individually and in his official capacity       :
as the Mayor of the City of Wilmington,         :
and MAYOR AND COUNCIL OF                        :
WILMINGTON,                                     :
                                                :
      Defendants.                          :

**SEALED VOLUME OF APPENDIX TO PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT (Part III - A1218 - 1525)**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: July 27, 2007            Attorneys for Plaintiff

# TABLE OF CONTENTS

**Item**                                                                                              **Page**

*Part I:*

Defendant City of Wilmington's Response and Answers to Plaintiff's First Set of
      Interrogatories Directed to Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0335

Defendant City of Wilmington's Supplemental and Amended Responses and Answers
      to Plaintiff's First Set of Interrogatories Directed to Defendants . . . . . . . . . . . . . A0374

Defendant James M. Baker's Answers and Objections to Plaintiff's First Set of
      Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0416

Plaintiff's Answers and Objections to Defendant James Baker's First Set of
      Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1443

Defendant's Document Production


      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0426

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0746

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0793

*Part II:*


      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0794

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0860

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1208

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1210

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1212

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1217

*i*

***Part III:***

. . . A1218

. . . A1247

. . . A1248

. . . A1250

. . . A1252

. . . A1255

. . . A1256

D03391: Chart Illustrating the Progression and Replacements of WPD
    Inspectors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1257

Deposition of Chief Michael Szczerba, Jan. 25, 2007 . . . . . . . . . . . . . . . . . . . . . . . A1258

. . . A1323

. . . A1333

. . . A1343

. . . A1354

. . . A1363

. . . A1372

. . . . . A1375

. . . . . A1378

Deposition of Gilbert Howell, Apr. 5, 2007  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1389

Exhibits from the Deposition of Capt. Nancy Dietz, May 9, 2007

    Exhibit 1: Resume of Nancy S. Dietz (D02241-43)  . . . . . . . . . . . . . . . . . . . . . . A1416

    . . . . . . . . . . . A1419

    . . . . . . . . . . . A1437

    Exhibit 17: Except from Plaintiff's Answers and Objections to Defendant
        James Baker's First Set of Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . A1440

    Exhibit 20: Defendant's Progression Chart of Inspectors  . . . . . . . . . . . . . . . . . . . . A1441

Deposition of Chief Michael Szczerba in Boyd v. Wilmington Police Department,
    Jan. 23, 2006  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1474

# SEALED DOCUMENTS (A1218 - 1256)

| INSP/CHIEF OF | | PROMOTED | LAST DAY WORKED | REPLACED | PAF |
|---|---|---|---|---|---|
| | Eugene Maloney (W) | 10/16/73 | 7/1/83 | | |
| Chief of OPERATIONS | Charles Bryan III (W) | 12/15/78 | 9/28/81 | N. Valiente (W) | ✓ |
| Chief of Staff / Chief Admin | Stanley Friedman (W) | 4/3/79 | 6/30/83 | E. Mort, Sr. (W) | ✓ |
| Chief of OPERATIONS | Lawrence Curtis | 10/14/81 | 4/29/83 | Charles Bryan | ✓ |
| COMMUNITY AFFAIRS | John Johnson Sr. | 10/14/81 | 7/31/87 | Kenney Miles | ✓ |
| INSP of OPERATIONS | Donald Payne Jr. | 5/16/83 | 9/14/87 | Lawrence Curtis | ✓ |
| Chief of administration | Charles Dougherty (W) | 7/2/83 | 6/30/89 | Eugene Maloney | ✓ |
| Insp of SERVICES / Staff Insp | John Doherty (W) | 7/29/83 | 6/6/86 | Stanley Friedman | ✓ |
| OPERATIONS / Community SERVICES | Preston Hickman | 9/30/87 | 7/7/89 | John Johnson Sr. | ✓ |
| ? | Richard Lafoshia (W) | 2/8/89 | 5/13/89 | John Doherty (?) LAFOSHIA BRYAN | |
| Insp. of administration | William Draper (W) | 5/8/89 | 10/28/94 | Richard Lafoshia | |
| UNIFORM OPERATIONS | Samuel Pratcher (B) | 7/3/89 | 1/17/93 | Preston Hickman | ✓ |
| UNIFORM OPERATIONS | R. Michael Dixon (B) | 2/5/93 | 9/22/95 | Samuel Pratcher | |
| Administrative OPERATIONS | John Vignola (W) | 11/1/94 | 3/7/97 | William Draper | |
| UNIFORM OPERATIONS | Michael Boykin | 11/4/95 | 3/23/97 | Michael Dixon | |
| UNIFORM OPERATIONS | Keith Ash (B) | 3/7/97 | 2/20/98 | Michael Boykin | |
| administration OPERATIONS | John Murray | 3/23/97 | 5/26/99 | John Vignola | |
| UNIFORM OPERATIONS | James Stallings | 2/20/98 | 2/16/01 | Keith Ash | |
| administration OPERATIONS | Ronald Huston (W) | 5/27/99 | 7/30/99 | John Murray | |
| administration OPERATIONS | Martin Donohue (W) | 7/31/99 | — | Ronald Huston (W) | |
| UNIFORM OPERATIONS | James Wright | 2/17/01 | 10/27/05 | James Stallings | |
| UNIFORM OPERATIONS | Gilbert Howell (B) | 10/28/05 | — | James Wright | |

community affairs  )
Chief of OPERATIONS
staff                          } FOUR INSPECTORS                    } NOW 2
SERVICES

D03391

Confidential

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,          )
                                 )
          Plaintiff,      )
                          )  Civil Action
     v.           )   No.06-256
                          )
MAYOR JAMES M. BAKER, individually )
and in his official capacity as the) PAGES 27 TO 58
Mayor of the City of Wilmington,   )  AND 149 TO 181
and MAYOR AND COUNCIL OF           )  ARE CONFIDENTIAL
WILMINGTON,                 )
                            )
          Defendants.    )


          Deposition of MICHAEL J. SZCZERBA taken
pursuant to notice at the law offices of The Neuberger
Firm, Two East Seventh Street, Suite 302, Wilmington,
Delaware, beginning at 9:10 a.m. on Thursday,
January 25, 2007, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.


APPEARANCES:


          THOMAS S. NEUBERGER, ESQUIRE
          CHERYL A. HERTZOG, ESQUIRE
          THE NEUBERGER FIRM
            Two East Seventh Street - Suite 302
            Wilmington, Delaware  19801-3707
            for the Plaintiff


------------------------------------------------------
          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477

          www.wilfet.com

Page 2

1  APPEARANCES (Continued):
2
3       REBECCA L. BUTCHER, ESQUIRE
        LANDIS RATH & COBB LLP
          919 Market Street - Suite 600
4         Wilmington, Delaware  19899
          for the Defendant Mayor James M. Baker
5
        TERESA A. CHEEK, ESQUIRE
6       YOUNG, CONAWAY, STARGATT & TAYLOR LLP
          1000 West Street
7         The Brandywine Building - 17th Floor
          Wilmington, Delaware  19899-0391
8         for the Mayor and Council of
            Wilmington
9
10  ALSO PRESENT:
11      CAPTAIN NANCY S. DIETZ
12          - - - - -
13      MICHAEL J. SZCZERBA,
14    the witness herein, having first been
15    duly sworn on oath, was examined and
16    testified as follows:
17  BY MR. NEUBERGER:
18    Q.  Chief, could you state your full name for the
19  record?
20    A.  Michael J. Szczerba.  The last name is spelled
21  S-z-c-z-e-r-b-a.
22    Q.  Your date of birth?
23    A.  10/25/55.
24    Q.  Chief, have you had your deposition taken

Page 3

1  before?
2    A.  Yes.
3    Q.  On more than one occasion?
4    A.  Yes.  Some dating back more than others, but I
5  guess as recently in probably 2006 I did have a
6  deposition.
7    Q.  Are you on any medications that might interfere
8  with your being able to remember things today?
9    A.  No.
10    Q.  If you ever need to take a break or anything,
11  if anybody does, just let us know and we'll take a
12  break.
13    A.  Thank you.
14    Q.  If I ever ask you a question that you don't
15  understand, just ask me to repeat it and I'll be glad
16  to rephrase it or repeat it.  I don't want you to
17  guess at anything.
18        Do you understand that?
19    A.  Yes.
20    Q.  Maybe you could just give me a brief little
21  history of your assignments.  Let's say we'll start
22  with the police academy going forward, if that's
23  easier.  Okay?
24    A.  Okay.

Page 4

1    Q.  But first of all, did you go to Salesianum
2  school here in Wilmington?
3    A.  Yes.
4    Q.  When did you graduate?
5    A.  In 1973.
6    Q.  Did you go to Delaware or anyplace?
7    A.  Yes.  University of Delaware and graduated in
8  1977.
9    Q.  Did you go to the police academy after that?
10    A.  Yes.  I entered the police academy in July of
11  '78.
12    Q.  July of 1978.  Okay.
13        When would you have then joined the force
14  after the academy?  When would you have started?
15    A.  I would have started on the street in November
16  of '78.
17    Q.  November of 1978.
18        Is it a good guess that you started on
19  patrol?
20    A.  Yes, you're correct.
21    Q.  Why don't we just start with how long you were
22  on patrol and take your assignments all the way up to
23  the present, if you can.
24    A.  I was in the patrol division approximately

Page 5

1  until about 1982.  And thereabout I was detailed to an
2  assignment with our Drug, Organized Crime and Vice
3  Division better known as the vice squad.  That
4  detailed assignment turned into a permanent position.
5  Stayed there until 1989.
6    Q.  So about 1982 to 1989 you were in vice?
7    A.  Yes.
8    Q.  Okay.
9    A.  I was promoted to the rank of sergeant.  Was
10  then reassigned to the patrol division as a street
11  supervisor.
12        After about a year and a half I was
13  transferred to the detective division as a squad
14  supervisor.
15    Q.  So this would be 1990, 1991 detectives?
16    A.  Right.
17    Q.  A supervisor in detectives.  I got you.
18    A.  That lasted for a year and a half to two years.
19  I was then transferred to the internal affairs
20  division now known as the Office of Professional
21  Standards.
22    Q.  As a sergeant?
23    A.  Yes, as a sergeant investigator.
24    Q.  Yes.

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1259

Michael J. Szczerba

Page 6

1    A.  I remained there for a couple years.  Took a
2  brief assignment in our Support Services Division,
3  which was less than a year.
4         Then moved on to our Community Services
5  Division.
6    Q.  So about 1996-1997 in the Community Services?
7    A.  Approximately, yes.  I'm not sure of the years.
8    Q.  I'm following you.  You said Community
9  Services?
10   A.  Yes.
11   Q.  Okay.  How long would you have been there,
12  maybe?
13   A.  Probably '97 through '99.
14   Q.  Any promotions yet or are you still sergeant?
15   A.  No.  Then promoted to the rank of lieutenant
16  in, I think it was, 1999.
17   Q.  Okay.
18   A.  Went back to the Patrol Division.  I was a --
19  at that time how we had it set up, there were
20  districts, six districts or six police service areas
21  in the City of Wilmington.  I was in charge of one of
22  those police service areas.
23   Q.  Which district was it?
24   A.  Northwest Wilmington.

Page 7

1    Q.  All right.
2    A.  Northern One.
3         And then I was then offered -- after doing
4  that about a year, I was offered a position as the
5  strategic planning lieutenant.  That was out of the
6  chief's office.
7    Q.  Who was the chief then?
8    A.  Michael Boykin.
9    Q.  Boykin.
10   A.  I also worked in cooperation of the director of
11  public safety, who was David Bostrom.  Remained there.
12  All throughout this service, too, I did some dabling
13  in the public information office.
14   Q.  Oh, yes.
15   A.  Some people still relate to me as the public
16  information officer.  I never held that position
17  permanently, but when I was the strategic planning
18  lieutenant, I did have some mixed duties with -- the
19  public information officer worked out of my office,
20  but, you know, when he was absent, sometimes I would
21  fill in for him.  I remained in that position until
22  2001 when I was appointed as chief of police.
23   Q.  So you went from lieutenant to chief of police?
24   A.  Yes.

Page 8

1    Q.  Oh, okay.  I didn't realize that.  Okay.
2    A.  Yes.  When there was a change in the
3  administration, it was offered to the ranks of
4  lieutenant and above to submit resumes for the
5  position of chief of police.  I obviously did that and
6  was successful in the process and officially on
7  January 3rd, 2001, I was sworn in as the chief of
8  police.
9    Q.  You were selected by then-Major Jim Baker?
10   A.  That's correct.  Actually, the selection
11  process was officially, you know, when Major Baker was
12  in office, but the selection process occurred as he
13  was the mayor-elect.
14   Q.  Got you.
15   A.  And then I think it was in -- my appointment
16  was announced in December, but I really wasn't
17  officially sworn in until January.
18   Q.  So you served in patrol.  You served in the
19  vice unit.  You've been a supervisor.  We call them a
20  road supervisor in patrol?
21   A.  Street.
22   Q.  State police called it road.  For us it's the
23  street; right?
24   A.  Yes.  It's the highway patrol versus

Page 9

1  full-service policing.
2    Q.  Supervisor in detectives, sergeant investigator
3  in IA, but never the person in charge of IA?
4    A.  That's correct.
5    Q.  Never the commander.
6         You worked in support services?
7    A.  For a very short time.
8    Q.  Short time.  Okay.
9         Community services for a couple years?
10   A.  Yes.
11   Q.  Then you were a street lieutenant in the
12  Northern One district in northwest Wilmington?
13   A.  That's right.
14   Q.  As the street, as the lieutenant for a
15  district, are you responsible for patrol and traffic
16  and criminal enforcement in that area?
17   A.  Mainly patrol functions within that area.  I
18  worked in cooperation, of course, with the other
19  lieutenants, but, you know, not as far as any
20  follow-up investigations.  Traffic division is a
21  separate division, but of course part of the duties
22  with the Patrol Division is traffic enforcement, but
23  that's not the only duty.
24   Q.  So there would be other lieutenants serving in

3 (Pages 6 to 9)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1260

## Michael J. Szczerba

1  the Northern One district or what?
2  A.  No.
3  Q.  No?
4  A.  No.  There's lieutenants in charge.  You know,
5  one person cannot work around the clock, but there was
6  a lieutenant in charge of each one of those six police
7  service areas.
8  Q.  Okay.  I got you.
9       Then let me just see.  So you started on
10 the force in 1978.  Let's see what you can remember of
11 who were the chiefs going back.  We'll go back from
12 you.  Okay?  So we have you.
13      Michael Szczerba start serving as the chief
14 from January 3rd from the year 2001; correct?
15 A.  Correct.
16 Q.  Prior to you, Mike Boykin was the chief?
17 A.  Right.
18 Q.  Wasn't he the chief from around 1997 to 2001?
19 A.  Approximately.
20 Q.  Does that sound about fair?
21 A.  Yes, yes, it does.
22 Q.  Prior to him it was Sam Pratcher?
23 A.  Yes.
24 Q.  Does it sound about fair he was the chief from

1  1993 to 1997?
2  A.  Yes.
3  Q.  Before Chief Pratcher, Guy Sapp was the chief.
4  Is that true?
5  A.  That's true.
6  Q.  Does it sound about fair that he served from
7  1988 to 1993?
8  A.  Yes.
9  Q.  Before Guy Sapp was a chief by the name of
10 Donald Payne who I just don't remember.  Was he a
11 chief for about two years from 1987 to 1999?
12 A.  That's correct.
13 Q.  Then there was Joe Pennell before Don Payne.
14 Is that true?
15 A.  Yes.
16 Q.  Did Joe Pennell serve as chief from around 1985
17 to around 1988?
18 A.  Yes.
19 Q.  We are still at your time on the force.  Okay.
20      So before Joe Pennell was Dennis Regan the
21 chief?
22 A.  Yes.
23 Q.  Does it sound like he served from around 1981
24 to 1985?

1  A.  Yes, that's fair.
2  Q.  Then taking to when you started, was Harry
3  Manelski the chief when you started at the police
4  academy?
5  A.  Yes, he was.
6  Q.  He would have served from at least the time you
7  were in the police academy through 1981 when Regan
8  took over?
9  A.  Yes.
10 Q.  All right.  Thank you.
11 A.  I know he was on his way out in November of
12 1980, so I guess it was probably a transition there.
13 But I don't know what his official date was because it
14 was a memorable date for me because I was shot and
15 wounded in the line of duty and I knew that Harry was
16 still the chief, but on his way out then.
17 Q.  So I remember having a meeting in your hospital
18 room when everybody came over.
19 A.  Yes, yes.  Vaguely.
20      MR. NEUBERGER:  I would like to mark a
21 document.  Why don't we mark this organizational
22 chart.
23      (Szczerba Exhibit 1 was marked for
24 identification.)

1  BY MR. NEUBERGER:
2  Q.  Chief, I've put in front of you an
3  organizational chart that my client, Captain Nancy
4  Dietz, gave me that's listed, identified WPD
5  Organization Chart 2005, and at the bottom it has a
6  Bates number that we put on it, P90.  Okay.
7       Have you seen this kind of an
8  organizational chart before?
9  A.  Yes.
10 Q.  For the year 2005, does this chart appear to
11 accurately depict the organizational structure of the
12 WPD at that time?
13 A.  Yes.
14 Q.  Has it changed significantly up till today?
15 A.  No.
16 Q.  Today is it basically the same organizational
17 chart?
18 A.  Yes.
19 Q.  How many uniformed officers are in your force?
20 I probably need to get an understanding of that.  How
21 many do you have and how many are authorized?  Why
22 don't you explain it that way?
23 A.  Authorized presently for 322.  That includes
24 the academy class that we presently have in session.

Michael J. Szczerba

Page 14

1  It's due for graduation on March 9th.
2        I believe now we are probably into the --
3  the number almost changes monthly or sometimes weekly.
4  I believe we are in the area of probably the high 280s
5  right now as far as actual strength on the street.
6        And then it's deducted from there when you
7  get into the next number will be our working strength,
8  and our working strength is taking into consideration
9  our true number with people that are on long-term
10  injury issues, military service, administrative
11  duties, regardless of investigations and so on.  So
12  the number gets whittled down.  And that number
13  generally runs maybe around, any given week, maybe
14  around 12 officers.
15        So we cannot go on the authorized strength.
16  You cannot really go on the actual strength.  The
17  number we look at is the actual working strength.
18  Q.  At the end of 2005, were the numbers, actual
19  strength similar, around the high 280s, or less?
20  A.  Probably less because our authorized strength
21  was less than -- since I came in as chief, when I came
22  in as chief, our authorized strength then was 289
23  authorized.  We since increased in incremental steps
24  until the present 322.

Page 15

1  Q.  In November of 2005, what is your best
2  recollection of the authorized strength of the force?
3  A.  Probably about 307, maybe around there.
4  Q.  What was your estimate of the number you could
5  actually put on the street at that time?
6  A.  In the 270s.
7  Q.  270s.  Got you.  Thank you.
8        Now, going back to this Exhibit Number 1,
9  there are two inspectors shown on the organizational
10  chart reporting to you; is that correct?
11  A.  That's correct.
12  Q.  Then the bottom two-thirds of the chart
13  identified the people who report through those
14  inspectors; is that correct?
15  A.  That's correct.
16  Q.  Does this chart accurately depict the various
17  divisions or units who reported to the inspectors at
18  that time?
19  A.  Yes.
20  Q.  Okay.  Thank you.
21        Now, with the help of my client, I prepared
22  a chart that we are going to look at and go through
23  your memory just like who the chiefs were.  I'm going
24  to try to go through who the various inspectors might

Page 16

1  have been during your career.  Okay?
2  A.  Okay.
3  Q.  I don't want you to guess.  The ones you
4  remember, you remember.
5        MR. NEUBERGER:  Let's just mark this as
6  Szczerba Number 2.
7        (Szczerba Exhibit 2 was marked for
8  identification.)
9  BY MR. NEUBERGER:
10  Q.  So I've prepared this chart with my client's
11  assistance.  For now let's look at the investigative
12  operations inspector.  Do you see that on the
13  left-hand side of the chart?
14  A.  Yes.
15  Q.  Then on the right-hand side I've listed the
16  other inspector position that's called uniformed
17  operations inspector; right?
18  A.  Yes.
19  Q.  Those are the two that are found on Exhibit
20  Number 1, the organizational chart we just looked at;
21  right?
22  A.  Yes.
23  Q.  Now, let's do the easy one first.
24        Martin Donohue is the present investigative

Page 17

1  operations inspector; is that correct?
2  A.  That's correct.
3  Q.  He's been serving since around 1999; is that
4  correct?
5  A.  Yes.
6  Q.  Now, he's a white male; isn't that right?
7  A.  Yes.
8  Q.  Now, his predecessor was Inspector Ronald
9  Huston.  Do you remember that?
10  A.  Yes.
11  Q.  Right?
12  A.  Yeah.
13  Q.  Ronald Huston was the investigative operations
14  inspector; is that correct?
15  A.  Yes.  Not for long.  I wouldn't be able to
16  relate as to what side of the house he was on, meaning
17  the uniform services versus the investigative side.
18  Q.  He only served for a couple months?
19  A.  Right.
20  Q.  Was he a white male?
21  A.  Yes.
22  Q.  Now, before Ronald Huston, John Murray was an
23  inspector; right?
24  A.  Yes.

5 (Pages 14 to 17)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

Michael J. Szczerba

Page 18

1    Q.  He served from 1997 to 1999.  Does that sound
2    about right?
3    A.  Yes.
4    Q.  He was a white male; is that right?
5    A.  Yes.
6    Q.  Then there was a John Vignola.  Was he an
7    inspector before Murray?
8    A.  I believe so.
9    Q.  Did he serve from around 1994 to 1997?
10   A.  Yes.
11   Q.  Was he a white male?
12   A.  Yes.
13   Q.  Then there's Bill Draper.  Okay.  Was there a
14   William Draper who was an inspector?
15   A.  Yes.
16   Q.  Was he a white male?
17   A.  Yes.
18   Q.  Did he serve from around 1989 to 1994?
19   A.  Yes.
20   Q.  Then was there a Richard LaFashia who was an
21   inspector?
22   A.  Yes.
23   Q.  Did he serve for a short period of time in
24   1989?

Page 19

1    A.  Yes.
2    Q.  He was a white male?
3    A.  Yes.
4    Q.  Before he was chief, was Guy Sapp the next
5    inspector?
6    A.  I believe so.
7    Q.  He was a white male; is that correct?
8    A.  Yes.
9    Q.  Did he serve from sometime in 1987 and in 1988?
10   A.  I believe so.  I will be able to state this,
11   that I can identify all these people being inspectors
12   as to their race.  But as far as the years of service,
13   I'm not really sure.
14   Q.  That's why I'm not asking you specific dates.
15   My client is the director of human resources, the
16   captain responsible for the human resources function
17   for the Wilmington Police right now, isn't she?
18   A.  Yes.
19   Q.  My client has served on the force approximately
20   the same period of time you have, hasn't she?
21   A.  Yes.  A couple years less.  I believe she
22   probably came in around 1980.
23   Q.  I think what you are telling me is that Donald
24   Payne was an inspector who served before Guy Sapp;

Page 20

1    right?
2    A.  Yes.
3    Q.  Charles Dougherty was an inspector who served
4    before Donald Payne?
5    A.  Yes.
6    Q.  And John Doherty was an inspector who served
7    before Charles?
8    A.  Right.
9    Q.  All right.  And that Payne, Dougherty, and
10   Doherty were white males, also?
11   A.  Yes.
12        MS. CHEEK:  I'm going to object to the
13   extent that what your questions are addressing aren't
14   consistent with the information on your chart because
15   you have Charles Dougherty and John Doherty serving
16   for at least the same period of time.
17        MR. NEUBERGER:  There might be a typo on
18   there.
19        MS. CHEEK:  And also Donald Payne, ditto.
20        MR. NEUBERGER:  If there's a typo, we'll
21   check that.
22   BY MR. NEUBERGER:
23   Q.  Wasn't there a time when there was more than
24   two inspectors?

Page 21

1    A.  Yes.  And also I think with the objection, too,
2    the question there may have been some -- there could
3    have been some changes as far as being investigative
4    inspector and on to the uniform side, so I'm not sure
5    about that, if any of these inspectors have ever
6    changed as far as their assignments.
7        And, yes, the number has changed.  I
8    believe when I came on, there may have been four
9    inspectors and then down to three and now we presently
10   have two.
11   Q.  Right.  Under Chief Manelski, if we go back.
12        Does it sound like there may have been four
13   inspectors?
14   A.  Yes, yes, possibly.  And they may have been in
15   the transition from when they came on the police
16   department moving from four inspectors down to three
17   inspectors.
18   Q.  Let's go down to the right-hand side of this
19   document where I have Uniform Operations inspectors
20   listed.  Do you see that?
21   A.  Yes.
22   Q.  Gilbert Howell is the incumbent Uniform
23   Operations inspector; right?
24   A.  Yes.

6 (Pages 18 to 21)

Michael J. Szczerba

Page 22

1    Q.  He is a black male; right?
2    A.  Yes.
3    Q.  He served from late 2005 through the present;
4  right?
5    A.  Right.
6    Q.  Then his predecessor was James Wright; is that
7  right?
8    A.  Yes.
9    Q.  His predecessor was James Stallings?
10   A.  Yes.
11   Q.  And the predecessor before Stallings was Keith
12  Ash?
13   A.  Yes.
14   Q.  Before that it was Michael Boykin?
15   A.  Yes.
16   Q.  Those four people are all black males; is that
17  right?
18   A.  That's correct.
19   Q.  Before Michael Boykin is it true that Michael
20  Dixon was the uniformed operations inspector?
21   A.  That's correct.
22   Q.  And he was a black male; correct?
23   A.  Yes.
24   Q.  Before Michael Dixon, Samuel Pratcher was the

Page 23

1  Uniform Operations inspector; is that correct?
2    A.  Yes.
3    Q.  And he was a black male?
4    A.  Yes.
5    Q.  Before Inspector Pratcher, Preston Hickman was
6  the uniformed operations inspector?
7    A.  Yes.
8    Q.  He was a black male?
9    A.  Yes.
10   Q.  Before him John Johnson served in that
11  position; is that correct?
12   A.  I remember he was an inspector, yes.
13   Q.  And he was a black male?
14   A.  Yes.
15   Q.  Before him there at least was an inspector by
16  the name of Kenneth Miles; is that right?
17   A.  That's correct.
18   Q.  And he was a black male; is that right?
19   A.  Yes.
20   Q.  That's all I have on that, I think, Chief.  Let
21  me just see.
22        Now, in all those positions we just
23  identified on Szczerba Number 2, there's never been a
24  woman who has held either of those two inspector

Page 24

1  positions; is that correct?
2    A.  That's correct.
3        MR. NEUBERGER:  I think we are going to
4  mark two performance appraisals as exhibits.  One is
5  the performance appraisal for Captain Nancy Dietz
6  which starts at page D-2950 in the Bates stamped
7  record.  So we'll mark this as Szczerba 3 if we could.
8        (Szczerba Exhibit 3 was marked for
9  identification.)
10       MR. NEUBERGER:  Then we'll mark as
11  Szczerba 4 a performance appraisal of Gilbert Howell
12  of the same period of time which is marked as starting
13  at D-3084 in the Bates stamped records produced by the
14  defendants.
15       (Szczerba Exhibit 4 was marked for
16  identification.)
17       MR. NEUBERGER:  Before I start any
18  questioning, Counsel, I would like to make sure we are
19  all on the same page as far as confidentiality.
20       We are going to be asking some questions
21  about documents that have been stamped "Confidential"
22  by the defendants, so I'd ask the court reporter to
23  mark this questioning starting here as confidential
24  and to separately seal it.  Then when we come out of

Page 25

1  confidential documents, we'll then tell the court
2  reporter again and then that can go into the unsealed
3  part of the record.  That, I think, is what our
4  confidentiality order will require.
5        Do you agree?
6        MS. CHEEK:  That sounds right.
7        MS. BUTCHER:  That's fine.
8        MR. NEUBERGER:  So that sounds like a good
9  procedure to follow?
10       MS. CHEEK:  Yes.
11       MR. NEUBERGER:  Then that would mean that
12  the exhibits, also, are protected by the
13  confidentiality order, and if we use them in briefing
14  or whatever, they'll be in a sealed appendix or
15  whatever.
16       Is that what everybody understands?
17       MS. CHEEK:  Yes.  That's all right.
18            - - - - -
19
20
21
22
23
24

7 (Pages 22 to 25)

Michael J. Szczerba

Page 26

1
2
3
4
5
6
7
8
9      PAGES 27 TO 58 OF THIS TRANSCRIPT
10
11     HAVE BEEN DEEMED TO BE CONFIDENTIAL
12
13     BY THE PARTIES AND CAN BE FOUND IN A
14
15     SEALED ENVELOPE AT END OF THIS
16
17     TRANSCRIPT.
18
19
20
21
22
23
24

Page 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

8 (Pages 26 to 29)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

# SEALED DOCUMENTS (A1266 - 1272)

Michael J. Szczerba – CONFIDENTIAL

Page 58

1
2
3
4
5
6
7
8                                                                    )
9
10
11        (_____ was taken at this time.)
12        MR. NEUBERGER:  Why don't we come out of
13 the sealed portion here.  We are coming out of
14 documents that are confidential.  This makes it easier
15 for us.
16        - - - - -
17
18
19
20
21
22
23
24

Page 59

1        MR. NEUBERGER:  Let's mark this as the next
2 number.  This will be Szczerba 8, a document marked
3 P087, one page.
4        (Szczerba Exhibit 8 was marked for
5 identification.)
6 BY MR. NEUBERGER:
7   Q.   Chief Szczerba, I've put this document,
8 Szczerba 8, in front of you.  Is this an accurate
9 organizational chart of the City of Wilmington for the
10 year 2005?
11   A.   Yes.
12   Q.   So this shows that the mayor has a chief of
13 staff by the name of William S. Montgomery; right?
14   A.   Yes.
15   Q.   He was the chief of staff when Gilbert Howell
16 was selected to be inspector; right?
17   A.   Yes.
18   Q.   Then it shows that about 11 city departments
19 report directly to the mayor through the chief of
20 staff; is that right?
21   A.   Yes.
22   Q.   There's a Department of Public Safety for the
23 City of Wilmington; right?
24   A.   I could not say, you know, under that title

Page 60

1 alone.  Sometimes it's referred to as Office of Public
2 Safety.
3   Q.   Okay.
4   A.   That leads to some confusion to me as a city
5 employee and as a city resident because I consider,
6 you know --
7   Q.   Yes, I see what you mean.
8   A.   Police and fire, a department.
9   Q.   Right, right.
10   A.   I don't know if you get into the city charter
11 or the city code to see if it's actually listed as the
12 Department of Public Safety or is it the Office of
13 Public Safety.
14   Q.   Okay.
15   A.   I say that in that position the director of
16 public safety has been intermittent even throughout my
17 police service meaning sometimes we have one,
18 sometimes we don't.
19   Q.   For now let's just think of it as the Office of
20 Public Safety.
21   A.   Okay.
22   Q.   My question is:  There is a Department of
23 Police.  That's an official title; right?
24   A.   Yes.

Page 61

1   Q.   You're the chief of police?
2   A.   Yes.
3   Q.   The next report for you is to the director,
4 James N. Mosley of this office or whatever of public
5 safety; correct?
6   A.   Yes.
7   Q.   Then Mosley reports to the mayor?
8   A.   Mosley reports to the chief of staff.
9   Q.   Mosley reports to the chief of staff.
10        Then the chief of staff reports to the
11 mayor; right?
12   A.   Yes.
13   Q.   The chief of staff is one level under the
14 mayor; right?
15   A.   Yes.
16   Q.   Mosley is the second layer employee the mayor?
17   A.   Yes.
18   Q.   You are the third level below the mayor; right?
19   A.   According to this chart, yes.
20   Q.   Then your two current inspectors are
21 fourth-level employees the mayor; is that correct?
22   A.   Yes.
23   Q.   Your two inspectors as shown by the chart we
24 looked at earlier report to you; correct?

16 (Pages 58 to 61)

Michael J. Szczerba

---

Page 62

1   A.  Correct.
2   Q.  They do not report directly to chief of staff
3   William S. Montgomery?
4   A.  No.
5   Q.  They do not report directly to Mayor James M.
6   Baker?
7   A.  Correct.
8   Q.  They report through a chain of command; is that
9   right?
10  A.  Yes.
11      MR. NEUBERGER:  Then let's mark this next
12  document as Exhibit 9.
13      (Szczerba Exhibit 9 was marked for
14  identification.)
15  BY MR. NEUBERGER:
16  Q.  I have put in front of you a document which
17  came from plaintiff's document production starting at
18  page 104 identified as City of Wilmington and FOP
19  Lodge #1, Captains and Inspectors Bargaining
20  Agreement, July 1, 2001, to June 30th, 2007.  Do you
21  see that?
22  A.  Yes.
23  Q.  There is such a collective bargaining agreement
24  that the captains and inspectors have signed with the

---

Page 63

1   City of Wilmington; is that correct?
2   A.  Correct.
3   Q.  Does this appear to be that document?
4   A.  Yes.
5   Q.  If you look at the last page, P126, we see
6   Mayor Baker's signature to this document; is that
7   right?
8   A.  Yes.
9   Q.  The city clerk's signature; right?
10  A.  Yes.
11  Q.  On the other side Captain Nancy Dietz's
12  signature; right?
13  A.  Yes, correct.
14  Q.  Then Inspector James Wright's signature; right?
15  A.  Yes.
16  Q.  Current Inspector Martin Donohue's signature;
17  right?
18  A.  Yes.
19  Q.  Then Captain Gilbert Howell?
20  A.  Yes.
21  Q.  Can you read the other ones?
22  A.  Victor Ayala.
23  Q.  Captain?
24  A.  Yes.

---

Page 64

1   Q.  Okay.
2   A.  And then the signature below that, the
3   squiggles there, sorry about that term, I believe
4   that's Captain Sean Finerty.  Below that is Captain
5   Michael Maggitti.  And below that I believe is the
6   signature Sergeant Robert Donovan, who was then, I
7   guess, the FOP president.
8   Q.  Okay.  Okay.
9       This contract was in place in 2004 when
10  Gilbert Howell was selected to be inspector; right?
11  A.  Yes.
12  Q.  This contract was in place earlier when James
13  Wright was selected to be inspector; is that correct
14  says 2001?
15  A.  Right.  I believe at that point, yeah, it was a
16  long-term expired contract, so the contract was
17  long-term expired, so this is retro back to that one
18  date.
19  Q.  When was the promotion of Inspector Wright?
20  When was the selection of Inspector Wright, Captain
21  Wright, to be inspector?
22  A.  I believe in March of '01.
23  Q.  March of 2001?
24  A.  Yes.

---

Page 65

1   Q.  This collective bargaining agreement went into
2   effect July of 2001?
3   A.  Yes.
4   Q.  Was there an expired agreement before that --
5   Is that what you are telling me? -- for the inspectors
6   and the captains?
7   A.  Okay.  It would have been a present contract in
8   effect then because then that contract -- when Wright
9   was appointed to inspector, that contract would have
10  expired in June 30th of '01.
11  Q.  Okay.  What I'm saying is:  Did the inspectors
12  and the captains have a contract with the city before
13  this one here that's marked as Szczerba 9?
14  A.  Yes, they would have, yes.
15  Q.  They were in a collective bargaining unit, the
16  captains and inspectors, before this contract marked
17  Szczerba 9 came into existence?
18  A.  Yes.
19  Q.  Right?
20  A.  Yes.
21  Q.  So for some time now captains and inspectors
22  have been in a collective bargaining unit --
23  A.  That is correct.
24  Q.  -- together.  Okay.

17 (Pages 62 to 65)

Michael J. Szczerba

Page 66

1    Now, you, as the chief, aren't in any
2  collective bargaining unit; right?
3    A.  That's correct.
4    Q.  You, as the chief, are not represented by the
5  union?
6    A.  That's right.
7    Q.  You're management?
8    A.  Yes.
9    Q.  So you don't have any contract rights to fall
10  back on should you have a dispute with the city?
11    A.  No, I don't.  I don't even have anything under
12  state law to fall back on.  The chief of police
13  position for the City of Wilmington is quite unique in
14  that because of the police officer's bill of rights,
15  police chiefs of all municipalities and
16  superintendents of all police are entitled to due
17  process, and then the clause comes in with the
18  exception of municipalities greater than 60,000.  So
19  there's one.  So I stand alone as the chief of police.
20    Q.  You're telling me that one paragraph provision
21  in state law when one reads it clearly, carefully --
22    A.  Yes.
23    Q.  -- for all those chiefs who get hearings for
24  discharge --

Page 67

1    A.  Correct.
2    Q.  -- including the colonels in of the state
3  police --
4    A.  Yes.
5    Q.  -- you're not covered by that?
6    A.  That is correct.  I have to get that changed.
7  So essentially, I wear the wrong color socks to work
8  and I could be dismissed.
9       MR. NEUBERGER:  Off the record.
10       (Discussion off the record.)
11  BY MR. NEUBERGER:
12    Q.  You told me that by state law as the chief of
13  Wilmington you have no contract rights; right?
14    A.  Correct.
15    Q.  You told me that you, as the chief, do not have
16  any collective bargaining rights with the City of
17  Wilmington like are found in Szczerba Number 9?
18    A.  Right.
19    Q.  Now, the inspectors of the City of Wilmington,
20  if one looks at this contract, have various written
21  rights; is that correct?
22    A.  That's correct.
23    Q.  So, for example, they have grievance procedures
24  should they have a grievance?

