**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-256-SLR |
| | ) | |
| JAMES M. BAKER, et al. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT**

Teresa A. Cheek (#2657)
Adria B. Martinelli (#4056)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Dated: August 10, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES........................................................................................iii

INTRODUCTORY STATEMENT ................................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 2

STATEMENT OF FACTS.............................................................................................. 4

The Parties................................................................................................................... 4

Appointment Eligibility ............................................................................................ 5

City Policies Regarding Appointment and Discrimination............................................. 6

There Is No Quota System ......................................................................................... 8

Appointment Process ................................................................................................. 10

Basis for Wright's and Howell's Appointments............................................................ 12

Dietz's Qualifications ................................................................................................. 13

SUMMARY OF ARGUMENT..................................................................................... 15

ARGUMENT ................................................................................................................ 16

    I. STANDARD FOR SUMMARY JUDGMENT................................................ 16

    II. DEFENDANTS DO NOT MAINTAIN AN ILLEGAL RACIAL
       QUOTA SYSTEM ........................................................................................ 17

    III. THE CITY HAS A COMPELLING INTEREST IN PROMOTING
        DIVERSITY IN ALL RANKS OF THE WILMINGTON POLICE
        DEPARTMENT ........................................................................................... 18

    IV. DIETZ HAS NOT PROVIDED DIRECT EVIDENCE SUFFICIENT
        TO SHIFT THE BURDEN TO DEFENDANTS UNDER A
        *PRICE WATERHOUSE* STANDARD FOR COUNT TWO......................... 21

        A. The *McDonnell Douglas-Burdine* and *Price Waterhouse*
           Standards ................................................................................... 21

i

B. Dietz Has Not Set Forth Material Undisputed Facts Sufficient to
Support a Judgment that Race Was a Substantial Factor in the
Challenged Appointments ................................................................. 22

V. DIETZ'S REQUEST FOR SUMMARY JUDGMENT ON THE *FUENTES*
PRONGS IS INAPPROPRIATE .................................................................... 26

CONCLUSION ............................................................................................................. 31

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................16

*Detroit Police Officers' Ass'n v. Young*,
608 F.2d 671 (6th Cir. 1979)..................................................................................18

*Fuentes v. Perskie*,
32 F.3d 759 (1994)..............................................................................................27-29

*Goodman v. Mead Johnson & Co.*,
534 F.2d 566 (3d Cir. 1976).................................................................................1, 28

*Grutter v. Bollinger*,
539 U.S. 306 (2003)...........................................................................................17-20

*Hook v. Ernst & Young*,
28 F.3d 366 (3d Cir. 1994)................................................................................23, 25

*Keller v. Orix Credit Alliance, Inc.*,
130 F.3d 1101 (3d Cir. 1997)..................................................................................28

*Lomack v. City of Newark et al.*,
463 F.3d 303 (3d Cir. 2006)....................................................................................18

*Patrolmen's Benevolent Ass'n. v. New York*,
310 F.3d 43 (2d Cir. 2002)................................................................................18, 19

*Petit v. City of Chicago*,
352 F.3d 1111 (7th Cir. 2004)...........................................................................18-20

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir.) *cert. denied* 510 U.S. 994 (1993) .......................................16

*Phillips v. DaimlerChrysler Corp.*,
2003 U.S. Dist. LEXIS 23941 (D. Del. Mar. 27, 2003)..............................................16

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)........................................................................................22, 23

*Radabaugh v. Zip Feed Mills, Inc.,*
997 F.2d 444 (8th Cir, 1993) ................................................................................................22

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ..............................................................................................................16

*St. Mary's Honor Center v. Hicks,*
113 S.Ct. 2742 (1993) ...........................................................................................................22

*Talbert v. City of Richmond,*
648 F.2d 925 (4th Cir. 1981) ................................................................................................18

*Texas Department of Community Affairs v. Burdine,*
450 U.S. 248 (1981) ..........................................................................................................21, 22

*Valhal Corp. v. Sullivan Assocs., Inc.,*
44 F.3d 195 (3d Cir. 1995) ....................................................................................................16

*Walden v. Georgia-Pacific Corp.,*
126 F.3d 506 (3d Cir. 1997) .............................................................................................23-25

*Wygant v. Jackson Bd. of Educ.,*
476 U.S. 267 (1986) ..............................................................................................................20

## Statutes

U.S. Const., Amend. XIV .......................................................................................................2, 3

42 U.S.C. §1981 .....................................................................................................................2, 3

42 U.S.C. §1983 .....................................................................................................................2, 3

Wilmington City Charter § 1-100 ..............................................................................................4

Wilmington City Charter §2-339(e)(2) .......................................................................................6

Wilmington City Charter §2-339(h)(4) .......................................................................................6

Wilmington City Charter §3-303 ................................................................................................6

Wilmington City Charter §§7-200 to 7-204 ...............................................................................6

Wilmington City Charter §9-209 ................................................................................................6

Wilmington Code §35-111 ..........................................................................................................6

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................................16

## INTRODUCTORY STATEMENT

Dietz's Motion for Summary Judgment sets forth a voluminous and highly contested factual record losing sight of the standard under which this Court will make determinations on her claims at this stage in the proceedings. Dietz's Statement of Facts is a recitation of a disputed and contested record, replete with improper inferences Dietz has drawn and legal argument on the import of those "facts". Summary judgment is granted only when the Court can make a determination as a matter of law based on the <u>undisputed</u> material facts that one party is entitled to judgment. The material facts necessary to prove or disprove Dietz's claims are disputed and therefore, prevent a determination of liability in this matter except at trial.

"The purpose of summary judgment is to avoid a pointless trial in cases where it would only cause delay and expense." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). For this reason, Defendants limited their dispositive motion in this matter to a discrete legal issue that may be addressed by the Court without making credibility determinations or weighing the evidence as is prohibited at the summary judgment stage. Dietz's failure to do the same is a waste of the parties' and the Court's time and resources. While Defendants are confident they will succeed in defeating Dietz's claims on the merits at trial, her claims are not susceptible to summary judgment.

1

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Captain Nancy S. Dietz ("Dietz" or "Plaintiff") initiated this action on April 20, 2006 by filing a complaint ("Complaint") against James M. Baker, Mayor of the City of Wilmington, individually and in his official capacity (the "Mayor"), and the City of Wilmington (the "City," and collectively with the Mayor, "Defendants") alleging employment discrimination. (D.I. 1.) The Complaint contains three counts: 1) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 based on an alleged quota system resulting in a failure to appoint Dietz to the position of Inspector in 2001 and 2005; 2) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 relating to the same appointments; and, 3) a claim for gender discrimination pursuant to the Fourteenth Amendment and 42 U.S.C. §1983 relating to the same appointments. (D.I. 1.)

