**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CAPTAIN NANCY S. DIETZ,      )
                                  )
        Plaintiff,          )
                                  )
      v.                     )   C.A. No. 06-256-SLR
                                  )
JAMES M. BAKER, et al.     )   JURY TRIAL DEMANDED
                                  )
        Defendants.      )
                                  )

**DEFENDANTS' REDACTED APPENDIX PART 1 OF 2 TO THEIR ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT**

Teresa A. Cheek (#2657)
Adria B. Martinelli (#4056)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Dated: August 13, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-256-SLR |
| | ) | |
| JAMES M. BAKER, et al. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REDACTED APPENDIX TO THEIR ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT**

Teresa A. Cheek (#2657)
Adria B. Martinelli (#4056)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Dated: August 13, 2007

# TABLE OF CONTENTS

City of Wilmington Executive Order Policy Statement
P079 ........................................................................................................ B001

U.S. Census Fact Summary for Wilmington (2000)
P009-10 ................................................................................................... B002

City of Wilmington Equal Employment Opportunity Affirmative Action Plan (2000)
D00871-889.............................................................................................. B004

City of Wilmington Executive Order Policy Statement (2001)
D00870..................................................................................................... B023

City of Wilmington Equal Employment Opportunity Affirmative Action Plan (2001)
D00850-869.............................................................................................. B024

City of Wilmington Executive Order Policy Statement (2003)
D00843..................................................................................................... B044

Job Description for Inspector—Department of Police (2006)
D00829..................................................................................................... B045

Wilmington Police Department Agency Demographics Report (2006)
D00834-35................................................................................................ B046

Declaration of Mayor James M. Baker (2007) ..................................... B048

**REDACTED**
D01466-72................................................................................................ B126

**REDACTED**
D02385-89................................................................................................ B133

**REDACTED**
D03397..................................................................................................... B138

**REDACTED**
D02861..................................................................................................... B139

JAMES M. BAKER
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

# EXECUTIVE ORDER

# POLICY STATEMENT

Equal Employment Opportunity and Affirmative Action have long been the philosophy and practice of the City of Wilmington.  However, as Mayor, I feel it is important to add my personal commitment to this philosophy.

In recent years, there has been legislation at all levels of government which is aimed at ensuring that all citizens be given equal opportunity in employment.  In response to this legislation, the City developed an Affirmative Action Program.  This program, in effect, assures that employment practices used by the City will seek out the best qualified persons available without regard to race, age, color, religion, sex, national origin, disability, or sexual orientation.

To this end, we have established an active policy of encouraging and soliciting the protected classes as well as those who are discriminated against.  The mechanisms used to carry out this policy include advertising in publications that target protected classes and other discriminated groups.  We shall also recruit through colleges, universities and agencies whose main concern is the training and placement of individuals in the protected classes or discriminated groups.  In addition, we are concentrating our efforts in developing internal training programs which will encourage promotional opportunities for all our employees.

We shall continue to assure that just and equal treatment is given to employees and applicants in all areas of our employment practices including, but not limited to, recruitment, employment, compensation, dismissal, training, layoff, reinstatement, discipline and promotion.  Our ultimate goal is representation at all levels of responsibility which approximates the composition of the community we serve, for it is to these citizens we must answer.


James M. Baker
Mayor
City of Wilmington

JMB/wpc

Wilmington (city) QuickFacts from the US Census Bureau

# Delaware QuickFacts

## Wilmington (city)

| People QuickFacts | Wilmington | Delaware |
|---|---|---|
| Population, 2000 | 72,664 | 783,600 |
| Population, percent change, 1990 to 2000 | 1.6% | 17.6% |
| Persons under 5 years old, percent, 2000 | 6.8% | 6.6% |
| Persons under 18 years old, percent, 2000 | 25.9% | 24.8% |
| Persons 65 years old and over, percent, 2000 | 12.6% | 13.0% |
| Female persons, percent, 2000 | 52.3% | 51.4% |
| White persons, percent, 2000 (a) | 35.5% | 74.6% |
| Black or African American persons, percent, 2000 (a) | 56.4% | 19.2% |
| American Indian and Alaska Native persons, percent, 2000 (a) | 0.3% | 0.4% |
| Asian persons, percent, 2000 (a) | 0.7% | 2.1% |
| Native Hawaiian and Other Pacific Islander, percent, 2000 (a) | Z | Z |
| Persons reporting some other race, percent, 2000 (a) | 5.2% | 2.0% |
| Persons reporting two or more races, percent, 2000 | 2.0% | 1.7% |
| Persons of Hispanic or Latino origin, percent, 2000 (b) | 9.8% | 4.8% |
| Living in same house in 1995 and 2000', pct age 5+, 2000 | 51.4% | 56.0% |
| Foreign born persons, percent, 2000 | 5.0% | 5.7% |
| Language other than English spoken at home, pct age 5+, 2000 | 12.6% | 9.5% |
| High school graduates, percent of persons age 25+, 2000 | 74.4% | 100.0% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 21.4% | 82.6% |
| Mean travel time to work (minutes), workers age 16+, 2000 | 22.9 | 24.0 |
| Housing units, 2000 | 32,138 | 343,072 |
| Homeownership rate, 2000 | 50.1% | 72.3% |
| Median value of owner-occupied housing units, 2000 | $89,100 | $130,400 |

http://quickfacts.census.gov/qfd/states/10/1077580.html

7/25/2005

Wilmington (city) QuickFacts from the US Census Bureau

| | | |
|---|---|---|
| Households, 2000 | 28,617 | 298,736 |
| Persons per household, 2000 | 2.39 | 2.54 |
| Median household income, 1999 | $35,116 | $47,381 |
| Per capita money income, 1999 | $20,236 | $23,305 |
| Persons below poverty, percent, 1999 | 21.3% | 9.2% |

| Business QuickFacts | Wilmington | Delaware |
|---|---|---|
| Manufacturers shipments, 1997 ($1000) | D | 13,397,302 |
| Wholesale trade sales, 1997 ($1000) | 1,158,065 | 12,585,529 |
| Retail sales, 1997 ($1000) | 708,463 | 8,236,970 |
| Retail sales per capita, 1997 | $9,840 | $11,206 |
| Accommodation and food services sales, 1997 ($1000) | 155,900 | 1,008,954 |
| Total number of firms, 1997 | 8,293 | 56,586 |
| Minority-owned firms, percent of total, 1997 | 13.0% | 9.4% |
| Women-owned firms, percent of total, 1997 | 15.7% | 24.1% |

| Geography QuickFacts | Wilmington | Delaware |
|---|---|---|
| Land area, 2000 (square miles) | 11 | 1,954 |
| Persons per square mile, 2000 | 6,698.1 | 401.1 |
| FIPS Code | 77580 | 10 |

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

FN: Footnote on this item for this area in place of data
NA: Not available
D: Suppressed to avoid disclosure of confidential information
X: Not applicable
S: Suppressed; does not meet publication standards
Z: Value greater than zero but less than half unit of measure shown
F: Fewer than 100 firms

7/25/2005



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

### CITY OF WILMINGTON
### EEO AFFIRMATIVE ACTION PLAN

The goal of the City of Wilmington's Equal Employment Opportunity and Affirmative Action Plan is to increase the diversity of the pool of applicants, thereby ensuring employee selection results in an ethnically diverse City workforce that includes the protected classes. It is the policy of the City of Wilmington that this program of equal employment opportunity and access to service prohibiting discrimination on the basis of race, age, color, religion, sex, national origin, military status, disability, and sexual orientation will be adhered to by itself and its government funded projects, in accordance with the specifications of the following legislation and regulations:

- ☛ Title VI and VII of the Civil Rights Act of 1964 as amended;

- ☛ Equal Pay Act of 1963;

- ☛ Age Discrimination in Employment Act of 1967 as amended;

- ☛ Rehabilitation Act of 1973;

- ☛ Americans with Disabilities Act of 1990;

- ☛ Delaware Code -- Title 19; and

- ☛ Other State and Local Laws.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 1 of 20 |
|--------|------------|----------------|-----------------------------------|--------------|
|        | 10/96      | 10/03/00       | *Monica Gonzaly-Gellena* | |
| ::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01 | | | 01/11/01 | |

D00871



### CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

---

## DEFINITIONS

**Protected Classes:** Minorities, Females, Disabled, Vietnam-Era Veterans, Disabled Veterans, and those over forty (40) years old.

**Minorities:** Blacks, Hispanics, Asian Americans, American Indians, Eskimos, Aleuts, or any member or any other group who are able to demonstrate that they have been the victims of past discrimination comparable to that suffered by the previously referenced minorities.

**Disability:**

a) A physical or mental impairment that substantially limits one or more of the major life activities of an individual;

b) A record of such an impairment; or

c) Being regarded as having such an impairment.

**Reasonable Accommodation:** Making reasonable changes in the workplace, including but not limited to, making facilities accessible, modifying equipment and providing mechanical aids to assist in the operation of equipment, or making reasonable changes in the schedules or duties of a job question that would accommodate the known disabilities of an otherwise qualified applicant; provided, that "reasonable accommodation," unless otherwise prescribed by applicable law, does not require that an employer:

a) Provide accommodations of a personal nature, including but not limited to, eyeglasses, hearing aids, or prostheses, except to employer's employees generally;

b) Reassign duties of the job in question to other employees without assigning to the disabled employee duties that would compensate for those reassigned;

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 2 of 20 |
|--------|-----------|----------------|-----------------------------------|--------------|
|        | 10/96     | 10/03/00.      |                                   |              |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00872



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

---

c) Reassign duties of the job in question to one or more other employees where such reassignment would significantly increase the skill, effort, or responsibility required of such other employees from that required prior to change in duties;

d) Make changes to accommodate handicapped persons where:

    1. For a new employee the cost of such changes would exceed five percent (5%) of the annual salary or annualized hourly wage of the job in question; or

    2. For an existing employee, the total cost of the changes would bring total cost of changes made to accommodate the employee's disabilities since the employee's initial acceptance of employment with the employer to greater than five percent (5%) of the employee's current salary or current annualized hourly wage; or

e) Make any changes that would impose on the employer an undue hardship, provided that the costs of less than five percent (5%) of an employee's salary or annualized wage as determined in paragraph (d) of this definition shall be presumed not to be an undue hardship.

| Number | Supercedes | Effective Data | Approved By: Administrative Board | |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | Page 3 of 20 |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00873



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

### RESPONSIBILITIES FOR THE IMPLEMENTATION

A.  The Department of Personnel and the Office of the Mayor shall be responsible for the implementation of the City's Affirmative Action Plan including periodic review and adjustments necessary to achieve our goals and further the principles of equal opportunity employment. Responsibilities of the Personnel Department shall include, but not be limited to:

   1.   Developing a plan aimed at achieving equal employment opportunity goals and objectives;

   2.   Administering and coordinating internal and external affirmative action efforts;

   3.   Evaluating, revising, and updating our Affirmative Action Plan;

   4.   Identifying equal employment problem areas and developing solutions;

   5.   Keeping informed of the latest developments in the equal opportunity area;

   6.   Meeting periodically with department heads, supervisory personnel, and employees to inform them of changes in our Affirmative Action Plan;

   7.   Working cooperatively with the Wilmington Civil Rights Commission in implementing our Affirmative Action Plan; and

   8.   Reviewing the City's Affirmative Action Plan on a regular basis.

B.  Responsibilities of the Affirmative Action Officer shall include, but not be limited to:

   1.   Serving as liaison between the City, State and Federal governmental agencies and other groups concerned with equal employment of members of the protected classes;

   2.   Advising and assisting the Department of Personnel and the Office of the Mayor in the implementation of the Affirmative Action Plan;

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 4 of 20 |
|--------|-----------|----------------|-----------------------------------|--------------|
|        | 10/28     |                |                                   |              |

D00874



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

---

3. Monitoring and analyzing the employment practices of the City of Wilmington. Monitoring and determining the effectiveness of the affirmative action effort of the City of Wilmington;

4. Identifying problem areas and advising the department head on appropriate actions in areas of employment practices and in-house operational practices and procedures;

5. Maintaining statistics on departmental and City workforce composition and establishing a periodic reporting system to measure the implementation and progress of the Affirmative Action Plan;

6. Following established procedure for handling complaints of discrimination by applicants and by City employees;

7. Reviewing and revising, when necessary, the City's Affirmative Action Plan on a regular basis; and

8. Displaying posters indicating the City of Wilmington is an Equal Opportunity/Affirmative Action Employer in every City department.

