## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-256-SLR |
| | ) | |
| JAMES M. BAKER, et al. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REDACTED APPENDIX PART 2 OF 2 TO THEIR ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR FULL AND/OR PARTIAL SUMMARY JUDGMENT

Teresa A. Cheek (#2657)
Adria B. Martinelli (#4056)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Daniel B. Rath (#3022)
Rebecca L. Butcher (#3816)
LANDIS RATH & COBB LLP
919 Market Street
Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Dated: August 13, 2007

The large majority of the cases reviewed by Amnesty International involved allegations of excessive physical force by patrol officers during the course of arrests, disputes or other incidents in the street or public places. Some alleged ill-treatment occurred in police stations or on the way to a police station. The most common forms of ill-treatment alleged were repeated kicks or punches by officers using fists, batons or other instruments such as police radios or flashlights, sometimes while the suspect was handcuffed or otherwise restrained. In most cases injuries were sustained which required medical treatment, and in at least a dozen cases the injuries were severe enough to require the victim to spend some time in hospital.

The sample includes 15 cases in which suspects died after being forcibly restrained by police officers. In some cases death was caused by asphyxia after pressure had been applied to the victim's neck or chest, a procedure known to inhibit breathing in certain circumstances. In several cases it appears that police used a "choke hold", in violation of police guidelines. In some of these cases there were also signs of the deceased having been beaten (death-in-custody cases are dealt with in more detail under *Section 3*).

In many of the cases examined, the alleged victims were not involved in or suspected of criminal activity prior to their contact with the police but were reportedly ill-treated after they questioned police authority or became involved in relatively minor disputes. In these and other cases police officers appeared to have resorted to unwarranted levels of force out of all proportion to any threat posed, in violation of their own guidelines. Several of the victims were so-called "bystanders" who were allegedly brutalized after taking photographs or criticizing police treatment of others. These latter cases violated police guidelines which prohibit officers from arresting or restraining onlookers who intervene verbally during an incident or who request officers' badge numbers or take photographs.[11]

## 2. 5 Charging victims of police misconduct

In a large proportion of cases, the alleged victims of police assaults were themselves charged with offences such as resisting arrest or assaulting a police officer, charges which were usually dismissed later for lack of evidence. Amnesty International was told that it was common practice for police officers involved in misconduct to charge victims with offences in order to justify the use of force and cover up abuses. Amnesty International was told that it was common also to "overcharge" suspects (i.e. charge someone with additional offences or more serious charges) to cover up misconduct; in such cases the suspect may be under pressure to accept a plea bargain to a lesser charge rather than persist with a complaint against the police. Such claims are supported by evidence uncovered by other bodies in recent years. The Mollen Commission, for example, found that police perjury and falsification of documents was common among officers guilty of abuses and was often used to conceal corruption or excessive force.[12]

---

[11]The guidelines were introduced in 1977 following a court order after a lawsuit was filed alleging a pattern of ill-treatment of onlookers. They were allowed to lapse in the 1980s but were reinstated and incorporated into the NYPD Patrol Guide following further concern about such cases in the early 1990s.

[12]The Mollen Commission found perjury and falsification of documents to be among the most common forms of corruption by NYPD officers. It also observed that "A number of officers told us how they and others would insulate themselves from excessive force complaints simply by adding charges of 'resisting arrest' to the arrest report - a practice rarely questioned by supervisors". (Mollen report at pp. 37). Several recent police corruption

## 2. 6 Shootings

In addition to physical brutality, the sample of cases reviewed by Amnesty International included some 30 cases in which suspects were shot, and killed or injured, by police officers. The NYPD has very stringent guidelines for when officers may resort to deadly physical force and police shootings are relatively rare compared to the arrest rate and number of police contacts with criminal suspects. However, Amnesty International is disturbed by a number of cases in which officers appear to have shot suspects in circumstances which did not warrant the use of lethal force, in violation of police guidelines and international standards. This issue is dealt with in more detail under *Section 4*.

## 2. 7 Race of victims

The alleged brutality occurred across a wide area of New York City and involved victims from a variety of social, racial and ethnic backgrounds. However, the most serious complaints tended to be concentrated in high crime precincts and in precincts with large minority populations.  More than two-thirds of the victims in the cases examined were African-American or Latino and most, though not all, of the officers involved were white. Nearly all of the victims in the cases of deaths in custody (including shootings) reviewed by Amnesty International were members of racial minorities.

Statistics published by the Civilian Complaint Review Board in its bi-annual reports also indicate that minorities are disproportionately the victims of police abuse compared to the overall racial composition of New York City. Three-quarters (75.9%) of the people who lodged complaints with the CCRB from January to June 1995 were African-American (50.3%) and Latino (25.6%), while the remainder were either white (21.2%) or "other" (2.8%), including Asian. These statistics (which do not give a racial breakdown of the final disposition of complaints)  are similar to previous reports by the CCRB. Most complaints received by the CCRB were of excessive force; other complaints included abuse of authority, discourtesy and offensive language, including ethnic or racial slurs.

The CCRB reports reveal that the race of the subject officers in police misconduct complaints broadly reflects their proportion in the force as a whole. The  January - June 1995 CCRB report stated that 69.2% of subject officers were white; 17.5% Latino, 12.5% African-American, and 0.8% "other", including Asian. Thus, while it appears that much of the abuse is directed toward racial minorities, the problem of excessive force within the PD is not confined exclusively to white officers but may reflect a wider police culture.

Amnesty International was told that civil lawsuits for police misconduct do not necessarily reflect the incidence of racist ill-treatment. Lawyers with the Asian American Legal Defense Fund (AALDF), for example, told Amnesty International that the organization received numerous reports of abusive and discriminatory treatment of Asian Americans by police, including false arrests, failure to take seriously complaints by Asian victims of abuses by non-Asian perpetrators, and brutality. However, it had resources to litigate only a few cases, concentrating on those where there was serious injury or particularly strong

---

trials, following police, DA and CCRB investigations, have included charges that officers routinely covered up brutality by falsely filing assault charges against suspects.

independent evidence. Several cases in which AALDF have filed or assisted in lawsuits involving Asian Americans are cited below, including the case of Yong Xin Huang, a 16-year-old Chinese boy shot dead by a police officer in March 1995.

Other attorneys said that cases involving relatively minor injury/assaults arising out of a challenge to police authority were more likely to be brought by white victims and that similar cases involving minority victims (especially in poor areas) were unlikely to result in civil lawsuits.

## 2. 8 Disciplinary action for excessive force

The police did not respond to most of Amnesty International's inquiries as to whether disciplinary action had been imposed against officers in the specific cases reviewed. However, information from other sources (including attorneys representing plaintiffs) indicated that very few officers had been disciplined, and that only minor sanctions were imposed against those found guilty of misconduct. This applied even in cases where substantial damages were later awarded to victims of alleged police excessive force in civil actions. Several of the officers named in police brutality complaints were later promoted. Several of the officers named in police misconduct lawsuits had prior complaints of brutality lodged against them, most of which, however, were ruled "unsubstantiated" [13] after police internal, or CCRB, investigations.

It is rare for NYPD officers to be criminally prosecuted for on-duty excessive force and even rarer for convictions to be obtained. For example, although there have been dozens of deaths in police custody in disputed circumstances during the past 20 years, and a number of officers have been prosecuted, at the time of writing only one NYC police officer since 1977 had been convicted of a homicide committed while on duty.[14] Officers charged with serious crimes in NYC will usually elect to be tried without a jury as the chances of acquittal by a judge in a non-jury trial are thought to be greater in inner city districts - a practice which was criticized by some prosecutors to whom the organization spoke.

Various reasons have been given for the lack of internal disciplinary sanctions or successful prosecutions in apparently serious cases. Amnesty International was told that there was a high threshold for proving criminal charges against police officers who may legitimately use physical force in many situations; others said that investigations were often inadequate, and that there was a conflict of interest between prosecutors who depended upon the police in other investigations - something strenuously denied by the prosecutors with whom Amnesty International raised this. However, one of the greatest barriers to prosecution or disciplinary action, appears to be the "code of silence" among officers. This can make it difficult either to prove that misconduct occurred at all (by, for example, officers covering up abuses by charging the victims with assault, as mentioned above) or to identify the officers responsible, especially in cases where there are no independent witnesses. In several of the cases Amnesty International looked at, ill-treatment was found to have occurred but investigators could not prove which officer was responsible. These issues are discussed in more detail under *Section 5*.

---

[13] This means there was insufficient evidence to clearly prove or disprove allegations made.

[14] In April 1995 a former officer from the NYC Housing Police Department was convicted of criminally negligent homicide and sentenced to one to four years' imprisonment for shooting an unarmed black man as he sat in his car.

## 2. 9 The extent of police ill-treatment: statistics on complaints

It is impossible to measure the full extent of police brutality from the data examined. The sample of cases reviewed by AI represent only a small proportion of complaints filed against the police. They also represent a small proportion of encounters between the police and members of the public each year, most of which do not involve the use of force.[15] However, the information collected suggests that police brutality and unnecessary force is nevertheless a widespread problem. The cases show a pattern of similar abuses occurring across the city, with minorities most at risk of being the victims of excessive force.

Furthermore, civil claims filed against New York City for police misconduct have been rising steadily for some years. A report prepared by the City Comptroller in February 1992 stated that the number of police misconduct claims filed with the Comptroller's Office had increased 53% over the five years from 1987 to 1991 (from just over 1,000 in 1987 to more than 1,500 in 1991). Claims have risen since then to around 2,000 annually. The number of actual lawsuits filed in any given year is somewhat lower but still substantial. More than 3,000 State and Federal civil lawsuits were brought against the City of New York alleging police misconduct for the years 1992 through 1995.[16]

The number of cases actually disposed of in any given year is much lower, as civil lawsuits usually take years to reach a settlement. Statistics provided by the City Comptroller's Office show that damages have been awarded to victims of police misconduct in between 200-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. The money paid out by the city in damages to alleged victims of police misconduct has risen from around $7m in 1988 to more than $24m in 1994.

Some city counsel and police officials have suggested that the increase in civil actions is due to an increasingly litigious society and opportunistic lawyers prepared to file lawsuits in frivolous cases. However, it appears that civil lawsuits may in fact under-represent the true level of police misconduct. Attorneys and civil rights groups repeatedly told Amnesty International that many cases of ill-treatment did not result in lawsuits; these included cases where there were no independent witnesses; or the alleged victim was convicted of an offence arising out of the incident and had little chance of prevailing against the testimony of police officers; or the injuries were not severe enough to justify the costs involved in pursuing litigation. Although most such cases go unrecorded this appeared to be borne out in some of the cases reviewed.[17]

---

[15] The NYPD reported that it made 265,229 arrests in 1993 and that force was required in about 8% of cases (Report of The Task Force On the Restraint of Suspects Who Resist Arrest, NYPD October 1994).

[16] To file a lawsuit in a state court, the plaintiff must first file a notice of claim with the City Comptroller within a certain period. This means that there may be a large number of claims filed, not all of which eventually result in lawsuits; some claims may be settled very quickly, others dropped. There are also often delays in starting civil lawsuits (e.g. if a criminal trial is pending).

[17] For example, Amnesty International learned of one case where criminal charges were filed against two officers for assaulting a suspect. Although they were acquitted after trial in a nonjury court, officials from the Bronx District Attorney's office said they thought the evidence against the officers was strong. However, the

Complaints against the police lodged by members of the public with the Civilian Complaint Review Board (CCRB) have also risen sharply since 1993, despite reforms following the Mollen Commission of inquiry. The CCRB reported that it received 4,920 new complaints in 1994, an increase of 37.43% over the previous year. While the CCRB takes complaints covering a range of alleged abuses from deadly force to discourtesy, 1,670 complaints (the largest proportion) were for excessive force and these had also risen proportionately from 1993. A further increase of 31.8% was noted for the first six months of 1995 (the last figures available) compared to the first six months of 1994.

Police Commissioner William Bratton questioned the CCRB's statistics, stating that part of the increase was due to the merger of NYPD with the Transit and Housing police. However, these account for only a small proportion of the overall increase in complaints.[18] Police officials have also suggested that the sharp increase in complaints was due to increased arrests and police activity during an intensive anti-crime drive in the city during the past two years (known as the "quality of life initiative"), and that many complaints arose from more effective policing and an increase in arrests, rather than genuine abuses.[19] The CCRB conceded in its reports that no firm conclusions could be drawn from the increases solely on the raw data on incoming complaints, and that part of the increase in complaints could be due to more civilian-police interactions during the anti-crime operations. However, they suggested that part of the increase could be due also to more awareness of the issue of police misconduct and publicity surrounding the creation of the new CCRB. They also noted that most of the complaints arose from encounters with patrol officers that did not involve arrests or persons receiving summonses and that "This would seem to discount the speculation that the increase is due to the increase in arrests resulting from the new quality-of-life initiatives".[20] They noted also that most complainants had no prior complaint history, thus discounting suggestions that many of those lodging complaints were "chronic" complainers.

It is also noteworthy that the Police Department's own statistics for the same period show a rise in both the number of civilians who died from officers' firearms discharges and in the number of people who died while in police custody. These show a 34.8% increase in civilians shot dead in 1994 compared to 1993 (from 23 in 1993 to 31 in 1994) and a 53.3% increase in civilians who died in police custody (from 15 in 1993 to 23 in 1994).[21] The figures also show an increase in the number of civilians injured from officer's firearms discharge during the same period (up from 54 to 60). Figures for 1995 were not

---

suspect's attorney said that he had not filed a civil lawsuit in the case as his client's injuries were not great enough to merit the cost of the action; his client also had a criminal record and it was feared that his account of the events may not prevail over that of the police officers.

[18]The CCRB told Amnesty International that the merger of the three departments accounted for a 3.5% increase in complaints in the first six months of 1995.

[19]The "quality of life" campaign to reduce crime in the city started when present Police Commissioner William Bratton took office under Mayor Rudolf Guiliani in January 1994. The strategy ranged from rounding up juveniles playing truant from school to the targeting of police resources to key areas. There has been an historic drop of 27% in reported serious crime in the city since 1994, with homicides reportedly falling by nearly 40%.

[20] CCRB Status Report July-December 1994, p 20.

[21]Statistics from Police Department sources cited in the CCRB Status Report July-December 1994, p.19.

available at the time of writing this report.

During their last visit to New York in November 1995, Amnesty International's delegates were told by several sources, including officials from the CCRB, that more aggressive policing in the past few years had led to an increase in complaints of ill-treatment. While effective measures to combat crime in New York City are obviously to be applauded, Amnesty International believes that an increase in complaints of unwarranted force, leading to ill-treatment and deaths in custody, should be a matter of urgent concern.

## 2. 10 Secrecy of information on complaints against the police

Amnesty International was unable to obtain the full facts in many of the cases it reviewed because of the secrecy surrounding the investigation of complaints of police misconduct.

Under Section 50-a of the Civil Rights Law (CRL) of New York State, police personnel records are confidential and may not be disclosed except by the consent of the subject officer or a court order. The law has been held to apply to the results of internal disciplinary inquiries into alleged police misconduct which are not made public even after an investigation has been closed. The same law on confidentiality applies to CCRB investigations. Although the CCRB publishes annual statistical data on the number, type and disposition of complaints, it may not make public its findings in individual cases. Once a complaint has been investigated, the CCRB will write informing the complainant only of the final disposition in the case (i.e. whether the complaint was substantiated, unsubstantiated, unfounded or the officer exonerated), but no details of the evidence are given or the reasons for the findings. Only if a police officer faces formal administrative charges (for serious offences for which the penalty ranges from 10 or more days' suspension to dismissal from the force) will there be a public hearing on an allegation of misconduct. In such cases the officer will be tried before an administrative law judge in proceedings which are open to the public; however, only a small proportion of cases go to an administrative trial.

Most cases involving the deaths of civilians in police custody in disputed circumstances in New York City, and other allegations of serious criminal misconduct, are presented to a grand jury whose proceedings are conducted in secret. If a grand jury decides not to return an indictment, the evidence it considered may never be known. If an officer is charged with a crime, then the ensuing trial will provide public disclosure of evidence. New York State law requires the trial record to be sealed in the case of anyone acquitted at a state criminal trial. As noted above, the majority of police officers charged with a criminal offence are acquitted after non-jury trials (or the charges are dismissed before trial) and the record is not therefore publicly available in such cases.

Amnesty International was informed that it was extremely difficult to obtain the records of completed internal police investigations even when requested by the plaintiffs' attorneys in a civil lawsuit. Although disclosure may be obtained through a court order as part of a lawsuit, the process of discovery can take years, and then part of the record may be sealed on the order of the presiding judge. Civil lawsuits may still reveal more through the discovery process than was previously made available about an incident of alleged ill-treatment. However, most cases in which the city agrees to pay damages to an alleged victim of police abuse are settled out-of-court (ie without going to trial). Amnesty International was told that the reasons given by the city for recommending settlement in such cases (contained in settlement memoranda to the budget committee) are "specifically exempted from disclosure" under New

York State law.[22]  Many of the pre-trial settlement agreements negotiated through the courts are also confidential.

Other independent bodies have criticized the secrecy covering police misconduct investigations in New York. The Curran Commission in its 1987 report referred to the "veil of secrecy legislatively imposed on the investigative, disciplinary and prosecutorial processes of law enforcement agencies regarding claims of misuse of force". One of its recommendations was that the legislature amend Section 50-a of the Civil Rights Law to authorize a Supreme Court judge (on an application by a law enforcement chief executive and on finding that it is in the public interest) to disclose the method and results of investigations into misuse of force and deadly force and the reasons for action taken or not taken. The Commission also recommended changing the law to allow a Supreme Court judge (on an application by a district attorney and on finding that it is in the public interest) to disclose the substance of a grand jury investigation involving the use of deadly or physical force in cases where no indictment is returned, and to allow grand juries to submit to the Court a report of their findings and conclusions in such cases. The Mollen Commission recommended that state law be amended to allow the NYPD statutory access to the sealed records of police officers who have been the subject of criminal proceedings. These recommendations have not been implemented.

