## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN NANCY S. DIETZ,                    )
                                           )
      Plaintiff,                           )
                                           )
   v.                                     )    C.A. No. 06-256-SLR
                                           )
JAMES M. BAKER, et al.                     )    JURY TRIAL DEMANDED
                                           )
      Defendants.                          )
                                           )

## DEFENDANTS' ANSWERING BRIEF IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

Teresa A. Cheek, Esquire (#2657)
Adria B. Martinelli, Esquire (#4056)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Attorneys for Defendant City of Wilmington

Dated: August 31, 2007

Daniel B. Rath, Esquire (#3022)
Rebecca L. Butcher, Esquire (#3816)
James S. Green, Jr., Esquire (#4406)
LANDIS RATH & COBB LLP
919 Market St., Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Attorneys for Defendant Mayor James M. Baker

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTORY STATEMENT ..................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ........................................... 2

STATEMENT OF FACTS ................................................................................ 4

The Parties ..................................................................................................... 4

Appointment Eligibility .................................................................................. 5

City Policies Regarding Appointment and Discrimination ................................ 5

There Is No Quota System .............................................................................. 7

Appointment Process ...................................................................................... 9

Basis for Howell's Appointment ..................................................................... 11

Dietz's Qualifications ..................................................................................... 12

Howell's Retirement ....................................................................................... 13

SUMMARY OF ARGUMENT ........................................................................ 15

ARGUMENT .................................................................................................. 16

I. STANDARD FOR PRELIMINARY INJUNCTION ..................................... 16

II. DIETZ CANNOT DEMONSTRATE IRREPARABLE HARM .................... 16

   A. There Is No Legal Support For Dietz's Argument That Being Denied An
      Appointment Constitutes Irreparable Harm. ............................................ 17

   B. Employment Discrimination Is Not Irreparable Harm Per Se. ................. 20

III. PLAINTIFF HAS NOT SHOWN A REASONABLE LIKELIHOOD OF
     SUCCESS ON THE MERITS. ................................................................... 22

   A. Defendants Do Not Maintain An Illegal Racial Quota System. ............... 22

B. Dietz Has Not Shown That She Has A Reasonable Likelihood of
    Prevailing on Her Discrimination Claims.........................................................23

   1. The *McDonnell Douglas-Burdine* and *Price Waterhouse* Standards .........23

   2. Dietz Has Not Set Forth Facts Sufficient to Demonstrate That Race
    Was a Substantial Factor in the Challenged Appointment. .......................24

   3. Dietz's Evidence Of Pretext Is Insufficient For Her To Establish
    A Reasonable Probability Of Success On The Merits...............................28

C. Dietz Has Not Demonstrated That She Has a Reasonable Likelihood of
    Being Awarded Instatement at Trial ................................................................31

IV. INNOCENT THIRD PARTIES WILL BE INJURED IF A PRELIMINARY
    INJUNCTION IS ISSUED. .........................................................................................32

V. ISSUING A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO
    THE PUBLIC INTEREST...........................................................................................34

CONCLUSION..................................................................................................................37

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

*Adams v. City of Chicago,*
135 F.3d 1150 (7th Cir. 1998) .................................................................................. 18

*Black Firefighters Assoc. of Dallas v. City of Dallas,*
905 F.2d 63 (5th Cir. 1990) ..................................................................................... 34

*Bradley v. Pittsburgh Bd. of Educ.,*
910 F.2d 1172 (3d Cir. 1990)................................................................................... 16

*Brewer v. West Irondequoit Cent. Sch. Dist.,*
212 F.3d 738 (2d Cir. 2000)..................................................................................... 21

*Brown v. City of Chicago,*
 917 F. Supp. 577 (N.D. Ill 1996) ............................................................................ 35

*Bullen v. Chaffinch,*
336 F.Supp.2d 357 (D. Del. 2004)....................................................................... 19, 31

*Burge v. City of Dover,*
1987 Del. Ch. LEXIS 446 (June 8, 1987)................................................................. 18

*Constructors Assn. of Western Pennsylvania v. Kreps,*
573 F.2d 811 (3d Cir. 1978).............................................................................. 16, 20

*Elrod v. Burns,*
427 U.S. 347 (1976)................................................................................................. 20

*Farley v. Nationwide Mutual Ins. Co.,*
197 F.3d 1322 (11th Cir. 1999) ............................................................................... 18

*Fuentes v. Perskie,*
32 F.3d 764 ........................................................................................................28-30

*Hiraldo-Cancel v. Aponte,*
925 F.2d 10 (1st Cir. 1991)...................................................................................... 18

*Hook v. Ernst & Young,*
28 F.3d 366 (3d Cir. 1994).................................................................................. 24, 27

*In re Arthur Treacher's Franchisee Litigation,*
689 F.2d 1137 (3d Cir. 1982).................................................................................. 16

*In re Lewis*,
845 F.2d 624 (6th Cir. 1988) ................................................................. 18

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989) ................................................................. 17

*Keller v. Orix Credit Alliance, Inc.*,
130 F.3d 1101 (3d Cir. 1997) ............................................................... 29

*Lasco v. Northern*,
733 F.2d 477 (7th Cir. 1984) ............................................................... 35

*Lewis v. Kugler*,
446 F.2d 1343 (3d Cir. 1971) ............................................................... 21

*Maldonado v. Houston*,
177 F.R.D. 311 (E.D. Pa. 1977) ........................................................... 21

*Moore v. Summers*,
113 F. Supp. 2d 5 (D. D.C. 2000) ........................................................ 35

*Moteles v. University of Pennsylvania*,
730 F.2d 91 (3d Cir. 1984) ............................................................ 19, 20

*Oburn v. Shapp*,
521 F.2d 142 (3d Cir. 1975) ......................................................... passim

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) ...................................................................... 24, 25

*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................................................ 17, 18

*Squires v. Bosner*,
54 F.3d 168 (3d Cir. 1995) .................................................................. 18

*St. Mary's Honor Center v. Hicks*,
113 S.Ct. 2742 (1993) ........................................................................ 24

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981) ...................................................................... 23, 24

*United States v. New York City Board of Education*,
2002 U.S. Dist. LEXIS 23956 (E.D.N.Y. July 24, 2002) ................... 20, 21

*Via v. Taylor*,
2004 U.S. Dist. LEXIS 11246 (D. Del. June 16, 2004) ............................................ 31

*Virginia Petroleum Jobbers Ass'n v. FPC*,
259 F.2d 921 (D.C. Cir. 1958) ................................................................................. 18

*Walden v. Georgia-Pacific Corp.*,
126 F.3d 506 (3d Cir. 1997) ............................................................................. 24, 27

**Statutes**

United States Constitution, amend. XIV .......................................................................... 2

42 U.S.C. §1981 ............................................................................................................. 2

42 U.S.C. §1983 ............................................................................................................. 2

Wilmington City Charter § 1-100 .................................................................................. 4

Wilmington City Charter §§7-200 to 7-204 ................................................................. 5

Wilmington City Charter §2-339(e)(2) .......................................................................... 6

Wilmington City Charter §2-339(h)(4) .......................................................................... 6

Wilmington City Charter §9-209 .................................................................................. 6

Wilmington Code §35-111 ............................................................................................ 6

## INTRODUCTORY STATEMENT

Preliminary injunctions are granted in extraordinary circumstances to prevent irreparable harm. While Dietz has attempted to portray her current employment situation as critical and requiring immediate Court intervention, this is hardly the case. Her main complaint is that if the Court does not keep this vital position in the Wilmington Police Department vacant, then she may not receive all of the relief sought in the Complaint. Dietz has not alleged that she will be prevented absolutely from receiving the appointment to Inspector, just that it will be potentially more difficult. Dietz cannot even allege with certainty that it will be more difficult, because there is no way for the parties to predict whether there will be any vacant Inspector positions after the trial is completed in February. Dietz has alleged no real, substantial and irreparable harm that would justify keeping the Inspector position vacant for the next 7 months.

Dietz's attempts to overstate her harm are matched by the understatement of the effect the proposed injunction will have on the Wilmington Police Department. Having a vacancy at the top level of the Wilmington Police Department is not the "status quo." The status quo is allowing the Police Department to proceed with its normal appointment and promotion process for the Inspector position and all the vacancies such an appointment creates in the lower ranks. The interests of the public and Defendants in having an efficiently functioning police department far outweighs the possible harm to Dietz if she succeeds in proving her claim at trial and obtains an instatement order that cannot be immediately satisfied. The mere potential for harm to Dietz cannot outweigh the competing interests of the public and the Police Department in being allowed to function normally and fill vacancies to maximize effectiveness and efficiency.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Nancy S. Dietz ("Dietz" or "Plaintiff") initiated this action on April 20, 2006 by filing a complaint ("Complaint") against James M. Baker, Mayor of the City of Wilmington, individually and in his official capacity (the "Mayor"), and the City of Wilmington (the "City," and, collectively with the Mayor, "Defendants") alleging employment discrimination. (D.I. 1.) The Complaint contains three counts: 1) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 based on an alleged quota system resulting in a failure to appoint Dietz to the position of Inspector in 2001 and 2005; 2) a claim for race discrimination pursuant to the Fourteenth Amendment, 42 U.S.C. §1981 and 42 U.S.C. §1983 relating to the same appointments; and 3) a claim for gender discrimination pursuant to the Fourteenth Amendment and 42 U.S.C. §1983 relating to the same appointments. (D.I. 1.) As part of her request for relief, Dietz seeks appointment to the position of Inspector in the Wilmington Police Department. (D.I. 1.)

