IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPTAIN NANCY S. DIETZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-256-SLR |
| | ) |
| MAYOR JAMES M. BAKER, | ) |
| individually and in his official capacity | ) |
| as the Mayor of the City of | ) |
| Wilmington, and CITY OF | ) |
| WILMINGTON, | ) |
| | ) |
| Defendants. | ) |

Thomas S. Neuberger and Stephen J. Neuberger, of the Neuberger Firm, P.A., Wilmington, Delaware.  Counsel for Plaintiff.

Teresa A. Cheek of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.  Daniel B. Rath and Rebecca L. Butcher, of Landis, Rath & Cobb LLP, of Wilmington, Delaware.  Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: December 13, 2007
Wilmington, Delaware

**ROBINSON, District Judge.**

## I. INTRODUCTION

Plaintiff Nancy S. Dietz ("plaintiff") brought suit against defendants James M. Baker ("Mayor Baker"), individually and in his official capacity as the Mayor of the City of Wilmington, and the City of Wilmington ("City") (collectively, "defendants") asserting violations of 42 U.S.C. §§ 1981, 1983 and Title VII. (D.I. 1 at 1-2) More specifically, plaintiff claims that defendants violated her rights when they failed to promote her to the rank of inspector because they maintained an illegal racial quota system, and engaged in racial and gender discrimination. (Id. at 6, 13-14) Before the court are plaintiff's motions for summary judgment (D.I. 62) and a temporary restraining order (D.I. 71); and defendants' joint motion for partial summary judgment (D.I. 69). Also before the court is plaintiff's motion to compel the production of documents. (D.I. 48) This court has jurisdiction pursuant to 28 U.S.C. § 1331.[1] For the reasons that follow, defendants' joint motion for partial summary judgment is granted and plaintiff's motions for summary judgment and a temporary restraining order are denied. Plaintiff's motion to compel production of documents is denied.

## II. BACKGROUND

Plaintiff, a white female, joined the Wilmington Police Department ("WPD") in 1980 after completing a Bachelor's degree in administration of justice from Pennsylvania State University. (D.I. 1, 30, 31, ¶¶ 7, 9, 12) In 1997, plaintiff became the second female officer in the WPD's history to be promoted to captain and currently is

---

[1] Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

the only female captain. (Id. at ¶¶ 7, 12) She presently serves as the Commanding Officer of the Human Resources Division. (Id. at 6) Plaintiff's employment record contains various commendations. (D.I. 64 at A0162, A0164, A0168, A0171)

The City is a municipal corporation. Wilmington City Charter § 1-100. As of 2000, the City's total population was 72, 644. (D.I. 82 at B049, ¶ 4) The racial distribution of the City in 2000 was as follows: Thirty-six percent (25,811) Caucasian, fifty-six percent (41,001) African-American, seven percent (5,174) Hispanic, and one percent (678) Other. (Id.) The WPD sworn workforce is sixty-eight percent Caucasian, twenty-three percent African-American, seven percent Hispanic, and two percent Other. (Id.) Mayor Baker is a resident of the City and served on the City Council from January 1973 through December 2000. (D.I. 64 at A0229, 11:18-13:23; A0228 7:2-20; D.I. 82 at B048, ¶ 1) During his tenure on the City Council, Mayor Baker sponsored and wrote legislation for the City prohibiting discrimination based on race, gender, religion, and sexual orientation, among other things. (D.I. 64 at A0229, 11:18-12:13) Mayor Baker was sworn into office on January 2, 2001. (D.I. 82 at B048, ¶ 1) Shortly after his election, Mayor Baker appointed Michael Szczerba ("Szczerba"), a white male, to Chief of Police. (D.I. 1, 30, 31, ¶ 32)

Currently, there are two inspector positions: Investigations Operations and Uniformed Operations.[2] (Id.) Inspector is the second highest rank in the WPD. (Id.) In February 2001 and October 2005, a vacancy existed in the Uniformed Operations inspector position. (Id. at ¶¶ 30, 37) The WPD examines the existing captains when

---

[2]Since 1978, the number of inspectors has varied with as many as four serving.

2

considering who to promote to inspector. (D.I.64 at A0277-78, 53:17-54:4; D.I. 68 at A1285, 108:7-109:6) When both vacancies arose, plaintiff met the qualifications for inspector; however, plaintiff did not receive either promotion.[3] (D.I. 1, 30, 31, ¶¶ 30, 66, 71, 76) James Wright ("Wright"), an African-American male, filled the first vacancy in 2001. (Id. at ¶ 30) When Wright retired in October 2005, Gilbert Howell ("Howell"), also an African-African male, assumed Wright's prior duties.[4] (Id. at ¶ 38) Plaintiff was included in the pool of qualified candidates for both vacancies.[5] (D.I. 30, 31, ¶¶ 66, 76; D.I. 68 at A1282, 97:12-18) With respect to the 2005 promotion, Szczerba recommended plaintiff to Mayor Baker who ultimately appoints individuals to the inspector position.[6] (D.I. 1, 30, 31, ¶¶ 68, 78; D.I. 64 at A023, 14:22-15:24)

Mayor Baker proffered several reasons for his choice of Howell over plaintiff. Specifically, Mayor Baker thought Howell "would make a good candidate" based, in part, on recommendations from the community and City Council. (D.I. 64 at A0243, 68:2-69:20) In addition, Mayor Baker liked Howell's ideas for how he planned to serve

---

[3]Plaintiff did not actively seek the position vacated by Inspector Stallings in 2001, but she did express interest in the inspector position in 2005. (D.I. 64 at A0294, 48:20-49:14)

[4]Gilbert Howell retired from the inspector position in July 2007.