Page 68

1    A.  Correct.
2    Q.  Their working conditions are described, they
3  have certain rights of working conditions in here;
4  right?
5    A.  Yes.
6    Q.  They have certain rights for discipline?
7    A.  Yes.
8    Q.  So, for example, if we found Article 10, which
9  is on page 118 at the bottom, do you see Section 10.2,
10  "Disciplinary Suspensions"?
11    A.  Yes.
12    Q.  And various things following that.  Okay?
13    A.  Right.
14    Q.  These give the inspectors certain rights should
15  they have a dispute with the city?
16    A.  Yes.
17    Q.  But you, as the chief, don't have those kinds
18  of rights?
19    A.  No.
20    Q.  The director of public safety, Mr. Mosley, he
21  doesn't have a collective bargaining agreement with
22  the city, either, does he?
23    A.  No.
24    Q.  He's either an office head or a department

Page 69

1  head?
2    A.  That's correct.
3    Q.  He doesn't have any rights similar to those
4  found in this Exhibit Number 9, Szczerba 9?
5    A.  Correct.
6       MR. NEUBERGER:  I pulled together some
7  other documents that we produced for the city found in
8  The White Book, some directives about the inspectors,
9  maybe even the chief.  I want to mark those now.
10       So let's mark this as Szczerba Number 10.
11       (Szczerba Exhibit 10 was marked for
12  identification.)
13  BY MR. NEUBERGER:
14    Q.  I put in front of you documents marked P-11
15  through, apparently, 21.  I don't expect I'm going to
16  ask you any questions on P13 and 14.  They appear to
17  have been inadvertently included in this document.
18       The bottom of this first page here, P11, it
19  says in the left-hand corner "Directive 3.0."  Okay?
20  Is this something that's found in that White Book we
21  talked about earlier?
22    A.  Yes.
23    Q.  So The White Book, what's the formal title for
24  that again?

18 (Pages 66 to 69)

Michael J. Szczerba

Page 70

1    A.   Police officers -- Wilmington Police Officer's
2    Manual.
3    Q.   Manual.  Okay.  Picture of the city on the
4    front?
5    A.   White binder.
6    Q.   Okay.  Directive 3.0 here, is this a
7    description of responsibilities of the director of
8    uniformed operations?
9    A.   Yes.
10   Q.   So the director of uniformed operations is
11   responsible for the Patrol Division, the Traffic
12   Division, Support Services, and Community Services
13   divisions; is that correct?
14   A.   Yes.  And there's been a change since then, so
15   this is outdated.
16   Q.   What would be added to that?
17       MS. CHEEK:  Objection to form.
18   Q.   What's the change been?
19   A.   The Patrol Division would be the Uniformed
20   Services Division.
21   Q.   They renamed it?
22   A.   Yes.
23   Q.   What else?
24   A.   The Traffic Division is not a division.  It's a

Page 71

1    unit.  It's part of the Special Operations Division.
2    Q.   So traffic should be the traffic unit.  Okay.
3        Is there a Support Services Division?
4    A.   Yes, there is.
5    Q.   Is there still a Community Services Division?
6    A.   No, there is not.
7    Q.   Did that get subsumed in something else?
8    A.   Yes.  It would essentially be included under
9    the Special Operations Division.  So the Special
10   Operations Division has a traffic unit, has a
11   community policing unit, but it's not a division in
12   itself.
13       So essentially under that position of
14   inspector you have presently the Uniform Services
15   Division, the Special Operations Division, and Support
16   Services stands as is.
17   Q.   Okay.
18   A.   And you have the Communications Division.
19   Q.   In 2001 when James Wright was promoted to the
20   inspector of Uniform Operations, did this document
21   correctly describe the responsibilities at that time?
22   A.   Yes.
23   Q.   In November or so of 2005 when Gilbert Howell
24   was promoted to the inspector of uniform operations,

Page 72

1    did this document describe accurately the
2    responsibilities at that time?
3    A.   No.  That's when the divisions would have been
4    changed.
5    Q.   So they had already been changed?
6    A.   Right.
7    Q.   Got you.  Okay.
8        Is there a new 3.0 somewhere?
9    A.   I do not know if it's been corrected.  We've
10   been going through this for, you know, accreditation
11   purposes and through redeployments and changes in the
12   police department.  So sometimes you have to, you
13   know, catch up to where, if you change one directive,
14   it may affect another directive as far as the titles
15   of divisions.  So some may still present day be
16   outdated, some have been changed.  I don't know if
17   this has been amended.
18   Q.   Okay.
19   A.   As of yet.
20   Q.   But the point is that the inspector of Uniform
21   Operations has certain units or divisions that work
22   under him?
23   A.   Yes.
24   Q.   Under A here where we looked at whatever the

Page 73

1    list might be, is it true that when this document was
2    prepared and when Inspector Wright was selected, he
3    was responsible for the overall efficient operation of
4    various divisions or units?
5    A.   Yes.
6    Q.   Even today when Gilbert Howell was selected, he
7    was responsible for the efficient operation of various
8    divisions and units?
9    A.   Yes.
10   Q.   Paragraphs B and C here, have they changed in
11   any way or are they still in effect?
12   A.   Still in effect.
13   Q.   So under B it says that the inspector of
14   uniformed operations meets regularly with the
15   commanders of divisions for, among other things, the
16   purpose of formulating plans consistent with the
17   objectives of the department?
18   A.   That's correct.
19   Q.   Is that one of his duties?
20   A.   Yes.
21   Q.   Now, if we go to the next page, we have
22   Directive 2.0, Inspector of Investigative Operations.
23   A.   Yes.
24   Q.   Is that position still responsible for the

19  (Pages 70 to 73)

Michael J. Szczerba

1  overall efficient operation of various divisions or
2  units?
3    A.  Yes.
4    Q.  The six listed here, are they still in effect?
5    A.  Some of the titles have changed, but in
6  essence, it's still the same responsibilities.
7    Q.  What might have been a title change, if you
8  could identify that for me?
9    A.  Internal Affairs Division is now the Office of
10  Professional Standards.
11    Q.  Okay.
12    A.  The Personnel and Planning Division is now the
13  Human Resources Division.
14    Q.  Okay.
15    A.  And, of course, the number six there, the
16  Administrative Personnel, that would be included under
17  the Human Resource Division.
18    Q.  So the titles might have changed, but the
19  functions are still the same and they still report to
20  the same person?
21    A.  Correct.
22    Q.  Then B, C, D, E, and F, are they still
23  accurate?
24    A.  Yes.

1    Q.  Then let's skip over the next two pages.  Let's
2  go to page P15.  We have a Directive 1.2.  Okay?
3    A.  Yes.
4    Q.  The first thing in 1.2 is the section on chief
5  of police, then inspector, then captains.  Do you see
6  that?
7    A.  Yes.
8    Q.  The description of the authority and the
9  responsibilities of a chief of police, is that
10  accurate as of today?
11    A.  Yes.
12    Q.  Was it accurate as of the end of 2005 when
13  Gilbert Howell was selected?
14    A.  Yes.
15    Q.  In 2001 when James Wright was selected, did
16  this still describe the authority and responsibility
17  of the chief of police?
18    A.  Yes.
19    Q.  So under your responsibilities, it says you
20  have final authority on all matters pertaining to the
21  department; is that correct?
22    A.  That's correct.
23    Q.  You're, in the paramilitary organization,
24  you're the top of the chain of command; is that right?

1    A.  That's right.
2    Q.  Now, under "Responsibility," that first
3  paragraph, it says that you, as the chief executive
4  officer, are responsible for, among other functions,
5  planning for the department; is that correct?
6    A.  Yes.
7    Q.  It doesn't list you as formulating department
8  or division policies.  That seems to be found under
9  captains.  Do you see that?
10    If you flip to the second page under the
11  captain's responsibilities, second line there, it
12  mentions about them formulating and implementing
13  departmental or division policies.  Do you see that?
14    A.  Yes.
15    Q.  You, as the chief at the top of the chain of
16  command, have authority for whatever might be coming
17  up the chain of command from your captains in the area
18  of policy; right?
19    A.  Yes.
20    Q.  But policy for the Wilmington Police
21  Department, it has to be officially approved by
22  something called the administrative board of the City
23  of Wilmington?
24    A.  That's correct.

1    Q.  Your White Book, the police officer's manual,
2  is full of policies and things like that, but at some
3  stage in history those policies had to be approved by
4  the administrative board of the City of Wilmington; is
5  that correct?
6    A.  Yes.
7    Q.  The police department on its own can't go out
8  and adopt policies?
9    A.  Correct.
10    Q.  And the administrative board has various
11  members.  You're aware of that?
12    A.  Yes.
13    Q.  The mayor is on the administrative board;
14  right?
15    A.  Yes.
16    Q.  Director of personnel for the City of
17  Wilmington is on the board?
18    A.  Yes.
19    Q.  Do you remember anybody else?
20    A.  Possibly the finance director.  There's members
21  of council because I know the council president.
22    Q.  Might be the council president, right.  And
23  there may be others; right?
24    A.  Yes, yes.

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

Michael J. Szczerba

Page 78

1  Q.  Okay.
2  A.  You mentioned the mayor.  I'm unsure of that
3  because usually the representative of the mayor is the
4  chief of staff.  It possibly could be the chief of
5  staff.
6  Q.  I'm sure there's a statute or something we can
7  look at --
8  A.  Right.
9  Q.  -- as to who is on the board.  Okay.
10  A.  Right.
11  Q.  Swinging back to you as the chief, okay, in
12  this document, Directive 1.2, it says you're
13  responsible for planning, directing, and various other
14  things.  Okay?  It didn't mention the formulation of
15  policy.  Okay?
16  A.  Okay.
17  Q.  So I'm just sort of trying to understand how
18  that might work.  Okay?  Under captains, we go to the
19  next page, it says the captain shall be responsible
20  for the formulation and implementation of departmental
21  or division policies, then it goes on.  You see that;
22  right?
23  A.  Yes.
24  Q.  So there are captains over various divisions of

Page 79

1  the city police?
2  A.  Yes.
3  Q.  They also have responsibility for various
4  units?
5  A.  Yes.
6  Q.  There may be policy changes needed within a
7  division or a unit that could happen; right?
8  A.  Correct.
9  Q.  It would be the responsibility of the captain
10  to be formulating recommendations for changes in
11  policies?
12  A.  Yes.
13  Q.  So, for example, Captain Nancy Dietz is
14  currently assigned to the human resource function;
15  isn't that right?
16  A.  Yes.
17  Q.  So she is the captain responsible for human
18  resources?
19  A.  Yes.
20  Q.  Correct?
21  A.  Yes.
22  Q.  She's involved in formulating all kinds of
23  recommendations for policies affecting the department?
24  A.  Yes, she is.

Page 80

1  Q.  Then those policies go up a chain of command to
2  you?
3  A.  Correct.
4  Q.  Those recommendations go up a chain of command
5  to you?  I'm sorry.
6  A.  Yes.
7  Q.  And if you approve them, where would they go
8  from you?
9  A.  They need the approval of the administrative
10  board and then they would be put in as policy.
11  Q.  You can have a captain in charge of some other
12  division; right?
13  A.  Yes.
14  Q.  Let's just say internal affairs.
15  A.  Yes.
16  Q.  That captain might recommend certain changes in
17  policies; right?
18  A.  Yes.
19  Q.  They'd have to come to you?
20  A.  Yes.
21  Q.  You, as the chief executive officer for the
22  police function, would have to have your input into
23  any changes; right?
24  A.  Yes.

Page 81

1  Q.  Those kinds of policy changes coming up through
2  the captains would have to go from you to the
3  administrative board of the City of Wilmington?
4  A.  Yes.  From -- right, from me to the
5  administrative board, but it would be the chain of
6  command from the captain to inspector for my approval.
7  And also if it's policy change, also to the director
8  of public safety.
9  Q.  We had talked about your duties here.  Let's
10  look under "Inspector."  This is page P015 under
11  Directive 1.2 in Szczerba 10.
12      The authority of the inspector is stated
13  there; right?
14  A.  Yes.
15  Q.  The responsibilities of the inspector are
16  stated there; right?
17  A.  Yes.
18  Q.  It says "Inspector," and I'm reading the first
19  paragraph, the second sentence, "Inspector."
20  A.  Yes.
21  Q.  He's authorized to implement all matters of
22  policy and discipline to all divisions.  Do you see
23  that?
24  A.  Yes.

21 (Pages 78 to 81)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1278

Michael J. Szczerba

Page 82

1    Q.  It didn't say anywhere there that the
2  inspectors are responsible for the formulation of
3  departmental policies, did it?
4    A.  No, it does not say that.
5    Q.  It doesn't say there that they're responsible
6  for the formulation of any of the policies for various
7  divisions or units?
8    A.  Correct.
9    Q.  Right?
10    A.  Yes.
11    Q.  That all comes up through the captains --
12    A.  Yes.
13    Q.  -- as stated in a Directive 1.2; is that
14  correct?
15    A.  Correct.
16    Q.  And if we go back to Directive 3.0 and 2.0 that
17  dealt with the inspectors of uniformed operations and
18  the inspector of investigative operations, there was
19  nothing in there indicating that there was responsible
20  for the formulation of policies; isn't that correct?
21    A.  Correct.
22    Q.  So would you agree with me that functionally
23  within the Wilmington Police Department, it's not part
24  of the responsibility of the inspectors to be the

Page 83

1  front-line people formulating policies?
2    A.  Yes, that's correct.  However, working in
3  cooperation with their respective captains, they can
4  work in cooperative effort, and sometimes that does
5  occur.
6    Q.  The captain reports to them?
7    A.  Sure.  If they see the need, the captain could
8  be assigned from the inspector to try to explore
9  formulating some type of policy change.
10    Q.  I'm sorry.  I don't really follow that.  Could
11  I ask you to just to rephrase that?
12    A.  The inspector may see a need to formulate a
13  policy change, and he would then give that assignment
14  to the captain and those two possibly could work on
15  it, or with the autonomy of the captain, they would be
16  able to work on it him- or herself and then still be
17  reporting back to the inspector.
18    Q.  So you could see a need for a policy change and
19  ask somebody to work on something; right?
20    A.  Correct.
21    Q.  An inspector could see a need --
22    A.  Yes.
23    Q.  -- and you're saying could ask somebody to do
24  something?

Page 84

1    A.  Right.
2    Q.  The captains who have operational
3  responsibility for their divisions and work on a
4  day-to-day basis for their divisions, they can see a
5  need; right?
6    A.  Yes.
7    Q.  In their description here it specifically says
8  they formulate policies?
9    A.  Essentially it would be a project manager.
10    Q.  Has the mayor of Wilmington ever directed you
11  to reexamine or formulate policies affecting the
12  Wilmington Police Department?
13    A.  Bring about some changes as far as policy
14  changes, no.  But as far as assignments, yes.
15    Q.  Okay.  There's this ongoing debate on where
16  people should be assigned in the City of Wilmington,
17  that kind of stuff?
18    A.  Correct.
19    Q.  Our elected officials, as part of their
20  responsibilities, express their opinions on those
21  kinds of things; right?
22    A.  Yes, they do.
23    Q.  And the mayor is the highest elected official?
24    A.  Yes.

Page 85

1    Q.  It would be within his authority to discuss
2  with you those kinds of things?
3    A.  Yes.
4    Q.  Sure.  Okay.
5       But as far as what the punishment for
6  infractions ought to be, what kind of hearing
7  procedures you ought to have, all the other kinds of
8  things that are found in The White Book, has the mayor
9  of Wilmington ever given to you assignments on policy
10  changes that he would like found in The White Book?
11    A.  No.
12    Q.  Has the mayor of Wilmington ever given an
13  assignment to any of the two inspectors working under
14  you as far as changes he would want done in The White
15  Book?
16       MS. BUTCHER:  Object as to form.
17    A.  Not that I'm aware of.
18    Q.  You have a chain of command; right?
19    A.  Yes.
20    Q.  Nothing has ever come through to you?
21    A.  Right.
22    Q.  Are you aware of either of your inspectors
23  performing a policy consultative function for the City
24  of Wilmington?

22 (Pages 82 to 85)

Michael J. Szczerba

Page 86

1    A.  No, I am not.  However, there is sometimes
2    where a directive from the mayor to the director of
3    public safety, the director of public safety may
4    address those with the inspectors.
5    Q.  So are you saying that there are communications
6    from the mayor of the City of Wilmington through the
7    director of public safety to your inspectors that
8    don't go through you and the chain of command?
9         MS. BUTCHER:  Object as to form.
10   A.  Yes.  And eventually I may be notified of that,
11   but that's correct.
12   Q.  Where would we find those kinds of
13   communications?
14   A.  They're verbally.
15   Q.  Right.  There may be discussion?
16   A.  Right.
17   Q.  So you're saying those kinds of instances would
18   have been verbal instances?
19   A.  Correct.
20   Q.  What do you remember of any such incidents,
21   occurrences?
22   A.  Maybe with personnel, how they're assigned
23   maybe to a particular district or with our community
24   policing officers.

Page 87

1    Q.  Personnel?
2    A.  Right, right.
3    Q.  Assignments?
4    A.  Yes.
5    Q.  Okay.
6    A.  The most recent example did come directly from
7    the mayor to the public safety director to me in
8    regards to how officers are assigned in the downtown
9    area here.
10   Q.  Right.  Okay.  Assignment of officers, the six
11   downtown here, within three or four blocks versus six
12   in the Riverside area or whatever, do you characterize
13   those as a matter of policy or just something else?
14   A.  Matter of deployment, not policy.
15   Q.  Right.  Right.  Right.
16        Are you aware of Inspector Wright or
17   Inspector Howell serves in some sort of a consultative
18   capacity with the mayor of the City of Wilmington
19   giving him advice on the formulation of policy --
20   A.  No.
21   Q.  -- for the City of Wilmington?
22   A.  No.
23   Q.  Is any such responsibility part of their
24   written job descriptions?

Page 88

1    A.  No.
2    Q.  Is any such responsibility, any part of the
3    day-to-day execution of their responsibilities?
4    A.  No.
5    Q.  Are you aware of Inspector Wright or Inspector
6    Howell being called into meetings with the mayor and
7    Mr. Montgomery and other department heads of the City
8    of Wilmington to discuss policy for the City of
9    Wilmington?
10   A.  Not that I'm aware of.
11   Q.  Are you aware of their being called into those
12   kinds of meetings to discuss policies affecting the
13   Wilmington Police Department?
14   A.  No.
15   Q.  Are you aware of their being called into
16   meetings of the administrative board of the City of
17   Wilmington to give advice on the formulation or
18   approval of policies for the City of Wilmington?
19   A.  Not that I'm aware of, but that is a
20   possibility.
21   Q.  Are you saying when the administrative board is
22   debating anything, they can call in any city employee
23   to answer questions about something that might be
24   within the knowledge of the employee?

Page 89

1    A.  That's correct.  For example, if a policy
2    within a particular division, a human resources
3    policy, you might have Captain Dietz to appear in
4    front of that board with one of her sergeants.
5    Q.  Right.  But the inspector of uniformed
6    operations and the inspector of investigative
7    operations, they are not listed on any organizational
8    document as being part of a consultative body for the
9    mayor to help him make policy for the City of
10   Wilmington?
11   A.  No.
12   Q.  They're not on any written document or chart to
13   help the city council of the City of Wilmington make
14   policy for the City of Wilmington?
15   A.  No.
16   Q.  You've been an officer since 1978?
17   A.  Yes.
18   Q.  Over that period of time, have you ever been
19   aware of inspectors serving as a consultative body for
20   mayors of the City of Wilmington or the city council?
21        MS. BUTCHER:  Object as to form.
22   A.  Not that I'm aware of, but there may be some
23   confusion, too.  We have, for example, a public safety
24   committee meeting.  May have inspectors appearing at

23 (Pages 86 to 89)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1280

Michael J. Szczerba

Page 90

1   that public safety.
2   Q.   Sure.
3   A.   And the members of that committee on council
4   may be exploring implementation of a new law or
5   developing new law ordinance.
6   Q.   Sure.  Public safety committee of the city
7   council?
8   A.   And have the input of the inspectors.
9   Q.   They may be talking about deployments or all
10  sorts of things?
11  A.   Yes.
12  Q.   And if it's a human resources thing, they may
13  ask Captain Dietz to come in so she, as the hands-on
14  person, would be able to answer questions?
15  A.   Right.
16  Q.   I understand that.  Any commander within the
17  police department could be called upon by the public
18  safety committee; right?
19       MS. BUTCHER:  Object as to form.
20  A.   Yes.  Most likely it would occur through me and
21  sometimes I have them appearing alongside of me, the
22  public safety committee meeting, if they have the
23  expertise.
24  Q.   But, once again, as a hierarchical organization

Page 91

1   with a chain of command, as you say, you'd be involved
2   in that?
3   A.   Yes.
4   Q.   Now, if we look at the last three pages of
5   Szczerba Exhibit Number 10, let's go three from the
6   back.  We have a chief of police document from the
7   time of Mayor Sills.  Do you see that up in the
8   left-hand corner?
9   A.   Yes.
10  Q.   This is the kind of document that the personnel
11  department of the City of Wilmington puts together
12  when there's a job announcement; is that right?
13  A.   Yes.
14  Q.   The next two pages is a job description for a
15  police inspector, and the last page is a job
16  description for a captain of the police department; is
17  that right?
18  A.   Yes.
19  Q.   Those last two documents actually say
20  "Department of Personnel" in the upper right-hand
21  corner; right?
22  A.   Yes.
23  Q.   Are these accurate copies of job descriptions
24  you've seen coming from the personnel office for the

Page 92

1   position of inspector or for captain?
2   A.   Yes.
3   Q.   If we are looking at captain, the very last
4   page again, under "Examples of Work Performed," the
5   third category, is it true that it says the captain of
6   police shall be responsible, it says, once again, for
7   the formulation of departmental or divisional
8   policies?
9   A.   Yes.
10  Q.   If we flip to the page before for inspectors,
11  do you see under "Nature of Work Performed"?
12  A.   Yes.
13  Q.   The second paragraph?
14  A.   Yes.
15  Q.   The second sentence, "He/she shall be
16  authorized to implement all matters of policy" is that
17  right?
18  A.   Yes.
19  Q.   Nothing is listed in there about inspectors
20  formulating policies; is that right?
21  A.   Correct.
22  Q.   Nothing is in there about being on advisory
23  capacity for the mayor of the City of Wilmington; is
24  that right?

Page 93

1   A.   That's right.
2   Q.   It also has certain educational requirements.
3   It says to be inspector you have to have completed a
4   four-year college.  Do you see that?
5   A.   Yes.
6   Q.   Gilbert Howell, I haven't seen a resume from
7   him, it's one of those things that hasn't been
8   produced yet in the case.  But do you know at the time
9   he was promoted in 2005 whether he had a four-year
10  college degree or related experience?
11  A.   That I'm not sure of.
12  Q.   You just don't know?
13  A.   Right.
14  Q.   That's fine.  We can always ask him.
15       Let's look at the chief of police one.  It
16  talks about what you told me a little earlier.  Why
17  don't I ask you to just quietly read this one over so
18  that you have it in your mind.  Okay?
19  A.   Okay.  (The witness reviews the document.)
20  Q.   Does this accurately describe the nature of the
21  work you performed as chief?
22  A.   Yes.
23  Q.   It gives some examples of the kinds of things
24  you do; right?

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

Michael J. Szczerba

Page 94

1    A.  That's correct.
2    Q.  So, for example, under "Examples of Work
3  Performed," the very first words in that paragraph
4  are:  "This position sets policy and direction for law
5  enforcement in the City."  Is that what it says?
6    A.  Yes.
7    Q.  Is that a true statement?
8    A.  Yes.
9    Q.  Then we look at the last sentence in that
10  paragraph.  "The position demands that this individual
11  plans police policies and procedures...."  Do you see
12  that?
13    A.  Yes.
14    Q.  Those are responsibilities you have; right?
15    A.  Yes.
16    Q.  The next page, the inspectors, it doesn't say
17  the inspectors plan police policies and procedures,
18  does it?
19    A.  No.
20    Q.  Okay.  I think we are done with that.
21    A.  Getting on to this form 2, you had me review
22  it.
23    Q.  Go ahead.
24    A.  Nature of work performed, the second sentence,

Page 95

1  "position reports directly to the office of mayor and
2  through the administrative assistant."  There's a step
3  in between there.
4    Q.  That's inaccurate.  What you told me earlier
5  about the office or director of public safety?
6    A.  I just wanted to clarify that.
7    Q.  I appreciate that.
8        MR. NEUBERGER:  Now we have another
9  document, one page marked P102.  Let's mark this as
10  Szczerba 11.
11        (Szczerba Exhibit 11 was marked for
12  identification.)
13  BY MR. NEUBERGER:
14    Q.  This document for August of 2005 seems to
15  indicate that the inspectors can even be paid more
16  than the chief.  You told me a little earlier you even
17  have less rights under state law than all these other
18  public employees.  Is that true, that the inspectors
19  can be paid more than you?
20    A.  Yes, that's correct.
21    Q.  Do you have any reason or do you understand how
22  that ever happened?
23    A.  You pretty much covered it in that they're
24  represented by a collective bargaining agreement and I

Page 96

1  am not.
2    Q.  Okay.
3    A.  Also, when there is the existence of the public
4  safety director's position, I am sandwiched in between
5  the public safety director's position, who actually
6  should be earning a higher salary than me, and a
7  collective bargaining agreement.  So essentially I'm
8  squeezed out and left out as far as salary is
9  concerned.
10    Q.  Now, this document is dated August 23rd, 2005.
11  Does it appear to accurately depict what the pay
12  scales were at that time?
13    A.  Yes.
14    Q.  Okay.  Thank you.
15        MR. NEUBERGER:  Let's mark this next one as
16  Exhibit 12.
17        (Szczerba Exhibit 12 was marked for
18  identification.)
19  BY MR. NEUBERGER:
20    Q.  Is this an announcement that the Office of
21  Public Safety, Department of Police, made on
22  November 10, 2005?
23    A.  Yes.
24    Q.  Did this, using its own words, did this

Page 97

1  indicate that the following departmental promotions
2  were effective as of a certain time?
3    A.  Yes.
4    Q.  This indicates Gilbert's selection to the rank
5  of inspector?
6    A.  Yes.
7    Q.  Did he become the incumbent in that office on
8  Saturday, October 29, 2005?
9    A.  Yes.
10    Q.  That was his first day in that rank?
11    A.  Yes.
12    Q.  Now, did you recommend to Mayor James Baker
13  that Nancy Dietz, Captain Nancy Dietz, be selected for
14  that job?
15    A.  Yes.
16    Q.  Did you feel that she was the most qualified
17  person for that job?
18    A.  Yes.
19    Q.  Did you feel that she was more qualified for
20  the job than Captain Gilbert Howell?
21    A.  Yes.  He would be included in a group of people
22  that I considered her more qualified.
23    Q.  Yes.
24    A.  Yes.

25 (Pages 94 to 97)

Michael J. Szczerba

Page 98

1    Q.  Did you feel that her attendance record was
2  better than his attendance record?
3    A.  I believe so, yes.
4    Q.  Did you feel that her disposition was such that
5  she would be a better person in that job than Gilbert
6  Howell?
7    A.  Yes.
8    Q.  In making your judgment for your
9  recommendations, was the various candidates' loyalty
10  to the department a factor that you considered?
11    A.  Yes.
12    Q.  Did you believe that, using a factor of loyalty
13  to the department, that she was a better selection
14  than Gilbert Howell?
15    A.  Yes, but not in that category alone.  That was
16  one of the categories.
17    Q.  No.  I'm just trying to identify some
18  categories.
19    A.  Okay.
20    Q.  I guess, just to jump back, did you ever put
21  your recommendation in writing?
22    A.  No, I did not.
23    Q.  So there's not like a document I can look at?
24    A.  No.

Page 99

1    Q.  So I'm just trying to probe your memory.
2    A.  Right.
3    Q.  Was his or her educational background, formal
4  educational background a factor that you had
5  considered?
6    A.  Yes, that was taken into consideration.
7    Q.  Did you feel that she had a better educational
8  background than he did for the job?
9    A.  Yes.
10    Q.  Did you feel that the leadership skills she had
11  demonstrated better qualified her for the job than
12  Gilbert Howell?
13    A.  Yes.
14    Q.  Did you feel that her knowledge of the
15  department better qualified her for the job than
16  Gilbert Howell?
17    A.  Yes.
18    Q.  Did you feel that the most written performance
19  evaluation that we had talked about earlier today
20  better qualified her for the job than Gilbert Howell?
21    A.  Yes.  After review of that today, yes.
22    Q.  Right.  Back then do you remember looking at
23  that document?
24    A.  No.

Page 100

1    Q.  From what you knew of her performance, her
2  performance on the job, did you feel that her
3  performance better qualified her for the job than
4  Gilbert Howell?
5    A.  Yes.
6    Q.  Did you feel that her disciplinary history
7  better qualified her for the job than Gilbert Howell?
8    A.  Yes.
9    Q.  Did you feel that her experience in the various
10  assignments she had held within the Wilmington Police
11  Department better qualified her for the job than
12  Gilbert Howell?
13    A.  Yes.
14        MR. NEUBERGER:  I have to take a break.
15  Can we just take a ten-minute break?
16        (A recess was taken at this time.)
17  BY MR. NEUBERGER:
18    Q.  We will actually go into some documents later.
19  It looks like people on the force engage in some sort
20  of continuing education, you go to seminars on how to
21  be a hostage negotiator and antiterrorism.
22        Is that something that the officers and the
23  commanders under your command are encouraged to do?
24    A.  Yes.

Page 101

1    Q.  Are they required to do so many hours a year,
2  or you just encourage people?
3    A.  Both.  I encourage them and they are required
4  by the council and police training, I believe
5  presently it's 16 hours.  I'd have to refer to the
6  commanding officer of the Human Resource Division, but
7  I believe it's 16 hours.
8    Q.  Have you found Nancy Dietz to be a
9  conscientious person in trying to keep up her training
10  and skill levels?
11    A.  Yes.
12    Q.  Did you feel that, when you made your
13  recommendation to Mayor Baker, that she had
14  demonstrated through her training and skill levels
15  that she was more qualified than Gilbert Howell?
16    A.  Yes.
17    Q.  Did you feel that through those intangible
18  qualities found in a person's character, for want of a
19  better word, she had demonstrated that she was more
20  qualified than Gilbert Howell?
21    A.  Yes.
22    Q.  You were in I think what's called the Office of
23  Professional Standards now?
24    A.  Yes.

26 (Pages 98 to 101)

Michael J. Szczerba

Page 102

1    Q.   The old Internal Affairs?
2    A.   Yes.
3    Q.   You were a sergeant investigator; right?
4    A.   Just a sergeant.
5    Q.   But there's two or three of you at the time,
6    probably?
7    A.   Yes.
8    Q.   Then there was a captain?
9    A.   Yes.
10   Q.   Right?
11   A.   Yes.
12   Q.   Nancy Dietz has served as the captain in
13   Internal Affairs.  You're aware of that?
14   A.   That's right.  I'm also aware of her service as
15   an investigator.
16   Q.   And an investigator.  Probably as a sergeant?
17   A.   Yes.  Just a sergeant.
18   Q.   Is it true that the people who are selected
19   within the Wilmington Police Department to be the
20   commander for Internal Affairs are highly respected
21   people?
22   A.   Yes.
23   Q.   Is it true that they have impeccable
24   professional reputations?

Page 103

1    A.   Yes.
2    Q.   Part of the reason for putting people like that
3    in there is so that the decisions of Internal Affairs
4    are respected by the uniformed officers; right?
5    A.   That's correct.
6    Q.   Are the people who are selected to be the
7    commander of Internal Affairs known to be highly
8    ethical people?
9    A.   Yes.
10   Q.   Are they known to be people who realize that to
11   protect the public and have an efficient police
12   department, that you have to abide by the rules and
13   regulations applicable to law enforcement?
14   A.   Yes.
15        MS. BUTCHER:  Object as to form.
16   Q.   Did you find that when Nancy Dietz was in the
17   Office of Internal Affairs she demonstrated those
18   kinds of qualities?
19   A.   Yes.
20   Q.   Those kinds of qualities that she demonstrated
21   to be there, did she have better qualities than
22   Gilbert Howell in those kinds of areas?
23        MS. BUTCHER:  Object as to form.
24   A.   I believe so, and that was part of my decision

Page 104

1    process in placing Captain Dietz in that position.
2    Q.   Oh, so you're the one that put her in Internal
3    Affairs?
4    A.   That's correct.
5    Q.   Okay.  I forgot that.
6    A.   She hasn't.
7    Q.   So those were things that you looked to when
8    you selected her?
9    A.   Yes.
10   Q.   You're telling me her reputation is one of the
11   highest order within the police department?
12   A.   Yes.
13   Q.   You told me about the staffing levels of the
14   department.  Okay?  Over a couple years.  Okay?  And
15   is it true that the police department is a close-knit
16   community?
17   A.   Yes.
18   Q.   And then there's always officers retiring;
19   right?
20   A.   Yes.
21   Q.   To varying degrees, they keep up ties with
22   what's happening in the force, don't they?
23        MS. BUTCHER:  Object as to form.
24   A.   I believe so.

Page 105

1    Q.   Based on your experience?
2    A.   Yes.
3    Q.   Do you ever go over to the FOP lodge?
4    A.   Occasionally I attend a meeting.
5    Q.   There's also social events going on over there;
6    right?
7    A.   That's separate.  I think maybe you are
8    referring to the social club aspect of the Delaware
9    Association of Police separate from the FOP.  But as
10   chief, I do periodically attend FOP meetings.
11   Q.   What I'm trying to say is that the active
12   members of the force, I think you told me, form a
13   close-knit community?
14   A.   For the most part, yes.
15   Q.   When I was asking you about her reputation, I
16   think you were telling me about what her reputation
17   was within the force; right?
18   A.   Yes.
19   Q.   And then there are people who have been in the
20   force but who have retired; correct?
21   A.   Yes.
22   Q.   They still keep up contacts with other officers
23   they've worked with.  Isn't that a fair statement?
24   A.   Yes.

27 (Pages 102 to 105)

Michael J. Szczerba

| Page 106 |
|---|

1     MS. BUTCHER: Object as to form.
2     A.   Yes. And there are some family members.
3     Q.   I'm only asking you based on your personal
4  experience.
5     A.   Yes.
6     Q.   Right. Yes.
7          When Nancy Dietz was not selected for the
8  position of inspector within the Wilmington Police
9  Department, did that affect her reputation within that
10  close-knit community?
11        MS. CHEEK: Objection to form.
12    A.   Not that I'm aware of.
13    Q.   Did you ever hear anybody say anything about
14  did Nancy have some deep, dark secret in her
15  background, that's why she wasn't selected, I suspect?
16  Anything like that?
17    A.   No.
18    Q.   So you're telling me that the fact that she
19  wasn't selected hasn't lowered her in the esteem of
20  her fellow officers based on what you know?
21    A.   Yes.
22    Q.   Okay. Thanks.
23        Are there any other characteristics that
24  Nancy Dietz has demonstrated that were superior to

| Page 107 |
|---|

1  those of Gilbert Howell that led to your
2  recommendation for her for the selection for inspector
3  in 2005?
4     MS. BUTCHER: Object as to form.
5     A.   Yes.
6     Q.   What would those have been?
7     A.   One, in looking at the job responsibilities, I
8  don't know where it was with the job description,
9  maybe about being involved with the community. I know
10  she's been involved with the community all along.
11  Always steps up to this present day.
12        One example being active with the Big
13  Sisters program now, even this present day being
14  involved with the program where the women that are
15  incarcerated, going in, making recordings so they can
16  read to their children. She's active in many
17  community outreaches. She's been active as the human
18  resources commander because in that responsibility she
19  also commands our police academy. And that has been
20  reflected, her philosophy has been reflected in the
21  police academy with the outreach that they've had in
22  the community.
23        So I think that's an important aspect.
24  It's one of those things that maybe they don't make it

| Page 108 |
|---|

1  to a performance rating, but they are things that I
2  keep an eye on for the full-rounded candidate, and
3  that's one thing that I think hasn't been mentioned
4  here this morning.
5     Q.   Anything else you might remember right now that
6  hasn't been mentioned?
7     A.   No. Just looking at, you know, when I make
8  those selections, I look at -- for any promotion,
9  whether it be for sergeant or for the rank of
10  inspector looking who I believe that the men and women
11  or the Wilmington Department of Police would best
12  follow. Not that there aren't other qualified
13  candidates that could fill that position, but I have
14  to make that decision from a group of candidates who I
15  believe is the best.
16        And, you know, in this case that particular
17  to fill that position, I thought that she was the best
18  candidate that I had available within that group.
19        So, in essence, it wasn't, you know,
20  Captain Nancy Dietz versus Captain Gilbert Howell. It
21  was Captain Dietz versus the rest of the folks, the
22  rest of the captains who were eligible. And it was
23  Captain Howell versus the rest of the folks who were
24  eligible.

| Page 109 |
|---|

1     Q.   Are you telling me that the pool of available
2  people was considered to be the captains of the police
3  force?
4     A.   That's correct.
5     Q.   For inspector?
6     A.   That's what I was considering.
7     Q.   You weren't considering lieutenants or
8  anything?
9     A.   No, I was not.
10    Q.   You're saying of the pool of captains, she was
11  the most qualified?
12    A.   Yes.
13    Q.   Got you. I understand.
14        We've alleged in the complaint in paragraph
15  67 that "At all times while she was working for the
16  force, Captain Dietz was a diligent, honest, and loyal
17  employee who always performed her job in an exemplary
18  manner."
19        Would you agree with that statement?
20    A.   Yes.
21    Q.   Do you know that she attended the FBI Academy?
22    A.   Yes, I'm aware of that.
23        MR. NEUBERGER: Okay. Let's just mark this
24  as 13.