The Mayor and the City filed answers to the Complaint on August 21, 2006 refuting the allegations of discrimination and asserting affirmative defenses. (D.I. 5, 6.) In February, 2007, the City (D.I. 30) and the Mayor (D.I. 31) amended their answers to the Complaint.

On October 24, 2006, the Court entered a scheduling order setting the case deadlines. (D.I. 15.) The scheduling order has been twice revised with regard to dispositive motions. (D.I. 46, 60.) The most recent scheduling order, dated July 12, 2007, provides that dispositive motions and opening briefs shall be served and filed on July 27, 2007 and answering briefs for dispositive motions shall be served and filed on August 10, 2007. (D.I. 60.) Dietz filed her Motion for Full and/or Partial Summary Judgment, opening brief in support thereof and appendix on July 27, 2007 ("Motion"). (D.I. 62, 63, 64, 65.) On the same day, Defendants filed their Motion for Partial Summary Judgment and opening brief. (D.I. 69, 70.)

Dietz's Motion seeks summary judgment on Count One of the Complaint alleging that she has proven the existence of a racially discriminatory quota system that resulted in a failure to appoint Dietz to the position of Inspector in violation of the Equal Protection Clause of the U.S. Constitution and 42 U.S.C. §§1981 and 1983. (D.I. 62, ¶1.) Dietz's Motion seeks partial summary judgment on Count Two of the Complaint alleging that she has provided sufficient direct evidence of racial discrimination in violation of 42 U.S.C. §§1981 and 1983 and that under the *Price Waterhouse* standard the burden on that count has shifted to Defendants to prove by a preponderance of the evidence that they would have taken the same adverse employment action absent the discrimination. (D.I. 62, ¶2.) Dietz's Motion further seeks partial summary judgment on Counts Two and Three of the Complaint asserting that Dietz has established a *prima facie* case for race and gender discrimination under the *McDonnell Douglas-Burdine* standard. (D.I. 62, ¶3.) Dietz's Motion also inexplicably seeks partial summary judgment in that Dietz has produced sufficient evidence of pretext under *Fuentes* prongs one and two to reach a jury. (D.I. 62, ¶3.) Finally, Dietz's Motion seeks partial summary judgment alleging that there is no compelling state interest that would justify the use of race or gender as criteria to make the adverse employment decisions that are the bases for the Complaint. (D.I. 62, ¶4.)

Defendants' submit this answering brief in opposition to Dietz's Motion requesting that the relief sought by Dietz, except for partial summary judgment that Dietz has met her *prima facie* burden under the *McDonnell Douglas-Burdine* standard for Counts Two and Three, be denied in its entirety.

## STATEMENT OF FACTS

**The Parties**

Plaintiff Nancy Dietz was born on November 1, 1957 in Pittsburgh, Pennsylvania, and grew up in Pittsburgh and in State College, Pennsylvania. (D02385 (B133).) She has been a member of the Wilmington Police Department ("WPD") since 1980. (D.I. 1, 30, 31, ¶9 (A0003, A0020, A0030).) On or about April 17, 1997, she was promoted to Captain, becoming the second female Captain in the WPD. (D.I. 1, 30, 31, ¶12 (A0003-5, A0020-21, A0030-31), D02861, D03397 (B138-39).)

The City is a municipal corporation. Wilmington City Charter § 1-100. The City is a racially and ethnically diverse city with a history of racial tensions, including riots in 1968 after the assassination of Dr. Martin Luther King that led the governor of Delaware to call in the National Guard. (Mayor Decl. ¶2 (B048).) In 1969, the City appointed its first African-American police inspector. (*Id.*) After his retirement, all of the City's police inspectors were white once again. (*Id.*)

As of 2000, the City's total population was 72,644. Thirty-six percent (25,811) were Caucasian, fifty-six percent (41,001) were African-American, seven percent (5,174) were Hispanic and one percent (678) were Other. (Mayor Decl. ¶4 (B049); P0009-10 (B002).) The WPD sworn workforce is sixty-eight percent (68%) Caucasian, twenty-three percent (23%) African American, seven percent (7%) Hispanic and two percent (2%) Other. (Mayor Decl. ¶4 (B049); D0834-35 (B046-47).) Many members of the general population of the City are not qualified to become WPD officers because of their age, educational level, criminal history, among other reasons, and the WPD applicant pool includes persons who are not City residents at the time they apply, but the discrepancy between the percentage of police officers who are

4

African-American and the percentage of City residents who are African American has been a source of dissatisfaction in the community. (Mayor Decl. ¶4 (B049).)

The Mayor has resided in the City since 1966 and has been the mayor of the City since January 2001. (Mayor Dep. 7 (A0228); Mayor Decl. ¶1 (B048).) The Mayor also served on the Wilmington City Council from January 1973 through December 2000. (Mayor Dep. 9-10 (A0228-29).) During his tenure on the City Council, the Mayor sponsored and wrote legislation for the City of Wilmington prohibiting discrimination based on race, gender, religion, sexual orientation, and so on. (Mayor Dep. 11-12 (A0229).) Immediately after his election as mayor, the Mayor appointed Michael Szczerba, a white male who was at that time a lieutenant in the WPD, to the position of Chief of Police. (D.I. 1, 30, 31, ¶ 32 (A0007, A0022. A0033).)

**Appointment Eligibility**

Dietz complains that she was denied appointment to the position of inspector in the WPD on two occasions because of her race (white) and/or gender. According to the City's job description, the minimum qualifications for the position of Police Inspector are "graduation from an accredited four (4) year college, with a degree in Criminal Justice or a related field, and extensive experience within a police department; or any equivalent combination of education and experience with a strong emphasis in police department administration." (D00829 (B045).) In both 2001, when Inspector James Stallings retired and Captain James Wright was appointed as his replacement, and in 2005, when Wright retired and Captain Gilbert Howell was appointed as his replacement, Director of Public Safety James Mosley ("Mosley") considered all of the Captains to be eligible for appointment as Inspector. (Mosley Dep. 18-21, 24-25, (A0253-54).) Dietz did not actively seek the position vacated by Inspector Stallings' retirement in 2001, but

she did express interest in the inspector position in 2005.  (Dietz Dep. p.49, pp.111-13 (A0294, A0310).)