C. Responsibilities of all department heads should include, but not be limited to:

1. Being knowledgeable about the City's EEO/AA Plan;

2. Assisting in the identification of problem areas and the development of corrective solutions;

3. Ensuring complete fairness of all employees to ensure minorities and women are given full opportunity for transfers, promotions, selection, assignments, and training within their department in conjunction with the Department of Personnel; and

4. Conducting meetings with supervisors to ensure employees are informed of any changes in the Affirmative Action Plan.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 5 of 20 |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00875



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

D.   Responsibilities of supervisory personnel shall include, but not be limited to:

    1.   Being knowledgeable about the City's EEO/AA Plan;

    2.   Ensuring employees in the work groups are given fair and equal treatment regardless of race, age, color, religion, sex, national origin, disability, or sexual orientation; and

    3.   Disciplining employees who engage in practices which do not provide just and equal treatment to fellow employees on the basis of race, age, color, religion, sex, national origin, disability, or sexual orientation.

E.   The Civil Rights Commission will be advised of the goals and objectives of our Affirmative Action Plan and will prepare recommendations, when, as and if appropriate, to the Personnel Department and the Mayor's Office in furthering the principles of equal opportunity employment.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 6 of 20 |
|--------|-----------|----------------|----------------------------------|--------------|
|        | 10/96     | 10/03/00       |                                  |              |

D00876



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

#### DISSEMINATION

**Action Elements**

1. The City Affirmative Action Plan shall be set forth in appropriate employee communications.

2. The Affirmative Action Statement should be reviewed and revised on a regular basis and a copy given to each employee.

3. The subject of equal employment opportunity shall become an integral part of the orientation of all new employees.

4. Policy orientation sessions shall be held for department heads and supervisors and each supervisor shall be made aware of their individual responsibility for effective implementation of our Affirmative Action Plan.

5. Review of our Affirmative Action Plan shall be scheduled periodically at staff meetings to ensure a vigorous application.

6. The subject of equal employment opportunity shall be included in supervisory and management training programs.

7. Information regarding our affirmative action efforts, hiring and promotions of individuals in the protected classes, and matters relative to equal employment opportunities, and the implementation of this plan shall be communicated in City publications whenever appropriate.

8. A notice shall be posted in the Department of Personnel and other conspicuous places informing applicants of their equal employment rights and their right to notify the appropriate agencies if they believe they have been victims of discrimination.

9. Our Affirmative Action Plan shall be included in our personnel rules and regulations.

10. All job advertisements and official stationery shall include a statement that the City of Wilmington is an Equal Opportunity/Affirmative Action Employer.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 7 of 20 |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00877



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

11.   The City shall periodically reaffirm through recruitment sources, including State and Federal agencies, high schools, colleges, our equal employment opportunity plan and our interest in applicants from the protected classes. We shall request these sources to actively recruit and refer such applicants for all positions listed.

12.   The City shall incorporate an equal opportunity clause in all documents, contracts, leases, covenants, and agreements, and require all contractors, vendors, and suppliers to establish similar policy with any subcontractor.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 8 of 20 |
|--------|-----------|----------------|-----------------------------------|--------------|
|        | 10/96     | 10/03/00       |                                   |              |

D00878

# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

### RECRUITMENT

The task of recruiting members of the protected classes is not limited solely to attracting these applicants to particular job openings but is much broader in scope. It includes the City's efforts to demonstrate to the public our equal opportunity employer posture and our commitment to an affirmative action effort. Recruitment in this broad sense aims at attracting members of protected classes to the City of Wilmington as a potential source of employment rather than attracting them to a specific job opening. The goal of the City's Affirmative Action Plan is to increase the diversity of the pool of applicants, thereby ensuring employee selection results in an ethnically diverse City workforce.

A. In order to encourage both consciously and unconsciously job-seeking members of the protected classes to consider and utilize the City as a realistic source of employment, the City shall:

Action Elements

1. Widely distribute and publicize this Affirmative Action Plan and the City's commitment hereto.

2. Utilize job development programs to provide work opportunity for persons in the protected classes.

3. Continue to utilize and encourage programs, such as school district's occupation training programs, Wilmington Youth Development Corporation, and other programs with similar goals and objectives, which give all youth an opportunity to be employed by the City.

4. Make a periodic general written reiteration of our equal opportunity employer's status and our commitment to an effort of affirmative action to the following agencies and any others which have contact with potential protected class applicants until the composition of our workforce approximates the composition of our community:

| | | |
|---|---|---|
| a. Area high schools | g. | Women's groups |
| b. Area colleges | h. | Private employment agencies |
| c. Community centers | i. | Culturally-oriented organizations |
| d. State Employment Service | j. | LACE |
| e. Job training programs | k. | B.P.A. |
| f. NAACP | l. | Vocational rehabilitation |

| Number | Supercedes | Effective Date | Approved By: Administrative Board | |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | Page 9 of 20 |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00879



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

5.    Encourage the local news media in their coverage of the City of Wilmington to include members of the protected classes in their presentation.

6.    Periodically make personal contact with area high schools, college guidance counseling, and placement services emphasizing our general attitude toward affirmative action and encourage them to refer qualified students who are members of the protected classes to us.

B.    In order to effectively recruit, solicit, and encourage protected class applicants to apply and compete for specific job vacancies with the City of Wilmington, we shall:

Action Elements

1.    Advertise our available positions for all City departments for a minimum of ten (10) calendar days.

2.    Continue to advertise our available positions in publications aimed primarily at the City's disadvantaged communities.

3.    Include a reference to our Eequal Employment Opportunity Plan of Affirmative Action in every employment advertisement.

4.    Continue to distribute copies of appropriate job announcements to the following agencies as well as others whose primary concern is the training and/or placement of members of the protected classes. A complete list of agencies is available from the Department of Personnel. (This list should be updated semiannually.)

a.    Latin American Community Center
b.    West End Neighborhood House
c.    Radio UNO
d.    Training Facilities
e.    LaBorinquena Recreation Center
f.    Job Bank (Employment Service)
g.    NAACP
h.    Kingswood Community Center and others concerned with employment
i.    Community Colleges and Universities

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 10 of 20 |
|---|---|---|---|---|
|  | 10/96 | 10/03/00 |  |  |

D00880



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

  j.  Vocational Rehabilitation--State of Delaware
  k.  Delaware Elwyn Institute
  l.  Puerto Rican Civil Rights League
  m.  HANDI

5.  Consider posting announcements in other public places such as the Wilmington Public Library, Post Office, and other governmental facilities.

6.  Use special recruiting materials aimed at the protected classes when necessary.

7.  Call upon individual community leaders to encourage members of the protected classes with whom they are acquainted to apply.

8.  For those professional and technical positions filled from outside the local labor market, recruitment will include colleges and universities.

| Number | Supercedes | Effective Date | Approved By:  Administrative Board | Page 11 of 20 |
|--------|-----------|----------------|-----------------------------------|---------------|
|        | 10/96     | 10/03/00       |                                   |               |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00881



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

---

### SELECTION

The City and its merit system must scrutinize each step in the selection process used by the City to ensure that the criteria, methods, and techniques used to screen candidates are fair and non-discriminatory.

A.  In order to prepare applicants for the selection process, every person given an application for a position with the City may be given an accurate written posting for the position.

B.  In order to ensure fair and equal treatment of candidates competing for positions in the classified service, the City shall:

Action Elements

1.  Review the job-relatedness of our pre-selection screening devices, such as educations requirements, prior experience requirement, and medical and physical standards.

2.  Review, and if necessary, revise the job descriptions of each of our position classifications, so they accurately describe the responsibilities of the position and demand only those qualities actually necessary to perform the responsibilities so described. This review should be done with the assistance of the employing departments and the Affirmative Action Officer.

3.  Reasonable accommodation shall be made in these areas on a case-by-case basis.

C.  Neutralize and remove subjective prejudice from the oral interview process by:

Action Elements

1.  Training interviewers in interviewing techniques with particular emphasis on extinguishing subject bias.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 12 of 20 |
|--------|-----------|----------------|-----------------------------------|---------------|
|        | 10/96     | 10/03/00       |                                   |               |

CODMA\WORDLODX E\DATA\PH5161??'2008120.WPDM\17\01

D00882



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

---

D.  All department heads, or other persons selecting between equally qualified candidates, shall follow the affirmative action practice and principles in making their selection.

    1.  Performance evaluations on a regular basis and in a manner so as to apprise each employee of his/her strengths and weaknesses. These evaluations will continue to be done during the probationary period and on an annual basis.

E.  Working Conditions

    1.  No employees shall be denied access to facilities or services of the City of Wilmington on account of race, age, color, religion, sex, national origin, military status, disability, or sexual orientation. Reasonable accommodation will be made so that access shall be provided to all people to encourage their employment with the City.

    2.  Race, age, color, religion, sex, national origin, disability, or sexual orientation shall not be a basis for differentiating in the amount of responsibility, compensation, latitude, or discretion given an employee within a given position classification or job title.

F.  Promotion and Transfer

    1.  All department heads and others making promotional appointments or transfers shall follow the affirmative action practice and principles in making their appointment from among those candidates available to them.

    2.  Maximum opportunity shall be provided for employees to advance so as to perform at their highest potential. Every possible consideration will be given to all employees for promotional and advancement opportunities consistent with merit principles.

    3.  There shall be no discriminatory impediments which constitute unwarranted barriers to upward mobility. In this regard, all promotion and transfer selection devices and procedures shall be reviewed and made to conform to the specific requirements of the Affirmative Action Plan.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 13 of 20 |
|---|---|---|---|---|
|  | 10/96 | 10/03/00 |  |  |

::ODMA\WORLDOX\F:\DATA\l0116101\W0008120.WPD\1/17/01

D00883



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

### CAREER DEVELOPMENT, SELF-DEVELOPMENT, AND WORKING CONDITIONS

The goal of the City's Affirmative Action Plan is to effectively integrate an ethnically diverse population into our workforce. It is the City's obligation to provide all, including minority employees, with equal opportunities for self-improvement and career development, and it is our responsibility to actively encourage them to utilize the available resources in order to increase their skills, improve their competence, enhance self-confidence, and generally improve the quality of work and better the working conditions for all employees in the City of Wilmington.

A.    Awareness of Opportunities

Every employee shall be made aware of the potential for self-development and advancement in the employment of the City of Wilmington. The City's position of providing equal opportunity for self-development and personal advancement and its commitment to affirmatively encourag employees in the protected classes to utilize the resources available to them shall be emphasized in the following ways:

Action Elements

1.    A statement of the City Affirmative Action Plan shall be posted in every department and distributed to each employee upon entry into the City's employment.

2.    Point out career possibilities to applicants during interview process.

3.    The Personnel Department will be available to all employees who wish to discuss the opportunities for self-development and career advancement opportunities.