Amnesty International recognizes the need to protect the confidentiality of information under certain circumstances, especially during ongoing investigations. However, it believes that there should be public disclosure of at least the findings and recommendations of all investigations into allegations of ill-treatment and misuse of force by law enforcement officials. In cases involving allegations of serious human rights violations, including deaths in custody and disputed killings by law enforcement officials, such disclosure should indicate both the evidence on which the findings are based and the scope and methodology of the inquiries.

## SAMPLE CASE OF ALLEGED PHYSICAL BRUTALITY

### Grady Alexis

Grady Alexis, a 26-year-old Haitian artist, died in May 1991 after an altercation with an off-duty police officer and his friend. The incident occurred after Alexis and his friends brushed into the officer's jeep while they were crossing a Manhattan street. A fight ensued during which Alexis was reportedly punched several times by the officer and his friend. He received a fatal blow to the head but the officer and his friend left the scene as Alexis lay dying on the pavement. The officer was later arrested when the jeep's registration number was traced to him.

Both the officer and his friend, Terry Presely, were charged with misdemeanour assault but the charges against them were dismissed by a judge on the grounds of weak and contradictory evidence. The charges were later reinstated but the officer was acquitted after he argued that he had acted in self-defence. In 1993 Presely was convicted of third-degree assault and sentenced to serve week-ends in jail for four months plus community service.

---

[22] Reply from Deputy General Counsel at Office of the Comptroller to Amnesty International's request for reasons for settlement recommendations in a number of individual cases; the law cited was the New York State Public Officers Law Section 87 (2) (a).

In November 1994 the federal Justice Department said there was not enough evidence to bring civil rights charges against the officer as Alexis' death was the result of a street fight without a "provable racial animus". (Both Alexis and the officer were black.)

The officer was reportedly facing disciplinary charges by the Police Department for failing to report the incident and failing to get medical assistance. However, according to press reports, no departmental charges were filed against him. He has reportedly since retired from the police force. (Amnesty International included this case in a list of cases it submitted to the Police Department for information on the outcome of any disciplinary investigation but received no response.)

**Tracy Brock**

Tracy Brock, black, was arrested by two police officers from the 10th Precinct in Manhattan in November 1986 following an argument after a drunk driver had driven into the back of his new car. Brock alleged that a police officer smashed his head through the plate glass window of a police station door, when he resisted being taken into the officers' lunchroom, virtually the only area inside the station which had no surveillance camera; he was handcuffed behind his back at the time. The officers said he fell through the window when he slipped while trying to get away and that he had tried to kick an officer. When Brock's mother arrived at the police station after the incident she was reportedly told that Brock and his brother (who had also been arrested) were not there. She did not learn until later that Brock had been injured.

Charges against Brock of assault and resisting arrest were later dropped. In November 1990 a jury in a federal civil rights suit awarded Brock $261,000 damages, including punitive damages against the three white police officers involved, for false arrest and assault. No officers were disciplined.

At the time of his arrest, Brock was waiting to take up a job as a corrections officer; this was delayed for a year while the criminal case against him was pending.

**Carlton Brown**

Brown, black, was a 28-year-old unlicensed van driver who became a quadriplegic as a result of injuries sustained in police custody at the 63rd Precinct in Brooklyn on 11 August 1992. Brown alleges that, when being taken into the police station with his hands cuffed behind his back, he was thrown head first by two officers into the glass panel of the station's inner entrance door with enough force to shatter the double-plated glass. The police maintain that Brown was injured when he tried to run away and that he tripped and fell with the officers into the door causing the glass panel to shatter. Brown's injuries were a crushed spinal cord resulting in permanent paralysis from the neck down.

The two police officers involved were charged with second-degree assault and tried in a non-jury state court in November 1994. Dr Martin Camins, a neurologist, appeared as an expert witness for the prosecution. He testified that given the nature of the injuries he would expect that a significant degree of force had been involved; however, under cross-examination he conceded that the injuries could have been caused by either Brown's head being forcefully pushed into the door or as a result of a fall. The officers were acquitted by the judge who stated: "I have a reasonable doubt about what really happened as these three men entered that police station. The evidence is as consistent with a struggle and an accidental striking of the head as it is with a forceful, intentional act."

*Amnesty International June 1996*    *AI Index: AMR 51/36/96*

Brown's attorney maintains that the medical evidence strongly supports Brown's version that his head was forcibly pushed through the glass panel, but he said that the prosecution failed to question Camins again as to how unlikely it was that the injuries could have been caused accidentally. Professor Derrick J. Pounder, Head of the Department of Forensic Medicine at Dundee University, in the United Kingdom, reviewed part of the court record and medical papers for Amnesty International. He agreed that the degree of force required to result in such injuries - especially in the limited space between the outer and inner station doors - made it unlikely that Brown had fallen accidentally and supported Brown's version that he had been pushed through the glass. He also found it odd that police witnesses testified to seeing Brown struggling as he entered the outer station door, but saw nothing just a few feet on when Brown suffered massive injury.

Carlton Brown brought a civil action jointly against the City of New York, the NYPD and the two officers, claiming personal injury, deprivation of his civil rights, assault and negligence. In March 1995 the parties agreed to settle the case before trial, and Brown was awarded $4,500,000 in a "structured settlement" amounting to $16,590,000 future value.

**Alphonso Garcia**

Alphonso Garcia, aged 16, was assaulted at his school by a police officer from the 34th Precinct in Washington Heights, Manhattan, in February 1992. The officer was assigned to security duties at the school at the time and was with two caretakers with whom Garcia had been in trouble earlier, who were friends of the officer. When they saw Garcia in the school the caretakers pointed him out to the officer who allegedly grabbed him, pulled him into a room and physically attacked him. Garcia was found, bruised and crying in the hallway and the school called an ambulance. The officer at first took no action. However, when the ambulance arrived about an hour after the incident, and he saw Garcia being taken out of the school on a stretcher, he arrested him. Garcia was charged with assaulting the officer and resisting arrest. The school principal went to the police station to complain about the officer's actions but no disciplinary action was taken against the officer. Alphonso Garcia was eventually brought to trial and acquitted of all charges. In 1994 he received $120,000 in damages in an out-of-court settlement of a civil action.

**Harvey Goldman**

Harvey Goldman was arrested by two police officers from the 13th Precinct in September 1990 outside a Manhattan night club. According to his testimony in a civil action, Goldman had been removed from the club when he tried to intervene after a man struck a woman who was with his party. He called for police assistance but was himself arrested. Whilst in the police car he alleged that one of the officers struck him in the face with his fist and a police radio, causing severe injury, while the other officer looked on. Goldman spent four days in hospital and required plastic surgery. He was charged with disorderly conduct, resisting arrest and assault on a police officer, charges which were later dismissed. Both officers had a history of complaints of brutality and other misconduct filed against them. Goldman sued the police and the city and the case was settled for $135,000 in November 1993, after a pre-trial conference.

Amnesty International wrote to the police department for information on whether any disciplinary action had been taken against any officers involved in this and other cases but received no response.

### Chris Griffiths

Chris Griffiths, black, a photographer, was allegedly assaulted by police while photographing disturbances in Crown Heights in August 1991. He sued the police for false arrest and assault resulting in bruising and abrasions and head and back injuries. The case was settled for $70,000 in May 1993. Charges against Griffiths of assaulting the police, resisting arrest and obstruction were dropped in 1992. Griffiths filed a complaint with the CCRB which found that excessive force had been used to arrest him but it was unable to identify which of several officers was responsible.

### Ann Hamilton

Ann Hamilton, a 71-year-old black woman who was the wife of a prominent church minister, was allegedly brutalized in November 1988 by police officers who suspected her of drug dealing and swallowing the drugs as she sat in her car in an area of Queens. Mrs Hamilton, who suffered from diabetes, had reportedly stopped her car after feeling dizzy, and was eating peanuts when the car was surrounded by three plain clothes police officers. Hamilton, who said she was frightened and didn't know who they were, refused to unlock her car door. The officers smashed the car window and forced the door open, dragging her out of the car. She was taken to hospital with sore wrists and a sprained back and forced to have her stomach pumped. No drugs were found but she was charged with assault and "reckless endangerment", charges which were later dropped. The mayor and the Police Commissioner later apologized to Hamilton and her family. The officers were reportedly cleared of any wrongdoing by the former CCRB.

### Christopher Hennelly

Christopher Hennelly, white, was allegedly beaten by police while taking part in an Act-Up[23] demonstration in front of the Manhattan Midtown North precinct on 11 February 1991. The demonstration was to protest about the alleged ill-treatment of another Act-Up member by police from the same precinct the week before. Hennelly spent five days in hospital as a result of his treatment suffering from cerebral concussion, partial loss of hearing and blurred vision. He reportedly suffers from seizures as a result of the injuries.

Hennelly was charged with assaulting the police and the case went to trial. However, the judge threw out the assault charges after seeing a video of the incident. In a 19-page judgment dismissing the case against Hennelly, the judge said that the video showed "... without provocation, the police charge into the crowd of demonstrators" and that "A police officer can clearly be seen turning the defendant around and then taking a two-handed swing with his club directly at the spot on the defendant's head where the defendant's arrest photograph shows a bruise". The judge added that "...at least one officer appears to be clubbing the defendant while he is on the ground."

In 1994 the city agreed to settled a civil lawsuit brought by Hennelly for $350,00 just before the case was due to go to trial.

---

[23]An organization supporting Lesbian and gay rights.

*Amnesty International June 1996*                                                              *AI Index: AMR 51/36/96*

### Oliver Jones

Oliver Jones, black, was standing outside his Bronx apartment among a crowd of onlookers whom the police tried to move after arresting another man on 2 July 1994. When someone shouted "police brutality" the officers reportedly turned on Jones and beat him repeatedly with flashlights. Jones was reportedly left bleeding and unconscious as a result of the incident. Charges against Jones of stealing a police radio and resisting arrest were later dropped.

Two police officers were charged with assault in the case and the trial was still pending at the time of writing. They were among a group of officers from 48th Precinct indicted by a grand jury in May 1995 for engaging in a pattern of assaults, perjury and other misconduct.

### Ki Tae Kim

Ki Tae Kim is a Korean grocer who was allegedly beaten by a police officer in Brooklyn in April 1994 after a customer accused him of passing her a counterfeit bill. Mr Kim denied the accusation and alleged that, when he accused the police of siding unfairly with the customer, an officer punched him and slammed his head onto the counter and subjected him to racial slurs. Mr Kim was treated in hospital for lacerations to his mouth and bruises and he spent three days in jail. He was charged with disorderly conduct and resisting arrest, charges which were later dropped.

Two store employees and an independent witness supported Mr Kim's story and the officer concerned was charged with third-degree assault (a misdemeanour offence which is triable only in a nonjury court). At his trial in November 1995 the officer was convicted of attempted assault rather than the more serious assault charge - a decision which was condemned by the chief lawyer for the Patrolmen's Benevolent Association who said the officer should have been acquitted of all charges. The officer was sentenced to 700 hours of community service, plus a $500 fine and one year's probation; he was also ordered to pay Mr Kim's medical bills. An appeal lodged by the officer against his conviction and sentence was pending in April 1996, as was a police departmental disciplinary hearing against him.

### Euclid Levine

In March 1995 Euclid Levine, an immigrant from the Caribbean island of Nevis, was awarded $1m damages in settlement of a police brutality claim. He claimed that he was severely beaten by a Bronx police officer in September 1985 after being pulled over for an alleged traffic violation. He suffered nerve damage in both hands as a result of being too tightly handcuffed and tinnitus resulting from the beating. He had been charged with a traffic violation, resisting arrest and assault on a police officer but was acquitted at trial.

No disciplinary action had been taken against either of two officers present.

### Marcos Maldonado

Marcos Maldonado, a Latino supermarket worker, was allegedly ill-treated by police officers from the 112th Precinct on 22 April 1995, after they mistook him for a suspect following an armed robbery at the

*AI Index: AMR 51/36/96*

*Amnesty International June 1996*

store. When the police arrived one of the suspects fled and the other, who was holding Mr Maldonado in the basement, was shot in the face and wounded. Maldonado alleged that he obeyed a police order to come out of the basement with his hands up and told the officers that he worked in the store. He alleged that the officers handcuffed him behind his back and threw him on the floor and repeatedly hit him on the back of the head with their pistols and nightsticks, and kicked him in the back, chest and legs. He further alleged that, while handcuffed on the floor, an officer put a gun into his mouth, used an ethnic slur and threatened to "blow his head off". He also alleged that the officer who shot the robbery suspect gave no warning and failed to identify himself as a police officer. Marcos Maldonado was treated at hospital for bruises and cuts to his head and hands.

The Commanding Officer of the 112th Precinct later informed Amnesty International that a police investigation had found that the officers involved had acted "totally within the parameters of both New York State law and guidelines set forth by the New York City Police Department" and that no disciplinary action had therefore been taken against them. The letter also stated that there was no rule or law mandating that a warning must be given when officers were confronted with deadly physical force (a reference to the shooting of the armed robber). The letter made no comment on the other allegations made, except to state that the matter was under investigation by the CCRB. This investigation was still pending as of March 1996.

### Greg Maro

In August 1990 Greg Maro was harassed in Times Square by a group of teenagers who threw a bottle at him because he was gay. When he sought assistance from a police officer, he was allegedly hit, handcuffed, dragged across the ground and verbally abused by the officer who, according to Maro, said that he was a "fag basher" himself. Maro's complaint against the officer to the former CCRB was ruled "unsubstantiated".

The officer involved in the incident had been the subject of three prior misconduct complaints and an incident in which he was severely criticized by a district attorney for refusing to cooperate in a criminal inquiry. He was not disciplined in the Maro case and in 1994 was reported to be involved in the training of new officers.

### Yunwas Muhammad

Yunwas Muhammad, 18, was seriously injured on 16 September 1992 in an alleged vengeance beating by off-duty police officers after an argument on a train during which Yunwas Muhammad slashed an officer's face with a razor. The officers, in civilian clothes, were returning from a rowdy demonstration outside City Hall to protest at proposals for an all-civilian complaints review board (see *Section 1.3*). Yunwas Muhammad apparently stepped on an officer's outstretched foot as he was walking through the train. He alleged that when he apologized the man (who he did not know was police officer) went to punch him, and Muhammad took out a razor and cut him on the face. Six police officers then allegedly beat and kicked him so badly that passengers who witnessed the incident got off the train and followed them to the police station to make a complaint. Two officers reportedly continued to punch Yunwas Muhammad repeatedly in the back of a police car, breaking his jaw. The officers alleged that he had resisted arrest.

B074

Two officers were charged with felony assault in the case and were tried before a jury. One was acquitted and the other convicted of a misdemeanour assault and was sentenced to probation and fired from the police force. Yunwas Muhammad was also charged with assault in the case but the jury could not agree on the verdict (he was later sentenced for an unrelated offence).

**Ron Narr**

Ron Narr, white, an artist, alleged that he was beaten by plain clothes officers in October 1989 after he challenged them when he saw a group of men kicking a black man on the ground. He had not realised that the eight men involved were narcotics squad officers arresting a drugs suspect and thought he was witnessing a racist attack. Narr was jailed for 31 hours but charges of disorderly conduct, resisting arrest and obstruction were subsequently dropped. He later received $100,000 damages in settlement of a civil suit against the city and NYPD. According to press reports, the officers involved were cleared of wrongdoing and none were disciplined.



©Ed Quinn/ NYT Pictures

Yunwas Muhammad. His jaw was broken in an alleged vengeance beating by off-duty police officers during an altercation in a New York subway in September 1992.

**Dat Nguyen**

Dat Nguyen, a Vietnamese refugee and student, alleged that he was brutalized by a police officer outside a Chinatown shopping mall in November 1993. The plain clothes officer had barred Nguyen's entry to the mall during a police operation to confiscate counterfeit goods, and an argument ensued. Nguyen said the

officer did not identify himself and pulled a gun, then beat him with a police radio. Nguyen (who was five feet three inches tall and weighed 115 pounds) was hospitalized with cuts to his face and head. The officer (who weighed 180 pounds) did not deny hitting Nguyen but claimed it was in self defence after Nguyen had pulled a knife on him. No knife was found on Nguyen but police produced a knife found at another location later that day which they said Nguyen had dropped when he tried to escape, although the weapon was never tested for fingerprints.

Nguyen was charged with assault, possession of a deadly weapon and obstruction but was acquitted of all charges at his trial in October 1994. (He had earlier refused the chance to plead guilty to reduced charges, insisting on his innocence.)

A civil action against the city and the NYPD was settled out of court in February 1996 for $65,000. A CCRB investigation was still pending in April 1996.

**Keith Pavlik**

Keith Pavlik, white, a junior executive, was among a group of bystanders watching a police officer trying to arrest a gay man in Greenwich Village,

©Fred R. Conrad/ NYT

Pictures

Ron Narr, allegedly beaten and jailed for 31 hours in October 1989 after intervening when he saw a group of men kicking a black man on the ground. The attackers turned out to be plainclothes narcotics squad officers arresting a drugs suspect.

Manhattan, in October 1989. About seven other officers from the 6th Precinct tried to disperse the crowd and one of them allegedly threw Pavlik's female companion about 10 feet into the air. Pavlik alleged that when he tried to intervene with the words "You can't do that! This is our neighbourhood", several officers set upon him, wrestling him to the ground, kicking him and beating him with their nightsticks. He was hospitalized with a broken finger, two broken ribs, a head laceration and bruising to his back. Charges against him of disorderly conduct and resisting arrest were later dismissed.

The CCRB substantiated Pavlik's complaint of being beaten as well as the claim that his friend had been assaulted. Amnesty International wrote to the police department to ask if any disciplinary

charges had been brought against any officers in the case but received no reply. A civil lawsuit brought by Pavlik against the city and NYPD was settled for $150,000 in 1994.

### William Polanco

William Polanco, a Venezuelan immigrant, alleged that he was beaten by police officers in Washington Heights, Manhattan, in an unprovoked attack on 9 May 1992. According to a civil lawsuit filed against the city and the NYPD, the incident took place while Polcano was on his way home from visiting his mother-in-law and saw a group of people running towards him, chased by uniformed police officers. He took cover between two parked cars to wait for them to pass but one of the officers ordered him out at gunpoint. The officer allegedly hit him about the head, face and body with a police baton, causing a fractured wrist, head wounds that required stitches and damage to his teeth. He was hospitalized for 24 hours under police guard, during which police allegedly subjected him to racial epithets. The lawsuit also alleged that the police destroyed or discarded his bloody clothing while he was in the hospital. Charges against him of assault and resisting arrest were eventually dismissed. In December 1994 the city agreed to settle the lawsuit for monetary damages.
No officers in the case were disciplined.