The Mayor and the City filed answers to the Complaint on August 21, 2006 denying the allegations of discrimination and asserting affirmative defenses. (D.I. 5, 6.) In February 2007, the City (D.I. 30) and the Mayor (D.I. 31) amended their answers to the Complaint.

On October 24, 2006, the Court entered a scheduling order setting the case deadlines. (D.I. 15.) The scheduling order has been twice revised with regard to dispositive motions. (D.I. 46, 60.) The most recent scheduling order, dated July 12, 2007, provides that dispositive motions and opening briefs shall be served and filed on July 27, 2007 and answering briefs for dispositive motions shall be served and filed on August 10, 2007. (D.I. 60.) Dietz filed a Motion for Full and/or Partial Summary Judgment, Opening Brief and Appendix on July 27, 2007

("Motion"). (D.I. 62, 63, 64, 65.) On the same day, Defendant's filed a Motion for Partial Summary Judgment and opening brief. (D.I. 69, 70.)

Briefing has been completed on Dietz's motion for Summary Judgment. (D.I. 85.) Dietz did not file a brief in response to Defendants' Motion for Partial Summary Judgment, and the parties have filed a stipulation and proposed order for the dismissal of Dietz's claims that she was discriminated against based on race and gender in connection with the appointment of James Wright to the position of Inspector in 2001. (D.I. 86.) The Court granted partial dismissal pursuant to the stipulation on August 28, 2007. (D.I. 87.)

On August 1, 2007, Dietz filed a Motion for a Temporary Restraining Order And/or a Preliminary Injunction. (D.I. 72.) The parties thereafter entered into a stipulation providing interim relief to Dietz pending the completion of briefing and a decision on the merits of her motion and setting a schedule for the briefing of her motion. (D.I. 79.) This is Defendants' answering brief in opposition to Dietz's motion for a preliminary injunction.

## STATEMENT OF FACTS

**The Parties**

Plaintiff Nancy Dietz was born on November 1, 1957 in Pittsburgh, Pennsylvania, and grew up in Pittsburgh and in State College, Pennsylvania. (D02385 (B133)[1].) She has been a member of the Wilmington Police Department ("WPD") since 1980. (D.I. 1, 30, 31, ¶9 (A0003, A0020, A0030).) On or about April 17, 1997, she was promoted to Captain, becoming the second female Captain in the WPD. (D.I. 1, 30, 31, ¶12 (A0003-5, A0020-21, A0030-31), D02861, D03397 (B138-39).)

The City is a municipal corporation. *See* Wilmington City Charter § 1-100. As of 2000, the City's total population was 72,644. Thirty-six percent (25,811) were Caucasian, fifty-six percent (41,001) were African-American, seven percent (5,174) were Hispanic and one percent (678) were Other. (Mayor Decl. ¶4 (B049); P0009-10 (B002).) The WPD sworn workforce is sixty-eight percent (68%) Caucasian, twenty-three percent (23%) African-American, seven percent (7%) Hispanic and two percent (2%) Other. (Mayor Decl. ¶4 (B049); D0834-35 (B046-47).) Many members of the general population of the City are not qualified to become WPD officers because of their age, educational level, criminal history, among other reasons, and the WPD applicant pool includes persons who are not City residents at the time they apply, but the discrepancy between the percentage of police officers who are African-American and the percentage of City residents who are African-American has been a source of dissatisfaction in the community. (Mayor Decl. ¶4 (B049).)

The Mayor has resided in the City since 1966 and has been the mayor of the City since January 2001. (Mayor Dep. 7 (A0228); Mayor Decl. ¶1 (B048).) The Mayor also served on the

---

[1] All cites to A___ refer to the Appendix attached to Plaintiff's Opening Brief in Support of Her Motion for Full and/or Partial Summary Judgment. All cites to B___ refer to the Appendix attached to Defendants' Answering Brief in Opposition to Plaintiff's Motion for Full and/or Partial Summary Judgment.

Wilmington City Council from January 1973 through December 2000. (Mayor Dep. 9-10 (A0228-29).) During his tenure on the City Council, the Mayor sponsored and wrote legislation for the City of Wilmington prohibiting discrimination based on race, gender, religion, sexual orientation, and so on. (Mayor Dep. 11-12 (A0229).) Immediately after his election as mayor, the Mayor appointed Michael Szczerba, a white male who was at that time a lieutenant in the WPD, to the position of Chief of Police. (D.I. 1, 30, 31, ¶ 32 (A0007, A0022. A0033).)

## Appointment Eligibility

Dietz complains that she was denied appointment to the position of Inspector in the WPD because of her race (white) and/or gender. According to the City's job description, the minimum qualifications for the position of Police Inspector are "graduation from an accredited four (4) year college, with a degree in Criminal Justice or a related field, and extensive experience within a police department; or any equivalent combination of education and experience with a strong emphasis in police department administration." (D00829 (B045).) In both 2001, when Inspector James Stallings retired and Captain James Wright was appointed as his replacement, and in 2005, when Wright retired and Captain Gilbert Howell was appointed as his replacement, Director of Public Safety James Mosley ("Mosley") considered all of the Captains to be eligible for appointment as Inspector. (Mosley Dep. 18-21, 24-25, (A0253-54).) Dietz did not actively seek the position vacated by Inspector Stallings' retirement in 2001, but she did express interest in the Inspector position in 2005. (Dietz Dep. p.49, pp.111-13 (A0294, A0310).)

## City Policies Regarding Appointment and Discrimination

Dietz claims that there were no preexisting written policies, restrictions or guidelines regarding the Mayor's exercise of discretion in the selection of police Inspectors. (D.I. 72, p17.) To the contrary, the City's own charter, Wilmington City Charter §§7-200 to 7-204, as well as its

written affirmative action plan and similar policy statements (D00871-889, P0079, D00870, D00850-869, D00843 (B004-22, B001, B023, B024-43, B044)) limited the Mayor's discretion and prohibited him from discriminating based on gender or race. Wilmington City Charter §2-339(e)(2) provides:

> Elected city officers are obligated to uphold the fundamental legal principles of our system of government, as set forth in the United States Constitution, the state Constitution, and the city charter, as well as all applicable provisions of federal, state and local law and court decisions. They are bound to do so, and the failure to so act shall constitute malfeasance in office.

Wilmington City Charter §2-339(h)(4) requires elected and appointed city officials to "prevent and eliminate any and all discrimination in any action by the city government itself." Wilmington City Charter §9-209 also prohibits discrimination against City employees: "No person shall be . . . in any way favored or discriminated against with respect to employment by the city because of race, color, religion, sex, national origin or political opinions." Section 3-303 of the City Charter states: "all deputies, superintendents and bureau or division chiefs and all other employees not in the merit system shall be persons especially qualified for their positions by training and experience." Wilmington Code §35-111 also prohibits discrimination against City employees. The City has adopted equal employment opportunity policies on several occasions, including on October 20, 2000 (D00871-889 (B004-22)) and October 31, 2001 (D00850-869(B024-43)). Striving for diversity does not violate the City's official affirmative action plan, approved by the Administrative Board, which states that "[a]ll department heads and others making promotional appointments or transfers shall follow the affirmative action practice and principles in making their appointment from among those candidates available to them. ... There shall be no discriminatory impediments which constitute unwarranted barriers to upward mobility." Dietz admits that attempting to promote diversity is not the equivalent of illegal

discrimination. (N. Dietz Dep. 103 (A0308).) Dietz also admits that the City's policy is to prohibit making appointment and promotion decisions on the basis of race or gender. (N. Dietz Dep. 97 (A0306).) Pursuant to the City's affirmative action policy and in an attempt to proactively prevent discrimination claims, Director Mosley monitors promotions and transfers within the WPD, after the decisions have been made by Szczerba, to ensure that the decisions do not appear to be the result of discrimination. (Montgomery Dep. 10-17 (A0267-68); Mayor Dep. 37-38 (A0235-36).)