[5]Mayor Baker also considered Captain Sean Finerty (Caucasian), Captain Victor Ayala (Hispanic) and Captain Robert Cummings (African-American) for the 2005 promotion. (D.I. 64 at A0243, 67:6-22)

[6]Plaintiff claims that, historically, the Chief of Police made a "meaningful recommendation" to the Mayor. (D.I. 63 at 13) In making this claim, plaintiff relies on Mayor Baker's testimony that he promoted Wright based on Sczcerba's recommendation. (D.I. 64 at A0242, 63:13-19) In 2005, however, plaintiff asserts that the recommendation process changed when Mayor Baker disregarded the Chief's recommendation and made the decision himself. (D.I. 63 at 13)

3

as inspector if granted the position. (Id. at A0243, 68:9-11) Adding to the above reasons, Mayor Baker also commented on Howell's "good street sense" and "street smarts," as they related to Howell's ability to combat crime.[7] (Id. at A0244, 70:4-15; D.I. 68 at A1313, 218:17-23) In making his decision, Mayor Baker did not review job evaluations, attendance records, or disciplinary records but did review two biographies of plaintiff and Howell. (D.I. 64 at A0245, 77:16-21)

The parties dispute Mayor Baker's process for deciding which individual to promote to inspector. Plaintiff alleges that defendants maintain a racial quota system and discriminate based on race and gender classifications.[8] (D.I. 63) Defendants contend that they abide by the anti-discrimination policies contained in the City's Charter, but admit that diversity is a consideration.[9] (D.I. 81 at 17) Defendants also

---

[7]Mayor Baker's "street sense" reason for promoting Howell surfaced during a meeting attended by Sczcerba, Montgomery and Mosley in November 2005. At this meeting, "Sczcerba took this opportunity to discuss with [Mayor] Baker the reasons he selected plaintiff for promotion." (D.I. 63 at 15) Mayor Baker did not respond to Sczcerba's comments. (Id.)

[8]In making this assertion, plaintiff and defendants dispute the interpretation of charts that outline the employment history of the inspector position. (D.I. 81 at 17; D.I. 85 at 5) Defendants' charts are reproduced in full at the end of this memorandum opinion. (D.I. 65 at A0376-80) A chart, similar to plaintiff's, compiled by the court is also included.

[9]The City's charter prohibits discrimination on the basis of "race, color, sex, religious beliefs, national origin or political affiliations" in employment decisions. Wilmington City Charter § 7-204. Additionally, the City has an affirmative action plan and similar policy statements forbidding such discrimination. (D.I. 82 at B004-22, B024-43) The City's charter also states that an elected official's failure to abide by the provisions of it, or the United States and Delaware Constitutions, is an act of malfeasance in office. Wilmington City Charter § 2-339(e)(2). Similarly, elected and appointed city officials must "prevent and eliminate any and all discrimination in any action by the city government itself . . . ." Wilmington City Charter § 2-339(h)(4).

add that a diverse police force helps to improve relationships between the police and the community because it aids individual officers to see past stereotypes and to improve their understanding of people of other races and ethnicities which, in turn, leads to improvements in trust, respect, and communication.[10]  (D.I. 82 at B049, ¶ 5)

Plaintiff alleges that the City, in 1978, instituted a racial quota system and continues to use it to promote individuals to the rank of inspector. (D.I. 63 at 7)  Since 1978, the number of inspectors has varied, with as many as four serving concurrently. (D.I. 68 at A1263, 20:23-21:17)  According to plaintiff, the creation of the"African-American" inspector position occurred in 1978 after Chief of Police Manelski attended a meeting with Mayor William McLaughlin, community representatives and politicians, including Baker.[11]  (D.I. 64 at A0321, 9:1-23)  Prior to the meeting, the WPD had three inspectors, all of whom were white males.[12]  (D.I. 64 at A0327, 30:22-31:8)  The attendees of the meeting resolved to create a fourth inspector position to be filled by an

_____

[10]Another contested issue is the extent to which the WPD uses race as a factor in transfer and promotion decisions outside of the inspector position.  (D.I. 81 at 7; D.I. 88 at 6-8)  Defendants assert that their goal "is to fill each open position with an individual who is well qualified for the job and to consider all factors, including the applicants' racial and ethnic background, that may affect their job performance in a positive way."  (D.I. 81 at 18).  Additionally, defendants admit that Director Mosley monitors promotions and transfers within the WPD, after the decisions have been made by Sczcerba, in an attempt to proactively prevent discrimination claims.  (D.I. 81 at 7)  Plaintiff, relying in part on these statements, alleges that "all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process) in the WPD."  (D.I. 72 at 26)

[11]Mayor Baker was, at the time, a member of Wilmington City Council.

[12]The first African-American to serve as an inspector was Andrew Turner who was appointed in 1969. (D.I. 64 at A0327, 30:1-21)  After Turner retired, all inspectors were once again white. (Id.)

African-American to help alleviate community pressures. (D.I. 64 at A0321, 9:1-23) Based on plaintiff's interpretation of the charts, she argues that, since that time, one African-American has always served as an inspector. (D.I. 85 at 2) Specifically, plaintiff asserts that "anytime a black Inspector retires, he is automatically replaced by another African-American." (D.I. 63 at 9) According to plaintiff, this evidences a quota whereby defendants require one African-American inspector to serve, regardless of the title of his inspector position. (D.I. 85 at 5) Defendants, in contrast, represent that it is apparent that no quota system exists because there is not one title that is exclusively African-American. (D.I. 81 at 17) Despite this interpretative dispute, the charts demonstrate that, since 1997, the Uniformed Operations position has been held exclusively by an African-American male and that the Investigative Operations position has been held exclusively by a white male. (D.I. 65 at A0376-380) Plaintiff also points to evidence which, in her opinion, demonstrates that she was more qualified for the position than Howell.[13] (D.I. 63 at 20-27) Plaintiff also produced testimony by Fraternal Order of Police Vice President George Collins ("Collins") that Mayor Baker admitted that, with respect to the 2005 promotion, Mayor Baker "wanted the [i]nspector to be black." (D.I. 64 at A0221, 8:17-9:13) The Mayor denies making this statement. (Id. at A0239, 59:4-16) Undisputed, however, is that the WPD has never employed a female inspector. (D.I. 1, 30, 31, ¶ 85)

_____

[13]Specifically, plaintiff relies on a comparison of attendance records, disciplinary history, job performance, leadership skills, training and skill levels, character, community involvement, experience, loyalty to department, disposition and knowledge of the department to illustrate her allegedly superior qualifications. (D.I. 63 at 20-27) Because the court finds an examination of these facts unnecessary to the disposition of the motions currently before it, this acknowledgment is not a finding of fact.