28 (Pages 106 to 109)

Michael J. Szczerba

Page 110

1    (Szczerba Exhibit 13 was marked for
2    identification.)
3    BY MR. NEUBERGER:
4    Q.    This is a transcript that Nancy would testify
5    that she received from the University of Virginia
6    after attending the FBI Academy.  Does that appear to
7    be what this is?
8    A.    Yes.
9    Q.    This indicates that in 1987 she attended the
10   academy.  Do you see that?
11   A.    Yes.
12   Q.    Then if you look at the second page of this
13   document, this appears to be a copy of her diploma
14   from Penn State University.  Do you see that?
15   A.    Yes.
16   Q.    Is it true that the Wilmington Police
17   Department had to select Nancy Dietz to go to the FBI
18   Academy?
19   A.    That's correct.
20   Q.    When those selections are made, only officers
21   with the highest promise are chosen for that?
22   A.    Yes.  She would be one of those officers, yes.
23   Q.    I'm sure there are other people on the force
24   who have gone to the FBI Academy?

Page 111

1    A.    It's actually selected by the police department
2    or recommended by the police department, but the
3    actual selection would be made by the FBI.
4    Q.    Right.  So your department recommends people?
5    A.    Right.
6    Q.    And so your department couldn't guarantee that
7    she went to the FBI Academy?
8    A.    No.
9    Q.    The FBI made its own independent decision made
10   on her record that they'd like to have her attend the
11   academy.  Is that what you are telling me?
12   A.    Yes.  I know by experience of being selected an
13   alternate in 1991, but never made it that far.
14   Q.    But you got promoted then?
15   A.    Yes.
16   Q.    Gilbert Howell is not a graduate of the FBI
17   Academy?
18   A.    No, he's not.
19   Q.    There are a couple other places that people go
20   to.  Did he go to the Northeastern School or something
21   like that?
22   A.    I'm not aware of that.
23   Q.    Are you aware of any, I think there's two,
24   maybe three or four places where outstanding law

Page 112

1    enforcement officers can go around the country to take
2    the kind of training that's offered at the FBI
3    Academy?  Would you agree with that?
4    A.    Yes.
5    Q.    I forget the names.  Do you remember where any
6    of them are?
7    A.    One school in Chicago.  I believe that's mainly
8    traffic oriented.  There's a school out at the
9    University of Louisville.  Of course, the FBI Academy.
10   And then I believe there's one in south Florida, but I
11   don't know the official title of those schools, but
12   they are the usual --
13   Q.    I don't think we've received Gilbert Howell's
14   resume or educational information in the documents
15   that have been turned over to us yet, so I just have
16   to ask you based on what you might know about memory
17   or whatever:  Are you aware of his ever attending any
18   of those schools?
19   A.    Not to my knowledge.
20   Q.    So if he hasn't attended any of those schools
21   and Captain Dietz is a graduate of the FBI Academy
22   with a cumulative average around 3.7 or something like
23   that, would that demonstrate that she was more
24   qualified for the position in the area of educational

Page 113

1    background than Gilbert Howell?
2    A.    Yes, in that category, yes.
3    Q.    When the nominations are made to the FBI
4    Academy by the department, is it ultimately the chief
5    of police of the City of Wilmington who selects the
6    nominees?
7    A.    Yes.  Also, I'd like to include in that that
8    since I've been in as chief, when we have availability
9    of a position for a Wilmington police officer, I
10   utilize the past graduates of the FBI National Academy
11   to make a recommendation of a candidate or candidates
12   to me, although, but ultimately I make that selection.
13   But I do include past graduates to get the opinion
14   throughout the department, so get a cross-section of
15   the department to refer candidates or candidates back
16   to me.
17   Q.    Just to make sure I understood what you said, I
18   believe you are saying you consult with the graduates
19   of the academy within the department when you are
20   making what kind of decisions?
21   A.    Making decision to recommend someone for the
22   FBI Academy.
23   Q.    Got you.
24   A.    So exclusively I know it's not leadership by

29 (Pages 110 to 113)

Michael J. Szczerba

Page 114

1  committee, but I get the input of other folks within
2  the police department, but ultimately I will be the
3  one to make that decision.
4          Also, we do not pick an officer -- when I
5  announce the positions that are opened, and if you're
6  interested, to apply, so as not the entire department
7  that we take into consideration, only those officers
8  that apply themselves.
9          Right now through the requirement of the
10  FBI Academy, it's only people of the rank of
11  lieutenant or above are to be considered. So I do
12  have that restriction.
13          But other than that, the candidate, if he
14  or she is interested in attending the academy, they at
15  least have to show the initiative that they're
16  interested.
17  Q.  Are you aware that Nancy Dietz is currently
18  enrolled in Wilmington College's graduate program for
19  leadership?
20  A.  Yes, I am, and that's by way of some tuition
21  reimbursement I'm aware of that, and also was asked as
22  sort of a reference to -- for the graduate school. So
23  I did submit a reference.
24  Q.  Okay.

Page 115

1          MR. NEUBERGER:  Let's mark this as our next
2  exhibit, Exhibit 14.
3          (Szczerba Exhibit 14 was marked for
4  identification.)
5  BY MR. NEUBERGER:
6  Q.  I put in front of you what Nancy will testify
7  is a two-page resume of hers that she had prepared and
8  would probably be found in her personnel records.
9  Okay?
10          If we had Gilbert Howell's resume, which
11  hasn't been produced to us, would you agree we would
12  be able to make a comparison of their assignments,
13  their career paths?
14  A.  Yes.
15  Q.  If educational background is listed on Gilbert
16  Howell's, we would be able to make comparisons there?
17  Yes?
18  A.  Yes.
19  Q.  And memberships, awards and things like that,
20  if Gilbert Howell has any, we can make comparisons
21  there, also?
22  A.  Yes.
23  Q.  Nancy started off in patrol. Do you see that?
24  A.  Yes.

Page 116

1  Q.  You were two years on the force. She comes
2  onboard around 1980. Do you remember her being a
3  patrol officer?
4  A.  Yes, I do. I believe maybe even at one point
5  we may have been on the same patrol platoon, so that
6  means we were working the same schedule.
7  Q.  Aside from serving in patrol, she says she was
8  an investigator in vice. Do you agree with that?
9  A.  Yes.
10  Q.  Then she also was an investigator in criminal
11  investigations?
12  A.  Yes.
13  Q.  Do you agree with that?
14  A.  Yes.
15  Q.  Then you told us earlier that you agree that
16  she was an investigator in the Office of Professional
17  Standards; right?
18  A.  Yes.
19  Q.  Do you agree that she did at some point in time
20  as a sergeant command a patrol platoon --
21  A.  Yes.
22  Q.  -- in uniformed services? Okay.
23          So a patrol platoon would have involved
24  supervision of about 25 uniformed officers? Does that

Page 117

1  sound about fair?
2  A.  Yes, on the platoon. And then the duties are
3  split up amongst a couple street sergeants on that in
4  addition to our house sergeants so that direct
5  supervisory duties would be split up amongst those 25.
6  So we make a range of supervision of about nine
7  officers for a street sergeant.
8  Q.  Just to educate me a little bit on your force,
9  then somebody would be doing the night shift versus
10  the day shift?
11  A.  They would work a rotating shift.
12  Q.  So they are all working rotating shifts?
13  A.  Right.
14  Q.  So she might be working supervising people on
15  the rotating day shift this time and then another time
16  on rotating night shift?
17  A.  She would be working right along with them.
18  Q.  With them. But I'm saying she wouldn't always
19  be day shift? She would be night shift sometimes?
20  A.  Right.
21  Q.  So with a platoon of 25 officers, back in the
22  1980s, was the force on what kind of work shifts?
23  Eight-hour shifts? Ten-hour shifts?
24  A.  Primarily eight-hour shifts, a seven-day duty

30 (Pages 114 to 117)

Michael J. Szczerba

Page 118

1   tour. Probably at that time in 1980, changed -- the
2   shift structure has changed over the years, been
3   modified. But generally back then it would have been
4   a seven-day rotation with an eight-hour tour of duty.
5      Q.  So when she was doing her tour of duty, you're
6   saying as a road sergeant she would be responsible for
7   around nine people who are actually out there on the
8   road?
9      A.  Direct responsibilities. Then there would be
10  days that maybe the other sergeant is not working, so
11  that street sergeant would have all people who are on
12  the street. That would be a total of 20, 25. There's
13  a possibility there.
14     Q.  Okay. I understand.
15         Then she was also, as a lieutenant she was
16  a commander in patrol; is that right?
17     A.  Yes.
18     Q.  All right. I got you.
19     A.  Basically when receiving the promotions to that
20  of sergeant and lieutenant, generally that new
21  promotee will go into the Uniformed Services Division
22  for the experience of supervising within that division
23  being the basic function of the police department.
24     Q.  So when she's either a sergeant in patrol or

Page 119

1   she is a lieutenant in patrol, she's in the chain of
2   command under the uniformed operations inspector?
3      A.  Yes.
4      Q.  So that's experience she had in the chain of
5   command for the position that Gilbert Howell was
6   selected for?
7      A.  Yes.
8      Q.  All right. When she was an investigator for
9   then the Office of Professional Standards, when she
10  was doing criminal investigation or working on the
11  vice squad, she was in a different chain of command
12  for the other inspector?
13     A.  Yes.
14     Q.  Okay. I understand. So she has experience in
15  both chains of commands?
16     A.  Yes.
17     Q.  Operational experience in both chains of
18  commands?
19     A.  Correct.
20     Q.  So then she goes from a lieutenant in the
21  patrol platoon to a lieutenant in human resources. So
22  that would probably be the person right under the
23  captain?
24     A.  Yes.

Page 120

1      Q.  Then that's under Martin Donohue who is the
2   inspector?
3      A.  Yes.
4      Q.  Then she's a lieutenant in criminal
5   investigations for criminal investigations platoon?
6      A.  Yes.
7      Q.  That's, again, under Martin Donohue?
8      A.  Yes.
9      Q.  Then she becomes the captain and commanding
10  officer in criminal investigations?
11     A.  Yes. That's presently under Inspector Donohue.
12  I don't know going back to 1997 whether that would
13  fall under him. I don't believe so.
14     Q.  Okay.
15     A.  Nonetheless, it would be the predecessor to
16  Inspector Donohue of holding that position of the
17  inspector of investigative operations.
18     Q.  I understand. Then you put her in charge of
19  the Office of Professional Standards, and then lastly
20  as the human resources captain; right?
21     A.  That's correct.
22     Q.  Is the human resources person the person who
23  always commands the police academy?
24     A.  Yes.

Page 121

1      Q.  So she's commanded the police academy since she
2   became the human resources director?
3      A.  Yes. And she would have commanded as the
4   lieutenant, also, as the deputy commander of the Human
5   Resources Division, ultimately the responsibility of
6   the police academy falls under the commanding officer
7   of the Human Resources Division.
8          But as far as the day-to-day operations, it
9   would fall upon the lieutenant. She also had that
10  experience as a lieutenant in the Human Resources
11  Division in running a police academy.
12     Q.  I've seen commendations or accolades in her
13  behalf indicating approval of the fact that she's been
14  able to secure recruits, you know, from a diverse
15  background, the kinds of people who would be able to
16  serve all the different constituencies in the City of
17  Wilmington. You are aware of that kind of a credit
18  that's been given to her?
19     A.  Yes. Part of the credit would be coming from
20  me, too, in that the effort that we put forth, it's a
21  very challenging field in recruitment. Not only in
22  law enforcement, but bringing qualified candidates
23  into our work force.
24         And I was quite impressed with the effort

31 (Pages 118 to 121)

Michael J. Szczerba

Page 122

1 that was made this time and know we can make some
2 improvements, but, you know, even looking beyond
3 diversity, looking at gender and the color of one's
4 skin, even beyond that of calling into many different
5 areas in innovative recruiting and getting the word
6 out about our job openings.
7    Q.  Recruiting is the lifeblood of the Wilmington
8 Police Department, isn't it?
9    A.  That's correct.
10    Q.  I mean, Wilmington Police Department is not the
11 highest paid police department in the state?
12    A.  No.
13    Q.  It's probably the lowest paid among the State
14 Police or academy police?
15    A.  Yes.
16    Q.  Is that right?
17    A.  Yes, and other smaller municipalities.  We are
18 below that and we have the challenge of a residency
19 requirement.
20    Q.  You have that.
21    A.  Yes.  With the nature of the work in itself as
22 compared to the other major departments, it's -- they
23 do a fine job of what they do, but it's still not the
24 same responsibilities.

Page 123

1    Q.  A Wilmington police officer in one night on
2 patrol might have to respond to more violent incidents
3 than a state trooper on patrol in a week.  Is that a
4 fair statement?
5         MS. BUTCHER:  Object as to form.
6    Q.  Based on your experience?
7    A.  Based on my experience, that's a possibility.
8    Q.  The Wilmington Police Department loses people
9 to the other police departments because they have a
10 higher rate of pay?
11         MS. BUTCHER:  Object as to form.
12    Q.  Do you see attrition because of that?
13    A.  That's one of the factors.  Not a stand-alone
14 factor.
15    Q.  Right.  There's a residency requirement and all
16 sorts of things; right?
17    A.  Yes.
18    Q.  Does the Wilmington Police Department have a
19 tough job to do in policing in the City of Wilmington
20 because of violence, drug use, things like that, the
21 kinds of crimes that you're devoted to preventing or
22 solving?
23         MS. CHEEK:  Objection to form.
24    A.  Yes.  And it's not exclusive to us.  Of course,

Page 124

1 as a police department policing in any urban area, but
2 I think it's highlighted more so here in the State of
3 Delaware with having the City of Wilmington as the
4 only truly urban area.  We stand alone there, and I
5 think that's part of why we stand alone in some of the
6 criticism that we receive.
7    Q.  I'm sure you're proud of the job you are doing,
8 that the Wilmington Police Department is doing for the
9 citizens of the city of Wilmington?
10    A.  Extremely proud.
11    Q.  And it's a difficult job?
12    A.  Yes, it is.
13    Q.  And the kind of people that you bring into the
14 Wilmington Police Department to do that difficult job,
15 their selection is an important thing?
16    A.  Yes, it is.
17    Q.  And finding the best raw material to make into
18 police officers to serve the City of Wilmington, is
19 that a very important function of the Wilmington
20 Police Department?
21    A.  Yes.
22    Q.  How has Nancy Dietz performed in finding that
23 raw material, the people who can make Wilmington
24 police officers good officers and who can do the

Page 125

1 difficult job that a police officer in the City of
2 Wilmington does?  How has she performed in that
3 function?
4         MS. CHEEK:  Object as to form.
5    A.  She has done an outstanding job in that area.
6 Not -- it doesn't end at recruitment.  It doesn't end
7 at training.  It ends up at the follow-up, and I think
8 there's been stepping up to another level, too, in the
9 following up on those officers on their probationary
10 period and keeping an eye on them where some
11 corrections need to be made, additional training, or
12 it may in some instances may end up in terminating
13 their employment because they don't cut the grade as
14 far as the professionalism that we are looking for on
15 the job.
16         MR. NEUBERGER:  Okay.  We have some
17 documents from Nancy Dietz's personnel record that
18 she's provided to the defendants in this case as well
19 as more job evaluations I want to go through.
20         So let's mark this as our next exhibit,
21 which is 15.
22         (Szczerba Exhibit 15 was marked for
23 identification.)
24

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

Michael J. Szczerba

---

Page 126

1  BY MR. NEUBERGER:
2     Q.  This Exhibit 15 consists of various
3  certificates of educational certificates and things
4  taken from Nancy Dietz's personnel file.  Okay?
5           Would you agree that she does attend
6  seminars and things to enhance her police knowledge
7  and skills?
8     A.  Yes.
9     Q.  These kinds of documents reflect that fact,
10  don't they?
11    A.  Yes, they do.
12    Q.  So this top one is something put on by the
13  New York State Police; right?
14    A.  Yes.
15    Q.  About investigating homicides; right?
16    A.  Yes.
17    Q.  And then the third one is about terrorist
18  bombing awareness and things like that?
19    A.  Yes.
20    Q.  Next, managing police discipline within your
21  department; right?
22    A.  Yes.
23    Q.  Then hostage negotiations, a couple seminars on
24  that; correct?

---

Page 127

1     A.  Correct.
2     Q.  And we could go on.
3           Do these things demonstrate some of the
4  qualities you've attributed to Nancy earlier?
5     A.  Yes.
6     Q.  Okay.  Let's go to another one.
7           MR. NEUBERGER:  Let's mark this as our next
8  number, which would be 16.
9           (Szczerba Exhibit 16 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12    Q.  Nancy, before she got married, was known as
13  Nancy Spell.  Do you remember that?
14    A.  Yes, I do.
15    Q.  Patrolwoman Nancy Spell.  Okay.
16           Is it true that over her career she's
17  received various written commendations?
18    A.  Yes.
19    Q.  That resume we looked at a few minutes ago had
20  a second page with commendations and things like that.
21  We can use that at another time, but these are just a
22  few commendations I've pulled out of her personnel
23  file.  Okay?
24    A.  Yes.

---

Page 128

1     Q.  This first page here of Szczerba 16 is a
2  commendation approved by then-Chief Dennis Regan.  Do
3  you see that?
4     A.  Yes.
5     Q.  This is a commendation to her and her partner
6  while on patrol prevented a rape from occurring.  Do
7  you see that?
8     A.  Yes.
9     Q.  So this is 1982, so this would be like her
10  second year on the force; right?
11    A.  Yes.
12    Q.  Then if we flip into the third page in, 1983,
13  is this an award to Nancy Spell from Chief Regan at
14  that time for resuscitating a 73-year-old man through
15  CPR?
16    A.  Yes.
17    Q.  Who was dying on the streets?
18    A.  Yes.
19    Q.  If we turn to the next page, P180, this, again,
20  is some documentation on that CPR incident; is that
21  right?
22    A.  Right.
23    Q.  If we go to the next page, P200, are you aware
24  that she was nominated on at least one occasion for

---

Page 129

1  the Kiwanis quarterly award for her accomplishments?
2     A.  No, I wasn't, but I'm aware by seeing the
3  document here.
4     Q.  Is this a Wilmington Police Department
5  document?
6     A.  Yes, it is.
7     Q.  This is a memo from a Then-Captain Robert
8  Longyear to Inspector John Johnson; isn't that right?
9     A.  Yes.
10    Q.  It's dated November 24th, 1981; is that right?
11    A.  Yes.
12    Q.  If we look at the second page of this document,
13  the top, it says that Patrolman Spell has shown a
14  great interest in improving herself by volunteering
15  and attending various schools.  Do you see that?
16    A.  Yes.
17    Q.  So this was back in 1981 that she was
18  demonstrating those qualities; right?
19    A.  Right.
20    Q.  Have you seen her demonstrate those qualities
21  throughout her career --
22    A.  Yes, I have.
23    Q.  -- to be interested in getting more training to
24  better her professional competence.  Would you agree

---

33 (Pages 126 to 129)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1290

Page 130

1  she does that?
2  A.  Yes, she does.
3  Q.  The second paragraph there indicates that back
4  then that her supervisors in the Patrol Division felt
5  that she had done tremendous work while working in the
6  patrol division.  Is that what it says?
7  A.  Yes.
8  Q.  And the next paragraph says that she has
9  demonstrated extreme dedication to her police work.
10  Do you see that?
11  A.  Yes.
12  Q.  Then the last paragraph recommends her to be
13  the first woman ever to have received the Kiwanis
14  award.  So they were nominating her at this time.  Do
15  you see that?
16  A.  Yes.
17  Q.  Then if we go to the third quarter of 1982, a
18  year later, okay, from this 1981 document, we've got
19  on page 183 another document.  Does that appear to be
20  a Wilmington Police Department document?
21  A.  Yes.
22  Q.  Does that indicate that she did get a Kiwanis
23  award in the third quarter of 1982?
24  A.  Yes.

Page 131

1  Q.  Does that reflect that from joining the force
2  she had worked in the vice division, helped make
3  undercover drug buys, help fight prostitution, act as
4  a hostage negotiator?
5  A.  Yes.
6  Q.  Then at the last paragraph, does this
7  Wilmington police document indicate that she displays
8  initiative and dedication to her work?
9  A.  Yes.
10  Q.  Throughout her career, have you observed Nancy
11  to display initiative and dedication to her work?
12  A.  Yes.
13  Q.  The next page is a memo from the director of
14  personnel of the City of Wilmington in 1995 to
15  then-Chief Pratcher.  Do you see that?
16  A.  Yes.
17  Q.  I think you told us that the lieutenants
18  working in personnel under the captain have a lot of
19  hands-on responsibility in the ongoing police
20  academies?
21  A.  That's correct.
22  Q.  If we look at paragraph 3 of this memo, does it
23  indicate from the director of personnel of the City of
24  Wilmington that Nancy was demonstrating dedication,

Page 132

1  professionalism, and determination in executing her
2  duties for the police academy?
3  A.  Yes, it does.
4  Q.  Does it call her an outstanding police officer
5  there?
6  A.  Yes.
7  Q.  Does it thank her at the end for a job well
8  done for that police academy?
9  A.  Yes.
10  Q.  Then the last page, this is a commendation for
11  a 1996 incident where Nancy was off duty and rushed to
12  the aid, to break up a robbery in progress and she was
13  given the distinguished service award.  Do you see
14  that?
15  A.  Yes.
16  Q.  She got that from the director of public safety
17  and she was commended by the chief; is that right?
18  A.  That's correct.
19  Q.  All right.  Let's go to another document here.
20  MR. NEUBERGER:  Let's mark this as Exhibit
21  Number 17.
22  (Szczerba Exhibit 17 was marked for
23  identification.)
24

Page 133

1  BY MR. NEUBERGER:
2  Q.  This first page on Exhibit 17, is this a
3  commendation from then-Mayor James Sills to
4  then-Lieutenant Nancy Dietz?
5  A.  Yes, it is.
6  Q.  The next page, is that, again, a commendation
7  to her from Mayor Sills of a different date?
8  A.  Yes.
9  Q.  And the third page in is an award signed by
10  Mayor James M. Baker to Nancy dated February 13th,
11  2003?
12  A.  That's correct.
13  Q.  Does that evidence the kind of community
14  service you mentioned earlier that Nancy engages in?
15  A.  Yes, it is.
16  Q.  This is for her work with the Big Brothers/Big
17  Sisters program; right?
18  A.  That's correct.
19  MS. BUTCHER:  I think it's February 10th.
20  I think.
21  MR. NEUBERGER:  Did I misstate the date?
22  MS. BUTCHER:  Yes.
23  MR. NEUBERGER:  I apologize.
24

34 (Pages 130 to 133)

Michael J. Szczerba

Page 134

1  BY MR. NEUBERGER:
2  Q.  February 10th, 2003, she got this award; right?
3  A.  Yes.
4  Q.  This is from Mayor Baker; right?
5  A.  Yes.
6  Q.  Does Mayor Baker want police officers to be
7  involved in community activities with children?
8       MS. CHEEK:  Objection to form.
9  A.  Yes, he does.
10  Q.  Have you seen him give those kinds of
11  directions?
12  A.  Yes.
13  Q.  Does Mayor Baker want police officers to be
14  involved with kids?
15  A.  Yes.
16       MS. BUTCHER:  Object as to form.
17  Q.  Has he told you that?
18  A.  In recognizing people being involved with Big
19  Brothers/Big Sisters in a mentoring program, yes, I've
20  heard him publicly state that.
21  Q.  You've heard him publicly state that?
22  A.  Yes.
23  Q.  Mayor Baker lives in the city, doesn't he?
24       MS. BUTCHER:  Object as to form.

Page 135

1  A.  Yes.
2  Q.  Does the mayor have to meet a residency
3  requirement, do you know?
4  A.  Yes, he does, as elected official.
5  Q.  He lives down around Adams Street, somewhere
6  like that?
7       MS. BUTCHER:  Object as to form.
8  Q.  Are you aware that he lives on that side of 95?
9  A.  No.  It would be actually the other side of 95,
10  but in that vicinity.
11  Q.  On the other side of 95?
12  A.  Yes.
13  Q.  Okay.  Let's look at the next page, June 4th,
14  2001, Mayor Baker again gave Nancy Dietz an award for
15  her outstanding performance, dedication, and
16  contribution to the Big Brothers/Big Sisters program;
17  correct?
18  A.  Correct.
19  Q.  So twice he signed an award to her indicating
20  that she was dedicated to the Big Brothers/Big Sisters
21  program?
22       MS. CHEEK:  Objection to form.
23  A.  Yes.
24  Q.  Do you see these two documents here?

Page 136

1  A.  Yes.
2  Q.  Did Mayor Baker ever tell you he disapproved of
3  those activities by Nancy Dietz?
4  A.  No.
5  Q.  You've heard him speak on Wilmington police
6  officers being involved with the community?
7  A.  Yes, and city employees, in general, being
8  involved in the community and, in particular, I know
9  this program from meeting the little sisters.  She's
10  involved with city children, now some of them city
11  adults.
12       So it's a very important community outreach
13  just the same as we have officers involved in coaching
14  athletics.  Whether they are a resident or not, they
15  are still active here in the city, active in their
16  churches.  That's all important because it presents
17  the department in a very positive light.
18  Q.  Are you aware of whether Gilbert Howell is
19  involved in Big Brothers/Big Sisters?
20  A.  No, I am not aware.
21  Q.  You don't know one way or the other?
22  A.  Right.
23  Q.  Do you have any idea what kind of community
24  activities Gilbert Howell is involved in?

Page 137

1  A.  In particular, I'm not aware of any.
2  Q.  So you're not aware of any community activities
3  he's involved in?
4  A.  Right, right, not that I'm aware of that's been
5  brought to my attention.
6  Q.  Right.
7  A.  But it's a possibility he could be, but that
8  I'm not aware of.
9  Q.  Lastly, the last page here is a 1994
10  commendation from the city council to a police officer
11  and a fire department officer that also mentions Nancy
12  Dietz.  Do you see that?
13  A.  Yes.
14  Q.  It mentions her being injured in a scuffle
15  trying to arrest a thief.  Do you see that?
16  A.  Yes.
17  Q.  Okay.  We are done with that.
18       MR. NEUBERGER:  Here is 18.
19       (Szczerba Exhibit 18 was marked for
20  identification.)
21  BY MR. NEUBERGER:
22  Q.  Is this a letter to the chief of police in 1989
23  from Peter Letang, a deputy attorney general at the
24  time?

35 (Pages 134 to 137)

Michael J. Szczerba

Page 138

1    A.  Yes.
2    Q.  Does this letter commend then-Detective Nancy
3    Dietz for her aid in solving, to use a vernacular, a
4    rape charge?
5    A.  Yes.
6    Q.  At the end does he say that he appreciated her
7    professional assistance in seeing that this
8    perpetrator was convicted and is awaiting sentencing
9    for crimes that could exceed 110 years?
10   A.  Yes.
11   Q.  Okay.  Thank you.
12        MR. NEUBERGER:  Let's just mark this as
13   Exhibit 19.
14        (Szczerba Exhibit 19 was marked for
15   identification.)
16   BY MR. NEUBERGER:
17   Q.  Now what I've done is I've put a whole
18   compilation of Nancy Dietz's Employee Performance
19   Appraisals in front of you.  The first one
20   we've already talked about, so let's just turn in to
21   page P282.  This is the performance appraisal for the
22   year before September 2004, which was the last
23   performance appraisal before Gilbert Howell was
24   selected.  Okay?  So this is performance appraisal

Page 139

1    dated September 2003.  Do you see that?
2    A.  Yes.
3    Q.  If we go back to page 286 on this document, do
4    you see that?
5    A.  Yes.
6    Q.  Is it true that at that time in September of
7    2003 she received the second highest rating of above
8    expectations?
9    A.  Correct.
10   Q.  If we go to the next document we have,
11   page P287, do you see that?
12   A.  Yes.
13   Q.  That's for the year before that with a review
14   in August of 2002; is that right?
15   A.  Yes.
16   Q.  If we stop at page 292, is it correct that our
17   evaluator under "Results" stated that "Captain Dietz
18   has an excellent disciplinary record, and has managed
19   high ethical and professional standards"?
20   A.  Yes.  She has "maintained" high --
21   Q.  That's right.  "...maintained high ethical and
22   professional standards"; right?
23   A.  Yes.
24   Q.  Are you aware of anyone ever saying that

Page 140

1    Gilbert Howell has an excellent disciplinary record?
2    Did you ever hear anybody say that?
3    A.  I don't have any recall.
4    Q.  Have you ever seen a document that you recall
5    that said that Gilbert Howell has an excellent
6    disciplinary record?
7    A.  I don't recall.
8    Q.  Has anyone ever told you verbally that Gilbert
9    Howell maintains high ethical and professional
10   standards?
11   A.  No.
12   Q.  Have you ever seen a written document that
13   states that Gilbert Howell maintains high ethical and
14   professional standards?
15   A.  No.
16   Q.  Now, if we go on to page P296 of this document,
17   for the overall ratings, is it true that Nancy Dietz
18   received a rating here again of above expectations?
19   A.  Yes.
20   Q.  Page 299, we've already gone over that
21   document.
22        Let's go to page P306, a 1996 document.
23   Okay?
24   A.  Okay.

Page 141

1    Q.  Is this a January 12, 1996, job performance
2    evaluation for then-Lieutenant Nancy Dietz?
3    A.  Yes.
4    Q.  The rating system here is still a five-point
5    rating system; is that correct?
6    A.  That's correct.
7    Q.  The highest rating is superior.  That's a 5;
8    right?
9    A.  Yes.
10   Q.  Then the next rating is a 4; right?
11   A.  Yes.
12   Q.  Then the next is a 3; right?
13   A.  Yes.
14   Q.  And you have a 2 and then a 1; right?
15   A.  Yes.
16   Q.  So 1 would be the flunk; right?
17   A.  Yes.
18   Q.  And 2 would be a D; is that correct?
19   A.  Correct.
20   Q.  And 3 would be a C; is that correct?
21   A.  Yes.
22   Q.  A 4 would be a B; right?
23   A.  Yes.
24   Q.  And then 5 would be an A; right?

36 (Pages 138 to 141)

Michael J. Szczerba

Page 142

1    A.  Right.
2    Q.  So let's just look at some of the comments
3  here.
4         On the "Comments" section, do you see the
5  right-hand side of the page?
6    A.  Yes.
7    Q.  There's comments.  In the left-hand side is the
8  job task; right?
9    A.  Right.
10   Q.  So for the first job task which consisted of
11 40 percent of the ratings, Nancy received the second
12 highest rating of a 4; is that right?
13   A.  That's right.
14   Q.  Then for the second job task, again for
15 30 percent of the rating she received the second
16 highest of a 4; right?
17   A.  Yes.
18   Q.  The third job task, 15 percent of the rating
19 she received the highest rating, a 5; right?
20   A.  Correct.
21   Q.  The fourth job task, 7 and a half percent of
22 the rating, she received a C, a 3; right?
23   A.  Yes.
24   Q.  And for the last task 7 and a half percent of

Page 143

1  the rating she received a second highest rating again;
2  right?
3    A.  Right.
4    Q.  Then we go back to 1991.  Let's look at
5  page P308.  Is this an evaluation job performance
6  evaluation for Nancy Dietz in September 25th of 1992?
7  Do you see that in the right-hand column, the first
8  page?
9    A.  Yes, yes.
10   Q.  Just looking at job tasks and comments again
11 here, under the first job task, which was 60 percent,
12 she received the absolute highest rating of a 5; is
13 that right?
14   A.  Yes.
15   Q.  Then for the next job task, 15 percent, she
16 received the highest rating of a 5?
17   A.  Yes.
18   Q.  In fact, we go to the next page, for all the
19 job tasks she received the absolute highest rating of
20 a 5; is that correct?
21   A.  Yes.
22   Q.  That's when she was the rank of lieutenant; is
23 that correct?
24   A.  Correct.

Page 144

1    Q.  If we go to page P311, that job evaluation was
2  done by a Captain Monaghan; is that correct?
3    A.  That's correct.
4    Q.  Then the police chief who signed off on it was
5  Guy Sapp; is that right?
6    A.  Yes.
7    Q.  Then I don't remember who the director of
8  public safety was back then.  Can you read the name?
9    A.  Yes.  It's Karen Johnson.
10   Q.  Karen Johnson?
11   A.  Yes, yes.  The late Karen Johnson.
12   Q.  Okay.
13   A.  And also there's the initials of the inspector,
14 SDP.  That's Samuel D. Pratcher.
15   Q.  So former Chief Pratcher was inspector then?
16   A.  Yes.
17   Q.  Now, the next page, P312, we have some job
18 evaluations there.  If you look at the second page on
19 P313, this is an evaluation done by then-Lieutenant
20 Gilbert Howell; is that correct?
21   A.  Yes.
22   Q.  This was on September 6, 1990; right?
23   A.  Yes.
24   Q.  The first question he was asked to answer there

Page 145

1  was:  "Does she use good judgment in making
2  decisions?"  And what did he respond?  Yes?
3    A.  Yes.
4    Q.  She was asked if she was courteous to the
5  public in question 27, and what did he respond?
6    A.  "Yes."
7    Q.  And question number 36 he was asked:  "Has she
8  gained the respect of her subordinates?"  And his
9  response was --
10   A.  "Yes."
11   Q.  Then there's some text at the bottom of that
12 page before his signature.  Do you see that?
13   A.  Yes.
14   Q.  Does he indicate there that she is very much
15 qualified --
16   A.  Yes.
17   Q.  -- to fulfill her position?
18   A.  Yes.
19       MS. CHEEK:  I'd like to note for the record
20 it appears that a page is missing.
21       MR. NEUBERGER:  Yes, it does.
22 BY MR. NEUBERGER:
23   Q.  If we go to the next page, page 315 through
24 P316, there's a page missing again here and hopefully

37 (Pages 142 to 145)

Michael J. Szczerba

Page 146

1  we can get it from the city.
2       But this is, again, an evaluation done of
3  Gilbert Howell, of then-Lieutenant Howell of Nancy
4  Dietz; right?
5  A.  Yes.
6  Q.  Again, he says she uses good judgment in making
7  decisions in number 1; right?
8  A.  Yes.
9  Q.  27 says she's courteous to the public?
10 A.  Yes.
11 Q.  In 33 he says she's loyal?
12 A.  Yes.
13 Q.  Let's look at his handwritten text at the
14 bottom there.  You see four lines of text?
15 A.  Yes.
16 Q.  Is it true he says:  "Sergeant Dietz sets a
17 fine example in all aspects of police supervision"?
18 A.  Yes.
19 Q.  Does he conclude that she is "a very noteworthy
20 asset to our department"?
21 A.  Yes.
22 Q.  Is that what he said at that time?
23 A.  Yes.
24 Q.  Okay.  We are done with that.

Page 147

1       MR. NEUBERGER:  Why don't we take our lunch
2  break now?
3       MS. CHEEK:  All right.
4       MR. NEUBERGER:  Why don't we just come back
5  at 1:30.  It is 12:15 now, we'll take an hour and 15
6  for lunch.
7       MS. CHEEK:  Okay.
8       (A luncheon recess was taken at this time.)
9       - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 148

8       PAGES 149 TO 181 OF THIS TRANSCRIPT
10      HAVE BEEN DEEMED TO BE CONFIDENTIAL
12      BY THE PARTIES AND CAN BE FOUND IN A
14      SEALED ENVELOPE AT END OF THIS
16      TRANSCRIPT.