**City Policies Regarding Appointment and Discrimination**

Dietz claims that there were no preexisting written policies, restrictions or guidelines •
regarding the Mayor's exercise of discretion in the selection of police inspectors.  (D.I. 63, p.5.)
To the contrary, the City's own charter, Wilmington City Charter §§7-200 to 7-204, as well as its
written affirmative action plan and similar policy statements (D00871-889, P0079, D00870,
D00850-869, D00843 (B004-22, B001, B023, B024-43, B044)) limited the Mayor's discretion
and prohibited him from discriminating based on gender or race.  Wilmington City Charter §2-
339(e)(2) provides:

> Elected city officers are obligated to uphold the fundamental legal
> principles of our system of government, as set forth in the United States
> Constitution, the state Constitution, and the city charter, as well as all
> applicable provisions of federal, state and local law and court decisions.
> They are bound to do so, and the failure to so act shall constitute
> malfeasance in office.

Wilmington City Charter §2-339(h)(4) requires elected and appointed city officials to "prevent
and eliminate any and all discrimination in any action by the city government itself."
Wilmington City Charter §9-209 also prohibits discrimination against City employees: "No
person shall be . . . in any way favored or discriminated against with respect to employment by
the city because of race, color, religion, sex, national origin or political opinions."  Section 3-303
of the City Charter states: "all deputies, superintendents and bureau or division chiefs and all
other employees not in the merit system shall be persons especially qualified for their positions
by training and experience."  Wilmington Code §35-111 also prohibits discrimination against
City employees.  The City has adopted equal employment opportunity policies on several
occasions, including on October 20, 2000 (D00871-889 (B004-22)) and October 31, 2001

6

(D00850-869(B024-43)).  Striving for diversity does not violate the City's official affirmative action plan, approved by the Administrative Board, which states that "[a]ll department heads and others making promotional appointments or transfers shall follow the affirmative action practice and principles in making their appointment from among those candidates available to them. ... There shall be no discriminatory impediments which constitute unwarranted barriers to upward mobility."  Dietz admits that attempting to promote diversity is not the equivalent of illegal discrimination.  (N. Dietz Dep. 103 (A0308).)  Dietz also admits that the City's policy is to prohibit making appointment and promotion decisions on the basis of race or gender.  (N. Dietz Dep. 97 (A0306).)  Pursuant to the City's affirmative action policy and in an attempt to proactively prevent discrimination claims, Director Mosley monitors promotions and transfers within the WPD, after the decisions have been made by Szczerba, to ensure that the decisions do not appear to be the result of discrimination.  (Montgomery Dep. 10-17 (A0267-68); Mayor Dep. 37-38 (A0235-36).)

Researchers have reported that having a diverse police force helps improve relationships between the police and the community and helps prevent incidents of police misconduct. (Mayor Decl. ¶5 (B049).)  For example, a 1996 Amnesty International Report (Mayor Decl. Ex. A, p.66 (B119).) recommended, among other things, that New York City should "encourage recruitment from ethnic minorities, and more patrolling of inner city areas by these groups."  In the Mayor's experience, many people in the African-American community find it easier to trust and communicate with African-American officers, which increases the community's cooperation with law enforcement efforts, leading to improved public safety.  (Mayor Decl. ¶5 (B049).) Diversity within the police department also helps individual officers to see past stereotypes and to improve their understanding of people of other races and ethnicities, leading to improvements

in trust, respect and communication not only within the department but also in the department's dealings with the public. (Mayor Decl. ¶5 (B049).)

**There Is No Quota System**

Dietz claims that the WPD uses an "illegal racial quota system for all promotions to the rank of inspector." (D.I. 63, p.7.) She claims that this alleged quota system has been in place since 1978. (*Id.*) Dietz is wrong. She concedes that since 1978 there have been, at various times, two, three or four inspectors. (D.I. 63, p.8.) However, Dietz contends, relying on the testimony of former WPD Chief Manelski, who was a patrolman in 1968, that Captain Andy Turner was the first African-American to be promoted to inspector, and that Turner's appointment was the result of community pressures after the riots in Wilmington that followed the assassination of Dr. Martin Luther King in 1968. However, Manelski is not competent to testify about why Andy Turner was appointed to the position of inspector in the late 1960s because, as a patrolman, Manelski was not involved in making the appointment and has no first-hand information about the motives of those who made the appointment. His testimony is speculative.

In any event, according to Manelski, at some point after Turner's term as inspector ended, the inspectors were once again all white. When Manelski became acting chief of police in 1976, he appointed a white captain, which he testified prompted some members of the community to picket his house and some members of the City Council to call for more "black representation at the upper echelon of the department." (Manelski Dep. 31-32, 35 (A0327-28).) African-American City Council members expressed the view that white officers could not relate to the problems in the streets of Wilmington as well as African-American officers. (Manelski Dep. 35 (A0328).) As a result of these concerns, according to Manelski, the City decided to

8

create a fourth inspector position and in July 1978, Kenneth Miles, the only African-American captain, was appointed to the new position of Inspector of Services. (Manelski Dep. 38-40 (A0329).) Miles was succeeded as Inspector of Services by Eugene Maloney, who was white. (Defs.' Supp. and Amended Interr. Ans., No. 1(A0375-80).) Manelski admitted he had no first-hand information regarding the motives of any of the mayors holding office since 1978 with respect to their appointments of police department inspectors. (Manelski Dep. 17 (A0323).)

There is no basis in the record for Dietz's claim that "anytime a black Inspector retires, he is automatically replaced by another African-American" or that "anytime a white Inspector retires, he is automatically replaced by another white." Miles, an African-American, was replaced by Maloney, a white. (Defs.' Supp. and Amended Interr. Ans., No. 1(A0375-80).) Johnson, an African-American, was appointed to Maloney's former role as Inspector of Staff Inspections. (*Id.*) When John Vignola, white, retired in 1997 from the position of Inspector of Uniformed Operations, his replacement was Keith Ash, African-American. (*Id.*) The City's records show that there was no "African-American Inspector position," and that both African-Americans and whites have held all the different inspector positions over the years since 1980. (*Id.*) Dietz's assertions are incorrect based on the factual record.