B.    Opportunities for Self-Development

In offering any opportunities for self-development, the City and its supervisory personnel shall be guided by the intent and purpose of this Affirmative Action Plan and the City's commitment to equal employment opportunity. The City shall provide its employees, without reference to race, age, color, religion, sex, national origin, disability, or sexual orientation, the following opportunities for self-development:

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 14 of 20 |
|---|---|---|---|---|
|  | 10/96 | 10/03/00 |  |  |

D00884



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

Action Elements

1.    The posting of all merit vacancies to allow for internal application.

2.    In-service training on the job whenever possible.

3.    Provide departments with a conference budget to encourage employees to attend pertinent seminars to their field of work.

4.    Tuition Refund program that provides reimbursement to employees for college-level course work.

5.    Personnel Department-sponsored training.

6.    Departmental training.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 15 of 20 |
|---|---|---|---|---|
|  | 10/96 | 10/03/00 |  |  |

::ODMA\WORLDOX\F:\DATA\10116101\W0008120.WPD\1/17/01

D00885



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

---

### SELF-ANALYSIS

The Personnel Department will, on an on-going basis, compile statistical data indicating by membership in a protected class the composition of our applicants and our workforce for each position classification. The Personnel Department and the Affirmative Action Officer shall be responsible for the following elements of the self-analysis effort:

1.  Prepare periodic reports on the results obtained through this Affirmative Action Plan, but not less than annually.

2.  Forms, such as the EEO-4, shall be prepared and filed with the appropriate agency as required.

3.  Determine annually the seniority for each employee both on the basis of continuous service with the City and on the basis of continuous service in a particular job classification.

4.  In an effort to retain employees in the protected classes, the City will offer to conduct exit interviews with all employees leaving the City's employment and analyze the reasons for their departure.

5.  All information and data compiled as a part of this self-analysis shall be available to the Mayor's Office and the Affirmative Action Officer. They shall periodically review this information in order to document and measure the success of the Affirmative Action Plan and to implement appropriate changes where the plan has not reached its objectives.

These terms are not being used as an indication of, or admission of, actual under-representation or un derutilization.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 16 of 20 |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | |

H:OE\A.\WORLDOX\ F.\DATA\ 01.\ 51011 T.D00\ 00\ W.PGM\17\01

D00886



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

### COMPLAINT RESOLUTION PROCEDURE

The City provides a Complaint Resolution Procedure and resources to assist employees in resolving issues that surface during their employment. It is believed that most complaints can be resolved expediently and to the party's satisfaction within the procedure described below. Applicants and employees may file discrimination complaints with Delaware's Anti-Discrimination Section of the Department of Labor, the Federal agency providing the relevant program to the City, or the U.S. Equal Employment Opportunity Commission at any time.

1.  Current employees of the City may file a complaint with their immediate supervisor, the Employee Relations Advisor/Affirmative Action Officer, ADA Coordinator, Deputy, or Director of Personnel in an attempt to resolve the issue. If the supervisor is the party notified and can resolve the complaint, the matter can be closed. If the issue is not settled at this level, the complainant or supervisor notifies one of the other parties mentioned above.

2.  The designated Personnel representative(s) will begin investigating the situation by interviewing appropriate parties concerned; reviewing records and performing all tasks necessary to determine the substance of the complaint. The Law Department will be notified of the complaint and its ongoing progress. All inquiries and information will be kept confidential and on a "need to know" basis.

3.  Upon gathering of all the pertinent information about the situation, the Personnel representative(s) will provide a report and preliminary recommendation for a review by the Director of Personnel and/or the Deputy Director of Personnel. The Director of Personnel or Deputy will sign off on the recommendation indicating agreement or discussion will ensue until agreement is reached.

4.  The Personnel representative(s) will provide results of their investigation and accompanying recommendation, if applicable, to the complainant. Other individuals directly affected by the implementation of the recommendations will also be notified.

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 17 of 20 |
|---|---|---|---|---|
| | 10/96 | 10/03/00 | | |

::ODMA\WORLDOX\F:\DATA\1\011 6101\W0008120.WPD\1/17/01

D00887



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## CITY OF WILMINGTON
## EQUAL EMPLOYMENT OPPORTUNITY
## AFFIRMATIVE ACTION PLAN

---

Applicants and employees may file a complaint with the U.S. Equal Employment Opportunity Commission and/or the State of Delaware, Department of Labor, Anti-Discrimination Section or other agency relevant to these issues for the City.

If an employee would like counseling before filing a complaint or has questions about the procedure, the employee may request assistance from the City's Employee Relations Advisor.

The City of Wilmington has designated the following person as the contact to coordinate efforts to comply with the Affirmative Action Plan:

> Elinza Cain
> Department of Personnel
> City/County Building
> 800 French Street, 4th Floor
> Wilmington, DE 19801 • Telephone: 571-4280

Persons with disabilities should contact:

> William C. Jones
> ADA Coordinator
> Department of Personnel
> City/County Building
> 800 French Street, 4th Floor
> Wilmington, DE 19801 • Telephone: 571-4280

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 18 of 20 |
|--------|-----------|----------------|-----------------------------------|---------------|
|        | 10/96     | 10/03/00       |                                   |               |

D00888



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### CITY OF WILMINGTON
### EQUAL EMPLOYMENT OPPORTUNITY
### AFFIRMATIVE ACTION PLAN

---

Los aspirantes y los empleados pueden clasificar una queja con el U.S. Equal Employment Opportunity Commission y/o el State of Delaware, Departmento de Labor, la Anti-Discrimination Section e otra agencia que dirige estos asuntos para la Ciudad.

Si un empleado requiere consejo antes de clasificar una queja o tiene preguntas sobre el procedimiento, el empleado puede solicitar ayuda del consejero de las relaciones del empleado (Employee Relations Advisor) de la Ciudad.

La Ciudad de Wilmington ha apuntado las personas representantes siguientes para coordinar esfuerzos para cumplir con el Plan de Acción Afirmativo (Affirmative Action Plan).

> Elinza Cain
> Departamento de Personnel
> City/County Building
> 800 N. French St, 4th Floor
> Wilmington, DE 19801 • Teléfono: 571-4280

Las personas con inhabilidades deben entrar en contacto con:

> William C. Jones
> Coordinador del ADA
> Departamento del Personnel
> City/County Building
> 800 N. French St, 4th Floor
> Wilmington, DE 19801 • Teléfono: 571-4280

| Number | Supercedes | Effective Date | Approved By: Administrative Board | Page 20 of 20 |
|---|---|---|---|---|
|  | 10/96 | 10/03/00 |  |  |

D00889

JAMES M. BAKER
MAYOR

# City of Wilmington
## Delaware



LOUIS L. REDDING - CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537

June 27, 2001

# EXECUTIVE ORDER

# POLICY STATEMENT

Equal Employment Opportunity and Affirmative Action have long been the philosophy and practice of the City of Wilmington. However, as Mayor, I feel it is important to add my personal commitment to this philosophy.

In recent years, there has been legislation at all levels of government which is aimed at ensuring that all citizens be given equal opportunity in employment. In response to this legislation, the City developed an Affirmative Action Program. This program, in effect, assures that employment practices used by the City will seek out the best qualified persons available without regard to race, age, color, religion, sex, national origin, disability, or sexual orientation.

To this end, we have established an active policy of encouraging and soliciting the protected classes as well as those who are discriminated against. The mechanisms used to carry out this policy include advertising in publications that target protected classes and other discriminated groups. We shall also recruit through colleges, universities and agencies whose main concern is the training and placement of individuals in the protected classes or discriminated groups. In addition, we are concentrating our efforts in developing internal training programs which will encourage promotional opportunities for all our employees.

We shall continue to assure that just and equal treatment is given to employees and applicants in all areas of our employment practices including, but not limited to, recruitment, employment, compensation, dismissal, training, layoff, reinstatement, discipline and promotion. Our ultimate goal is representation at all levels of responsibility which approximates the composition of the community we serve, for it is to these citizens we must answer.

James M. Baker
Mayor
City of Wilmington

JMB/wpc

F:\DATA\1011601 1\W0008120.WPD\6/27/01

D00870



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

**POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan**

### CITY OF WILMINGTON
### EEO AFFIRMATIVE ACTION PLAN

The goal of the City of Wilmington's Equal Employment Opportunity and Affirmative Action Plan is to increase the diversity of the pool of applicants, thereby ensuring employee selection results in an ethnically diverse City workforce that includes the protected classes. It is the policy of the City of Wilmington that this program of equal employment opportunity and access to service prohibiting discrimination on the basis of race, age, color, religion, sex, national origin, military status, disability, and sexual orientation will be adhered to by itself and its government funded projects, in accordance with the specifications of the following legislation and regulations:

- Title VI and VII of the Civil Rights Act of 1964 as amended;

- Equal Pay Act of 1963;

- Age Discrimination in Employment Act of 1967 as amended;

- Rehabilitation Act of 1973;

- Americans with Disabilities Act of 1990;

- Delaware Code -- Title 19; and

- Other State and Local Laws.

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 1 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00850



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

**POLICY 100.1 Equal Employment Opportunity/Affirmative Action Plan**

### DEFINITIONS

**Protected Classes:**  Minorities, Females, Disabled, Vietnam-Era Veterans, Disabled Veterans, and those over forty (40) years old.

**Minorities:**  Blacks, Hispanics, Asian Americans, American Indians, Eskimos, Aleuts, or any member or any other group who are able to demonstrate that they have been the victims of past discrimination comparable to that suffered by the previously referenced minorities.

**Disability:**
   a)  A physical or mental impairment that substantially limits one or more of the major life activities of an individual;

   b)  A record of such an impairment; or

   c)  Being regarded as having such an impairment.

**Reasonable Accommodation:**  Making reasonable changes in the workplace, including but not limited to, making facilities accessible, modifying equipment and providing mechanical aids to assist in the operation of equipment, or making reasonable changes in the schedules or duties of a job question that would accommodate the known disabilities of an otherwise qualified applicant; provided, that "reasonable accommodation," unless otherwise prescribed by applicable law, does not require that an employer:

   a)  Provide accommodations of a personal nature, including but not limited to, eyeglasses, hearing aids, or prostheses, except to employer's employees generally;

   b)  Reassign duties of the job in question to other employees without assigning to the disabled employee duties that would compensate for those reassigned;

   c)  Reassign duties of the job in question to one or more other employees where such reassignment would significantly increase the skill, effort, or responsibility required of such other employees from that required prior to change in duties;

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 2 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\W0017301.WPD\2/12/03

D00851



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

**POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan**

    d)   Make changes to accommodate handicapped persons where:

        1.   For a new employee the cost of such changes would exceed five percent (5%) of the annual salary or annualized hourly wage of the job in question; or

        2.   For an existing employee, the total cost of the changes would bring total cost of changes made to accommodate the employee's disabilities since the employee's initial acceptance of employment with the employer to greater than five percent (5%) of the employee's current salary or current annualized hourly wage; or

    e)   Make any changes that would impose on the employer an undue hardship; provided that the costs of less than five percent (5%) of an employee's salary or annualized wage as determined in paragraph (d) of this definition shall be presumed not to be an undue hardship.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 3 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00852



CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

**POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan**

---

### RESPONSIBILITIES FOR THE IMPLEMENTATION

A.  The Department of Personnel and the Office of the Mayor shall be responsible for the implementation of the City's Affirmative Action Plan including periodic review and adjustments necessary to achieve our goals and further the principles of equal opportunity employment. Responsibilities of the Personnel Department shall include, but not be limited to:

   1.  Developing a plan aimed at achieving equal employment opportunity goals and objectives;

   2.  Administering and coordinating internal and external affirmative action efforts;

   3.  Evaluating, revising, and updating our Affirmative Action Plan;

   4.  Identifying equal employment problem areas and developing solutions;

   5.  Keeping informed of the latest developments in the equal opportunity area;

   6.  Meeting periodically with department heads, supervisory personnel, and employees to inform them of changes in our Affirmative Action Plan;

   7.  Working cooperatively with the Wilmington Civil Rights Commission in implementing our Affirmative Action Plan; and

   8.  Reviewing the City's Affirmative Action Plan on a regular basis.

B.  Responsibilities of the Affirmative Action Officer shall include, but not be limited to:

   1.  Serving as liaison between the City, State and Federal governmental agencies and other groups concerned with equal employment of members of the protected classes;

   2.  Advising and assisting the Department of Personnel and the Office of the Mayor in the implementation of the Affirmative Action Plan;

---

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 4 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00853



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

3. Monitoring and analyzing the employment practices of the City of Wilmington. Monitoring and determining the effectiveness of the affirmative action effort of the City of Wilmington;

4. Identifying problem areas and advising the department head on appropriate actions in areas of employment practices and in-house operational practices and procedures;

5. Maintaining statistics on departmental and City workforce composition and establishing a periodic reporting system to measure the implementation and progress of the Affirmative Action Plan;

6. Following established procedure for handling complaints of discrimination by applicants and by City employees;

7. Reviewing and revising, when necessary, the City's Affirmative Action Plan on a regular basis; and

8. Displaying posters indicating the City of Wilmington is an Equal Opportunity/Affirmative Action Employer in every City department.