### Eliseo Quiñones

The CCRB sustained a complaint filed by Eliseo Quiñones alleging that a Bronx police officer had "pistol whipped" him (beat him about the head with a gun) in August 1989. The corroborating evidence included an indentation mark on his forehead which matched the butt of the gun. A departmental hearing was held against the two police officers involved, one for beating Quiñones and the other for lying about it. The administrative law judge hearing the case recommended that one officer be sentenced to a year's probation and 30 days' suspension and that the other lose 15 days' vacation. The Police Commissioner accepted the finding but reduced the penalties to 5 and 3 days' loss of vacation respectively on the theory that Polanco had exaggerated the number of times he had been hit on the head. A civil action brought by Quiñones against the city and the police officer was settled in March 1993 for monetary damages. Both officers in the case have since been indicted on corruption charges and are currently suspended from the NYPD. Their trial was still pending in April 1996.

### Judith Regan

Judith Regan, white, a senior book editor and TV producer, was allegedly brutalized by a Manhattan police officer in September 1990, after she criticized the officer for berating her taxi driver over a faulty tail light. The officer allegedly pulled Regan from the cab by her hair, arrested and handcuffed her and held her at a police station for several hours. She was awarded $150,000 damages in settlement a civil action against the city and police department.

### Gabriel Rodriguez

AI Index: AMR 51/36/96    *Amnesty International June 1996*

Gabriel Rodriguez, a 12-year-old boy who suffered from epilepsy, was allegedly beaten by 4-6 Bronx police officers on 23 December 1989. The officers had gone to the area where Gabriel was playing after receiving a hoax 911 call and spotted Gabriel on the sidewalk. The officers got out of their cars and allegedly threw him against a garage door, searched him and punched him several times about the head and face both before and after handcuffing him. They reportedly continued the ill-treatment despite the protests of onlookers who warned the officers that he was epileptic and a "special education" child[24] (he was also wearing a medical bracelet confirming his epilepsy). His parents were not allowed to ride with him to the police station, where he was held for more than six hours before being released without charge.

The officers denied assault, claiming that Gabriel had assaulted them, causing them injuries. However, a police internal investigation recommended that criminal or departmental charges be imposed against four of the six officers present. More than a year later the charges were dropped - reportedly after a "mystery witness" located by PBA investigators came forward. Gabriel's attorney told Amnesty International that the police have never revealed who this witness was. Nor have any details been given of injuries sustained by the police officers. Gabriel himself is alleged to have suffered permanent injury as a result of being beaten, with more frequent, more severe seizures.

A civil lawsuit in the case was still pending in April 1996.

**Victor Rosado**

Victor Rosado was allegedly beaten and robbed of $100 by three off-duty police officers from the 109th Precinct in the early hours of the morning of 2 February 1994. The incident took place in a convenience store after the officers had reportedly asked Rosado where he had got the money when he pulled out a wad of notes to pay for cigarettes. Rosado was treated at New York Medical Center in Queens and released. After reviewing a store videotape of the incident, the police authorities suspended the three officers without pay pending further investigation. Amnesty International wrote to the police for information on the outcome of the inquiry but received no response.

---

[24]A child with learning difficulties.

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

## 3. DEATHS IN CUSTODY

There have been several disturbing cases in recent years in which unarmed suspects have died in NYPD custody after being forcibly restrained. In some cases suspects have died from asphyxia after officers used techniques known to restrict respiratory movement, such as applying pressure to the neck or chest or placing a suspect face-down in restraints. There is also evidence that some suspects were beaten.

### 3. 1 Statistics on deaths in police custody and preventative guidelines

A study by an NYPD task force in 1994 reported that 55 people had died in police custody between January 1990 and the end of April 1994, a figure described as "astonishingly low" compared to the number of arrests (more than 1 million) over the same period.[25] The study found that the large majority of the 55 deaths were due to causes unrelated to police action (such as accidental drug overdose), and that only three cases were directly attributable to police actions in restraining a suspect. However, the report did not identify in which cases suspects had died during or after a struggle with officers which might have contributed indirectly to their death, a concern in some of the cases reviewed by Amnesty International (see below). According to the study, 89% of those who died in police custody during the period reviewed were black or Hispanic.

The number of deaths in NYPD custody is relatively small but appears to have been rising in the past few years. According to the 1994 task force report and updated figures since then, there were 11 deaths in 1990; 12 in 1991; 15 in 1992; 15 in 1993 and 23 in 1994 (the last year that figures were made available to AI). Police officials are reported to have stated that the rise in deaths coincided with the rise of crack cocaine which made suspects more liable to violently resist arrest. However this does not appear to have been a factor in some of the most disturbing cases described below.

The NYPD has introduced a series of guidelines over the years designed to reduce deaths in police custody from procedures known to carry a risk of asphyxia. The practice of "hogtying" (tying a suspect's rear-cuffed hands to cuffed or shackled ankles) - which has led to a number of deaths in the USA - was banned by the NYPD in 1987. In 1985 the NYPD banned the use of choke holds except in circumstances where deadly force was necessary to protect the life of the officer or others and this was the least dangerous option available. In 1993, the use of choke holds was banned in all cases, following concern about the deaths of several suspects from apparent asphyxia in the 1990s.[26] In 1994 the NYPD established the task force referred to above to review policy and training for handling prisoners who resist arrest. This resulted in the issuing of *Positional Asphyxia Prevention Guidelines* in September 1994. The guidelines reiterate what was mostly already NYPD policy, such as the ban on hogtying. They state

---

[25]*The Restraint Report: The Task Force On the Restraint of Suspects Who Resist Arrest*, published in October 1994. The Task Force was composed of police representatives and outside experts and also sought information from the Chief Medical Examiner of NYC.

[26] The order did not distinguish between different types of choke hold and applied equally to the "bar-arm hold", where the forearm is used to suppress the trachea, constricting the flow of oxygen to the brain, and the "carotid hold", where pressure is applied to the carotid arteries at either side of the neck, constricting the flow of blood to the brain.

*AI Index: AMR 51/36/96*                                        *Amnesty International June 1996*

that the risk of positional asphyxia increases where the restrained subject is obese and in a face-down position and if intoxicated with drugs or alcohol. The guidelines instruct officers not to transport or maintain a suspect face-down and wherever possible to avoid sitting or standing on someone's back or chest which reduces the ability to breathe.

However, since these guidelines were introduced there have been further deaths from apparent asphyxia or other police restraining techniques (see cases, below).

## 3. 2 Cases examined by Amnesty International

Amnesty International reviewed information on 15 deaths of suspects in police custody in New York City between 1988 and December 1995. Ten of the 15 were black, three were Latino and in two cases the race of the deceased was not known. In five cases the cause of death was classified by the NYC Medical Examiner as asphyxia caused by compression of the neck or chest. In another three cases, the deaths were attributed to a combination of factors, including cocaine intoxication or pre-existing medical conditions such as heart disease, but there is evidence that use of restraints or compression of the suspect's neck or chest contributed to the death. In three cases, police were alleged to have applied a choke hold in violation of NYPD guidelines. In some of these cases there was also evidence of blunt force trauma indicative of the prisoner having been subjected to physical force such as beatings.

While the direct cause of death in other cases was found to be from factors such as heart disease or drug intoxication, blunt force injuries were also present on the deceased, or the prisoners had been involved in a violent struggle with police just before their death..

In all the cases reviewed, the officers involved either maintained that the force used was justified because of the violence exhibited by the suspect or denied that their actions had caused the suspects' deaths. Although in several cases the ME ruled the death to be a homicide,[27] no officer had been convicted of a criminal offence in connection with any of the deaths although two cases were still under investigation and in another a trial was pending in April 1996. In no case to Amnesty International's knowledge were internal disciplinary proceedings imposed against any officers involved.

Amnesty International recognizes that there are situations in which high levels of force may be needed to restrain violently resisting suspects. However, it is concerned that in the cases examined officers appeared to have moved quickly to very high levels of force in situations that did not warrant such extreme measures, contrary both to police guidelines and to Article 3 of the Code of Conduct for Law Enforcement Officials.[28] While Amnesty International recognizes that genuine efforts have been made to combat this problem by regular revision of police guidelines, it believes that more needs to be done to ensure that the guidelines are strictly enforced, and that those found guilty of breaching them are brought to justice and/or receive appropriate disciplinary action. Amnesty International also believes that the results of inquiries into all disputed deaths in custody should be made public.

---

[27] The ruling means that the actions of a person, or persons, caused the death but does not assess blame.

[28] Article 3 of the Code of Conduct states "Law enforcement officials may use force only when strictly necessary and to the extent required for the performance of their duty".

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

### 3. 3 Deaths by pepper spray

Two of the prisoners who died in NYPD custody in 1995 had been sprayed with the pepper-spray Oleoresin Capsicum (OC) during the course of their arrest. OC spray is a cayenne pepper based agent used to temporarily disable a target subject by causing an extreme burning sensation of the skin and involuntary closing of the eyes, and inflammation of the mucous membrane, upper respiratory tract and esophagus. Many US police departments have introduced OC spray in the last few years as an allegedly safer and more effective alternative to chemical mace in restraining violent or disturbed individuals. However, there remains concern about the health risks associated with OC spray as well as its potential for misuse.

The NYPD started introducing OC spray in 1993  as a substitute for chemical mace  in controlling violent "emotionally disturbed persons" (EDPs). The  1994 Task Force on the Restraint of Suspects (see above) recommended that "the use of pepper spray be greatly expanded to include situations in which suspects resist arrest". The task force recommended that OC spray was not only more effective than mace in controlling violent individuals and those under the influence of drugs, but that it would reduce or eliminate the need for substantial physical force and therefore the risk of injury from contact such as baton strikes.

NYPD regulations on pepper spray state that it should be used as the first line of defence in situations where substantial force is necessary, after verbal reasoning has proved ineffective; that it must be fired directly at the face to be effective; and that its recommended frequency is "two (2) one-second bursts". They also provide that a warning should be given where possible before using pepper spray against unarmed suspects; and that it should not be used in small contained areas or in the presence of pregnant women, infants, the elderly or people with "chronic respiratory problems".

The task force concluded that there were no serious health risks associated with pepper spray and that "despite earlier reports, no person has died as a result of being exposed to pepper spray". This conclusion was based on a survey of the use of pepper spray by other US police departments, and two reports commissioned by the US National Institute of Justice (NIJ), published in March 1994, which discounted the role played by OC in some 30 in-custody deaths reported nationwide at that time.

However, the safety of pepper spray has continued to be questioned.  In March 1995 the American Civil Liberties Union (ACLU) of Southern California published the results of an inquiry it had conducted into pepper spray, including a review of 26 cases where people had died after being sprayed in California as well as research by the California Environmental Protection Agency (EPA). The findings suggested that OC spray may be a serious complicating factor when used on people with heart disease or asthma. The ACLU report also cited an internal memorandum produced by the largest supplier of pepper spray in California that concluded that serious health risks may ensue if police spray someone with more than a single one-second burst of OC - contrary to NYPD guidelines which provide for twice that amount. Contrary to the view taken by many police departments, the memorandum also warned that OC may not always be effective against subjects who are extremely agitated, mentally ill or under the influence of drugs or alcohol,  and that there was a risk that officers who fail to incapacitate the subject after one burst may be tempted to overuse the spray. The ACLU report noted that the research conducted so far on the subject was far from complete, and that even the NIJ report (cited above) had found a lack of objective data on OC, its risks and benefits.

The ACLU of Southern California did not call for the use of pepper spray to be banned outright

by law enforcement personnel. However, it called for stringent standards to be immediately implemented governing its use, pending detailed scientific research on the effects of pepper spray.        Although pepper spray was not found to be a direct or sole cause of death in the New York cases cited below, it was cited as a contributing factor in one case. The cases also illustrate some of the general concerns raised about the spray, including the risk in using OC on people suffering from respiratory or heart problems - conditions which may not be known to officers at the time of use. Amnesty International believes that the NYPD should use pepper spray with great caution pending further studies and that steps should be taken to ensure that it is not misused. There is concern in at least one case that, contrary to police guidelines, the spray may have been used, not as a first line of defence, but after the subject had already been subdued.(see the case of Mohammed Assassa, below).

## SAMPLE CASES OF DEATHS IN CUSTODY

### Mohammed Assassa

Mohammed Assassa, aged 55, reportedly went into cardiac arrest while struggling with officers called to a domestic disturbance at his home on 7 December 1995. The NYC Medical Examiner's report called the death a "homicide" and said the cause of death was a combination of heart disease, asthma, exposure to pepper spray and a "struggle involving multiple blunt impacts". The report also noted that the hyoid bone, near the voice box, had been broken, a sign that the neck had been squeezed forcibly. His wife was reported to have said that Mohammed Assassa was beaten by police and then sprayed with pepper spray as he lay unconscious on the floor. The death was still under investigation at the time of writing.

### Anthony Baez

Anthony Baez, aged 29, of Puerto Rican origin, died of injuries sustained during his arrest by officers from 46th Precinct in the Bronx, on 22 December 1994. He had been visiting his family from Florida and was kicking a football around with his brothers outside the family home when the ball accidentally hit two parked police patrol cars. According to family members who witnessed the incident, one officer lost his temper and arrested Anthony Baez's brother David, placing him in handcuffs. When Anthony Baez questioned the officer's arrest and treatment of his younger brother, the officer reportedly grabbed him, placing him in a choke hold; he and other officers present then allegedly knelt on his back while handcuffing him behind his back as he lay face-down on the ground. Anthony Baez's father and other family members reportedly warned the officers to be careful as he suffered from chronic asthma. According to the civil action filed by the family in the case, Anthony Baez was left face-down on the ground in a prone position for around 10-15 minutes before being dragged into a police car, with no attempt made to resuscitated him. He was taken face-down in a police car to a hospital where he was pronounced dead about an hour later.

   The police stated that Baez had died of an asthmatic attack while resisting arrest. However, the

Medical Examiner concluded that Baez's death was caused by "asphyxia due to compression of the neck and chest" as well as acute asthma, and classified the death as a "homicide". A pathologist hired by the family found bruises on the scalp, wrists, hands and neck, and evidence of internal bleeding around the eyes (another sign of asphyxia).



©Chang Lee/NYT Pictures

The wife and family of Anthony Baez, who died during his arrest by police officers in December 1994 after his football accidentally hit two parked police patrol cars. His wife is showing his photograph, with the family's attorney sitting next to her.

The officer who had allegedly applied the choke hold was subsequently charged with criminally negligent homicide. His trial was still pending in April 1996.

According to the Baez family's attorney, the same officer had 14 prior complaints of brutality filed against him, eight for excessive force and four for using a choke hold, nearly all of which had been ruled "unsubstantiated" by the former CCRB. The NYPD was nevertheless concerned enough to have placed him on the Force Monitoring Program for special surveillance and psychological counselling. However, he had been taken out of the Monitoring Program six months before Anthony Baez's death. One prior complaint against the same officer, which had been pending since 1993, was substantiated by the present CCRB in 1995. This was a complaint of his having slapped and choked a 16-year-old boy in September 1993. A criminal trial in that case was also pending as of April 1996.

### Richard Butler

Richard Butler, black, aged 40, died in hospital the day after his arrest by police officers from 83rd and 78th Precincts in Brooklyn on 23 December 1995. Richard Butler had been involved in a car chase with police, during which he reportedly drove through several red lights and smashed into a car before being finally apprehended. The NYC Medical Examiner's Office issued a press release in March 1996

announcing their findings in the case that "the underlying cause of death was acute cocaine intoxication". However, the ME's report also stated that Richard Butler had sustained "multiple blunt impacts" to his head and body during a struggle with police officers and that "The physical injuries contributed to Mr Butler's death". The ME report classified the death as a homicide. An investigation by the Brooklyn District Attorney's office was still being conducted in April 1996. The ME's report had not yet been released to the family, pending that investigation.

### Michael Wayne Clark

Michael Wayne Clark, aged 31, died in March 1995 following an altercation with at least seven police officers at a Brooklyn subway station after he had been seen urinating on a platform. A female officer reportedly called for back-up after Clark became verbally abusive and started poking her in the stomach. One of the back-up officers sprayed him in the face with pepper spray but it reportedly failed to subdue him. After a further struggle he was handcuffed and carried out of the station. He suffered a heart attack while in an ambulance and died later in hospital. The NYC Medical Examiner found the cause of death to be "chronic alcoholism with fatty liver and cardiomyopathy", with the manner of death classified as "natural". Amnesty International did not have access to the full autopsy or other ME records in this case and does not know whether there is a reference to the use of pepper spray.

### Johnnie Cromartie

Johnnie Cromartie, black, died while in police custody in a NYC hospital on 25 May 1993 after a struggle with police officers. He had been admitted to hospital after suffering from epileptic seizures following his arrest for a weapons violation. The NYC Medical Examiner (ME) found the cause of death to be (i) "multiple blunt impacts preceding restraint, with subsequent postural compromise of respiration", following alcohol withdrawal syndrome, with seizures and "agitated, violent behaviour", and (ii) hypertensive cardiovascular disease. The manner of death was ruled a homicide.

In March 1994 a grand jury voted not to indict any of the officers involved on the ground that the level of force used to restrain Johnny Cromartie had been justified. Following this decision, on 18 March 1994 the Manhattan District Attorney (DA) made public a 24-page letter to the Police Commissioner in which he summarized the investigation into the case. The DA said that because of the public attention the case had received and his concern with "maintaining public confidence in the integrity and soundness of the investigation that has been conducted ... I think it important to disclose ... as many of the pertinent facts as may lawfully and fairly be revealed". The DA sent Amnesty International a copy of this report in response to its inquiries about the case.