**There Is No Quota System**

Dietz claims that the WPD uses an "illegal racial quota system for all promotions to the rank of inspector." (D.I. 72, pp.10-15.) She claims that this alleged quota system has been in place since 1978. (*Id.* p.10.) Dietz is wrong. She concedes that since 1978 there have been, at various times, two, three or four Inspectors. (D.I. 72, p.10.) However, Dietz contends, relying on the testimony of former WPD Chief Manelski, who was a patrolman in 1968, that Captain Andy Turner was the first African-American to be promoted to Inspector, and that Turner's appointment was the result of community pressures after the riots in Wilmington that followed the assassination of Dr. Martin Luther King in 1968. However, Manelski is not competent to testify about why Andy Turner was appointed to the position of Inspector in the late 1960s because, as a patrolman, Manelski was not involved in making the appointment and has no first-hand information about the motives of those who made the appointment. His testimony is speculative.

In any event, according to Manelski, at some point after Turner's term as Inspector ended, the Inspectors were once again all white. When Manelski became acting chief of police in 1976, he appointed a white captain, which he testified prompted some members of the

community to picket his house and some members of the City Council to call for more "black representation at the upper echelon of the department." (Manelski Dep. 31-32, 35 (A0327-28).) African-American City Council members expressed the view that white officers could not relate to the problems in the streets of Wilmington as well as African-American officers. (Manelski Dep. 35 (A0328).)  As a result of these concerns, according to Manelski, the City decided to create a fourth Inspector position and in July 1978, Kenneth Miles, the only African-American captain, was appointed to the new position of Inspector of Services. (Manelski Dep. 38-40 (A0329).)  Miles was succeeded as Inspector of Services by Eugene Maloney, who was white. (Defs.' Supp. and Amended Interr. Ans., No. 1(A0375-80).)  Manelski admitted he had no first-hand information regarding the motives of any of the mayors holding office since 1978 with respect to their appointments of police department Inspectors. (Manelski Dep. 17 (A0323).) Manelski also stated that at no time was he told that the fourth Inspector position was reserved solely for African-American candidates. (Manelski Dep. 13 (A0322).)

There is no basis in the record for Dietz's claim that "anytime a black Inspector retires, he is automatically replaced by another African-American" or that "anytime a white Inspector retires, he is automatically replaced by another white." Miles, an African-American, was replaced by Maloney, a white. (Defs.' Supp. and Amended Interr. Ans., No. 1(A0375-80).) Johnson, an African-American, was appointed to Maloney's former role as Inspector of Staff Inspections. (*Id.*)  When John Vignola, white, retired in 1997 from the position of Inspector of Uniformed Operations, his replacement was Keith Ash, African-American. (*Id.*)  The City's records show that there was no "African-American Inspector position," and that both African-Americans and whites have held all the different Inspector positions over the years since 1980. (*Id.*) Dietz's assertions are incorrect based on the factual record.

Dietz is also mistaken regarding the sequence of events in the 1980s. The position of Inspector of Staff Inspections was the first to be eliminated. The last incumbent, John Doherty, a white, was not replaced when he retired in 1986. (*Id.*) Three whites (Stanley Friedman, Eugene Maloney and John Doherty) and an African-American (John W. Johnson) had held that position. (*Id.*) The position of Inspector of Community Services was eliminated in December 1988 when Preston Hickman (African-American) retired. (*Id.*) Three whites and four African-Americans held that position while it existed. (*Id.*) Both African-Americans and whites have held the remaining two positions in the years since 1989. (*Id.*) Neither Inspector position has been "exclusively white" or "exclusively African-American." (*Id.*) Again Dietz makes bald factual assertions which prove untrue when the record is reviewed.

The flaw in Dietz's claim about the alleged quota system is readily apparent from her own description of it. Dietz's own chart, at page 13 of her brief, shows that there have in fact been periods of time when there were no African-American Inspectors at all (July 31, 1987 to September 30, 1987, January 7, 1993 to February 5, 1993, and September 22, 1995 to November 4, 1995). (D.I. 72, p.10.) If a "quota system" varies from 0% to 25% to 33% to 50% of the incumbents, it is not "fixed" and is not a "quota system." It is simply a description of the racial composition of the incumbents, which has varied from time to time.

**Appointment Process**

Dietz argues that to ensure conformity with the alleged racial quota system, the Mayor changed the promotion process. However, Dietz has proffered no competent evidence regarding the process by which Inspectors were appointed in the past. Neither Szczerba, nor the Mayor, nor Mosley, nor Montgomery was ever involved in the process of appointing a WPD Inspector before 2001, when Wright was appointed. There is no record regarding the history of the process

of Inspector appointments before the appointment of Wright and there is no basis for Dietz's hyperbolic claims about the supposed change in process for the 2005 appointment of Howell. There had been only one prior appointment to Inspector by the Mayor, so any variation at all would have been, in Dietz's words, "unprecedented."

Contrary to Dietz's claims, there was no significant difference between the selection process in 2001 and 2005. (Mosley Dep. 24-25 (A0254); Montgomery Dep. 20 (A0269).) As Dietz concedes, in 2005, the Mayor, Mosley, Montgomery and Szczerba discussed the potential candidates, and the Mayor listened to Szczerba's recommendation of Dietz and concerns about Howell. (Szczerba Dep. 216-17 (A1312).) Szczerba did not go into much detail about Dietz's qualifications. (Mayor Dep. 66 (A0243).) The Mayor was inclined to prefer Howell, whom he had favored in 2001, but the Mayor also liked Captain Sean Finerty (a white male) because of his demeanor and forceful way of policing. (Mayor Dep. 67 (A0243).) The Mayor was also considering Captain Victor Ayala (Hispanic) and Captain Robert Cummings (African-American). (*Id.*)

To the extent there was any change in the appointment procedure the Mayor used in 2005, it was in Dietz's favor. Dietz admits that the Mayor reviewed Dietz's and Howell's resumes. (D.I. 63, p.16). In addition, the Mayor and Mosley met with Dietz and Howell personally. During her meeting with the Mayor and Mosley, Dietz sat nearly silently. (Dietz Dep. 110-11 (A0310).) Eventually she stated that she felt she was well qualified for the position and suggested that the WPD should focus on improving its reputation by "doing more positive things with the community." (Dietz Dep. 112 (A0310).) She did not address the issue of how to reduce the City's crime rate, did not advise the Mayor or Mosley that she had concerns about the ability of Howell to perform the job and did not tell them that she was concerned that they might

be planning to make a decision based on race. (Dietz Dep. 113 (A0310).)  In response to comments by Szczerba about the possibility that Howell's health might interfere with his ability to perform the job, the Mayor met with Howell to ask him for a response to that concern. (Mayor Dep. 57-58, 60-61 (A0240-41).)  Howell assured the Mayor that his health would not interfere with his ability to perform the duties of an Inspector.  (Mayor Dep., pp.57-58 (A0240-241).)

**Basis for Howell's Appointment**

Much of Dietz's brief centers on her contention, backed in part by the WPD's personnel files and in part by the opinion of Chief Szczerba, that she was more qualified for the position of Inspector of Uniformed Operations than the African-American appointee, Gilbert Howell.

In 2005, after careful consideration of input from the community, city council members, Mosley, Szczerba, Montgomery, Howell and Dietz herself, the Mayor appointed Howell because: (a) the Mayor was impressed by Howell's resume (Mayor Dep. 68 (A0243)); (b) the Mayor thought Howell really wanted the job and would do the best he could at it (Mayor Dep. 68 (A0243)); (c) the Mayor liked Howell's "ideas about gathering up people and putting together special teams and going out and attacking our problem areas" (Mayor Dep. 68 (A0243)); and (d) Howell was "very street wise," meaning he knew the communities, and knew what their problems were and who and where the "bad guys" were (Mayor Dep. 70, 72 (A0244)).  Indeed, Howell was born and raised in Wilmington. (D01466-72 (B126-132).)  In early 1975, Howell applied for a position with the WPD.  (*Id.*)  At that time he was 25 years old and was married with one child.  (*Id.*)  He had four brothers and two sisters still living in Wilmington or nearby. (*Id.*)  Five of Howell's siblings still lived at home with their mother in Wilmington. (*Id.*)  His father had died in 1971.  (*Id.*)  He was enrolled in Police Science classes at Delaware Technical

and Community College. (*Id.*) In short, Howell had very strong ties to the Wilmington community.

Dietz claims that shortly after Howell's appointment in 2005, the Mayor admitted in a conversation with George Collins that he had appointed Howell because of race. (Collins Dep. 8-10 (A0221-22).) The Mayor denies making this statement. (Mayor Dep. 50-55 (A0239-40).) No one other than Collins claims to have heard the alleged statement, although there were other people in the room at the time. (Collins Dep. 8-10 (A0221-22).) In fact, the Mayor's Chief of Staff was also present for this meeting and does not agree with Collins. (Montgomery Dep. 34-7 (A0273).) No such statement was uttered, but at a minimum there is a factual dispute that a jury must resolve.