## III. SUMMARY JUDGMENT

In her complaint, plaintiff requests relief from defendants based on alleged violations of 42 U.S.C. § 1981 and 42 U.S.C. § 1983 in conjunction with the Equal Protection Clause of the Fourteenth Amendment. (D.I. 1) Plaintiff argues that she is entitled to summary judgment of liability based on the wrongful failure to promote, occurring in 2005. (D.I. 85 at 19) With respect to plaintiff's summary judgment arguments, defendants contend that a genuine issue of material fact exists and summary judgment is improper.[14] (D.I. 81 at 15-16)

### A. Standard of Review

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita,

---

[14]Defendants concede that plaintiff satisfied her burden of proof for a prima facie case of racial and gender discrimination under McDonnell Douglas. (D.I. 81 at 15)

7

475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon viewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## B. Discussion

### 1. Fourteenth Amendment

#### a. Racial discrimination

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating

8

on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1976). "Racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" Grutter v. Bollinger, 539 U.S. 306, 326 (2003) (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995)). A racial classification "must ultimately be traced to a racially discriminatory purpose." See Davis, 426 U.S. at 240. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of relevant facts . . . ." Richardson v. Pennsylvania Dept. of Health, 561 F.2d 489, 492 (3d Cir. 1977). Under strict scrutiny, the government may treat people differently based on their race, but only for the most compelling reasons. See Grutter, 539 U.S. at 326. In turn, racial classifications are constitutional only when "they are narrowly tailored to further [these] compelling governmental interests." See id. Strict scrutiny is used to "smoke out illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool." See id.

## 1. Discriminatory policy

In the case at bar, plaintiff alleges that the WPD employs a racial quota system to promote individuals to the rank of inspector in which a "certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" See Grutter, 539 U.S. at 335 (quoting Richmond v. J.A. Croson Co., 488 U.S. 469, 496 (1989)); see also (D.I. 63 at 7). Specifically, plaintiff claims that, since the creation of a fourth inspector position occurred, in 1978, the WPD has reserved one inspector position for an African-American, regardless of the title that the African-American

9

inspector held.[15] (D.I. 63 at 8) In contrast, defendants assert that the claimed "African-American Inspector position" is not title-specific (i.e., an African-American will not always fill a particular title) and, therefore, no quota system exists. (D.I. 81 at 17) They dispute plaintiff's interpretation of the evidence and argue that their original charts refute plaintiff's contention that there is a "white inspector position" and a "black inspector position." (Id.; D.I. 63 at 10) Defendants also add that the City's official policy, which the Mayor helped to develop, is that "discrimination based on race, gender, and other prohibited characteristics is prohibited." (D.I. 81 at 17)

At the summary judgment stage, the question is whether a genuine dispute of material fact exists with respect to defendants' alleged use of a racial quota system. See Revis, 814 F. Supp. at 1215. Although the parties devote significant discussion to the interpretation of the charts, the dispute over the facts contained in the charts is relatively minor. Inferring from the totality of relevant facts, plaintiff produced evidence showing that defendants may operate under a quota system when appointing inspectors. See Richardson, 561 F.2d at 492. Defendants' evidence of an official non-discriminatory policy for employment decisions creates a genuine issue of material fact as to whether such a quota system exists and is applied. Moreover, defendants correctly point out that plaintiff failed to adduce "testimony by any [M]ayor that the motive for appointing an African-American inspector during his tenure was to

---

[15]The court notes that there are a few limited exceptions to this claim. At various times since 1978, there have been periods of time when no African-American inspectors served or when two African-American inspectors served concurrently. (D.I. 65 at A0374-80) In particular, no African-American held an inspector position during 8/1/87 to 9/30/87 and 9/23/95 to 11/4/95. (Id.) Additionally, two African-Americans held inspector positions during 7/2/89 to 7/7/89 and 3/7/97 to 3/21/97. (Id.)

10

perpetuate an illegal racial quota system." (D.I. 81 at 17) For the reasons stated above, the court denies plaintiff's motion for summary judgment.

## 2. Compelling state interest

As a general principle, whether a compelling state interest exists is a question of law. See Lomack v. City of Newark, 463 F.3d 303, 307 (3d Cir. 2006). The City denies plaintiff's allegation of an illegal racial quota system, but admits that it strives for "racial and gender diversity at all levels and with regard to all positions in all departments, including the position of police inspector." (D.I. 81 at 18) In other words, the City claims that it permissibly may use race as a "plus" factor due to its asserted compelling interest, the "operational needs" of law enforcement. (Id.) Plaintiff argues that "operational needs" are not a recognized compelling interest and that the record does not support defendants' operational needs argument to use race as a factor in promotion considerations.[16] (D.I. 85 at 7) Specifically, plaintiff contends that defendants have failed to make a strong evidentiary showing that the WPD's operational needs require the use of race as a factor. (Id. at 7-8) In support of their assertion that a compelling state interest exists in the case at bar, defendants provide the racial composition of the City of Wilmington, a 1996 Amnesty International Report on Policy Brutality in New York City,[17] and cite to four other cases where courts recognized "operational needs" as a compelling interest. (D.I. 81 at 4, 18-20)

---

[16]Plaintiff's argument that "compelling interests" are limited to those recognized by the Supreme Court is unavailing. In particular, the Supreme Court itself has noted that "we have never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination." Grutter, 539 U.S. at 328.