Page 149

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

# SEALED
# DOCUMENTS
# (A1296 - 1303)

Page 182

1  BY MR. NEUBERGER:
2   Q.  Did you ever receive a complaint from the FOP
3  about Inspector Howell being on the scene, on a
4  homicide scene without his gun belt, his hat, those
5  kinds of things?
6   A.  Yes.
7   Q.  What year would that have been?
8   A.  2006.
9   Q.  2006?
10  A.  Yes.
11  Q.  Was that something that was investigated?
12  A.  No.  It was an issue where the FOP president
13  expressed that.  I arranged for Inspector Howell to
14  meet with the FOP president on that issue and that's
15  where it ended there.
16  Q.  As the chief, you sign the pay sheets for
17  Inspector Howell every couple of weeks?
18  A.  Yes.
19  Q.  Right?  So that makes you aware of what his
20  status is as far as attendance and things like that?
21  That's one way of letting you know; right?
22  A.  Yes.
23  Q.  Are you aware that on occasions when he's been
24  out on sick time or comp. time or vacation, that he

Page 183

1  has, nevertheless, worked extra-duty jobs?  Are you
2  aware of that ever happening?
3   A.  No.
4   Q.  No?
5   A.  Prior to knocking off sick and working jobs,
6  yes, but not while working while on a sick status.
7   Q.  Not being in the department, I didn't quite
8  follow that.  Could you tell me that again?  You said
9  prior to -- try that again.
10  A.  I'm not aware of any allegations of working
11  while you're out sick and then working a job.
12  Q.  Okay.
13  A.  Maybe prior to knocking off sick, working a
14  function and then knocking off sick afterwards.
15  Q.  Okay.
16  A.  So the way I understood your question was that
17  he was off sick and he's working.
18  Q.  So you're saying he could have been working and
19  then done an extra-duty job and then he would be off
20  sick?
21  A.  Yes.
22  Q.  But not the other way around?
23  A.  Right.
24  Q.  Got you.

Page 184

1   Were you aware of Director Mosley ever
2  checking up on Gilbert Howell and going to his house
3  to check in when he was supposedly off sick?
4   A.  No.
5   Q.  Do you know what DEMA is?
6   A.  DEMA, Delaware Emergency Management Agency.
7   Q.  Did they conduct an exercise in the City of
8  Wilmington and Inspector Howell failed to take command
9  of the scene as the incident commanded?
10  A.  That was part of the criticisms that he
11  received after that drill.
12  Q.  So they ran a drill in Wilmington?
13  A.  Yes.
14  Q.  As part of a trial to keep the State of
15  Delaware prepared for emergencies?
16  A.  Right.
17  Q.  Inspector Howell was supposed to be part of
18  that drill?
19  A.  Yes.
20  Q.  This is designed to enhance the public safety
21  in case of a tragedy; right?
22  A.  Right.  Also in a, you know, a test function to
23  show us where maybe we're lacking.
24  Q.  Inspector Howell didn't show up for the scene

Page 185

1  or the incident practice?
2   A.  He was there.
3   Q.  He didn't take command of the scene as he
4  should have?
5   A.  That was some of the criticism we received, not
6  in particular to him, but he was at the scene, so it
7  was part of his responsibilities.  But we received
8  other criticisms in addition to that.
9   Q.  Right.  I understand.  They are trying to make
10  it ready in all respects; right?
11  A.  Right.  So exclusively to put that, you know,
12  saying there was a direct criticism of only Inspector
13  Howell, it wouldn't be part.  He was part of it
14  including myself and everyone else that participated
15  in that.
16  Q.  Right.  But on the scene he was the person
17  highest in command?
18  A.  Yes.
19  Q.  He did not take command of the scene during the
20  exercise?
21  A.  Right.
22  Q.  That's what they claimed?
23  A.  Yes.
24  Q.  As a result, was all of your staff required to

47 (Pages 182 to 185)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1304

Michael J. Szczerba

Page 186

1  take some training because he didn't take command of
2  the scene?
3    A.  Yes, in the after-action report.
4    Q.  Did Gilbert Howell fail to show up for three of
5  the training sessions that were scheduled?
6    A.  That I could not state as far as his
7  attendance.  I'm not aware of that.
8    Q.  Now, his performance since his promotion to
9  inspector, have you sat down with Director Mosley and
10  talked about any issues you might have with Inspector
11  Howell's performance?
12       MS. BUTCHER:  Object as to form.
13    A.  Yes.  We have spoken about it, but mainly it
14  revolved around his presence or his lack of his
15  presence.  So that has been the main issue.
16    Q.  Has all this been verbal?
17    A.  Verbal.
18    Q.  Meetings?
19    A.  In addition to what you've seen submitted in
20  the Executive Summary, the reports that are entitled
21  "Executive Summary," that's the purpose of that
22  because that's been the issue.
23    Q.  That's been the issue?
24    A.  Yes.

Page 187

1    Q.  Okay.
2    A.  Yes.
3    Q.  Have you had those kinds of discussions with
4  the chief of staff of the mayor, Mr. Montgomery, or
5  the mayor himself?
6    A.  Not with the mayor himself in passing, not any
7  official meeting.  But it's been mentioned and talked
8  about with the chief of staff.
9    Q.  So what kinds of things would you have told the
10  chief of staff?
11    A.  That we are challenged with the attendance of
12  Inspector Howell.  It continues to be an issue.
13    Q.  How does Inspector Howell relate as to the
14  other inspector?
15       MS. BUTCHER:  Object as to form.
16    Q.  Or do they have any overlap that you observe?
17    A.  They have overlap, but it revolves back to the
18  issue of being there.
19    Q.  If you are not there, you can't relate to
20  somebody?
21    A.  Right.
22    Q.  Okay.
23    A.  But I haven't had any problems between the two
24  when they are both there.

Page 188

1    Q.  After you told the chief of staff, Montgomery,
2  about the attendance issue, what did he respond to
3  you?
4       MS. BUTCHER:  Object as to form.
5    A.  There really hasn't been a response.  Most of
6  the conversation has been between myself and the
7  director.
8    Q.  But when you've mentioned it to Mr. Montgomery,
9  he hasn't given you a response is what you are telling
10  me?
11    A.  No, no.
12    Q.  Right?
13    A.  Right.  There's only been one time where we
14  have officially sat down and discussed it.  There's
15  been other times in passing, but I do recall one
16  meeting between myself, the director, and
17  Mr. Montgomery.
18    Q.  Was the purpose of that meeting to discuss
19  Gilbert Howell?
20    A.  That was one of the topics.  The others were
21  unrelated, but that was mentioned.
22    Q.  You brought up this problem of how it was
23  affecting your staffing?
24    A.  Yes, yes, I did.  I want to explain, too, that

Page 189

1  there are monthly meetings with the chief of staff and
2  every department head.
3    Q.  All in one table or separate meetings?
4    A.  Separate meetings.
5    Q.  Go ahead.
6    A.  He has monthlies with the department heads.
7  Myself and the chief of fire are not included in those
8  monthlies.  So every other department director has a
9  monthly meeting.  We do not.
10       So I want to clear that up in case that
11  would become an issue, don't you meet with your chief
12  of staff.  No, I don't.  I guess it's with the chief
13  of staff meeting with the director, it covers for
14  other departments.
15    Q.  Okay.  I understand.
16       Have you asked the other inspector to
17  assume some of the duties of Inspector Howell because
18  he's not there?
19    A.  Asked him, no.  The other inspector has stepped
20  up when needed and so has the other members of my
21  senior staff which I consider the ranks of captain and
22  above.  They've stepped up to...
23    Q.  I seem to remember from other depositions long
24  ago a little bit about the chief having command

48 (Pages 186 to 189)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1305

Page 190

1    meetings or whatever. Let's call it your senior staff
2    is -- what? Your captains and up?
3    A. Yes.
4    Q. How frequently do you have meetings with your
5    senior staff since you've been the chief?
6    A. At least weekly.
7    Q. I remember some big conference room in your new
8    building.
9    A. Yes.
10   Q. You have meetings at least weekly with all
11   those commanders?
12   A. Yes.
13   Q. You're saying that, as need be, Inspector
14   Donohue has stepped up to help fill the gap, as
15   necessary?
16   A. And so have the captains.
17   Q. And so have the captains. Okay.
18           Have problems arisen with paperwork not
19   being processed in a timely fashion because he's not
20   there?
21   A. Yes, that's an issue, also. But again, it's
22   all about being there.
23   Q. So, for example, people can put in for
24   transfers or retirements or things like that and it's

Page 191

1    not getting pushed up the chain of command if he's not
2    there?
3    A. That's correct.
4    Q. How does that kind of a thing transfer to
5    requests not being timely forwarded or retirements or
6    resignations impact on the operations of the
7    Wilmington Police Department?
8    A. It does impact upon it, but something as urgent
9    as that, I would assign that to go through the mail or
10   the departmental paperwork to go through and pull that
11   out. However, some things, it could cause a delay in
12   someone putting in for a training that we have
13   requirements within the city to put in for the
14   expenses for that, and so you may have a time window
15   of ten days where you are not going to get within
16   that, so it could possibly deny someone from going to
17   training, or maybe not denial, but it would delay
18   paperwork where they would have to get reimbursement
19   instead of being paid up front.
20   Q. Is there a Captain Cummings who is doing some
21   of his paperwork? Is there a Captain Cummings?
22   A. Yes, there's Captain Cummings. He's the
23   commanding officer of Support Services Division which
24   falls under inspector of Uniform Operations. And,

Page 192

1    yes, has he pulled through? Yes. But like I stated
2    earlier, so have the other captains.
3    Q. Got you. Okay.
4           Have you discussed any problems with
5    failing to timely move paperwork with the director?
6    A. No, I haven't. It may have been an issue maybe
7    a couple times with training issues looking for
8    paperwork, but I haven't discussed it. Mainly, again,
9    centered on the attendance.
10   Q. Have you discussed the failure to timely move
11   paperwork with Mr. Montgomery?
12   A. No.
13   Q. Concerning the attendance issues caused by
14   Inspector Howell, has Mr. Montgomery -- I want to see
15   if this jogs your memory -- has he ever advised you to
16   just simply have the rest of the staff pick up the
17   slack? Has he ever told you that?
18           MS. BUTCHER: Object as to form.
19   A. That was -- I do recall that. And that
20   actually was stated prior to the official appointment
21   of Inspector Howell when I was discussing the issues
22   that I possibly could be facing. And looking at,
23   well, does he have other people pick up, I said it
24   wouldn't be a matter of picking up, it's a matter of

Page 193

1    him being there in anticipation that everybody knew
2    what the attendance record was in the previous years
3    prior to that appointment and pretty much left it at
4    that.
5    Q. I am going to follow up on that. I want to
6    address how the appointment or the selection of
7    Inspector Howell came about and any meetings you had
8    with Mr. Montgomery, any meetings you had with the
9    mayor. Okay? And your recollection of those events.
10   Okay?
11           But I think you are telling me that at some
12   time prior to the elevation of Inspector Howell, the
13   possible impact on the operations of the police
14   department was discussed because of concerns you had
15   about his attendance record?
16   A. Concerns I had about his attendance, concerns I
17   had about his capacity to be able to handle that
18   assignment, knowing firsthand the pressure and the
19   stress that's brought upon in a position such as that.
20   You know, I expressed that.
21   Q. In response to my question, I think you were
22   saying that Mr. Montgomery replied, in effect, that if
23   those kinds of problems arose, the rest of the staff
24   could pick up the slack?

49 (Pages 190 to 193)

Michael J. Szczerba

---

Page 194

1    A.  Possibly.
2        MS. BUTCHER:  Object to form.
3        MR. NEUBERGER:  Counsel, I don't know what
4  you mean.  I'm asking a question.  He's the manager
5  and I keep asking leading questions or whatever.  What
6  is your objection that I can correct it, the supposed
7  objection you think there was to my asking of him?
8        MS. BUTCHER:  Because you ask him a
9  question and then he answers a question, you take
10  his answer and recharacterize it and you ask it to him
11  again.  You've either covered the ground or you're
12  restating things and putting words into his mouth.
13        MR. NEUBERGER:  You think that's asked and
14  answered or something?
15        MS. BUTCHER:  Yes.
16        MR. NEUBERGER:  Now at least I have an
17  idea.
18        Can you read the question back, please?
19        (The reporter read from the record as
20  requested.)
21  BY MR. NEUBERGER:
22    Q.  What do you recall him saying about the slack?
23    A.  The captains under his command would be able to
24  pick it up.

---

Page 195

1    Q.  So you recall him saying something to the
2  effect of if he's absent, the rest of the captains
3  under you, the chief's command, could pick up the
4  slack?
5    A.  I don't think it was -- I -- my take on that is
6  I don't think he was gearing that towards attendance.
7  He was gearing him towards him having the capacity
8  while he is there to be able to handle those duties.
9    Q.  So you had said, you talked to him about
10  attendance and also capacity to handle the assignment
11  I think is what you said?
12    A.  Yes.
13    Q.  So you're saying that during the discussion of
14  then-Captain Howell's capacity to handle the
15  assignment as an inspector, Mr. Montgomery made some
16  sort of comment about other captains would have the
17  ability to fill in the gaps of any lack of capacity on
18  his part?
19    A.  Right.
20    Q.  Right.  Okay.  Okay.
21        Was this meeting with Mr. Montgomery
22  separate from any meeting you might have had with the
23  mayor to discuss the filling of this vacancy?
24    A.  Yes.  This didn't occur at the official

---

Page 196

1  meeting.  I remember this was out on the street in a
2  discussion with Mr. Montgomery.  There was -- that
3  was -- that followed a meeting where one morning I met
4  at a breakfast meeting with the county leadership,
5  account executive and his staff.  I believe they
6  routinely meet maybe about once a month, the county
7  leadership and the city leadership at the breakfast
8  meeting.  And that was after that breakfast meeting.
9  But that breakfast meeting wasn't geared towards the
10  pending appointment of Inspector Howell.  You know, it
11  covered many different topics.  And we had a
12  discussion after that.
13    Q.  Maybe just laying the foundation for all this,
14  how many times did you speak with the mayor prior to
15  the selection of Gilbert Howell to discuss the pool of
16  people for that?
17    A.  I recall twice.
18    Q.  Twice with the mayor.  Okay.
19    A.  That the mayor was present.  It wasn't just
20  one-on-one with me and the mayor.
21    Q.  No.  I understand.
22        On both those occasions, was Mr. Montgomery
23  available?  Did he attend the discussion, also?
24    A.  I believe so.

---

Page 197

1    Q.  So you were present with the mayor on two
2  occasions to discuss the selection?
3    A.  Yes.
4    Q.  And Mr. Montgomery was present on both those
5  occasions?
6    A.  Yes.
7    Q.  Was anybody else present on those two
8  occasions?
9    A.  I believe the director of public safety was
10  there on both occasions.
11    Q.  Okay.  So he was there both times.  Okay.
12        Was anybody else present?
13    A.  Not that I recall.
14    Q.  Were any notes or records made of that meeting?
15    A.  Not that I recall.  I don't believe so.
16    Q.  No recording was made of that meeting that you
17  are aware of?
18    A.  No.
19    Q.  Aside from those two meetings there, did you
20  ever have any meetings or discussions or conversations
21  with Mr. Montgomery outside of those two meetings?
22    A.  No.
23    Q.  I think you sort of said after this monthly
24  breakfast meeting with the county leadership?

---

50 (Pages 194 to 197)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

**A1307**

Michael J. Szczerba

Page 198

1    A.   Right, that was one time where all four people
2  would have been present, including myself, the mayor,
3  the director, and chief of staff, Mr. Montgomery.
4        The other time would have been after a
5  meeting in the mayor's office where it was -- may have
6  been a monthly update.  I do a monthly update with the
7  mayor in regards crime issues.  And after that meeting
8  was terminated, we had another meeting after that to
9  discuss the pending promotion.
10   Q.   So those are the two times?
11   A.   Yes.
12   Q.   So these would have been prior to that November
13  2005 announcement of the selection of Gilbert Howell?
14   A.   Yes.
15   Q.   Would they have been in 30 days beforehand or
16  six months beforehand?
17   A.   Thirty days would be safe.
18   Q.   So the two meetings were in that 30-day time
19  period?
20   A.   Yes, yes.  And I believe there were meetings
21  that I wasn't present at maybe between then-Captain
22  Howell and the mayor and the director, but I cannot
23  speak on that because I wasn't invited to those
24  meetings or could not tell you how many, there was

Page 199

1  only one or how many meetings there were.
2    Q.   But is your impression that the mayor and the
3  director, either jointly or separately, would have
4  spoken to Captain Howell?
5    A.   Yeah.  Once I was advised that Captain Howell
6  was going to be the appointment for the inspector
7  spot, I was out of the conversation at that point and
8  it was handled either directly with the mayor or
9  directly with the director of public safety.
10   Q.   Aside from those two meetings where the mayor
11  was there and the director of public safety was there,
12  Mr. Montgomery was there, was there another occasion
13  when you had a conversation with Montgomery?  I want
14  to make sure I understand that.
15   A.   Yes.  That would have been a street
16  conversation in passing --
17   Q.   Okay.
18   A.   -- after that meeting with New Castle County.
19   Q.   Yes.
20        Do you have any idea what the date of that
21  meeting was with New Castle County?
22   A.   No, no, I do not.  I believe possibly at the
23  end of September '05.  I'm not sure of the exact date.
24   Q.   Were there, besides the meeting of the three of

Page 200

1  them, the two meetings of the three of them with you,
2  this conversation with Mr. Montgomery, were there any
3  other conversations you had with the public safety
4  director about filling the inspector spot?
5    A.   There would have been, but not an official
6  meeting.  Just me expressing my concern over that
7  appointment.  But not an official, scheduled meeting
8  that it would make it to my calendar.  Just in
9  passing.
10   Q.   I understand.
11        When did you learn that Wright was going to
12  retire?
13   A.   I'm guesstimating.  I'm not sure of the exact
14  date.  I guess it would be in September '05.
15   Q.   Sometime in the fall there, and then in
16  November the slot is filled?
17   A.   Yes.  Or late October the slot was filled.
18   Q.   Late October.  Okay.
19        Are you saying that once you realized that
20  that slot had to be filled, you did an inventory and
21  evaluation of the people under your command who would
22  be able to do that job?
23   A.   Yes, but it's -- you know, that inventory
24  didn't start upon the announcement of Inspector

Page 201

1  Wright's retirement.  I'm always thinking of staff
2  replacements and the next move they could make in
3  doing some strategic planning.  So I already had that
4  in mind.
5        You know, getting back to if there were any
6  other conversations, it started with when the
7  retirement of Inspector Wright was already announced,
8  the director coming to me, you know, advising me that
9  this time it would be different, that this is the
10  mayor's appointment and he wants to make that clear.
11   Q.   So you're saying --
12   A.   Director.
13   Q.   -- the director was, when this conversation
14  started, he relayed to you that the mayor wanted it to
15  be made clear that he would be the person making the
16  selection and not you?
17   A.   Yes.
18   Q.   That message was relayed to you from the
19  director --
20   A.   Yes.
21   Q.   -- from the mayor's office?
22   A.   He was taking -- that's the way he was advised
23  by the mayor.
24   Q.   So the director indicated to you that the mayor

51 (Pages 198 to 201)

Michael J. Szczerba

Page 202

1  advised him that he would be making the selection, not
2  you?
3  A. Right.
4  Q. At that time did you start identifying for him
5  problems that you foresaw if it was Gilbert Howell?
6  A. No, I did not. I just asked a question, well,
7  will I be able to make a recommendation? I was told
8  that I can do what I wanted to, but the mayor would be
9  making the decision.
10  Q. You decided you would make a recommendation?
11  A. Yes, I did.
12  Q. When Inspector Wright was selected in 2001,
13  let's go back to him, the mayor takes office the
14  beginning of January in 2001, it's announced that you
15  are going to be the chief when he's the mayor elect
16  after the November election, there's a process and
17  you're identified as the person who is going to be the
18  chief.
19  A. Yes.
20  Q. Early on in the year there's the vacancy and
21  it's going to have to be filled; right? Was it the
22  first six months, nine months of the year?
23  A. Within the first five months.
24  Q. First five months?

Page 203

1  A. I believe as early as March, I believe.
2  Q. Did the mayor's office let you know that it
3  wanted you to be selecting Gilbert Howell at that
4  time?
5  A. It was suggested that I consider him.
6  Q. Okay.
7  A. I wasn't told that it was him.
8  Q. I understand. Right. It was suggested that
9  you consider Gilbert Howell for the selection at that
10  time?
11  A. Yes.
12  Q. Gilbert Howell wasn't your first choice by any
13  stretch of the imagination, was he?
14  A. No.
15  Q. Gilbert Howell had attendance problems back
16  then; right?
17  A. Yes. And the same issues.
18  Q. Same kinds of issues. Okay.
19  He demonstrated the same kinds of qualities
20  that we reviewed earlier on this morning?
21  A. Right.
22  Q. There was a pool of other available captains at
23  that time; right?
24  A. Right.

Page 204

1  Q. You had just been selected by the mayor to be
2  the chief about five months earlier; right?
3  A. Yes.
4  Q. You were asked to consider Gilbert Howell;
5  right?
6  A. Yes.
7  Q. He would have been your last choice; isn't that
8  correct?
9  A. It's a possibility he wouldn't have been at the
10  top of the list.
11  Q. It's fair to say Gilbert Howell would not have
12  been at the top of the list?
13  A. Right, because there were some fairly new,
14  inexperienced captains at that point, too, so he and
15  experience may have put them further down the list,
16  but I don't know if he would have been the last on the
17  list.
18  Q. I understand what you are saying.
19  A. Okay.
20  Q. But the people at the top of the list would
21  have included Captain Wright?
22  A. Yes.
23  Q. And the people at the top of the list would
24  have included Nancy Dietz at that time?

Page 205

1  A. Yes.
2  Q. You had received this mention of Gilbert
3  Howell; right?
4  A. Yes.
5  Q. Then you were allowed to select the inspector
6  at that time, weren't you?
7  A. The inspector that I selected ended up being
8  the one appointed.
9  Q. You weren't told at that time that the mayor
10  was going to make the selection?
11  A. No.
12  Q. The public safety director didn't convey to you
13  that there's an inspector vacancy open and the mayor
14  is going to make that decision on his own?
15  A. No, I was not told that.
16  Q. But for the second time around in 2005 you were
17  told that?
18  A. Yes.
19  Q. So the procedure changed, didn't it?
20  A. Yes.
21  Q. When you were faced with the selection of
22  someone in 2001, you were told you were going to be
23  allowed to make the selection; right?
24  A. Yes.

52 (Pages 202 to 205)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1309

Michael J. Szczerba

Page 206

1    Q.  Gilbert Howell's name was specifically
2  mentioned from the mayor's office; right?
3    A.  Yes.
4    Q.  You selected James Wright?
5    A.  That's correct.
6    Q.  James Wright, is it fair to say in your
7  judgment James Wright was a more qualified person for
8  that position than Gilbert Howell?
9    A.  Yes.
10   Q.  Was it fair to say in your judgment that you
11  felt that if Gilbert Howell was selected at that time,
12  that the same kinds of problems you are having to deal
13  with today you would have had to have been facing in
14  2001?
15   A.  I considered that as a distinct possibility,
16  yes.
17   Q.  That's one of the reasons why you didn't select
18  him?
19   A.  That's correct.
20   Q.  So now we are back to 2005 and you are telling
21  me that James Wright has announced he is retiring or
22  whatever and there's going to have to be an inspector
23  selected; right?
24   A.  Yes.

Page 207

1    Q.  You are told that you, as the chief of police
2  of the Wilmington Police Department, will not be
3  making that selection?
4    A.  Correct.
5    Q.  Did the public safety director tell you why
6  that was going to occur?
7    A.  No, he did not.
8    Q.  During your two meetings with the mayor and
9  Mr. Montgomery where all four of you were present, did
10  Montgomery, the mayor, or the public safety director
11  tell you why you weren't going to be allowed to make
12  the selection?
13   A.  No.
14   Q.  Did anyone ever tell you why you weren't going
15  to be allowed to make the selection?
16   A.  No.
17   Q.  So during your reign, your term in office as
18  the chief, this was unprecedented for them to tell you
19  you could not make the selection?
20   A.  Correct.
21   Q.  There have been occasions, haven't there, when
22  you've had to make selections for lower positions
23  below inspector when the public safety director has
24  told you that he was displeased with the selection you

Page 208

1  were going to make?
2    A.  Yes.  In a roundabout way, yes.
3    Q.  There have been occasions where he has pushed
4  for somebody other than the person you've selected?
5    A.  Correct.
6    Q.  That's happened on more than one occasion,
7  hasn't it?
8    A.  Yes.
9    Q.  On those occasions, the public safety director
10  has voiced concern over the race of the person under
11  consideration?
12   A.  Yes.
13   Q.  On those occasions, for example, you might have
14  selected a white employee for promotion and he has
15  told you he would have preferred an African-American
16  employee?
17   A.  Yes, and that was the only qualifier that he
18  stated.
19   Q.  He has recited that kind of a qualifier on more
20  than one occasion concerning a promotion; isn't that
21  true?
22   A.  Yes.  It's one-time dealing with the same
23  promotion in a one-on-one meeting with myself and the
24  director, and then there was a follow-up meeting in

Page 209

1  the mayor's office.
2    Q.  Without using any names or anything like that,
3  what ranks might have been involved?
4    A.  Lieutenant's rank at that time.
5    Q.  So on two occasions that came up with a
6  lieutenant's rank?
7    A.  Yes.  And it actually comes up any time I make
8  my selection for promotions.  I will come in and give
9  the names of the officers, and that's usually followed
10  up with a question from the director as to their race.
11   Q.  You're saying, first of all, whenever you're
12  making promotions, are you telling me you met then
13  with the public safety director?
14   A.  Yes, and also transfers.  That did not start
15  initially when I come in as a chief, but I also bring
16  transfers to them.
17   Q.  When you're making a promotion, the public
18  safety director will ask you what the race of the
19  individual being promoted is?
20   A.  Yes.
21   Q.  And he also asks you that in regard to
22  transfers?
23   A.  Yes, and will also ask the race of the people
24  remaining on the band in our promotional system.

53 (Pages 206 to 209)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1310

Michael J. Szczerba

Page 210

1  Q.  For the ranks of lieutenant on down, you use a
2  banding and testing process?
3  A.  Correct.
4  Q.  Captains and up you don't have a banding
5  process?
6  A.  Right.
7  Q.  But when you're making selections from bands of
8  lieutenants and sergeants and things like that, and
9  you're advising the public safety director of the
10 selection, you're telling me he always asks you the
11 race of the individual?
12 A.  Yes.
13 Q.  When James Wright was selected by you, is it
14 true that you felt they wanted a black individual to
15 be the uniformed operations inspector in 2001?
16 A.  No.
17 Q.  You didn't feel they wanted you to place a
18 black in that position?
19 A.  No.
20 Q.  They were telling you to consider Gilbert
21 Howell, weren't they?
22 A.  That's correct.
23 Q.  You knew, of course, he was African-American?
24 A.  Yes.

Page 211

1  Q.  But no one explicitly told you to put an
2  African-American into that position in 2001?
3  A.  No.
4  Q.  At that time you were aware, weren't you, that
5  for more than 20 years that the person who held that
6  position as uniformed inspector had been an
7  African-American?
8      MS. CHEEK:  Objection to form.
9  A.  The answer to that question is no.
10 Q.  Oh, okay.  At the very beginning today I
11 marched out a little chart I created.
12 A.  And I saw the breakdown then.
13 Q.  You saw the breakdown?
14 A.  Yes.  I always was aware that, within the
15 inspector's rank, there was an African-American and a
16 Caucasian.
17 Q.  You are always aware of that?
18 A.  Yes, but I wasn't sure that it fell along those
19 lines with that particular assignment versus the
20 investigative or administrative side versus the
21 uniformed side.
22 Q.  You have been around since about '78 I think
23 you told us?
24 A.  Yes.

Page 212

1  Q.  That goes back to Chief Manelski's time and
2  even Mayor Maloney's time?
3  A.  Mayor McLaughlin.
4  Q.  So Maloney would have been before.
5      But there was a time when there were four
6  inspectors, then three inspectors.  Do you remember
7  that?
8  A.  Yes.
9  Q.  You are aware of that and it ultimately came
10 down to two?
11 A.  Yes.
12 Q.  You are telling me when you were making your
13 decision in 2001 that you are aware there has always
14 been at least one black and one white in the inspector
15 positions?
16 A.  Yes.  They have never been of the same race.
17 Q.  Right.  Never the same race at the same time?
18 A.  Whether it's four, three, or two inspectors,
19 they were never all the same race.
20 Q.  Right.  But we are at the meetings that you are
21 having in 2005 and the conversations where you are
22 being told you are being taken out of the loop for
23 this position.  Okay?  Right?
24 A.  I was really only told that once, and that was

Page 213

1  by the director.
2  Q.  I apologize.
3  A.  Okay.
4  Q.  We are at the meetings.  The point is there's
5  been a retirement of a black inspector; right?
6  A.  Right.
7  Q.  There is a white inspector, Martin Donohue;
8  right?
9  A.  Right.
10 Q.  The pool of available people includes a white
11 female captain, Nancy Dietz?
12 A.  That's correct.
13 Q.  The pool also includes other white officers?
14 A.  That's correct.
15 Q.  And the pool also includes a black officer,
16 Gilbert Howell?
17 A.  Yes, an Hispanic officer.
18 Q.  Captain Ayala?
19 A.  Yes.
20 Q.  Those are the people in the pool?
21 A.  Yes.
22 Q.  You told me this morning how much better
23 qualified you felt Nancy Dietz was for selection for
24 the inspector position --

54 (Pages 210 to 213)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

Michael J. Szczerba

Page 214

1   A.  Right.
2   Q.  -- versus Gilbert Howell; right?
3   A.  Yes.
4   Q.  I think you told me this morning you felt she
5   was the most qualified person for the position?
6   A.  Yes.
7   Q.  And if allowed to make the promotion, you would
8   have promoted a white female?
9   A.  Yes.
10  Q.  That would have resulted in two Caucasian
11  officers being the inspectors in the Wilmington Police
12  Department?
13  A.  Correct.
14  Q.  If the 20-year history we went over this
15  morning is correct, that would have been the first
16  time in 20 some years when two people of the same race
17  held the rank of inspector?
18  A.  That's correct.
19  Q.  So that was the situation that the mayor's
20  office was facing when Inspector Wright retired?
21  A.  Correct.
22  Q.  If you were allowed to make it, you would have
23  selected a white female?
24  A.  Yes.  I was allowed to select the best

Page 215

1   candidate I thought for that position as I did in
2   2001.  That's the same way I thought in 2005.  Race or
3   gender had no play in my mind.  I want to put the best
4   person in that position.  People might question my
5   decisions, but that's what I should be able to do as
6   chief of police.  As one of the citizens of
7   Wilmington, I want the chief of police to have that
8   authority.
9       So, you know, I put a blindfold on as far
10  as anyone's characteristics.  I wanted the best person
11  for that position.
12  Q.  You are not saying you recommended Nancy Dietz
13  because she was a female?
14  A.  Not because she's female.  Not because she's
15  white.  I did not select James Wright because he was
16  African-American or because he was male.  I wanted to
17  put the best person I thought at that time to put in
18  that position.
19  Q.  You are saying you wouldn't have selected Nancy
20  Dietz because she was white and you wanted to have two
21  white inspectors?
22  A.  Most definitely not.
23  Q.  But the point is you were told you weren't
24  going to be making the decision?

Page 216

1   A.  That's right.
2       MR. NEUBERGER:  So let's take our break
3   right here and we'll reconvene in ten minutes.  Okay?
4       THE WITNESS:  Okay.
5       (A recess was taken at this time.)
6   BY MR. NEUBERGER:
7   Q.  We were on the meetings.  Why don't you tell me
8   the first meeting you were at.  I think you've told me
9   that it was indicated that you weren't going to be
10  making the decision, you want to say something, say
11  it.
12      So then did the first meeting occur?
13  A.  No.  That was the initial meeting between
14  myself and Director Mosley.
15  Q.  Mosley told you that.  Then after that, one of
16  the two meetings with the mayor Mosley and Montgomery
17  happened?
18  A.  Yes.
19  Q.  Go ahead.  What happened in that first meeting?
20  A.  It was after an update meeting with the mayor.
21  We met again almost immediately after this update
22  meeting, but it was different.  It was just -- then it
23  was limited to myself, the mayor, Mr. Montgomery, and
24  the director.  There was some brief discussions to my

Page 217

1   selection and the mayor listened to that.  There
2   wasn't really much of a meeting there.
3       You know, it was still -- at that point the
4   mayor was going to recommend or was appointing
5   Inspector Howell -- or Captain Howell to the rank of
6   inspector and pretty much just left it at that.  I was
7   spoken out on the subject.  I stated my feelings and
8   anticipation of what could bring about.
9       Then the next meeting was after a meeting
10  with the county leadership, a breakfast meeting which
11  occurred at the -- it's now the Doubletree, and we met
12  out in the lobby after that meeting with the county
13  officials.  It was pretty much a rerun.  At that point
14  it was agreed upon that the director and mayor would
15  be meeting with Captain Howell.
16  Q.  So you are saying at the first meeting, this is
17  a meeting for other purposes --
18  A.  Yes.
19  Q.  -- and the vacancy comes up?
20  A.  Right.
21  Q.  Are you the one that brings it up or did they
22  bring it up?
23  A.  I didn't bring it up.  It may have been brought
24  up by either Mr. Montgomery or the director.

55 (Pages 214 to 217)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1312

Michael J. Szczerba

Page 218

1    Q.  It's communicated to you that the mayor has
2    selected Gilbert Howell?
3    A.  Yes.
4    Q.  Did any of the three people tell you what
5    information they reviewed in arriving at that
6    decision?
7    A.  No.
8    Q.  Did any of them tell you who the pool of
9    qualified candidates was, if any, that they surveyed?
10   A.  No.
11   Q.  They never told you that they considered
12   anybody besides Gilbert Howell; right?
13   A.  No, they did not.
14   Q.  Gilbert Howell was the one who was communicated
15   to you in 2001 that they wanted you to look at?
16   A.  Yes, to consider him, yes.
17   Q.  Did the mayor state why he selected Gilbert
18   Howell?
19   A.  No.  The only comment I remember being made by
20   the mayor is that Captain Howell has good street
21   sense.  He's a street person, street cop.  That was
22   about it.  No other comments or qualifications or
23   things like that.
24   Q.  Did the mayor indicate he looked at his job

Page 219

1    evaluations from the city personnel department?
2    A.  He never indicated that, so I don't know.  I
3    can't respond to that.
4    Q.  Did the mayor indicate that he looked at his
5    disciplinary record?
6    A.  No, he did not.
7    Q.  Did the mayor indicate he looked at his
8    attendance record?
9    A.  No, he did not.
10   Q.  All you are remembering is his remark on the
11   street smarts?
12   A.  Yes.
13   Q.  How about the public safety director, what do
14   you remember him saying at the meeting?
15   A.  I pretty much don't remember him saying much at
16   all, if anything.
17   Q.  So --
18   A.  Not while I was present.
19   Q.  While you were present, was he agreeing with
20   the fact that the decision had been made to select
21   Gilbert Howell?
22   A.  Neither.
23   Q.  So he wasn't disagreeing or whatever?  He was
24   just sitting there?

Page 220

1    A.  Right.
2    Q.  How about Mr. Montgomery, is there anything
3    Mr. Montgomery said at the meeting?
4    A.  Very little.  I think when they, you know, they
5    were speaking on the qualities of the then,
6    now-Captain Dietz, he agreed with me that she is a
7    very fine officer, fine supervisor, fine
8    representative of the department, not in those exact
9    words, but he was agreeing it would be a good
10   selection.
11   Q.  So are you saying he brought up her name?
12   A.  No.  I did.
13   Q.  Right.  I think you are going to tell me you
14   argued why she should be selected?
15   A.  Correct.
16   Q.  But I'm saying before you brought up her name,
17   did any three of those people bring up her name?
18   A.  No.
19   Q.  Well, once you were told that the selection had
20   been made, what did you say about Captain Dietz or
21   other candidates?
22   A.  It was a selection made by the mayor.  It was
23   done at that point.  I knew there was going to be some
24   follow-up discussion with the mayor and the director

Page 221

1    and/or the director with then-Captain Howell.
2    Q.  Maybe I'm wrong.  Didn't you tell them about
3    problems that would be caused by the selection of
4    Captain Howell?
5    A.  Yes, yes.
6    Q.  Didn't you tell them reasons why Captain Dietz
7    was a better selection?
8    A.  Yes.
9    Q.  Right.
10   A.  In addition to some, you know, questions I had
11   with, you know, Captain Howell's health issues, you
12   know, again coming in his capacity to handle that job,
13   attendance, you know, other factors with disciplinary
14   history.
15   Q.  You pointed out all those things to him?
16   A.  Yes.
17   Q.  It didn't change their minds?
18   A.  No.
19   Q.  It didn't change the mayor's mind?
20   A.  No.
21   Q.  What kind of things did you tell them about
22   Nancy Dietz?  Because you did say Mr. Montgomery said
23   something about she's a fine officer or whatever, so
24   you must have been telling him something.  What were

56 (Pages 218 to 221)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1313

Michael J. Szczerba

Page 222

1  you saying?
2   A.  Diversified work experience, always represented
3  our department well, covered the, you know, education,
4  some of the things we covered here today, education,
5  FBI National Academy graduate, lack -- pretty much the
6  lack of disciplinary record, my firsthand knowledge
7  and experience in limited time working with her,
8  actually working under her command at one point
9  because she was a supervisor, that I never worked
10  directly for her, but on occasions I would have to
11  work for her and knew her work ethic, knew her
12  community involvement, so on and so forth.  I can't
13  remember exactly what I told them, but I know I
14  covered all that.
15   Q.  So you covered all that?
16   A.  Yes.
17   Q.  And we are talking --
18   A.  Yes.  There was not much -- there was never any
19  feedback in the negative from any of the people in the
20  room, from the mayor, Bill -- Mr. Montgomery, or the
21  director.
22   Q.  So they knew all these positive things about
23  Nancy Dietz that you communicated to them that day?
24   A.  Yes.