Dietz is also mistaken regarding the sequence of events in the 1980s. The position of Inspector of Staff Inspections was the first to be eliminated. The last incumbent, John Doherty, a white, was not replaced when he retired in 1986. (*Id.*) Three whites (Stanley Friedman, Eugene Maloney and John Doherty) and an African-American (John W. Johnson) had held that position. (*Id.*) The position of Inspector of Community Services was eliminated in December 1988 when Preston Hickman (African-American) retired. (*Id.*) Three whites and four African-Americans held that position while it existed. (*Id.*) Both African-Americans and whites have held the

remaining two positions in the years since 1989. (*Id.*) Neither inspector position has been "exclusively white" or "exclusively African-American." (*Id.*) Again Dietz makes bald factual assertions which prove untrue when the record is reviewed.

The flaw in Dietz's claim about the alleged quota system is readily apparent from her own description of it. Dietz's own chart, at page 10 of her brief, shows that there have in fact been periods of time when there were no African-American inspectors at all (July 31, 1987 to September 30, 1987, January 7, 1993 to February 5, 1993, and September 22, 1995 to November 4, 1995). (D.I. 63, p.10.) If a "quota system" varies from 0% to 25% to 33% to 50% of the incumbents, it is not "fixed" and is not a "quota system." It is simply a description of the racial composition of the incumbents, which has varied from time to time.

**Appointment Process**

Dietz argues that to ensure conformity with the alleged racial quota system, the Mayor changed the promotion process. However, Dietz has proffered no competent evidence regarding the process by which inspectors were appointed in the past. Neither Szczerba, nor the Mayor, nor Mosley, nor Montgomery was ever involved in the process of appointing a WPD inspector before 2001, when Wright was appointed. There is no record regarding the history of the process of inspector appointments before the appointment of Wright and there is no basis for Dietz's hyperbolic claims about the supposed change in process for the 2005 appointment of Howell. There had been only one prior appointment to inspector by the Mayor, so any variation at all would have been, in Dietz's words, "unprecedented."

Contrary to Dietz's claims, there was no significant difference between the selection process in 2001 and 2005. (Mosley Dep. 24-25 (A0254); Montgomery Dep. 20 (A0269).) As Dietz concedes, in 2005 the Mayor, Mosley, Montgomery and Szczerba discussed the potential

candidates, and the Mayor listened to Szczerba's recommendation of Dietz and concerns about Howell. (Szczerba Dep. 216-17 (A1312).) Szczerba did not go into much detail about Dietz's qualifications. (Mayor Dep. 66 (A0243).) The Mayor was inclined to prefer Howell, whom he had favored in 2001, but the Mayor also liked Captain Sean Finerty (a white male) because of his demeanor and forceful way of policing. (Mayor Dep. 67 (A0243).) The Mayor was also considering Captain Victor Ayala (Hispanic) and Captain Robert Cummings (African-American). (*Id.*)

To the extent there was any change in the appointment procedure the Mayor used in 2005, it was in Dietz's favor. Dietz admits that the Mayor reviewed Dietz's and Howell's resumes. (D.I. 63, p.16). In addition, the Mayor and Mosley met with Dietz and Howell personally. During her meeting with the Mayor and Mosley, Dietz sat nearly silently. (Dietz Dep. 110-11 (A0310).) Eventually she stated that she felt she was well qualified for the position and suggested that the WPD should focus on improving its reputation by "doing more positive things with the community." (Dietz Dep. 112 (A0310).) She did not address the issue of how to reduce the City's crime rate, did not advise the Mayor or Mosley that she had concerns about the ability of Howell to perform the job and did not tell them that she was concerned that they might be planning to make a decision based on race. (Dietz Dep. 113 (A0310).) In response to comments by Szczerba about the possibility that Howell's health might interfere with his ability to perform the job, the Mayor met with Howell to ask him for a response to that concern. (Mayor Dep. 57-58, 60-61 (A0240-41).) Howell assured the Mayor that his health would not interfere with his ability to perform the duties of an Inspector. (Mayor Dep., pp.57-58 (A0240-241).)

11

**Basis for Wright's and Howell's Appointments**

Much of Dietz's brief centers on her contention, backed in part by the WPD's personnel files and in part by the opinion of Chief Szczerba, that she was more qualified for the position of Inspector of Uniformed Operations than the African-American appointees, James Wright and Gilbert Howell. However, in Szczerba's opinion, Wright was the most qualified candidate in 2001 and race and gender had nothing to do with his recommendation. (Szczerba Dep. 205-06, 214-15 (A1309-10, A1312).) The Mayor accepted Szczerba's recommendation because he had just appointed Szczerba even though the Mayor preferred Howell for the inspector position. (Mayor Dep. 43-45, 63 (A0237, A0242).)

In 2005, after careful consideration of input from the community, city council members, Mosley, Szczerba, Montgomery, Howell and Dietz herself, the Mayor appointed Howell because: (a) the Mayor was impressed by Howell's resume (Mayor Dep. 68 (A0243)); (b) the Mayor thought Howell really wanted the job and would do the best he could at it (Mayor Dep. 68 (A0243)); (c) the Mayor liked Howell's "ideas about gathering up people and putting together special teams and going out and attacking our problem areas" (Mayor Dep. 68 (A0243)); and (d) Howell was "very street wise," meaning he knew the communities, and knew what their problems were and who and where the "bad guys" were (Mayor Dep. 70, 72 (A0244)). Indeed, Howell was born and raised in Wilmington. (D01466-72 (B126-132).) In early 1975, Howell applied for a position with the WPD. (*Id.*) At that time he was 25 years old and was married with one child. (*Id.*) He had four brothers and two sisters still living in Wilmington or nearby. (*Id.*) Five of Howell's siblings still lived at home with their mother in Wilmington. (*Id.*) His father had died in 1971. (*Id.*) He was enrolled in Police Science classes at Delaware Technical

and Community College. (*Id.*) In short, Howell had very strong ties to the Wilmington community.

Dietz claims that shortly after Howell's appointment in 2005, the Mayor admitted in a conversation with George Collins that he had appointed Howell because of race. (Collins Dep. 8-10 (A0221-22).) The Mayor denies making this statement. (Mayor Dep. 50-55 (A0239-40).) No one other than Collins claims to have heard the alleged statement, although there were other people in the room at the time. (Collins Dep. 8-10 (A0221-22).) In fact, the Mayor's Chief of Staff was also present for this meeting and does not agree with Collins. (Montgomery Dep. 34-7 (A0273).) No such statement was uttered, but at a minimum there is a factual dispute which the jury will have to hear to assess the witnesses' credibility.