C. Responsibilities of all department heads should include, but not be limited to:

1. Being knowledgeable about the City's EEO/AA Plan;

2. Assisting in the identification of problem areas and the development of corrective solutions;

3. Ensuring complete fairness of all employees to ensure minorities and women are given full opportunity for transfers, promotions, selection, assignments, and training within their department in conjunction with the Department of Personnel; and

4. Conducting meetings with supervisors to ensure employees are informed of any changes in the Affirmative Action Plan.

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 5 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00854



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

D.     Responsibilities of supervisory personnel shall include, but not be limited to:

    1.     Being knowledgeable about the City's EEO/AA Plan;

    2.     Ensuring employees in the work groups are given fair and equal treatment regardless of race, age, color, religion, sex, national origin, disability, or sexual orientation; and

    3.     Disciplining employees who engage in practices which do not provide just and equal treatment to fellow employees on the basis of race, age, color, religion, sex, national origin, disability, or sexual orientation.

E.     The Civil Rights Commission will be advised of the goals and objectives of our Affirmative Action Plan and will prepare recommendations, when, as and if appropriate, to the Personnel Department and the Mayor's Office in furthering the principles of equal opportunity employment.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 6 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00855



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## POLICY 100.1 Equal Employment Opportunity/Affirmative Action Plan

### DISSEMINATION

**Action Elements**

1.   The City Affirmative Action Plan shall be set forth in appropriate employee communications.

2.   The Affirmative Action Statement should be reviewed and revised on a regular basis and a copy given to each employee.

3.   The subject of equal employment opportunity shall become an integral part of the orientation of all new employees.

4.   Policy orientation sessions shall be held for department heads and supervisors and each supervisor shall be made aware of their individual responsibility for effective implementation of our Affirmative Action Plan.

5.   Review of our Affirmative Action Plan shall be scheduled periodically at staff meetings to ensure a vigorous application.

6.   The subject of equal employment opportunity shall be included in supervisory and management training programs.

7.   Information regarding our affirmative action efforts, hiring and promotions of individuals in the protected classes, and matters relative to equal employment opportunities, and the implementation of this plan shall be communicated in City publications whenever appropriate.

8.   A notice shall be posted in the Department of Personnel and other conspicuous places informing applicants of their equal employment rights and their right to notify the appropriate agencies if they believe they have been victims of discrimination.

9.   Our Affirmative Action Plan shall be included in our personnel rules and regulations.

10.  All job advertisements and official stationery shall include a statement that the City of Wilmington is an Equal Opportunity/Affirmative Action Employer.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 7 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00856



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

11.  The City shall periodically reaffirm through recruitment sources, including State and Federal agencies, high schools, colleges, our equal employment opportunity plan and our interest in applicants from the protected classes. We shall request these sources to actively recruit and refer such applicants for all positions listed.

12.  The City shall incorporate an equal opportunity clause in all documents, contracts, leases, covenants, and agreements, and require all contractors, vendors, and suppliers to establish similar policy with any subcontractor.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 8 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00857



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

### RECRUITMENT

The task of recruiting members of the protected classes is not limited solely to attracting these applicants to particular job openings but is much broader in scope. It includes the City's efforts to demonstrate to the public our equal opportunity employer posture and our commitment to an affirmative action effort. Recruitment in this broad sense aims at attracting members of protected classes to the City of Wilmington as a potential source of employment rather than attracting them to a specific job opening. The goal of the City's Affirmative Action Plan is to increase the diversity of the pool of applicants, thereby ensuring employee selection results in an ethnically diverse City workforce.

A.    In order to encourage both consciously and unconsciously job-seeking members of the protected classes to consider and utilize the City as a realistic source of employment, the City shall:

**Action Elements**

1.    Widely distribute and publicize this Affirmative Action Plan and the City's commitment hereto.

2.    Utilize job development programs to provide work opportunity for persons in the protected classes.

3.    Continue to utilize and encourage programs, such as school district's occupation training programs, Wilmington Youth Development Corporation, and other programs with similar goals and objectives, which give all youth an opportunity to be employed by the City.

4.    Make a periodic general written reiteration of our equal opportunity employer's status and our commitment to an effort of affirmative action to the following agencies and any others which have contact with potential protected class applicants until the composition of our workforce approximates the composition of our community:

| | | | |
|---|---|---|---|
| a. | Area high schools | g. | Women's groups |
| b. | Area colleges | h. | Private employment agencies |
| c. | Community centers | i. | Culturally-oriented organizations |
| d. | State Employment Service | j. | LACE |
| e. | Job training programs | k. | B.P.A. |
| f. | NAACP | l. | Vocational rehabilitation |

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 9 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00858

CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

5. Encourage the local news media in their coverage of the City of Wilmington to include members of the protected classes in their presentation.

6. Periodically make personal contact with area high schools, college guidance counseling, and placement services emphasizing our general attitude toward affirmative action and encourage them to refer qualified students who are members of the protected classes to us.

B. In order to effectively recruit, solicit, and encourage protected class applicants to apply and compete for specific job vacancies with the City of Wilmington, we shall:

**Action Elements**

1. Advertise our available positions for all City departments for a minimum of ten (10) calendar days.

2. Continue to advertise our available positions in publications aimed primarily at the City's disadvantaged communities.

3. Include a reference to our Equal Employment Opportunity Plan of Affirmative Action in every employment advertisement.

4. Continue to distribute copies of appropriate job announcements to the following agencies as well as others whose primary concern is the training and/or placement of members of the protected classes. A complete list of agencies is available from the Department of Personnel. (This list should be updated semiannually.)

    a. Latin American Community Center
    b. West End Neighborhood House
    c. Radio UNO
    d. Training Facilities
    e. LaBorinquena Recreation Center
    f. Job Bank (Employment Service)
    g. NAACP
    h. Kingswood Community Center and others concerned with employment
    i. Community Colleges and Universities
    j. Vocational Rehabilitation--State of Delaware
    k. Delaware Elwyn Institute
    l. Puerto Rican Civil Rights League
    m. HANDI

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 10 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\\W0017301.WPD\2/12/03

D00859



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

**POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan**

5.    Consider posting announcements in other public places such as the Wilmington Public Library, Post Office, and other governmental facilities.

6.    Use special recruiting materials aimed at the protected classes when necessary.

7.    Call upon individual community leaders to encourage members of the protected classes with whom they are acquainted to apply.

8.    For those professional and technical positions filled from outside the local labor market, recruitment will include colleges and universities.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 11 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\W0017301.WPD\2/12/03

D00860



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1 Equal Employment Opportunity/Affirmative Action Plan

### SELECTION

The City and its merit system must scrutinize each step in the selection process used by the City to ensure that the criteria, methods, and techniques used to screen candidates are fair and non-discriminatory.

A.  In order to prepare applicants for the selection process, every person given an application for a position with the City may be given an accurate written posting for the position.

B.  In order to ensure fair and equal treatment of candidates competing for positions in the classified service, the City shall:

**Action Elements**

1.  Review the job-relatedness of our pre-selection screening devices, such as educational requirements, prior experience requirement, and medical and physical standards.

2.  Review, and if necessary, revise the job descriptions of each of our position classifications, so they accurately describe the responsibilities of the position and demand only those qualities actually necessary to perform the responsibilities so described. This review should be done with the assistance of the employing departments and the Affirmative Action Officer.

3.  Reasonable accommodation shall be made in these areas on a case-by-case basis.

C.  Neutralize and remove subjective prejudice from the oral interview process by:

**Action Elements**

1.  Training interviewers in interviewing techniques with particular emphasis on extinguishing subject bias.

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 12 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

D00861

CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

D.  All department heads, or other persons selecting between equally qualified candidates, shall follow the affirmative action practice and principles in making their selection.

  1. Performance evaluations on a regular basis and in a manner so as to apprise each employee of his/her strengths and weaknesses. These evaluations will continue to be done during the probationary period and on an annual basis.

E.  **Working Conditions**

  1. No employees shall be denied access to facilities or services of the City of Wilmington on account of race, age, color, religion, sex, national origin, military status, disability, or sexual orientation. Reasonable accommodation will be made so that access shall be provided to all people to encourage their employment with the City.

  2. Race, age, color, religion, sex, national origin, disability, or sexual orientation shall not be a basis for differentiating in the amount of responsibility, compensation, latitude, or discretion given an employee within a given position classification or job title.

F.  **Promotion and Transfer**

  1. All department heads and others making promotional appointments or transfers shall follow the affirmative action practice and principles in making their appointment from among those candidates available to them.

  2. Maximum opportunity shall be provided for employees to advance so as to perform at their highest potential. Every possible consideration will be given to all employees for promotional and advancement opportunities consistent with merit principles.

  3. There shall be no discriminatory impediments which constitute unwarranted barriers to upward mobility. In this regard, all promotion and transfer selection devices and procedures shall be reviewed and made to conform to the specific requirements of the Affirmative Action Plan.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 13 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\W0017301.WPD\2/12/03

D00862



### CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

## POLICY 100.1 Equal Employment Opportunity/Affirmative Action Plan

### CAREER DEVELOPMENT, SELF-DEVELOPMENT, AND WORKING CONDITIONS

The goal of the City's Affirmative Action Plan is to effectively integrate an ethnically diverse population into our workforce. It is the City's obligation to provide all, including minority employees, with equal opportunities for self-improvement and career development, and it is our responsibility to actively encourage them to utilize the available resources in order to increase their skills, improve their competence, enhance self-confidence, and generally improve the quality of work and better the working conditions for all employees in the City of Wilmington.

A.  **Awareness of Opportunities**

Every employee shall be made aware of the potential for self-development and advancement in the employment of the City of Wilmington. The City's position of providing equal opportunity for self-development and personal advancement and its commitment to affirmatively encourage employees in the protected classes to utilize the resources available to them shall be emphasized in the following ways:

**Action Elements**

1.  A statement of the City Affirmative Action Plan shall be posted in every department and distributed to each employee upon entry into the City's employment.

2.  Point out career possibilities to applicants during interview process.

3.  The Personnel Department will be available to all employees who wish to discuss the opportunities for self-development and career advancement opportunities.