The letter revealed that Johnnie Cromartie had waited without incident for nearly 30 hours in the hospital's Emergency Room, during which period he was handcuffed to a bed almost continuously. He was then transferred to a room and, when the handcuff was removed to allow him to use the bathroom, announced his intention to leave the hospital. A violent struggle reportedly followed in which five officers were involved at various stages in trying to restrain him (two were white, two black and one Hispanic, according to the DA's report). He was eventually placed face-down on a stretcher, handcuffed behind his back with his ankles tied together with Velcro straps. A doctor who examined him found him to be in no imminent danger but some 15 minutes later he went into cardiac arrest. The DA's letter said that

the ME had found that death was due to stress caused by the impact of blows inflicted by the police and whatever else his body struck during the struggle, and "the relative difficulty, for a man of his size, of breathing while rearcuffed and lying on his stomach" (Johnnie Cromartie weighed 210 1bs at the time of his death). A contributing factor was also the stress of alcohol withdrawal, and his vulnerability due to hypertensive cardiovascular disease. According to the letter, another forensic expert, who was asked to perform a second autopsy by the State Commission for Correction,[29] disagreed with the ME's conclusion as to the cause of death, believing that it was caused by some form of neck compression (such as a choke hold), but did not submit a written report. The letter summarized in some detail the testimony of one witness who claimed that force was used after Cromartie had already been restrained and was accompanied by racial slurs, stating that there were inconsistencies in this testimony and that it was not supported by the medical evidence or other witnesses.

Amnesty International remains concerned that this was a death in which restraint procedures played a significant part. A forensic pathologist reviewed the DA's report for Amnesty International and commented that: "When people are restrained by some techniques they become literally helpless and this places upon the police a heavy responsibility for monitoring the well-being of the prisoner and protecting them from harm. That a death can occur in a hospital setting following such a restraint procedure emphasises the difficulty of monitoring the well-being of the prisoner".[30] Johnnie Cromartie's death was one of a number of cases which led to the NYPD establishing the Task Force on the Restraint of Suspects, cited above.

### Dane Kemp

Dane kemp, black, age 28, died on 1 January 1990 in a holding cell at the 69th Precinct station house in Brooklyn. He had been arrested after a woman told the police he had assaulted her. The Emergency Services Unit was called to the station after Kemp (who had one hand handcuffed to a cell bar) had been kicking at the mesh of his cell and threatening to kill the woman who had accused him. He died while being restrained by five officers who strapped his legs together with Velcro strip, tied his hands behind his back and placed him face-down on a stretcher. The NYC Medical Examiner concluded that Kemp "was asphyxiated as the result of compression of his chest and neck during restraint for violent, agitated behaviour." A grand jury subsequently indicted one of the officers on charges of criminally negligent homicide. A judge later dismissed the indictment. Amnesty International wrote to the Brooklyn District Attorney in November 1995 asking for information about the reasons for the dismissal but received no response.

### Richard Luke

Richard Luke, black, died on May 1989 while in the custody of NYC Housing Authority Police. The police

---

[29]A state body empowered to investigate all inmate deaths in correctional facilities, including inmates in custody in hospital.

[30]From letter to Amnesty International by Derrick J Pounder, Professor of Forensic Medicine and Head of the Department of Forensic Medicine at Dundee University, UK, dated 13 February 1996.

had responded to a call for medical assistance from his mother's apartment and Luke was arrested after a violent struggle. He was placed in a cell he reportedly began to strike his head against the bars, floors and cell wall. Police removed him from the cell and placed him in a restraining blanket; he was taken to a local hospital but died on the way.

The NYC Medical Examiner concluded that the cause of death was cocaine intoxication. However, an investigation by New York State Commission of Corrections Medical Review Board concluded that he had choked to death on vomit while lying face-up in a retraining blanket. The Commission recommended that the NYPD Emergency Services Unit (a police squad trained to handle emotionally disturbed people including those suffering from drug-induced psychosis) afford its personnel training which "emphasizes that greater caution must be exercised whenever subjects are fully restrained, especially when lying supine", noting that "drug abuse with agitation presents a particularly high risk for emesis and aspiration". The Commission also recommended that "such training be accompanied by guidelines outlining the proper precautions in the use of restraining blankets ...".

### Frederico Pereira

Frederico Pereira - a 21-year-old of Puerto Rican origin - died during a struggle with five white police officers in the early hours of 5 February 1991, as they dragged him from a stolen car in which he had been sleeping. The city Medical Examiner ruled the death a homicide and concluded from a number of signs, including a bruise to the neck near the hyoid bone, that Pereira had died from traumatic asphyxia associated with compression of the neck. The autopsy also noted multiple blunt force injuries, including a laceration above the eye, abrasions to his head and knees and contusions, all of which had occurred shortly before death.

Before the Medical Examiner's report was released, a police internal inquiry had cleared the officers of blame, stating that Pereira had violently resisted arrest and that lacerations and marks to the face were caused by his banging his head against the pavement. The officers denied using a choke hold against Pereira as he lay face-down, handcuffed on the ground, as alleged by two civilian witnesses who came forward three days after the death.

In March 1991 a Queens grand jury indicted all five police officers on charges of second-degree murder, manslaughter, assault and criminally negligent homicide. In announcing the decision, the District Attorney said that although only one officer was accused of having choked the victim, all had played a role in the death. However, a few months later a Supreme Court judge dismissed all charges against four of the officers at the request of a new District Attorney, and reduced the charges against the fifth officer to manslaughter and criminally negligent homicide.

Between March 1991 and the officer's trial in March 1992, several articles appeared in the press citing police experts who challenged both the medical evidence and the credibility of the civilian witnesses. A police defence lawyer, for example, is quoted as saying that there was little evidence in the autopsy report to back up accounts by the witnesses that officers kicked and beat the victim. Another police defence lawyer is quoted as saying that "There is an insignificant injury to the neck, a small abrasion on the side of the neck and that's it. The injuries are just not there that are consistent with asphyxiation".

At his trial before a non-jury court in March 1992, the officer denied that he or any other officer had beaten Pereira or choked him. The defence maintained that the cocaine found in Pereira's body at the time of his arrest had caused his death. A medical expert testifying for the defence disagreed with

the Medical Examiner's finding of asphyxia. The officer was acquitted.

In 1995 Pereira's family received $175,000 damages in an out-of-court settlement of a wrongful death civil lawsuit.

Professor Derrick J. Pounder, Head of the Department of Forensic Medicine at Dundee University in the United Kingdom, reviewed the autopsy report in this case for Amnesty International. He concluded that it showed evidence of asphyxia and neck pressure sufficient to kill (although not necessarily so). Other injuries indicated a beating but there had been no dissection of underlying tissues to assess severity, which might have helped to establish the level of force used. Professor Pounder noted that, although the level of cocaine was not given in the Medical Examiner's report, this had not caused Pereira's death before the struggle with police. It may have been a predisposing factor in combination with other circumstances, in particular the use of a choke hold.

### Juan Rodriguez

Juan Rodriguez, a 40 year-old emotionally disturbed Latino man, died in police custody on 30 January 1988 after being arrested by NYPD police officers from 83rd Precinct for allegedly breaking door and windows in his apartment building. An autopsy report found he had suffered "blunt force injuries" to his head and body and had died of a heart attack. A grand jury subsequently returned criminal assault charges against three police officers involved. At the arraignment an assistant district attorney alleged that the officers had struck Rodriguez with "police instruments", including their radio, "punching him in the head and striking him about the body." A fourth officer had reportedly testified before the grand jury on a grant of immunity from prosecution. The officers contended that Rodriguez became violent when they tried to handcuff him.

At a non jury trial in 1990 all three officers were acquitted. In announcing the verdict the judge in the case is reported to have stated that "the evidence has not established beyond reasonable doubt that these officers recklessly or negligently caused physical injuries to Juan Rodriguez".[31]

The officers were reportedly returned to full duty and did not face disciplinary charges. A civil action filed by Rodriguez's family was settled for $275,000 in September 1994.

### Ernest Sayon

Ernest Sayon, black, died during his arrest by Staten Island police officers on 29 April 1994. The NYC Medical Examiner issued a press release reporting its finding that Sayon had suffocated because of pressure on his back, chest and neck while he lay face-down on the ground with his hands cuffed behind him. A private autopsy arranged by his family also found evidence of suffocation or asphyxiation, with lacerations also to the top of his head and bruises and contusions to his face and back. The incident leading to Sayon's death took place while police were conducting a drugs search of the area where he lived and were in the process of arresting another man when a firecracker exploded. The officers moved in the direction of the noise and Sayon, who was among a crowd of people in the vicinity, was arrested. There were conflicting accounts of the exact circumstances of the arrest. The

---

[31]Accounts of the case and quotes as reported in *The New York Times* 18 November 1988 and 20 March 1990.

police reported that Sayon started running and resisted arrest, a version contradicted by some other witnesses who said that the police approached him and struck him on the head with a gun. Some witnesses also alleged that an officer hit Sayon on the head and kneed him in the back while he was on the ground. The officers denied hitting him or using a choke hold. Although two ambulances were called to the scene, Sayon was put into the back of a police van and taken to hospital; according to the family's attorney the police radio transmission tapes show that there was a delay of some 17 minutes before Sayon arrived at the hospital a few blocks away. He was pronounced dead on arrival at the hospital.

In December 1994 a grand jury failed to indict any of the six officers involved in the arrest. The Staten Island District Attorney was reported in the press as calling the decision "justifiable and appropriate".

Amnesty International was informed by the IAB that a departmental inquiry had cleared the officers involved of any wrongdoing. A CCRB investigation was conducted into the case and is the subject of some controversy. Press reports on 31 October 1995 stated that a three-member panel of the CCRB had found no evidence of wrongdoing by any of the four officers involved in the case. According to reports, the panel members confirmed that the complaint filed in the case had been



©Chester Higgins Jr/NYT

Pictures
A shrine erected in the spot where Ernest Sayon died during his arrest by police on 29 April 1994.

r u l e d
e i t h e r
unfounded or unsubstantiated, although no further details were given. A source within the CCRB was also

reported to have stated that the CCRB investigative staff had been ready to recommend that the complaint be substantiated but that, in an unusual move, the Chairman of the CCRB, David Zornow, directed that the results of the investigation be submitted to the panel without a recommendation.[32] There was also concern that a three-member panel rather than the full Board had made the final decision on such a controversial case. (An attorney also told Amnesty International in April 1996 that Sayon's family had never been personally informed of the outcome of their complaint to the CCRB.)

### Kevin Thorpe

Kevin Thorpe, black, aged 31, a mentally disturbed man, died of asphyxia on 10 July 1989 after at least four officers lay on top of him while he was face-down on the floor in his mother's Brooklyn apartment, handcuffed behind his back with his legs strapped together. Four witnesses alleged that police officers hit Thorpe with their nightsticks and fists after he was handcuffed on the ground, and bruises were noted in the autopsy report. The police were called to the apartment after Kevin Thorpe have became violent after failing to take his medication. The two police officers who first arrived at the apartment were alleged to have violated procedures in calling for backup from regular patrol officers rather than the specially trained unit. Amnesty International wrote to the Brooklyn District Attorney in October 1995 for information on the outcome of the investigation into this case, but received no response.

---

[32]From press reports appearing in the *Staten Island Advance* and the New York *Daily News*, 31 October 1995. It was also reported that the handling of this case led Executive Director of the CCRB, Hector Soto, to resign. Hector Soto announced his resignation from the CCRB in October 1995 and left office in February 1995. There had reportedly been growing conflict for some time between Soto and the Chairman of the CCRB who was the present mayor's appointee.

## 4. POLICE SHOOTINGS

The NYPD has stringent guidelines governing the use of firearms. However, Amnesty International has received information on more than 30 cases in which suspects have been shot and killed or injured by NYC police officers in questionable circumstances in recent years. While it has been difficult to obtain official reports of these shootings, Amnesty International is concerned that police actions may have violated international standards on the use of deadly force, as well as the department's own guidelines. Article 6 of the ICCPR states that the right to life shall be protected by law and that "No one shall be arbitrarily deprived of his life". The UN Basic Principles on the Use of Force and Firearms provide that firearms may be used only in self defence or the defence of others against the "imminent threat of death or serious injury" and "only when less extreme measures are insufficient to achieve these objectives" and that "In any event, intentional use of firearms may only be made when strictly unavoidable to protect life" (Principle 9). NYPD guidelines set a similar standard (see below).

In most cases of on-duty police shootings of civilians in NYC, internal inquiries have found the officers' actions to have been justified given the threat encountered or perceived at the time.[33]  Amnesty International recognizes that police officers often have to make split-second decisions in difficult circumstances, and it does not have access to the full facts in all the cases it has examined.

Nevertheless, there appear to be serious doubts in many of the cases as to whether the suspects had offered an immediate threat to life when they were shot. Most of the victims (who included several teenagers aged between 14 and 17 years) were unarmed at the time they were shot and some were fleeing the scene of minor crimes; some were shot allegedly after they had already been disabled or had surrendered; in several cases independent witnesses disputed police accounts of the shootings. In some cases the victims, or relatives of the deceased, were subsequently awarded substantial damages in the civil courts following wrongful death or injury claims. While most officers were neither charged nor disciplined, in three cases police officers were convicted of offences arising from the shootings.

Amnesty International's findings are not a comprehensive review of police shootings by NYC police. However, the organization is disturbed by the number of disputed shootings drawn to its attention and by evidence suggesting that racial minorities may be disproportionately the victims of unjustified shootings.

### 4. 1 NYPD Guidelines on Deadly Force

The NYC Police Department's patrol guide states that "The primary duty of all members of the service is to preserve human life". The department's guidelines for the use of firearms provides that deadly force may be used as a last resort when an officer or another person is in imminent danger of serious physical injury or death and all other reasonable alternative measures have been exhausted.      N Y P D guidelines on fleeing suspects state that "deadly force shall not be used to subdue a fleeing felon who

---

[33]An average of 87% of NYPD firearms discharges reviewed by the Firearms Discharge Review Board from 1990 to 1993 were found not to violate police guidelines (source:*Investigating Firearms Discharges*, prepared August 1994 by Police Academy City of New York).

presents no threat of imminent death or serious physical injury to themselves or another person". Under this standard a NYC police officer may not fire at a suspect fleeing from the scene of even a violent crime simply in order to stop the suspect, or make an arrest, unless someone's life is in direct and immediate danger. This is a stricter standard than provided under both New York state law and nationally.[34]

The guidelines also prohibit the firing of warning shots; discharging firearms in defence of property; firing at a moving vehicle unless the occupants are using deadly force other than the vehicle itself; and discharging firearms when doing so will unnecessarily endanger innocent persons. They provide that, wherever feasible, a verbal warning should be given before firearms are discharged. They also state that police officers shall never cock a firearm (hold the gun with the trigger lever raised in readiness for firing) under any circumstances.

### 4. 2 Statistics on police shootings

After the above guidelines were introduced in 1972 there was a general decline in shootings by NYC police officers, at least until the late 1980s. The number of people shot fatally fell from an average of 63 a year from 1970-1974 to 24 a year from 1979 to 1988 (reaching an all-time low of 14 in 1987), with a corresponding decline in the number of shots fired and civilians injured.[35] Police shootings in NYC are also relatively infrequent both in terms of the number of contacts police officers have with civilians and offenders, and in comparison with some other major US cities. In 1991, for example, NYC police officers are reported to have shot civilians (fatally and nonfatally) at less than half the rate of police in Atlanta, Kansas City and Houston, and significantly less also than in Los Angeles or Philadelphia, compared to the size of the police force or population. Shootings by NYC officers were also lower compared to the number of violent crime arrests and reported homicides.[36]

The number of police shootings in NYC started to rise again from the late 1980s onwards, a trend seen also in some other major cities. In 1990 41 civilians were shot dead by NYC police officers, the highest number since the mid 1970s. Although the numbers shot dead or injured have fallen below this level since then, they remain higher than in previous years, and rose significantly between 1993 and 1994 (from 23 in 1993 to 31 in 1994). The police have said that the rise in shootings is due to the increase in the number of violent, heavily armed criminals encountered by police officers. According to reports, violent crimes and shootings reached a peak in NYC in 1989 (a year in which three police officers were

---

[34]The US Supreme Court established a national minimum standard governing police use of deadly force in *Tennessee v Garner* in 1985, ruling that deadly force may not be used against a nonviolent fleeing suspect; however the use of deadly force to prevent the escape of someone suspected of a serious felony involving violence, or the threat of violence, has not been ruled unconstitutional. NY state law allows the use of deadly force against fleeing felons suspected of certain categories of dangerous crime.

[35]From statistics on NYCPD shootings published in *Deadly Force: What We Know* by William A. Geller and Michael Scott, Police Executive Research Forum, Washington, D.C., 1992.

[36]From tables showing rates at which civilians were shot in various US cities, Appendix E to *Deadly Force*, op cit.

killed and 76 were wounded by gunfire). However, police shootings have apparently continued to rise during a period in which violent crime has dropped significantly in NYC.[37] Between 1990 and 1994 (the last year in which figures were available to Amnesty International) less than two NYC police officers a year on average have been shot and killed by offenders. In 1994 two NYC police officers were fatally shot by offenders and 18 were grazed or wounded by bullets.

### 4. 3 Racial disparities in police shootings

While the total number of police shootings remains relatively small overall, Amnesty International is disturbed by evidence suggesting that a disproportionate number of people shot in apparently non-threatening or questionable circumstances in New York City are racial minorities. At least 32 of the 35 suspects shot by police in the cases examined by Amnesty International were minorities (16 were Latino, 15 were black, 1 was Asian, 1 was white and in two cases the race of the deceased was unknown). They included two black plain clothes police officers who were shot by white officers who mistook them for suspects.

Amnesty International does not have a complete racial breakdown of those shot or fired at by New York City police officers matched to the circumstances in which shootings took place and further study is needed to account for the disparities.