**Dietz's Qualifications**

At pages 6-9 of her brief, Dietz details at length the reasons why she believes that she was better qualified than Howell. (D.I. 72, pp.6-9.) The records on which Dietz relies speak for themselves, but these records and opinions are largely irrelevant, because there is no evidence that the Mayor relied on them in reaching his decision. Indeed, Dietz herself points out that the Mayor "never reviewed job evaluations, attendance records, or disciplinary records in arriving at his decision to promote Howell." (D.I. 63, p.16.) In the absence of any evidence that the Mayor reviewed or was otherwise familiar with the contents of Dietz's, Howell's or Wright's personnel files, the information in the files is simply not relevant. Similarly, events that occurred after Howell's appointment to Inspector are irrelevant, because the Mayor could not have known them at the time of the decision in question.

With regard to Dietz's reliance on Szczerba's testimony regarding Howell, Szczerba's opinions are not facts and Szczerba was not the decision maker. The fact that Szczerba

disagreed with the Mayor's decision does not prove that the Mayor was motivated by racial or gender bias.

Indeed, Dietz has admitted that Howell was qualified for the Inspector position. (Dietz Dep. 37 (A0291)) and, at least as of 2001, Szczerba refused to say that Howell was at the bottom of his list of qualified candidates. (Szczerba Dep. 204 (A1309).) Dietz also admits that Howell had more experience than she did in the Uniformed Services side of police operations. (Dietz Dep. 85-6 (A0303-04).)

**Howell's Retirement**

Howell recently retired effective July 31, 2007. (D.I. 72 at 5). Defendants have not yet reached a decision regarding which officer is best qualified for appointment to the vacant Inspector position. However, the WPD is suffering harm while this Inspector position remains vacant. (Szczerba Decl. at ¶¶ 6-8, attached as Exhibit 1.) The duties of the Inspector of Uniformed Operations include administration and operation of all uniformed services divisions, including, but not limited to, patrol division, community policing, traffic, special operations and auxiliary units such as the crisis management team (SWAT). (*Id.* at ¶7.) The Inspector of Uniformed Operations is also responsible for developing and implementing police deployment strategies, such as anti-terrorism plans. (*Id.*) The Inspector of Uniformed Operations also has responsibility for planning, staffing, equipping and evaluating special events. (*Id.*) The Inspector of Uniformed Operations also has numerous other administrative duties related to budget and fiscal matters and the preparation of statistical and analytical reports. (*Id.*) In addition to the foregoing duties, the Inspector of Uniformed Operations is the second in command and assumes the duties of the Chief of Police in his absence. (*Id.*)

These outlined duties are too numerous to be "covered" by the other Captains until after the trial on the merits. (*Id.* at ¶8.) The other subordinate officers are already burdened with their own responsibilities and no officer can give his or her full time and attention to the duties of the Inspector of Uniformed Operations. (*Id.*)

Further, other officers in the WPD are being harmed because the failure to appoint an officer to the vacant Inspector position prevents promotions in each of the lower ranks, specifically Sergeant, Lieutenant and Captain. (*Id.* at ¶10.) With regard to the ranks of Sergeant and Lieutenant, the "band" or list of officers currently eligible for promotion will expire April 14, 2008. (*Id.*) Even though the list expires after the scheduled trial on the merits, barring the trial date being moved, the written exam for the next promotional period (2008-2010) will be administered on February 2, 2008, prior to trial. (*Id.*) Those officers who are currently eligible for promotion, but not promoted prior to the exam date, must take the February promotional exam to ensure their eligibility for promotion in the next two years. (*Id.*) Officers currently in the highest band, and therefore a good position for promotion, may not score as well on the next exam and as such may be effectively denied a promotion. (*Id.*)

The appointment of an interim Inspector will not cure the harms listed above. The appointment of an interim Inspector does not open vacancies for promotions in the lower ranks. The appointment of an interim Inspector does not cure the problem of too many duties, because the interim Inspector would presumably have the duties of the Inspector and the duties of the vacant Captain position. Further, the appointment of an interim Inspector is damaging to morale given that the person appointed would be aware such position was only temporary. (*Id.* at ¶9.)

## SUMMARY OF ARGUMENT

1.    There is no legal support for Dietz's argument that being denied a promotion constitutes irreparable harm.

2.    Dietz cannot establish a reasonable likelihood of success on the merits because she is relying on highly disputed facts.

3.    Innocent third parties, consisting of all WPD officers who would otherwise be eligible for appointment into the vacant Inspector position or for promotion into the vacancies created by that appointment, will be harmed if the motion for a preliminary injunction is granted. In addition, anyone appointed on an interim basis to the Inspector position would be harmed.

4.    It is contrary to the public interest to preclude the City from following its normal appointment process to fill the vacancy created by the retirement of Howell.

**ARGUMENT**

## I.    STANDARD FOR PRELIMINARY INJUNCTION

To obtain preliminary injunctive relief, the plaintiff must show that in the absence of its issuance, she will suffer irreparable injury and that she is likely to prevail on the merits. *Constructors Assn. of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814 (3d Cir. 1978). Traditionally, the court must examine four factors in ascertaining the propriety of a preliminary injunction:

> the moving party must show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party…the district court should take into account…(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Id.* at 814-15 (internal citations omitted). While these factors structure the court's inquiry, "no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements." *Id.* at 815.

"In order to obtain a preliminary injunction plaintiffs must show <u>both</u> that they will prevail on the merits of their claim and that they are likely to suffer irreparable harm in the absence of an injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990). While all four factors are important, failure to show either likelihood of success on the merits or irreparable harm "must necessarily result in denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982).

## II.    DIETZ CANNOT DEMONSTRATE IRREPARABLE HARM.

Dietz cannot demonstrate that she will suffer irreparable harm if her request for a preliminary injunction preventing the appointment of an officer to the vacant position of Uniformed Operations Inspector is denied. Dietz has not cited a single case involving claims of

employment discrimination where a court has ruled that an injunction preventing promotions was warranted. Similarly, Dietz has not cited a single case in which a failure to promote or hold a vacancy open for promotion constituted irreparable harm. Because Dietz cannot demonstrate irreparable harm, the Court must deny Dietz's request for a preliminary injunction.

### A.    There Is No Legal Support For Dietz's Argument That Being Denied An Appointment Constitutes Irreparable Harm.

In order to meet her burden of showing irreparable harm, plaintiff "must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). "What constitutes irreparable injury in a case depends upon the particular facts of that case." *Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir. 1975).

In the context of public employment, courts very rarely find irreparable injury. In fact, courts have all but categorically denied preliminary injunctive relief in the employment context, absent truly extraordinary situations. In *Sampson v. Murray*, the Supreme Court set a high standard for obtaining preliminary injunctions regarding employment disputes. 415 U.S. 61 (1974). There, the plaintiff, a probationary federal employee who had been notified that she would be discharged on a specified date, alleged humiliation, damage to reputation and loss of income stemming from the potential loss of her job. *Id.* at 91. The Supreme Court held that these injuries did not rise to the level of an extraordinary employment situation and accordingly that there was no irreparable harm that warranted preliminary injunctive relief. *Id.* at 91-29, 92

n.68.[2]

The losses that accompany an adverse employment decision "may be remedied by appropriate judicial decrees if the plaintiff should prove successful," and "[s]uch judicial relief may properly include provisions for employment, back-pay, fringe benefits and the like," *Oburn*, 521 F.2d at 151. The court is "guided by the consideration that":

> The key word in this consideration is <u>irreparable</u>. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim for irreparable harm.

*Id.* (citing *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) *quoted with approval in Sampson*, 415 U.S. at 90). In short, "some delay in promotion does not constitute irreparable injury." *See Adams v. City of Chicago*, 135 F.3d 1150, 1155 (7th Cir. 1998) (denying injunctive relief to police officers who allege racial discrimination in promotion policies and procedures in Chicago Police Department).