[17]Plaintiff disputes the relevance and admissibility of this report. (D.I. 85 at 9)

In Grutter v. Bollinger, 539 U.S. 306 (2003), the Court examined "[w]hether

diversity is a compelling interest that can justify the narrowly tailored use of race in

selecting applicants for admission to public universities." 539 U.S. at 322. The Court's

examination of this issue led to the conclusion that "race 'is only one element in a range

of factors a university properly may consider in attaining the goal of a heterogeneous

student body.'" Id. at 324 (quoting Regents of Univ. of California v. Bakke, 438 U.S.

265, 314 (1978)). This

> is not an interest in simple ethnic diversity, in which a specified
> percentage of the student body is in effect guaranteed to be members of
> selected ethnic groups, that can justify the use of race. Rather, the
> diversity that furthers a compelling state interest encompasses a far
> broader array of qualifications and characteristics of which racial or ethnic
> origin is but a single though important element.

Id. at 324-25 (internal citations and quotations omitted). Ultimately, the Court held that

the Michigan Law School possessed a compelling interest in attaining a diverse student

body. See id. at 328. This holding was based, in part, on the Court's conclusion that

the Michigan Law School had "a compelling interest in a diverse student body . . .

informed by [its] view that attaining a diverse student body [was] at the heart of the

[Michigan] Law School's proper institutional mission." Id. at 329. Equally important to

the Court was that "[a]ll members of our heterogeneous society must have confidence

in the openness and integrity of the educational institutions . . . ." See id. at 332.

The Third Circuit, in Lomack v. City of Newark, 463 F.3d 303, 309 (3d Cir. 2006),

found that "the Grutter court held – quite narrowly – that the 'educational benefits' of a

diverse student body are a sufficiently compelling interest to justify race-based

enhancements of minority students' applications to law school." Id. (quoting Grutter,

12

539 U.S. at 328-33). In Lomack, the City argued that "integration in fire companies leads to greater camaraderie between coworkers, acceptance and consideration for people of varying backgrounds, sharing of information and study support. It also promotes tolerance and mutual respect among colleagues." Id. The Third Circuit generally agreed with the City's statement, but disagreed that this argument alone compelled the diversity policy at issue. Id. In particular, the Third Circuit interpreted Grutter to establish that educational benefits are compelling in a law school context, but not in the firefighting context. Id. "The 'relevant difference' between a law school and a fire department is their respective missions." Id. (quoting Grutter, 539 U.S. at 331-32). Accordingly, "[Grutter] stands for the narrow premise that the educational benefits of diversity can be a compelling interest to an institution whose mission is to educate." Id. at 310.

Despite this interpretation, the Third Circuit noted that other Courts of Appeals found the "operational needs" argument persuasive in the law enforcement context. Id. at 310 n.8 (citing Petit v. City of Chicago, 352 F.3d 1111, 1114 (7th Cir. 2007) and Patrolmen's Benevolent Ass'n v. New York, 310 F.3d 43, 52 (2d Cir. 2002)). "In a sense, Grutter" is "an 'operational needs' opinion. The Supreme Court essentially found that law schools have an operational need for a diverse student body in order to effectively achieve their educational mission." Lomack, 463 F.3d at 310 n.8. In the case at bar, the relevant question is, therefore, whether the WPD has an operational need to consider race as a factor when it promotes individuals to the inspector position in order to effectively achieve its mission. See id.

Petit involved an Equal Protection challenge, brought by white police officers, to

13

the promotion process for sergeant in Chicago. Petit v. City of Chicago, 352 F.3d 1111,

1112 (7th Cir. 2003). Specifically, sergeant-hopefuls for the Chicago Police

Department took a test and the raw scores were standardized based on race and

ethnicity. Id. The City defended its actions on the ground that its practice was

"necessary to maintain operational effectiveness" of the Chicago Police Department.

Id. Comparing the facts in Grutter to the situation before it, the Seventh Circuit held

that "there is an even more compelling need for diversity in a large metropolitan police

force charged with protecting a racially and ethnically divided major American city like

Chicago." Id. at 1114. To reach this conclusion, the Court "rel[ied] on the views of

experts and Chicago police executives that affirmative action was warranted to enhance

the operations of the [Chicago Police Department.]" Id. The Court discussed evidence

presented by an expert in criminal justice and police-community relations, a former

Chief of Police, and a number of high-ranking Chicago Police Department officials. Id.

at 1114-15. In summary, "the City presented a strong basis to conclude that some

rather modest affirmative action promotions were necessary for the effective operation

of the Police Department." Id. at 1114. The Court continued its discussion of the

operational needs compelling interest:

> We have previously recognized that a visible presence of minorities
> in supervisory positions is critical to effective policing in a racially diverse
> city like Chicago because supervisors 'set the tone for the department.'
> Equally important, the presence of minority supervisors is an important
> means of earning the community's trust: 'Effective police work, including
> the detection and apprehension of criminals, requires that the police have
> the trust of the community and they are more likely to have it if they have
> ambassadors to the community of the same [race or] ethnicity.' Reynolds
> v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002). In another case
> involving promotions to sergeant, we found that "[t]he composition and
> operation of an effective police force should be in as complete harmony

14

as possible with the community from which it springs.  United States v.
City of Chicago, 663 F.3d 1354, 1364 (7th Cir. 1981) (en banc).