Page 223

1   Q.  Mr. Montgomery indicated that he had some
2  familiarity with Nancy Dietz?
3   A.  Yes.
4   Q.  We've seen two documents here the mayor signed
5  about the Big Brothers/Big Sisters that the mayor
6  signed regarding Nancy Dietz.  Did he mention her
7  community involvement?
8   A.  No, not that I recall.
9   Q.  Did you tell him that she had street smarts,
10  too, in response to what the mayor had said?
11   A.  I don't know if I used the term "street
12  smarts," but she has experience in our patrol
13  division, follow-up investigations, held the
14  position -- you know, the responsible positions of
15  being in our Internal Affairs Division, and then the
16  responsible position of being in our Human Resources
17  Division, that she was a person I called upon to --
18  you know, when I wanted to rearrange the house, so to
19  speak, when I -- I don't know how long after being
20  chief, which necessitated her moving from the position
21  which she enjoyed very much in the Criminal
22  Investigation Division to move to the Office of
23  Professional Standards because I knew she was a person
24  I needed in that position at that point.  I know that

Page 224

1  it didn't meet to her liking right away.
2       We sat down and she gracefully accepted
3  that and did well in that position, in turn doing well
4  in that position is why I did not hesitate in putting
5  her in the position of the commanding officer of the
6  Human Resource Division.
7   Q.  So you were making all those kinds of points
8  with them?
9   A.  Yes.
10   Q.  The mayor didn't change his mind?
11   A.  No, he did not.
12   Q.  The only reason he was giving to you --
13   A.  Right, to me.
14   Q.  -- at that time for the selection of Gilbert
15  Howell was a reference that he has street smarts?
16   A.  Yes.  And he also made reference to some of the
17  references that he was receiving from the community,
18  and I could not name any of those people.  I don't
19  recall who they were.  But that he was getting some
20  feedback from the community as to the quality of
21  Inspector -- Captain Howell to be inspector.
22   Q.  So he made reference to he had received
23  feedback from the community supportive of Howell?
24   A.  Yes, Captain Howell.

Page 225

1   Q.  Have you ever made an appointment or promotion
2  within the police department because people in the
3  community were pushing for somebody?
4   A.  No.  No, that would not be the reason for me to
5  promote anyone.  I do occasionally receive, you know,
6  candid references and people making comments when they
7  know there's a position open, but it's not dependent
8  upon those references from the community for me to
9  make a promotion.
10   Q.  Well, your police department has to be
11  accredited; right?
12   A.  Yes, we are.
13   Q.  What's the organization that accredits your
14  police department?
15   A.  The Commission For Law Enforcement
16  Accreditation.
17   Q.  That's some national body?
18   A.  Yes.
19   Q.  They come around every ten years or something
20  and you have to jump through the hoops?
21   A.  No.  Jumping through the hoops every five
22  years.
23   Q.  Five.
24   A.  It originally started at five years, so it's

57 (Pages 222 to 225)

Michael J. Szczerba

Page 226

1   down to three, so I stand corrected.  It's quite a
2   task.  It's quite a task.  About the 17,000 police
3   agencies, there are only about 600 that are fully
4   accredited.
5       Q.   And you are a fully accredited police agency?
6       A.   Yes, we are.
7       Q.   You are probably very proud of that.
8       A.   Yes.
9       Q.   That accreditation is some sort of a mark of
10  the professionalism of your police agency and the
11  other 599; right?
12      A.   Yes, yes.  I think it demonstrates to the
13  community that we are up to the task of providing the
14  best possible police services.
15      Q.   They review your standards, your process for
16  promotions?
17      A.   Yes, yes.
18      Q.   Have you identified as one of the reasons for
19  promotions that you give in to whoever in the
20  community is lobbying for a promotion, that would not
21  be looked upon favorably by an accrediting body; is
22  that right?
23           MS. CHEEK:   Objection to form.
24      A.   That's correct.

Page 227

1       Q.   The rules and regulations of the accrediting
2   body require that those kinds of extraneous influences
3   be eliminated from a modern, professional police
4   force; isn't that correct?
5       A.   Yes.  I cannot quote you a directive or a
6   standard, but I'm sure that would be covered.  We have
7   a set promotional system in place that the
8   accreditation team has reviewed several times that
9   meets their standards, and that's the one we presently
10  have today.
11      Q.   The City of Wilmington has an affirmative
12  action plan?
13      A.   Yes.
14      Q.   There is an affirmative action plan for the
15  police department, isn't there?
16      A.   For the whole city.
17      Q.   For the whole city.
18           You are not supposed to select people for
19  positions because of their race or their gender or
20  their religion and various other protected categories;
21  right?
22      A.   Correct.
23      Q.   You are not supposed to select people because
24  of their political affiliation, are you?

Page 228

1       A.   That's correct.
2       Q.   For example, if I'm a Republican and I want to
3   be a police officer and I say pick me because I'm a
4   Republican, you'd say you better be able to do the
5   physical and all these other kinds of things, you are
6   not getting in because you are a Republican; right?
7       A.   Right.
8       Q.   You got to meet neutral objective standards;
9   right?
10      A.   Yes.
11      Q.   And community pressure for a person is not a
12  neutral objective standard that would allow a police
13  department to function according to professional
14  norms, is it?
15      A.   No.
16      Q.   But the mayor did tell you about that factor,
17  community support for him and tell you about street
18  smarts?
19      A.   Yes.
20      Q.   Are there any other reasons the mayor gave you
21  for the selection of Gilbert Howell --
22      A.   No.
23      Q.   -- on that day?
24      A.   No.

Page 229

1       Q.   On any other day, are there any other reasons
2   the mayor gave you for the selection of Gilbert
3   Howell?
4       A.   No.
5       Q.   So the mayor didn't respond when you said that
6   Nancy Dietz had better educational background than
7   Gilbert Howell?
8       A.   No.
9       Q.   He didn't respond when you pointed out the
10  attendance and management problems that you expected
11  if Gilbert Howell was selected?  He didn't respond to
12  that?
13      A.   Right.
14      Q.   The other kinds of demonstrated abilities that
15  Nancy Dietz had that you passed on to the mayor, he
16  didn't respond to any of those?
17      A.   No.
18      Q.   All you remember him was just giving these two
19  reasons?
20      A.   Yes.
21      Q.   Now, how about Mr. Montgomery, did he throw any
22  other reasons out during anything he said at that
23  time?
24      A.   No.

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1315

Michael J. Szczerba

---

Page 230

1   Q.  You are telling me the director of public
2   safety didn't throw any other reasons out at that
3   time?
4   A.  No.
5   Q.  Right?  Okay.
6       And I think you said there was a second
7   occasion when the four of you were present that at
8   least the inspector position came up?
9   A.  Yes.
10  Q.  This is the time when they told you that they
11  were having Gilbert Howell in or something to talk to
12  him?
13  A.  Right.
14  Q.  Did you try to reargue the decision at that
15  time?
16  A.  No, no.  At that point I knew it was a made
17  decision.  It would be up for them -- in discussion
18  with them, being the mayor and/or the director with
19  Captain Howell.
20  Q.  So it just sort of came up briefly?  Is that
21  what you are saying?
22  A.  Yes.
23  Q.  Did the public safety director give any
24  additional reasons why Gilbert Howell was selected at

---

Page 231

1   that time?
2   A.  No.
3   Q.  Did Mr. Montgomery give any additional reasons
4   why Gilbert Howell was selected at that time?
5   A.  No.
6   Q.  Did the mayor at that time give any additional
7   reasons?
8   A.  No.
9   Q.  Were either of these meetings recorded?
10  A.  No.
11  Q.  Has there been any e-mail traffic about the
12  selection of Gilbert Howell that you participated in?
13  A.  No.
14  Q.  Are you aware of any documentation that's out
15  there that contains a statement of the reasons why the
16  mayor selected him?
17  A.  None that I'm aware of.
18  Q.  Has Gilbert Howell ever told you why the mayor
19  selected him?
20  A.  No.
21  Q.  No?
22  A.  No.
23  Q.  Are you aware that Nancy Dietz went and spoke
24  to the mayor?

---

Page 232

1   A.  Yes.
2   Q.  Are you aware that she went and spoke to the
3   director?
4   A.  Yes.  That was done through -- I'm aware of
5   that because it was done through the chain of command.
6   Q.  Would her meeting with the mayor have occurred
7   or the public safety director have occurred after
8   Gilbert Howell was selected?
9   A.  My recollection is it occurred before.
10  Q.  I think you're saying that when you had that
11  first meeting, they were telling you that the decision
12  had been made to select Gilbert Howell?
13  A.  Yes, but not officially announced.
14  Q.  Not officially announced?
15  A.  Okay.
16  Q.  So I'm saying:  Do you understand that she met
17  with the mayor or anybody before that meeting where
18  you learned that it was unofficially --
19  A.  No.  I believe it was after.
20  Q.  It was after?
21  A.  After, but before -- before the specific
22  announcement.
23  Q.  We had a document earlier in the day with a
24  date and everything.

---

Page 233

1   A.  Right, right.
2   Q.  You think it was before that specific document
3   was published?
4   A.  Right.
5   Q.  Rhett Ruggerio, is that something that might
6   have been present at any of these meetings?
7   A.  No.
8   Q.  A John Rago, was he somebody that would have
9   been present at any of those meetings?
10  A.  I don't believe so.
11  Q.  After that first meeting, okay, but before the
12  second one, did a rumor start that Gilbert Howell was
13  going to be selected within the department?
14      MS. CHEEK:  Objection to form.  I'm just
15  not clear on which meeting.  When you say the first
16  meeting, which meeting you are talking about?  Because
17  there are three, I think.
18      MR. NEUBERGER:  Yes, there really are.
19  BY MR. NEUBERGER:
20  Q.  The very first meeting with the four of you
21  where it was indicated that Gilbert Howell was going
22  to be selected.
23      Did a rumor start after that time that
24  Gilbert Howell was going to be the new inspector?

---

59 (Pages 230 to 233)

Michael J. Szczerba

Page 234

1   A.  That's a possibility.  Nothing came back to me
2   directly.
3   Q.  I'm just trying to jog your memory.
4        My client, I think my client would testify
5   that some sort of a rumor started and she spoke to you
6   or saw you in the staff garage.  I didn't even know
7   there is a staff garage.  A parking lot out back, but
8   there's a staff garage, apparently, and she asked you
9   about it that she had heard that Gilbert Howell was
10  going to be selected.  Does that jog anything in your
11  memory?
12  A.  That's a possibility, but it doesn't jog my
13  memory.
14  Q.  It's possible, but you don't remember the
15  conversation?
16  A.  Correct.
17  Q.  Are you aware that she eventually went and
18  spoke to the director before the announcement was
19  officially made?
20  A.  Yes.
21  Q.  Was it on your recommendation?  Do you remember
22  that she might have had a conversation with you?
23  A.  Yes.  I do recall a conversation.  I don't
24  think that was a parking lot or garage conversation.

Page 235

1   I believe that was in my office.
2        Of course, I wasn't going to deny when I
3   thought, you know, that that would maybe provide some
4   information to her that she could get on her own that
5   was fine because at that point I was out of the
6   conversation or the selection process.
7   Q.  So she asked you something about the inspector
8   position?
9   A.  Or if she could meet with the director.
10  Q.  Right.  She was asking you permission to go to
11  the director?
12  A.  Yes.
13  Q.  Through the chain?
14  A.  Ultimately, I believe, to speak with the mayor.
15  Q.  She was going through you because she wanted to
16  go through the chain?
17  A.  Yes.
18  Q.  Is it your understanding she did so?
19  A.  Yes, I believe so.
20  Q.  Did the public safety directory ever tell you
21  that, that he met with her?
22  A.  I don't know we ever had a conversation that he
23  confirmed that.
24  Q.  Did you ever learn from the mayor that he had

Page 236

1   met with her?
2   A.  No.
3   Q.  There was a lawsuit involving somebody by the
4   name of Kenneth Boyd.  You are aware of that?
5   A.  Yes.
6   Q.  I think you gave a deposition in that lawsuit;
7   is that correct?
8   A.  Yes.
9   Q.  I think, was that a recent trial?
10  A.  Yes, in October of '06.
11  Q.  You testified?
12  A.  Yes.
13  Q.  Were you questioned at the deposition about the
14  inspector position that went to Gilbert Howell?
15  A.  Yes, it did come up.
16  Q.  What do you recall came up?
17  A.  It came up a question as to is it true that
18  Gilbert Howell was not your selection, and yes.  Who
19  was that?  And I stated "another Wilmington police
20  captain," and then there was an objection, and then I
21  ended up saying the person I selected as Captain Nancy
22  Dietz.
23  Q.  Did you let Nancy Dietz know after that
24  deposition that you had to use her name in the

Page 237

1   deposition?
2   A.  Yes, just after that deposition, never before.
3   There was never any discussion --
4   Q.  Right.
5        I guess what I'm trying to ask you is:  Did
6   she then ask you why she wasn't selected or anything
7   and you may have told her something?
8   A.  No.
9   Q.  So you don't remember her asking you why she
10  wasn't selected in that time?
11  A.  After the deposition?
12  Q.  Yes.  After the deposition, I think you just
13  told me that you mentioned to her that her name came
14  up at the deposition?
15  A.  Right.
16  Q.  Because the question was asked about the
17  inspector position?
18  A.  Right.  And I had informed her of that because
19  I know it has never been discussed up to that point as
20  to confirmation from me directly to her or anyone else
21  for that fact that there may have been speculation as
22  to who my selection was, but it never came from me or
23  anyone else.
24  Q.  So you then let her know at that time since it

60 (Pages 234 to 237)

9d15ae66-51ec-4bb3-a90d-e150ac1dc71c

A1317

Page 238

1   was given in a deposition that you had recommended
2   her?
3   A.   Yes.
4   Q.   Then what I'm asking you is:  Do you remember
5   discussing with her the fact that she didn't get the
6   appointment besides just telling her that one thing?
7   A.   No.  There's a possibility we discussed it, it
8   was the mayor's selection that Mr. Montgomery agreed
9   that she was a well-qualified candidate, but I don't
10  recall anything else.
11  Q.   What I'm asking you is:  You don't have much of
12  a memory of a discussion with Nancy Dietz that day?
13  A.   Right, right.
14  Q.   Would you have any notes of your discussion
15  with Nancy Dietz that day?
16  A.   No.
17  Q.   Do you have any reason to believe that she
18  wouldn't give an accurate recollection of what her
19  memory is of the conversation that day?
20  A.   No.
21  Q.   Is it fair to say from your conversations with
22  the mayor on those two occasions that he made the
23  final decision to select Gilbert Howell for the
24  position of the inspector?

Page 239

1   A.   Yes.
2   Q.   Do you have any reason to doubt that he had the
3   final authority to make that selection?
4   A.   No.
5   Q.   Do you have any reason to believe that the
6   authority to make that selection resided in some
7   committee, some group other than the mayor?
8   A.   No.
9   Q.   That selection is not something that had to be
10  made by the administrative board or the City of
11  Wilmington, was it?
12  A.   No.
13  Q.   He wasn't acting in such a way that would lead
14  you to believe that he selected Gilbert Howell by
15  accident, did he?
16  A.   No.
17  Q.   He wasn't acting in such a way as to lead you
18  to believe that he made a mistake in uttering Gilbert
19  Howell's name when he meant somebody else?
20  A.   No.
21  Q.   So would you agree that he deliberately chose
22  Gilbert Howell for that position?
23  A.   Yes.
24  Q.   As a city employee and a manager, you undergo

Page 240

1   certain training on the laws relating to the treatment
2   of employees under you; right?
3   A.   Yes.
4   Q.   You know that you can't discriminate against an
5   employee because of where they go to church or their
6   age or their race or their gender.  You know that;
7   right?
8   A.   Yes.
9   Q.   Is it your observation that Mayor Baker also
10  knows that there are such laws?
11  A.   Yes.
12  Q.   Without asking any address, does the mayor have
13  more than one house in the City of Wilmington?  Does
14  he own more than one residence or something?
15  A.   No.  I believe he rents his residence.
16  Q.   He rents.  So he might not even own a residence
17  in the city?
18  A.   I believe he lives in an apartment.  I don't
19  know if he has a house.
20  Q.   Shows how much I know.
21       Since I know what you make a year now, do
22  you have any idea what the mayor makes a year?
23  A.   I believe roughly in the area of $100,000.  I'm
24  not sure.  I'm not aware of his salary.

Page 241

1   Q.   Do you have a pension?
2   A.   Yes, I do.
3   Q.   Do you know if the mayor, as a formal council
4   person and the mayor now, has a pension?
5   A.   I believe he does.
6   Q.   You think so.  Okay.
7       So is it your understanding that the mayor
8   is the person who always has the final decision on
9   selecting inspectors for the City of Wilmington?
10  A.   Yes.
11  Q.   Are you saying the final decision for other
12  promotions within the police department rest with the
13  public safety director or with you?
14  A.   Supposed to rest with me.
15  Q.   But...
16  A.   However, I make notification to the public
17  safety director as to all my promotions and all my
18  transfers.  They have never been altered in any way.
19  However, I still have to, before I can announce those
20  in a memorandum like you saw officially, I have to
21  report that to the director of public safety.
22  Q.   Right.  And you can't announce someone until he
23  gives some sort of a go-ahead?
24  A.   That's correct, and I believe that go-ahead

61 (Pages 238 to 241)

Page 242

1 comes from Mr. Montgomery.
2   Q.  On occasion that go-ahead hasn't been as
3 swiftly issued as you would wish?
4   A.  Right.
5   Q.  Are you aware of any written ordinances or
6 policies of the City of Wilmington that govern the
7 mayor's exercise of authority to appointment
8 inspectors?
9   A.  Just that they are appointed, but I'm not aware
10 of any.
11   Q.  For example, we talked a little bit about
12 there's an affirmative action plan for the city a
13 little while ago; right?
14   A.  Right.
15   Q.  There's also a city ordinance that says the
16 city shall not discriminate against people on the base
17 of race, religion, and other categories; right?
18   A.  Yes.
19   Q.  That's the law?
20   A.  Yes.
21   Q.  You know that there are federal laws dealing
22 with that, too, for employees; right?
23   A.  Yes.
24   Q.  And you also know as a trained police officer

Page 243

1 that there's something called the United States
2 constitution that deals with discriminating against
3 people because of their race, for example; right?
4   A.  Yes, yes.
5   Q.  Aside from those kinds of laws and ordinances
6 that say the mayor shall not discriminate against
7 people on the base of race and everything, do you
8 believe that when he's appointing somebody he can
9 ignore those laws?
10   A.  No.
11   Q.  You are not saying that?
12   A.  Right, right.
13   Q.  But what I'm saying is:  Are there any other
14 policies or ordinances out there that you are aware of
15 that say he has to go through a posting process, you
16 know, 30 days, a job description and give people time
17 to apply and assign points during interviews or
18 anything?  Is there anything that governed the
19 exercise of his authority?
20   A.  No.
21   Q.  You, being within the police department, you
22 are unaware of any such written documents that would
23 govern his --
24   A.  Yes.

Page 244

1   Q.  Is it your understanding that the city charter
2 or the city government, its laws, just give that
3 authority to the mayor to exercise?
4   A.  Yes.
5   Q.  It's your understanding, I think you are
6 telling me that there are no other committees or
7 groups that participate in the exercise of that
8 authority?
9   A.  No.
10   Q.  Right?
11   A.  Right.
12   Q.  Do you agree that the mayor is the ultimate
13 person in charge of appointing the inspectors?
14   A.  Yes.
15   Q.  The City of Wilmington contends in this case
16 that it has exercised reasonable care to prevent the
17 presence of discrimination in the selection of Gilbert
18 Howell.  Okay?
19       Are you aware of any things the personnel
20 department or any other managers in the City of
21 Wilmington did to ensure that the mayor didn't
22 discriminate in selecting Gilbert Howell?
23   A.  I'm not aware of any.
24   Q.  Not aware of any?

Page 245

1   A.  No.
2   Q.  Throughout the police department, from captain
3 on down, for promotions, there's a process that's
4 followed; right?
5   A.  Yes.
6   Q.  In fact, over the past ten years, hasn't the
7 city or the police department worked with some sort of
8 outside experts about trying to see that your
9 promotion process is a fair and efficient and modern
10 one?
11   A.  Yes.  We utilize a consultant for our
12 promotional system.
13   Q.  It's not this fellow up at Penn, is it?  Who is
14 it?
15   A.  It's a management scientist to the person who
16 runs that company, a gentleman by the name of David
17 Wagner.
18   Q.  When it comes to promotions through lieutenant,
19 there's a testing process; right?
20   A.  Yes, there is.
21   Q.  The tests are sought to be neutral and
22 nondiscriminatory?
23   A.  Correct.
24   Q.  They're constructed with the purpose in mind of

62 (Pages 242 to 245)

Michael J. Szczerba

Page 246

1  eliminating the opportunity for discrimination to
2  occur?
3      A.  Correct.
4      Q.  Then you are telling me you end up with bands?
5      A.  Yes.
6      Q.  And then I assume within a band there's
7  rankings like A, B, C band?  How does it happen with
8  your force?
9      A.  That's how it happens.
10     Q.  Then the chief would have authority within
11 A band to select people?
12     A.  Right.
13     Q.  And if you exhausted all of the A's, then you'd
14 have to go down to a B?
15     A.  Correct.
16     Q.  Within A, the chief is given some authority to
17 make his selection?
18     A.  Yes.
19     Q.  But when the chief is making that selection,
20 the chief is always acting in a way such that he is
21 not discriminating against people on the basis of race
22 or gender; isn't that right?
23     A.  That's right.
24     Q.  You're trained that way; right?

Page 247

1      A.  Yes.
2      Q.  The management people that you consult with
3  make sure that you understand that?
4      A.  Yes.
5      Q.  Then at the captain's level, what do you do?
6  Do you have assessment boards?  What do you do when
7  you are making selections from lieutenants to
8  captains?  How does that happen?
9      A.  It's just a -- it's considered a promoted
10 position, but it's actually technically appointed.
11     Q.  Okay.
12     A.  Appointed by the chief of police, anyone within
13 the lieutenant's rank, and there are thirteen
14 lieutenants on the Wilmington Department of Police
15 that are eligible to become a captain when you have a
16 captain's opening.
17     Q.  A captain what?
18     A.  When you have a captain's opening.
19     Q.  But you don't go through any assessment within
20 the captains other than you as the chief exercising
21 your discretion?
22     A.  That's correct.
23     Q.  So these outside consultants or whatever
24 haven't come up with a process for you to follow when

Page 248

1  you're looking at the pool of captains for promotion?
2      A.  No.  It's just a pool of eligible sergeant
3  candidates and a pool of eligible lieutenant
4  candidates, which are sergeants.
5      Q.  But there's not an outside board that comes in
6  and does oral interviews of captains in various areas
7  such as leadership and decision-making and things like
8  that and then rankings and then that gives you some
9  raw data --
10     A.  No.
11     Q.  -- to make a decision from?
12     A.  No, there is not.
13     Q.  So you don't do that?
14     A.  Right.
15     Q.  You do it based on your experience with the
16 people and your knowledge of their prior record?
17     A.  Correct.
18     Q.  But all the time knowing that you shouldn't
19 discriminate against people on the base of race or
20 gender or whatever?
21     A.  Correct.
22     Q.  Do you keep a personal file which relates to
23 Inspector Gilbert Howell where you have documents that
24 might not be found elsewhere in the city's records?

Page 249

1      A.  No, other than what I submitted here.
2      Q.  Right.  You've given us that.
3      A.  Right.
4      Q.  But aside from that, information on him would
5  be in the disciplinary file?
6      A.  Right.
7      Q.  And attendance --
8      A.  Official department records.
9      Q.  But there's nothing else that you have?
10     A.  No.
11     Q.  Has Director Mosley ever told you that he keeps
12 a personal file on Gilbert Howell?
13     A.  No, he hasn't.
14     MR. NEUBERGER:  Counsel, on request for
15 production number 14, you can just cross that off.
16 I'll withdraw that.  Remember what I was asking for in
17 14?
18     MS. BUTCHER:  Okay.
19     MR. NEUBERGER:  I think you've given us all
20 that already.  Or you can just say you've already done
21 it.
22     Counsel, in looking over the request for
23 production, there's just one or two, it looks like,
24 that I need a little more specificity.  Everything

63 (Pages 246 to 249)

Page 250

1  else is going to be you already produced it or
2  whatever.  So aside from these couple things we talked
3  about, I think you've complied.
4          MS. CHEEK:  Okay.
5  BY MR. NEUBERGER:
6  Q.  Have you done an evaluation of Gilbert Howell
7  since he has become the inspector?
8  A.  No, I haven't.
9  Q.  Have you been told not to do one of him?
10 A.  No, I have not been told not to do one, no.
11 Q.  So he's been inspector since November of 2005,
12 so it's been 12, 13 months or so.  Is he due for one?
13 A.  I would say so when we get those -- every
14 employee of the City of Wilmington gets an evaluation
15 from their supervisor and that comes through our
16 office of personnel for the city.
17 Q.  So they are the ones who pull the trigger and
18 say it's time for evaluations?
19 A.  Yes.  I'll do one for my secretary.
20 Q.  So you haven't heard anything from the
21 personnel department for doing one for him?
22 A.  Correct.
23 Q.  Until you hear from them, you are not supposed
24 to do one?

Page 251

1  A.  Correct.
2  Q.  Okay.  Thanks.
3          MR. NEUBERGER:  Let me check with my
4  cocounsel outside and we can wrap this up.
5          (A recess was taken at this time.)
6          MR. NEUBERGER:  I don't have any other
7  questions at this time.  Okay?
8          MS. CHEEK:  Okay.
9          MS. BUTCHER:  Okay.
10         (The deposition was then concluded at
11 4:05 p.m.)
12         - - - - -
13
14     INDEX TO TESTIMONY
15
16 MICHAEL J. SZCZERBA            PAGE
17
   Examination by Mr. Neuberger        2
18
19
         - - - - -
20
21
22
23
24

Page 252

1       INDEX TO EXHIBITS
2
SZCZERBA EXHIBIT NO.:          PAGE
3
4  1  A one-page copy of a 2005 Organization
      Chart for the Wilmington Police
5     Department            12
6  2  A one-page copy of a document entitled
      "Inspector Ranks Since 1978"    16
7
   3  A ten-page copy of an Executive and
8     Managerial Employee Performance Appraisal
      dated 9/22/04 for Captain Nancy Dietz    24
9
   4  A ten-page copy of an Executive and
10    Managerial Employee Performance Appraisal
      dated 9/2/04 for Captain Gilbert Howell   24
11
   5  An eleven-page copy of an Executive and
12    Managerial Employee Performance Appraisal
      dated 10/11/00 for Captain Nancy S. Dietz 52
13
   6  A nine-page copy of an Executive and
14    Managerial Employee Performance Appraisal
      dated 10/12/2000 for Captain Gilbert
15    Howell             52
16 7  A nine-page copy of an Executive and
      Managerial Employee Performance Appraisal
17    dated 10/11/2000 for Captain James Wright 52
18 8  A one-page copy of a City of Wilmington
      Organization Chart        59
19
   9  A multipage copy of a Captains and
20    Inspectors Bargaining Agreement dated
      7/1/01 to 6/30/07        62
21
22 10 A multipage copy of Chapter III, Office
      of Uniformed Operations      69
23 11 A one-page copy of a document entitled
      "Police Pay by Rank"       95
24

Page 253

1  SZCZERBA EXHIBIT NO. (Continued):     PAGE
2
   12 A one-page copy of an Informational
3     Bulletin dated Thursday, November 3,
      2005, to All Personnel from Michael J.
4     Szczerba           96
5  13 A two-page copy of a document from the
      Office of the University Registrar    110
6
   14 A two-page copy of a document entitled
7     "Professional Experience and Assignments"
      for Nancy S. Dietz        115
8
   15 An eight-page copy of various
9     certificates         125
10 16 A multipage copy of certificates and
      letters            127
11
   17 A five-page copy of letters and
12    certificates         132
13 18 A two-page copy of a letter dated
      March 8, 1989, to Guy Sapp from Peter N.
14    Letang            137
15 19 A multipage copy of an Executive and
      Managerial Employee Performance Appraisal
16    for Captain Nancy Dietz      138
17 20 A three-page copy of attendance records
      for Nancy Dietz        167
18
   21 A three-page copy of attendance records
19    for Gilbert Howell       167
20 22 An 11-page copy of documents, the first
      being a memo dated April 17, 2006, to
21    James N. Mosley from Michael J. Szczerba 175
22
23        - - - - -
24

Page 254

```
1
2
3
4
5
6
7
8           REPLACE THIS PAGE
9
10          WITH THE ERRATA SHEET
11
12          AFTER IT HAS BEEN
13
14          COMPLETED AND SIGNED
15
16          BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

Page 255