Dietz claims that in January 2006 she first "discovered" that she had been the victim of racial discrimination in 2001 and 2005. She asserts that in a conversation she had with Szczerba, he told her for the first time that he had recommended her for appointment to inspector in 2005 and that she did not get the position because it was a "black position". Dietz alleges that the Mayor's decision had been based on race. (D.I. 63, p.17.) Dietz admits that she and Szczerba did not discuss the appointment of Wright in 2001 during their January 2006 conversation. (Dietz Dep. 46 (A0294).)

**Dietz's Qualifications**

At pages 20-27 of her brief, Dietz details at length (and in violation of the Court's rule requiring double spacing, D.Del. L.R. 7.1.3 (a)(2)) the reasons why she believes that she was better qualified than Howell and Wright. (D.I. 63, pp.20-27.) The records on which Dietz relies speak for themselves, but these records and opinions are largely irrelevant, because there is no evidence that the Mayor relied on them in reaching his decision. Indeed, Dietz herself points out

13

that the Mayor "never reviewed job evaluations, attendance records, or disciplinary records in arriving at his decision to promote Howell." (D.I. 63, p.16.) In the absence of any evidence that the Mayor reviewed or was otherwise familiar with the contents of Dietz's, Howell's or Wright's personnel files, the information in the files is simply not relevant. Similarly, events that occurred after Howell's appointment to inspector are irrelevant, because they could not have been known to the Mayor at the time of the decision in question.

With regard to Dietz's reliance on the testimony of Szczerba regarding Howell, she relies on Szczerba's opinions, these are not facts and Szczerba was not the decision maker. The fact that Szczerba disagreed with the Mayor's decision does not prove that the Mayor was motivated by racial or gender bias.

Indeed, Dietz has admitted that Howell was qualified for the inspector position. (Dietz Dep. 37 (A0291)) and, at least as of 2001, Szczerba refused to say that Howell was at the bottom of his list of qualified candidates. (Szczerba Dep. 204 (A1309).) Dietz also admits that Howell had more experience than she did in the Uniformed Services side of police operations. (Dietz Dep. 85-6 (A0303-04).)

The question to be determined at trial will simply be whether the Mayor appointed Howell and not Dietz because of race or gender. The only material facts are those that were known to the Mayor at the time he made the decision.

## SUMMARY OF ARGUMENT

1.    Summary judgment should only be granted on the basis of material undisputed facts. The facts set forth in Dietz's Opening Brief are contested, and cannot form the basis for a summary judgment opinion.

2.    The Court should deny Dietz's motion for summary judgment on the claim that the Defendants maintain an illegal racial quota system for the position of WPD inspector because there is sufficient conflicting evidence to present a jury question regarding whether Defendants have in fact deliberately reserved a fixed proportion or number of positions for African-American inspectors.

3.    The Court should deny Dietz's motion for summary judgment requesting a holding that the City does not have a compelling need to use race as a "plus" factor in filling the position of police inspector because there is sufficient evidence, including the City's history of racial strife and the need to establish a relationship of trust and confidence between the City's African-American community and the police department, to present a jury question regarding whether the City has a compelling interest in promoting diversity in the WPD.

4.    Dietz has not produced material undisputed facts sufficient to sustain a judgment that by a preponderance of the evidence race was a substantial motivating factor in the decision to promote Howell or Wright. Therefore, the question of whether Dietz can produce sufficient evidence for the *Price Waterhouse* standard to apply to Count Two is a question for trial.

5.    Defendants concede Dietz has produced sufficient evidence to establish her *prima facie* burden of proof under the *McDonnell Douglas-Burdine* standard on Counts Two and Three. Whether the proffered evidence of pretext under the two *Fuentes* prongs is sufficient to go to a jury is a question for trial.

15

**ARGUMENT**

**I.    STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To raise a genuine issue of material fact the opponent of the summary judgment motion "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the mere scintilla standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.) *cert. denied* 510 U.S. 994 (1993) (internal quotations omitted).

In determining whether there is a triable issue of material fact a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *See Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 200 (3d Cir. 1995). However, a court should not make credibility determinations or weigh the evidence. *See Phillips v. DaimlerChrysler Corp.*, C.A. No. 01-247-JJF, 2003 U.S. Dist. LEXIS 23941, *4 (D. Del. Mar. 27, 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citing Wright & Miller, 299) (emphasis added).

## II.   DEFENDANTS DO NOT MAINTAIN AN ILLEGAL RACIAL QUOTA SYSTEM.

Dietz argues that she is entitled to summary judgment on the issue of whether the City

maintains an illegal quota system for the position of police department inspector under which "'a

certain fixed number or proportion of opportunities are reserved specifically for certain minority

groups.'" (D.I. 63, p. 29, *quoting Grutter v. Bollinger*, 539 U.S. 306, 123 S. Ct. 2325, 156 L. Ed.

2d 304 (2003).)   Dietz seems to assume that the only reason any African-American would be

appointed to the rank of inspector is race.   Defendants deny that they maintain a racial quota

system.   The City's official policy, outlined in its written affirmative action plan as well as in its

charter and code, is that discrimination based on race, gender and other prohibited characteristics

is prohibited.   The Mayor himself played a role in the creation and implementation of these laws

and official policies.   There is no testimony by any mayor that the motive for appointing an

African-American inspector during his tenure was to perpetuate an illegal racial quota system.

As set forth in detail above, there are numerous factual disputes with Dietz's allegations of a

quota system.   *See supra* Statement of Facts, pp.8-10.

Dietz claims that there is a "white inspector position" and a "black inspector position,"

and that a black never replaces a white and vice versa.   This is untrue.   The evidence shows that

the total number of inspectors has varied from two to four, that at various times the City had no

African-American inspector at all, and that both African-Americans and whites have held each of

the various inspector positions.   The Mayor has denied that he appointed either Howell or Wright

in an effort to comply with a racial quota.   Because there are substantial disputes of material fact,

Dietz's motion for summary judgment on the racial quota issue must be denied.

17

## III.    THE CITY HAS A COMPELLING INTEREST IN PROMOTING DIVERSITY IN ALL RANKS OF THE WILMINGTON POLICE DEPARTMENT.

The City denies having instituted an illegal racial quota system for filling the position of police inspector, but agrees that it strives for racial and gender diversity at all levels and with regard to all positions in all departments, including the position of police inspector. The City's goal is to fill each open position with an individual who is well qualified for the job and to consider all factors, including the applicants' racial and ethnic background, that may affect their job performance in a positive way.