B.  **Opportunities for Self-Development**

In offering any opportunities for self-development, the City and its supervisory personnel shall be guided by the intent and purpose of this Affirmative Action Plan and the City's commitment to equal employment opportunity. The City shall provide its employees, without reference to race, age, color, religion, sex, national origin, disability, or sexual orientation, the following opportunities for self-development:

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 14 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

I:\0116011\W0017301.WPD\2/12/02

D00863



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

### Action Elements

1. The posting of all merit vacancies to allow for internal application.

2. In-service training on the job whenever possible.

3. Provide departments with a conference budget to encourage employees to attend pertinent seminars to their field of work.

4. Education Reimbursement Program that provides reimbursement to employees for college-level course work.

5. Personnel Department-sponsored training.

6. Departmental training.

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 15 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\W0017301.WPD\2/12/03

D00864



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

### SELF-ANALYSIS

The Personnel Department will, on an on-going basis, compile statistical data indicating by membership in a protected class the composition of our applicants and our workforce for each position classification. The Personnel Department and the Affirmative Action Officer shall be responsible for the following elements of the self-analysis effort:

1.    Prepare periodic reports on the results obtained through this Affirmative Action Plan, but not less than annually.

2.    Forms, such as the EEO-4, shall be prepared and filed with the appropriate agency as required.

3.    Determine annually the seniority for each employee both on the basis of continuous service with the City and on the basis of continuous service in a particular job classification.

4.    In an effort to retain employees in the protected classes, the City will offer to conduct exit interviews with all employees leaving the City's employment and analyze the reasons for their departure.

5.    All information and data compiled as a part of this self-analysis shall be available to the Mayor's Office and the Affirmative Action Officer. They shall periodically review this information in order to document and measure the success of the Affirmative Action Plan and to implement appropriate changes where the plan has not reached its objectives.

*These terms are not being used as an indication of, or admission of, actual under-representation or underutilization.

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 16 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

D00865



CITY OF WILMINGTON, DELAWARE.
# PERSONNEL POLICY MANUAL

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

### COMPLAINT RESOLUTION PROCEDURE

The City provides a Complaint Resolution Procedure and resources to assist employees in resolving issues that surface during their employment. It is believed that most complaints can be resolved expediently and to the party's satisfaction within the procedure described below. Applicants and employees may file discrimination complaints with Delaware's Anti-Discrimination Section of the Department of Labor, the Federal agency providing the relevant program to the City, or the U.S. Equal Employment Opportunity Commission at any time.

1. Current employees of the City may file a complaint with their immediate supervisor, the Employee Relations Advisor/Affirmative Action Officer, ADA Coordinator, Deputy, or Director of Personnel in an attempt to resolve the issue. If the supervisor is the party notified and can resolve the complaint, the matter can be closed. If the issue is not settled at this level, the complainant or supervisor notifies one of the other parties mentioned above.

2. The designated Personnel representative(s) will begin investigating the situation by interviewing appropriate parties concerned; reviewing records and performing all tasks necessary to determine the substance of the complaint. The Law Department will be notified of the complaint and its ongoing progress. All inquiries and information will be kept confidential and on a "need to know" basis.

3. Upon gathering of all the pertinent information about the situation, the Personnel representative(s) will provide a report and preliminary recommendation for a review by the Director of Personnel and/or the Deputy Director of Personnel. The Director of Personnel or Deputy will sign off on the recommendation indicating agreement or discussion will ensue until agreement is reached.

4. The Personnel representative(s) will provide results of their investigation and accompanying recommendation, if applicable, to the complainant. Other individuals directly affected by the implementation of the recommendations will also be notified.

| Supercedes | Approved | Effective Date | Approval(s): Administrative Board | Page 17 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\I011601I\W0017301.WPD\2/12/03

D00866



## CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

---

### POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

Applicants and employees may file a complaint with the U.S. Equal Employment Opportunity Commission and/or the State of Delaware, Department of Labor, Anti-Discrimination Section or other agency relevant to these issues for the City.

If an employee would like counseling before filing a complaint or has questions about the procedure, the employee may request assistance from the City's Employee Relations Advisor.

The City of Wilmington has designated the following person as the contact to coordinate efforts to comply with the Affirmative Action Plan:

> Elinza Cain
> Department of Personnel
> City/County Building
> 800 French Street, 4th Floor
> Wilmington, DE 19801 • Telephone:  576-2460

Persons with disabilities should contact:

> William C. Jones
> ADA Coordinator
> Department of Personnel
> City/County Building
> 800 French Street, 4th Floor
> Wilmington, DE 19801 • Telephone:  576-2460

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 18 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301.WPD\2/12/03

D00867



# CITY OF WILMINGTON, DELAWARE
# PERSONNEL POLICY MANUAL

## POLICY 100.1　Equal Employment Opportunity/Affirmative Action Plan

### PROCESO PARA PRESENTAR Y RESOLVER QUEJAS

La Ciudad ofrece un Procedimiento para Resolver Quejas y recursos local para ayudar los empleados ejecutar resoluciónes de problemas que emergen durante su empleo. Se cree que la mayoría de las quejas pueden ser resueltas en una manera eficiente y a la satisfacción del las personas envueltas usando el proceso que sigue. Los aspirantes y los empleados pueden clasificar quejas de discriminación con Delaware's Anti-Discrimination Section del Department of Labor, la agencia federal que dirige este tipo de servicio para a la ciudad, o con la U.S. Equal Employment Opportunity Commission, en cualquier momento.

1. Los empleados actuales de la ciudad deben presentar sus quejas a su jefe directo, al Employee Relations Advisor/Affirmative Action Officer, al ADA Coordinator, al Deputy o al Director of Personnel. Si el jefe y el empleado pueden resolver la queja, el asunto se termina. Si el problema no logra solucion a este nivel o si el empleado desea hablar con otro representante, debe notificar uno de los otros representantes mencionados para tratar de resolver la situacion.

2. El representante apuntado del Departamento de Personnel comenzará una investigacion sobre la queja, entrevistándo las personas apropiadas; repasando registros; y completando todas las tareas necesarias para determinar la sustancia de la queja. El Departamento de Ley será notificado de la queja y de su progreso en curso. Todas las preguntas e información serán mantenidas confidencial e información sera communicada solamente con las personas que necesitan saber del tema.

3. Cuando toda la información pertinente sobre la situación este colectada, el representante del Departamento de Personnel preparara un informe y recomendaciónes preliminarias para el Director y/o el Diputado de Personnel. El Director o el Diputado de Personnel repasan el informe. Si estan de acuerdo con las recomendaciónes, ambos firmán el documento indicando su apoyo. Si no estan de acuerdo, se mantiene una discusión hasta ponerse de acuerdo.

4. El representante de Personnel somete los resultados de su investigación y las recomendaciónes al empleado con la queja. También notificará a otros individuos afectados directamente por la recomendaciones.

| Supercedes | Approved | Effective Date | Approval(s):　Administrative Board | Page 19 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\1011601\W0017301.WPD\2/12/03

D00868



# CITY OF WILMINGTON, DELAWARE.
# PERSONNEL POLICY MANUAL

---

## POLICY 100.1  Equal Employment Opportunity/Affirmative Action Plan

Los aspirantes y los empleados pueden clasifiar una queja con el U.S. Equal Employment Opportunity Commission y/o el State of Delaware, Departmenot of Labor, la Anti-Discrimination Section e otra agencia que dirige estos asuntos para la Ciudad.

Si un empleado requiere consejo antes de clasificar una queja o tiene preguntas sobre el procedimiento, el empleado puede solicitar ayuda del consejero de las relaciones del empleado (Employee Relations Advisor) de la Ciudad.

La Ciudad de Wilmington ha apuntado las personas representantes siguientes para coordenar esfuerzos para cumplir con el Plan de Acción Afirmativo (Affirmative Action Plan).

> Elinza Cain
> Departamento de Personnel
> City/County Building
> 800 N. French St, 4th Floor
> Wilmington, DE 19801 • Teléfono:  576-2460

Las personas con inhabilidades deben entrar en contacto con:

> William C. Jones
> Coordinador del ADA
> Departamento de Personnel
> City/County Building
> 800 N. French St, 4th Floor
> Wilmington, DE 19801 • Teléfono:  576-2460

| Supercedes | Approved | Effective Date | Approval(s):  Administrative Board | Page 20 of 20 |
|---|---|---|---|---|
| 10/03/00 | 10/30/01 | 10/30/01 | | |

J:\10116011\W0017301 WPD\02/12/03

D00869

**JAMES M. BAKER**
MAYOR

# City of Wilmington
## Delaware

LOUIS L. REDDING · CITY/COUNTY BUILDING
800 FRENCH STREET
WILMINGTON, DELAWARE
19801 - 3537



# EXECUTIVE ORDER

# POLICY STATEMENT

Equal Employment Opportunity and Affirmative Action have long been the philosophy and practice of the City of Wilmington. However, as Mayor, I feel it is important to add my personal commitment to this philosophy.

In recent years, there has been legislation at all levels of government which is aimed at ensuring that all citizens be given equal opportunity in employment. In response to this legislation, the City developed an Affirmative Action Program. This program, in effect, assures that employment practices used by the City will seek out the best qualified persons available without regard to race, age, color, religion, sex, national origin, disability, or sexual orientation.

To this end, we have established an active policy of encouraging and soliciting the protected classes as well as those who are discriminated against. The mechanisms used to carry out this policy include advertising in publications that target protected classes and other discriminated groups. We shall also recruit through colleges, universities and agencies whose main concern is the training and placement of individuals in the protected classes or discriminated groups. In addition, we are concentrating our efforts in developing internal training programs which will encourage promotional opportunities for all our employees.

We shall continue to assure that just and equal treatment is given to employees and applicants in all areas of our employment practices including, but not limited to, recruitment, employment, compensation, dismissal, training, layoff, reinstatement, discipline and promotion. Our ultimate goal is representation at all levels of responsibility which approximates the composition of the community we serve, for it is to these citizens we must answer.

James M. Baker
Mayor
City of Wilmington

JMB/wpc

J:\1011 6011\W0017301.WPD\2/11/03

B044

D00843



**CITY OF WILMINGTON**
**DEPARTMENT OF PERSONNEL**

**ADMINISTRATION DIVISION**          Wilmington, Delaware 19801

## JOB DESCRIPTION

**JOB TITLE:**          Police Inspector (Office of Public Safety, Department of Police)

**SALARY GRADE:**          " "

**FLSA STANDARD:**

**AFFILIATION:**

**MINIMUM QUALIFICATIONS:** Graduation from an accredited four (4) year college, with a degree in Criminal Justice or related field, and extensive experience within a police department; or any equivalent combination of education and experience with strong emphasis in police department administration.

**NATURE OF WORK PERFORMED:** An Inspector of the Department of Police is the authorized representative of the Chief of Police throughout the department. He/she shall be authorized to implement all matters of policy and discipline to all divisions and he shall be empowered to act as the Chief of Police, or in the absence of the Chief, by implication.

**EXAMPLES OF WORK PERFORMED:** Reviews all recommendations for disciplinary action against any member of the department; serves at the discretion of the Chief of Police in matters of internal investigations and the resulting discipline; periodically directs an inspection of all personnel, their equipment, lockers, uniforms, and offices to which they are assigned; initiates and directs the requirements necessary for the preparation and execution of the budget; supervises the preparation of the annual reports for the Department of Police; meets regularly with Commanders of each division under his command for the purpose of discussing their current operational needs and to formulate plans consistent with the overall objectives of the Department; keeps the Chief of Police informed of the current operational techniques being employed to combat crime and address traffic problems.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Ability to exercise creative leadership and management skills. Ability to make sound recommendations in such diverse areas as community relations, fiscal matters, labor management, urban issues, and modern police practices. Must be able to promote a positive image of the City of Wilmington and the Department of Police. Complete familiarity with all departmental rules and regulations, orders and policies.