Detailed internal reports of police shootings are in fact prepared annually by the NYPD Police Academy's Firearms and Tactics Section, and these were made available to Amnesty International for the years 1990 through 1994. The reports give a breakdown of the total number of firearms discharges by NYPD officers and the types of incident (including off-duty shootings, accidental shootings, self-inflicted shootings and shootings of dangerous animals), with the type weapons used, number of shots fired, range of shots and precincts involved. They also give the number of shots fired at police stations by "perpetrators" (armed offenders) and a breakdown of weapons used. The reports also provide aggregate statistics on the race and ethnicity both of officers and perpetrators involved in firearms discharge incidents. Although the statistics indicate that the large majority of "perpetrators" during the period 1990-1994 were black or Hispanic, the reports do not provide a racial breakdown of the types of incident leading to police firearms discharges, for example cases in which unarmed suspects were shot or where shootings were found to have violated departmental policy. Thus, although the reports provide valuable data in general on the use of firearms and the threat faced by officers, further analysis would be necessary to identify the extent to which racial discrimination may be a factor in police shootings.

### 4. 4 Procedures for investigating police shootings

Until 1995 most police shootings were investigated by a senior officer on duty in the patrol borough where the shooting occurred, under the supervision of the borough commander if the shooting resulted in serious injury or death. During a meeting with IAB representatives in 1994 Amnesty International was told that,

---

[37]Serious crime is reported to have fallen by 27% in NYC between 1993 and 1995, and homicides by more than 40% ( homicides using firearms by 56%). The NYPD firearms reports reveal that in 1994 there was a decrease of 34% in the number of offenders with firearms involved in confrontations with police officers.

although NYPD regulations provided that IAB be immediately informed of shootings involving serious injuries, this did not happen in practice and IAB investigators rarely attended the scene immediately after a shooting. However, the department was planning to change this as well as to establish specialized shooting investigation teams, as the quality of the investigation in the first 48 hours after a shooting was of vital importance.

In response to these concerns, special Borough Shooting Teams were established in each patrol borough in February 1995. These respond to all shootings in the borough and are composed of borough police officers, usually of the rank of supervisor, led by a Captain. Amnesty International was told that IAB officers also now attend the scene of all shootings resulting in injury or death, but will conduct the investigation only if the circumstances are particularly controversial or they are asked to do so by the Borough commander. Otherwise the Borough Shooting Team will investigate the shooting and prepare a report of the circumstances, including witness statements and the past shooting records of the officers involved, with recommendations on whether departmental guidelines have been violated. Under police regulations, officers involved in shooting incidents are not questioned during the first 48 hours after a shooting to allow them time to consult with police union representatives and their attorneys before being interviewed.

A police officer may be relieved of his/her gun and placed on modified assignment (usually desk duty) while an investigation is underway. An officer may also be suspended for a maximum of 30 days while the case is being investigated. The report of the investigation is forwarded to Chief of Department and the Firearms Discharge Review Board, an oversight body of senior NYPD police officers established in 1972.

The Firearms Discharge Review Board reviews all police shootings, whether or not someone has been hit, and prepares annual statistical reports. It also reviews the findings of departmental investigations and makes a final determination of whether the shooting conforms to departmental policy, with a recommendation on whether disciplinary action or retraining should be undertaken. The Review Board receives the report on a case only after the investigation has been completed. Amnesty International was told that there were often long delays before the case reached the Firearms Review Board, which limited its effectiveness in reviewing individual cases and making recommendations.

The Board's findings are also dependent upon the quality of the initial police investigation. There have been allegations in some cases of a lack of thoroughness in police investigations of shootings or other incidents, or even of "cover-ups" (ranging from accusations of weapons being planted on suspects to inaccurate reporting of the incident leading to a shooting or failure to release pertinent information about the evidence). Although the Borough Shooting Teams are designed to increase the efficiency and quality of internal police shooting investigations Amnesty International believes that the system should continue to be carefully monitored and that steps should be taken to ensure that reports are sent to the Firearms Discharge Review Board without undue delay.

There is no provision for civilian oversight of police shooting investigations. However, the all-civilian CCRB established in 1993 can investigate individual shooting cases if a complaint is lodged with them. There was conflict, however, between the CCRB and the Police Department regarding a police shooting in January 1995, where the CCRB substantiated a complaint of excessive force (see the case of Rosario, Vega and Bonilla below).

## 4. 5 Criminal investigations

Case 1:06-cv-00256-SLR    Document 84    Filed 08/13/2007    Page 33 of 65

The New York City district attorneys also investigate all police shooting cases involving death or serious injury for evidence of possible criminal misconduct. Amnesty International was told that they will usually present cases to a grand jury for a determination of whether there is sufficient evidence to indict anyone on a criminal charge. As stated earlier, grand juries do not often return indictments against officers involved in on-duty shootings. A 1991 study by the New York journal Newsday found that NYC police officers had shot dead more than 125 civilians between 1985 and 1990, and that fewer than 15 officers (roughly nine per cent) had been charged with criminal offences arising from the shootings; most of those who were charged were acquitted after non-jury trials or had the charges dismissed. The study reported that the standards for indicting police officers appeared to be stricter than for civilians, as police officers are authorized to use deadly force under certain circumstances and nearly always offered a defence for their actions, for which they were given the benefit of the doubt.[38]  In 1995 the first NYC police officer since 1977 was convicted of homicide for an on-duty shooting (see the case of Douglas Orfaly, below).

A number of NYC police officers have been criminally charged or convicted for  shootings committed while off-duty. The most notorious case was that of a NYPD officer who in April 1994 was sentenced to 25 years to life for robbing a liquor store and murdering the Chinese store owner by shooting him in the back as he lay on the floor. In July 1990 an off-duty police officer was convicted of second-degree manslaughter for shooting an unarmed motorist to death over a traffic dispute. In October 1995 a grand jury indicted an off-duty officer for second-degree murder for firing his gun in a Manhattan restaurant during a drunken altercation with another customer, wounding one bystander and killing a young mother who was celebrating her birthday: this was the first murder charge brought against a police officer in nearly ten years in Manhattan. Although these officers were clearly not acting in the course of their duty, the cases raise disturbing questions about the caliber of some of those recruited to the police force.

### 4. 6 Public information on police shootings

Although the NYPD prepares annual statistical reports on police firearms discharges (see above), these are internal reports that are not generally made public. CCRB representatives told Amnesty International in November 1995 that  the former Deputy Commissioner for Public Information (DCPI) used to make public statistics on the number of deaths in custody and police shootings. However, they said that less information had been provided during the past year and that decisions on releasing information about the police were made by the Mayor's office; several people to whom Amnesty International spoke believed that  information about the police was more tightly controlled than before.

The NYPD sent Amnesty International copies of their internal statistical reports on officer-involved shootings after several requests.  However, departmental investigations of individual cases, and CCRB findings, are not made public even after a case is closed. In many of the cases brought to its attention, Amnesty International wrote to the Police Commissioner and/or the DCPI asking for very basic information on whether an internal investigation had been completed and whether a shooting was found to have violated departmental policy. However, information was provided on only one case.[39]

---

[38]*Newsday*, 10 March 1991.

[39] See case of Marcus Maldonado, p 22.

Amnesty International believes that the publication of regular statistical data on police shootings and deaths in custody would increase the accountability of the police department and public awareness of policy and practice as regards the use of deadly force.

Amnesty International also believes that **the findings and recommendations of any internal investigation of police misconduct where there are allegations of human rights violations, including disputed shootings and deaths in custody, should be made public promptly after completion of the investigation**. The publication of findings should indicate on what evidence the findings were based and the scope and methodology of the investigation. This does not preclude keeping certain information confidential where there are legitimate grounds for doing so.

The latter would be in keeping with the Principles endorsed by the United Nations Economic and Social Council on *Effective prevention and investigation of extra-legal, arbitrary and summary executions* (resolution 1989/65 adopted on 24 May 1989), bearing in mind that the Principles explicitly apply to situations where death results from "excessive or illegal use of force by a public official ... and situations where deaths occur in custody" (Principle 1). Principle 17 states that:

> "A written report shall be made within a reasonable period of time on the methods and findings of such investigations. The report shall be made public immediately and shall include the scope of the inquiry, procedures and methods used to evaluate evidence as well as conclusions and recommendations based on findings of fact and on applicable law. The report shall also describe in detail specific events that were found to have occurred and the evidence upon which such findings were based, and list the names of witnesses who testified, with the exception of those whose identities have been withheld for their own protection..."

### 4. 7 Change in NYPD to semi-automatic weapons

Since 1994 all NYPD officers have been issued with 15-round rapid firing 9-millimeter semi-automatic handguns, replacing the 6-bullet .38 caliber revolvers that were formerly carried. There has been controversy around the change to semi-automatic weapons on the ground that the increased firepower could be dangerous to bystanders as well as increase the likelihood of officers firing more rounds than necessary by emptying their guns in stressful situations. Former Police Commissioner Lee Brown had resisted attempts to issue semi-automatic weapons department-wide on these grounds. Police officials, however, have defended the introduction of 9-millimeter semi-automatics on the ground that the increased firepower is necessary to match the weaponry on the street and protect officers who may be shot while reloading their revolvers.

Statistics produced by the department in 1995 indicated that officers using 9-millimeter handguns had fired more rounds per shooting than those using other guns, but that the overall number of shots fired by officers carrying 9-millimeter weapons in the department was less than three years previously (when the department first started introducing semi-automatics). However, there has been concern that the triggers in the semi-automatics used by the department make it easier to fire the guns accidentally. This may have happened in the case of a 16-year-old boy shot dead during a struggle with a police officer in March 1995 (see the case of Yong Xin Huang, below). The department was reported to be looking into measures for tightening the triggers.

## SAMPLE SHOOTING CASES

### Luis Allende

Luis Allende, an unarmed Latino man suspected of a street robbery, was shot dead by a NYC Transit Police officer in the Bronx on 9 August 1990. According to the police report, patrol officers received a report that a woman's necklace had been snatched from her; as they were transmitting a description of the robber over the radio, an officer spotted the suspect and Allende flagged down a cab in an attempt to escape. The officers surrounded the cab and ordered Allende, who was sitting in the back seat, not to move. Allende was shot once in the head, allegedly after turning toward one of the officers who was opening the car door to arrest him.

The shooting was found to be within police guidelines as the officer thought that Allende might have been reaching for a weapon, even though he was found to be unarmed. A civil lawsuit filed by Allende's family was still pending in April 1996, claiming that Allende had posed no immediate threat to life when he was shot as the police had the car surrounded and Allende in full vision at the time.

### Frankie Arzuega

Frankie Arzuega, an unarmed 15-year-old Puerto Rican boy, was shot dead by a NYPD police officer on 12 January 1996. According to press reports, Arzuega was a passenger in the back seat of a parked car which was approached by three officers from the 90th Precinct in Brooklyn. According to police statements, the driver tried to drive off as he was being questioned by a police officer who was dragged along with the car; another officer then fired through the back window of the moving vehicle, killing Arzuega. No weapons were found in the car. Two other people in the car were reportedly charged afterwards with grand larceny, assault and criminal possession of a stolen vehicle.

According to an article in the *New York Post*, dated 18 January 1996, the shooting was not recorded in the Police Department's log of major incidents which is distributed within the department and to reporters. News of the shooting became public only after the family contacted a reporter from *El Diario* (a NYC Spanish language newspaper) three days afterwards.

Amnesty International was seeking further information on the case, and on the outcome of official inquiries into the shooting in April 1996.

### Jacques Camille

Jacques Camille, a Haitian taxicab driver, was shot and wounded by a police officer on 9 April 1992, after police officers stopped his cab looking for robbery suspects. The robbery victim had reported the cab's number to the police. Camille - in his first week as a cab driver - had unwittingly taken the two robbers on board. The officer said he fired after Camille turned suddenly to the officer to protest at being stopped. Several witnesses said Mr Camille's hands were raised when the officer fired a single shot which destroyed a kidney and part of his liver. The officer was tried in a nonjury court on a charge of recklessly shooting Mr Camille. He was convicted of a reduced charge of misdemeanour assault and sentenced to three years' probation. In May 1994 a civil lawsuit for wrongful shooting was settled by the city for $1,500,000.

*Amnesty International June 1996*                                     *AI Index: AMR 51/36/96*

*Police brutality and excessive force in New York City*

**Anibal Carasquillo**

Anibal Carasquillo, an unarmed 21-year-old Puerto Rican man, was shot dead by a police officer in the Flatbush area of Brooklyn on 22 January 1995. The incident reportedly took place after police officers saw him peering into parked car windows. A police spokesperson initially stated that Carasquillo was shot in the chest after turning to face the police officer in "a gun stance". However, the NYC Medical Examiner subsequently reported that the autopsy had shown that he was shot in the back. A grand jury subsequently voted not to indict the officer in the case. On 13 March 1996, relatives of Anibal Carasquillo and Yong Xin Huang (another police shooting victim in Brooklyn: see below) occupied the Brooklyn DA's office to demand that he reconvene a grand jury in both cases. After more than three hours, the demonstrators were eventually arrested, including the mother of Anibal Carasquillo and Yong Xin Huang's two sisters. They were charged with obstructing governmental administration and released on bail.

   Amnesty International wrote to the Police Commissioner in February 1995 asking to be informed out the outcome of the police investigation into this case but received no response. Amnesty International subsequently wrote to both the NYPD's Deputy Commissioner for Public Information and the Brooklyn District Attorney for information on this and other cases but received no response. A CCRB investigation into the shooting was still pending in April 1996, as was a civil action filed by Anibal Carasquillo's family.

**David Cotto**

David Cotto, aged 20, was shot dead by Brooklyn police officers in his parent's apartment on 1 March 1990. According to the family, Cotto had been in a fight with a neighbour over a card game and was in the apartment washing blood out of his mouth when the police arrived. Cotto's 19-year-old sister Lisette, who witnessed the whole incident, told Amnesty International that the police were abusive to David Cotto, who they knew, and pushed him to the ground after which there was a violent struggle. Cotto then ran into the kitchen and picked up two knives which he allegedly held to his own throat, threatening to kill himself. According to Lisette, Cotto dropped the knives after one of the officers maced him and two other officers fired as he was rubbing his eyes and stumbling forward. Both Lisette and the family's attorney maintain that the officers continued firing after Cotto had fallen and was lying on the floor. He was hit by 11 bullets. Lisette who was standing nearby was grazed on the knee by one of the bullets. The description of the gunshot wounds in the autopsy report seen by Amnesty International suggests that David Cotto was hit by two shooters firing 8-9 bullets and then received two further shots in the thigh and scrotum when he was lying on his back on the ground.

   A grand jury did not return criminal charges against any of the officers involved. According to the Cotto family's attorney neither of the two officers who shot Cotto were disciplined. The other officer present, a sergeant, was reportedly mildly reprimanded for failing to follow the required procedure for dealing with an EDP (Emotionally Disturbed Person).[40]

   Amnesty International wrote to the NYPD and the Brooklyn District Attorney for more

---

[40]This includes calling for prompt emergency medical services backup and use of non-lethal restraining devices such as Velcro straps.

information about the case but did not receive a response.

### Lydia Ferraro

Lydia Ferraro, white, unarmed 32-year-old woman, was shot dead on 27 April 1988, after six NYPD officers fired 16 bullets into her car following a car chase in East Harlem. A grand jury voted not to bring criminal charges against any of the officers for the shooting itself, after the police said that they believed she had been reaching for a gun.

A civil lawsuit for wrongful death brought on behalf of Ferraro's son was settled for $300,000 in August 1993. According to a summary of the court-agreed settlement police officers saw Ferraro make an improper turn against traffic lights and began following her, believing that she had driven to Harlem to buy drugs. They were joined by another police car and Ferraro's car was eventually cut off and stopped. The officers approached her car with their weapons drawn; the City claimed that as one officer opened the car door, Ferraro pulled away from him and an officer shot at her. Other officers then opened fire, killing her with multiple gun shot wounds.

A departmental investigation found that the officers who had fired the fatal shots at the end of the chase had acted within police guidelines. Only one officer was disciplined, for firing at her car while it was still moving: he had also reportedly tried initially to cover up his role in the shooting by replacing the three spent cartridges he had fired at the car.

### Lebert Folkes

Lebert Folkes, a Jamaican immigrant, was shot in the face and injured by an undercover police officer on 11 February 1996. Folkes had been driving his sister's car which was wrongly listed as stolen on a police computer. As he was parking the car outside his home in Queens, NYC, two police officers blocked the car with their own vehicle and ordered Folkes out of the car at gunpoint. Lebert Folkes said that as he was reaching to unbuckle his seat belt, the officer dragged him out of the car onto the ground and shot him. According to press reports, the police alleged that Folkes had initially refused to get out of the car and that the officer's gun went off accidentally during a struggle. Folkes was reported as saying there was no reason for him to struggle, adding "Why would I resist arrest while they had two guns at my head?" According to press reports, Folkes and at least two witnesses said that the police officers did not identify themselves when ordering Folkes out of the car. Police officials are reported to have apologized to Lebert Folkes for the computer error which had led to the vehicle being wrongly listed as stolen.[41] Amnesty International was seeking more information on the case and the outcome of the police investigation in April 1996.

### Yong Xin Huang

---

[41]Details of the case as reported in *The New York Times*, 13 February 1996

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

Yong Xin Huang, a 16-year-old Chinese boy, was fatally shot by a white police officer in Sheepshead Bay, Brooklyn, on 24 March 1995. He and two other boys had been playing with an air gun (pellet gun) in the driveway of a friend's house and a neighbour had alerted the police. Yong Xin Huang died after being shot at close range behind his left ear. The officer claimed that his gun - a 9 millimeter Glock semi-automatic - went off accidentally during a struggle with Huang who was holding the pellet gun, and that Huang had been facing him at the time. Huang's friends said there had been no struggle and that Huang had his back to the officer when he was shot. They also said that the officer smashed Huang's face into a glass door at the side of the house which was shattered during the incident. Both the City Medical Examiner's report and an independent autopsy report show that Huang had blunt impact wounds to the top of his head and his face and forehead, which attorneys for Huang's parents have stated are consistent with the allegation that his face was rammed into the door.

A 911 tape of the call to the police, seen by Amnesty International, reveals that the neighbour had correctly reported the approximate age of the "Asian males" as "14 to 16" and stated that they were "playing" with the gun, which she did not know was real or not.