Dietz's alleged harm is redressable by a final order after trial. Her laments, Op. Br. at 30, about her lifelong dream to "reach the upper echelon" and be a Wilmington Police Department Inspector and to "pass[] on her knowledge and skill to help younger officers...and better serve the City of Wilmington," to paraphrase Chancellor Allen of the Delaware Court of Chancery, is "transparent makeweight."[3] Fulfilling a childhood dream and helping the community, though important aspirations, are intangible and abstract. The Court should not base a finding of

---

[2] *Cf. Squires v. Bosner*, 54 F.3d 168, 173 (3d Cir. 1995) (cited in Plaintiff's brief, Op. Br. at 30, for the proposition that "it is at best disingenuous to say that money damages can suffice to make a person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored," but not discussed in the preliminary injunction context; rather on appeal from a final order on reinstatement). Plaintiff also cited *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999), *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 13 (1st Cir. 1991), and *In re Lewis*, 845 F.2d 624, 630 (6th Cir. 1988), for this same proposition. None of these cases involve preliminary injunctions, and therefore none discuss the relevant issue of the requirement of irreparable harm.
[3] *See Burge v. City of Dover*, 1987 Del. Ch. LEXIS 446 (June 8, 1987).

irreparable harm on such ethereal factors as a party's childhood desires. This would, in effect, entitle every aggrieved employee to injunctive relief. Dietz has, in fact, reached the upper echelon of the WPD. She is the head of the Police Academy and the Head of the Human Resources Division. She already has the opportunity to train and influence the development of uniformed officers. Her "losses" are tenuous at best.

Moreover, even the losses Dietz alleges, i.e., the opportunity for her childhood's highest aspirations to become reality and for her to "reap the intangible psychic reward of a job well done at the Inspector level," Op. Br. at 30, "may be remedied by appropriate judicial decrees" if she succeeds at trial. *See Oburn*, 521 F.2d at 151. If the jury finds in favor of Dietz and the Court deems her to be entitled to instatement to Inspector under the standard set forth at section III.C. *infra*, then she will be instated. If Dietz must wait for a vacancy to occur, she will be fully compensated by an order for monetary relief in the interim. *See, e.g., Bullen v. Chaffinch*, 336 F.Supp.2d 357 (D. Del. 2004).

Since harm is not imminent and relief at the conclusion of a trial on the merits necessarily still will be available to Dietz, any actual harm that is alleged is not irreparable pendente lite. Thus, some delay in Dietz's appointment cannot constitute irreparable injury. At most, Dietz's brief describes an inconvenience easily compensable by damages. *See Moteles v. University of Pennsylvania*, 730 F.2d 913, 919 (3d Cir. 1984) (finding no irreparable harm for female security guard in employment discrimination case).

Further, even if filling the vacant Inspector position in the normal course results in the inability to appoint Dietz to Inspector immediately at the conclusion of the trial, the Court can still order her appointment to the next available Inspector position. The rate of turnover in the Inspector rank is fairly high. In the past thirty years there have been twenty-four different

Inspectors. Since the Inspector positions were reduced to two in 1989, there have been fourteen different Inspectors. Ten of these fourteen Inspectors have remained in the position for less than three years. Given the high turnover in the Inspector ranks, the delay in Dietz's appointment to the position of Inspector after a trial on the merits would be minimal. Any such delay that occurred would be reparable through the award of money damages.

The harm alleged by Dietz is far from "irreparable." Without irreparable harm, Dietz cannot sustain her claim for a preliminary injunction.

### B.    Employment Discrimination Is Not Irreparable Harm Per Se.

Plaintiff's argument that the deprivation of a Constitutional right is irreparable harm per se is not applicable to the facts of this case. Plaintiff did not make the more relevant argument, that <u>employment discrimination</u> is irreparable harm per se, because it is contrary to the weight of relevant legal authority. Specifically, in a Title VII employment discrimination case, the Third Circuit has found that "the plaintiff must establish irreparable injury as a prerequisite to the receipt of preliminary injunctive relief." *Moteles*, 730 F.2d at 918. As the Third Circuit in *Constructors Ass'n* explained: "unlike First Amendment rights whose deprivation even for minimal periods of time constitutes irreparable injury, a denial of equal protection rights may be more or less serious depending on the injuries which accompany such deprivation." 573 F.2d at 820 (citing *Elrod v. Burns*, 427 U.S. 347, 372-73 (1976)). For instance, the ability to vote in the Presidential election is necessarily more immediate and irreparable if it is denied as compared to the right to vote where no election will be held until after a trial on the merits. Alleged employment discrimination is on the less serious end of the spectrum. *See supra* Section III.A.

The cases cited by Plaintiff are not distinguishable because none involve employment discrimination. *See United States v. New York City Board of Education ("NYC Board of*

*Education"),* 2002 U.S. Dist. LEXIS 23956, at *29 n.3 (E.D.N.Y. July 24, 2002) ("The cases

movants cite for the proposition that racial classifications constitute irreparable harm per se all

appear outside of the employment context and are wholly distinguishable.") (distinguishing

*Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738 (2d Cir. 2000) (cited by Plaintiff in

the Opening Brief at 31-32) which upheld finding of irreparable harm, but vacated preliminary

injunction on other grounds, in case with "unique and somewhat outrageous facts" in which

fourth grader challenging race-based school transfer policy was twice told she could attend

school in neighboring district and the offers were later withdrawn).[4]   In *NYC Board of*

*Education*, the district court found no irreparable harm in a case based on violations of Title VII

of the Civil Rights Act of 1964 for claims of disparate impact on behalf of black and Hispanic

New York City school custodians.   In seeking a preliminary injunction, the movants alleged

irreparable injury because, *inter alia*, they claimed they would be discriminated against.  *Id.* at

*21-22.   The court reasoned that "[t]here is no question that a preliminary injunction is

appropriate if constitutional interests are threatened or in fact being impaired at the time

injunctive relief is sought.   However, irreparable injury sufficient to warrant a preliminary

injunction does not exist in every case alleging discrimination." *Id.* (citations omitted).

"Accordingly," the court summarized, "courts are loathe to grant preliminary injunctions in

employment cases where other remedies are available." *Id.*

     Dietz can still be awarded instatement even if the vacant Inspector position is filled.   If

that instatement cannot take place immediately after trial, then Dietz can be compensated for the

---

[4] The other cases cited by Plaintiff are similarly unhelpful in the context of this motion. *See Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (discussing in the availability of injunctive relief to prevent a deliberate pattern and practice of unconstitutional searches and seizures by the New Jersey State Troopers); *Maldonado v. Houston*, 177 F.R.D. 311, 333 (E.D. Pa. 1977) (challenging constitutionality of statute that states that residents must live in the state for at least 12 months to receive full welfare benefits, claiming irreparable harm in the denial of their fundamental right to travel among states).

delay. Dietz has other remedies than the requested injunction and will not suffer irreparable harm if the injunction is denied.

## III.    PLAINTIFF HAS NOT SHOWN A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    Defendants Do Not Maintain An Illegal Racial Quota System.

Dietz argues that she is entitled to a preliminary injunction because she has shown a reasonable likelihood that she will succeed at trial on the merits of her claims. She argues, first, that the City maintains an illegal quota system for the position of police department Inspector under which a fixed number or proportion of Inspector positions are reserved specifically for African-Americans. Since about 1980, the number of police Inspectors has ranged from two to four. Dietz seems to assume that if an African-American is holding one of those positions, the reason must be his skin color.

Defendants deny that they maintain a racial quota system for the position of police Inspector. The City's official policy, outlined in its written affirmative action plan as well as in its charter and code, is that discrimination based on race, gender and other protected characteristics is prohibited. Mayor Baker himself played a role in the creation and implementation of these laws and official policies. There is no testimony by any Mayor that his motive for appointing an African-American police Inspector was to perpetuate an illegal racial quota system. *See supra* Statement of Facts, pp 7-9. The Mayor denies that he appointed Howell in an effort to comply with an alleged racial quota system.

Dietz claims that there is a "white inspector position" and a "black inspector position," and that a black never replaces a white and vice versa. This is untrue. The evidence shows that at various times the City has had no African-American Inspector at all, and that both African-Americans and whites have held each of the various Inspector positions and have replaced each

other. Dietz seems to believe that all she needs to show is that there has been at least one African-American Inspector since 1978 and that proves a quota system. But she needs to prove that Defendants had a system in place that specifically reserved a "fixed number or proportion of opportunities" for African-American officers. The mere inclusion of an African-American officer in the Inspector rank is not sufficient to prove the existence of a quota system. Because there are substantial disputes of material fact as to the existence of a racial quota for appointments to Inspector, Dietz has not shown that she has a reasonable probability of succeeding on the merits of her racial quota claim.

**B.      Dietz Has Not Shown That She Has A Reasonable Likelihood of Prevailing on Her Discrimination Claims.**

Dietz argues that she has produced sufficient direct evidence of discrimination that, under the "*Price Waterhouse* standard," she would be entitled at trial to have the burden of proof shifted to the Defendants to prove that the same decision would have been made even if race or gender had played no role in the decision. Dietz has failed to meet the evidentiary burden to prove that the *Price Waterhouse* standard applies. Additionally, under the *Mc Donnell Douglas-Burdine* standard Dietz has failed to put forth sufficient evidence to show that the *Fuentes* factors will be decided in her favor. Therefore, Dietz cannot show a likelihood of success on the merits of her discrimination claims under either standard.