Id. at 1115.  Remembering the suspect status of racial classifications, "courts
recognizing the [operational need] defense have required the government actor to
demonstrate that it is 'motivated by a truly powerful and worthy concern and that the
racial measure . . . adopted is a plainly apt response to that concern.'"  Patrolman's
Benevolent Ass'n, 310 F.3d at 52-53.

      "The existence of a compelling state interest [ ] is a question of law;" however, a
court "cannot conduct the strict scrutiny review required . . . without first identifying with
specificity the discrimination allegedly giving rise to the compelling state interest."  See
Lomack, 463 F.3d at 307; Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia, 91
F.3d 586, 596-97 (3d Cir. 1996).  In this case, for the reasons discussed above, the
record is unclear as to (1) whether defendants, in fact, engage in race based
classifications, and (2) if so, to what extent, and (3) whether defendants adduced
sufficient evidence to demonstrate WPD's operational needs as a compelling interest.
If, in fact, plaintiff proves that the defendants operate a "quota system," then
defendants' asserted compelling interest becomes irrelevant because the Fourteenth
Amendment forbids "outright racial balancing."[18]  On the other hand, if plaintiff fails in

_____

      [18]      "A 'quota' is a program in which a certain fixed number or proportion of
opportunities are 'reserved exclusively for certain minority groups.'" Grutter, 539 U.S. at
335 (quoting Croson, 488 U.S. at 496).  Quotas, which set aside a "specified
percentage of a particular group merely because of race," "amount to outright racial
balancing" and are "patently unconstitutional."  See id.  "To be narrowly tailored, a race-
conscious admissions program cannot use a quota system – it cannot 'insulat[e] each
category of applicants with certain desired qualifications from competition with all other
applicants.'" Id. at 334 (quoting Regents v. University of California v. Bakke, 438 U.S.
265, 315 (1978)) (alteration in original).  It is permissible, however, to "consider race

15

this regard and defendants sufficiently demonstrate WPD's compelling need for diversity among inspectors, then the question of whether the WPD's policy is narrowly tailored will be the decisive factor.[19]

## b. Gender discrimination

"Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." United States v. Virginia, 518 U.S. 515, 531 (1996). "The State must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" Id. at 533 (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)) (internal citations omitted).

Plaintiff argues that defendants failed to meet their burden of proving an exceedingly persuasive justification to use gender as a factor in promotions because the issue of gender discrimination is not addressed in defendants' answering brief; she seeks summary judgment on this basis. (D.I. 85 at 6) Although plaintiff is correct in her statement, the court finds that a genuine issue of material fact exists as to whether defendants engage in gender based classifications. Plaintiff's presentation of proof on this issue rests on the undisputed fact that no female has ever held the inspector

_____

more flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." Id.

[19]Presently, an examination into whether the WPD's policy is narrowly tailored is unnecessary given that its answer is necessarily dependent on the answers to the first two questions which will be determined at trial. See Lomack, 463 F.3d at 311 n.9 (declining to address whether policy was narrowly tailored after finding that the policy did not further a compelling state interest).

16

position in the WPD. (D.I. 1, 30, 31, ¶ 85) Conversely, defendants allege that they
abide by an anti-discrimination policy which precludes reliance on gender. (D.I. 81 at 6)
For the reasons stated above, a reasonable jury could conclude that defendants do not
discriminate on the basis of gender; therefore, the court denies plaintiff's motion for
summary judgment with respect to this issue.

### 2. Title VII and § 1981

Plaintiff alleges that the WPD wrongly failed to promote her due to gender and
race discrimination. In direct evidence cases, the employee alleging discrimination
must produce "direct evidence that decisionmakers placed substantial negative reliance
on an illegitimate criterion in reaching their decision." Price Waterhouse v. Hopkins,
490 U.S. 228, 277 (1989); see also Starceski v. Westinghouse Elec. Corp., 54 F.3d
1089, 1097 (3d Cir. 1995). If the employee produces direct evidence of discriminatory
animus, the employer must then produce evidence sufficient to show that it would have
made the same decision if the illegal bias had played no role in the employment
decision. See Price Waterhouse, 490 U.S. at 244-45; see also Starceski, 54 F.3d at
1096. In order to shift the burden, plaintiff must produce evidence that is "so revealing
of discriminatory animus that it is not necessary to rely upon any presumption from the
prima facie case . . . ." Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994).
"Stray remarks in the workplace, statements by nondecisionmakers, or even statements
by decisionmakers unrelated to the decisional process itself, do not constitute direct
evidence of discrimination." Fakete v. Aetna, Inc., 152 F. Supp. 2d 722, 733 (E.D. Pa.
2001) (citing Starceski, 54 F.3d at 1096)); see also Ezold v. Wolf, Block, Schorr &
Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers

17

or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

When a plaintiff does not present direct evidence of discriminatory animus, courts analyze a plaintiff's claims pursuant to a pretext theory of discrimination. In Title VII employment discrimination actions invoking the pretext theory of discrimination, courts apply the McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Pursuant to McDonnell Douglas, a plaintiff has the initial burden to establish a prima facie case of discrimination. Id. at 802. To establish a prima facie case of discrimination, plaintiff must provide evidence that: (1) She was a member of a protected class; (2) she was qualified for the position(s) applied for; and (3) another person outside of the protected class was treated more favorably. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citing McDonnell Douglas, 411 U.S. 792 at 802-03). If plaintiff succeeds in establishing her prima facie case, the burden shifts to defendant employer to proffer "legitimate non-discriminatory" reason for its actions. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997). If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. Id. at 804. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). If a defendant carries this burden, the presumption of discrimination drops from the case,