```
1    State of Delaware )
2                     )
3    New Castle County )
4
5
6           CERTIFICATE OF REPORTER
7
8           I, Kathleen White Palmer, Registered
     Professional Reporter and Notary Public, do hereby
9    certify that there came before me on the 25th day of
     January, 2007, the deponent herein, MICHAEL J.
10   SZCZERBA, who was duly sworn by me and thereafter
     examined by counsel for the respective parties; that
11   the questions asked of said deponent and the answers
     given were taken down by me in Stenotype notes and
12   thereafter transcribed into typewriting under my
     direction.
13
            I further certify that the foregoing is
14   a true and correct transcript of the testimony given
     at said examination of said witness.
15
            I further certify that I am not counsel,
16   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
17
18
19
20           _____
21           Kathleen White Palmer, RPR, RMR, CLR
             Certification No. 149-RPR
22           (Expires January 31, 2008)
23
     DATED:  January 30, 2007
24
```

65 (Pages 254 to 255)

# SEALED
# DOCUMENTS
# (A1323 - 1388)



# CONFIDENTIAL PORTIONS

### In The Matter Of:

# Dietz v. Baker, et al.

### C.A. # 06-256

### Gilbert R. Howell

### April 5, 2007

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A1389

Dietz v. Baker, et al.

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF DELAWARE


CAPTAIN NANCY S. DIETZ,          )
                                 )
               Plaintiff,        )
                                 )  Civil Action
          v.                     )  No.06-256
                                 )
MAYOR JAMES M. BAKER, individually )
and in his official capacity as the)
Mayor of the City of Wilmington, )  PAGES 33 to 98
and MAYOR AND COUNCIL OF         )  ARE CONFIDENTIAL
WILMINGTON,                      )
                                 )
               Defendants.       )


          Deposition of GILBERT R. HOWELL taken
pursuant to notice at the law offices of The Neuberger
Firm, Two East Seventh Street, Suite 302, Wilmington,
Delaware, beginning at 10:10 a.m. on Thursday,
April 5, 2007, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.


APPEARANCES:


          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM
             Two East Seventh Street - Suite 302
             Wilmington, Delaware  19801-3707
             for the Plaintiff



     --------------------------------------------------
                    WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

                    www.wilfet.com

c4f527ae-c863-4e81-9786-b088c3aa7158

A1390

Dietz v. Baker, et al.

Page 2

1  APPEARANCES (Continued):
2
3      REBECCA L. BUTCHER, ESQUIRE
       LANDIS RATH & COBB LLP
         919 Market Street - Suite 600
4        Wilmington, Delaware  19899
         for the Defendant Mayor James M. Baker
5
6      TERESA A. CHEEK, ESQUIRE
       YOUNG, CONAWAY, STARGATT & TAYLOR LLP
         1000 West Street
7        The Brandywine Building - 17th Floor
         Wilmington, Delaware  19899-0391
8        for the Mayor and Council of
           Wilmington
9
10  ALSO PRESENT:
11      CAPTAIN NANCY S. DIETZ
12      - - - - -
13          GILBERT R. HOWELL,
14  the witness herein, having first been
15  duly sworn on oath, was examined and
16  testified as follows:
17  BY MR. NEUBERGER:
18  Q.  Could you state your full name, sir?
19  A.  Gilbert R. Howell.
20  Q.  When were you born?
21  A.  3/21/51.
22  Q.  3/21?
23  A.  Yes, sir.
24  Q.  All right.  Thanks.

Page 3

1          So you're about 56?
2   A.  Fifty-six, first day of spring.
3   Q.  There you go.  Okay.
4          And you are an African-American?
5   A.  Yes, sir.
6   Q.  Have you ever had your deposition taken before?
7   A.  Plenty of times.
8   Q.  Many times.  Okay.  And I think recently you
9   even testified in a federal court trial, didn't you?
10  A.  Yes, sir.
11  Q.  What was the name of that case?
12  A.  Kenneth Boyd.
13  Q.  Kenneth Boyd.  Okay.
14         So is it correct that you understand that
15  if there's a trial in this case and you were called as
16  a witness and said something different at trial than
17  what I asked you about today, gave a different answer,
18  I'd have the right to point that out to the judge or
19  jury?
20  A.  Certainly.
21  Q.  You probably have testified in criminal cases,
22  I'm sure --
23  A.  Yes.
24  Q.  -- over the years; right?

Page 4

1   A.  Yes, sir.
2   Q.  And you've given depositions in civil cases?
3   Is that what you are telling me?
4   A.  Yes.
5   Q.  And then you've even testified in at least one
6   federal court civil trial; is that right?
7   A.  Several.
8   Q.  Several.  Okay.
9          Now, you've taken an oath to tell the truth
10  today.  Do you understand the importance of that,
11  telling the truth?
12  A.  Yes.
13  Q.  If I ask you a question today that you don't
14  understand, just let me know and I'll be glad to
15  rephrase it.  Okay?
16  A.  All right.
17  Q.  If I ask you a question today that you don't
18  know the answer to, I don't want you to guess.  Just
19  tell me you don't know and we'll go on to something
20  else.  Do you understand?
21  A.  Yes, sir.
22  Q.  If you need for me to repeat a question because
23  you're having trouble understanding the question, just
24  let me know and I'll be glad to repeat it.  Is that

Page 5

1   okay?
2   A.  Yes, sir.
3   Q.  Are you on any medications or anything that
4   might interfere with your remembering things about
5   events several years ago?
6   A.  I'm on medication and it might not be the
7   medication as opposed to just the age.
8   Q.  Well, I'll be 60 in a couple of weeks.  I
9   understand what you are saying.  Okay.
10         So whatever you are taking, it's nothing
11  that's interfered with your memory before.  Is that
12  what you're telling me?
13  A.  That's correct.
14  Q.  And if you need a break, you let me know.
15  Okay?
16  A.  Okay.
17  Q.  How about reviewing with me a couple things
18  about where you grew up and where you went to school?
19  Where were you born?
20  A.  Here in Wilmington, Delaware.
21  Q.  In Wilmington?  Okay.
22         Where did you go to elementary school?
23  A.  Well, we were like gypsies, so I went to quite
24  a few.  George Gray, Lore.

2 (Pages 2 to 5)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1391

Dietz v. Baker, et al.
Gilbert R. Howell

Page 6

1   Q.  So did I.
2   A.  Yes.
3   Q.  So you went to George Gray and Lore, Charles B.
4   Lore; right?
5   A.  Yes, sir.
6   Q.  And how about junior high?
7   A.  P.S. duPont.
8   Q.  And how about high school?
9   A.  P.S. duPont.
10  Q.  P.S.  Okay.
11       So you would have graduated from P.S.
12  around 1969 or so?
13  A.  Yes, but I quit.
14  Q.  You didn't finish, you mean?
15  A.  Yes.
16  Q.  Did you play any sports over there?
17  A.  Tennis.
18  Q.  Tennis?  On those old courts behind the school?
19  A.  To the west of the school.
20  Q.  To the west of the school.  Okay.
21       So are you saying you left sometime during
22  your senior year?
23  A.  Yes.
24  Q.  Did you join the service?  Is that what

Page 7

1   happened?
2   A.  Yes.
3   Q.  You served in -- was it --
4   A.  United States Air Force.
5   Q.  The Air Force?
6   A.  Yes.
7   Q.  Why don't you tell me where you were stationed,
8   what different places they sent you?
9   A.  Well, first off we started in Lackland, Texas.
10  That's where the United States Air Force has their
11  training facility.  My first assignment was in Minot,
12  North Dakota.  And in that assignment I was assigned
13  to ballistic missiles.
14  Q.  Right.
15  A.  So what that entailed was we would be chopper'd
16  out to the various missile sites and we lived there
17  for a couple weeks and we would come in.  Each missile
18  site -- there was a mother missile sight.  Each center
19  site had ten ballistic missiles that we were
20  responsible for.
21  Q.  Okay.
22  A.  Okay?  After that, given the climate of Minot,
23  North Dakota, I volunteered for Vietnam because it was
24  nothing there in North Dakota but cold.

Page 8

1   Q.  How long did you serve in North Dakota?
2   A.  I think it was about two years.
3   Q.  So did you do a two-year tour in Vietnam?  A
4   one-year tour in Vietnam?
5   A.  Yes, sir.
6   Q.  Were you at a base?
7   A.  I was at Phan Rang.
8   Q.  And what was your assignment there?
9   A.  I was a combat soldier, security police.  We
10  were the only security for -- most of the Air Force
11  bases in southeast Asia were either guarded by the
12  Army or the Korean marines.  At our particular base we
13  had the sole responsibility of maintaining the combat
14  structure for our base.
15  Q.  And after your tour in Vietnam, what happened?
16  A.  Well, they called -- after you serve in
17  Vietnam, they give you a choice of any base that you
18  want to do, I guess this is in lieu of -- because you
19  served there in a combat zone.
20       So my next assignment was -- my next
21  assignment I was stationed in Mendenhall, England.
22  Q.  There was an Air Force Base there; right?
23  A.  That's correct.
24  Q.  Same kind of duties?  Protecting the base?

Page 9

1   A.  Yes.
2   Q.  How long did you serve there?
3   A.  I was in England for about five years.
4   Q.  That's at least eight or nine years in the
5   service.  How long were you in the service?
6   A.  Eight and a half years.
7   Q.  So was England your last duty station?
8   A.  No, it was not.
9   Q.  Oh, okay.
10  A.  After I left England I was stationed in Warner
11  Robins, Georgia.  I was stationed in Roswell,
12  New Mexico.
13  Q.  Roswell?  Were you looking for flying saucers?
14  A.  Yeah.  How about that?
15  Q.  Go ahead.
16  A.  And then my final base was Dover Air Force
17  Base.
18  Q.  So after about eight and a half years you left
19  the service?
20  A.  Yes.
21  Q.  So would that have been shortly before you went
22  to the police academy?
23  A.  Yes.  I got out in 1975, joined the police
24  department in 1976.

3 (Pages 6 to 9)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1392

Dietz v. Baker, et al.
Gilbert R. Howell

Page 10

1    Q.  All right.  Did you leave your junior or senior
2  year out of P.S.?
3    A.  It was ninth grade.
4    Q.  Oh, okay.  So you enlisted in the service after
5  ninth grade?
6    A.  Yes.
7    Q.  I misunderstood you.  Okay.
8    A.  Yes.
9    Q.  So it would have been around 1967 or so, 1967,
10  1966?
11    A.  Around '69.
12    Q.  '69?  Okay.  Well, okay.
13    A.  Around '69.
14    Q.  If you enlisted in '69 and you left in '75,
15  that would be like six years in the service.  I think
16  you said you were eight and a half years in the
17  service.
18    A.  Eight and a half years.  I went into the
19  service May 5th, 1969.
20    Q.  Okay.  May 5th, and if we added eight and a
21  half years from that, that's when we know you left the
22  service.  So eight and a half years, it might be
23  somewhere around 1977 or something like that you left
24  the service?

Page 11

1    A.  Yes.  I did five years Reserves.
2    Q.  Okay.  So you did Reserves, also?
3    A.  Yes.
4    Q.  After you left active duty --
5    A.  Yes.
6    Q.  -- you did Reserves?
7    A.  Yes.
8    Q.  So you started at the Wilmington Police Academy
9  and you stayed in the Reserves for five years?
10    A.  Yes.
11    Q.  Is that what you're saying?  Okay.  I got you.
12    A.  And within that time that I dropped out of
13  school, they had a program in the United States Air
14  Force which I embarked upon and I got my diploma from
15  Biddeford, Maine, so I had my high school diploma.
16  And that allowed me to attend certain college courses
17  while I was in England.
18    Q.  Right.  So the Air Force provided you the
19  opportunity to complete your high school education?
20    A.  That's correct.
21    Q.  Then after you did that, you were able to take
22  some courses while you were in England?  Is that what
23  you are telling me?
24    A.  Yes.

Page 12

1    Q.  I think I've seen something that says that --
2  well, first of all, let's go back here.  It says
3  Wesley College, MBA program.  Are you in the MBA
4  program at Wesley?
5    A.  Not now.  I was in MBA college working on my
6  master's degree when I was offered this position.
7    Q.  Got you.
8    A.  Okay?
9    Q.  So you were promoted to inspector sometime the
10  end of 2005; is that right?
11    A.  That's correct.
12    Q.  And you're saying that at that time before then
13  you had been taking some courses at --
14    A.  I was enrolled at Wesley College, yes.
15    Q.  -- Wesley College?
16        Do they have a campus up here in New Castle
17  County or did you have to go to Dover?
18    A.  They had a campus at Corporate Commons.
19    Q.  Okay.  And you were taking courses for an MBA
20  program?
21    A.  Yes, sir.
22    Q.  And how many courses had you taken by the time
23  you had --
24    A.  Well, I had started because I went right in

Page 13

1  from my bachelor's degree and I think I got into about
2  four or five classes.
3    Q.  About four or five classes.
4        Confidentially your personnel file has been
5  produced in this case and the lawyers have seen it.
6  Okay?  And the parties.  But it's not a public
7  document or anything.  And in a few minutes when we
8  start getting into your personnel records, we are
9  going to mark all the questions confidential.  Okay?
10  So once again, they aren't public questions.  Okay?
11        But I noticed in the files that have been
12  turned over to us, I don't think I've seen any records
13  in the police department files about your attending
14  Wesley College.
15        Have you ever submitted to them a
16  transcript or anything like that about the courses you
17  were enrolled in down there?
18    A.  No.
19    Q.  Okay.  So no.  Okay.
20    A.  At least I don't remember.  At least I don't
21  remember submitting any documentation.  But I sure got
22  a lot -- I got a lot of bills if you want to see them.
23    Q.  Well, before that, I think you've indicated you
24  got the equivalent of a college degree from somewhere;

4 (Pages 10 to 13)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1393

Dietz v. Baker, et al.
Gilbert R. Howell

---

Page 14

1 right?
2 A. No, not the equivalent.
3 Q. You have a college degree?
4 A. Yes.
5 Q. We are not talking about high school?
6 A. University of Phoenix.
7 Q. Now, when did you get that degree?
8 A. 2002 to '5. I had to go to Philadelphia three
9 or four nights a week and -- and after I completed the
10 program, business management --
11 Q. Business management?
12 A. Yes, sir.
13 Q. Okay.
14 A. -- I was awarded a bachelor's degree.
15 Q. Business management. Was it a Bachelor of
16 Science in business management?
17 A. Bachelor of Science.
18 Q. Did you attend from 1999 to around 2003?
19 A. Yes.
20 Q. Now, once again, in looking at your personnel
21 records, I haven't seen a copy of your Bachelor of
22 Science degree from the University of Phoenix.
23     Do you remember submitting that to the City
24 of Wilmington?

Page 15

1 A. No. I didn't submit any of those things.
2 Q. They don't pay for continuing education or
3 anything like that?
4 A. No. Always a day late and a dollar short.
5 When I finished my bachelor's degree, then CJC came up
6 with a program that they provided law enforcement
7 officers with financial funds. You passed a course,
8 send in the course, they send you the money for the
9 course.
10 Q. But that wasn't in place when you were doing
11 it; right?
12 A. No, it was not.
13 Q. Okay. At home or in your office do you have
14 framed a diploma from the University of Phoenix
15 somewhere?
16 A. Sure.
17 Q. Could I ask you to make a copy of that and give
18 it to your lawyer?
19 A. Sure.
20     MR. NEUBERGER: Counsel, would you be kind
21 enough to produce that for me a little later?
22     MS. CHEEK: We'll take it under
23 consideration.
24     MR. NEUBERGER: Okay. Thank you.

Page 16

1 BY MR. NEUBERGER:
2 Q. And then I think you've indicated that you also
3 took some courses at Wilmington College sometime in
4 your career?
5 A. Yes.
6 Q. What kind of courses would they have been?
7 A. Courses in behavior science.
8 Q. Behavioral science. Okay. Would that have
9 been in the early 1990s?
10 A. Around '89, '90, I would think.
11 Q. It looks like you have an associate's degree in
12 police science from DelTech. Is that true?
13 A. Yeah, I have a dual, police science -- police
14 science and criminal justice from DelTech.
15 Q. Do you know whether you ever submitted that
16 diploma to the Wilmington Police Department?
17 A. No, but it's definitely in our records.
18 Q. Do you have that diploma at home, too?
19 A. Yeah, and I can give you the accompanying bills
20 that go with it.
21 Q. Could I ask you to try and make a copy of that
22 and submit that to your lawyer, also?
23 A. Sure.
24 Q. All right. Thank you.

Page 17

1     And then, of course, there's all sorts of
2 like continuing courses you take as a law enforcement
3 officer over the years. Is that a fair statement?
4 A. Numerous.
5 Q. Now, when did you enroll in the academy? Were
6 you saying 1975? 1976? What would that have been?
7 A. May 3rd, 1975 -- '76.
8 Q. Have you been serving as a Wilmington police
9 officer ever since?
10 A. Yes.
11 Q. So it's about 29 years now?
12 A. This May it will be 31 years.
13 Q. Now, what was your first assignment out of the
14 academy? Patrolman somewhere?
15 A. That's correct.
16 Q. I'd like to, whatever is easiest, take you
17 from the academy through your assignments up to your
18 present position or go backwards. Whatever is
19 easiest. Could you just try to list for me your
20 history within the department, your assignments?
21 A. Yeah. Well, 31 years is a long time.
22 Q. I understand.
23 A. It might be quite -- I might get some wrong.
24 Q. No. That's okay.

5 (Pages 14 to 17)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1394

Dietz v. Baker, et al.
Gilbert R. Howell

Page 18

1    A.  I was in Patrol Division, naturally, out of the
2    academy and the first assignment I had was a plain
3    clothes assignment working undercover.
4         The next assignment I had was I was
5    assigned to detectives, and I was there for 12, 13
6    years.
7    Q.  Straight in detectives?
8    A.  Yes.
9    Q.  So that's like the Criminal Division and that's
10   the Detective Division?  Is that what they called it
11   then?
12   A.  That's correct.
13   Q.  And your rank while you were in detectives, did
14   it stay the same or did you eventually get promoted?
15   A.  From patrolman, they call it detective, but you
16   are still a patrolman.  But while there I did make
17   sergeant.
18   Q.  Okay.
19   A.  And I did make lieutenant.
20   Q.  So while you were in detectives, you advanced
21   to sergeant and lieutenant?
22   A.  Yes.
23   Q.  Do you remember approximately when you were
24   promoted to sergeant, what year that might have been?

Page 19

1    If you can.
2    A.  (No response.)
3    Q.  How about lieutenant?  Do you remember when you
4    became a lieutenant?
5    A.  To be accurate, no, I don't remember.
6    Q.  Okay.
7    A.  I mean, I have documentation that would be
8    proof positive for you.
9    Q.  No.  I know you were a sergeant and a
10   lieutenant.  Would you have been a lieutenant around
11   1989, 1990, at least a lieutenant at that time?
12   A.  Yes, could be possible.
13   Q.  And there was some point in time when
14   then-Sergeant Dietz was a sergeant under your command
15   in your platoon or something?
16   A.  Yeah.  A couple times after being promoted,
17   while in the Detective Division, you come out, you
18   serve a stint in the Patrol Division, and you go back,
19   get promoted again, came out as a lieutenant.
20   Q.  Okay.  So you're saying during that period of
21   time you would have gone back in patrol, worked with
22   the platoon or whatever, and then gone back into
23   detectives?  Is that what you are saying?
24   A.  Yes.

Page 20

1    Q.  Got you.  Okay.
2         And did there come a time when you weren't
3    in patrol or weren't in detectives in the Criminal
4    Division?  Did you progress to some other
5    responsibility?
6    A.  Yes.  I was assigned to community policing.
7    Q.  Do you remember when that might have started?
8    A.  Oh.
9    Q.  Do you remember how long you were in community
10   police?
11   A.  Probably about two and a half years.
12   Q.  What other assignments have you had beyond
13   community policing?
14   A.  Community policing, Internal Affairs.
15   Q.  Oh, okay.  So you served in Internal Affairs?
16   A.  Yes.
17   Q.  What rank did you have when you were in
18   Internal Affairs?
19   A.  Captain.
20   Q.  Oh, okay.  Was it called Internal Affairs or
21   Office of Professional Standards?  What did they call
22   it when you were --
23   A.  When I was there they called it Internal
24   Affairs and they changed it to the Office of

Page 21

1    Professional Standards.
2    Q.  Do you remember the years when you served as
3    the captain in Internal Affairs?
4    A.  Probably started in 2005.
5    Q.  2005?
6    A.  Yes.
7    Q.  Okay.
8    A.  That's when I was promoted to captain.
9    Q.  I think it was the end of 2005 when you became
10   an inspector.  And so you're saying was your last
11   assignment before you became inspector the head of
12   Internal Affairs or was it something else?
13   A.  Say that again, please.
14   Q.  What assignment did you have when you were
15   promoted to inspector?
16   A.  Then that's when I was promoted to Uniform
17   Operations inspector.
18   Q.  Right.  That was in the end of 2005?
19   A.  Yes.
20   Q.  And what assignment did you have as captain
21   just before you were promoted?
22   A.  Internal Affairs.
23   Q.  Okay.
24   A.  No.  I'm sorry.  I'm sorry.  It was Records

6 (Pages 18 to 21)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1395

Dietz v. Baker, et al.
Gilbert R. Howell

Page 22

1   Division.
2   Q.  Got you.
3   A.  Records Division.
4   Q.  Before records, is that when you were in
5   Internal Affairs?
6   A.  Yes.
7   Q.  Got you.  Okay.
8       Do you remember how long you served in
9   records?
10  A.  Approximately three years.
11  Q.  Before records, were you in Internal Affairs?
12  A.  Yes.
13  Q.  About how long did you serve in Internal
14  Affairs?
15  A.  About a year and a half.  Somewhere squeezed in
16  the middle of there I was the commanding officer of
17  community policing.
18  Q.  And by "commanding officer," what rank did you
19  have?
20  A.  Captain.
21  Q.  Who was your chief when you were serving in
22  Internal Affairs?
23  A.  Boykin.
24  Q.  Did Chief Boykin assign you to Internal

Page 23

1   Affairs?
2   A.  Yes.
3   Q.  Who was the chief who promoted you to captain?
4   A.  Sam Pratcher.
5   Q.  Your first assignment as a captain, what was
6   it?
7   A.  Internal Affairs.
8   Q.  Okay.  Well, I think you said that Pratcher
9   promoted you to captain; right?
10  A.  Yeah.  And my first assignment without a doubt
11  when I made captain was Internal Affairs.
12  Q.  So was Pratcher the chief at the time you were
13  in Internal Affairs or was it Boykin?
14  A.  Well, chief made me captain.  Chief Pratcher,
15  he promoted me, and during that period of time there
16  was some riff between Chief Pratcher and certain
17  situations that was going on, and he stepped down and
18  Boykin took his place.
19  Q.  Oh, right, right.  This was when Jim Sills was
20  mayor?
21  A.  Yes.
22  Q.  And then there came a time that Chief Pratcher
23  stepped down; right?
24  A.  Yes.

Page 24

1   Q.  And then he was replaced by Chief Boykin?
2   A.  Yes.
3   Q.  And you're saying that you got promoted while
4   Pratcher was still there; right?
5   A.  Yes.
6   Q.  And then Boykin came in shortly after; right?
7   A.  Yes.
8   Q.  I understand.
9       Now, records, was that called Support
10  Services commander?  Is that the official title of it?
11  A.  Yes.
12  Q.  Now, in records, was part of your
13  responsibility sending Wilmington information into the
14  DelJIS system down in Dover?
15  A.  Not per se me, but that was one of the
16  functions that was performed in the division.
17  Q.  Right.  So people working under your command
18  had to perform that function?
19  A.  That's correct.
20  Q.  At the end of 2005, weren't there public
21  criticisms of the fact that inaccurate DelJIS
22  reporting was coming from the City of Wilmington that
23  was affecting the crime statistics for the State of
24  Delaware?

Page 25

1   A.  No.
2   Q.  Do you remember that?
3   A.  I remember that, but it wasn't inaccurate.
4   Q.  Not inaccurate.  They just hadn't got the
5   reports in yet?
6   A.  That's correct.
7   Q.  Is that fair to say?
8   A.  Before I took over Records Division, they
9   terminated three of the workers there because within
10  the department they had decided to go to a paperless
11  department, so, therefore, three persons was
12  terminated from Support Services because they thought
13  this paperless system was just going to be the answer
14  to everything.  It should have did the job analysis
15  because it never worked and, in fact, that because
16  they were down three people, the work just escalated.
17  And it was a lot of work that didn't get done.
18  Q.  So you're saying that happened before you took
19  over in Support Services as commander?
20  A.  It was a little bit while I was there.
21  Q.  Well, you took over as Support Services
22  commander in the year 2001; is that correct?
23  A.  I would say so.  Around that time.
24  Q.  And are you saying that during your whole time

7 (Pages 22 to 25)

c4f527ae-c863-4e81-9786-b088c3aa7158

**A1396**

Dietz v. Baker, et al.
Gilbert R. Howell

Page 26

1  commanding Support Services there were difficulties in
2  getting the information into the DelJIS system?
3    A.  Yes.  We were -- we didn't have enough
4  personnel to handle that particular job aspect.  And
5  on top of that, they took away three.  So that made
6  things worse.
7    Q.  At the end of 2005 you were promoted to
8  inspector; right?
9    A.  Yes.
10   Q.  So I think you're saying that throughout your
11  term as the captain responsible for Support Services
12  from 2001 to 2005, your office wasn't able to fulfill
13  its duties in sending information into the DelJIS
14  system?
15       MS. CHEEK:  Objection to form.
16   A.  1904, 1905 records were not supplied for
17  DelJIS.
18   Q.  So I think you're saying -- you might have
19  misspoke.  The year 2004 and the year 2005 records had
20  not been submitted to DelJIS?  Is that what you are
21  saying?  You said 19 --
22   A.  Oh, yeah.  2004, 2005, right.
23   Q.  So those are the two years that DelJIS didn't
24  get the information from your office?

Page 27

1    A.  That's right.
2    Q.  Let's just go back.
3        Before that you were captain in Community
4  Affairs and Operations; is that right?
5    A.  Yes.
6    Q.  Were you the captain in Community Affairs and
7  Operations before or after you were the captain in
8  Internal Affairs?
9    A.  Before.
10   Q.  So between Community Affairs and Operations and
11  Support Services, that's when you served in Internal
12  Affairs; is that correct?
13   A.  Yes.  That was the first assignment that I had
14  when I was promoted to captain.
15   Q.  In community affairs, approximately how many
16  officers would you have been supervising?
17   A.  (No response.)
18   Q.  More or less than 50?
19   A.  Well, I had the lieutenants and each lieutenant
20  had a platoon, so it was around 50.
21   Q.  Now, as the uniformed operations inspector --
22   A.  Yes.
23   Q.  -- what functions reported to you?
24   A.  Uniform -- Uniform Service Division, so the

Page 28

1  Communications Division reports to me, Support
2  Services reports to me, Patrol Division, and Special
3  Operations.
4    Q.  So the Community Services Division reports
5  directly to you; right?
6    A.  Mm-hmm.
7    Q.  And you were the captain there once; right?
8    A.  Yes.
9    Q.  The Support Services Division reports to you
10  and you were the captain there; right?
11   A.  Yes.
12   Q.  Then the patrol function reports to you?
13   A.  Yes.
14   Q.  Approximately how many uniformed officers does
15  Wilmington have at this time, today?
16   A.  We have about 329.
17   Q.  Did you say 329?
18   A.  Yes.
19   Q.  How many officers are there in the patrol
20  function that is under you?
21   A.  I would say about 310.
22   Q.  Now Special Ops., Special Operations, what is
23  Special Operations?
24   A.  Special Operations is the division that deals

Page 29

1  with Special Operations.  Something would come up and
2  they would handle it, affairs, community affairs,
3  functions like that, or under community affairs is
4  Traffic Division and a lot of the details that's
5  involved in Special Operations entails traffic.  So
6  traffic is also a subdivision of Special Operations.
7    Q.  Okay.  So Special Operations isn't like the
8  SWAT team or something like that?
9    A.  No.
10   Q.  Where is the Criminal Division in all of this?
11   A.  That's on the other side of the house.  That's
12  on the uniformed -- I mean on the investigative side
13  of the house.
14   Q.  So the whole Criminal Division is over on the
15  investigative side of the house?
16   A.  That's correct.  Along with HR.
17   Q.  HR is over on that side, too?
18   A.  Yes, sir.  Along with vice.
19   Q.  Vice.
20   A.  And along with Office of Professional
21  Standards.
22   Q.  And the SWAT team is over on that side, too?
23   A.  Yes.
24   Q.  But traffic is over on your side?

8 (Pages 26 to 29)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1397

Dietz v. Baker, et al.
Gilbert R. Howell

Page 30

```
 1   A.  Yes.
 2   Q.  And patrol is over on your side?
 3   A.  Yes.
 4   Q.  Okay.  Thanks.
 5       Oh, here is something.  I want to show you,
 6  this is a confidential page, it's page D-3175.  It
 7  looks like it was prepared by you.  Why don't you take
 8  a quick look at that.
 9   A.  (The witness reviews the document.)
10       MS. CHEEK:  I'm going to object because
11  this is not a complete document.
12       MR. NEUBERGER:  No.  I understand.
13  BY MR. NEUBERGER:
14   Q.  Here is the whole document if you want to look,
15  but I'm just going to ask you if this is something you
16  prepared.
17   A.  Yes, sir.
18   Q.  Right.  Is that something you prepared?
19   A.  Yes, sir.
20   Q.  And was it accurate when you prepared it?
21   A.  Yes, sir.
22   Q.  This page here, 3175, it lists a bunch of
23  assignments you had and gives some dates.  Do you see
24  that?
```

Page 31

```
 1   A.  Yes.
 2   Q.  So would those dates be accurate?
 3   A.  Yes.
 4   Q.  Okay.  Thanks.
 5   A.  More accurate than --
 6   Q.  Your memory today?
 7   A.  Yes.
 8   Q.  Okay.  Thanks.
 9       MR. NEUBERGER:  Counsel, what I would like
10  to do is I'm going to start going into his personnel
11  records, so why don't we seal the deposition from this
12  point forward?  Is that okay?
13       MS. CHEEK:  Yes.
14       MS. BUTCHER:  Yes.
15           - - - - -
16
17
18
19
20
21
22
23
24
```

Page 32