The United States Supreme Court has not limited the situations in which there is a compelling state interest sufficient to justify the intentional use of race by the government. *See Grutter v. Bollinger*, 529 U.S. 306, 332 (2003) ("we have never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination"). The *Grutter* Court noted, "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." 529 U.S. at 327. At least four Circuit courts have upheld consideration of race as a "plus" factor due to the "operational needs" of law enforcement. *See Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2004); *Patrolmen's Benevolent Ass'n. v. New York*, 310 F.3d 43, 52 (2d Cir. 2002); *Talbert v. City of Richmond*, 648 F.2d 925, 931-32 (4th Cir. 1981); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 695-96 (6th Cir. 1979). The Third Circuit Court of Appeals has cited *Petit* and *Patrolmen's Benevolent Ass'n* with approval, stating "[c]ourts have found such 'operational needs' arguments to be persuasive in the law enforcement context." *Lomack v. City of Newark et al.*, 463 F.3d 303, 310 n.8 (3d Cir. 2006).

18

This need is predicated on a law enforcement body's duty to "carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves." *Patrolmen's Benevolent Ass'n*, 310 F.3d at 52. Courts have recognized that "effective police work, including the detection and apprehension of criminals, requires that the police have the trust of the community and that they are more likely to have it if they have 'ambassadors' to the community of the same [race or] ethnicity." *Petit*, 352 F.3d at 1115 (citing cases). In the streets, as in the law school classroom addressed in *Grutter*, a policy designed to ensure diversity promotes "'cross-racial understanding,' helps to break down racial stereotypes, and "enables [students [and law enforcement officers]] to better understand persons of different races.'" *Grutter*, 539 U.S. at 330. "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters." *Id.* at 331.

A 1996 Amnesty International Report on Policy Brutality in New York City recommended, inter alia, that the City "encourage recruitment from ethnic minorities, and more patrolling of inner city areas by these groups." (Mayor Decl. Ex. A, p.66 (B119).) Many African-Americans distrust the police. In the interest of public safety, the City has a compelling interest in taking reasonable narrowly tailored steps to promote diversity throughout the police department in order to improve the relationship between the police department and the minority community. The City's interest in promoting diversity in its police force is more than merely "political."

The Seventh Circuit in *Petit*, relying on *Grutter*, upheld the operational need justification for Chicago's police force to institute race-conscious promotions. The Seventh Circuit cited

*Grutter's* finding that "student body diversity is a compelling state interest that can justify the use of race in university admissions" and that "such diversity is essential to its educational mission." *Grutter*, 539 U.S. at 325. The court further reasoned "that there is an even more compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city . . . ." *Petit*, 352 F.3d at 1114 (emphasis added). Because Wilmington, like Chicago, is racially divided, its need for a racially diverse police force is equally compelling.

Any race-conscious state policy that is justified by a compelling state purpose must be narrowly tailored to accomplish the asserted purpose. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986) (plurality opinion). *Grutter* explained the narrow tailoring requirement as follows:

> To be narrowly tailored, a race-conscious admissions program cannot use a quota system--it cannot "insulate each category of applicants with certain desired qualifications from competition with all other applicants." *Bakke, supra*, at 315, 57 L Ed 2d 750, 98 S Ct 2733 (opinion of Powell, J.). Instead, a university may consider race or ethnicity only as a "'plus' in a particular applicant's file," without "insulating the individual from comparison with all other candidates for the available seats." *Id.*, at 317, 57 L Ed 2d 750, 98 S Ct 2733. In other words, an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Ibid.*

539 U.S. at 334.

The policy of the current administration regarding diversity has been that minority status may be considered as a "plus" factor in appropriate cases, so that if two candidates are both qualified for a position, the fact that one is a minority group member may weigh in that person's favor. It is a flexible policy, not a rigid quota or goal, which allows consideration of the merits of each individual applicant for a position. The Mayor has made only two appointments to the

position of inspector.  The first one was made on the recommendation of Szczerba, who denied that race played any role at all in his decision, and the second was made for legitimate reasons explained by the Mayor.  As such, Dietz cannot meet her burden of proving that the City is following a quota system for police inspectors.  Moreover, even if the City sometimes considers race as part of the promotion process in the police department together with an individual's qualifications, the City has a compelling interest in promoting diversity within the police department and the method it has chosen to promote diversity is narrowly tailored, in accordance with the guidelines provided in *Grutter*.

For these reasons, Dietz's motion asking the Court to rule as a matter of law that the City has no compelling reason to promote diversity in the police department must be rejected.

## IV.   DIETZ HAS NOT PROVIDED DIRECT EVIDENCE SUFFICIENT TO SHIFT THE BURDEN TO DEFENDANTS UNDER A *PRICE WATERHOUSE* STANDARD FOR COUNT TWO.

Dietz has asserted that she is entitled to partial summary judgment on Count Two of the Complaint stating that she has produced sufficient direct evidence of discrimination such that under the *Price Waterhouse* standard the burden of persuasion has shifted to Defendants to prove that they would have taken the same adverse employment action absent the discrimination. Dietz has failed to meet the evidentiary burden to prove that the *Price Waterhouse* standard applies to Count Two, therefore summary judgment should be denied.

### A.   The *McDonnell Douglas-Burdine* and *Price Waterhouse* Standards

The courts have set forth two standards under which a plaintiff may prove employment discrimination.  Under the *McDonnell Douglas-Burdine* standard, the employee plaintiff must make a *prima facie* showing of discrimination.  *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The burden then shifts to the employer defendant to

articulate a legitimate non-discriminatory reason for the adverse employment decision. *See id.* The burden then shifts back to the employee to show that the employer's proffered explanation is pretextual. *See id.* at 254-55. At all times the burden of proof or burden of non-persuasion, including the burden of proving causation in fact, remains on the employee. *See id.* at 253; *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2749 (1993).

Under the *Price Waterhouse* standard an employee must show by direct evidence that an illegitimate criterion was a substantial factor in the adverse employment decision. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989). The evidence must demonstrate that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in making their decision." *Id.* at 277. When a plaintiff has met this standard, the burden of persuasion shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even if the protected trait had not been considered. *See id.* at 244-45, 260 (plurality opinion).

**B.    Dietz Has Not Set Forth Material Undisputed Facts Sufficient to Support a Judgment that Race Was a Substantial Factor in the Challenged Appointments.**

In order to shift the burden of persuasion to Defendants under the *Price Waterhouse* standard on a motion for summary judgment Dietz must show that based on <u>material undisputed facts</u> the preponderance of the evidence--direct evidence--supports a finding that race was a substantial factor in the decisions to appoint Wright and/or Howell.[1] Dietz has not met this burden and her request for partial summary judgment on this point should be denied.