**WORKING CONDITIONS:** While performing the duties of this job, the employee is frequently required to sit and talk or hear. The employee is occasionally required to stand; walk; use hands to finger, handle, or operate objects, tools, or controls listed above; and reach with hands and arms; climb, balance, stoop, kneel, crouch, or crawl; and taste and smell. The employee must occasionally lift and/or move up to 100 pounds. Specific vision required by this job includes close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus. While performing the duties of this job, the employee frequently works in outside weather conditions. The employee occasionally works near moving mechanical parts; in high, precarious places, and with explosives and is occasionally exposed to wet and/or humid conditions, fumes, or airborne particles, toxic, or caustic chemicals, extreme cold, extreme heat, and vibration.



## COMMISSION ON ACCREDITATION FOR LAW ENFORCEMENT AGENCIES, INC.
## AGENCY DEMOGRAPHICS REPORT

The purpose of this form is to standardize the reporting of demographics information to the Commission.  Initial accreditation agencies should record information for the past two years.  Re-accreditation agencies should record data for the current year and the year of the last assessment.

AGENCY NAME Wilmington Police Department

INITIAL ACCREDITATION_____REACCREDITATION____X___(Check One)

CURRENT YEAR    2006    COMPARISON/PREVIOUS YEAR    2005

I.    AGENCY DEMOGRAPHICS(S=Sworn/ N=Non sworn):

|  | Current Year | | Previous Year | |
|---|---|---|---|---|
| Authorized Strength | S:  322   N:   85 | | S:  300  N:  77 | |
| Actual Strength | S:  292   N:   84 | | S:  291  N:  82 | |

### (Check One)
This agency has ethnic and gender composition in the sworn law enforcement ranks in approximate proportion to the makeup of the available work force in its service community (31.2.1)_____ or;
A recruitment plan is in effect to decrease under-representation (31.2.2)   X

II:    SERVICE AREA POPULATION
Using the latest census figures, provide a breakdown of raw population numbers and percentages in the categories given.  You may use the blank box to identify a specific minority group indigenous to your service area having a significant impact on your agency's personnel practices.  Use the estimate column only if you are aware of more accurate figures.

Date of Census 2000    Total Population 72644

| CATEGORY | CENSUS FIGURES | | | | CURRENT ESTIMATE | | | |
|---|---|---|---|---|---|---|---|---|
| Caucasian | # | 25811 | -- | 36  % | # | 0 | -- | 0   % |
| African-American | # | 41001 | -- | 56  % | # | 0 | -- | 0   % |
| Hispanic | # | 5174 | -- | 7  % | # | 0 | -- | 0   % |
| Other | # | 678 | -- | 1  % | # | 0 | -- | 0   % |

III.    AVAILABLE WORKFORCE DATA        IV.    ACTUAL SWORN WORKFORCE DATA
Provide a percentage breakdown of currently filled sworn positions

| | | | |
|---|---|---|---|
| Caucasian | 75  % | Caucasian | 68  % |
| African-American | 19  % | African-American | 23  % |
| Hispanic | 5  % | Hispanic | 7  % |
| Other | 1  % | Other | 2  % |
| Percentage of above = Female | 51  % | Percentage of above = Female | 9  % |

Provide a percentage breakdown of your available workforce data for sworn positions.  Available workforce percentages are not raw population figures.  These percentages represent reasonable estimates of available females and minorities from within your local labor market.  The figures are used for comparison with agency goals or expectations to provide a diversified workforce.  Your applicant pool figures should resemble this percentage.  For example, females are likely to be near 50% of the total population, but a smaller percentage of the population might be available for public safety job opportunities.  You may find 10%-14% is a more reasonable figure.  There are many local factors impacting available workforce figures.  Sources for your data can include the U.S. Department of Labor, local personnel departments, or previous applicant flow figures; none of these should be considered the sole source.  In the absence of reliable local data on available females, you may use the national average of 14% cited by the *National Center for Women* or a comparison with similar law enforcement agencies.

                                                    D00834

**V.　AGENCY-WIDE BREAKDOWN OF SWORN AND CIVILIAN POSITIONS**

Provide numerical data (**raw numbers**) for categories given.　Only include the number of **full-time** sworn and civilian positions assigned to the law enforcement function.　Exclude part-time positions, volunteers, or employees assigned to corrections, fire services, or other non-law enforcement related functions.　Record data for the past two years for an **initial accreditation**.　For **reaccreditation**, record data for current year and year of previous assessment.

**CURRENT YEAR:**　　　　2006

| Sworn Personnel | Males | | | | Females | | | |
|---|---|---|---|---|---|---|---|---|
| | Caucasian | African American | Hispanic | Other | Caucasian | African American | Hispanic | Other |
| Entry Level/Technician | 143 | 49 | 13 | 3 | 9 | 7 | 1 | 0 |
| Supervisory (Corp/Sgt) | 29 | 2 | 3 | 0 | 2 | 3 | 0 | 0 |
| Command (Lt/Capt) | 11 | 5 | 0 | 0 | 3 | 1 | 0 | 0 |
| Executives (Maj.-above) | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 0 |
| Subtotal | 185 | 57 | 17 | 6 | 14 | 11 | 2 | 0 |
| **Non-sworn Personnel** | | | | | | | | |
| Clerical/Custodial | 7 | 14 | 0 | 0 | 14 | 35 | 6 | 0 |
| Supervisory/Technical | 4 | 0 | 0 | 0 | 1 | 2 | 0 | 0 |
| Managerial/Professional | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Executive | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal | 11 | 15 | 0 | 0 | 15 | 37 | 6 | 0 |
| **TOTAL** | 196 | 72 | 17 | 6 | 29 | 48 | 8 | 0 |

**COMPARISON YEAR:**　　　　2005

| Sworn Personnel | Males | | | | Females | | | |
|---|---|---|---|---|---|---|---|---|
| | Caucasian | African American | Hispanic | Other | Caucasian | African American | Hispanic | Other |
| Entry Level/Technician | 138 | 52 | 13 | 3 | 11 | 7 | 1 | 0 |
| Supervisory (Corp/Sgt) | 28 | 4 | 3 | 0 | 1 | 3 | 0 | 0 |
| Command (Lt/Capt) | 11 | 5 | 1 | 0 | 3 | 1 | 0 | 0 |
| Executives (Maj.-above) | 2 | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| Subtotal | 179 | 61 | 17 | 6 | 15 | 11 | 2 | 0 |
| **Non-sworn Personnel** | | | | | | | | |
| Clerical/Custodial | 6 | 14 | 0 | 0 | 15 | 33 | 6 | 0 |
| Supervisory/Technical | 4 | 0 | 0 | 0 | 1 | 2 | 0 | 0 |
| Managerial/Professional | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Executive | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal | 10 | 15 | 0 | 0 | 16 | 35 | 6 | 0 |
| **TOTAL** | 189 | 76 | 17 | 6 | 31 | 46 | 8 | 0 |

Printed name of Person Submitting Form　Master Corporal Nicholas Caruso

D00835

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )    C.A. No. 06-256-SLR
                                       )
JAMES M. BAKER, et al.                 )    JURY TRIAL DEMANDED
                                       )
            Defendants.                )
                                       )

## DECLARATION OF JAMES M. BAKER

James M. Baker makes the following declaration to the best of his knowledge, information and belief, subject to the penalties for perjury set forth in 28 U.S.C. § 1746:

1.     I am the Mayor of the City of Wilmington (the "City") and a defendant in the above-captioned case. I was sworn into office on January 2, 2001. I have been a resident of the City since 1966. I was a member of the City Council from 1972 to 2000, and served as City Council President from 1984 to 2000.

2.     The City of Wilmington is a racially and ethnically diverse city with a history of racial tensions, including riots in 1968 after the assassination of Dr. Martin Luther King that led the governor of Delaware to call in the National Guard. In 1969, the City appointed its first African-American police inspector. After his retirement, all of the City's police inspectors were white once again.

3.     In 1978, members of the African-American community expressed concerns to the City's administration about the continued lack of African-American police officers in the upper levels of the Wilmington Police Department (the "WPD"). African-American City Council members and community leaders attended meetings with City officials to discuss how to improve relations between the police department and the African-American community. During

these discussions, the City agreed to create a new inspector position, which was filled by an African-American, Kenneth Miles.

4.      As of 2000, the City of Wilmington's total population was 72,644. Thirty-six percent (25,811) were Caucasian, 56% (41,001) were African-American, 7% (5,174) were Hispanic and 1% (678) were Other. The WPD sworn workforce is 68% Caucasian, 23% African-American, 7% Hispanic and 2% Other. Of course, many members of the general population of the City are not qualified to become WPD officers because of their age, educational level, criminal history, and so on, and the WPD applicant pool also includes people who are not City residents at the time they apply, but the discrepancy between the percentage of police officers who are African-American and the percentage of City of Wilmington residents who are African-American has been a source of dissatisfaction in the community.

5.      Researchers report that having a diverse police force helps improve relationships between the police and the community and helps prevent incidents of police misconduct. For example, a 1996 Amnesty International Report (attached hereto as Ex. A) recommended, among other things, that New York City should "encourage recruitment from ethnic minorities, and more patrolling of inner city areas by these groups." In my experience, many people in the African-American community find it easier to trust and communicate with African-American officers, which increases the community's cooperation with law enforcement efforts, leading to improved public safety. Diversity within the police department also helps individual officers to see past stereotypes and to improve their understanding of people of other races and ethnicities, leading to improvements in trust, respect, and communication not only within the department but also in our dealings with the public.

6.    This does not mean that I am willing to nor that I have appointed police inspectors, or any other top City officials, based solely on their skin color. I always try to select the individuals whom I believe have the best qualifications for the job. But I believe that the City has a compelling interest in promoting diversity in the police department for the reasons described above.

The preceding is true and correct to the best of my knowledge, information and belief. I make this declaration in Wilmington, Delaware, subject to the penalties for perjury set forth in 28 U.S.C. § 1746.