In May 1995 a grand jury concluded that no criminal charges should be filed

©Andrea Mohin/NYT Pictures

16-year-old Yong Xin Huang, shot in the back of the head at close range by a police officer in March 1995 after Huang and some friends were spotted playing in a garden with an air rifle (pellet gun).

against the officer involved. The Brooklyn District Attorney (DA) issued a public statement immediately afterwards summarising the "facts" of the case.[42] The statement repeated the officer's account of the incident which, the DA said, was consistent with the forensic evidence on both sides. Attorneys with the Asian American Legal Defense and Education Fund (AALDF), wrote to the DA afterwards to express concern that the statement raised questions about the way the DA had presented the case to the grand

---

[42]The statement added that the information was developed separately from the grand jury investigation and may therefore be lawfully disclosed.

jury. The AALDF urged that he take the necessary steps to release the minutes of the grand jury proceedings "to further the public's interest in knowing whether the presentation to the grand jury preserves the integrity of the criminal justice system". However no such information was released.[43]

A lawsuit on behalf of Huang's family was filed against the City of New York and the officer involved, alleging that Huang's civil rights had been violated through, among other things, the improper use of force, including battery. The lawsuit claimed that the Glock 9 millimeter automatic did not have a safety device and that the pressure necessary to pull the trigger was too slight; despite being aware of this risk the officer had been "reckless and/or grossly negligent" in placing the gun behind Yong Xin Huang's ear. It also alleged that the City of New York was negligent in failing to train the officer in the proper use of a Glock 9-millimeter weapon in effecting an arrest, and in allowing the use of this particular type of gun despite its lack of a safety mechanism. It further claimed that the NYPD "is negatively predisposed towards Asian Americans and to the Asian American community" which it believed to be a factor influencing the officer's response to the incident resulting in Huang's death.

In March 1996 the city agreed to pay $400,000 damages to the family in an out-of-court settlement.

No disciplinary action was taken against the officer involved. A federal civil rights investigation into the case by the US Attorney's office was being conducted as of April 1996.

**Shu'aib Abdul Latif**

Shu'aib Abdul Latif, black, an unarmed 17-year-old was shot dead by police on 11 January 1994. The shooting occurred after 12 police officers raided a residential building, apparently in search of drugs. The officers descended to a basement area where Latif was hiding in a cubicle. A tenant who lived in the basement arrived shortly afterwards and approached the police, asking what they were doing. According to her testimony, Latif began to rise from a stooped position on hearing her voice; before he had stood up properly an officer, without warning, shouted "There he goes" and started shooting; Latif was shot twice and fell forward to the ground; she then heard a third shot, then two more shots. This tenant was the only civilian eye-witness to the shooting. It was later established that four officers had discharged their weapons. One officer, Officer Sherman, was shot in the thigh from a police weapon although it was not established how this had occurred.

In March 1995 a grand jury concluded that no criminal charges should be brought against any officers involved in the incident. The Brooklyn District Attorney afterwards issued a statement stating that the grand jury had reached its conclusion "after a full review of all the evidence and careful deliberations". The statement then gave a "brief summary of the facts and circumstances" of the

---

[43]The grand jury proceedings may be disclosed on an application to a court under certain narrow circumstances.

shooting. [44] This stated that Latif was shot after rising up suddenly and grabbing Officer Sherman's arm, and that Sherman's gun went off accidentally as they fell during the struggle. The statement adds that two more shots were fired by other police officers and that "after Latif got up and started to run, other shots followed. Latif was struck twice and mortally wounded".

A forensic pathologist has reviewed the Medical Examiner's (ME) report and other information on the case for Amnesty International and has noted that critical information is missing. There is no report of whether gunshot residue was found on Shu'aib Latif's clothing which would have been very likely to have been present if he had been shot at close range while entangled with a police officer (as the police and the DA's statement alleged). The ME's report states that the victim's clothing had been processed by the NYPD laboratory for evidence of gunshot residue, before being turned over to the ME's office, but there is no reference to the findings, which suggests that there may, in fact, have been no positive trace. The ME's own laboratory report states that no residue was observed on the clothing (although it does not state whether they actually tested the clothing themselves for trace residue). There is also no indication as to whether the police test-

Shu'aib Abdul Latif, a 17-year-old unarmed teenager shot dead by police in January 1994, shown with his father. He was hiding in the basement of a house raided by police and an eye witness alleges that the police gave no warning when they fired at him. Although the police allege that he was accidentally shot during a struggle with an armed police officer - and the officers were subsequently cleared of wrongdoing - this appears to be contradicted by other evidence; however the police forensic reports have not been made available to Latif's familiy.

---

[44]The statement added that the information given "was developed separately from the grand jury investigation, so it may be lawfully disclosed.

fired the weapons to see at what range the gunshot residue would have disappeared.[45] Also, although one bullet was recovered from Latif's body, the identity of who fired the shot is not given.

In regard to the latter point, the bullets used in the shooting were reportedly nyclad bullets, with a protective plastic coating to prevent lead contamination. According to information from the Latif family attorney, this type of bullet does not leave engravings which can be matched against individual weapons of the same type. This allegedly makes it difficult, or impossible, to identify which officer fired the fatal bullet. Sources have suggested that this is why the grand jury failed to return an indictment in the case.

The results of the police internal inquiry into the shooting, including the police laboratory tests, which may provide the answers to some of these questions, have not been made available to the family or their legal representatives.

Negotiations with the city to settle a civil lawsuit filed on behalf of the family of Shu'aib Abdul Latif, whose father is a prominent Muslim cleric, were reported to be in their final stages as of April 1996.

**Jose Luis Lebron**

Jose Louis Lebron, an unarmed Latino boy, aged 14, was shot dead by a police officer from the 83rd Precinct on 31 January 1990. The shooting took place in the Bushwick area of Brooklyn at around 5.30 pm after a man in a police patrol car identified him as being one of two youths who had robbed him of $10. One of the suspects was captured but Lebron ran away and was cut off by the patrol car. He turned to go back the other way, and was shot in the back of the head by an officer who said he thought he was reaching for something in the front of his jacket. Two eye-witnesses denied that Lebron had reached into his jacket; they said that the officer ordered Lebron to "freeze" then immediately fired two shots in quick succession when he kept on walking.

In March 1990 a grand jury voted to charge the officer with second-degree manslaughter. In September 1990 the indictment was dismissed by a judge. The District Attorney (DA) brought the case before a grand jury again in 1992 but this time there was no indictment (Lebron's attorney told Amnesty International that the DA did not call or seek the eye-witnesses in the case during the second time it came before the grand jury) .

A civil lawsuit was filed on behalf of Lebron's family, which was still pending in April 1996. Amnesty International wrote to the Police Department to ask if any disciplinary charges had been brought against the officer involved but received no reply.

**Louis Liranso**

Lebron was the second unarmed teenager to be fatally shot by police within a week in the same area. On 27 January 1990, in Bushwick, Brooklyn, 17-year-old Louis Liranso was shot in the back by a female police officer as she was holding him with his hands raised at gunpoint after a drunken brawl near a Chinese restaurant. A grand jury later cleared the officer of wrongdoing, after she told the jury that the

---

[45]AI was advised that in any close struggle the inference is that there will be gunshot residue, although a simple trace test is necessary to be sure; as the distance at which gunshot residue disappears may vary with the type of weapon it would also be necessary to test fire the gun and match this to the clothing tests.

*Police brutality and excessive force in New York City*

gun went off as Liranso turned and grabbed her arm. This contradicted accounts by witnesses that Liranso simply tripped as the officer was ushering him into the restaurant at gunpoint, as well as earlier police reports that he was shot as he lowered his hands and started to turn towards the officer.

**Mary Mitchell**

Mary Mitchell, black, aged 41, was shot dead by a white police officer in her Bronx apartment in November 1990. The shooting occurred after police officers were called to investigate a violent fight between Mary Mitchell and her daughter. During the fight an officer apparently tried to barricade Mary Mitchell in a room; however at some point the door opened and the officer dropped his nightstick. He shot Mitchell once in the chest after she grabbed the nightstick and, according to the officer, started swinging it at him. A grand jury charged the officer with second-degree manslaughter. In a nonjury trial in October 1991 a judge acquitted the officer, ruling that Mary Mitchell had been a deadly threat at the time she was shot. The family maintain that as at least eight police officers were at the scene at the time she was shot less lethal methods could have been used to restrain her, and that she may have been treated differently had she been white.

**Douglas Orfaly**

Douglas Orfaly, an unarmed Latino man aged 29, was shot and killed by a NYC Housing Authority police officer as he sat in his car on 3 March 1992. The officer, who had been responding to a burglary report, said he thought Orfaly fitted the description of the burglar. As the officer moved towards the car Douglas Orfaly allegedly made a sudden movement and the officer shot him once through the head through the car window. It was reported afterwards that the officer had

©Steve Hart/NYT

Pictures
Douglas Orfaly, an unarmed Latino man shot dead by a police officer while he was sitting in his car in March 1992. The officer was later convicted of criminally negligent homicide and sentenced to between one and four years in prison.

*AI Index: AMR 51/36/96*                                          *Amnesty International June 1996*

twice had accusations of excessive force brought against him in civil lawsuits.

In August 1995 the officer was found guilty by a jury of criminally negligent homicide in the shooting and was sentenced to one-to-four years' in prison. He was the first NYC police officer to be convicted of an on-duty homicide since 1977.

**Derwin Pannel**

Derwin Pannel, a black undercover transit police officer, was shot and wounded by three white NYC Transit Police Department officers who saw him trying to arrest a female fare-evader in a Brooklyn subway on 20 November 1992. The officers, who said they thought he was an armed mugger, fired a total of 21 shots at Pannel: one officer fired all 15 rounds in his 9-millimeter semi-automatic and another six bullets from a .38 caliber revolver. Pannel was hit three times in the back; he was saved by his bullet-proof vest but one bullet lodged in the back of his neck causing severe injury. The chief of the NYC Transit Police was reported afterwards as saying that race was not a factor in the shooting. However, representatives of the Guardians Association, a group representing black police officers, said the shooting highlighted the need for greater sensitivity by white officers to the fact that black and other minority officers working under cover may be police officers rather than criminals. The transit police were reported to have included a section on racial awareness in undercover work in its training sessions following the incident. No officers were criminally charged in the incident.

**Gerard J Papa and James Rampersant Jr**

Gerard Papa, a white attorney and James Rampersant Jr., who is black, were shot at multiple times and beaten by police in a case of mistaken identity in March 1986. A jury later awarded them substantial damages in a federal civil action filed against the city, the NYPD and the officers concerned. According to the facts as recorded in the court report, Papa and Rampersant were driving down a deserted Brooklyn street when they were boxed in by two

©AP
Photo
Derwin Pannell, an undercover transit police officer shot and wounded by three white police officers in November 1992. He was arresting a fare-evader in a Brooklyn subway at the time and the other officers mistook him for an armed mugger.

*Amnesty International June 1996*                    *AI Index: AMR 51/36/96*

unmarked police cars. Police officers in plain clothes jumped from their cars with their guns drawn and allegedly shouted profanities at the men, ordering them to get out of their car. Papa and Rampersant testified that they refused to get out of their car, fearing that they had been caught up in a drugs operation, and that the officers did not identify themselves. The police opened fire at the car, one officer allegedly pulling back to reload. The plaintiffs were then pulled from the car and beaten and kicked. Papa sustained a dislocated shoulder, three fractured ribs and contusions. Rampersant suffered cuts, bruises and contusions. Both men were charged with attempted murder, criminal mischief, resisting arrest and other offenses, and spent two-and-a half days in jail. The case was dismissed after the grand jury refused to return an indictment.

The officers stated that Papa and Rampersant fitted the description of two men who had been involved in a purse snatching in the area six days earlier. They defended their actions on the ground that Papa and Rampersant had been trying to escape from the scene and had then refused to get out of their car.

The court trying the civil lawsuit heard evidence that the police had tried to cover up the incident and had not prepared a firearms report until months later. A PBA lawyer advised the officers not to make any statement when interrogated after the incident and a supervising sergeant who appeared at the scene testified that he picked up spent cartridges but could not recall what he did with them.      No officers were charged or disciplined in the incident.

## Eric Pitt and Donald Taylor

Eric Pitt and Donald Taylor, black, were shot dead by a police officer after a car chase in Jamaica, Queens in December 1994. According to police reports, the chase started after officers were confronted by three men, one of whom fired at them. Pitt and Taylor fled in a car which was forced to a halt by police. According to press reports, each man was then shot once in the head after police said the officer saw one of them make a "furtive gesture". No weapon was found in the vehicle. Amnesty International wrote to the Police Department in February 1995 and in November 1995  asking for information on the outcome of the police investigation into the shooting. However, no response was received.

## Hector Rivera

Hector Rivera, an unarmed man of Puerto Rican origin, was shot dead on 29 December 1991, when two Brooklyn police officers were called to a domestic dispute outside his home. He was shot in the chest by one of the officers after police said he put his hand into a paper bag when told to "freeze"; Rivera was apparently holding on to a can of beer wrapped in the bag. The officer was indicted on a second-degree murder charge but a judge dismissed the indictment on the ground that the prosecutor's instructions to the grand jury regarding self-defence had been in error. A second grand jury concluded there should be no charges.

## Desmond Robinson

Desmond Robinson, black, an undercover plain clothes officer with the NYC Transit Police Department, was shot four times in the back and seriously wounded by a white off-duty NYPD officer in a New York

subway on 22 August 1994.

The incident occurred during the evening rush hour when Robinson and other transit officers were chasing two youths reported to be armed; one of the youths dropped a shotgun near the open doors of a train and the gun went off, wounding a woman and setting off panic. The off-duty NYPD officer was standing on the platform and pulled out his off-duty revolver. When he saw Robinson running down the platform with a gun, he mistook him for a criminal and fired five times, four shots hitting Robinson in the back. Several witnesses, including Robinson's police partner, alleged that the officer continued to fire after Robinson was lying on the ground, something denied by the NYPD officer. An investigation by a forensic specialist hired by Robinson's attorneys noted two "shored" (obliquely oriented) exit wounds which he said showed signs consistent with the bullets having come into direct contact with a hard surface after exiting the body. The police report of the shooting has not been made public.

A Manhattan grand jury later charged the NYPD officer with first degree assault for having recklessly shot Robinson, an offence which carries five to 15 years' imprisonment on conviction. The officer was brought to trial in March 1996 and was convicted of assault in the second-degree, which carries a sentence ranging from probation to three years in prison. Sentencing was deferred until May 1996.

### Antonio Rosario, Hilton Vega and Freddie Bonilla

Antonio Rosario (aged 18) and Hilton Vega (aged 22) were shot dead by police officers on 22 January 1995 inside a Bronx apartment. Two detectives fired a total of 28 shots, killing Rosario and Vega and wounding 18-year-old Freddie Bonilla who was shot once in the leg.

The police had been called to the apartment by the occupants, an elderly couple who reported that three men had robbed them the day before and said they would return that night. According to the police, the detectives waited for the men inside the apartment from 8.30pm until 11pm when the suspects arrived; they waited for the couple to let them in and then confronted the men. The police said that they fired at the men when Rosario went for his gun. Two .45 caliber pistols and one 9 millimeter handgun, all loaded but not fired, were recovered from the men. (The robbery story has been disputed by relatives of the men who say they went to the apartment to collect a debt.)

In March 1995 a grand jury voted not to bring criminal charges against the two detectives. However, in July 1995 the CCRB concluded that the officers had used excessive force when firing at the men. Although the details of CCRB findings are not made public, a source familiar with the investigation told the press that the CCRB had found that the detectives were not in danger when the shots were fired; that all the bullets were fired from behind the victims; that both Rosario and Vega had bullet entry wounds under their arms, indicating that their hands were raised; and that they sustained wounds to the backs of their heads, torso and back. It was reported in the press in August 1995 that a pathologist hired by the family for one of the victims had concluded that the men were lying on the floor when they were shot.

The CCRB sent its report to the Police Commissioner who publicly criticized the Board for having carried out an investigation into the case while a federal inquiry into the shooting was pending, and he announced that he would not look at the CCRB report until the federal investigation had been completed. However, the CCRB insisted that it had completed its investigation before the federal investigation was

announced.[46]

Amnesty International has reviewed the autopsy report in the case of Hilton Vega, which indicates that he was shot in the back from two sides with different bullets, both coming from behind. There are four bullet holes in the floor which suggests that he may have been shot while face down on the floor and therefore already disabled. Amnesty International did not have further evidence about the scene - for example whether there were bullet holes in the floor or wall - to establish more firmly whether he was lying on the floor or standing when shot.

In July 1995 the US attorney's office began an investigation to determine whether the police had violated the suspects' federal civil rights. The results of this investigation were still pending in April 1996.

---

[46]There was also a dispute about the type of bullets used in the shooting. CCRB investigators said that some of the bullets were Teflon coated, armour piercing bullets which are not authorized by the NYPD. IAB officials told Amnesty International that the CCRB had mistaken Nyclad bullets (wrapped in a nylon coating to avoid lead contamination) for Teflon.

## 5. INVESTIGATION AND MONITORING OF COMPLAINTS: REMEDIES FOR POLICE ABUSES

### 5. 1 Internal investigations into police misconduct

The Internal Affairs Bureau (IAB) is the primary body within the NYPD with responsibility for monitoring and overseeing complaints of police misconduct. The IAB was established in 1993 to replace the Internal Affairs Division and its various field units, which had been criticized by the Mollen Commission for failing to conduct adequate investigations into allegations of police misconduct. The IAB's role is to receive and monitor allegations of serious misconduct in the NYPD, as well as to conduct investigations. It deals mainly with corruption, although since 1995 precinct commanders have also been given a direct role in investigating corruption within their precincts. A special unit, known as Group 54, has also been set up within IAB to conduct investigations into the use of force. Amnesty International was told that, as with shooting incidents, the aim of the unit is to send IAB investigators promptly to the scene in all cases of alleged police assaults resulting in death or serious injury, something that did not happen in the past. IAB officials said that the unit would investigate high profile, or disputed cases, where there is death or serious injury. However, it appears that the patrol force in the precinct where the incident occurred will investigate other cases, although IAB should be informed. As mentioned above the reports of internal police inquiries into misconduct allegations are confidential and may not be disclosed except through a court order (see **Section 2. 10**).