**1.      The *McDonnell Douglas-Burdine* and *Price Waterhouse* Standards**

The courts have set forth two methods by which a plaintiff may prove employment discrimination. Under the *McDonnell Douglas-Burdine* standard, the employee plaintiff must first make a *prima facie* showing of discrimination. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).The burden then shifts to the employer defendant to articulate a legitimate non-discriminatory reason for the adverse employment decision. *See id.*

The burden then shifts back to the employee to show that the employer's proffered explanation is pretextual and that the decision was motivated by discrimination. *See id.* at 254-55. At all times the burden of proof or burden of non-persuasion, including the burden of proving causation in fact, remains on the employee. *See id.* at 253; *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2749 (1993).

Under the *Price Waterhouse* standard, an employee must show by direct evidence that an illegitimate criterion was a substantial factor in the adverse employment decision. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989). The evidence must demonstrate that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in making their decision." *Id.* at 277. When a plaintiff has met this standard, the burden of persuasion shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even if the protected trait had not been considered. *See id.* at 244-45, 260 (plurality opinion).

### 2. Dietz Has Not Set Forth Facts Sufficient to Demonstrate That Race Was a Substantial Factor in the Challenged Appointment.

In order to shift the burden of persuasion to Defendants under the *Price Waterhouse* standard on a motion for summary judgment Dietz must produce direct evidence demonstrating that race was a substantial factor in the decision to appoint Howell. Employees seeking to shift the burden of persuasion under *Price Waterhouse* must clear a high hurdle. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997). "The burden of persuasion shifts to the employer only after the plaintiff has proven that her employer acted unlawfully and not merely on the basis of a prima facie showing." *Id.* (internal quotations omitted). Under *Price Waterhouse* the employee's evidence must "directly reflect the alleged unlawful basis for the adverse employment decision." *Id.* (quoting *Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir.

1994)). Therefore, "stray remarks in the workplace," "statements by non-decisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not satisfy this evidentiary burden. *Price Waterhouse*, 490 U.S. at 277. Dietz has not produced evidence sufficient to meet this high standard.

Dietz has listed several items of "direct evidence" in support of her assertion that she has a reasonable likelihood of success on the merits of her discrimination claims. However, each item of "direct evidence" is disputed by Defendants, factually and as to its significance in the overall circumstances of the case. None of these items address gender; Dietz has set forth no evidence that she will likely succeed on her gender discrimination claims under a *Price Waterhouse* standard. Further, this patchwork of contested events and interpretations is insufficient to establish that Dietz will likely succeed on her discrimination claims under a *Price Waterhouse* theory.

Dietz's first item of direct evidence is an alleged statement by the Mayor that "he wanted the Inspector to be black." (D.I. 72, p.25.) George Collins testified that the Mayor made this statement during a meeting in the Mayor's office with certain Fraternal Order of Police officers. (Collins Dep. 8-10 (A0221-22).) The Mayor denies that he made this statement. (Mayor Dep. 50-55 (A0239-40).) The Mayor's Chief of Staff was also present for this meeting and did not hear the alleged statement. (Montgomery Dep. 34-37 (A0273).) This evidence is so highly disputed that it cannot provide a basis for Dietz's argument that she has a reasonable probability of success on the merits.

Dietz's next piece of so-called direct evidence is her argument that the City maintains a racial quota system for Inspector appointments. (D.I. 72, pp.25-26.) As described above, Defendants deny that they maintain a quota system and, in fact, the City's official policy is that

race discrimination is prohibited. Defendants have produced sufficient evidence that a reasonable jury could find that a quota system does not exist. Dietz bears the burden of persuasion on this issue and as stated above, the mere existence of at least one African-American officer in the Inspector rank is not incontrovertible proof that Defendants maintain a system for reserving a fixed number of opportunities for minority officers. For this reason, Dietz cannot rely on the alleged existence of a quota system as a basis for her motion for a preliminary injunction.

Dietz then argues that she has direct evidence of discrimination because "all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process)" in the WPD. (D.I. 72, p.26 (emphasis added).) Dietz's authority for this statement is the deposition testimony of Chief Szczerba and Chief of Staff Montgomery. (*Id.*) To the contrary, Director Mosley monitors promotions and transfers within the WPD, after the decisions have been made by Szczerba, to ensure that the decisions do not appear to be the result of discrimination. (Montgomery Dep. 10-17 (A0267-68); Mayor Dep. 37-38 (A0235-36).) Neither Szczerba nor Montgomery stated that race was a substantial factor in promotion decisions within the WPD. While Dietz has proposed a potential interpretation of these conversations, this evidence does not show a reasonable likelihood of success on the merits of her discrimination claims by mandating a burden shift under the *Price Waterhouse* standard.

Further, these discussions of the race of certain individuals recommended for promotion within the WPD are not "direct evidence" that Defendants discriminated against Dietz in making the adverse employment decisions. The Mayor is the only decision maker under the *Price Waterhouse* standard. Consequently, conversations regarding promotions between Szczerba and

Mosley are statements made by non-decision-makers and are ineligible for consideration as "direct evidence."

Even if Szczerba and Montgomery had been decision makers, their statements would be classified as "unrelated to the decisional process itself." Statements that "are unconnected to the decision at issue, even if made by people who hold positions of authority with the employer, are not direct evidence" of discriminatory motive. *Walden*, 126 F.3d at 514. These conversations are stray remarks, not "direct evidence" that could support Dietz's request for summary judgment.

Dietz goes on to allege that documents produced by Defendants show that when a white Inspector retires he is replaced by a white and when an African-American Inspector retires he is replaced by an African-American. (D.I. 72, p.26.) Various mayors other than Mayor Baker appointed eight African-Americans and fourteen Caucasians to the position of Inspector between 1973 and 2000. The actions of individuals in prior administrations cannot be construed as "direct evidence" of discriminatory animus by an entirely different person. In addition, the prior appointments do not form the basis for an inference of racial animus because "purely statistical evidence" does not warrant a *Price Waterhouse* jury charge and cannot provide a basis for Dietz's preliminary injunction motion. *Hook*, 28 F.3d at 374.

Finally, Dietz alleges that the Mayor's deposition testimony regarding diversity in employment decisions is "direct evidence" reflecting discriminatory animus. (D.I. 72, pp.26-27.) However, Dietz has admitted that striving for diversity is not the equivalent of engaging in illegal racial discrimination. Moreover, the Mayor's statement that certain departments may take diversity into consideration when making promotion decisions is not direct evidence that the

Mayor considered race in making the appointment of Howell. The Mayor's testimony regarding diversity therefore does not show that Deitz has a reasonable likelihood of success on the merits.

Dietz's alleged direct evidence is too weak to establish that she has a reasonable likelihood of success on the merits. The evidence presented does not meet the "high hurdle" of proving that race was more likely than not the motivating factor in the Mayor's decision to appoint Howell.

### 3. Dietz's Evidence Of Pretext Is Insufficient For Her To Establish A Reasonable Probability Of Success On The Merits.

Dietz has offered numerous statements why she considers herself more qualified for the position of Inspector than Howell and other reasons (mostly addressed above in the direct evidence section) why a jury could conclude that race or gender was the reason for Howell's promotion. In her summary judgment brief, Dietz only claims that these facts are sufficient to require that a jury determine whether the reasons proffered by Defendants for Howell's appointment are pretextual. However, now Dietz claims the exact same facts show indisputably that she is likely to prevail on the merits of these claims. Dietz's proffered evidence under the *Fuentes* prongs is insufficient to satisfy her burden of persuasion that she is likely to prevail on the merits of her claims.

Under the *McDonnell Douglas-Burdine* standard, once the defendant articulates a legitimate non-discriminatory explanation for its decision, the burden returns to the plaintiff employee to show that the proffered explanation is pretextual. The Third Circuit in the *Fuentes* decision identified two ways in which a plaintiff could prove pretext. The first is to produce evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate nondiscriminatory reasons. *See Fuentes v. Perskie*, 32 F.3d 759, 764. Under this prong, "plaintiff must demonstrate such weaknesses, implausabilities, inconsistencies, or

contradictions in the employer's proffered legitimate reasons" that a reasonable jury could disbelieve them. *Id.* at 764-65. Under the second *Fuentes* prong, the plaintiff may prove pretext by producing evidence from which a reasonable factfinder could believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See id.* at 764. As noted in *Fuentes*, however, "[t]o discredit the employer's proffered reason, however, the plaintiff cannot show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." 32 F.3d at 765. The Third Circuit reiterated in *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quotation omitted), that "the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."