18

and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable fact finder to conclude that the reasons are fabricated. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc). Although plaintiff identified indicia of discrimination, she failed to identify undisputed direct evidence that "decisionmakers placed substantial negative reliance on illegitimate criterion in making their decision." See Price Waterhouse, 440 U.S. at 277. Specifically, plaintiff alleges the following for direct evidence: (1) Mayor Baker's admission that he wanted the inspector to be African-American; (2) the racial quota system; (3) race is always considered in the promotion process; and (4) race is the determinative factor for a promotion between two otherwise equal candidates. (D.I. 63 at 32-34) Defendants contest each of these assertions. First, the Mayor denies making a statement where he expressed his desire to have the next inspector be African-American. (D.I. 64 at A0239, 52:11-53:1) Second, the court concluded earlier in this opinion that a reasonable jury could find that a quota system does not exist. Third, plaintiff alleges that "all decisionmakers and other high ranking officials in this case admit that race permeates the promotion (and transfer process) in the WPD." (D.I. 63 at 33) Although there is evidentiary support for this assertion, plaintiff's statement represents an interpretation of the actual evidence presented to the court. Any inferences to be drawn must be drawn in favor of the defendants as the non-moving parties, not the plaintiff; therefore, this is not direct evidence sufficient to grant summary judgment. See Pa. Coal Ass'n, 63 F.3d at 236. Finally, plaintiff alleges that a

19

statement by Mayor Baker in his deposition constitutes direct evidence.[20]  (D.I. 63 at 33)

Defendants acknowledge that Mayor Baker is the decisionmaker under the Price

Waterhouse standard.  (D.I. 81 at 24)  "[S]tatements by the decisionmaker[ ] unrelated

to the decisional process itself, do not constitute direct evidence of discrimination."

_____

[20]    The relevant portion of the deposition occurred as follows:

Q: But in making a selection between two qualified candidates for a
position, hypothetically, one being white and another being black –

A: Mm-hmm.

Q:  – your decision makers under your plan are not supposed to consider
the race of the two candidates, are they or –

A: In the band.  I don't know what the contractual agreement says in terms
of how they determine that, but it's just like the fire department.  They do
consider, if you got two equal candidates, they can still consider the issue
of diversity, especially if you have all whites.

***

Q: Right.  So you're saying, for example, if two candidates are equal –

A: Yeah.

Q:  – the fact of wanting to diversify the department comes into play in
making a decision?

A: Oh, I think so.  I think so.  I think that's in any department.

***

Q: Okay.  And if you have two candidates who are of equal – equal
strength, one's a man, one's a female, the desire to diversify the work
force could come into play in making that kind of decision?

A: In promotions, that probably would.

(D.I. 64 at A0234-235, 33:19-35:21)

20

Fakete, 152 F. Supp. 2d at 733. Granting all factual inferences in defendants' favor, it is unclear from the deposition testimony whether Mayor Baker was testifying about the promotional process for inspectors or the promotional process for within bands.[21] Moreover, this testimony does not provide direct evidence that the Mayor considered race or gender in making the appointments of Wright and Howell. In any event, plaintiff failed to produce evidence that is "so revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case" in order to shift the burden to defendants on this issue. See Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994). For the above stated reasons, a reasonable jury could conclude that direct evidence does not exist and a grant of summary judgment on this issue is improper.

Defendants concede that plaintiff has "produced sufficient evidence to establish her prima facie burden of proof under the McDonnell Douglas [ ] standard on Counts Two and Three." (D.I. 81 at 15) Defendants, in turn, have rebutted plaintiff's evidence with respect to her prima facie case of discrimination. Specifically, the proffered legitimate non-discriminatory reasons are: (1) Howell's resume impressed the Mayor; (2) the Mayor believed Howell truly desired the job and would strive to excel at it; (3) the Mayor liked Howell's ideas for how he would perform as an inspector; and (4) Howell was very "street wise." (D.I. 81 at 27) Genuine issues of material fact remain. Under a

---

[21]The inspector position is not promoted according to the band system where the particular band to which an applicant is assigned affects the probability of receiving the promotion. (D.I. 64 at A0233, 29:12- 30:6) Inspectors are promoted by the Mayor. (Id. at A0242, 63:13-19; D.I. 81 at 24) In general, how the band system operates and what positions it is used for is unclear to the court; apparently, however, the band system is used for promotions to the ranks of sergeant and lieutenant. (D.I. 87 at 33)

21

burden shifting theory, a reasonable jury could find that defendant proffered a

"legitimate non-discriminatory reason" for its actions.[22]  Accordingly, the court denies

plaintiff's motion for summary judgment.[23]

## IV. TEMPORARY RESTRAINING ORDER

### A. Standard of Review

"[T]he grant of injunctive relief is an 'extraordinary remedy, which should be

granted only in limited circumstances.'"  Instant Air Freight Co. v. C.F. Air Freight, Inc.,

882 F.2d 797, 800 (3d Cir. 1989) (quoting Frank's GMC Truck Ctr., Inc. v. Gen. Motors

Corp., 847 F.2d 100, 102 (3d Cir. 1988)).  A plaintiff has the burden of making a "clear

showing of immediate irreparable injury." Cont'l Group, Inc. v. Amoco Chems. Corp.,

614 F.2d 351, 359 (3d Cir. 1980) (quoting Ammond v. McGahn, 532 F.2d 325, 329 (3d

Cir. 1976)).  The "requisite feared injury or harm must be irreparable not merely serious

or substantial." Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977).  "[T]he injury must be

of a peculiar nature, so that compensation in money alone cannot atone for it." Id.

(internal citation omitted).

In the Third Circuit, there is no presumption of irreparable injury in Title VII

cases. See Marxe v. C.W. Jackson, 833 F.2d 1121, 1127 (3d Cir. 1987).  Rather, the

---

[22]Moreover, the court notes that both parties appear to agree that the pretext question should be submitted to the jury under either of the Fuentes prongs. (D.I. 63 at 34; D.I. 85 at 28; D.I. 85 at 15)  In particular, plaintiff moved for summary judgment but both headings are entitled "Plaintiff . . . has sufficient evidence under both prongs of Fuentes to go to the jury."