```
 1
 2
 3
 4
 5
 6
 7
 8
 9   PAGES 33 TO 98 OF THIS TRANSCRIPT
10
11   HAVE BEEN DEEMED TO BE CONFIDENTIAL
12
13   BY THE PARTIES AND CAN BE FOUND IN A
14
15   SEALED ENVELOPE AT END OF THIS
16
17   TRANSCRIPT.
18
19
20
21
22
23
24
```

Page 33

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

9 (Pages 30 to 33)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1398

# SEALED DOCUMENTS (A1399 - 1414)

Dietz v. Baker, et al.
Gilbert R. Howell - CONFIDENTIAL

Page 98

1
2
3
4
5                                                      ,
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24          -----

Page 99

1          INDEX TO TESTIMONY
2

GILBERT R. HOWELL                    PAGE
3
4    Examination by Mr. Neuberger        2
5
6          -----
7
         INDEX TO EXHIBITS
8
9
     (No exhibits marked for identification.)
10
11
           -----
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 100

1
2
3
4
5
6
7
8          REPLACE THIS PAGE
9
10         WITH THE ERRATA SHEET
11
12         AFTER IT HAS BEEN
13
14         COMPLETED AND SIGNED
15
16         BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 101

1    State of Delaware )
2                     )
3    New Castle County )
4
5
6          CERTIFICATE OF REPORTER
7
8          I, Kathleen White Palmer, Registered
     Professional Reporter and Notary Public, do hereby
9    certify that there came before me on the 5th day of
     April, 2007, the deponent herein, GILBERT R. HOWELL,
10   who was duly sworn by me and thereafter examined by
     counsel for the respective parties; that the questions
11   asked of said deponent and the answers given were
     taken down by me in Stenotype notes and thereafter
12   transcribed into typewriting under my direction.
13         I further certify that the foregoing is
     a true and correct transcript of the testimony given
14   at said examination of said witness.
15         I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
16   interested in the event of this suit.
17
18
19
20
21   Kathleen White Palmer, RPR, RMR, CLR
     Certification No. 149-RPR
22   (Expires January 31, 2008)
23
     DATED:  April 9, 2007
24

26 (Pages 98 to 101)

c4f527ae-c863-4e81-9786-b088c3aa7158

A1415

# NANCY S. DIETZ    300 N. Walnut Street, Wilmington, Delaware 19801 (302) 576-3193

## PROFESSIONAL EXPERIENCE AND ASSIGNMENTS



**1997 – PRESENT**
*Captain*
- Commanding Officer, Human Resources Division 11/05
- Commanding Officer, Office of Professional Standards 10/01
- Commanding Officer, Criminal Investigations Division 3/97

**1991 – 1997**
*Lieutenant*
- Commander of Criminal Investigations Platoon 6/95
- Deputy Commander of Human Resources Division 2/93
- Commander of Patrol Platoon in Uniformed Services 11/91

**1989 – 1991**
*Sergeant*
- Investigator for the Office of Professional Standards 10/90
- Supervisor of Patrol Platoon Squad in Uniformed Services 7/89

**1980 – 1989**
*Patrol Officer / Detective*
- Investigator in the Criminal Investigations Division 5/84
- Investigator in the Drug, Organized Crime & Vice Division 81'
- Patrol Officer in the Patrol Division 6/80

## EDUCATION

| 2005 | *Wilmington College* | New Castle, De. |
|---|---|---|
| | Currently enrolled in Graduate Degree Program | |
| | Leadership & Administration in Administration of Justice GPA 4.0 | |

| 1975 – 1979 | *Pennsylvania State University* | State College, Pa. |
|---|---|---|
| | Bachelor of Science Degree, Administration of Justice | |

| 1987 | *FBI National Academy* | Quantico, Virginia |
|---|---|---|
| | University of Virginia GPA 3.93 | |

D02241

Confidential

**A1416**

## PAST SPECIAL ASSIGNMENTS / POSITIONS

- Commander, 83rd Wilmington Police Academy
- Commanding Officer, 91st Wilmington Police Academy 06'
- Chairperson, United Way Campaign for Wilmington Police
- Chairperson, Special Olympics Campaign & Torch Run
- Team Member, Crisis Management Hostage Negotiation Team 85'- 90'
- Team Leader, Crisis Management Hostage Negotiation Team 90'- 97'
- Member, Governor's Task Force for the Homeless 9/91' (Castle)
- Attorney General's Special Investigations Unit 86' (Oberly)
- Representative, Juvenile Justice Advisory Board
- Representative, Child Death Review Commission
- Representative, Children's Advocacy Center
- Representative, Child Abuse Intervention Committee
- Representative, U.S. Attorney's Integrated Firearms Reduction Committee
- Representative, U.S. Attorney's Nuisance Property Committee
- Representative, Justice of the Peace Court Liaison 98'
- Representative, Governor's Task Force, Operation Safe Streets
- Past President, F.B.I. National Academy Associates, Maryland/De. Chapter
- Past Secretary/Treasurer, F.B.I. National Academy Associates, Maryland/De. Chapter
- Certified Polygraph Examiner in 1989

## CURRENT POSITIONS / MEMBERSHIPS

- YMCA Resource Center, Board Member
- Senator Biden's Military Service Academy Selection Committee
- Big Brother / Big Sister Organization, United Way
- Delaware Council on Crime and Justice
- Delaware Association of Police
- Pennsylvania State University Alumni Association
- International Association of Police Chiefs
- F.B.I. National Academy Associates, Maryland/Delaware Chapter
- Guest Speaker, Wilmington College, Women in Criminal Justice 5/05
- Instructor, Wilmington Police Academy
- Guest Instructor, University of Delaware, Continuous Education 3/05

## AWARDS

- Kiwanis Outstanding Service Award 82'
- Police Marksmanship Distinguished Shooting Award 80'
- 9 Department Medals
- 27 Police, Citizen and Organization Commendations

D02242

Confidential

**A1417**

- 3 Resolutions from Wilmington City Council

## PERSONAL
Married to Marlyn Dietz, has two children, Katie 17 years old, & Madison, 13 years old.

D02243

Confidential

**A1418**

# SEALED
# DOCUMENTS
# (A1419 - 1439)

18,24,35,40). Interestingly, a female has never held the rank of Inspector in the WPD. (Compl. & Ans. ¶85; Szczerba 23-4; Baker 27; Montgomery 64; Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba Ex. 2).

In January of 2006, plaintiff learned that she was the victim of racial discrimination for promotion to the rank of Inspector both in 2001 and 2005. After giving deposition testimony in another lawsuit, Szczerba approached plaintiff to explain that in October of 2005, he had specifically recommended her to Baker for promotion to Uniformed Operations Inspector. (Szczerba 237; Dietz Inter. Response #2 p._; Szczerba deposition testimony in Boyd v. Wilmington Police Department, 05-178-KAJ, January 23, 2006, p.5-6). Plaintiff then inquired as to why she did not receive the promotion. Szczerba stated Baker's appointment was based on race only and it had nothing to do with her personally or her qualifications. His explanation was simply that it was a black position.

**Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination.**

Through Baker's own admissions and testimony of those who worked closely with him during the time period the promotion decisions at issue were made, the record contains abundant evidence which a reasonable jury can accept to conclude that the denial of these two promotions were discriminatory. Both circumstantial and direct evidence of illicit intent exists, such as:

1. Baker admitted to then FOP Vice-President George Collins in October of 2005 that the Inspector position had to be given to a black. (Collins 9,11).

2. Szczerba testified that Public Safety Director James Mosley inquires into the race of every candidate for promotion and with regard to any transfers. (Szczerba 208-9). Baker admits Mosley may be inquiring into the race of these candidates to promote diversity in the workforce. (Baker 30,37; Montgomery 24).

3. Baker admits that department decision makers are to consider diversity when promoting candidates who are of equal caliber, especially when the existing positions are filled by all whites. (Baker 33-35; Montgomery 11-17).

4. Baker admits that he took into consideration various recommendations from the community and City Council members in appointing Howell to Inspector. (Baker 72-74). However, Baker also admitted that the recommendations for Howell came from the

15



DEPOSITION
EXHIBIT
Dietz 20
RH 5/4/07

| Name | Title | Dates of Active Duty | Race |
|------|-------|---------------------|------|
| Keith Ash | Inspector of Uniformed Operations | 3/7/97 to 2/20/98 | African-American |
| Michael A. Boykin | Inspector of Investigative Operations | 11/4/95 to 3/23/97 | African-American |
| Charles E. Bryan, III | Inspector of Operations | 12/15/78 to 9/28/81 | White |
| Lawrence H. Curtis | Inspector of Operations | 10/14/81 to 4/29/83 | White |
| R. Michael Dixon | Inspector of Uniformed Operations | 2/5/93 to 9/22/95 | African-American |
| John G.P. Doherty | Inspector of Services | 1/29/83 to 6/16/85 | White |
| John G.P. Doherty | Inspector of Staff Inspections | 6/17/85 to 6/6/86 | White |
| Martin Donohue | Inspector of Investigative Operations | 7/31/99 to present | White |
| Charles A. Dougherty | Inspector of Administration | 5/16/83 to 6/30/89 | White |
| William Draper | Inspector of Administration | 5/8/89 to 10/28/94 | White |
| Stanley Friedman | Inspector of Administration | 4/3/79 to 6/30/83 | White |
| Preston J. Hickman | Inspector of Community Services | 9/30/87 to 12/27/88 | African-American |
| Preston J. Hickman | Inspector of Operations | 12/28/88 to 7/7/89 | African-American |
| Gilbert Howell | Inspector of Uniformed Operations | 10/29/05 to present | African-American |
| Ronald Huston | Inspector of Investigative Operations | 5/27/99 to 7/30/99 | White |
| John W. Johnson | Inspector of Staff Inspections | 10/14/81 to 6/16/85 | African-American |
| John W. Johnson | Inspector of Community Services and Community Affairs | 6/17/85 to 8/11/85 | African-American |
| John W. Johnson | Inspector of Uniformed Services | 8/12/85 to 3/29/87 | African-American |
| John W. Johnson | Inspector of Community Services | 3/30/87 to 7/31/87 | African-American |

065366.1001

**A1441**

| | | | |
|---|---|---|---|
| Richard LaFashia | Inspector of Administration | 2/8/89 to 5/12/89 | White |
| Eugene G. Maloney | Inspector of Services | 10/26/75 to 2/15/81 | White |
| Eugene G. Maloney | Inspector of Staff Inspections | 2/16/81 to 10/13/81 | White |
| Eugene G. Maloney | Inspector of Services | 10/14/81 to 7/1/83 | White |
| Kenneth Miles | Inspector of Services | 7/6/78 to 10/13/81 | African-American |
| John T. Murray | Inspector of Investigative Operations | 3/22/97 to 5/26/99 | White |
| Donald Payne | Inspector of Operations | 5/16/83 to 8/11/85 | White |
| Donald Payne | Inspector of Criminal Investigations | 8/12/85 to 3/29/87 | White |
| Donald Payne | Inspector of Operations | 3/30/87 to 9/13/87 | White |
| Samuel D. Pratcher | Inspector of Operations | 7/3/89 to 1/7/93 | African-American |
| Guy Sapp | Inspector of Operations | 9/30/87 to 12/21/88 | White |
| James Stallings | Inspector of Uniformed Operations | 2/20/98 to 2/16/01 | African-American |
| John P. Vignola | Inspector of Investigative Operations | 10/29/94 to 11/3/95 | White |
| John P. Vignola | Inspector of Uniformed Operations | 11/4/95 to 3/7/97 | White |
| James Wright | Inspector of Uniformed Operations | 2/17/01 to 10/28/05 | African-American |

065366.1001

**A1442**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MAYOR JAMES M BAKER, | : | C.A.No.06-256-SLR |
| individually and in his official capacity | : | |
| as the Mayor of the City of Wilmington, | : | |
| and the CITY OF WILMINGTON, a | : | |
| municipal corporation, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANT JAMES BAKER'S FIRST SET OF INTERROGATORIES

Plaintiff, by and through her attorneys, hereby objects to Defendant James Baker's First

Set of Interrogatories Directed to Plaintiff ("Interrogatories") in accordance with the numbered

paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses

contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement her

responses at a later time as discovery is completed.

## GENERAL OBJECTIONS

1.       Plaintiff objects to Defendant's Interrogatories to the extent they purport to

impose an obligation on Plaintiff or to require the disclosure of information in a manner that

exceeds the requirements of Rules 26 and 33 of the Federal Rules of Civil Procedure or the case

law in the Third Circuit.

2.      Plaintiff objects to Defendant's  Interrogatories to the extent they seek the disclosure of information that is protected from disclosure by the attorney-client privilege or other privilege, and/or the work product doctrine, and/or the protection afforded by attorney-client work product, and/or the deliberative process, and/or the protection afforded mental impressions, conclusions, opinions, legal research, or legal theories of one or more attorneys and/or representatives of the Plaintiff concerning the litigation, and/or any other applicable privileged or doctrine.

3.      Plaintiff objects to Defendant's  Interrogatories to the extent they seek the disclosure of information that is not relevant to the subject matter involved in the pending action, will not be admissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to Defendant's  Interrogatories to the extent they request information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.      Plaintiff objects to Defendant's  Interrogatories to the extent they request personal or confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

6.      Plaintiff objects to Defendant's  Interrogatories to the extent they do not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b).  Plaintiff will produce the indicated documents for inspection and

2

copying at a time and location to be agreed upon by the parties.

7.    Plaintiff objects to Defendant's Interrogatories to the extent they seek discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

8.    Plaintiff objects to Defendant's Interrogatories to the extent they request or call for information that is unduly burdensome to produce, are oppressive, and/or seek to require the making of an unreasonable investigation on Defendant's behalf or the discovery it seeks is already in the possession, custody or control of Defendants.

9.    Plaintiff objects to Defendant's Interrogatories to the extent that Defendant's definitions and instructions cause each interrogatory to ask multiple questions.

10.    Plaintiff objects to any and all Interrogatories to the extent that they request or call for the manner or method of proof at any hearing.

11.    Plaintiff objects to Defendant James M. Baker's Interrogatories directed to Plaintiff to the extent they violate paragraph 2(b) of the Rule 16 Scheduling Order in this case, which provides that each party may not propound more than 50 interrogatories to any other party. Interrogatory No. 2 consists of 12 subparts because it asks for two categories of information (that is (1) identify all communications related to the Actions between You and any other party to this action or their Affiliates and (2) describe all communications related to the Actions between You and any other party to this action or their Affiliates) for each of at least three communications. In addition, because your definition of "identify" with respect to a natural person (definition no. 12) requires three more categories of information (that is, (i)state the full person's full name; (ii) state

3

the person's present or last known business and residence address; and (iii) state the person's present or last known position and business affiliations), there are in effect three additional subparts for each at least three communications. Interrogatory No. 3 has 42 subparts because it asks for identification with respect to a natural person (which, as stated previously, is defined as asking for three categories of information) for each of fourteen persons identified in Plaintiff's Rule 26 Initial Disclosures.  Interrogatory No. 6 has eight subparts because your definition of "identify" when used in reference to an event or occurrence (definition no. 13) requires eight categories of information (that is, (a) state the time and date of the event or occurrence; (b) state the nature of the event or occurrence; (c) specify the place where the event or occurrence took place; (d) identify every participant in the event or occurrence; (e) identify every non-participating witness to the event or occurrence; (f) identify the person or persons of whom each and every participant and witness was a representative or agent; (g) identify each and every document, whether predating, postdating or contemporaneous with the event or occurrence, describing, referring to, used in connection with, or otherwise relating to such event or occurrence; and (h) describe the event or occurrence and, if it was a meeting, communication or statement, state the substance of the matters communicated or discussed. Interrogatory No. 7 has two subparts (that is, (a) identify and (b) describe all facts that support such contention). Interrogatory No. 8 has two subparts (that is, (a) identify and (b) describe all facts that support such contention). Interrogatory No. 13 has at least three subparts.  There are also seven other interrogatories, for a total of more than 76 interrogatories, including subparts.

12.    Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

4

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Plaintiffs object to Defendant's definitions and instructions insofar as they impose burdens on Plaintiffs beyond that required by the Federal Rules of Civil Procedure, or the case law in the Third Circuit.

2.      Plaintiff objects to Defendant's definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

3.      Plaintiff objects to Defendant's definitions and instructions to the extent they imply an obligation to supplement answers to Discovery which impose upon plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

4.      Plaintiff objects to Defendant's definitions and instructions insofar as they would require counsel for plaintiff to disclose their mental impressions, conclusions, opinions, or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

## CONDITIONS

1. Through this response, Plaintiff does not waive but rather preserves:

A. All objections as to competency, relevancy, materiality, privilege and admissibility as evidence for any purpose in subsequent proceedings.

B. The right to object to the use of any information which may be provided, or the subject matter thereof, in any subsequent proceedings or the trial of this or any other action on any grounds.

C. The right to object on any ground at any time to further discovery proceedings involving or relating to the subject matter of these Interrogatories.

5

D. The right at any time to revise, correct, supplement, clarify or amend this response in accordance with the Federal Rules of Civil Procedure.

2. All responses to Interrogatories are based on Plaintiff's best understanding of the Interrogatories and/or the terms used therein. Such responses cannot properly be used as evidence except in the context in which plaintiff understood the Interrogatories and/or the terms used therein.

3. These responses are not a representation or concession as to the relevance and/or relationship of the information to this action.

## ANSWERS AND OBJECTIONS TO SPECIFIC INTERROGATORIES (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1. Identify each person answering these interrogatories on Your behalf.

**Answer:** Plaintiff, Captain Nancy S. Dietz.

2. Identify and describe all communications related to the Action between You and any other party to this Action or their affiliates.

**Answer:** Objection. Overbroad, burdensome, not designed to lead to the discovery of admissible evidence. Without waiving the objection:

See all written communications found in D00001 through D03184 and P00001 through P00353.

In October of 2005, prior to the official announcement of Howell's promotion to Uniformed Operations Inspector in November, plaintiff requested a meeting with Public Safety Director Mosley. (Szczerba 232; Szczerba Ex. 12). Plaintiff made this request through the proper chain of command by requesting permission from her superior officer, Chief Szczerba.

6

(Szczerba 232,234-5). Plaintiff began hearing rumors circulating through the WPD that then Captain Howell was bragging about being promoted to Inspector. Plaintiff also heard rumors that the selection of Howell was made based on race because a black inspector was retiring, therefore the replacement had to be black. (Szczerba 233-4). As a result, plaintiff approached Szczerba regarding these rumors and requested a meeting with Mosley. (Mosley 39-40; Szczerba 234-5).

In this meeting, Mosley admitted to plaintiff that since his appointment in 2001 there has been a minority serving as the Uniformed Operations Inspector. (Mosely 41-42). Additionally, Mosley stated that when Baker made his selection, he argued against it. (Mosley 29,35-36,48). Also during this meeting, Mosley discussed with plaintiff the idea of meeting with the mayor directly regarding the promotion. (Mosley 40-41). Accordingly, on October 27, 2005, plaintiff met with Baker and Mosley at the Hotel DuPont for a breakfast meeting. (Baker 59; Mosley 40-41; D03181). To ensure Baker was aware of her experience, background and overall qualifications for promotion to the rank of Inspector, plaintiff brought a copy of her resume. (Szczerba Ex. 14). Baker merely commented on her resume and stated that it was very impressive and how all the staff was considered qualified.

3. Identify each person You expect to call as a witness at the trial of the Action, and with respect to each such person, state the substance of the facts to which each such person is expected to testify.

**Answer:** Objection. Delaware Local Rule 16.4(d)(7) does not require the disclosure of trial witness until three days prior to trial.

4. State the basis for Your contention in paragraph 20 of the Complaint that "since at least

7

1980, the City of Wilmington has used a racial quota system in selecting qualified persons for the promotion to the rank of Inspector."

**Answer**:

Historically, since 1978, the City of Wilmington has used a racial quota system in promoting individuals to the rank of Inspector. Inspector is the second highest rank in the WPD. In the past there have been either three or four Inspectors within the WPD. Currently, there are only two Inspector positions: Investigations Operations and Uniformed Operations.

After the race riots of 1968 in Wilmington, there were community pressures directed toward Mayor Hal Haskell and Chief John McCool for the appointment of an African-American Inspector. As a result, in 1969 they selected Andy Turner, an African-American, for promotion to the rank of Inspector. Inspector Turner was the first African-American ever to be selected to the rank of Inspector. Subsequently, upon his retirement, he was replaced by a white Inspector making all three Inspectors white.

Upon Harry Manelski's ascension to acting Chief of Police in 1976, all Inspectors were white. This again caused an uproar in the African-American community and they took to the streets in opposition by picketing Chief Manelski. Accordingly, in 1978, a meeting was held with Mayor William McLaughlin, his chief of staff, the city solicitor, Chief Manelski, and several African-American politicians and community representatives. At this meeting, it was agreed that a fourth Inspector position would be created for community relations and it would be filled by an African-American. Chief Manelski, however, would only promote a qualified individual, so in July of 1978 the WPD appointed Kenneth Miles, an African-American, to the rank of Inspector. By the end of 1978, the WPD also promoted Stanley Friedman and Charles Bryan to join Eugene Maloney in the rank of Inspector, all white males. As a result, there were now four Inspectors, three of whom were white, and one black.

8

In 1982, Inspector Kenneth Miles retired and was replaced by John Johnson, another black male. From the time Kenneth Miles was appointed to the rank of Inspector in July of 1978 continuing to present day, anytime a black Inspector retires, he is automatically replaced by another African-American. This position has exclusively been held by and reserved for a black male. The chronological progression is quite telling.

| African-American Inspectors | | |
|---|---|---|
| **Name** | **Promotion Date** | **Retirement Date[1]** |
| Gilbert Howell | 10/29/05 | current |
| James Wright | 2/17/01 | 10/28/05 |
| James Stallings | 2/20/98 | 2/16/01 |
| Keith Ash | 3/7/97 | 2/20/98 |
| Michael Boykin | 11/4/95 | 3/6/97 |
| R. Michael Dixon | 2/5/93 | 9/22/95 |
| Samuel Pratcher | 7/3/89 | 1/7/93 |
| Preston Hickman | 9/30/87 | 7/7/89 |
| John Johnson | 10/12/81 | 12/12/87 |
| Kenneth Miles | 7/6/78 | 3/6/82 |

Likewise, since 1978 anytime a white Inspector retires, he is automatically replaced by another white. From 1978 to 1989, three of the four Inspector positions were consistently held by white males. Then when Inspector Donald Payne, a white male, retired in 1989, the WPD eliminated one Inspector position, leaving only three individuals with the rank of Inspector - Charles Dougherty, William Draper, and Preston Hickman. Of these three Inspectors, two were white males, Inspectors Dougherty

---

[1] Retirement date refers to the date of actual retirement and/or date of appointment to Chief of Police. Retirement date may not necessarily reflect the date the Inspector left office, but rather may reflect the date of retirement meaning he was no longer on the payroll and/or exhausting accrued leave.

A1451

and Draper, and one was a black male, Inspector Hickman. Subsequently, in 1990, upon Charles

Dougherty's retirement, the WPD reduced the number of Inspectors to only two, William Draper, a

white, and Samuel Pratcher, a black. Since then the one of the two Inspector positions has been

exclusively limited to a white male. Similar to the above chart, the chronological progression of white

Inspectors is also quite telling.

| White Inspectors since 1990 | | |
|---|---|---|
| **Name** | **Promotion Date** | **Retirement Date** |
| Martin Donohue | 7/31/99 | current |
| Ronald Huston | 5/22/99 | 7/30/99 |
| John Murray | 3/22/97 | 5/21/99 |
| John Vignola | 10/29/94 | 3/7/97 |
| William Draper | 5/8/89 | 10/18/94 |
| Richard LaFashia | 2/8/89 | 5/7/89 |
| Guy Sapp | 9/30/87 | 12/21/88 |
| Charles Dougherty | 7/2/83 | 3/3/90 |
| Donald Payne | 5/16/83 | 3/21/89 |
| John Doherty | 1/29/83 | 9/17/86 |
| Lawrence Curtis | 10/14/81 | 9/1/83 |
| Stanley Friedman | 4/3/78 | 2/24/84 |
| Charles Bryan | 12/15/78 | 2/16/82 |
| Eugene Maloney | 10/16/73 | 12/15/83 |

This chart illustrates that from 1978, no matter how many Inspector positions existed, if a white

Inspector retired, another white Inspector was promoted. This progression is even more apparent from

1990 forward when the WPD limited the Inspector positions to two. Beginning with Richard LaFashia's

retirement in May of 1989, if a white Inspector retired he was replaced within the same month by another

10

white Inspector, identical to the progression of black Inspectors.

The two progression charts above prove that since 1978, the WPD has effectively operated under a fixed quota system where 50, 33 or 25% of the positions had to be filled by a black, while the other available positions were filled by whites. Subsequently, when the WPD limited the Inspectors to only two in 1990, they have been operating under a fixed number quota system where 50% is reserved for whites, and the other 50% is reserved for blacks. As Szczerba testified he "always was aware that, within the Inspector rank, there was an African-American and a Caucasian." "Whether it's four, three or two Inspectors, they were never all the same race." (Former). Chief Manelski would explain that this result was intended since the WPD intentionally created one Inspector position to be held by a black.

5. State the basis for your contention in paragraph 20 of the Complaint that a "quota system has been approved by the Administrative Board of the City of Wilmington as set forth in § 4-200 of the Wilmington City Charter."

**Answer**: Discovery relating to this contention is still ongoing and Plaintiff is attempting to retrieve records from which the information can be ascertained. Plaintiff reserves the right to supplement this interrogatory answer.

6. Identify and describe the meeting with Public Safety director James Mosley set forth in paragraph 41 of the Complaint, including any matters discussed at the meeting.

**Answer**: See Response to Interrogatory No. 2.

7. If you contend or will contend that the Mayor has discriminated based on race, sex, religious affiliation, or ethnic background other than in relation to the facts and allegations of the pleadings, identify and describe all facts that support such contention.

11

**Answer**: Plaintiff makes no contention in this case that the Mayor discriminated against any individual(s) other than Plaintiff.

8. If you contend or will contend that the Mayor has a history of unconstitutional discrimination, identify and describe all facts supporting such contention.

**Answer**: Plaintiff makes no contention in this case that the Mayor discriminated against any individual(s) other than Plaintiff.

9. State all facts that support Your contention that the mayor and Defendants did not have a legitimate non-discriminatory reason for appointing Howell to the position of Inspector.

**Answer**:

**Plaintiff.**

Plaintiff is a 27 year veteran of the WPD. (Compl. & Ans. ¶6). She entered the police academy in 1980 after attaining her four year Bachelor's degree from Pennsylvania State University in Administration of Justice where she was on the dean's list. (Compl. & Ans. ¶9). Plaintiff moved up the ranks from patrol officer in 1980 and was eventually promoted to the rank of captain in 1997. (Compl. & Ans. ¶12). She now serves as the Commanding Officer of the Human Resources Division. (Compl. & Ans. ¶6). Plaintiff was awarded the honor of being only the second female officer in the WPD to ever be promoted to the rank of captain and currently she is the only female captain in the WPD. (Compl. & Ans. ¶7). Plaintiff has an noteworthy performance record, as well as numerous accolades and commendations. (Compl. & Ans. ¶14; Szczerba Ex. 3,5,16-19; Szczerba 127-38; P172-8,181-2,184-99,202,204,206-20,223-57,260-1,264-76). Current Chief of Police, Michael Szczerba testified that Plaintiff has an impeccable professional reputation, a reputation of the highest order. (Szczerba 102-104). As Montgomery stated, "I've always had a lot of respect for her." (Montgomery 55). At all times, plaintiff

12

was a diligent, honest, and loyal employee who performed her job in an exemplary manner. (Szczerba 109).

Plaintiff was qualified for promotion to Uniformed Operations Inspector in February of 2001 and October of 2005. (Compl. & Ans. ¶¶66,76; Baker 81; Szczerba 97,108-09,204-05; Montgomery 55-6,60). In fact, in 2005, Szczerba recommended plaintiff for promotion to Uniformed Operations Inspector as she was the most qualified person for that job. (Szczerba 97,108-9,214-15; Compl. & Ans. ¶¶68,78; Montgomery 21,42-43; Mosley 31-32). Szczerba thought plaintiff was clearly "the best candidate." (Szczerba 108). However, plaintiff was denied these two promotions because she is a white female.

**The Two Inspector Vacancies at Issue.**

In February of 2001, a vacancy for Uniformed Operations Inspector was created after James Stallings retired. (Compl. & Ans. ¶29; Baker 18-19; Szczerba 202-03; Mosley 18; Defendants Inter. Response[2] #1 p.3-4 and p.4-5). James Wright, a black male, was promoted to fill this vacancy. (Compl. & Ans. ¶30; Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba Ex. 2; Szczerba 22,64,202-5; Baker 19; Montgomery 19; Mosley 18,24). Then, in October of 2005, a subsequent vacancy for Uniformed Operations Inspector opened when James Wright retired. (Compl. & Ans. ¶31; Szczerba 200,206; Mosley 24-25). Plaintiff was included in the pool of qualified candidates for both of these vacancies. (Szczerba 97,108-09,203-05; Baker 81; Montgomery 55-6,60; Compl. & Ans. ¶¶66,76). In 2005, plaintiff actively sought promotion and was recommended to Mayor Baker for promotion by Szczerba. (Szczerba 97,214-7,221-22; Baker 65-6; Compl. & Ans. ¶¶68,78; Montgomery 21,25,42-43; Mosley 25,31-32,40). However, Baker appointed Gilbert Howell, a black male, instead. (Compl. & Ans. ¶31; Szczerba Ex. 2,12; Defendants Inter. Response #1 p.3-4 and p.4-5; Baker 16,149,49; Szczerba 22,27,75,96-97;

------

[2] Citations to "Defendants Inter. Response" refers to Defendant City of Wilmington's Responses and Answers to Plaintiff's First Set of Interrogatories Directed to Defendants and Defendant James M. Baker's Answers and Objections to Plaintiff's First Set of Interrogatories. (See D.I. 33 and 37).

Montgomery 20-22; Mosley 35). On both occasions the promotions went to less qualified African-American males. (Szczerba Ex. 2; Szczerba 97,108-9,214-15).

### The Wilmington Police Department Uses an Illegal Racial Quota System for All Promotions to the Rank of Inspector. See response to interrogatory # 4.

#### Plaintiff's Prima Facie Case.

1. **Count Two - Race Discrimination.** Plaintiff can easily prove her prima facie case for race discrimination. She is white. (Compl. & Ans. ¶70; *see* Szczerba 214). Admittedly, plaintiff was qualified for the position of Uniformed Operations Inspector both in 2001 and 2005. (Szczerba 204-5,214; Baker 81; Montgomery 55,60; Compl. & Ans. ¶¶66,76). In fact, Szczerba testified that in 2005 she was the most qualified person for the job and, in his mind, was more qualified for the position than Gilbert Howell. (Szczerba 97,108-9,213-14). Plaintiff was denied promotion to Inspector in 2001 and again in 2005 when the positions were ultimately given to James Wright and Gilbert Howell, both African-Americans. (Compl. & Ans. ¶71; Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba Ex. 2; Szczerba 22,27,64,75,96-97,202-05; Baker 16,18-19,49; Montgomery 19-22; Mosley 18,24,35,40).

2. **Count Three - Gender Discrimination.** Likewise, plaintiff can easily prove her prima facie case for gender discrimination. She is female. (Compl. & Ans. ¶80; *see* Szczerba 214). Admittedly, plaintiff was qualified for the position of Uniformed Operations Inspector both in 2001 and 2005. (Szczerba 204-5, 214; Baker 81; Montgomery 55,60; Compl. & Ans. ¶¶66,76). In fact, Szczerba testified that in 2005 she was the most qualified person for the job and in his mind was more qualified for the position than Gilbert Howell. (Szczerba 97,108-9,213-14). Plaintiff was denied promotion to Inspector in 2001 and again in 2005 when the positions were ultimately given to James Wright and Gilbert Howell, both males. (Compl. & Ans. ¶71; Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba Ex. 2; Szczerba 22,27,64,75,96-97,202-05; Baker 16,18-19,49; Montgomery 19-22; Mosley

14

18,24,35,40). Interestingly, a female has never held the rank of Inspector in the WPD. (Compl. & Ans. ¶85; Szczerba 23-4; Baker 27; Montgomery 64; Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba Ex. 2).

In January of 2006, plaintiff learned that she was the victim of racial discrimination for promotion to the rank of Inspector both in 2001 and 2005. After giving deposition testimony in another lawsuit, Szczerba approached plaintiff to explain that in October of 2005, he had specifically recommended her to Baker for promotion to Uniformed Operations Inspector. (Szczerba 237; Dietz Inter. Response #2 p._; Szczerba deposition testimony in Boyd v. Wilmington Police Department, 05-178-KAJ, January 23, 2006, p.5-6). Plaintiff then inquired as to why she did not receive the promotion. Szczerba stated Baker's appointment was based on race only and it had nothing to do with her personally or her qualifications. His explanation was simply that it was a black position.

**Fuentes Prong 2 - The Weight of the Evidence Proves Discrimination.**

Through Baker's own admissions and testimony of those who worked closely with him during the time period the promotion decisions at issue were made, the record contains abundant evidence which a reasonable jury can accept to conclude that the denial of these two promotions were discriminatory. Both circumstantial and direct evidence of illicit intent exists, such as:

1. Baker admitted to then FOP Vice-President George Collins in October of 2005 that the Inspector position had to be given to a black. (Collins 9,11).

2. Szczerba testified that Public Safety Director James Mosley inquires into the race of every candidate for promotion and with regard to any transfers. (Szczerba 208-9). Baker admits Mosley may be inquiring into the race of these candidates to promote diversity in the workforce. (Baker 30,37; Montgomery 24).

3. Baker admits that department decision makers are to consider diversity when promoting candidates who are of equal caliber, especially when the existing positions are filled by all whites. (Baker 33-35; Montgomery 11-17).

4. Baker admits that he took into consideration various recommendations from the community and City Council members in appointing Howell to Inspector. (Baker 72-74). However, Baker also admitted that the recommendations for Howell came from the

15

northeast area of Wilmington, which is predominately black, and the City Council members who recommended Howell were all African-American. (Baker 72-74).

5. Since 1978, there have never been Inspectors all of the same race. The WPD has historically reserved one Inspector position for an African-American male. (Defendants Inter. Response #1 p.3-4 and p.4-5; Szczerba 11; see Baker 39). Likewise, all other Inspector positions have been limited to white males. (Id). Thus, when a vacancy is created by a white male, the position is filled by another white male and when a vacancy is created by a black male, the position is automatically filled by a black male.

6. Since 1990, when the WPD decreased the number of Inspectors to two, it has operated under a fixed number quota where 50% is reserved for whites and 50% is reserved for blacks. (Defendants Inter. Response #1 p.3-4 and p.4-5; Baker 39). Further, Since Baker took office in 2001, this has been the result of his appointments to the rank of Inspector. (Montgomery 29-30; Mosley 41-43; see Baker 8).

7. Szczerba testified that the procedure for promoting Gilbert Howell in 2005 was procedurally irregular and unprecedented. (Szczerba 207). In 2001, Szczerba was able to make a meaningful recommendation to the mayor for the promotion to Uniformed Operations Inspector. (Szczerba 202-6). However, in 2005, when Szczerba was going to recommend a white female for promotion to Inspector, Baker made it exceedingly clear to Szczerba, that he would be making the decision regardless of Szczerba's recommendation. (Szczerba 201-2,205; Baker 64).

8. A female has never held the rank of Inspector in the WPD. (Compl. & Ans. ¶85; Szczerba 23-24; Baker 27; Defendants Inter. Response #1 p.3-4 and p.4-5).

**Fuentes Prong 1 - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case.**

An extremely telling **weakness** and **contradiction** in defendants' reason for promoting Howell is that Montgomery testified Baker promoted Howell, an African-American, to promote diversity. (Montgomery 24-26;62-64). Montgomery admitted that Howell's race "may have been one of the factors" and Baker selected Howell, among other reasons, to "have some diversity in the work force." (Montgomery 24-25). "I do believe that [diversity] is one of the reasons and that's something that we look at when we look for anyone to serve in an appointed position." (Mongtomery 64).

Yet perhaps the most telling **weakness** and **contradiction** in the defendants' non-discriminatory reason for promoting Gilbert Howell in 2005 is that Baker's own Public Safety Director, James Mosley,

16

and Chief of Staff, William Montgomery, did not agree with the appointment of Howell. (Montgomery 6,10,60,65; Mosley 5,35-36,48). Additionally, the Chief of Police, whom Baker himself appointed, argued against the appointment of Howell. (Szczerba 8,193,217,220-21; Baker 43,56). Interestingly, three of the four people who met to discuss the Inspector vacancy did not want Howell to be appointed to Uniformed Operations Inspector. (Szczerba 8,193,217,220-21; Montgomery 40-41,60,65; Mosley 28,35-36). It is **implausible** that Baker promoted Howell because he was the most qualified individual in light of the fact that Mosley, Montgomery and Szczerba did not feel he deserved or was capable of serving in that capacity.

In making his recommendation for promotion to Uniformed Operations Inspector, Szczerba attempted to set forth the reasons plaintiff would make an excellent Inspector, while also pointing out to the mayor potential problems the department would face if Howell was appointed. (Szczerba 216-17,221-22; Baker 65-66; Montgomery 42-43; Mosley 31-32). He explained in detail various factors explaining how plaintiff surpassed Howell in terms of qualification for this promotion. (Szczerba 222). These reasons help prove defendants' non-discriminatory reasons for promoting Howell, as well as Wright in 2001, are merely pretexual.

## Attendance Records

1.

2.

3.

4.

5.

17

# SEALED
# DOCUMENTS
# (A1460 - 1470)

12. State all facts that support Your contention in paragraph 33 that with regard to the

29

appointment of James Wright "because of the operation of the quota system, Chief Szczerba was forced to consider only African-Americans for promotion to this position, to the detriment of plaintiff."

**Answer**: See Response to Interrogatory No. 4.

13. State all facts not otherwise stated in Your responses to these interrogatories that support the allegations in Your claims against the Mayor and the Defendants, that support any other contention that You made or will make at trial.

**Answer**: Objection. Overbroad, burdensome, non-specific, and not designed to lead to the discovery of admissible evidence.  See also General Objection No. 11.


As to Objections:


**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated: April 13, 2007

Dietz, Nancy / Pleadings /Baker - First Interrogatory Responses.Final.wpd

30

## DECLARATION OF CAPTAIN NANCY DIETZ UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendant's Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.


_____
**CAPTAIN NANCY S. DIETZ**

_____
Date

31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENNETH A. BOYD,                    )
                                    )
          Plaintiff;                )
                                    )  Civil Action No.
v.                                  )  05-178 KAJ
                                    )
WILMINGTON POLICE DEPARTMENT,       )
                                    )
          Defendant.                )


          Deposition of MICHAEL J. SZCZERBA taken
pursuant to notice at the Law Offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 2:30 p.m. on Monday, January 23, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


APPEARANCES:

          JEFFREY K. MARTIN, Esquire
          LORI BREWLINGTON, Esquire
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19806
            on behalf of the Plaintiff;

          ROSAMARIA TASSONE, Esquire
          Assistant City Solicitor
            City of Wilmington Law Department
            Louis L. Redding City/Council Building
            800 North French Street - Ninth Floor
            Wilmington, Delaware  19801
            on behalf of the Defendant.


               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



1   ALSO PRESENT:

2            KENNETH BOYD

3                  - - - - -

4            MICHAEL J. SZCZERBA,

5       the witness herein, having first been

6       duly sworn on oath, was examined and

7       testified as follows:

8                  EXAMINATION

9   BY MR. MARTIN:

10    Q.    Good afternoon, Chief.  My name is Jeff Martin.

11  I am the attorney representing Ken Boyd in this

12  matter, and I have series of questions for you.

13            Let me first ask whether you're familiar

14  with the rules of depositions having gone through them

15  before.

16    A.    Yes, but it's been a while.

17    Q.    Let me just refresh you briefly, and that is,

18  first, I ask you to make all of your responses in a

19  audible fashion so the court reporter can take it down

20  rather than a nod or a shake of the head.  Try to

21  avoid mm-hmm or uh-huh, which is something that at

22  least I always lapse into, and if you do, I'll gently

23  remind to you, ask you whether that means yes or no.

24            I would ask you to listen carefully to



 1    each of the questions that I ask.  It's my intent to

 2    ask one question at a time.  And if you do not

 3    understand, need a clarification at all, please just

 4    ask for that and I'll be happy to rephrase the

 5    question.

 6       A.   Okay.

 7       Q.   If you need to have a break, need not tell us

 8    why.  You're the chief of police and sometimes chiefs

 9    have to go quickly.  I understand that.  I appreciate

10    the fact that you're here, and we'll try to do this

11    with as much dispatch as we can.

12             Chief, how many years have you served with

13    the Wilmington Police Department?

14       A.   27.

15       Q.   And you were promoted to sergeant and

16    lieutenant, is that correct?

17       A.   That's correct.

18       Q.   Do you remember the years of your promotions to

19    sergeant and lieutenant?

20       A.   Sergeant in '89, and I believe lieutenant in

21    '99.

22       Q.   And then after '99, were you appointed to

23    captain?

24       A.   No.



A1476

1    Q.   Went from lieutenant to chief?

2    A.   That's correct.

3    Q.   And you were appointed chief by then Mayor

4    Baker?

5    A.   Yes.

6    Q.   And just for my clarification purposes, I

7    understand that officers moving from corporal to

8    sergeant are promoted as well as those moving from

9    sergeant to lieutenant are promoted, is that correct?

10    A.   That's correct.

11    Q.   And I further understand that, beyond that,

12    it's a matter of appointment rather than promotion?

13    A.   No.  The captains are promoted positions.

14    Q.   Is that done with the benefit of the Management

15    Scientist program or no?

16    A.   No.

17    Q.   How is it that captains are promoted?

18    A.   Captains are promoted with selection by the

19    chief of police.

20    Q.   You're saying that's something different from

21    an appointment by the chief of police?

22    A.   That's correct.  It's -- according to our rules

23    and regulations, it's considered a promotion, and I

24    think contractually it's considered a promotion.



1     Q.    And is there any type of banding process that's

2     done for sergeants and lieutenants?

3     A.    Yes.

4     Q.    And who does the banding process for captain?

5     A.    It's not banded.  It's the eligible

6     lieutenants.

7     Q.    So, in other words, it was only the lieutenants

8     that could be promoted; it's not somebody moving from

9     sergeant up to captain?

10    A.    That's correct.

11    Q.    And then beyond that, there is the position of

12    inspector.  Is that an appointment?

13    A.    Yes.

14    Q.    And who exercises that appointment?

15    A.    The mayor of the City of Wilmington through the

16    recommendation of the chief of police.

17    Q.    And then the position of chief is also by the

18    mayor of the City of Wilmington?

19    A.    That's correct.

20    Q.    Now, we have just had an opportunity to take a

21    deposition of Inspector Howell.  He was, as I

22    understand it, was just appointed in October of '05,

23    is that correct?

24    A.    That's correct.



A1478

1      Q.   And did you recommend him to Mayor Baker for

2    appointment?

3      A.   No, I did not.

4      Q.   And who was it that you recommended for

5    appointment?

6      A.   Another captain.

7      Q.   Was that Captain Nancy Deitz?

8              MS. TASSONE:   I'm just going to, again,

9    object just for the record to this line of

10   questioning.

11             MR. MARTIN:   Sure.  Sure.  You have a

12   blanket objection on that.  That's fine.

13             MS. TASSONE:   You can answer.

14     A.   The answer to your last question is yes.

15   BY MR. MARTIN:

16     Q.   And what was the basis for recommending Captain

17   Deitz over then Captain Howell?

18     A.   The recommendation was based upon her ability

19   to lead which I believer her ability to lead that the

20   men and women of the Wilmington Department of Police

21   would follow, just her overall leadership qualities.

22   And those leadership qualities would be the ability to

23   make decisions, to recognize problems, her

24   communicative skills, respect by peers and

1    supervisors, self-initiated activity, planning,

2    organizational skills, so on, so forth.

3       Q.   Were there any other candidates for inspector

4    other than Howell and Deitz?

5       A.   Yes.  Essentially would have been the -- all

6    eight of the captains.

7       Q.   Do you know why it was that Mayor Baker

8    selected Captain Howell over your choice of Captain

9    Dietz?

10      A.   No, I do not.

11      Q.   Did you ever discuss that with the mayor?

12      A.   No.

13               I want to clarify that as far as

14   discussion.  I brought my recommendation to the mayor.

15   He accepted my recommendation and then decided not to

16   go with that.  So there was no explanation as to why

17   he selected someone else over Captain Deitz or over

18   really, as a matter of fact, any other captain that

19   was available.

20      Q.   Now, I'd like to understand your role as chief

21   in terms of the promotions to sergeant and lieutenant.

22   First of all, I want to get an explanation of the

23   process that is done to an extent by an outside

24   agency, is that correct?



A1480

1    A.    That's correct.

2    Q.    Do I understand that they do that pursuant to

3    Wilmington Police Department guidelines and requests?

4    A.    That's correct.

5    Q.    I understand that you instituted some type of

6    seniority point system into the selection process?

7    A.    Yes.  For seniority to be considered in the

8    computing of the final scores and placement of

9    individual officers within a particular band.  In

10   essence, I guess the short way of explaining it is

11   seniority could only help you.  It would not hinder

12   another officer per se, but an officer with seniority

13   points moving up from the third band into the second

14   band would then not knock someone out of that second

15   band.  It would just be an additional officer in that

16   second band.

17   Q.    So these seniority points are extra points that

18   might boost one from one band up to a higher band?

19   A.    That's correct.  If they are -- if all the

20   scores are computed for the written phase, the oral

21   interview phase, and the resume phase, the bands are

22   set, and then the seniority points are added at that

23   point to see if there's any movement within the list.

24   Q.    And the seniority points, as I understand it,



1    are used to place the candidate into a particular

2    band?

3        A.    That's correct.  It can possibly move a

4    candidate from one band to the next highest band.

5        Q.    Once inside a particular band, the seniority

6    points don't have any particular effect, is that fair

7    to say?

8        A.    That's fair to say, and neither do any of the

9    other points.

10       Q.    Once you're in a band, that's it.  Then you

11   make the selection from the band?

12       A.    Yes.  The recommendation from the consultant

13   is, at that point, all the individuals within a

14   particular band are of equal supervisory quality.

15       Q.    And do you as police chief or anybody in the

16   Wilmington Police Department, for that matter, have

17   any role in selecting the bands of the various

18   candidates?

19       A.    No.

20       Q.    That's all done by this outside agency?

21       A.    That's correct.

22       Q.    Have you had a situation where this outside

23   agency made an error, for example, a calculation error

24   and, you know, one person appeared in one of the bands



1    and should have been in quite another band?

2        A.   I have not had that experience.

3        Q.   Do you have any kind of recourse to adjust that

4    band when you find some type of error?

5        A.    If that was brought to the attention, there is

6    the availability of appeal.  For example, on the

7    written test, for -- appeal certain written questions

8    which were submitted in writing, and then they are

9    evaluated by the consultant, and the decision is made

10   then.

11       Q.   Okay.

12       A.   But as far as any appeal of one moving by way

13   of appeal where there was a mistake made in moving

14   from one band to another, I'm not aware of that.

15       Q.   Now, let's talk about how you select candidates

16   within each band.  As I understand your testimony,

17   once you're in the band, all those seniority points

18   and any other points go out the window.  All the

19   people are considered equal?

20       A.   Yes.

21       Q.   And then it's up to you as chief to make that

22   selection, correct?

23       A.   That is correct.

24       Q.   Before you make that selection from a band --



1    and we are just talking generically here.  We'll talk

2    in a few minutes specifically about Officer Boyd.

3    What do you do to determine the most eligible

4    candidates within the band?

5      A.    I try to pick the person who I believe that the

6    men and women of the Wilmington Department of Police

7    would follow.  And I'll be repeating myself somewhat,

8    but taking into consideration the overall supervisory

9    capabilities, again, the ability to make decisions,

10   make independent decisions, communication skills,

11   their display of their initiative, self-initiation of

12   activity, the ability to go above and beyond.  Example

13   there would be participation in our crisis management

14   team, for example.  Again, respect by peers and

15   subordinates.  If there was something recently

16   happened disciplinary-wise, that would be taken into

17   consideration and, of course, their experience.

18            By experience, it's just not a matter of

19   the number of years you have at any particular job or

20   on the police department, it's what you have done with

21   what you have learned with that experience.

22     Q.    Now, how is it as chief you gather this

23   information?

24     A.    Through constant review of personnel on a daily



Michael J. Szczerba - Martin                    12

1    basis, an hour-by-hour basis, actually get feedback

2    from supervisors. All investigations come across my

3    desk. There's a yearly performance evaluation

4    submitted by supervisors that are signed off by

5    myself.

6        Q.   As you're going to select from Band I, for

7    example, and let's say there are three candidates in

8    there, do you make it a point to talk to each of the

9    three candidates' supervisors?

10       A.   No.

11       Q.   You have access to their personnel files?

12       A.   Yes, I do.

13       Q.   You review those files?

14       A.   No.

15       Q.   You said that you do this hour by hour, meaning

16   that, at your desk, you see all kinds of complaints

17   and performance reviews, et cetera, that go through?

18       A.   That's correct.  Investigative reports,

19   supervisor evaluations, miscellaneous investigations,

20   reports, daily memorandums, the full gamut.  People

21   that are -- review of reports that are submitted by

22   our medical dispensary.

23       Q.   But as you prepare to select from a particular

24   band, you don't do anything specific with regard to



**A1485**

1    the candidates in the band?

2      A.    No.

3      Q.    This is just something that you keep in your

4    head based upon what you've seen happening in the last

5    year or years?

6      A.    Yes.

7      Q.    Now, is it fair to say, Chief, that, at least

8    for the first few years of your administration, that

9    you used a seniority system within the band for a

10   means of selecting the candidates?

11     A.    No.

12     Q.    Did you at any point use a seniority system for

13   the selection of candidates within a band?

14     A.    No.

15     Q.    So if I were to represent to you that Inspector

16   Howell sat in that seat just an hour ago and said that

17   he heard you on two or three occasions say that you

18   were going to follow a seniority system, you will

19   disagree with that?

20     A.    That's correct.

21          MR. MARTIN:  Might as well have this one

22   marked as an exhibit because I haven't done that yet,

23   and I probably should.  Let's have this marked

24   Szczerba 1.



A1486

1              (Szczerba Deposition Exhibit 1 was marked

2      for identification.)

3      BY MR. MARTIN:

4        Q.   Chief, I'm giving to you what has been marked

5      Szczerba 1 for this deposition, the document from

6      Management Scientist, dated April 15, 2002, addressed

7      to you, showing bands for all sergeant candidates.

8      Does that look familiar to you?

9        A.   Yes.

10       Q.   Let me direct your attention to Bands I and II

11     on this particular sheet of paper.  And I will

12     indicate to you that the numbers written there next to

13     the some names and Bands I and II were written by Ken

14     Boyd, and those numbers represent promotion dates of

15     various candidates.  Now.  If we look at Band I, do

16     you have any reason not to believe that Wyatt was the

17     first promoted, followed by Jones, and then Donohue?

18       A.   No.

19       Q.   Do you have any reason to believe that Wyatt

20     was more senior than Jones who was more senior than

21     Donohue?

22       A.   Technically, yes.  Wyatt would -- now knowing

23     him in hindsight, Wyatt with more time than Jones.

24     However, with Donohue, if you're -- I see it noted in

1    here in handwriting if you have the same list I do, it

2    has at that time she was not a cadet.  But which,

3    however she does have prior service under the police

4    department in a different capacity but not at a cadet.

5        Q.   She was actually a dispatcher, was she not?

6        A.   I believe she worked as a parking regulation

7    enforcement officer.  I believe she has some

8    experience as a supervisor in our support services

9    division, data entry, and that's all I'm aware of, but

10   she was not a cadet.

11       Q.   But that certainly would not count towards her

12   time and grade as a Wilmington police officer?

13       A.   Not as time and grade.  It would count for

14   vacation scheduling, and I guess towards retirement

15   because it would allow you to have a buy-in for the

16   add-on to your police time, military service, and

17   previous service with the city.  So in that essence,

18   yes, seniority does come into play there.

19       Q.   Let me go back.  A moment ago you denied that

20   you used the a seniority-based promotional system, is

21   that fair to say?

22       A.   That's correct.

23       Q.   And is it also your denial that you deny

24   telling other of your officers that you used seniority



A1488

1   to promote within a band?

2     A.    That's correct.

3     Q.    Are you aware of any type of misunderstanding

4   as to why other officers have come in here and

5   testified about seniority and you say it was not

6   seniority?

7             MS. TASSONE:  Objection.  I don't what

8   other individual --

9             MR. MARTIN:  I'm trying to understand.  I

10  mean, it's either -- I won't use the analogy black and

11  white.  That's probably very inept, but I mean, it's

12  180 degrees, you know, where you have an officer, your

13  number 2 man, Inspector Howell, who said he's heard

14  you on at least three occasions say it was seniority.

15            MS. TASSONE:  I'll object.  It

16  mischaracterizes -- it's not his testimony.

17            MR. MARTIN:  Well, that's fine.  You may

18  answer, Chief.

19            MS. TASSONE:  Yes.

20            MR. MARTIN:  We are trying to understand

21  this.

22    A.    It may have come up in discussions with

23  officers when you go over -- you can see this list,

24  for example, how it's marked up and officers trying to

1    gauge how picks are being made.  For example, it may

2    not also be spoken of as seniority.  They may try to

3    gauge, for example, myself -- oh, he served with him

4    and her in detectives and that's why they're picked,

5    or, look, these are all former A Platooners in the

6    patrol division.  So they try to -- I guess, in

7    discussions, try to fathom some type of system or how

8    the selections are being made.

9           It was brought to my attention one time of

10   a sergeant's candidate inquiring as to if this was

11   being done by seniority, who was subsequently

12   promoted.  But my response -- and I don't recall who

13   brought that to my attention -- my response was to

14   relay to that office it was not being done like that.

15   You have officers of varying service with the --

16   services with the department.

17          However, without having all of them from

18   the same class, you're going to -- same class I mean

19   same academy class -- you're going to have some

20   difference in their seniority with the police

21   department, some greatly and some just a matter of

22   years or matter of months.

23   BY MR. MARTIN:

24      Q.    As to Band I, though, do you dispute the



1    seniority of Wyatt, Jones, and then Donohue in

2    descending order?

3        A.    No, I do not.

4        Q.    Let's look at Band II, and in that band we have

5    O'Connor, being first promoted and then Sammons,

6    followed by Sullivan and Rodriguez.  Do you see that?

7        A.    Yes.

8        Q.    Do you have any question as to whether O'Connor

9    was the most senior person in Band II?

10       A.    Only through doing the research and looking it

11   up.  Other than that, if you brought me in here today

12   and asked me who was senior in these selections, I

13   would not be able to tell you.  But as a matter of

14   doing the research in preparation, yes, I know that he

15   was the most senior.

16       Q.    Okay.

17       A.    However, there's also another thing comes into

18   play too.  Again, I discussed, as in a situation with

19   Sergeant Donohue, also with Joe Sammons, he

20   technically, with service with the city and seniority,

21   would have been the most senior person and that would

22   include cadet time because he was a cadet.

23       Q.    So I'm sorry.  You're saying Joe Sammons had

24   more --



1     A.    Time with the city.

2     Q.    Than O'Connor?

3     A.    Yes.  I believe so.

4     Q.    That would be cadet time?

5     A.    Yes.

6     Q.    Striking the cadet time, O'Connor had more time

7     than Sammons, correct?

8     A.    Yes.

9     Q.    And then on Band II, beyond O'Connor and

10    Sammons, who had the next most seniority?

11    A.    I believe possibly Liam Sullivan, or they could

12    be out of the same class, he and Joe Sammons, again

13    meaning the academy class.

14    Q.    How about the seniority of Ken Boyd versus

15    Rodriguez?  Who had more seniority there?

16    A.    I believe Ken Boyd.

17    Q.    What can you tell me about your selection?

18    What factors entered into your consideration when you

19    selected Mike Rodriguez over Ken Boyd?

20    A.    Well, there wasn't a situation of Mike

21    Rodriguez over Ken Boyd.  It was Mike Rodriguez over

22    Ken Boyd, Steve Misetic, Robert Curry, Charles Emory,

23    Anthony Harris, and Ralph Hauck.  So it wasn't pitting

24    one candidate versus the other.  It was, again,



1    reviewing what I believed their supervisory abilities

2    are as compared to the rest of the people eligible.

3    So it's not a one on one, one candidate versus

4    another.  If it were two candidates on the list, yes,

5    that would be the situation.  But in this case, it is

6    not.

7       Q.    As you know, this case is about Ken Boyd not

8    being selected for sergeant.

9       A.    Yes.

10      Q.    You were the one who did that.  I'd ask you to

11   be brutally honest and candid with us, with me, and

12   tell me why Ken Boyd was not selected as sergeant?

13            MS. TASSONE:  First, I'm going to object

14   to any indication or implication, I should say, in

15   your question that the chief has not been honest up to

16   this point, meaning he took an oath and he's answering

17   your questions.

18            MR. MARTIN:  I don't dispute that.

19            MS. TASSONE:  Okay.  I just wanted to make

20   it clear for the record.

21            You can answer if you understand the

22   question.

23      A.    Well, my response would be a matter of why Mike

24   Rodriguez was selected, not as a matter of why Kenny



1    Boyd wasn't promoted, why a matter of the selection

2    wasn't Steve Misetic, why the selection wasn't Robert

3    Curry, why the selection wasn't Charles Emory, why the

4    selection wasn't Anthony Harris, why the selection

5    wasn't Ralph Hauck because it was presenting a

6    situation that those other candidates were not even

7    being considered.

8        Q.    Let us talk about Rodriguez and Boyd because in

9    terms of seniority, Chief, Boyd clearly had more

10   seniority than did Rodriguez.  I understand the

11   position that you're taking here today that you do not

12   use that, but could you please compare and contrast

13   the candidacies of Rodriguez versus Boyd?

14       A.    Mike Rodriguez, self-motivated, takes

15   self-initiated action.  He's a good communicator.

16   Recognized not only by his peers -- his peers and his

17   supervisors as a superb performer, recognized by the

18   Delaware League of Local Governments as the Police

19   Officer of the Year.

20       Q.    Let me ask you, if may -- I mean, if you want

21   to finish, that is fine, but I'd like to go back and

22   ask you about each one of those.  And I'm sorry I

23   didn't mean to cut you off.

24       A.    Okay.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.   Were there other qualifications that you can

2    think of?

3    A.   As communication skills, self-initiated action,

4    his willingness to go above and beyond, a member of

5    our crisis management team, better known as SWAT team.

6    Q.   Can you tell me how Mike Rodriguez was

7    self-motivated?

8    A.   I know from a period of him taking initiative

9    to always apply for training, his attending of college

10   courses and, I believe, attained a bachelor's degree

11   while on the police department, taking on his own

12   initiative Spanish classes to become more proficient

13   in Spanish, self-initiated in the ability to

14   investigate and especially as a drug investigator,

15   developing numerous search warrants, either through

16   complaint-related or, again, self-initiated with

17   working with informants.

18   Q.   Communication skills.

19   A.   Communication skills, I know he can put his

20   thoughts down in writing.  I witnessed his court

21   testimony before.  I witnessed his ability to

22   communicate at community meetings.

23   Q.   You said he was a superb performer?

24   A.   Yes.