---

[1] Additionally, summary judgment is generally not the appropriate stage to determine which standard will apply to a discrimination claim. Whether a case is a pretext or a mixed motives case is a question for the Court once all the evidence has been received. *See Price Waterhouse*, 490 U.S. at 247, n.12; *see also Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir, 1993).

In order to shift the burden of persuasion under *Price Waterhouse*, an employee must clear a high hurdle. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997). "The burden of persuasion shifts to the employer only after the plaintiff has proven that her employer acted unlawfully and not merely on the basis of a prima facie showing." *Id.* (internal quotations omitted). Under *Price Waterhouse* that evidence needs to "directly reflect the alleged unlawful basis for the adverse employment decision." *Id.* (quoting *Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir. 1994)). Therefore, "stray remarks in the workplace," "statements by non-decisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not satisfy this evidentiary burden. *Price Waterhouse*, 490 U.S. at 277. Dietz has not produced material undisputed facts sufficient to meet this high standard.

Dietz's first item of direct evidence is an alleged statement by the Mayor that "he wanted the Inspector to be black." (D.I. 63, p.32.) George Collins testified that the Mayor made this statement during a meeting in the Mayor's office with certain Fraternal Order of Police officers. Collins Dep. 8-10(A0221-22).) The Mayor has denied that he made this statement. (Mayor Dep. (A0239-40).) The Mayor's Chief of Staff was also present for this meeting and did not hear the alleged statement being made. (Montgomery Dep. 34-7 (A0273).) Collins' testimony cannot be the basis for a decision on summary judgment because it is disputed and its inclusion would require the Court to weigh the credibility of the deponents' testimony.

Dietz's next piece of alleged direct evidence is the existence of the quota system for Inspector appointments that is the basis of Count One of the Complaint. (D.I. 63, pp.32-33.) Ignoring the circular nature of this argument, the existence of the quota system is disputed for all of the reasons set forth in section II, *supra*. Defendants have produced sufficient evidence that a

reasonable jury could find that a quota system does not exist. For this reason, the existence of the quota system is a disputed fact that cannot be relied on for summary judgment purposes.

Dietz then alleges that she has direct evidence of discrimination because "all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process)" in the WPD. (D.I. 63, p.33 (emphasis added).) Dietz's authority for this statement is the deposition testimony of Chief Szczerba and Chief of Staff Montgomery. (*Id.*) To the contrary, Director Mosley monitors promotions and transfers within the WPD, after the decisions have been made by Szczerba, to ensure that the decisions do not appear to be the result of discrimination. (Montgomery Dep. 10-17 (A0267-68); Mayor Dep. 37-38 (A0235-36).) Neither Szczerba nor Montgomery stated that race was a substantial factor in promotion decisions within the WPD. While Dietz has proposed a potential interpretation of these conversations, the Court is not permitted to draw inferences from the facts in making its decision on summary judgment. Therefore, this "evidence" does not mandate a burden shift under the *Price Waterhouse* standard.

Further, these discussions of the race of certain individuals recommended for promotion within the WPD are not "direct evidence" that Defendants discriminated against Dietz in making the adverse employment decisions. First of all, the Mayor made the decision to appoint both Wright and Howell. He is the only decisionmaker under the *Price Waterhouse* standard. Therefore, these conversations regarding promotions between Szczerba and Mosley are statements made by non-decisionmakers and ineligible for consideration as "direct evidence."

Even if these individuals are considered decisionmakers, their statements would be classified as statements by decisionmakers "unrelated to the decisional process itself." Statements that "are unconnected to the decision at issue, even if made by people who hold

24

positions of authority with the employer, are not direct evidence" of discriminatory motive. *Walden*, 126 F.3d at 514. These conversations are not "direct evidence" that could support Dietz's request for summary judgment.

Dietz goes on to allege that the documents produced by Defendants show that when a white Inspector retires he is replaced by a white and when an African-American Inspector retires he is replaced by an African-American. (D.I. 63, p.33.) As set forth in section II, *supra*, Defendants deny the existence of a quota system. The mere fact that these appointments occurred, standing alone, do not form the basis for an undeniable inference of racial animus. "Purely statistical evidence" does not warrant a *Price Waterhouse* jury charge. *Hook*, 28 F.3d at 374. In order to use these statistics to arrive at such a conclusion, the Court would need to make inferences about the import of the facts presented that is impermissible at a summary judgment stage. Therefore, this history does not present direct evidence that the Court could use to award Dietz summary judgment.

Further, all appointments prior to 2001 were not made by the Mayor. The actions of prior administrations cannot be construed as "direct evidence" of discriminatory animus by the decisionmaker involved in the appointments at issue in the Complaint. The Mayor was not the decisionmaker for prior administrations and the decisions of prior administrations do not provide "direct evidence" that the Mayor acted out of a discriminatory motive for the appointments at issue.

Finally, Dietz alleges that the Mayor's deposition testimony regarding diversity in employment decisions is "direct evidence" reflecting discriminatory animus. (D.I. 63, pp.33-34.) First, what meaning can be inferred from these statements is a matter of interpretation that the Court should not engage in on a motion for summary judgment. The mere mention of diversity

is not incontrovertible proof of discriminatory animus because as set forth in section III, *supra*, the WPD does have a compelling interest in striving for diversity.  Second, these statements "are unrelated to the decisional process itself."  The Mayor's statement that certain departments may take diversity into consideration when making promotion decisions is not direct evidence that the Mayor considered race in making the appointments of Wright and Howell.  The Mayor's statements regarding diversity do not address his motivations when he made the appointments.  The Mayor's testimony regarding diversity is not the basis for summary judgment on the *Price Waterhouse* standard.

Dietz's alleged direct evidence is disputed by Defendants.  This court could only issue judgment in her favor by weighing the evidence, making credibility determinations or drawing inferences from the facts presented that are impermissible on a motion for summary judgment.  Even if the Court could take some of this evidence into consideration, the evidence presented does not meet the "high hurdle" of proving that race was more likely than not the motivating factor in either the decision to appoint Wright or the decision to appoint Howell.  For these reasons, Dietz should be denied partial summary judgment that the burden of persuasion under a *Price Waterhouse* standard has shifted to Defendants as a matter of law for Count Two.  Any determination on the appropriate standard to apply to Count Two should be made after a trial on the merits.