James M. Baker

# EXHIBIT A

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1. 1 Composition of the NYPD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1. 2 Inquiries into the NYPD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1. 3 The Civilian Complaint Review Board (CCRB). . . . . . . . . . . . . . . . . . . . . . 5
    1. 4 Past allegations of brutality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. SUMMARY OF AMNESTY INTERNATIONAL'S FINDDINGS . . . . . . . . . . . . . . . . 8
    2. 1 Sources of information collected by Amnesty International . . . . . . . . . . . . . . . . 8
    2. 2 Police guidelines on the use of force . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2. 3 International standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2. 4 Types of ill-treatment alleged and other findings . . . . . . . . . . . . . . . . . . . 10
    2. 5 Charging victims of police misconduct . . . . . . . . . . . . . . . . . . . . . . . . . 10
    2. 6 Shootings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2. 7 Race of victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2. 8 Disciplinary action for excessive force . . . . . . . . . . . . . . . . . . . . . . . . . 12
    2. 9 The extent of police ill-treatment: statistics on complaints . . . . . . . . . . . . . . . 13
    2. 10 Secrecy of information on complaints against the police . . . . . . . . . . . . . . . . 15

SAMPLE CASE OF ALLEGED PHYSICAL BRUTALITY . . . . . . . . . . . . . . . . . . . . . 16

3. DEATHS IN CUSTODY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    3. 1 Statistics on deaths in police custody and preventative guidelines . . . . . . . . . . . . 26
    3. 2 Cases examined by Amnesty International . . . . . . . . . . . . . . . . . . . . . . . . 27
    3. 3 Deaths by pepper spray . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SAMPLE CASES OF DEATHS IN CUSTODY . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4. POLICE SHOOTINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    4. 1 NYPD Guidelines on Deadly Force . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    4. 2 Statistics on police shootings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    4. 3 Racial disparities in police shootings . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    4. 4 Procedures for investigating police shootings . . . . . . . . . . . . . . . . . . . . . . 39
    4. 5 Criminal investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    4. 6 Public information on police shootings . . . . . . . . . . . . . . . . . . . . . . . . . 41
    4. 7 Change in NYPD to semi-automatic weapons . . . . . . . . . . . . . . . . . . . . . . 42

SAMPLE SHOOTING CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

5. INVESTIGATION AND MONITORING OF COMPLAINTS: REMEDIES FOR POLICE
    ABUSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    5. 1 Internal investigations into police misconduct . . . . . . . . . . . . . . . . . . . . . . 55
    5. 2 The CCRB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    5. 3 Strained Relations between CCRB and Police Department . . . . . . . . . . . . . . . . 57
    5. 4 Disciplinary action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    5. 5 Disposition of cases referred to the Police Commissioner by the CCRB . . . . . . . . . 59

5. 6  Statute of limitations for disciplinary action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
5. 7  Prosecutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
5. 8  Non-jury trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
5. 9  Federal prosecutions for police misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
5. 10 Civil actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
5. 11 Independent Oversight of Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
5. 12 State and federal monitoring of police use of deadly force . . . . . . . . . . . . . . . . . . 64

6. AMNESTY INTERNATIONAL'S RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . 65

Appendix 1 - Selected International Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Appendix 2 - A Selection of Reports Published by Amnesty International on the USA . . . . . . . . . . 71

# UNITED STATES OF AMERICA

# Police brutality and excessive force in the New York City Police Department

## INTRODUCTION

Amnesty International has received disturbing allegations of the ill-treatment of suspects, deaths in custody and unjustified shootings by officers from the New York City Police Department (NYPD) in the past few years. Although reports of police brutality are not new, the number of people bringing claims for police misconduct against the City of New York has increased substantially in recent years, from 977 in 1987 to more than 2,000 in 1994. The amount paid out by the city each year in settlements or judgments awarded to plaintiffs in police abuse cases has also risen, from $13.5 million in 1992 to more than $24m in 1994.

This report describes the results of research conducted by the organization over an 18-month period which included two fact-finding visits to New York. Amnesty International acknowledges that a number of reforms have taken place within the NYPD during the past three years, partly in response to a commission of inquiry into police corruption which was appointed in 1992. However, there remains a problem of police brutality and excessive force which the organization believes still needs to be urgently addressed.

Amnesty International has collected information on more than 90 cases of alleged ill-treatment, or excessive use of force resulting in ill-treatment or death, by New York City police officers dating from the late 1980s to early 1996. The allegations include people being repeatedly struck with fists, batons or other instruments, often after very minor disputes with officers on the street; deaths in police custody; and shootings in apparent violation of the NYPD's own very stringent guidelines. The victims include men and women, juveniles and people from a variety of social, racial and ethnic backgrounds. However, the evidence suggests that the large majority of the victims of police abuses are racial minorities, particularly African-Americans and people of Latin American or Asian descent. Racial disparities appear to be especially marked in cases involving deaths in custody or questionable shootings, an issue Amnesty International believes should be the focus of particular inquiry.

Amnesty International is not able to reach conclusions about the accuracy of all the allegations made in every case. This is partly because the circumstances are often heavily disputed but also because of the lack of public disclosure surrounding investigations into police misconduct in New York City, an issue also addressed in this report. However, the information gathered suggests that police brutality and unjustifiable force is nevertheless a widespread problem, with a pattern of similar abuses occurring over many years. Although the incidence of corruption has reportedly fallen, Amnesty International was disturbed to learn that complaints of brutality have continued to rise, with significant increases in the past two years. There was also a substantial rise in both deaths in police custody and police shootings between

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

1993 and 1994 (the last year that figures were available).

    Amnesty International recognizes that the police in New York City have a difficult and often dangerous job and that most encounters between officers and members of the public do not result in allegations of misconduct. Amnesty International also recognizes that the police are permitted - even obliged - to use force in certain situations. However, the authorities have a responsibility to ensure that ill-treatment and excessive force will not be tolerated in any circumstances. In many of the cases examined international standards as well as US law and police guidelines prohibiting torture or other cruel, inhuman or degrading treatment appear to have been violated with impunity. While there has been an increase in prosecutions for police corruption in recent years, prosecutions for on-duty excessive force remain relatively rare and convictions even rarer. In most of the cases examined police officers were not disciplined or received only minor sanctions. The "code of silence" in which police officers refuse to testify against their colleagues appears to have contributed to impunity in many cases.

    Amnesty International's recommendations, which are contained at the end of this report, include setting up an independent inquiry into allegations of police brutality, deaths in custody and police shootings in New York City; greater transparency in the investigation of complaints; an independent monitor for brutality as well as corruption; and the publication of regular statistics on police shootings and deaths in custody both in New York City and on a state-wide basis. Amnesty International is also calling on the federal authorities to maintain national statistics on police shootings and deaths in custody to allow greater accountability and monitoring of those who die at the hands of law enforcement officials.

    Amnesty International's investigation into the NYPD forms part of its ongoing work in monitoring and investigating allegations of ill-treatment across the USA. Its concern with police brutality is not confined to the NYPD as its annual reports and other publications show (see Appendix 2 for examples of AI's reports on the USA). However, as the largest municipal police department in the country (with 38,000 officers) covering a complex metropolitan area, the NYPD's mechanisms, guidelines and practices provide an example for other police departments. Many of Amnesty International's findings and recommendations regarding the NYPD are equally relevant to other law enforcement agencies in the USA.

## 1. BACKGROUND

## 1. 1 Composition of the NYPD

The New York City Police Department (NYPD) is the largest police force in the USA, with more than 38,000 serving officers at the end of 1995. The department is divided into 76 precincts covering the five boroughs of New York City (NYC): Manhattan, Brooklyn, The Bronx, Queens and Staten Island. In the spring of 1995 the NYC Housing Authority Police Department and the NYC Transit Police Department (comprising a total of 7,000 officers) were merged with the NYPD.

According to the 1990 census, the general population of New York City was 43.2% white; 28.7% black; 24.4% Latino (Hispanic); and 7.7% "other", including Asian. However, the large majority of NYPD officers are white. A study conducted in 1992 found that New York ranked last in a 50-city survey of how well US police departments reflected the racial makeup of their populations.[1] At the time of the study only 11.4% of NYPD officers were black and 13.6% Latino. As statistics indicate that blacks and other minorities are disproportionately the victims of police excessive force, the composition of the police force has given rise to particular concern, both within and outside the department. Although the the department has reportedly made efforts to recruit more minority officers, the percentage of black officers remains virtually unchanged. In 1995 the racial distribution of the NYPD was 72.2% white; 15.2% Latino; 11.5% African-American and 1.1% "other" including Asian.[2] Most NYPD officers live in the suburbs outside the city, and some critics of the department allege that this has contributed to a sense of alienation and tension between the police and the inner-city communities in which they work.

### 1. 2 Inquiries into the NYPD

Since its creation in the last century, the NYPD has suffered from a series of corruption scandals, running in approximately 20-year cycles, followed by investigations and periods of reform. A major inquiry conducted by the Knapp Commission in 1972 found institutionalized corruption throughout the department, mainly involving officers taking bribes to allow gamblers, prostitutes and others to avoid arrest. A number of reforms followed, including reorganization of the department's Internal Affairs Division (IAD), and the creation of the post of a State Special Prosecutor to prosecute police officers for corruption. This post, which operated independently of the local prosecutors (district attorneys), was dissolved in 1990.

However, new allegations of corruption surfaced in 1992 when six NYC police officers were arrested on drugs charges by neighbouring Suffolk County Police Department, and questions were raised as to how they managed to avoid detection for so long. The renewed scandal led to the appointment of the Mollen Commission of Inquiry in July 1992 by the then-mayor of New York City, David N. Dinkins.[3] In its report published in July 1994, the Mollen Commission found serious corruption among patrol officers

---

[1]The study was prepared by the Department of Criminal Justice at the University of Nebraska and compared the police departments and general populations of the 50 largest cities in the USA.

[2]Figures are cited in the January - June 1995 report of the NYC Civilian Complaint Review Board.

[3] The Commission was chaired by Milton Mollen, a former judge and deputy mayor of NYC.

in several of the city's high crime precincts which, though no longer as pervasive as the bribery uncovered by the Knapp Commission, was of a far more serious nature. The corruption included groups of officers protecting and assisting narcotics traffickers; conducting unlawful searches and seizures; committing perjury and falsifying records; and engaging directly in drug trafficking and robberies. The Commission found that the department from the top downwards had failed to monitor or adequately investigate officers guilty of abuses and that senior officers practised a deliberate "blindness" to corruption, with IAD investigations serving to minimize rather than expose corruption. It also found that corrupt officers were able to operate with impunity in certain areas largely because of a "code of silence" in which even honest officers were unwilling, or afraid, to incriminate their colleagues. The code of silence, the Commission found, was particularly powerful in crime-ridden precincts where fear and alienation from the local community had bred an "Us versus Them" mentality and officers depended upon each other for support. The report cited examples where officers who had tried to report or investigate police misconduct had suffered from hostility, lack of cooperation and in some cases reprisals.

Although the main focus of the inquiry was on corruption, the Mollen Commission found a direct link between corruption and brutality, stating that "Police brutality seemed to occur, in varying degrees, wherever we uncovered corruption, particularly in crime-ridden, drug infested precincts, often with large minority populations". The Commission found that it was difficult to quantify the extent of brutality because officers were even more reluctant to report acts of brutality than corruption, and because official records of such incidents in the past had been inadequate. However, it cited several reports of individual officers using extreme brutality.[4]   The Commission also found a degree of  tolerance within the department of certain levels of brutality, noting: "An excessive use of fists to face, nightsticks to ribs, and knees to groin are seen as the realities of policing". While some of this was in the form of "street justice" administered to those the police believed were involved with crimes, the commission noted that brutality was not always confined to people suspected of criminal activity.

The Commission found that not only patrol officers, but supervisors as well, often turned a blind eye to evidence of unnecessary force. The Commission stated that it was "repeatedly told" that supervisors did not question accounts given by officers when arriving at a station house with a visibly beaten suspect, that the suspect had "resisted arrest", and that it was easy to let such cases pass in the absence of independent witnesses. It found that such attitudes "breed, protect and justify" brutality and "allow even the otherwise good cop to take occasional liberties without remorse or fear".

The Police Department has taken steps to address the problem of corruption and other misconduct since the Mollen inquiry, a process which began while the Commission was still sitting. During the past two years dozens of officers - the largest group from the 30th Precinct in Harlem - have been arrested on charges including perjury, extortion and narcotics trafficking. While most criminal charges

---

[4]These reports were based on testimony to the Commission from co-operating police officers. They included reports of officers threatening to kill a drug dealer by placing a gun in his mouth;  throwing a bucket of ammonia into the face of a detainee in a precinct holding cell; and throwing boiling water onto a suspect found hiding during a search of a building. It was also alleged that one notoriously corrupt officer and his colleagues, after raiding a brothel on one occasion, then proceeded to line up and rape the women present. (Commission Report at pp 47)

*AI Index: AMR 51/36/96*

                                                                          *Amnesty International June 1996*

have involved corruption, 16 officers from two Bronx precincts were indicted in May 1995 on charges which included assaults on suspects as well as perjury and theft. There have also been internal reforms within the department in line with the Mollen Commission's recommendations. These have included an overhaul of the IAD and its field units into a centralized Internal Affairs Bureau (IAB); new procedures for monitoring officers for corruption and brutality and changes in recruitment and training policy.