A Performance Monitoring System was set up within the NYPD in late 1991 to identify officers found guilty of brutality at departmental trials and to provide counselling for officers who were the subject of repeated complaints to the CCRB. However, it did not track civil lawsuits and failed to identify many officers later exposed for corruption and other serious misconduct. The IAB told Amnesty International in 1994 that it was in the process of setting up a more comprehensive monitoring system, including a data base with access to police personnel files and other data.

The IAB also liaises with the CCRB who may conduct parallel investigations into cases involving death or serious injury. The IAB exchanges information with CCRB and, according to its 1994 annual report, the information "is used to analyse complaints and identify potential problem officers as well as emerging patterns and trends in police/citizen interactions".

According to the IAB 1994 annual report, an Executive Review Board was established in 1994 to monitor IAB investigations. This remains within the Police Department and is composed of the Police Commissioner, First Deputy Police Commissioner, Chief of Department and other senior police personnel.

### 5. 2 The CCRB

The CCRB became operational in July 1993 and is completely independent of the Police Department, with a 13-member Board of civilians, as well as civilian investigators and other staff (see *Section 1.3*). It has jurisdiction to investigate complaints involving excessive force, including shootings and deaths in custody; abuse of authority, including improper searches or detention; discourtesy; and offensive language, including derogatory remarks about a person's sexual orientation, race, ethnicity, religion, gender or disability.

The CCRB has no authority to open an investigation into an individual case unless it receives a formal complaint, which may initially be submitted by the complainant in person, by letter, by telephone or via a police station. Once it receives a complaint investigators will interview the complainant and then seek to obtain other evidence, including relevant documents and witness testimony, by subpoena if necessary. They will also interview police officers identified as being present during the alleged misconduct and, finally, the subject officer. The Police Department is required to cooperate with the CCRB in its investigations and to provide all relevant records that may be disclosed by law. Police officers called for interviews are required to answer questions and risk disciplinary action or dismissal from the force if they refuse (although their compelled testimony may not be used against them in any subsequent criminal proceedings).

The report of the investigation is then passed to the CCRB Board which makes the final decision on the disposition of the complaint, using the civil burden of proof based on a "preponderance of the evidence". The findings are usually one of the following: the complaint is **substantiated** (there is sufficient credible evidence to believe that the officer committed the misconduct alleged); the officer is **exonerated** (was not guilty of misconduct); the complaint is **unfounded** (the act complained of did not occur); the complaint is **unsubstantiated** (the evidence is insufficient to reach a conclusion one way or another).

If the CCRB substantiates a complaint it has discretion to recommend disciplinary action to the Police Commissioner which may range from "instructions" (the least serious discipline in which the officer is instructed as to appropriate procedures in the matter complained of) to formal administrative charges where the maximum penalty is dismissal from the force. Final responsibility for discipline within the Police Department rests with the Police Commissioner who is not obliged to follow the recommendation of the CCRB. As noted above, the CCRB will inform the complainant in writing only of the final disposition of the complaint, but will not give details of its investigation or the reasons for its findings.

The CCRB has reported that it reviewed and disposed of 3961 complaints during the period January to June 1995, less than one third of which (1,285) proceeded to a full investigation. Of these fully investigated cases, 119 (9.3%) were substantiated; 7.7% were "unfounded" and 75.8% were "unsubstantiated" for lack of sufficient evidence. In 7.2% of the cases officers were exonerated.

Some other complaints were dealt with by mediation or conciliation.[47] However, more than a third of all complaints disposed of by the CCRB during the above period were "administratively closed" without investigation, usually because the complainant did not turn up for the initial interview. Another 21% resulted in "truncated" (incomplete) investigations, often because the complainant no longer wished to proceed or witnesses were not available (the latter a particular problem with older cases the CCRB inherited). The CCRB reported that it hoped to increase the number of cases disposed of on the merits in the future, as it reduced its backlog and conducted more timely investigations into current cases.

However, there was concern that the CCRB lacked its full quota of investigators, despite receiving far more complaints than in previous years. Although it had been agreed that the CCRB required 87 investigators, at the end of 1995 the CCRB had only 51 investigators in post. According to CCRB staff this shortfall was due to budget cuts imposed by the mayor's office.

---

[47]Mediation is a non-disciplinary proceeding which must be agreed by the complainant and subject officer and is negotiated by a third party. Conciliation is an option of the complainant only, and requires the subject police officer to undergo some form of retraining on proper procedures.

The CCRB liaises regularly with precinct commanders as well as IAB to exchange information about complaints of brutality in particular precincts. However, it appears that many complaints may not reach the CCRB. CCRB staff and others pointed out that many abuses occur during the mid-night to 8am shift, and that precinct commanders (who are executives and are not on duty during this period) may not necessarily be aware of all incidents. In some cases complainants themselves may file only civil actions rather than complain to the CCRB (this happened especially in the past when there was little confidence in the independence of CCRB investigations). In some cases also complaints of excessive force and brutality - especially in the context of corruption allegations - are investigated by the IAB and are not passed to the CCRB. The CCRB in its January - June 1995 report observed that "A complete understanding of the scope of civilian complaints might be served by a uniform system of complaint data reporting".[48]

### 5. 3 Strained Relations between CCRB and Police Department

Since the CCRB became operational in July 1993 it has cooperated with the police (and the DAs) in some major investigations, most notably in the Bronx.[49] However its relations with the Police Department and, reportedly, with Mayor Guiliani's administration, appear to have become increasingly strained over the past two years and there are signs that the Police Department may still be reluctant in practice to accept a completely independent police complaints machinery. Police Commissioner William Bratton has publicly criticized the CCRB both for the statistical information contained in its biannual reports and for the quality of its investigations.

The area of most conflict appears to relate to complaints involving shootings and deaths in custody - an area not previously covered by the CCRB, where there may now be concurrent investigations by both the CCRB and the PD/IAB. There was particular controversy surrounding the CCRB's investigation of the police shooting of three men in January 1995, where the Police Commissioner was critical of the board for upholding a complaint of excessive force while other inquiries were pending (See Rosario/Vega/Bonilla cases). There also appears to have been some conflict within the CCRB (between the mayor's appointees on the board and CCRB investigators and executive staff) over the board's decision in the case of a man who died in police custody in 1994 (see the case of Ernest Sayon, above).

During its visit to New York in November 1995 IAB representatives told Amnesty International that they favoured joint investigations with the CCRB but that the CCRB wanted its own investigations to be completely separate and had consequently become isolated and would not share information; they also duplicated interviewing witnesses which IAB said had caused problems. IAB also said that the CCRB had substantiated complaints and asked the department to take action without providing the information on which its decision was based, including the names of relevant witnesses, something the

---

[48]CCRB Semi-Annual Status Report at p 22.

[49] The CCRB assisted a police investigation into the 48th Precinct in the Bronx by reviewing its files on a number of officers who had been the subject of repeated serious complaints of brutality and other misconduct.

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

CCRB categorically denied when Amnesty International raised this with them.[50]  Another criticism made by the IAB was that the CCRB deliberately passed on cases too close to expiry of the statute of limitations (see below)for the NYPD to take action. The CCRB denied they did this although they accepted that the huge backlog of cases had led to some unacceptable delays.

On the question of joint investigations, the CCRB said that they were willing to cooperate with IAB in various ways, such as conducting joint interviews of witnesses. However, they wished to maintain their independence and were opposed to the idea of issuing joint findings, which they believed the IAB wanted. The CCRB felt that this would jeopardize the impartiality of the CCRB and its role as an independent "truth finder".

Amnesty International believes that the conflict between the Police Department and CCRB undermines confidence in the investigation of complaints and that efforts should be made on each side to resolve differences as a matter of urgency. Amnesty International believes that it is important for the CCRB to be seen to retain its independence and that joint investigations and joint findings with the NYPD are not consistent with an independent investigative body.

### 5. 4 Disciplinary action

Police officers accused of serious misconduct may face an administrative trial before an Administrative Law Judge (ALJ). The accused officer may be represented by an attorney and the trials, which are open to the public, take place either at the Police Department or the City's Office of Administrative Trials. Penalties include loss of 10 or more vacation days or pay, suspension (for up to 30 days), probation or dismissal from the force. Disciplinary measures of up to 10 days' loss of pay or vacation are dealt with internally, without a trial. Under the City Charter the Police Commissioner makes the final decision on any disciplinary measure, including those recommended by an ALJ.[51]

During the course of its investigation Amnesty International wrote to the Police Department several times requesting information on whether disciplinary measures had been imposed in the cases examined but no information was provided. Information from other sources (including attorneys and records in civil lawsuits), however, suggests that few of the cases resulted in officers being disciplined. According to a report by the newspaper *New York Newsday*, published in November 1991, the number of NYPD officers fired for brutality had fallen each year from 1988 despite a rise in complaints of excessive force (six were fired in 1988, 4 in 1989, 1 in 1990 and none up to November 1991); the report also cited examples of several serious brutality cases in which only light penalties (such as a few days' suspension or loss of pay) had been imposed. Amnesty International wrote to the Deputy Commissioner for Public Information in November 1995 asking if statistics were available for the number of officers discharged, demoted or who resigned in lieu of discharge, for disciplinary offences involving the use of excessive force during the past five years. However, no information was provided.

It appears that most disciplinary actions against police officers are for misconduct other than on-

---

[50] The CCRB said that it forwarded the "entire package" to the PD with all the evidence, including photos and witness statements.

[51]The only challenge a police department employee may make to the Commissioner's decision would be through the courts.

duty excessive force. The Mollen Commission reported in 1994 that 25% of all suspensions and dismissals of NYPD officers, for example, were for drugs use. There have also been incidents in which NYPD officers have been disciplined for off-duty offences involving unruly or inappropriate behaviour. The New York Newsday study, cited above, found that most officers dismissed from the force between 1988 and 1991 were fired for drugs offences, followed by offences committed while off-duty.

## 5. 5 Disposition of cases referred to the Police Commissioner by the CCRB

The CCRB provides statistics on the disposition of cases referred by the CCRB to the Police Commissioner for disciplinary action. According to its July-December 1994 report, 80 cases in which complaints of misconduct were substantiated by the new CCRB were disposed of by the Police Commissioner in 1994. Of these 32 (40%) cases went to an administrative trial. However, in 22 (69%) of the 32 cases the charges were dismissed; in seven cases officers were acquitted and only in three (9%) cases were officers found guilty of misconduct. This represented a dramatic drop in the number of officers found guilty after administrative trials compared to 1992 when 63% of cases resulted in a guilty verdict.[52]

Two of the three officers found guilty of misconduct after administrative trials in 1994 were sentenced to 10 to 15 days' loss of vacation and one to 10 days' loss of vacation (neither the charges nor the misconduct alleged are specified in the CCRB reports).

Of the remaining 48 cases disposed of by the PC in 1994, the largest percentage (21%) were disposed of by "instructions" (the least serious disciplinary action); in three cases the officer resigned, retired or was terminated and in 11% of cases no disciplinary action was taken.

Although Amnesty International did not have complete figures for 1995, the CCRB informed it that a high percentage of cases that went to an administrative trial (after a complaint was substantiated by the CCRB) continued to be dismissed compared to previous years. CCRB staff also informed Amnesty International that, while the former Police Commissioner had acted upon 60% of the recommendations for disciplinary action made by the CCRB, this had fallen to only 19% under the present PC (for the period January 1994- June 1995).

The reason for the dramatic drop in cases acted on by the Police Commissioner remains unclear. However, Amnesty International was told that the Advocates Office (the prosecutor's office for administrative trials) was moving to have more cases dismissed than previously on the ground that the statute of limitations had expired. A senior CCRB executive to whom Amnesty International spoke was critical of this as the statute of limitations did not apply to misconduct that constitutes a crime: thus cases involving a potential criminal offence (such as assault) could still be tried administratively even if no criminal charges had been filed.[53] The seeking of so many dismissals on this ground was reported to be a change of practice from the previous administration.

---

[52]The July -December 1994 CCRB report compared 1994 figures to 1992 figures (statistics for 1993 - the year in which there was a changeover to the new Board - were not given).

[53]Section 17, subsect. 4 of the New York Civil Service Law reburies that disciplinary proceedings against an employee for incompetence or misconduct must be commenced within 18 months of the alleged incident, except in cases where the conduct in question would constitute a crime if proven in an appropriate court.

### 5. 6 Statute of limitations for disciplinary action

Under New York State Civil Service law disciplinary proceedings must be commenced within 18 months of the alleged incident. The statute of limitations used to be five years but was reduced to three years in 1962. In 1983 it was reduced still further to the present 18 months, largely due to pressure from labour unions (including the PBA).

The 18-month statute of limitations was cited by many sources as one obstacle to bringing disciplinary proceedings against police officers. A complex criminal inquiry, for example, might take longer than 18 months and, if no charges resulted, this would be too late to discipline an officer for any administrative offence that might have been uncovered, such as a violation of departmental procedures. Misconduct revealed during the course of a civil action is also invariably too late to institute disciplinary proceedings. Delays in CCRB investigations, already mentioned, could also preclude disciplinary action.

One of the recommendations of the Mollen Commission for improving the effectiveness of disciplinary action within the NYPD was to restore the statute of limitations for PD disciplinary proceedings to three years. This recommendation, which would require a change to state law, has not been implemented.

### 5. 7 Prosecutions

Since 1992 dozens of New York City police officers have been arrested and charged with criminal offences, mainly involving crimes such as drug trafficking and corruption. In May 1995 15 officers from the 48th Precinct in the Bronx were charged with offences which included serious assaults on suspects perpetrated during the precinct's overnight shift: this was one of the largest police investigations into misconduct which specifically included excessive force. Several officers from other precincts have also been charged with assaults in recent years and as of March 1996 one New York City police officer was awaiting trial on a homicide charge for the death of a suspect in police custody. However, criminal prosecutions of police officers for excessive force committed while on duty remain generally rare - and most are usually acquitted after non-jury trials.

Many of the contacts to whom Amnesty International spoke were critical of the District Attorneys who they said were less rigorous in prosecuting cases against the police than other cases; it was alleged that there was an inherent conflict of interest as District Attorneys relied on the police in other criminal investigations. There have been a number of controversial cases in which, despite apparently strong evidence, juries have failed to indict police officers accused of crimes.[54]

---

[54]Several prominent civil liberties and lawyers' associations have called for the office of State Special Prosecutor to be re-established, and for its jurisdiction to extend to brutality cases. (Such an office operated from 1972 to 1990 to investigate and prosecute allegations of corruption within NYC's criminal justice system, independently of the district attorneys). Others have argued that sufficient independent powers already exist through the DAs, the AG and the US attorneys, and that there would be complicated overlapping jurisdiction where complainants of police brutality are themselves the subject of criminal proceedings. Amnesty International is not qualified to take a position on this issue, or whether there should be a permanent statewide office, although it believes that an independent prosecutor may serve a valuable function in some disputed

Amnesty International spoke to attorneys from the Bronx District Attorney's office who denied that they handled police cases less rigorously than other cases. They said that police cases were often more complex, involving alleged victims who themselves may be charged with offences, and widely conflicting testimony. As police officers were authorized to use force in some circumstances, including deadly force, it was often difficult to establish criminal misconduct especially if the force arose out of an initial struggle or confrontation with a suspect, although police departmental rules may have been violated. Amnesty International was told that District Attorneys in New York City tended as a matter of policy to present most cases involving death or serious injury to a grand jury. However, assaults without serious injury were less likely to be pursued unless there was particularly strong corroborating evidence - often lacking in police cases.

Amnesty International was unable to arrange meetings with officials from the Brooklyn District Attorney's office, where there has been controversy surrounding a number of police shooting cases in which no officers were criminally charged.

Amnesty International was told that the state law on immunity can also hamper criminal investigations into police misuse of force. New York state law confers automatic "transactional immunity" on witnesses who testify in a legal proceeding, which means that the witness cannot be prosecuted for any crime relating to that testimony (except perjury).[55] As police officers routinely appear before grand juries in arrest cases (where claims of brutality are often made) they cannot afterwards be prosecuted for any alleged criminal misconduct arising out of the arrest and their testimony, unless they waive immunity. Amnesty International was told that there was an attempt by the New York State District Attorneys' association to change this to more limited "use immunity" but that this was opposed by the police unions.

Police officers who are questioned during police internal inquiries, or by prosecutors in their preliminary investigations, may also not be compelled to incriminate themselves, and their statements may not be used against them in any subsequent criminal proceedings. However, the Mollen Commission criticized police union representatives and PBA attorneys for helping to reinforce the "code of silence" by giving blanket advice to all police officers who are witnesses in police misconduct investigations not to co-operate with prosecutors or to give any statements at all unless formally granted prior immunity. This, the Commission found, placed enormous pressure on officers who may not be involved in any wrongdoing to remain silent. The Mollen Commission recommended the promulgation of a departmental order requiring police officers who are witnesses in departmental investigations to cooperate and answer questions (subject to assurances that their statements would not be used in evidence against them in any subsequent criminal proceedings). This recommendation has not been implemented.

## 5. 8 Non-jury trials

---

and/or sensitive cases.

[55]Transactional immunity means that any witness testifying before a grand jury or other proceeding cannot be prosecuted for any crime relating to that "transaction" - i.e. the subject of that testimony. Thus, even if new and completely separate evidence comes forward to implicate the witness in the crime about which he gave testimony, the witness cannot be prosecuted for that crime. This differs from the more limited "use immunity" prevailing under the federal jurisdiction, where immunity is conferred upon a witness only in relation to what is said in their specific testimony on that particular occasion.

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

Under New York Law anyone charged with a misdemeanour offence (for which the sentence is six months' imprisonment or less) is tried in a local criminal court by a single judge sitting without a jury. A defendant has the right to a jury trial in all other criminal cases. However, with the exception of first-degree murder, defendants may waive their right to a jury trial and the court must approve the waiver unless there are certain exceptional circumstances. In the federal jurisdiction the US Attorney (prosecutor) must consent to a defendant waiving his or her right to a jury trial; however, prosecutors have no such powers under New York law. As stated above, NYC police officers charged with felonies involving the use of excessive force (including homicides) almost invariably waive their right to be tried before a jury and are tried before a single judge. Many police officers are charged with misdemeanour offences which means that those cases too will automatically be dealt with by a judge without a jury. In the majority of cases known to Amnesty International, police officers were acquitted or the charges were dismissed after they had elected to be tried in a nonjury court.