The Mayor has articulated several legitimate non-discriminatory reasons for the appointment of Howell. (Mayor Dep. 68-72 (A0243-44).)   The Mayor appointed Howell because: (a) the Mayor was impressed by Howell's resume (Mayor Dep. 68 (A0243)); (b) the Mayor thought Howell really wanted the job and would do the best he could at it (Mayor Dep. 68 (A0243)); (c) the Mayor liked Howell's "ideas about gathering up people and putting together special teams and going out and attacking our problem areas" (Mayor Dep. 68 (A0243)); and (d) Howell was "very street wise," meaning he knew the communities, and knew what their problems were and who and where the "bad guys" were (Mayor Dep. 70, 72 (A0244)).

Dietz argues that the evidence on pretext shows that she has a reasonable probability of success. The facts raised by Dietz in her opening brief (D.I. 72, pp. 19-20) regarding pretext, based on personnel files and Chief Szczerba's testimony, do not satisfy her burden under *Fuentes*. In the absence of any evidence that the Mayor reviewed or was otherwise familiar with

the contents of Dietz's or Howell's personnel files, the information in the files is simply irrelevant. The *Fuentes* case indicates that the evidence must be sufficient to rebut each of the employer's proffered non-discriminatory reasons. *Fuentes*, 32 F.3d at 764. Dietz has proffered reasons why, in her own opinion, she was more qualified for the position of Inspector than Howell, but she has not proffered evidence that discredits the reasons proffered by the Mayor for the appointments: his reliance on Howell's resume, Howell's stated enthusiasm for the position, his approval of Howell's ideas for combating street crime and Howell's "street wise" knowledge of the City. Based on the evidence set forth in Dietz's brief, she has not met her burden on the first *Fuentes* prong.

Further, the facts proffered by Dietz in support of the second *Fuentes* prong are contested and insufficient for a judgment on their merits. (D.I. 72, pp.18-19.) Defendants have addressed the disputes with most of these facts above (see pp. 26-28): the Mayor's alleged statement to Collins, Mosley's inquiries regarding race in connection with promotional recommendations, the Mayor's statements regarding diversity, the existence of an alleged quota system. The other alleged facts are similarly disputed and therefore, insufficient to prove at this stage that an "invidious discriminatory reason was more likely than not a motivating or determinative cause" of the appointment decisions. The fact that the Mayor considered the recommendations of African-American community leaders in making an appointment decision does not point to invidious discrimination, unless Dietz can point to some evidence that these recommendations were based on race and the Mayor was aware of that bias. Additionally, contrary to Dietz's claims, there was no significant difference between the selection process in 2001 and 2005. (Mosley Dep. 24-25 (A0254); Montgomery 20 (A0269).) Finally, the mere fact that a white

female has never held the rank of Inspector, especially since Dietz is only the second female to hold the position of Captain, is not proof of discrimination.

The evidence set forth in Dietz's brief certainly allows Dietz to assert a claim for discrimination, but it falls well short of establishing a likelihood of success on the merits.

### C. Dietz Has Not Demonstrated That She Has a Reasonable Likelihood of Being Awarded Instatement at Trial

Even assuming that Dietz's highly contested "evidence" of discrimination is sufficient to establish a reasonable likelihood of success on her claims of discrimination, she cannot show a reasonable likelihood that those claims would result in her instatement to the position of Inspector. Dietz may prove discrimination without proving that she is entitled to instatement. Instatement, like reinstatement, is an equitable remedy requiring the court to consider several factors: "(1) whether there is irreparable animosity between the parties; (2) the effect of instatement on innocent third parties which may be disrupted by the replacement; (3) the availability of a replacement position; (4) the need to make the aggrieved party whole; and (5) the need to deter employers from engaging in unconstitutional conduct." *Via v. Taylor*, C.A. No. 97-4-JJF, 2004 U.S. Dist. LEXIS 11246, at *6 (D. Del. June 16, 2004); *Bullen*, 336 F. Supp. 2d at 359. As an equitable remedy instatement requires the court to make an individualized determination of appropriateness based on these factors and the particular circumstances in the case. *See id.*

Dietz is essentially asking this Court to hold the Inspector position open so that if she proves her case at trial it will be easier for her to be awarded instatement under this standard. She wants to eliminate the possibility that the second element, effect of the instatement on innocent third parties, will weigh against her after trial. However, Dietz has not demonstrated that she will meet the standard for instatement. A court's determination of whether instatement

is an appropriate remedy must be based on the circumstances of the case. Some of those circumstances are unknowable at this time. For example, while Defendants do not contend there currently is irreparable animosity between the parties that would make instatement impracticable, it is possible that such animosity will develop between now and the February trial or that the trial itself may provoke animosity between the parties. Further, a decision on appointment to the vacant Inspector position has not been made. Whether the appointee will be considered "an innocent third party" will need to be determined after the position is filled. Whether an Inspector position will be available at the time of trial is unknown. Even if Defendants appoint an officer as the Inspector of Uniformed Operations, that person could leave the position in the next seven months, as has happened before, *see* Plaintiff's Op. Br. at 13-14, or the current Inspector of Investigative Operations could leave that position prior to the scheduled trial in this matter. The parties simply cannot predict what the circumstances of this case will be at the time of trial. As Dietz cannot establish a reasonable likelihood of success on her request for the remedy of instatement, she should not be granted an injunction preventing the WPD from filling the vacancy.

Dietz's request to hold a vital position in the WPD open to increase her chances of success at receiving the remedy of instatement at trial is meritless. She not only has failed to demonstrate a reasonable likelihood of success on the merits, she cannot show that she will be entitled to instatement because the circumstances affecting instatement may change between now and the time of trial.

## IV. INNOCENT THIRD PARTIES WILL BE INJURED IF A PRELIMINARY INJUNCTION IS ISSUED.

Dietz's claim that the proposed injunction does not harm innocent third parties is incorrect. The failure to appoint an officer to the vacant Inspector position prevents promotions

in each of the lower ranks, specifically Sergeant, Lieutenant and Captain. (*Id.* at ¶10.) With regard to the ranks of Sergeant and Lieutenant, the "band" or list of officers currently eligible for promotion will expire April 14, 2008. (*Id.*) Even though the list expires after the scheduled trial on the merits, barring the trial date being moved, the written exam for the next promotional period (2008-2010) will be administered on February 2, 2008, prior to trial. (*Id.*) Those officers who are currently eligible for promotion, but not promoted prior to the exam date, must take the February promotional exam to ensure their eligibility for promotion in the next two years. (*Id.*) Officers currently in the highest band, and therefore in a good position for promotion, may not score as well on the next exam and as such may be effectively denied a promotion. (*Id.*) While any future appointments will be retroactive to the date of vacancy, each of the officers who would receive a promotion are currently being deprived of the increase in pay, seniority in rank and other benefits associated with a promotion. (*Id.* at ¶11.) As in the *Oburn* case, to the extent Plaintiff may potentially avoid the injury of inability to receive an immediate appointment to Inspector, she is inflicting an inability to receive a promotion on at least three other individuals. *See Oburn*, 521 F.2d at 152 ("it is nevertheless apparent that to the extent plaintiffs would <u>avoid</u> injury to themselves by the grant of preliminary injunction, those currently enrolled in the March 6, 1975 cadet class would <u>suffer</u> injury by the grant of the injunction.") Therefore, the corresponding harm to several innocent employees who are immediately deserving of a promotion outweighs any harm (which can be remedied by a final order) to Dietz.

Accordingly, contrary to Dietz's claims, innocent third parties, consisting of all WPD officers who might otherwise have been appointed to the vacant Inspector position as well as those who might have been promoted into the vacancies created by making the Inspector appointment, would be harmed if the motion for preliminary injunction is granted. An interim

appointment would not provide a vacancy that would allow promotions to proceed in the other ranks. Additionally, leaving a division without a Captain hardly helps the WPD operate efficiently.

Furthermore, anyone appointed on an interim basis as Inspector would be harmed by the interim nature of the appointment. Dietz's suggested solution of appointing an interim Inspector from the Captain rank would be damaging to morale. (Szczerba Decl. ¶9.) The interim Inspector would know that the appointment was only temporary and might be lost regardless of how well the interim Inspector was performing. Thus, the hypothetical interim Inspector would necessarily spend months on the job worrying about the future. It is precisely this potential damage to morale that lead the Fifth Circuit to determine that a balance of the harms between a class of plaintiffs who feared losing advancement opportunities and the interests of the fire department in making permanent promotions weighed in favor of denying a requested injunction against promotions. *See Black Firefighters Assoc. of Dallas v. City of Dallas*, 905 F.2d 63, 66 (5th Cir. 1990).

In sum, enjoining a promotion at the Inspector level would prevent additional promotions through the ranks at the WPD, harming innocent employees without the possibility of recompense, and appointing an interim Inspector would be demoralizing to the temporarily promoted Captain.