[23]"In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr v. Resorts Inter. Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999).  The court, therefore, denies summary judgment on plaintiff's § 1981 claim.

22

party seeking preliminary relief must "produce affirmative evidence indicating that he or she will be irreparably harmed should that relief be denied." Id. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir. 1975) (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (1958)).

"[T]he grant or denial of a preliminary injunction . . . requir[es] a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." Oburn, 521 F.2d at 147 n.13. "[T]he moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured [p]endente lite if relief is not granted." Id. at 147. "Moreover, . . . the district court 'should take into account . . . (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" Id. (quoting Del. River Port Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d 917, 920 (3d Cir. 1972)). These factors structure the court's inquiry, however, "no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements.'" Constructors Ass'n. of W. Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978). While all four factors are important, failure to show either likelihood of success on the merits or irreparable harm "must necessarily result in denial of a preliminary injunction." In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir. 1982).

## B. Discussion

23

### 1. Reasonable probability of eventual success

"It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." Oburn, 521 F.2d at 148. Plaintiff asserts that she has established a reasonable probability of success on the merits for essentially the same reasons that she asserted she is entitled to summary judgment; defendants disagree, citing the disputes of material fact discussed supra. Notwithstanding that genuine fact disputes preclude summary judgment at this stage, the court finds that plaintiff has adduced evidence that suffices to demonstrate a reasonable probability of success, i.e., that racial discrimination, gender discrimination, or both, occurred in this case.

A reasonable jury could infer discrimination from the employment history of the inspector positions and from a comparison of plaintiff's and Howell's qualifications. Similarly, a reasonable jury could credit the testimony of Collins and Sczcerba, who claim that defendants discriminated against plaintiff. For these reasons, the court concludes that plaintiff has adduced a prima facie case and will proceed to evaluate the remaining factors.

### 2. Irreparable injury

Plaintiff argues that, if the injunctive relief is denied, she will suffer irreparable harm because "[m]oney cannot substitute for [her] lost opportunity to lead the Uniformed Operations of the WPD, to improve its morale, efficiency and effectiveness, and to initiate new projects." (D.I. 72 at 30) Specifically, plaintiff's allegation of irreparable harm is the "intangible psychic reward of a job well done at the [i]nspector

24

level." (Id.) Moreover, plaintiff asserts that she not need demonstrate irreparable harm

given her strong probability of success on the merits.[24] (Id.) Defendants state that

irreparable harm is not present in the case at bar because "some delay in promotion

does not constitute irreparable injury," Adams v. City of Chicago, 135 F.3d 1150, 1155

(7th Cir. 1998), and that her alleged harm is redressable by a final order after trial. (D.I.

87 at 18)

Plaintiff cannot demonstrate that she will suffer irreparable harm if her request

for a preliminary injunction preventing the appointment of an officer to the vacant

position is denied. "The key word in this consideration is irreparable." Sampson v.

Murray, 415 U.S. 61, 91 (1974). Although intangible benefits relating to job

performance are recognized, plaintiff does not illustrate how her requested relief, the

temporary appointment of an inspector, is necessary so that she will experience the

"psychic reward" of a job well done at the inspector level.[25] Moreover, plaintiff's losses

"may be remedied by appropriate judicial decrees if the plaintiff should prove

successful" at trial, and "such judicial relief may properly include provisions for

employment, back-pay, fringe benefits and the like." Oburn, 521 F.2d at 151. This

---

[24]Plaintiff, while demonstrating a prima facie case of a reasonable probability of
success on the merits, has not shown the "strong probability" required to dismiss her
burden for showing irreparable harm. See Lewis v. Del. State College, 455 F. Supp.
239, 251 (D. Del. 1978).

[25]Plaintiff admits that her request for preliminary injunctive relief is "simply to
preserve her claim for instatement because once defendants fill the vacant inspector
position, she will be forced to overcome the obstacle of 'bumping' a presumably
innocent third party." (D.I. 87 at 14) Essentially, plaintiff asks the court to grant the
injunction to make her post-trial requested relief easier to obtain while admitting that
instatement is still an available remedy if defendants fill the vacant position. (Id.)

factor weighs heavily against granting injunctive relief. See id.

### 3. The public interest

"In considering where the public interest lies, it is essential to evaluate the [p]ossible effects upon the public from the grant or denial of injunctive relief." Id. at 152. Plaintiff argues that the public interest is to ensure that constitutional rights are respected. (D.I. 72 at 33) This is undoubtedly true, however, plaintiff's argument addresses an issue which requires the resolution of genuine disputes of material fact as discussed supra. As such, this cannot support plaintiff's argument at this juncture. More persuasive is defendants' assertion that issuing a preliminary injunction is contrary to the public interest because it prevents the efficient functioning of the WPD, thereby endangering public safety. With respect to plaintiff's status quo argument,[26] evidence that the WPD operates efficiently when understaffed, standing alone, fails to establish that the public interest would not be adversely affected by granting the requested relief. See Oburn, 521 F.2d at 152.

### 4. Other interested parties

Other interested parties are harmed while the inspector position remains vacant. Specifically, the failure to appoint an officer to the vacant inspector position prevents promotions in each of the lower ranks. See id. ("There can be no dispute that the minority and non-minority applicants admitted to the . . . cadet class would be adversely affected by the grant of an injunction which interrupts and may preclude their continued

_____

[26]Plaintiff asserts that Howell was "chronically absent" and, as such, the issuing of the preliminary injunction preserves the status quo because the WPD has essentially functioned with only one inspector since Howell's appointment in 2005.