```
 1        Q.   Is that measured by performance evaluations?
 2        A.   Yes.  Every officer is measured by performance
 3    evaluations.  It's a performance evaluation through
 4    the City of Wilmington for all employees on a yearly
 5    basis.
 6        Q.   Were his any different from, let's say, Officer
 7    Boyd's?
 8        A.   Probably not.  We have a tendency that -- to
 9    see with performance evaluations pretty much you're
10    ranked so closely on the ranking category of one to
11    five that it's usually not real significant changes
12    you can read in the supervisory comments -- in them
13    occasionally.
14        Q.   You said he was determined to be Police Officer
15    of the Year by the Delaware League?
16        A.   Yeah.  Delaware League of Local Governments.
17        Q.   Do you remember what year this was?
18        A.   Either in 2001 or 2002.  He was also recognized
19    by Kiwanis Club of Wilmington as a police officer of
20    the quarter and possibly of year, but I'm not sure of
21    the yearly award, but I know he was police officer of
22    the quarter.
23             He also received numerous departmental
24    commendations and awards.
```



A1496

1      Q.    And how long have you known Mike Rodriguez,

2    Chief?

3      A.    Probably at least since 1991.

4      Q.    And do you know him outside of the Wilmington

5    Police Department?

6      A.    No, I do not.

7      Q.    There was an allegation in the complaint that

8    was denied to the effect that you were the godfather

9    of one of his children.

10     A.    Yes.

11     Q.    You're denying that?

12     A.    That's correct.

13     Q.    I don't know how that came about, but all

14    right.

15            Let's take a look if we can at Ken Boyd

16    during his promotional process and determine what

17    aspects you found, you know, plus and minus with

18    Officer Boyd's application to be sergeant.

19     A.    Superb performer.  He is a schooled

20    investigator in our detective division.  Again, a good

21    detective.  Has a good detective background with his

22    experience in our evidence detection unit.  I believe

23    well educated with a bachelor's degree.  Respected by

24    his peers and supervisors.  Good communicator.  I



WILCOX & FETZER LTD.
Registered Professional Reporters

**A1497**

1    believe he's been involved in coaching youth in

2    sports.

3         Q.    And all of that's outside the realm.  You still

4    consider that a positive for a police officer?

5         A.    Yeah.  Positive, especially in the realm of

6    talking about community policing and officers

7    extending themselves above and beyond.

8         Q.    Okay.

9         A.    Kenny always represents the department well,

10   both in appearance and demeanor.

11              Has always responded to -- including calls

12   from myself for assistance, whether it be on the

13   street or investigations.

14              Lack of any significance in his

15   disciplinary record.

16        Q.    Do you recall whether there were any negatives

17   in Ken Boyd's background when you were considering his

18   applicant to be sergeant?

19        A.    No.  None.

20        Q.    How about with Mike Rodriguez?

21        A.    None also.

22        Q.    Given the two superb performers as you noted,

23   Rodriguez and Boyd, how would you match them up in

24   terms of their application to be sergeant?



1    A.    Again, all of almost equal ability according to

2    being banded.  I think the band is -- exemplifies how

3    close they are in that they are all together.  And

4    with the -- in comparison to the other candidates,

5    that was one advantage we have with the Wilmington

6    Department of Police is an excellent group of officers

7    who I would not have any reservation if I had the

8    openings to be able to promote the entire band.

9    Q.    When did you become aware that Officer Boyd

10   filed a claim against the City of Wilmington with

11   regard to his lack of promotion?

12   A.    I do not recall the date.  I was aware of a

13   complaint filing with the Department of Labor, I

14   believe.

15   Q.    Did you participate in the defense of that

16   complaint?

17   A.    Yes.  I believe through an interview with I

18   believe Martin Nessler of the city law department.

19   Q.    Were you aware that that was filed sometime in

20   2004?

21   A.    I could not give you even a year, if that was

22   the correct year.

23   Q.    Let me turn your attention to the selection of

24   Faheem Akil or the lack of the selection during the



1    process to promote him to lieutenant.  Are you

2    familiar with that lieutenant selection process as

3    well?

4        A.    Familiar with the lieutenant selection process,

5    yes.

6        Q.    Is it fair to say that William Brown was

7    promoted to lieutenant prior to Akil being promoted to

8    lieutenant?

9        A.    Yes.

10       Q.    And what was the reason for that?

11       A.    Again, it was William Brown as compared to the

12   rest of the candidates, just not Faheem Akil.

13       Q.    Chief, if I were to put the prior Management

14   Scientist list in front of you, would you agree or

15   disagree that, within the bands, we see promotions

16   that are aligned with seniority?

17       A.    Strictly aligned with seniority?

18       Q.    Yes.

19       A.    No, we would disagree.

20       Q.    Can you give me any examples to show that

21   promotions were not done by way of seniority?

22       A.    Initially coming in after my appointment as

23   chief of the police in 2001, there had not been any

24   promotions made for a significant amount of time, I



A1500

1    believe the whole previous year.  Coming in, I made a

2    series of promotions.  And this is through researching

3    that my initial four promotions to the rank of

4    lieutenant -- my first selection, for example, had

5    less seniority than my second selection.  In turn, my

6    third section had less seniority than my fourth

7    selection.

8              I recommended a captain for promotion to

9    inspector who was not the senior captain.

10   Q.    Who was that?

11   A.    James Wright.

12   Q.    Let me focus on sergeant levels.  As I

13   understand this, we looked at Szczerba 1 -- let me be

14   clear, because perhaps I'm not right now, that the

15   selections that were made and the order within the

16   bands is consistent with the seniority of the

17   individuals as shown on Szczerba 1 in front of you --

18   A.    Okay.

19   Q.    -- with the exception of Boyd being left out in

20   Band II before Rodriguez, is that accurate?

21   A.    Yes.

22             MR. MARTIN:  I'm going to take a break for

23   just a moment because I have that list in my office.

24   I need to pull that out.



A1501

1              (Recess taken.)

2              (Szczerba Deposition Exhibit 2 was marked

3       for identification.)

4       BY MR. MARTIN:

5        Q.    Chief, I put before you Szczerba 2 which is the

6       list of banding for sergeants.  They are the two years

7       prior to what we had seen on Szczerba 1 and again

8       written on there are notes written by Mr. Boyd with

9       regard to his understanding of the promotional dates

10      of these various individuals.  Could you first look at

11      Band I and look at the dates set forth there and see

12      if you see anything that you don't agree with in terms

13      of the promotional date.

14       A.    I don't -- I don't disagree.  I cannot be in

15      complete agreement without having, you know, a list to

16      be able to look to confirm the dates.  This was a list

17      that I inherited coming in as chief of police.

18       Q.    And would you agree that, in Band I, the

19      promotions were in line with the seniority of the

20      various individuals?

21       A.    No.

22       Q.    And why not?

23       A.    I believe my first pick from this band was

24      Thomas Dempsey.  So that's what's confusing me with



1    listing Mayna Santiago as the first pick.  And then,

2    for example, Thomas Dempsey would have been junior --

3    these are my initial picks coming in as chief.  So

4    Thomas Dempsey would have been, I believe, my first

5    pick and I guess less seniority than Steve Barnes and

6    Mayna Santiago.

7              Then there's, you now, noting the numbers

8    on there next to Donald Bluestein -- he was recently

9    promoted, was not promoted off of this list.  And I

10   don't believe Scott Jones was promoted off of that

11   list.  So as far as those dates and the order of the

12   sequence of promotions, I could not tell you.

13   Q.    Now, have you had any opportunity to speak with

14   the mayor with regard to issues involving racial

15   relations within the city police department?

16   A.    Speak with the mayor directly, no.

17   Q.    Have you spoken with any of his staff?

18   A.    Spoken with the director of public safety, but

19   that was mainly in response to several anonymous

20   letters that were submitted in one fashion or another

21   to council or however.  They were delivered

22   anonymously.

23   Q.    What was done about that situation?

24   A.    I issued a memorandum to all personnel for that



1     to cease, instructed the proper avenues to pursue with

2     complaints of that nature.  There was a letter that

3     went out from the mayor, myself, the city solicitor,

4     director of personnel, director of public safety,

5     pretty much all the same area, same subject area that

6     was delivered to all employees' homes.

7         Q.    All City of Wilmington or Wilmington Police

8     Department?

9         A.    Wilmington Police Department.

10        Q.    Do you believe that there was any validity to

11    any of the statements made in those anonymous letters?

12        A.    No.

13        Q.    Yes, you believe there's no validity?

14        A.    That's correct.

15        Q.    Have you discussed whether there's any validity

16    with any of your senior staffers?

17        A.    No.

18        Q.    You've not had that discussion with your

19    inspectors or captains?

20        A.    There may have been talk at staff meetings.  In

21    particular one of those letters, one of the former --

22    Inspector Wright was mentioned in one of those

23    letters.  May have spoken to him about it.  But as far

24    as recall as far as meeting for that particular



A1504

1   subject, no.

2      Q.    But you believe there's no validity at all to

3   any of the allegations made in those letters?

4      A.    No.  Not that I'm aware of.  You know, also

5   included which was mentioned earlier about being the

6   godfather for officer's son, so on and so forth.  So

7   that's what I mean by no validity to it.

8      Q.    So did you speak with any of the black senior

9   officers other than Inspector Wright about the

10  allegations in the letters?

11     A.    No.  Other than at the -- in the open forum

12  such as a staff meeting, but no direct conversation.

13     Q.    Do you believe anyone in the Wilmington Police

14  Department has any concern about any of the issues

15  raised currently?

16     A.    Well, an organization -- the answer to that

17  would be, yes, an organization of that size you would

18  always have some concerns.

19     Q.    But has there been any attempt on your part to

20  find out who may have the concerns and what the

21  concerns may be?

22     A.    Again, I submitted a memorandum to all

23  employees.  I have addressed roll calls and, you know,

24  advised the employees of proper channels to take such


**A1505**

1    complaints.

2       Q.   I'm sorry.  You've addressed roll calls?

3       A.   Yes.

4       Q.   What did you advise the officers during roll

5    call?

6       A.   Advised them, again, essentially the same thing

7    I put in writing, that there are proper avenues to

8    pursue complaints of such a nature, that it's

9    detrimental to the police department by putting such

10   letters out in that fashion.  However, I, you know,

11   emphasized that I may not be speaking to the correct

12   group, that I don't even know for a fact that that was

13   written, those letters were written by a police

14   officer, whether they were written by a spouse or

15   significant other or someone not affiliated with the

16   police department.

17      Q.   What are those proper avenues, Chief?

18      A.   Office of Professional Standards, City Office

19   of Personnel, the Department of Labor.

20      Q.   Now, if any officer made any complaints through

21   any of those resources, would you be advised?

22      A.   Yes.

23      Q.   And have you been advised of any complaints

24   issued by any of your officers?



1      A.   Not of the nature what was contained in those

2    letters.

3      Q.   Would it surprise you, Chief Szczerba, if one

4    of your most senior officers is very concerned about

5    the allegations and believes that many of the

6    allegations may still be valid today?

7      A.   No.

8      Q.   It would not surprise you?

9      A.   No.

10     Q.   Why, then, if it would not surprise you, why

11   would you not take any action or have any discussion

12   about that issue?

13     A.   I'm not aware of the person that you're

14   referring to and his or her concern or concerns.

15     Q.   Did you make any effort after the letters were

16   issued to determine whether there was validity to any

17   of these concerns expressed in the letters?

18     A.   Of my own knowledge, I could see -- again,

19   using his example of me being the godfather, that was

20   incorrect.  I cannot even recall some of the

21   allegations in those letters.

22     Q.   Well, allegations such as disparate treatment

23   between blacks and whites in the department.

24     A.   No.

WILCOX & FETZER LTD.
Registered Professional Reporters

**A1507**

1    Q.    What does your no mean?

2    A.    No meaning that does not exist.

3    Q.    It does not exist?

4    A.    Correct.

5    Q.    And what I was seeking from you as the top

6    administrator of the Wilmington Police Department was

7    to determine whether you have made any effort to look

8    to see if there are any of these areas of concern?

9    A.    No.

10    Q.    Who made the recent promotional decisions on

11    Custis and Akil?

12    A.    I did.

13    Q.    Did you have any input from anybody from the

14    City of Wilmington?

15    A.    No.

16    Q.    These were directly your decisions?

17    A.    That's correct.

18          There was also a recent sergeant's

19    promotion also.  They weren't the only two.

20    Q.    What do you mean by that?  What was the recent

21    sergeant's promotion?

22    A.    There were -- well, two recent sergeant

23    promotions, Donald Bluestein and Amy Rausch.  Also my

24    decisions.



A1508

1      Q.   Were you aware that Faheem Akil had filed with

2    the Delaware Department of Labor as well?

3      A.   Yes.

4      Q.   And were you aware that his charge was racial

5    discrimination on the basis of failure to promote?

6      A.   I believe that may have been part of it, but I

7    believe it was religious discrimination.  I'm not

8    aware of being racial discrimination.  That's a

9    possibility.

10     Q.   It was your understanding it was religious

11   discrimination and you're not aware of racial

12   discrimination?

13     A.   That's correct.  I know that may be a

14   possibility, but I'm aware of religious

15   discrimination, the claim of.

16               MR. MARTIN:   Thank you, sir.  That's all I

17   have.

18               MS. TASSONE:   Chief, just a few questions.

19                    EXAMINATION

20   BY MS. TASSONE:

21     Q.   Going back to when you took over as chief, did

22   you make the selection or recommendation to the rank

23   of captain?

24     A.   Yes.



1      Q.    And did you recommend for the rank of captain

2    an African American male?

3      A.    Yes.

4      Q.    Who was that?

5      A.    Bobby Cummings.

6      Q.    And did you make a recommendation as to the

7    individual to take the rank of inspector?

8      A.    That's correct.

9      Q.    And who was that?

10     A.    James Wright.

11     Q.    And what race was he?

12     A.    Black male, African American.

13     Q.    And going back to your recommendations or

14   promotions to the rank of captain, who else did you

15   recommend or promote, I should say, to captain?

16     A.    Initially we already mentioned Bobby Cummings,

17   Sean Finerty, and Victor Ayala.

18     Q.    What race is Sean Finerty?

19     A.    White male.

20     Q.    And Victor Ayala?

21     A.    Hispanic male.

22     Q.    You recently indicated that you recommended

23   Captain Nancy Deitz to the rank of inspector back in I

24   guess it was October.


A1510

Michael J. Szczerba - Tassone                    38

1      A.    That's correct.

2      Q.    Did you recommend her because she's white?

3      A.    No, I did not.

4      Q.    With regard to promotions within the band, are

5  all your promotions based on seniority within the

6  band?

7      A.    No.

8      Q.    Were you the first chief to officially add

9  seniority points to the promotional system in general?

10     A.    That's correct.

11     Q.    Have you ever made a decision based on an

12  individual's race or gender?

13     A.    No.

14     Q.    Going back to, I guess, it's Szczerba 1 --

15     A.    This is Szczerba 1.

16     Q.    Why did you promote Dennis O'Connor?

17     A.    Dennis had supervisory qualities which were

18  noteworthy.  First thing comes to mind is he has spent

19  some time in the development and bringing back of our

20  K9 unit which did not exist for quite some time.  He

21  then assumed a role of an acting supervisor at the

22  rank of corporal and held that position for quite some

23  time.  Not in particular for Dennis, but to have that

24  position elevated to a sergeant's position.  I tried



**A1511**

1    unsuccessfully a couple of times in the budget

2    process, but in essence he was holding a position that

3    would have supervisory responsibilities and someone

4    has to have supervisory qualities to lead in that

5    position.

6        Q.    Why did you promote Joseph Sammons?

7        A.    Joe has always shown great initiative,

8    dedicated officer.  He's always been self-motivated to

9    proceed in his professional qualifications.  He's a

10   fingerprint expert.  A lack of any significant

11   disciplinary matters.  He had been a leader within the

12   unit itself in the evidence detection unit.  So he

13   showed leadership qualities without the formal title.

14       Q.    And Liam Sullivan, why did you promote Liam

15   Sullivan?

16       A.    Liam Sullivan, again, highly motivated, a good

17   investigator, recognized by his peers and supervisors

18   as a quality officer, has brought distinction and

19   honor to the Wilmington department being one of the

20   top 50 officers in the entire country.  His -- I

21   guess, gone to the extreme limits of being

22   self-motivated and holding positions of -- that

23   really, not under close supervision, but working with

24   the FBI and the task force position, brought to



A1512

1    justice numerous wanted felons while as part of the

2    unit, and continues to conduct himself in such a

3    manner.

4       Q.   Now, you did explain why you selected Mike

5    Rodriguez.  Let me ask you specifically.  What is your

6    understanding of Sergeant Rodriguez's relationship

7    with outside agencies?

8       A.   He also held a task force position, I believe,

9    with the Drug Enforcement Administration, good working

10   relationship with the Attorney General's office, the

11   City Solicitor's office, federal prosecutors.

12      Q.   Would it be accurate to say that these

13   individuals stood out among the group?

14      A.   Yes.  Not collectively, but when it came time

15   for the selections, in comparison with the rest of the

16   band, there's has to be a breaking point somewhere,

17   and they are all highly qualified individuals and it

18   was a difficult or challenging decision to make.

19      Q.   This is based on what you know and in your

20   opinion, correct?

21      A.   That's correct.  It's the authority and

22   responsibility that the chief of police for the City

23   of Wilmington has.

24      Q.   And what race is Mike Rodriguez?



1     A.    Hispanic.

2     Q.    This issue with you being the godfather of Mike

3    Rodriguez's son, I think you've already said that that

4    was not true, correct?

5     A.    That's correct.

6     Q.    Any idea where this could come from?

7              MR. MARTIN:   Objection.  But go ahead and

8    answer it.

9     A.    Okay.  The possibility may be where there's a

10   confusion, at one point with -- prior to Mike

11   Rodriguez's wedding, I was working with him.  At the

12   time he came into a bind where -- I don't know what

13   the age of the child was, seven- or eight-year-old who

14   backed out from walking with the flower girl in his

15   wedding.  It was several days before the wedding.  I

16   offered the services of a friend of mine who had a son

17   the same age at that point and offered his services to

18   walk with this flower girl in a wedding.  Mike took me

19   up on the offer, and I got him through the tuxedo at

20   the last minute and we had him in the wedding.  And

21   that's maybe where the confusion lies as to whether I

22   was a godfather or not.

23    Q.    With regard to disciplinary records, do you

24   review the disciplinary records of the individuals who



A1514

1    you're looking at promoting?

2        A.    No.   If I had a question as to some recent

3    occurrence, I would get into that file and review it,

4    but you know, I sit in review of all of our complaint

5    hearing boards.   If anything goes to an appeal board,

6    I'm the chair of that appeal board.   So I'm aware of

7    all the disciplinary procedures.

8        Q.    So was disciplinary -- did you review the

9    disciplinary records of Emory, O'Connor, Rodriguez

10   Sammons, Sullivan, Boyd, or any of the other ones?

11       A.    No.   My decision process did -- that did not

12   come into play.

13       Q.    Prior to the filing of this complaint, did you

14   know, when you looked at the bands, the seniority of

15   the individuals in the band?

16       A.    No.   I have maybe had an idea but didn't look

17   at the seniority list, or that's what I would have to

18   refer to even to this date to look at this list if

19   someone had a question about who's senior to who

20   because it's a very difficult thing to do.   As time

21   passes in 27 years, in addition to -- sometimes

22   you're -- it's a matter of splitting hairs because you

23   have individuals within the same band out of the same

24   academy class.   However, they do have a pecking order



1    for seniority basis and how they finished in the

2    academy class.

3       Q.    So when you talk about seniority, it's

4    according to the seniority list generated by the

5    Wilmington Police Department?

6       A.    That's correct.  If you are going by that, for

7    example, the class of '82 or '84, you'll have a

8    seniority listing within that particular academy

9    class.

10      Q.    So do you know now, looking at Band II, in

11   Szczerba 1, after Kenny Boyd, do you know who the next

12   senior individual is?  Do you know that offhand?

13      A.    No, I do not.

14      Q.    I'm going to show you the seniority list.  This

15   is actually the Bates stamp number 2623.

16              MS. TASSONE:  I have an extra copy for

17   you.

18              MR. MARTIN:  Thank you.

19   BY MS. TASSONE:

20      Q.    This was actually provided by the defendant in

21   discovery.  You want to take a look at that and tell

22   me, if you can, who is next in terms of seniority

23   after Ken Boyd?

24      A.    Richard Sutton.



WILCOX & FETZER LTD.
Registered Professional Reporters

**A1516**

Michael J. Szczerba - Tassone                    44

```
 1      Q.   I'm sorry.  Let me clarify.  After meaning with
 2    regard to the individuals left in Band I.  That was my
 3    fault.
 4      A.   Okay.
 5      Q.   After Ken Boyd you have Robert Curry, Chuck
 6    Emory, Anthony Harris, Ralph Hauck, Stephen Misetic.
 7    Of those individuals, who's next after Ken Boyd in
 8    terms of seniority?
 9      A.   The first one I came to -- it may be a mistake.
10    I have to backtrack.  I have Ralph Hauck.
11      Q.   Who's before Ralph?
12      A.   Right before Ralph is Robert Curry.  But again,
13    they are out of the same class.
14      Q.   On the seniority list, it would be Bob Curry
15    and Ralph Hauck, correct?
16      A.   That's correct.
17      Q.   And then Mike Rodriguez?
18      A.   Yes.
19      Q.   So in terms of the seniority list, you chose
20    Mike Rodriguez over, regarding seniority, Robert Curry
21    and Ralph Hauck, correct?
22      A.   That's correct.
23      Q.   And Robert Curry and Ralph Hauck are what race?
24      A.   Both white males.
```



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    And Mike Rodriguez is?

2    A.    Hispanic.

3    Q.    Regarding this, Mr. Martin asked you a question

4    about a comment that was alleged to have been made by

5    you during a staff meeting and that comment was that

6    you were making your promotions within the bands based

7    on seniority.  Did you ever make that comment?

8    A.    No.

9    Q.    Did you ever discuss your promotional

10   selections during a staff meeting?

11   A.    No.

12   Q.    Did you discuss promotional selections,

13   obviously, before the announcement was made, did you

14   ever discuss your decisions with anyone else in the

15   police department?

16   A.    No.

17   Q.    Did you discuss at staff meetings your decision

18   to promote William Brown to lieutenant?

19   A.    No.

20   Q.    Did you promote William Brown to lieutenant

21   because his mother had passed away and he was

22   attending the funeral, would not be able to take the

23   test?

24   A.    No.



A1518

1    Q.   Why did you promote William Brown?

2    A.   I thought at the time, with the candidates that

3    were available, that he had best -- exhibited the best

4    supervisory quality.

5    Q.   In you read the complain, correct?  You

6    reviewed the complaint in this case?

7    A.   Yes.

8    Q.   And there's an allegation that you promoted

9    your friends.  Do you recall that?

10   A.   Yes.

11   Q.   Is that true?

12   A.   No.

13   Q.   Why is that?

14   A.   With 27 years of service, in serving with

15   hundreds of officers in that time, I believe that the

16   current officers on the department I consider having

17   one friend who's an academy mate of mine.  Other than

18   that, there's no friendship relationship, no social

19   relations.

20   Q.   Of all the individuals that you promoted -- and

21   just to help you out, let me give you this document.

22          MS. TASSONE:  I have one for you, too,

23   Jeff.  It's Bates stamp 2621.

24   Q.   Take a look at that and tell me, of all the

1    individuals that you've promoted, did you have any

2    type of social relationship outside of the police

3    department?

4       A.    No.   Starting -- I can go down the list, but

5    I -- no.   With anyone on that -- that I promoted --

6    some of the people I didn't promote prior to me coming

7    to their current rank.

8       Q.    You can correct me if I'm wrong, but your

9    promotions started with the ones promoted in 2000?

10      A.    That's correct because, although the promotions

11   were announced in early 2001, they were retroed back

12   to the year 2000, at least as far back as, according

13   to this list, June of 2000.

14      Q.    With any of those individuals, did you have

15   some type of social relationship outside of the

16   department?

17      A.    No.

18      Q.    Did you ever hunt with any of those

19   individuals?

20      A.    No.

21      Q.    So you're not hunting partners with any of

22   those people?

23      A.    No.

24      Q.    Looking at Szczerba 2, you had made a comment



A1520

Michael J. Szczerba - Tassone                    48

1    that this was incorrect, that the notes that Detective

2    Boyd made on this on Szczerba 2, that they were

3    incorrect, is that --

4       A.    Yes.

5       Q.    And why are they incorrect?

6       A.    Incorrect showing Mayna Santiago as my first

7    sergeant selection -- or no.  Showing Mayna Santiago

8    as -- I take it to be a Boykin selection, former Chief

9    Boykin in November of 2000.  However, Mayna was

10   promoted by me after I came in office behind Thomas

11   Dempsey, Stephen Barnes, and then Mayna Santiago.  So

12   Mayna Santiago was a -- should be correctly written as

13   a Szczerba promotion, not Boykin.

14      Q.    And was Mayna more senior or less senior than

15   Tom Dempsey?

16      A.    More senior.

17      Q.    And more senior, less senior than Steve Barnes?

18   And you can take a look at your seniority list.

19      A.    That I'm not sure of.

20            Please bear with me.  Find them on this

21   list.

22            Senior to Steve Barnes.

23      Q.    Understanding that you've said several times

24   that, when you looked at the promotion when you



**A1521**

1     promoted Mike Rodriguez, that you weren't basing it on

2     Rodriguez versus Boyd, that you were looking at all

3     the individuals that were left in Band II at that

4     time, understanding that that's what you're saying,

5     but as between Ken Boyd and Mike Rodriguez, who did

6     you feel had the better supervisory qualities that you

7     were looking for?

8         A.    It's -- my decision is Mike Rodriguez.

9         Q.    Did race have anything to do with that

10    decision?

11        A.    No.

12                    MS. TASSONE:    I have nothing further.

13                    MR. MARTIN:    No further questions.    Thank

14    you, Chief.

15                    (Deposition ended at approximately

16    3:55 p.m.)

17

18

19

20

21

22

23

24

A1522

1            INDEX TO TESTIMONY

2

3    MICHAEL J. SZCZERBA                          PAGE

4         Examination by Mr. Martin              2

5
          Examination by Ms. Tassone             36
6
                        - - - - -
7
                    INDEX TO EXHIBITS
8

9    SZCZERBA DEPOSITION EXHIBIT NO.              PAGE

10   1  Final Promotion Scores, April 15, 2002   14

11   2   Final Promotion Scores,
         November 29, 2000                        29
12

13

14

15

16

17

18

19

20

21

22

23

24

WILCOX & FETZER LTD.
Registered Professional Reporters

A1523

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.



A1524

State of Delaware  )
                   )
New Castle County  )


### CERTIFICATE OF REPORTER


      I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 23rd day of January, 2006,
the deponent herein, MICHAEL J. SZCZERBA, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.

      I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

<br>

                 _____
                 · Ann M. Calligan, RMR
                 (Certification No. 186-RPR)
                 (Expires January 31, 2008)

DATED:  January 25, 2006



## <u>CERTIFICATE OF SERVICE</u>

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

July 27, 2007, I sent this **Sealed Appendix** to the following by the means indicated:


Teresa A. Cheek, Esquire
Young, Conaway, Stargatt, & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
tcheek@ycst.com
(by Hand Delivery)

Rebecca Butcher, Esq.
Dan Rath, Esq.
Landis, Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19801
butcher@lrclaw.com
(by Hand Delivery)


/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ.**


Dietz / Appendix / SJOB Appendix / Dietz - SJOB App. Sealed TOC