## V.    DIETZ'S REQUEST FOR SUMMARY JUDGMENT ON THE *FUENTES* PRONGS IS INAPPROPRIATE

Defendants concede that Dietz has produced sufficient evidence to meet the *prima facie* requirements under the *McDonnell Douglas-Burdine* standard.  Defendants have no objection to the entry of partial summary judgment on Counts Two and Three of the Complaint that Dietz has

satisfied the initial *prima facie* showing of race and gender discrimination pursuant to *McDonnell Douglas-Burdine*.

With respect to the second prong of the standard, the Mayor has articulated several legitimate non-discriminatory reasons for the appointments at issue in Counts Two and Three. (Mayor Dep. 68-72 (A0243-44). The Mayor appointed Wright based on the recommendation of the Chief. The Mayor appointed Howell because: (a) the Mayor was impressed by Howell's resume (Mayor Dep. 68 (A0243)); (b) the Mayor thought Howell really wanted the job and would do the best he could at it (Mayor Dep. 68 (A0243)); (c) the Mayor liked Howell's "ideas about gathering up people and putting together special teams and going out and attacking our problem areas" (Mayor Dep. 68 (A0243)); and (d) Howell was "very street wise," meaning he knew the communities, and knew what their problems were and who and where the "bad guys" were (Mayor 70, 72 (A0244)).

Under the *McDonnell Douglas-Burdine* standard the burden now returns to the plaintiff employee to show that the proffered reasons are pretextual. The Third Circuit in the *Fuentes* decision identified two ways in which a plaintiff could prove pretext. The first is to produce evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate nondiscriminatory reasons. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (1994). Under this prong, "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons" that a reasonable jury could disbelieve them. *Id.* at 764-65. Under the second *Fuentes* prong, the plaintiff may prove pretext by producing evidence from which a reasonable factfinder could believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See id.* at 764. As noted in *Fuentes*, however, "[t]o discredit the employer's

proffered reason, however, the plaintiff cannot show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id.* at 765. Likewise in *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997), the Third Circuit quoted with approval the Seventh Circuit's statement that "'the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'"

Dietz has requested that the Court grant her partial summary judgment that "she has sufficient evidence to go to the jury under both prongs of *Fuentes.*" (D.I. 62, ¶3.) As stated earlier, the purpose of summary judgment is to avoid a pointless trial in cases where it would only cause delay or expense. *See Goodman*, 534 F.2d at 573. However, Dietz is not seeking partial summary judgment on this count to avoid a trial, but rather seeks a determination that "she has sufficient evidence to go to the jury." The odd request appears to seek that Defendants not be granted summary judgment on Counts Two and Three of the Complaint. However, Defendants have not sought summary judgment on these counts. Defendants' Motion for Summary Judgment, filed the same day as Plaintiff's, seeks only to establish that Dietz's claims under all counts of the Complaint as they relate to the appointment of James Wright are time barred. Defendants do not believe there is any reason for the Court to enter an order essentially denying relief that was not sought. As Dietz does not request that the Court rule on the sufficiency of her evidence to prove discrimination under the *Fuentes* prongs, Defendants request that all rulings on that aspect of Counts Two and Three of the Complaint be preserved for trial.

Defendants' position that determinations on the *Fuentes* prongs should be reserved for trial in no way concedes that the evidence raised under these prongs is meritorious. The facts raised by Dietz in her opening brief (D.I. 63, pp. 20-27) regarding her qualifications, based on personnel files and Chief Szczerba's testimony, do not satisfy her burden under *Fuentes*. In the absence of any evidence that the Mayor reviewed or was otherwise familiar with the contents of Dietz's, Howell's or Wright's personnel files, the information in the files is simply irrelevant. The *Fuentes* case indicates that the evidence must be sufficient to rebut each of the employer's proffered non-discriminatory reasons. *Fuentes*, 32 F.3d at 764. Dietz has proffered reasons why she believes she was more qualified for the position of Inspector than either Wright or Howell, but she has not proffered evidence that discredits the reasons proffered by the Mayor for the appointments: his reliance on the Chief's recommendation of Wright, his reliance on Howell's resume, Howell's stated enthusiasm for the position, his approval of Howell's ideas for combating street crime and Howell's "street wise" knowledge of the City. Based on the evidence set forth in Dietz's brief, she has not met her burden on the first *Fuentes* prong.

Further, the facts proffered by Dietz in support of the second *Fuentes* prong are contested and insufficient for a judgment on their merits. (D.I. 63, p.18-19.) Defendants have addressed the disputes with most of these facts *supra* in sections II and IV: the Mayor's alleged statement to Collins, Mosley's inquiries regarding race after promotional decisions have been made, the Mayor's statements regarding diversity, the existence of an alleged quota system. The other alleged facts are similarly disputed and therefore, insufficient to prove at this stage that an "invidious discriminatory reason was more likely than not a motivating or determinative cause" of the appointment decisions. The fact that the Mayor considered the recommendations of African-American community leaders in making an appointment decision does not point to

29

invidious discrimination, unless Dietz can point to some evidence that these recommendations were based on race and the Mayor was aware of that bias.  Additionally, contrary to Dietz's claims, there was no significant difference between the selection process in 2001 and 2005. (Mosley Dep. 24-25 (A0254); Montgomery Dep. 20 (A0269).)  Finally, the mere fact that a white female has never held the rank of Inspector, especially since Dietz is only the second female to hold the position of Captain, is not proof of discrimination.

For these reasons, Dietz's request for summary judgment that "she has sufficient evidence to go to the jury under both prongs of *Fuentes*" should be denied.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that Dietz's Motion for Full and/or Partial Summary Judgment be denied. Except, Defendants do not object to the entry of partial summary judgment on the discrete issue that on Counts Two and Three of the Complaint that Dietz has satisfied the initial *prima facie* showing of race and gender discrimination pursuant to *McDonnell Douglas-Burdine*. Dietz has failed to satisfy the burden for summary judgment on any of the Counts of the Complaint.

YOUNG CONAWAY STARGATT &
TAYLOR LLP

    /s/Teresa A. Cheek
Teresa A. Cheek, Esquire (#2657)
Adria B. Martinelli, Esquire (#4056)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Attorneys for Defendant the City of Wilmington

LANDIS RATH & COBB LLP


Daniel B. Rath, Esquire (#3022)
Rebecca L. Butcher, Esquire (#3816)
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Attorneys for Defendant Mayor James M. Baker