The Mollen Commission recommended that the Police Department should retain primary responsibility for investigating corruption within the force. However, one of its central recommendations was the creation of a permanent oversight agency, independent of the department, which would perform continuous assessments of the NYPD's own anti-corruption measures and, where necessary, conduct its own investigations. This proposal has not been implemented and is the subject of dispute between present Mayor Rudolf W.Guiliani and the City Council. The City Council passed a bill setting up an independent to monitor and investigate corruption along the lines recommended by Mollen, but this was vetoed by the mayor who established his own panel by executive order. Unlike the council's proposal, the mayor's panel has no independent powers to investigate police corruption.[5]    A number of other recommendations made by the Mollen Commission, designed to control brutality as well as corruption (for example, legislative changes to extend the statute of limitations for when officers can be disciplined), have also not been implemented. These issues are discussed further under ***Section 5 (Investigation of complaints: remedies for police abuses)***.

### 1. 3 The Civilian Complaint Review Board (CCRB).

New York City has had a review board to investigate complaints by members of the public against police officers since 1953. Until 1987 the board was composed entirely of non-uniformed members of the Police Department. From 1987 until 1993, the CCRB was composed of six private citizens appointed by the major and six civilian employees of the Police Department appointed by the Police Commissioner; it lacked subpoena power and most of its investigators were serving police officers. However, there was increasing concern about the board's lack of independence and the very small proportion of complaints which were substantiated (around 7% on average).

In January 1993 the City Council amended the City Charter to create for the first time an all-civilian board which was completely independent of the police. The new Civilian Complaint Review Board (CCRB), which came into operation in July 1993, has 13 members. While all are appointed by the mayor, five are chosen by the mayor; five representing each of the City's five boroughs are designated by the City Council; and three are designated by the Police Commissioner (the last three being the only board members permitted to have law enforcement backgrounds, although they may not be serving police officers). It also has a staff of all civilian investigators, with power to subpoena documents and compel witness testimony.

---

[5] The bill establishing an Independent Police Investigation Board, was passed by the City Council in November 1994 but was vetoed by the mayor who opposed an agency with broad investigative powers on the ground that this would conflict with the role of the district attorneys and other agencies. The mayor's veto was upheld by the State Supreme Court in June 1995 on the ground that the City Council had exceeded its powers. The matter was still pending further appeal in April 1996. The mayor's panel consists solely of mayoral appointees and has no independent investigative or subpoena powers.

There was strong opposition within the NYPD to the creation of the all-civilian complaints review board. When Mayor Dinkins' original proposal was being debated by the City Council in September 1992, thousands of off-duty police officers took part in a protest demonstration outside City Hall, organized by the main police union, the Patrolmen's Benevolent Association (PBA). The present mayor of New York City, Rudolf W.Guiliani, who was elected to office in January 1994, also opposed the creation of an all-civilian board. The bill that was eventually passed made some concessions to opponents of Dinkin's original proposal (which was for a board selected solely by the mayor) by providing that three board members would be chosen by the Police Commissioner and five by the City Council, but it retained its all-civilian composition and independence of the police department.

Under its present remit, the CCRB may investigate complaints involving excessive force; abuse of authority; discourtesy; and offensive language (including slurs against a person's sexual orientation, race, ethnicity, religion, gender or disability). Other types of misconduct, including corruption, do not fall within its jurisdiction. In cases involving deaths or serious injuries, there may be overlapping jurisdiction and the CCRB may conduct investigations which are concurrent with IAB inquiries. However, if the District Attorney is already conducting a criminal inquiry, the CCRB will suspend its own investigation until the results of the criminal inquiry are known. The CCRB reports its findings and recommendations to the Police Commissioner.

The CCRB clearly has an important role in ensuring public accountability in investigations into alleged police misconduct. However, there are signs of serious conflict between the police and the new CCRB, with each accusing the other of lack of cooperation. These strained relations undermine confidence in the investigation of complaints and in police willingness to be subjected to outside scrutiny, an issue which is discussed in more detail below: (see *Section 5: Investigation of complaints: remedies for police abuses*).

## 1. 4 Past allegations of brutality

Although most major inquiries into the NYPD have involved corruption, police brutality has also been a recurrent concern. There were calls for an inquiry into police brutality in the mid 1980s, following a series of highly publicized cases in which black people died or were ill-treated in custody. They included the cases of Michael Stewart, a young African American who died in September 1983 13 days after being taken to hospital hogtied, bruised and in a coma following his arrest by 11 officers from the New York City Transit Police Department for spraying graffiti in a Manhattan subway, and Eleanor Bumpers, a elderly, mentally disturbed woman shot dead in October 1984 by armed police who broke into her Bronx apartment to evict her after she had fallen behind with her rent. In both cases officers were acquitted of criminal wrongdoing after trials, although some officers' tactics were later criticized by internal inquiries.

In April 1985 officers from 106th Precinct in Queens were accused of torturing three suspects with an electronic stun gun to force them to confess to having sold small quantities of marijuana. Two officers and a sergeant were subsequently convicted of assault and other charges and sentenced to prison terms ranging from 2 to 6 years, and several high ranking police commanders were dismissed.

Although these and other cases were dismissed as isolated examples by the police department, public concern led New York State Governor Mario Cuomo to appoint a commission of inquiry in 1985. The remit of *The New York State Commission on Criminal Justice and The Use of Force* (also known

as the Curran Commission, after its chair Paul Curran) was  to investigate the use of force by police departments throughout the state and to examine, among other things, whether racial minorities were more likely to be victims of excessive or deadly force than other groups. The Curran Commission, which looked at procedures rather than individual cases, subsequently concluded in 1987 that there was no systematic misuse of deadly and physical force by law enforcement officials in the state and that race did not play a significant part, although it did find  abuse of suspects through police use of racial slurs. It made a number of recommendations for strengthening procedures, aimed at improving public confidence in the police. The report's findings have been dismissed as inadequate by several civil rights groups. Although there have been other concerns about police brutality since then, and some inquiries into specific incidents (or specific precincts[6]), there have been no further general inquiries into police use of force in New York.

---

[6]For example, the CCRB started a review of complaints of brutality in a number of Bronx precincts in 1994 following a rise in complaints in that area.

## 2. SUMMARY OF AMNESTY INTERNATIONAL'S FINDINGS

### 2.1 Sources of information collected by Amnesty International

Amnesty International's report is based on an 18-month investigation which included two research visits to New York City in October 1994 and November 1995.[7] Amnesty International's delegates met lawyers representing alleged victims of police brutality and members of civil rights groups. They also had meetings with officials from the Internal Affairs Bureau of the NYPD; the Civilian Complaint Review Board; the office of the US Attorney for the Southern District of New York[8] and the Bronx District Attorney's office. Meetings were requested with officials from the Manhattan and Brooklyn District Attorneys' offices but these were unable to be arranged. Amnesty International also obtained information from other sources, including the City Comptroller's office[9], the office of the City Counsel, court records, newspaper articles and police reports and guidelines on the use of force. Amnesty International also sought information from the Police Commissioner and from the NYPD's Public Information Department on both specific cases and statistics; however, not all the information requested from official sources was provided.

Amnesty International has reviewed more than 90 individual cases of alleged ill-treatment and excessive force by New York City police officers, dating from the late 1980s to early 1996.The large majority of the cases involve officers from the NYPD, although a few cases involve officers from the NYC Transit or Housing Authority Police Departments before their merger with the NYPD in 1995. In most cases civil lawsuits seeking damages for police misconduct were filed against the individual officers concerned, as well as against the Police Department and the City of New York as the authorities responsible for police practices and behaviour. These lawsuits include tort actions brought in the state courts, and cases brought under Title 42, Section 1983 of the United States Code (USC) - a federal civil rights statute which allows individuals to sue state officials directly in a state or federal court for violations of their civil or constitutional rights.[10] In many of the cases examined substantial damages were awarded to the plaintiffs for alleged police misconduct; other cases were still pending at the time of writing. The police and other authorities have pointed out that civil lawsuits do not prove misconduct and that most cases are settled out-of-court by the city (ie without going to trial), without any admission of liability.

[7]Amnesty International's delegates were David Marshall, a United Kingdom barrister and member of the Bar Human Rights Committee of England and Wales, and a staff member of Amnesty International's International Secretariat.

[8]The US Attorney is an official from the US Department of Justice responsible for investigating violations of federal law and state or federal officials alleged to have violated federal civil rights statutes.

[9] The chief fiscal officer, responsible for the city's finances.

[10]Civil rights actions for police misconduct commonly allege violations of the Eighth and Fourteenth Amendments to the US Constitution. The Eighth Amendment prohibits the imposition of cruel and unusual punishment; the Fourteenth Amendment states, *inter alia*, that no State shall deprive any person of "life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

However, Amnesty International was told that the city tends to settle cases where injuries or other evidence are consistent with the claims made. Many cases are settled on the basis of an independent evaluation of the facts by a judge, even if they do not go to trial. Amnesty International considers therefore that civil lawsuits provide an important source of information on the extent and nature of police misconduct. (This issue is discussed further under *Section 5*.)

## 2. 2 Police guidelines on the use of force

New York state law and police department policy provide that officers may use only the minimum amount of force which is necessary to achieve a legitimate purpose (e.g. effect an arrest or prevent the commission of an offence) when other options are not available or have been exhausted. NYPD guidelines set out the following five stages through which force can progress: (1) verbal persuasion; (2) unarmed physical force; (3) force using non-lethal weapons (e.g. pepper spray or mace); (4) force using impact weapons (e.g police batons); and (5) deadly force, which may be used only when an officer or another person's life is in direct danger. The guidelines also state that flashlights, radios and handguns are not designed as impact weapons and make clear that they should not be used as such in most circumstances. Police regulations also state that any officer at the scene of a police incident has an obligation to ensure that the law and regulations are complied with, and to intervene if the use of force against a subject becomes excessive. The guidelines note that failure to do so constitutes an offence under the law as well as departmental policy.

In many of the cases Amnesty International has looked at, the levels of force used and other police action appear to have violated these guidelines, as well as international standards.

## 2. 3 International standards

Amnesty International is concerned that in many cases the treatment alleged may have violated international human rights standards and treaties, including those prohibiting the imposition of torture or other cruel, inhuman or degrading treatment. Such treatment is prohibited under Article 5 of the Universal Declaration of Human Rights, under Article 7 of the International Covenant on Civil and Political Rights (ICCPR) and under the United Nations (UN) Convention against Torture and Other Cruel, Inhuman or Degrading Treatment. Both the ICCPR and the Torture Convention have been ratified by the USA.

In many cases also the treatment appears to have violated standards contained under the UN Code of Conduct for Law Enforcement Officials, adopted by the UN General Assembly in 1979, and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials (Basic Principles), adopted by the Eighth UN Congress on the Prevention of Crime and the Treatment of Offenders on 7 September 1990. These provide, among other things, that force should be used only as a last resort when non-violent measures have failed or would be clearly inappropriate, and that in all cases the amount of force must be proportionate to the threat encountered and designed to minimize damage and injury.

These and other international standards (including the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, and standards on the prevention and investigation of extra-legal, arbitrary and summary killings) are contained in the Appendix to this report or are referred to where relevant in the text.

## 2. 4 Types of ill-treatment alleged and other findings