Amnesty International was told that in some inner-city areas judges were likely to be more sympathetically disposed towards a defendant police officer than a jury chosen from the local population. In Brooklyn, it was alleged that a disproportionate number of cases involving police officers accused of misconduct were assigned to one judge who was a former PBA attorney. Although there may have been no impropriety in the assignment of such cases, Amnesty International believes that the appearance of impartiality could be jeopardized in such circumstances.

## 5. 9 Federal prosecutions for police misconduct

The US Justice Department or local federal prosecutors (US Attorneys), may also bring federal criminal civil rights charges against state officials who violate the constitutional rights of others while acting "under color of law"[56] (section 242 of Title 18 of the U.S.Code). Officials from the US Attorney's Office for the Southern District of New York told Amnesty International that they file between two and five civil rights cases a year against New York state officials. US Attorneys had cooperated with some of the investigations into police corruption in New York City and several prosecutions had taken place in the federal courts (for violations, for example, related to thefts of money during illegal searches and seizure). However, federal attorneys said it was difficult to get a conviction for excessive force where police officers were acting in the course of their duty. They had prosecuted a state police brutality case in Yonkers (New York State) in 1993, where one of the victims had sustained a serious injury, but the officer defendants were acquitted. (The US attorneys said that they usually asked for a jury trial in such cases as the verdict was "less assailable".)

Under federal criminal civil rights statutes the prosecution must prove that the accused had acted with specific intent to violate the victim's federal civil rights. Amnesty International was told that this sets a very high standard of evidence which can be difficult to meet. Cases which may involve other offences under state law (e.g. negligent manslaughter) cannot be pursued under federal criminal civil rights statutes.

It is rare for the federal authorities to prosecute a police officer who has been acquitted in a state court. The US attorneys said that they rarely prosecute state police shooting cases which are already

---

[56] While acting in their official capacity.

routinely presented to grand juries by the state district attorneys. However, at the time of writing the Justice Department was investigating one NYC police shooting case where a state grand jury had earlier failed to return an indictment (see Rosario/Vega case above).

## 5. 10 Civil actions

The most common remedy in cases of alleged abuses by law enforcement officials is for the victim to bring a civil lawsuit against the officer and/or authority responsible.

More than 3,000 lawsuits were filed against New York City from 1992 to 1995, most alleging brutality or excessive force. In the past five years the city has paid out damages for police misconduct in some 300-400 cases a year, usually as a result of out-of-court settlements agreed by the City Counsel. (More than $82m was paid in damages to alleged victims of police misconduct in 1,352 cases between 1992 and 1995.)

Unlike criminal cases, where juries must find evidence of misconduct beyond a reasonable doubt, damages in a civil trial may be awarded based on a "preponderance of the evidence". The City does not admit liability in cases which are settled out-of court and officials have said that such cases do not prove misconduct but that many are settled simply to avoid the further costs involved in defending them. However, settlements - which are usually arranged through a judge and are therefore subjected to impartial scrutiny - are most likely to be reached in cases where there are injuries consistent with the claim made or some other corroborative evidence. Amnesty International therefore considers that, taken as a whole, they are important indicators of police abuse.

Civil lawsuits provide only a limited remedy for police misconduct, especially where there are allegations of widespread or systematic abuse. As with complaints filed to the CCRB, the onus is on the victim to initiate a lawsuit, whereas international standards require a prompt and impartial investigation wherever there is reasonable ground to believe that an act of torture or ill-treatment has been committed (Articles 12 and 16 of the Convention Against Torture). Although there may be a remedy for the individual in the form of compensatory damages this may not prevent similar abuses from occurring in the future or an underlying pattern of abuse. Amnesty International was told that in many cases victims of police brutality do not file civil actions because there is no independent evidence or their injuries are too minor to be worth the costs of litigation. Also, although a court or jury may impose damages against individual police officers, the city may indemnify the officer against payment of such damages. The majority of cases are resolved by settlement, where payment is made only by the city, not by the individual officers.

## 5. 11 Independent Oversight of Complaints

Since The Mollen Commission started its inquiry, the NYPD has undertaken reforms aimed at strengthening its detection and investigation of misconduct, particularly corruption. It has also introduced measures aimed at preventing abuses, including better recruitment criteria, improved training and monitoring systems. While the Mollen Commission acknowledged that the Police Department must be primarily accountable for controlling and investigating corruption within its ranks, it believed that an independent, external oversight mechanism was essential to ensure that the reforms remained effective. However, its central recommendation - the creation of a permanent external Police Commission to

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

perform continuous assessments and audits of the department's corruption controls, with its own investigative powers - has not been implemented (see *Section 1.2*).

The Mollen Commission's recommendation for an independent monitor of the NYPD applied only to corruption. The CCRB is the only independent body involved in the routine investigation of complaints of brutality and other ill-treatment by NYPD officers. Although the CCRB has some authority to report on patterns of police misconduct and to make recommendations, its primary function is with the investigation of individual complaints, and it cannot investigate individual cases without first receiving a sworn complaint. Its findings in individual cases are not made public. There is no independent oversight body with the authority to systematically monitor cases of alleged excessive force by police officers, deaths in custody and police shootings.

## 5. 12 State and federal monitoring of police use of deadly force

There have been calls for better monitoring of the police use of deadly physical force in the USA, both within states and nationally. The Curran Commission in 1987 noted that New York did not have a reliable mandatory policy to report and record data relating to what it termed "deaths by legal intervention". It recommended that the state's Division of Criminal Justice Services and the Department of Health should periodically review data on police homicides in the state and ensure that statistics are available which accurately reflect the frequency of deaths at the hands of the police and peace officers. Amnesty International believes that it is important for states to keep such records in order to identify any problems that may emerge regarding the use of lethal force (including possible patterns of racial disparities), either across the state or within particular police departments.

Amnesty International believes that the US Justice Department should also set up a system of collecting reliable national data on the use of lethal force by law enforcement officials. Although the FBI produces annual reports on police officers killed nationally in the USA, there are currently no accurate, comprehensive, statistics on police shootings of civilians or deaths in police custody. The Violent Crime Control and Law Enforcement Act, 1994, includes a clause requiring the US Attorney General to collect data about the use of excessive force by law enforcement officers for research or statistical purposes. The act also contains a provision allowing the federal government to initiate civil actions to seek to eliminate a pattern of practice of abuses by law enforcement officials in any jurisdiction, including state jurisdictions. Amnesty International is currently seeking information on how these provisions are applied in practice.

## 6. AMNESTY INTERNATIONAL'S RECOMMENDATIONS

1. Amnesty International recommends that the New York City authorities appoint an independent inquiry into allegations of police brutality and excessive force by the NYPD to examine the concerns raised in this report. The inquiry should examine the extent to which police officers resort to excessive force amounting to torture or other cruel, inhuman or degrading treatment, and the effectiveness of measures taken to prevent or investigate such abuses. The terms of reference of the inquiry should include a review of deaths in police custody and officer-involved shootings. The inquiry should also examine evidence suggesting that racial minorities are disproportionately the victims of abuses by law enforcement officials. The findings and recommendations of the inquiry should be made public.

2. Pending an inquiry, there should be a clear, public message from the NYPD leadership and other responsible authorities, that police brutality and excessive force will not be tolerated and that police guidelines as well as international human rights standards will be strictly enforced. Strong disciplinary measures should be undertaken and, where appropriate, criminal prosecutions, for the abusive use of force and firearms, in accordance with international standards.

3. The city administration and the Police Department should fully support the CCRB as an independent investigative body. The CCRB should maintain its independence in its investigation of complaints by members of the public against the police, including its findings ( although this would not preclude cooperation with the Police Department in some way where there are concurrent investigations, such as conducting joint interviews where appropriate).

4. There should be greater transparency in the investigation of complaints of ill-treatment made against the police, in order to ensure public accountability and confidence in the process. The outcome of criminal, disciplinary and administrative investigations into alleged police ill-treatment, disputed killings and deaths in custody should be made public promptly after completion of an investigation, unless doing so would jeopardize any ongoing criminal proceedings.
      Consideration should be given also to introducing legislation to allow grand juries and/or district attorneys more discretion to provide information on the reasons for not seeking or recommending criminal charges in cases where there is serious public concern.

5. Amnesty International believes that the establishment of a permanent, independent oversight body as recommended by the Mollen Commission to monitor corruption is necessary to ensure the public accountability of the NYPD. Such a body should be able to perform continuous assessments of the police department's own measures to control the use of excessive force as well as to eradicate corruption; to monitor investigations; to record the incidence of complaints of excessive force, and where necessary conduct its own investigations.

6. Police training policies and programs should be reviewed in order to ensure that these include education in the international norms and standards of human rights, particularly on the prohibition of torture and ill-treatment, and international standards laid down in the Code of Conduct for Law Enforcement officials and the Basic Principles on the Use of Force and Firearms adequately and clearly represented (see

Appendix for relevant international standards).

7. The Police Department should encourage recruitment from ethnic minorities, and more patrolling of inner city areas by these groups.

8. The police unions should take positive steps to encourage their members to assist in all efforts to reduce the incidence of corruption and ill-treatment by police officers, including cooperating with investigations and reporting abuses.

9. If it has not already done so, the State Government should establish a system of maintaining a record of deaths of civilians at the hands of law enforcement officials in jurisdictions throughout the state.

10. Amnesty International recommends that the US Justice Department should similarly set up a system to collect reliable and comprehensive national data on the use of deadly force by law enforcement officials.

*AI Index: AMR 51/36/96*

*Amnesty International June 1996*

# Appendix 1 - Selected International Standards

*Articles of the International Covenant on Civil and Political Rights*
*(ratified by the US Government on 8 June 1992)*

### Article 6

1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

### Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

### Article 10

1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

### Article 26

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

*The United Nations (UN) Convention Against Torture and Other Cruel, Inhuman or Degrading*
*Treatment or Punishment*
*(ratified by the US government in October 1994)*

This provides, among other things, that education and information regarding the prohibition against torture or other cruel, inhuman or degrading treatment or punishment shall be fully included in the training of law enforcement personnel and others (Articles 10 and 16). It also provides that each State Party shall ensure there is a prompt and impartial investigation whenever there is reasonable ground to believe that an act of torture or other cruel, inhuman or degrading treatment has been committed in any territory under its jurisdiction (Articles 12 and 16).

*Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.*
*Adopted by General Assembly resolution 43/173 of 9 December 1988*

### Principle 1

All persons under any form of detention or imprisonment shall be treated in a humane manner and with respect for the inherent dignity of the human person.

*Amnesty International June 1996*

*AI Index: AMR 51/36/96*

*Principle 6*

No person under any form of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. No circumstance whatever may be invoked as a justification for torture or other cruel, inhuman or degrading treatment or punishment.

*Principle 34*

Whenever the death or disappearance of a detained or imprisoned person occurs during his detention or imprisonment, an inquiry into the cause of death or disappearance shall be held by a judicial or other authority, either on its own motion or at the instance of a member of the family of such a person or any person who has knowledge of the case. When circumstances so warrant, such an inquiry shall be held on the same procedural basis whenever the death or disappearance occurs shortly after the termination of the detention or imprisonment. The findings of such inquiry or a report thereon shall be made available upon request, unless doing so would jeopardize an ongoing criminal investigation.

*Standards on police codes of conduct and use of force*

Relevant articles under the **UN Code of Conduct for Law Enforcement Officials**, adopted by the UN General Assembly in 1979:

> Article 2: "In the performance of their duty, law enforcement officials shall respect and protect human dignity and maintain and uphold the human rights of all persons."

> Article 3: "Law enforcement officials may use force only when strictly necessary and to the extent required for the performance of their duty."

More detailed guidelines are set out in the **Basic Principles on the Use of Force and Firearms by Law Enforcement Officials**, adopted by the Eighth UN Congress on the Prevention of Crime and Treatment of Offenders on 7 September 1990. These provide in part:

> 4. "Law enforcement officials, in carrying out their duty, shall, as far as possible, apply non-violent means before resorting to the use of force and firearms. They may use force and firearms only if other means remain ineffective or without any promise of achieving the intended result."

> 5. "Whenever use of force and firearms is unavoidable, law enforcement officials shall:
> a. Exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved;
> b. Minimize damage and injury and respect and preserve human life;
> c. Ensure that assistance and medical aid are rendered to any injured or affected persons at the earliest possible moment";

*AI Index: AMR 51/36/96*                                          *Amnesty International June 1996*

9. "Law enforcement officials shall not use firearms against persons except in self-defence or defence of others **against the imminent threat of death or serious injury**, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger or resisting their authority, or to prevent his or her escape, **and only when less extreme means are insufficient to achieve these objectives. In any event, intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life."** (emphasis added)

10. "In the circumstances provided for under principle 9, law enforcement officials shall identify themselves as such and give a clear warning of their intent to use firearms, with sufficient time for the warning to be observed, unless to do so would unduly place the law enforcement officials at risk or would create a risk of death or serious harm to others, or would be clearly inappropriate or pointless in the circumstances of the incident."

The **Basic Principles** also provide that law enforcement officials shall, among other things:

11(b) "Ensure that firearms are used only in appropriate circumstances and in a manner likely to decrease the risk of unnecessary harm."

Article 6 of the **Basic Principles** provides that officials shall promptly report any use of force or firearms that results in injury or death. Article 7 provides that governments shall ensure that "arbitrary or abusive use of force and firearms by law enforcement officials is punished as a criminal offence under their law."

Governments were asked to consider incorporating the provisions of the **Code of Conduct for Law Enforcement Officials** into national legislation or guidelines for law enforcement agencies.

The Eighth UN Crime Congress invited member states to bring the **Basic Principles** to the attention of law enforcement officials and other members of the executive branch of government, judges, lawyers, the legislature and the public and to inform the UN Secretary-General every five years of the progress achieved in their implementation.

*Principles on the Effective Prevention and Investigation of extra-legal, arbitrary and summary executions, adopted by the United Nations Economic and Social Council on 24 May 1989*

*Principle 1*

Governments shall prohibit by law extra-legal, arbitrary and summary executions and shall ensure that any such executions are recognized as offences under their criminal laws, and are punishable by appropriate penalties which take into account the seriousness of such offences. Exceptional circumstances including

*Police brutality and excessive force in New York City*

a state of war or threat of war, internal political instability or any other public emergency may not be invoked as a justification of such executions. Such executions shall not be carried out under any circumstances including, but not limited to, situations of internal armed conflict, excessive or illegal use of force by a public official or other person acting in an official capacity or a person acting at the instigation, or with the consent or acquiescence of such person, and situations in which deaths occur in custody. This prohibition shall prevail over decrees issued by governmental authority.

### Principle 9

There shall be a thorough, prompt and impartial investigation of all suspected cases of extra-legal, arbitrary and summary executions, including cases where complaints by relatives or other reliable reports suggest unnatural death in the above circumstances. Governments shall maintain investigative offices and procedures to undertake such inquiries. The purpose of the investigation shall be to determine the cause, manner and time of death, the person responsible, and any pattern or practice which may have brought about that death. It shall include an adequate autopsy, collection and analysis of all physical and documentary evidence, and statements from witnesses. The investigation shall distinguish between natural death, accidental death, suicide and homicide.

### Principle 16

Families of the deceased and their legal representatives shall be informed of, and have access to, any hearing as well as to all information relevant to the investigation, and shall be entitled to present other evidence. The family of the deceased shall have the right to insist that a medical or other qualified representative be present at the autopsy. When the identity of a deceased person has been determined, a notification of death shall be posted, and the family or relatives of the deceased immediately informed. The body of the deceased shall be retuned to them upon completion of the investigation.

### Principle 17

A written report shall be made within a reasonable period of time on the methods and findings of such investigations. The report shall be made public immediately and shall include the scope of the inquiry, procedures and methods used to evaluate evidence as well as conclusions and recommendations based on findings of fact and on applicable law. The report shall also describe in detail specific events that were found to have occurred, and the evidence upon which such findings were based, and list the names of witnesses who testified, with the exception of those whose identities have been withheld for their own protection. The Government shall, within a reasonable period of time, either reply to the report of the investigation, or indicate the steps to be taken in response to it.

*AI Index: AMR 51/36/96*

*Amnesty International June 1996*

# Appendix 2
## A Selection of Reports Published by Amnesty International on the USA

United States of America: Reintroduction of Chain Gangs - Cruel and Degrading
(AMR 51/135/95) 1 November 1995

United State of America (New Jersey): Concerns about Shootings of Minority Suspects in New Jersey
(AMR 51/112/95) 29 August 1995

United States of America: Human rights violations: a summary of Amnesty International's concerns
(AMR 51/25/95) 1 March 1995

United States of America (Texas): Allegations of ill-treatment in five prisons
(AMR 51/48/95) 1 March 1995

Conditions for death row prisoners in H-Unit, Oklahoma State Penitentiary, USA (AMR 51/35/94) 1 May
1994

United States of America: Human Rights and American Indians (AMR 51/31/92) November 1992

United States of America: Torture, ill-treatment and excessive force by police in Los Angeles, California
(AMR 51/76/92) June 1992

United States of America: Allegations of police torture in Chicago, Illinois (AMR 51/42/90) December
1990

United States of America: The High Security Unit, Lexington Federal Prison, Kentucky
(AMR 51/34/88) August 1988

Allegations of ill-treatment in Marion Prison, Illinois, USA (AMR 51/26/87) May 1987

**Death Penalty Reports**

USA: The Death Penalty in Georgia: Racist, Arbitrary and Unfair. (AMR: 51/25/96) June 1995

United States of America: Developments on the death penalty in 1995 (AMR 51/01/96)
1 February 1996

United States of America: Guinevere Garcia: a case of state assisted suicide (AMR 51/146/95)
1 November 1995

*Amnesty International June 1996*                                         *AI Index: AMR 51/36/96*

United States of America: Reinstatement of the death penalty in New York (AMR 51/44/95)
1 May 1995

United States of America: Open letter to the President on the death penalty  (AMR 51/01/94)
1 January 1994

United States of America: The Death Penalty and Juvenile Offenders (AMR 51/23/91) October 1991

*AI Index: AMR 51/36/96*                              *Amnesty International June 1996*

# PAGES B126 THROUGH B139 REDACTED