## V.    ISSUING A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST.

It would be contrary to the public interest to preclude the City from following its normal appointment process to fill the vacancy created by the retirement of Howell. Citing principles of comity and federalism, courts generally hold that "it is against the public interest to disrupt the functioning of a government agency…without a strong showing that the discrimination is real

rather than perceived." *Moore v. Summers*, 113 F. Supp. 2d 5, 18 (D. D.C. 2000) (denying preliminary injunction regarding discriminatory promotions in United States Secret Service); *see Lasco v. Northern*, 733 F.2d 477, 481 (7th Cir. 1984) ("All things being equal, federalism, comity and proper respect by federal courts for proceedings of state agencies require [] restraint" from interfering in state agency employment decisions.) (citation omitted).

Public safety requires that the Court refrain from intervening in the City's normal functioning. As the Third Circuit has noted, "an inadequately staffed state police force would raise the possibility of substantial harm to the public interest." *Oburn*, 521 F.2d at 152. Faced with similar facts, the court in *Brown v. City of Chicago* recognized "the City's operational need to promote lieutenants to provide police services to the community in the coming months and to ensure public safety outweighs plaintiffs' private interests." 917 F. Supp. 577, 585 (N.D. Ill 1996).

Here, the absence of an Inspector appointed in due course on a non-interim basis would prevent efficient functioning of the WPD, correspondingly endangering the public. While Plaintiff indicates that Howell's "chronic absence" over his months in the Inspector position has proved that the WPD can operate without an Inspector, this position is untenable. *See Oburn*, 521 F.2d at 152 (noting that the movant's evidence that the state police were operating efficiently could not alone establish that the public interest would not be adversely affected by the injunction). The two Inspectors, who are essentially the deputy chiefs of police, perform vital functions for the Department. Without two active Inspectors, the workloads of the Chief, the other Inspector and the eight Captains are dramatically increased. (Szczerba Decl. ¶8.) Plaintiff's suggestion that the WPD could simply appoint an interim Inspector from the

Captain rank to cover the Inspector's duties until the trial, is insufficient because the Captain would not be replaced leaving another senior Department position vacant. (*Id.*)

Enjoining the WPD from filling vacant senior positions would jeopardize public safety and hamper the efficient and effective operation of the WPD. Dietz's private interest in "fulfilling her childhood dream" of an appointment to Inspector is vastly outweighed by the public's interest in a fully functioning police department.

## CONCLUSION

Dietz has not established irreparable harm that would justify the requested injunction. If Dietz is entitled to instatement to the position of Inspector an instatement order can be issued after trial. If the Court determines that instatement cannot be effectuated immediately because the position is not vacant, Dietz can receive monetary compensation for the delay in the appointment. This absence of harm combined with the interests of the police officers that will be promoted in the lower ranks upon the appointment of an Inspector and the public interest in having a fully staffed and efficiently functioning police force require that Dietz's request for an injunction be denied. For these reasons, as set forth in detail above, Defendants respectfully request that Dietz's Motion for Temporary Restraining Order And/Or Preliminary Injunction be denied in its entirety.

YOUNG    CONAWAY    STARGATT    &    LANDIS RATH & COBB LLP
TAYLOR LLP

_/s/ Teresa A. Cheek_____
Teresa A. Cheek, Esquire (#2657)
Adria B. Martinelli, Esquire (#4056)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6676

Attorneys for Defendant the City of Wilmington

Dated: August 31, 2007

Daniel B. Rath, Esquire (#3022)
Rebecca L. Butcher, Esquire (#3816)
James S. Green, Jr., Esquire (#4406)
919 Market St., Suite 600
Wilmington, Delaware 19801
(302) 467-4400

Attorneys for Defendant Mayor James M. Baker

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN NANCY S. DIETZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 06-256 SLR |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| JAMES M. BAKER, et al., | : | |
| | : | |
| Defendants. | : | |

AFFIDAVIT OF MICHAEL J. SZCZERBA

STATE OF DELAWARE      )
                       : SS.
NEW CASTLE COUNTY      )

I, MICHAEL J. SZCZERBA, being duly sworn according to law depose and state that the information contained herein is based upon my own personal knowledge and is true and accurate:

1.    I currently hold the position of Chief of Police of the Wilmington Police Department. I was appointed to this position by Mayor James M. Baker in January of 2001.

2.    There are two Inspector positions in the Wilmington Police Department, specifically "Inspector of Uniformed Operations" and "Inspector of Investigative Operations." Both Inspector positions are ranked directly beneath the Chief of Police.

3.    On October 28, 2005, Inspector James H. Wright retired from the Wilmington Police Department, leaving the position of Inspector of Uniformed Operations vacant.

4.    Effective **October 29, 2005**, Mayor Baker appointed Captain Gilbert R. Howell to the position of Inspector of Uniformed Operations.

5.    Effective July 31, 2007, Inspector Howell retired from the Wilmington Police Department

for health reasons, leaving the position of Inspector of Uniformed Operations vacant.

6.    On August 1, 2007, Plaintiff Nancy Dietz in the above captioned matter filed a Motion
      for a Temporary Restraining Order and a Preliminary Injunction to enjoin the City of
      Wilmington and Mayor Baker from appointing an officer to the now vacant position of
      Inspector of Uniformed Operations until a trial in this matter is concluded.  Should
      Plaintiff's Motion be granted, the Wilmington Police Department, and in turn the City of
      Wilmington, would suffer significant harm.

7.    The duties of the Inspector of Uniformed Operations include, but are not limited to the
      administration and operation of all uniformed services divisions (patrol division,
      including the community policing unit and traffic unit, special operations division, and
      auxiliary units such as the crisis management team (SWAT) and marine unit); direct
      supervision of division commanders in the foregoing divisions; developing,
      implementing and evaluating police deployment strategies and other operational plans
      such as anti-terrorism plans; directing and assuming responsibility for the security and
      disposition of prisoners; assuming responsibility for planning, staffing, equipping and
      evaluating special events; assisting with the formulation of departmental policies, rules,
      regulations, work methods and procedures; meeting regularly with subordinates regarding
      the administration of each division, its operational needs  and the effective delivery of
      police services; undertaking corrective action; planning and administering all fiscal
      matters for assigned divisions; supervising the expenditures of assigned divisions;
      assisting in the preparation of the annual budget for the department; acting as the point of
      contact with other City of Wilmington departments and Wilmington City Council;
      representing the Wilmington Police Department at community meetings, meetings with

other City departments and inter-agency meetings; coordinating and/or acting as point of contact for various inter-agency task forces; responding to citizen concerns; and preparing and/or overseeing the preparation of various statistical and analytical reports. In addition to the above, the Inspector of Uniformed Operations is the second in command and assumes the duties of the Chief of Police in his absence.

8. While Plaintiff states that former Inspector Howell's absences from the office over his months as Inspector proved that the Wilmington Police Department can operate without an Inspector of Uniformed Operations, Plaintiff's argument is untenable. There are only two Inspector positions. The absence of an Inspector of Uniformed Operations, who oversees the largest number of police officers and operations for the City of Wilmington, prevents the efficient functioning of the Wilmington Police Department. Other subordinate officers, who are already burdened with their own responsibilities and stretched thin, must continue to take on the numerous responsibilities of Inspector as outlined above. As such, no one officer is able to devote his or her full time and attention to carrying out the duties of Inspector of Uniformed Operations, taking a toll on the subordinate officers' own duties and responsibilities and affecting department morale.

9. It would also be damaging to morale to designate an interim Inspector given that the officer would be aware that the position is temporary and that he or she may not ultimately be selected for the position because of the pending lawsuit or through the appointment process.

10. Further, failure to appoint an officer to the vacant Inspector position prevents promotions in each of the lower ranks, specifically Sergeant, Lieutenant and Captain, again significantly affecting department morale. With regard to the ranks of Sergeant and

April 14, 2008. Although the list expires after the scheduled trial on the merits, barring

the trial date being moved, the written portion of the promotional exam for the 2008-2010

promotional list will be administered on February 2, 2008, prior to the trial. Therefore,

those officers who are currently eligible for promotion, but have not been promoted

before the exam date, must again take the promotional exam in January to ensure his or

her eligibility for promotion in the next two years. Officers who are currently in a good

position for promotion (i.e. within the highest band for promotion) may not score as well

on the next promotional exam and, therefore, may not be placed in the upper bands on the

2008-2010 promotional list. As such, these officers have been effectively denied a

promotion.

11.    Additionally, although the promotions are retroactive to the date of vacancy, each of the

officers who would receive a promotion would be currently deprived of the increase in

pay, seniority in rank and other benefits associated with a promotion.


_____
MICHAEL J. SZCZERBA

SWORN TO AND SUBSCRIBED before me this ___3/st___ day of August, 2007.


_____
Notary Public    LISA A. HEMPHILL
              NOTARY PUBLIC
              STATE OF DELAWARE
              My Commission Expires Sept. 3. 2010