26

training and employment as state troopers."). For this reason, this factor weighs against the grant of a preliminary injunction.

## C. Conclusion

Although plaintiff successfully established a reasonable probability of success, the other factors weigh against granting injunctive relief at this stage of the proceedings. In particular, plaintiff failed to demonstrate the requisite irreparable harm she would suffer in the absence of injunctive relief. The relief requested, if granted, would make it easier for plaintiff to obtain reinstatement post trial; however, this does not constitute irreparable harm because the instatement remedy sought by plaintiff exists regardless of whether plaintiff is granted or denied injunctive relief prior to trial. For the reasons stated above, plaintiff's motion for a preliminary injunction is denied.

## V. CONCLUSION

For the reasons stated, plaintiff's motions for summary judgment and a preliminary injunction are denied. Defendants' motion for partial summary judgment is granted.[27] Additionally, plaintiff's motion to compel is denied.[28] An appropriate order shall issue.

## VI. CHARTS

---

[27]Defendants' motion for partial summary judgment, with respect to dismissal of the 2001 failure to promote claim, is granted pursuant to a stipulation filed by the parties. (D.I. 86)

[28]Plaintiff's motion to compel is denied. With respect to the medical and psychological records of the comparator, their marginal relevance is far outweighed by the privacy concerns raised by their use. With respect to the emails, a more focused search for emails was conducted and no responsive emails were found. Extending the scope of the search is not warranted.

27

## Services/Community Services/Criminal Investigations Inspectors

| Name | Dates of Duty | Race |
|---|---|---|
| Kenneth Miles | 7/6/78 to 10/13/81 | African-American |
| Eugene G. Maloney | 10/14/81 to 7/1/83 | White |
| John G.P. Doherty | 7/29/83 to 6/16/85 | White |
| John W. Johnson | 6/17/85 to 8/11/85 | African-American |
| Donald Payne | 8/12/85 to 3/29/87 | White |
| John W. Johnson | 3/30/87 to 7/31/87 | African-American |
| Preston J. Hickman | 9/30/87 to 12/27/88 | African-American |

## Administration Inspectors

| Name | Dates of Duty | Race |
|---|---|---|
| Eugene G. Maloney | 10/26/75 to 2/15/81 | White |
| Stanley Friedman | 2/16/81 to 6/30/83 | White |
| Charles A. Dougherty | 5/16/83 to 6/30/89 | White |
| Richard LaFashia | 2/8/89 to 5/12/89 | White |
| William Draper | 5/8/89 to 10/28/94 | White |

## Investigative Operations Inspectors

| Name | Dates of Duty | Race |
|---|---|---|
| John P. Vignola | 10/29/94 to 11/3/95 | White |
| Michael A. Boykin | 11/4/95 to 3/21/97 | African-American |
| John T. Murray | 3/22/97 to 5/26/99 | White |
| Ronald Huston | 5/27/99 to 7/30/99 | White |
| Martin Donohue | 7/31/99 to present | White |

## Staff Inspectors

28

| Name | Dates of Duty | Race |
|------|---------------|------|
| Stanley Friedman | 3/12/79 to 2/15/81 | White |
| Eugene G. Maloney | 2/16/81 to 10/13/81 | White |
| John W. Johnson | 10/14/81 to 6/16/85 | African-American |
| John G.P. Doherty | 6/17/85 to 6/6/86 | White |

### Uniformed Operations Inspectors

| Name | Dates of Duty | Race |
|------|---------------|------|
| Charles E. Bryan III | 12/15/87 to 9/28/81 | White |
| Lawrence H. Curtis | 10/14/81 to 4/29/83 | White |
| Donald Payne | 5/16/83 to 8/11/85 | White |
| John W. Johnson | 8/12/85 to 3/29/87 | African-American |
| Donald Payne | 3/30/87 to 9/13/87 | White |
| Guy Sapp | 9/30/87 to 12/21/88 | White |
| Preston J. Hickman | 12/28/88 to 7/7/89 | African-American |
| Samuel D. Pratcher | 7/3/89 to 1/7/93 | African-American |
| R. Michael Dixon | 2/5/93 to 9/22/95 | African-American |
| John P. Vignola | 11/4/95 to 3/7/97 | White |
| Keith Ash | 3/7/97 to 2/20/98 | African-American |
| James Stallings | 2/20/98 to 2/16/01 | African-American |
| James Wright | 2/17/01 to 10/28/05 | African-American |
| Gilbert Howell | 10/29/05 to present | African-American |

### African-American Inspectors

| Name | Dates of Duty | Position |
|------|---------------|----------|
| Kenneth Miles | 7/6/78 to 10/13/81 | Services |
| John W. Johnson | 10/14/81 to 6/16/85 | Staff Inspections |

29

| John W. Johnson | 6/17/85 to 8/11/85 | Community Services |
| John W. Johnson | 8/12/85 to 3/29/87 | Uniformed Operations |
| John W. Johnson | 3/30/87 to 7/31/87 | Community Services |
| Preston J. Hickman | 9/30/87 to 12/27/88 | Community Services |
| Preston J. Hickman | 12/28/88 to 7/7/89 | Uniformed Operations |
| Samuel D. Pratcher | 7/3/89 to 1/7/93 | Uniformed Operations |
| R. Michael Dixon | 2/5/93 to 9/22/95 | Uniformed Operations |
| Michael A. Boykin | 11/4/95 to 3/21/97 | Investigative Operations |
| Keith Ash | 3/7/97 to 2/20/98 | Uniformed Operations |
| James Stallings | 2/20/98 to 2/16/01 | Uniformed Operations |
| James Wright | 2/17/01 to 10/28/05 | Uniformed Operations |
| Gilbert Howell | 10/29/05 to present | Uniformed Operations |